IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHARLES SEWARD, Individually, and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.  08 CIV 3976 KMK/MDF |
| INTERNATIONAL BUSINESS MACHINES, CORP. d/b/a IBM CORP., | ) ) ) ) | ECF CASE |
| Defendant. | ) ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO PROCEED AS A COLLECTIVE ACTION AND TO FACILITATE NOTICE UNDER 29 U.S.C. §216(b)

Erik H. Langeland
ERIK H. LANGELAND, P.C.
500 Fifth Avenue, Suite 1610
New York, NY 10110
(212) 354-6270
(212) 898-9086 (Fax)
elangeland@langelandlaw.com

James B. Zouras
Ryan F. Stephan
STEPHAN ZOURAS, LLP
205 North Michigan Avenue, Suite 2560
Chicago, IL 60601
(312) 233-1550
jzouras@stephanzouras.com

Jon A. Tostrud
CUNEO, GILBERT & LADUCA, LLP
1801 Century Park E., Suite 2400
Los Angeles, CA 90067
(310) 556-9621
jtostrud@cuneolaw.com

Attorneys for Plaintiff

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................ii

I. ISSUE PRESENTED.......................................................................................1

II. INTRODUCTION..........................................................................................1

III. FACTUAL BACKGROUND.........................................................................3

    A.  The Parties........................................................................................3

        1.  Named and Opt-in Plaintiffs...................................................3

        2.  Defendant IBM.......................................................................3

    B.  Call Center Representatives Are Similarly Situated.........................4

        1.  IBM's Call Center Representatives Have Nearly Identical Duties and Are All Required to Work Off-the-Clock.............................................4

        2.  IBM Applies Uniform Compensation and Timekeeping Practices to All its Call Center Representatives...........................................9

IV. ARGUMENT.................................................................................................13

    A.  This Court is Authorized to Issue Notice to Potential Opt-Ins..........13

    B.  Plaintiffs Are "Similarly Situated" With Regard To Job Duties and Pay Provisions And Were Subject to Defendant's Common Scheme.............17

    C.  Plaintiffs Have Demonstrated a Reasonable Basis for Conditional Certification of a Collective Action..........................................18

    D.  Courts Routinely Authorize Notice in Similar Cases......................20

    E.  Call Center Representatives Should Be Notified Of This Case Before The Statute Of Limitations Runs....................................................21

    F.  Plaintiffs' Proposed Notice is Fair and Adequate............................21

V. CONCLUSION...............................................................................................22

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*Allen v. Marshall Field & Company,*
    93 F.R.D. 438 (N.D. Ill. 1982)..................................................................15

*Burch v. Qwest Comm. Int'l, Inc.,*
    500 F. Supp. 2d 1181 (D. Minn. 2007).....................................................5, 13, 20

*Chowdhury v. Duane Reade, Inc.,*
    2007 WL 2873929 (S.D.N.Y. Oct. 2, 2007)................................................14-15

*Clarke v. Convergys Customer Mgmt. Group, Inc.,*
    370 F. Supp. 2d 601 (S.D. Tex. 2005).......................................................5, 13, 20

*Davis v. Abercrombie & Fitch Co.,*
    2008 WL 4702840, at *9 (S.D.N.Y. Oct. 23, 2008)......................................14, 20

*Doucoure v. Matlyn Food, Inc.,*
    2008 WL 1771771, *2 (E.D.N.Y. April 15, 2008)............................................16

*Dybach v. Estate of Florida Department of Corrections,*
    942 F.2d 1562-1567-68 (11th Cir. 1991)......................................................14

*Evans v. Lowe's Home Centers, Inc.,*
    2006 WL 1371073, *3-5 (M.D. Pa. May 18, 2006)............................................15

*Francis v. A & E Stores, Inc.,*
    2008 WL 4619858, *2 (S.D.N.Y. Oct. 16, 2008)............................................16

*Frederick v. Dreiser Loop Supermarket Corp.,*
    2008 WL 4724721, *1 (S.D.N.Y. Oct. 24, 2008)............................................14

*Garner v. G.D. Searle Pharm. & Company,*
    802 F.Supp. 418, 419 (M.D. Ala. 1991).......................................................21

*Grayson v. K-Mart Corp.,*
    79 F.3d 1086 (11th Cir.), *cert. denied,* 117 S.Ct. 435 (1996)....................13-16, 20-21

*Hens v. ClientLogic Operating Corp.,*
    No. 05- 381, 2006 WL 2795620 (W.D.N.Y. Sept. 26, 2006)...................5, 13, 15, 20

*Herman v. RSR Security Services, Ltd.,*
    172 F.3d 132, 141 (2nd Cir. 1999)...........................................................21

*Hipp v. Liberty National Life Insurance Company,*
    164 F.R.D. 574, 575 (M.D. Fla. 1996)……………………………………...............22

*Hoffman-LaRoche, Inc. v. Sperling,*
    493 U.S. 165, 168-169 (1989)…………………………………….....13, 21-22

*Hoffman v. Sbarro, Inc.,*
    982 F.Supp. 249, 262 (S.D.N.Y. 1997)…………………………………………16

*IBP v. Alvarez,*
    546 U.S. 21 (2005)………………………………………………………………19

*Iglesias-Mendoza v. La Belle Farm, Inc.,*
    239 F.R.D. 363, 367 (S.D.N.Y. 2007)……………………………………13-14

*Jacobs v. New York Foundling Hosp.,*
    483 F.Supp.2d 251, 265 (E.D.N.Y. 2007)………………………………………16

*King v. General Electric Company,*
    960 F.2d 617, 621 (7th Cir. 1992)………………………………………………15

*Lee v. ABC Carpet & Home,*
    236 F.R.D. 193, 197 (S.D.N.Y. 2006)………………………………...............14

*Lynch v. United Services Auto Ass'n,*
    491 F.Supp.2d 357, 367-68 (S.D.N.Y. 2007)……………………...............16, 19

*Masson v. Ecolab, Inc.,*
    No. 04 Civ. 4488, 2005 WL 2000133 at *14 (S.D.N.Y. Aug. 17, 2005)……………..20

*Mooney v. Aramco Services Corporation,*
    54 F.3d 1207, 1214 (5th Cir. 1995)……………………………………………15

*Morales v. Plantworks, Inc.,*
    2006 WL 278154, *1 (S.D.N.Y. Feb. 2, 2006)…………………………………15

*Patton v. Thomson Corp.,*
    364 F.Supp.2d 263, 267 (E.D.N.Y. 2005)………………………………………15

*Reich v. Waldbaum, Inc.,*
    52 F.3d 35, 40 (2nd Cir. 1995)…………………………………………………21

*Rodolico v. Unisys Corp.,*
    199 F.R.D. 468, 480 (E.D.N.Y. 2001)………………………………………...14

*Roebuck v. Hudson Valley Farms, Inc.,*

239 F. Supp. 2d 234, 238 (N.D.N.Y. 2002)……………………………………………………...20

*Russell v. Illinois Bell Telephone Co.,*
    2008 WL 4191763 (N.D.Ill. Sept. 15, 2008)……………………………………...5, 13, 20

*Schewd v. Gen. Elec. Co.,*
    159 F.R.D. 373, 375 (N.D.N.Y. 1995)………………………………………………..14

*Scholtisek v. Eldre Corp.,*
    229 F.R.D 381, 387 (W.D.N.Y. 2005)…………………………….....................14-15, 18

*Sherrill v. Sutherland Global Services, Inc.,*
    487 F.Supp.2d 344, 348-49 (W.D.N.Y. 2007)……………………………...5, 13, 15, 20

*Sobczak v. AWL Industries, Inc.,*
    2007 WL 4934239, at *6 (E.D.N.Y. Oct. 22, 2007)……………………….................16

*Sperling v. Hoffman-La Roche, Inc.,*
    862 F.2d 439, 444 (3rd Cir. 1988)……………………………………….................13-14

*Torres v. Gristede's Operating Corp.,*
    2006 WL 2819730, *7 (S.D.N.Y. Sept. 28, 2006)……………………………….....2, 15

*Tucker v. Labor Leasing, Inc.,*
    872 F.Supp. 941, 947 (M.D. Fla. 1994)………………………………….....................15

*Woods v. New York Life Insurance Corporation,*
    686 F.2d 578, 580 (7th Cir. 1982)…………………………………….................13, 15

*Young v. Cooper Cameron Corp.,*
    229 F.R.D. 50, 54 (S.D.N.Y. 2005)………………………………………………...16

**STATUTES, CODES & RULES**

29 U.S.C. §255(a)…………………………………………………………………………..21

29 U.S.C. §216(b)…………………………………………………...1, 13-15, 19-20, 22

29 U.S.C. §201………………………………………………………….....................1, 2

29 U.S.C. §206………………………………………………………….....................17

29 U.S.C. §207(a)(1)…………………………………………………….....................17

29 U.S.C. §211(c)………………………………………………………….....................17

29 C.F.R. §541………………………………………………………………………………18

29 C.F.R. §790.2 1(b)(2)……………………………………………………………......................21

Fed. R. Civ. P. 20………………………………………………………………………...15

Fed. R. Civ. P. 23………………………………………………………………………...15

Fed. R. Civ. P. 42………………………………………………………………………...15

# I. ISSUE PRESENTED

This Motion presents the Court with the following issue:

For this case to be conditionally certified as a collective action under the Fair Labor Standards Act ("FLSA"), Plaintiff Charles Seward must make a modest showing that he and other Call Center Representatives are victims of an unlawful payment policy or practice. As a matter of policy, IBM routinely requires its Call Center Representatives to work before their designated work shifts without pay—thus violating the FLSA. Should this case be conditionally certified?

# II. INTRODUCTION

Plaintiff, Charles Seward ("Seward" or "Plaintiff"), works as an hourly, non-exempt call center representative ("CCR" or "representative") for Defendant International Business Machines ("IBM" or "Defendant") in Atlanta, Georgia. He brings this collective action on behalf of himself and other similarly situated employees ("Plaintiffs") alleging that IBM violated the FLSA by failing to pay its CCR's for all of the time they actually worked. 29 U.S.C. § 201 *et seq.* Specifically, IBM fails to keep accurate time records and fails to compensate its CCR's for time they worked before the start of their scheduled shifts. To date, five other CCR's have confirmed they were (and are) subjected to IBM's common scheme and filed opt-in forms to join this collective action. Plaintiffs, through this motion, request permission to issue notice to all other similarly situated representatives and proceed collectively under Section 216(b) of the FLSA.[1]

IBM's policy is to regularly pay its CCR's only for their scheduled hours, which usually consists of an eight hour shift. This policy results in underpayment of wages because paying CCR's according to their scheduled hours fails to account for the compensable time CCR's are required to spend performing pre-shift tasks. One reason IBM fails to account for pre-shift time is because the extra time adversely impacts IBM's production matrix, which IBM uses to

---

[1] Upon information and belief, CCR's employed at IBM's other call center throughout the United States are subject to the same illegal policy and practice of failing to pay overtime for all hours worked. At this time, Plaintiffs seek conditional certification of CCR's at the Atlanta call center only. Plaintiffs reserve their right to present a motion to certify a class of call center

generate business.  In other words, if IBM accounts for pre-shift, it increases the amount of time it takes a CCR to handle a given number of calls from 8 hours to 8.5 hours or more.  By failing to accurately record and pay for all time worked, IBM wrongly withholds millions of dollars in payroll costs by squeezing free work out of its CCR's.  IBM's policy violates the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201 *et seq.,* and this collective action is brought to ensure that all CCR's are properly paid all back wages they rightfully earned.

A court should conditionally certify a class and facilitate notice to potential class members where plaintiffs present a colorable basis for their claim that potential class members are similarly situated.  *E.g., Torres v. Gristede's Operating Corp.,* 2006 WL 2819730, *7 (S.D.N.Y. Sept. 28, 2006) (citation omitted).  Conditional certification and court-facilitated notice are warranted here because Seward and other CCR's are "similarly situated" as they were all required to work off-the-clock and were, therefore, all subject to IBM's unlawful payment policy.  In support of this motion, Seward presents the following:

| | |
|---|---|
| 1) | Opt-in Consent Forms (Group Exhibit 1) |
| 2) | Deposition of IBM corporate representative George Lambousis (Exhibit 2) |
| 3) | Deposition of IBM corporate representative Gary Kamprath (Exhibit 3) |
| 4) | Deposition of Named Plaintiff Charles Seward (Exhibit 4) |
| 5) | Deposition of Opt-In Plaintiff Cathy Barday (Exhibit 5) |
| 6) | Deposition of Opt-In Plaintiff James Starkey (Exhibit 6) |
| 7) | Deposition of Opt-In Plaintiff Eugene Scott (Exhibit 7) |
| 8) | Deposition of Opt-In Plaintiff Raymond Liles (Exhibit 8) |
| 9) | Declaration of Plaintiff Charles Seward (Exhibit 9) |
| 10) | Declaration of Opt-In Plaintiff Cathy Barday (Exhibit 10) |
| 11) | Declaration of Opt-In Plaintiff Eugene Scott (Exhibit 11) |
| 12) | Declaration of Third-Party Witness Gary Salles, formerly of the IBM Global Technical Services Division (Exhibit 12) |
| 13) | April 25, 2005 email authored by IBM corporate representative George Lambousis (Exhibit 13) |
| 14) | August 3, 2006 email authored by IBM corporate representative Gary Kamprath (Exhibit 14) |

representatives employed at Defendant's other call centers at a later date.

2

| | |
|---|---|
| 15) | IBM's "Employee Compensation Policies – Manager Training" definition of "Off-the-Clock" work (Exhibit 15) |
| 16) | Sample "Comparison" or "Login/Logout Report" (Exhibit 16) |
| 17) | November 20, 2008 email of defense counsel (Exhibit 17) |

This testimony and supporting evidence provide more than a "modest showing" for Seward's claim that he and other similarly situated CCR's are subject to a common plan or policy requiring and permitting them to work off-the-clock without compensation.

## III. FACTUAL BACKGROUND

### A. The Parties

#### 1. Named and Opt-in Plaintiffs

Seward filed this collective action against IBM on April 28, 2008.  On November 13, 2008, Plaintiff filed an Amended Complaint in which he provided detailed allegations that he is similarly situated to other hourly non-exempt CCR's employed at Defendant's Atlanta call center with respect to: 1) basic job duties; 2) unpaid time worked pre-shift; and, 3) pay provisions.  *See* Am. Complaint at ¶¶13-40.  To date, five Plaintiffs have confirmed that IBM applied its common scheme to other representatives in the Atlanta facility regardless of which floor they worked on or which supervisor they reported to.  *See* Opt-in Consent Forms attached hereto as Group Exhibit 1; Exhibit 4, Dep. Seward at 12-14, 30-35 & 48-51; Exhibit 5, Dep. Barday at 106-114; Exhibit 6, Dep. Starkey at 14-19 & 23; Exhibit 7, Dep. Scott at 20-21; Exhibit 8, Dep. Liles at 31, 49-52, 89-90 & 99-103.

#### 2. Defendant IBM

IBM is a computer company with corporate headquarters located in Armonk, New York, where it formed its corporate policy decisions, including wage and hour policy decisions.  *See* Am. Complaint at ¶¶8 & 18.  Those decisions are disseminated to numerous call centers it operates throughout the United States, including the subject facility in Atlanta, Georgia.  *Id.* at ¶¶15 & 17.

3

IBM's call centers provide customer service and support. *Id.* at ¶11. The Atlanta facility consists of two multi-story buildings where Seward, the opt-ins and hundreds of other similarly situated CCR's work. Exhibit 4, Dep. Seward at 30-31 & 316; Exhibit 6, Dep. Starkey at 19-20; Exhibit 7, Dep. Scott at 20-21; Exhibit 8, Dep. Liles at 31 & 60.

**B.  Call Center Representatives Are Similarly Situated**

**1.  IBM's Call Center Representatives Have Nearly Identical Duties and Are All Required to Work Off-the-Clock.**

Regardless of specific job title, business unit, supervisor or floor where Plaintiffs and other CCR's work, their primary job duties remain the same: answering inbound calls from customers and providing them with service and support. *See* Am. Complaint at ¶¶14-15; Exhibit 3, Dep. Kamprath at 97-98; Exhibit 4, Dep. Seward at 22-24; Exhibit 5, Dep. Barday at 15; Exhibit 6, Dep. Starkey at 19-24; Exhibit 7, Dep. Scott at 14 & 20-21; Exhibit 8, Dep. Liles at 16. Because IBM's call centers have a high volume of calls and CCR's are consistently on the phone with customers, IBM uses a "production matrix" to maximize phone call efficiency. Exhibit 12, Dec. Salles at ¶¶23-28; Exhibit 9, Dec. Seward at ¶¶21-26; Exhibit 10, Dec. Barday at ¶¶21-26; Exhibit 2, Dep. Lambousis at 13-14; Exhibit 3, Dep. Kamprath at 17-18. IBM tracks the exact times CCR's are "logged in" and "logged out" of their telephone systems, the number of phone calls and length of each call to perform its matrix calculations and prepare statistical reports. *Id.*; Exhibit 16, (sample report); Exhibit 12, Dec. Salles at ¶¶9 & 23-28; Exhibit 9, Dec. Seward at ¶¶8 & 21-26; Exhibit 10, Dec. Barday at ¶¶8 & 21-26; Exhibit 2, Dep. Lambousis at 13-14 & 46-47; Exhibit 3, Dep. Kamprath at 25-30, 36, 46 & 56-57.

To maximize its production numbers (*i.e.* the number of calls handled during a scheduled shift) IBM does not take pre-shift time into account when preparing these matrices. Exhibit 12, Dec. Salles at ¶¶9, 12-13 & 26; Exhibit 9, Dec. Seward at ¶24; Exhibit 10, Dec. Barday at ¶24. If

4

IBM did accurately record CCR's pre-shift time, it would negatively impact its production numbers because CCR's do not handle calls during the time they spend preparing to accept calls pre-shift. Exhibit 12, Dec. Salles at ¶¶23-28; Exhibit 4, Dep. Seward at 86-87; Exhibit 6, Dep. Starkey at 52-53; Exhibit 3, Dep. Kamprath at 159-60. IBM therefore sets out to avoid any such additional, unproductive time because it will negatively affect its production numbers and accordingly, its ability to secure sponsors in this highly-competitive field. Exhibit 12, Dec. Salles at ¶¶23-28; Exhibit 9, Dec. Seward at ¶25-26; Exhibit 10, Dec. Barday at ¶¶25-26; Exhibit 2, Dep. Lambousis at 66; Exhibit 3, Dep. Kamprath at 171-72, 209-10, 228-29 & 233-34. More importantly, the "sponsor" or purchaser of IBM's call center services would have to pay overtime for this pre-shift work, making IBM's services more expensive and its call centers less competitive. Exhibit 3, Dep. Kamprath at 111 & 113-114.

The testimony from the named Plaintiff, five additional opt-in Plaintiffs, a former employee of IBM's Global Technical Services Division, and even IBM's own corporate representatives describe nearly identical experiences and observations of CCR's having to perform work before their shift without compensation. Indeed, IBM specifically directs, trains and requires its CCR's, *in writing*, to arrive at work before the start of their scheduled shift to perform essential tasks such as booting up their computers, opening numerous software applications and performing other duties to be ready to field customer calls immediately at the their start time.[2]  Exhibit 4, Dep. Seward at 46-51, 53-54, 58-62, 82-85, 100-101, 128-29, 133-35,

---

[2] Consistent with virtually every reported call center case, Plaintiffs, in addition to their other pre-shift duties, open and start a myriad of software applications before being able to provide customer service. For example, Seward must open 16 or more software tools every day. Exhibit 4, Dep. Seward at 59-6118; *See Sherrill v. Sutherland Global Services, Inc.,* 487 F.Supp.2d 344, 347 (W.D.N.Y. 2007); *Russell v. Illinois Bell Telephone Co.,* 2008 WL 4191763, *1 (N.D.Ill. Sept. 15, 2008); *Hens v. ClientLogic Operating Corp.,* No. 05-381, 2006 WL 2795620, *1 (W.D.N.Y. Sept. 26, 2006); *Burch v. Qwest Comm. Int'l, Inc.,* 500 F.Supp.2d 1181, 1187 (D. Minn. 2007); *Clarke v. Convergys Customer Mgmt. Group, Inc.,* 370 F.Supp.2d 601, 603 (S.D. Tex. 2005).

148-52 & 217-18; Exhibit 5, Dep. Barday at 21-33, 106-114 & 121; Exhibit 6, Dep. Starkey at 40-43, 48-50, 57-62 & 107; Exhibit 7, Dep. Scott at 26-27, 47-48, 54-64, 136-37; Exhibit 8, Dep. Liles at 33-48; Exhibit 3, Dep. Kamprath at 237-39; Exhibit 12, Dec. Salles at ¶¶9 & 17.  IBM requires CCR's to strictly adhere to their work schedule, especially start times, and continuously reinforces its requirement that CCR's ensure they are fully prepared to accept calls the moment their shift begins.  *Id.*; Exhibit 3, Dep. Kamprath at 71-72 & 158.  Being late or otherwise unprepared to begin handling calls exactly at the start of one's shift is a serious offense at IBM which can result in reprimands or other discipline.  Exhibit 4, Dep. Seward at 85-86; Exhibit 2, Dep. Lambousis at 66; Exhibit 12, Dec. Salles at ¶¶21-22; Exhibit 6, Dep. Starkey at 55-56, 67-68 & 99-100; Exhibit 8, Dep. Liles at 48.  One way IBM ensures strict adherence to the schedule is by generating "comparison reports" showing the exact times CCR's actually "login" to the telephone system in relation to their scheduled start time.  Exhibit 16, (sample report); Exhibit 2, Dep. Lambousis at 46-47; Exhibit 3, Dep. Kamprath at 40-43,104-05, 176-77 & 188.

While Plaintiffs are not required to find a "smoking gun" written policy that violates the FLSA, emails authored by IBM management leave no doubt that IBM does, in fact, enforce a policy requiring CCR's to perform work before their scheduled start time.  For example, George Lambousis, who personally oversees at least 160 similarly situated CCR's on the ninth floor, including opt-ins, summarized IBM's mandatory policy in a 2005 mass email directed to his team[3]:

> I have been hearing some different interpretations of our *policy* on start times recently and would like to take a minute and restate the *policy*. The expectation is that your workstation is powered up, you are logged on to the necessary applications, and you are in an available state on your phone at your start time.  The call center environment requires strict adherence to the

---

[3] Lambousis' team includes the entire ninth floor of the Atlanta facility along with additional persons in Raleigh, North Carolina, Dallas, Texas, Austin, Texas, Poughkeepsie, New York, Rochester, Minnesota, Tucson, Arizona and San Jose, California.  Exhibit 2, Dep. Lambousis at 10-11 & 34.

> schedule. Many hours are put into studying inbound call patterns and developing shifts/start times. If individuals on this Team are making independent decisions as to when they go available, we are in effect out of control with little hope of taking care of our customers in a timely manner. *I am actively monitoring this policy for adherence* and ask that you come forward to management quickly with any questions, comments, or concerns.

Exhibit 13 (emphasis added); Exhibit 6, Dep. Starkey at 15 & 20-21; Exhibit 8, Dep. Liles at 14; Exhibit 2, Dep. Lambousis at 10-11, 17, 54 & 64-65.

Opt-in Plaintiffs and other CCR's have received this and other similar emails which conveyed and reinforced the same policy periodically over the past few years. Exhibit 4, Dep. Seward at 148-52, 316 & 321-22; Exhibit 6, Dep. Starkey at 63-69; Exhibit 8, Dep. Liles at 52-55; Exhibit 12, Dec. Salles at ¶33. For example, in 2006 Gary Kamprath, who is the U.S. WorkForce Management Focal, testified that IBM studies call center activities in minute detail so that it does not overstaff its call centers. Exhibit 3, Dep. Kamprath at 35-39, 49, 51, 54-55. Indeed, IBM created a "Daily Operating Report" (referred to as a "DOR") to standardize the information needed to evaluate the performance of a call center group. Exhibit 3, Dep. Kamprath at 35-39, 49, 51 & 54-55. Kamprath sent an email to Seward and the approximately 250 other CCR's on the fifth floor and their managers which stated:

> As we move to this new DOR, please find below some recommendations which should help us ensure accurate data at a team view, for CSRs[4] and team-leads/seniors/non-csrs alike.
>
> (1) *Ensure reps log in, only as required (ie scheduled to work at 9:00, be ready at 8:50), but only log in at 9:00 am* to ensure we are not accumulating unproductive hours under Default AUX or AUX 0 for which we are not utilizing or occupying the reps in question. Crisp login and logouts will help eliminate any unutilized time for which we can't earn any hours.[5]
>
> (2) Ensure reps respect their breaks/lunches in terms of start time and length. Schedule adherence will impact service level achievement.

Exhibit 14, (emphasis added); Exhibit 4, Dep. Seward at 148-52, 316 & 321-22; Exhibit 8, Dep.

---

[4] "CSR" stands for Customer Service Representative and is synonymous with CCR.

[5] At his deposition, Kamprath testified he did not understand what his own email meant. Exhibit

Liles at 52-55; Exhibit 3, Dep. Kamprath at 22-23, 63, 151-54, & 168-69.

Lambousis does not know how long it takes CCR's to boot up their computers, open software applications and otherwise prepare to begin taking calls[6], though he would expect the time required to perform these functions is "similar" for all CCR's. Exhibit 2, Dep. Lambousis at 54-55. However, because IBM requires its CCR's to "be ready" to work at least 10-15 minutes before their scheduled shift, CCR's necessarily and regularly arrive at the call center as much as 60 minutes in advance of their shift time to prepare to receive calls.[7] Exhibit 4, Dep. Seward at 96-97; Exhibit 5, Dep. Barday at 21, 24 & 138; Exhibit 6, Dep. Starkey at 40; Exhibit 7, Dep. Scott at 60-61; Exhibit 8, Dep. Liles at 89-90.

Consistent with federal law, IBM's written policies confirm that all of this pre-shift work is compensable time. In fact, IBM's "Employee Compensation Policies – Manager Training", states that "common examples" off-the-clock work that "must" be compensated include:

> **Allowing or requiring work to be done *before* or after a shift**
>
> ■ **employee *arrives early* and starts working;**
>
> ■ **employee logs on to computer *before* start of shift**

Exhibit 15 (emphasis added).

IBM uniformly administers and enforces its policies regarding CCR job duties. In comparing the general job duties and pay provisions for CCR's, it is clear they are all subject to similar if not identical policies on pre-shift work. Exhibit 4, Dep. Seward at 46-51, 53-54, 58-62, 82-85, 100-101, 128-29, 133-35, 148-52 & 217-18; Exhibit 5, Dep. Barday at 21-33, 106-114 &

---

3, Dep. Kamprath at 153, 155-56 & 163-65.

[6] Lambousis' "guesstimate" is four to six minutes. Exhibit 2, Lambousis Dep. at 54.

[7] This practice is not unique to the Atlanta facility. For example, testimony reveals that CCR's are performing uncompensated pre-shift work at IBM call centers in Dallas, Texas and Boulder, Colorado. Exhibit 7, Dep. Scott at 136 & 152-160; Exhibit 4, Dep. Seward at 290.

121; Exhibit 6, Dep. Starkey at 40-43, 48-50, 57-62 & 107; Exhibit 7, Dep. Scott at 26-27, 47-48, 54-64 & 136-37; Exhibit 8, Dep. Liles at 33-52, 89-90, 92-93, 95 & 99-103; Exhibit 2, Dep. Lambousis at 10-11, 17-18, 54, 64-65 & 69; Exhibit 12, Dec. Salles at ¶¶9, 17 & 33; Exhibit 9, Dec. Seward at ¶30; Exhibit 10, Dec. Barday at ¶30; Exhibit 7, Dec. Scott at ¶13.  IBM conveys these policies, including uniform Human Resource policies on overtime, to CCR's and their managers in training, via mass emails, group meetings and online.  Exhibit 4, Dep. Seward at 282; Exhibit 5, Dep. Barday at 143-44; Exhibit 6, Dep. Starkey at 63-65 & 155; Exhibit 7, Dep. Scott at 50-51, 54-56 & 58; Exhibit 8, Dep. Liles at 33-48 & 52-55; Exhibit 2, Dep. Lambousis at 18, 64-65 & 69; Exhibit 12, Dec. Salles at ¶33.  In sum, IBM uses uniform policies in operating its call centers, including its policy to not pay for pre-shift work, to increase efficiency and promote standardization.

### 2.   IBM Applies Uniform Compensation and Timekeeping Practices to All its Call Center Representatives

IBM uniformly administers and enforces its policies governing compensation and recording time worked, including overtime, for all CCR's.  *See* Am. Complaint at ¶¶13-40.  CCR's are paid by the hour.  Exhibit 9, Dec. Seward at ¶¶1 & 10; Exhibit 10, Dec. Barday at ¶¶1 & 10; Exhibit 6, Dep. Starkey at 34.  They are typically scheduled to work eight hours per day and 40 hours per week.  Exhibit 5, Dep. Barday at 19; Exhibit 6, Dep. Starkey at 25; Exhibit 7, Dep. Scott at 50-51, 54-56 & 58; Exhibit 2, Dep. Lambousis at 40-41 & 67-68; Exhibit 12, Dec. Salles at ¶15.

To track CCR time, IBM uses a timekeeping system called "TOTALS."[8]   Exhibit 2, Dep. Lambousis at 42 & 49-50; Exhibit 12, Dec. Salles at ¶6; Exhibit 4, Dep. Seward at 52-53 & 288; Exhibit 5, Dep. Barday at 130; Exhibit 6, Dep. Starkey at 71; Exhibit 7, Dep. Scott at 50-51, 54-56 & 58; Exhibit 8, Dep. Liles at 24.  As a matter of IBM policy, TOTALS always defaults to reflect the "scheduled time" – eight hours a day/40 hours a week – as the actual time worked by CCR's.

Exhibit 2, Dep. Lambousis at 42 & 67; Exhibit 12, Dec. Salles at ¶¶7, 12-13 & 26; Exhibit 4, Dep. Seward at 251; Exhibit 7, Dep. Liles at 71; Exhibit 10, Dec. Barday at ¶6.  In other words, TOTALS presumes CCR's work a maximum of eight hours a day as a "default" setting.  *Id.*  Any additional time CCR's work in excess of eight hours per day, classified by IBM as "exceptions", can be entered only with manager approval.  Exhibit 12, Dec. Salles at ¶¶8 & 13; Exhibit 4, Dep. Seward at 276; Exhibit 5, Dep. Barday at 131; Exhibit 8, Dep. Liles at 21-24; Exhibit 3, Dep. Kamprath at 87 & 117.  Thus, IBM as part of its common scheme, generally pays CCR's based solely upon their scheduled 40 hour workweek.  *Id.*; Exhibit 2, Dep. Lambousis at 67-68.

IBM directs its CCR's to arrive before "clocking in" or "logging in" to the phone system to begin their scheduled shifts to perform integral, indispensable and therefore compensable tasks. Exhibit 4, Dep. Seward at 46-51, 53-54, 58-62, 82-85, 100-101, 128-29, 133-35, 148-52 & 217-18; Exhibit 5, Dep. Barday at 21-33, 106-114 & 121; Exhibit 6, Dep. Starkey at 40-43, 48-50, 57-62 & 107; Exhibit 7, Dep. Scott at 26-27, 47-48, 54-64 & 136-37; Exhibit 8, Dep. Liles at 33-48; Exhibit 12, Dec. Salles at ¶¶9, 15 & 17.  These tasks, at a minimum, include booting up their computers, opening software applications, reviewing work-related email alerts and memoranda and otherwise preparing themselves and their equipment to provide support and service to customers.  *Id.* As stated above, IBM sends mass emails which direct CCR's to "be ready" at least 10 minutes before their scheduled start time.  Exhibit 4, Dep. Seward at 148-52, 316 & 321-22; Exhibit 6, Dep. Starkey at 63-69; Exhibit 8, Dep. Liles at 52-55; Exhibit 12, Dec. Salles at ¶33.

To "be ready" 10 minutes before their start time, CCR's necessarily must arrive and begin work well in advance of this time – in some cases as much as 50 minutes earlier – to ensure they fully comply with IBM's policy.  Exhibit 4, Dep. Seward at 96-97; Exhibit 5, Dep. Barday at 21, 24 & 138; Exhibit 6, Dep. Starkey at 40; Exhibit 7, Dep. Scott at 60-61; Exhibit 8, Dep. Liles at 89-90.

---

[8] The online version of this timekeeping system, also utilized by IBM, is called "e-TOTALS."

Plaintiffs and the dozens of other CCR's they have known and observed throughout their several decades of combined service to IBM uniformly and religiously follow the practice of arriving well-in advance of their start times. Exhibit 4, Dep. Seward at 49-54, 84-85, 108, 131, 136, 209-218, 222-225, 315-323; Exhibit 5, Dep. Barday at 28-33, 43 & 106-114; Exhibit 6, Dep. Starkey at 68-69, 109, 116-19 & 147; Exhibit 7, Dep. Scott at 152-57; Exhibit 8, Dep. Liles at 92-93. Recording or receiving payment for pre-shift work—compensable time under federal law and IBM's own policies—is unheard of. Exhibit 4, Dep. Seward at 268; Exhibit 8, Dep. Liles at 90-93 & 95.

Pursuant to its uniform policies and as part of its common scheme, IBM fails to accurately record or compensate CCR's for any of their pre-shift work booting up their computers, opening software applications or other duties necessary to prepare fielding calls. Exhibit 2, Dep. Lambousis at 67-68; Exhibit 4, Dep. Seward at 265-69; Exhibit 9, Dec. Seward at ¶16; Exhibit 10, Dec. Barday at ¶16; Exhibit 6, Dep. Starkey at 86-91 & 95-97; Exhibit 7, Dep. Scott at 26 & 59; Exhibit 8, Dep. Liles at 49-52 & 90-93 & 95; Exhibit 12, Dec. Scott at ¶5. Although proof of a specific instruction to violate the FLSA is not required, some managers did specifically direct CCR's not to record this time. Exhibit 7, Dep. Scott at 59; Exhibit 8, Dep. Liles at 49-52 & 99-103. Because IBM requires CCR's to perform necessary and essential pre-shift tasks on top of their regularly-scheduled 40 hours per week, this uncompensated time amounts to several hours of uncompensated overtime per CCR each week. Exhibit 9, Dec. Seward at ¶18; Exhibit 10, Dec. Barday at ¶15; Exhibit 6, Dep. Starkey at 40-38; Exhibit 7, Dep. Scott at 60; Exhibit 8, Dep. Liles at 89-90. IBM does not allow "exceptions" or otherwise permit CCR's to record their pre-shift work. Exhibit 9, Dec. Seward at ¶20; Exhibit 6, Dep. Starkey at 86; Exhibit 7, Dep. Scott at 26 & 59; Exhibit 8, Dep. Liles at 90-93 & 95; Exhibit 10, Dec. Barday at ¶16. In fact, IBM trains and instructs CCR's that performing pre-shift tasks such as booting up their computers, opening

11

software applications and reviewing work-related emails without compensation is simply "the norm" and "part of the job." Exhibit 4, Dep. Seward at 267 & 320.  IBM does not record this time and CCR's who attempt to do so are subject to discipline including termination.  Exhibit 2, Dep. Lambousis at 67-68; Exhibit 12, Dec. Salles at ¶¶17-18; Exhibit 6, Dep. Starkey at 89, 95-96 & 115; Exhibit 5, Dep. Barday at 36-39 & 150.

In addition to its mandatory policies which require uncompensated pre-shift work, IBM has actual notice that CCR's regularly perform uncompensated work in excess of 40 hours per week.  For example, CCR's complained to management, unsuccessfully, that they were not compensated for all hours worked.[9]  Exhibit 5, Dep. Barday at 34; Exhibit 9, Dec. Seward at ¶¶19-20; Exhibit 12, Dec. Salles at ¶¶21-22.  Moreover, IBM maintains security badge records which reflect the time CCR's enter their respective floor where they perform their duties.  Exhibit 3, Dep. Kamprath at 104; Exhibit 12, Dec. Salles at ¶10; Exhibit 9, Dec. Seward at ¶9; Exhibit 5, Dep. Barday at 17 & 21-22; Exhibit 8, Dep. Liles at 31; Exhibit 2, Dep. Lambousis at 35.  Though IBM has yet to produce these records, Plaintiffs anticipate they will reflect that Seward and the opt-ins, consistent with their testimony, routinely arrive 20 to 60 minutes before their scheduled shifts. Similar electronic records likewise exist for all CCR's—a fact that not only underscores the similarity of class members, but confirms this case is easily manageable as a collective action.

Despite IBM's obvious technological ability to record and compensate CCR's for their pre-shift work, it has chosen to maintain its illegal practice to this day; even in the face of this lawsuit. Exhibit 6, Dep. Starkey at 68.  Strikingly, IBM makes no effort to track or record computer log-in times of its CCR's, or otherwise determine whether all time worked by CCR's is accurately recorded. Exhibit 17, (November 20, 2008 email of defense counsel); Exhibit 2, Dep. Lambousis at 71.  And IBM has never advised CCR's that they are permitted to record or receive compensation for their pre-

---

[9] When opt-in Plaintiff Cathy Barday asked IBM for compensation for overtime hours she worked,

shift time. Exhibit 5, Dep. Barday at 176; Exhibit 6, Dep. Starkey at 152. Consequently, IBM willfully deprives—as a matter of policy and practice—CCR's overtime compensation, even though they regularly work more than 40 hours per week. Because all of IBM's Atlanta CCR's are subject to this same policy requiring uncompensated pre-shift work, this case should be conditionally certified.

## IV. ARGUMENT

### A. This Court Is Authorized To Issue Notice To Potential Opt-Ins

Section 216(b) allows one or more employees to pursue an action in a representative capacity for other employees similarly situated. *Sherrill v. Sutherland Global Services, Inc.*, 487 F.Supp.2d 344, 348-49 (W.D.N.Y. 2007); *Hens v. ClientLogic Operating Corp.*, No. 05-381, 2006 WL 2795620, *3 (W.D.N.Y. Sept. 26, 2006); *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 367 (S.D.N.Y. 2007); *Russell v. Illinois Bell Telephone Co.*, 2008 WL 4191763, *2 (N.D.Ill. Sept. 15, 2008); *Burch v. Qwest Comm. Int'l, Inc.*, 500 F.Supp.2d 1181, 1186 (D. Minn. 2007); *Clarke v. Convergys Customer Mgmt. Group, Inc.*, 370 F.Supp.2d 601, 604 (S.D. Tex. 2005). Such "collective actions" under the FLSA require that each employee gives his consent in writing to become a participant in a collective action. *Id.* (citing 29 U.S.C. § 216(b)); *see also Sperling v. Hoffman-La Roche, Inc.*, 862 F.2d 439, 444 (3rd Cir. 1988) (Section 216(b) requires plaintiffs in a collective action to "opt-in" by affirmatively indicating their consent to be part of the class). Until an employee does so, the statute of limitations on his claims continues to run. *See Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1106 (11th Cir. 1996).

The United States Supreme Court has authorized district courts to certify a collective action and facilitate notice to potential plaintiffs under 29 U.S.C. § 216(b). *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989); *Woods v. New York Life Ins. Corp.*, 686 F.2d 578, 580 (7th

---

she was told "in your dreams." Exhibit 5, Dep. Barday at 34.

Cir. 1982) (district courts have the power to authorize notice of the action to potential plaintiffs); *Dybach v. Estate of Florida Dept. of Corrections,* 942 F.2d 1562, 1567-68 (11th Cir. 1991). Court facilitation of notice to potential "opt-in" plaintiffs serves the "broad remedial purpose of the act (FLSA)." *Dybach,* 942 F.2d at 1567. This is particularly true since judicial notice promotes the remedial purpose of Section 216(b) by preventing the erosion of claims due to the FLSA's short statute of limitations. *See, e.g., Schewd v. Gen. Elec. Co.,* 159 F.R.D. 373, 375 (N.D.N.Y. 1995).

To create an "opt-in" class under Section 216(b), an employee need only satisfy two basic requirements: 1) class members must be "similarly situated"; and 2) class members must affirmatively consent to join the action or "opt-in." *Sperling v. Hoffman-La Roche, Inc.,* 862 F.2d 439, 444 (3rd Cir. 1988); *Rodolico v. Unisys Corp.,* 199 F.R.D. 468, 480 (E.D.N.Y. 2001); *Chowdhury v. Duane Reade, Inc.,* 2007 WL 2873929, at *2 (S.D.N.Y. Oct. 2, 2007) (citations omitted); *see also Grayson v. K-Mart Corp.,* 79 F.3d 1086, 1096 (11th Cir.1996).

District courts in the Second Circuit utilize a two-tier test to determine who are "similarly situated" employees under Section 216(b). *Iglesias-Mendoza v. La Belle Farm, Inc.,* 239 F.R.D. 363, 367 (S.D.N.Y. 2007) (citing cases and discussing procedure for collective action certification under Section 216(b)). During the first stage, the court determines whether notice should be given to potential class members, based typically on an examination of the pleadings and affidavits submitted by the parties. *Id.; Lee v. ABC Carpet & Home,* 236 F.R.D. 193, 197 (S.D.N.Y. 2006); *Frederick v. Dreiser Loop Supermarket Corp.,* 2008 WL 4724721, *1 (S.D.N.Y. Oct. 24, 2008) (notice given to employees at seven supermarkets based upon declarations of three employees of one supermarket). "If the plaintiff satisfies the 'minimal burden of showing that the similarly situated requirement is met', the court certifies the class as a collective action." *Iglesias-Mendoza,* 239 F.R.D. at 367 (citing *Scholtisek v. Eldre Corp.,* 229 F.R.D. 381, 387 (W.D.N.Y. 2005); *Davis v. Abercrombie & Fitch Co.,* 2008 WL 4702840, at *9 (S.D.N.Y. Oct. 23, 2008).

14

"At this juncture—also termed the 'notice stage'—the court applies 'a fairly lenient standard' and (when it does so) typically grants 'conditional certification.'" *Id.*; *Torres v. Gristede's Operating Corp.,* 2006 WL 2819730, *7 (S.D.N.Y. Sept. 28, 2006) (citation omitted). Such conditional certification requires nothing more than "substantial allegations that the putative class members were together the victims of a single decision, policy or plan." *Sherrill v. Sutherland Global Services, Inc.,* 487 F.Supp.2d 344, 348-49 (W.D.N.Y. 2007) (citations omitted); *Hens v. ClientLogic Operating Corp.,* No. 05-381, 2006 WL 2795620, *3 (W.D.N.Y. Sept. 26, 2006). Potential class members are then notified and provided with the opportunity to opt-in to the action. *Id.*; *Scholtisek,* 229 F.R.D. at 387. Plaintiffs' claims and positions need not be identical to those of putative class members, but need only be similar. *Tucker v. Labor Leasing, Inc.,* 872 F.Supp. 941, 947 (M.D. Fla. 1994); *Chowdhury,* 2007 WL 2873929 at *2; *Allen v. Marshall Field & Co.,* 93 F.R.D. 438 (N.D.Ill. 1982). In the second stage, later in the litigation, the employer can move to decertify the class if discovery reveals that additional plaintiffs who opt-in to the lawsuit are not similarly situated. *Morales v. Plantworks, Inc.,* 2006 WL 278154, *1 (S.D.N.Y. Feb. 2, 2006); *Evans v. Lowe's Home Centers, Inc.,* 2006 WL 1371073, at *3-5 (M.D. Pa. May 18, 2006).

The applicable standard here is also considerably "less stringent" than the proof required under Rule 23 of the Federal Rules of Civil Procedure regarding traditional class certification. *Patton v. Thomson Corp.,* 364 F.Supp.2d 263, 267 (E.D.N.Y. 2005); *Grayson v. K-Mart Corp.,* 79 F.3d at 1096.[10] *See also Mooney v. Aramco Services Corp.,* 54 F.3d 1207, 1214 (5th Cir. 1995) (applying a "fairly lenient standard for § 216(b) determinations). The "difference between Rule 23 and § 216(b) means that Rule 23's class certification requirements do not apply to FLSA class actions." *King v. General Elec. Co.,* 960 F.2d 617, 621 (7th Cir. 1992); *Woods,* 686 F.2d 578,

---

[10] Likewise, the "similarly situated" requirement applicable to Section 216(b) collective actions is "more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance)." *Grayson v. K-Mart Corp.,* 79 F.3d at 1095.

580 (7th Cir. 1982).

   ***Seward's Motion does not involve a determination on the merits of his claims.***  *Lynch v.*
*United Services Auto Ass'n,* 491 F.Supp.2d 357, 367-68 (S.D.N.Y. 2007); *Hoffman v. Sbarro,*
*Inc.,* 982 F.Supp. 249, 262 (S.D.N.Y. 1997) ("the Court need not evaluate the merits of plaintiffs'
claims in order to determine that a definable group of similarly situated plaintiffs can exist here.").
As of the filing of this Motion, only limited discovery has taken place.  The case is therefore at the
first stage of collective action certification and the lenient "similarly situated" standard applies.
At this initial stage of the litigation, Plaintiffs need only make "a modest factual showing sufficient
to demonstrate that they and potential plaintiffs together were victims of a common policy or plan
that violated the law." *Francis v. A & E Stores, Inc.,* 2008 WL 4619858, *2 (S.D.N.Y. Oct. 16,
2008); *Doucoure v. Matlyn Food, Inc.,* 2008 WL 1771771, *2 (E.D.N.Y. April 15, 2008)
(citations omitted).  Seward may establish this standard through substantial and detailed allegations
in his Complaint, and with some modicum of evidentiary support such as affidavits.  *See, e.g.,*
*Jacobs v. New York Foundling Hosp.,* 483 F.Supp.2d 251, 265 (E.D.N.Y 2007); *Grayson v. K-*
*Mart Corp.,* 79 F.3d at 1097.

   ***Seward need not show an actual FLSA violation.***  Rather, he need only demonstrate that a
"factual nexus" exists between his situation and the situation of other potential plaintiffs. *Young*
*v. Cooper Cameron Corp.,* 229 F.R.D. 50, 54 (S.D.N.Y. 2005) ("The focus ... is not on whether
there has been an actual violation of law but rather on whether the proposed plaintiffs are
similarly situated ... with respect to their allegations that the law has been violated."). *Sobczak v.*
*AWL Industries, Inc.,* 2007 WL 4934239, at *6 (E.D.N.Y. Oct. 22, 2007).  Courts regularly grant
motions for conditional certification in collective actions "based upon employee affidavits setting
forth a defendant's plan or scheme to not pay overtime compensation and identifying by name
similarly situated employees." *Sobczak,* 2007 WL 4934239 at *6 (citation omitted).

**B. Plaintiffs Are "Similarly Situated" With Regard To Job Duties and Pay Provisions And Were Subject To Defendant's Common Scheme**

Notice should be issued in this case because Plaintiffs are similarly situated and were all subject to IBM's illegal compensation policy. Sections 206 and 207 of the FLSA generally require that employers pay employees specific hourly rates for up to forty hours per week and pay overtime compensation at a rate of one and one-half times the regular rate for hours worked in excess of forty hours. 29 U.S.C. §§ 206, 207(a)(1). To ensure compliance with these provisions, employers are required to keep accurate records of all hours worked by employees. 29 U.S.C. § 211(c).

Plaintiffs satisfy the requisite modest factual showing and provide this Court a reasonable basis for finding that a class of similarly situated CCR's exist. Plaintiffs' motion to proceed as a collective action and issue notice is supported by allegations in the Amended Complaint (¶¶13-40), the testimony of five current and former CCR's (Exhibits 4-11), a former employee of IBM's Global Technical Services Division (Exhibit 12), and two IBM corporate representatives (Exhibits 2 and 3), internal emails (Exhibits 13 and 14), written policies (Exhibit 15), and other documents (Exhibit 16 and 17). These allegations and testimony establish that IBM uniformly required its CCR's to work before their shifts without compensation. IBM did not pay its CCR's for all of the time they spent working pre-shift tasks such as booting up their computers, opening software applications and reviewing work-related emails. Instead, it only paid them for their *scheduled* time and not their *actual* time worked. IBM's own documents including emails distributed to CCR's show these employees are similarly situated. The limited amount of discovery conducted reveals that CCR's share the following similarities:

a.   They are subject to the same policies;

b.   They share the same basic job duty of providing customer service and support over the telephone;

c.   They receive similar directives which are conveyed in the same manner, *i.e.*, during training, in meetings and via mass emails;

d.   They are all entitled to overtime pay;

e.   They all work in the same IBM call center;

f.   They are scheduled the same number of hours per day (8) and per week (40);

g.   They all generally arrive in advance of their scheduled shifts to perform necessary work tasks including preparing their equipment and themselves to begin handling calls;

h.   Their pre-shift time is not accurately recorded;

i.   Their pre-shift time consistently results in them working more than forty (40) hours per week;

j.   They are not compensated for their pre-shift time; and,

k.   They are not properly paid for all overtime worked.

In short, CCR's are victims of IBM's common policy or plan that violates the FLSA. Plaintiffs have clearly demonstrated a "colorable basis" for the existence of a policy which requires non-exempt hourly-paid CCR's to perform essential tasks before their scheduled shift without compensation. *See* 29 C.F.R. §541, *et seq.*

## C. Plaintiffs Have Demonstrated a Reasonable Basis for Conditional Certification of a Collective Action

The parties have engaged in limited discovery which, along with the detailed allegations of Plaintiffs' Amended Complaint, provide more than a "modest factual showing" demonstrating that Seward, the opt-in Plaintiffs and other CCR's together were victims of a common policy of failing to pay overtime, through which it benefited by saving millions of dollars. *Scholtisek v. Eldre Corp.,* 229 F.R.D. 381, 390 (W.D.N.Y. 2005). This evidence shows that all CCR's— regardless of job title, supervisor or specific work location within the Atlanta facility—were non-exempt hourly employees who were not paid for consistently performing pre-shift work.

18

Plaintiff has shown that he and other similarly situated CCR's were victims of IBM's illegal compensation policy, which requires them to perform integral and indispensable tasks without compensation. *IBP v. Alvarez*, 546 U.S. 21 (2005) (holding that "any activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity'. . ." and therefore must be compensated).

At this preliminary stage, Plaintiffs have specifically demonstrated their collective action allegations through:

   a.  The depositions of two IBM corporate representatives.  Exhibits 2 & 3;

   b.  The depositions of Named Plaintiff and four other current and former CCR's.  Exhibits 4-8;

   c.  The declarations of CCR's describing uniform compensation practices, job duties and responsibilities.  Exhibits 9-11;

   d.  The declaration of a former employee of the IBM Global Technical Services Division. Exhibit 12;

   e.  IBM's own written policies, internal emails and other documents.  Exhibits 13-17;

   f.  Detailed allegations in Plaintiffs' Amended Complaint, including a description of the Plaintiffs' claims and Defendant's employment practices.  *See* Amended Complaint ¶¶13-40.

   g.  Consent forms filed by six CCR's alleging that they consistently work in excess of forty (40) hours per week and are denied overtime compensation. Group Exhibit 1.

Plaintiffs have demonstrated that CCR's are subject to IBM's illegal compensation policy and are, therefore, entitled to proceed as a collective class action. *See Lynch,* 491 F.Supp.2d at 3697 (granting plaintiffs' motion for notice under Section 216(b) where the plaintiffs, as here, submitted declarations and noting that "[c]ourts have routinely authorized notice to putative class members on far more modest records than present in this case.").

IBM will likely argue that no common policy or plan to deny compensation for pre-shift work exists and that it, in fact, takes steps to ensure CCR's are compensated for such time.  But the

Court does not resolve factual disputes, decide ultimate issues on the merits, or make credibility determinations at this stage. *Davis v. Abercrombie & Fitch Co.*, 2008 WL 4702840, *9 (S.D.N.Y. Oct. 23, 2008). Plaintiffs' evidence establishes that the allegations at issue are not personal to any single individual but instead demonstrate a common practice of failing to pay overtime for off-the-clock work to any CCR. The evidence is that IBM directed Seward, opt-ins and hundreds of similarly situated CCR's to perform necessary pre-shift work for which they were not paid. *(Supra, pp. 6-13).* Even if IBM offers contradictory evidence, this Motion cannot be defeated so long as Plaintiff submits evidence that "successfully engages" IBM's proof. *Grayson v. K-Mart*, 79 F.3d at 1099, n.17. Seward's proof is more than adequate to support a finding that there are "similarly situated" CCR's who should be notified of this action and given an opportunity to opt-in to this case.

**D.  Courts Routinely Authorize Notice in Similar Cases**

Courts routinely authorize notice on much thinner records.[11] And specifically in other call center cases, courts have conditionally certified similar FLSA claims where Plaintiffs have presented far less evidentiary support. *See Sherrill v. Sutherland Global Services, Inc.*, 487 F.Supp.2d 344 (W.D.N.Y. 2007) (conditionally certifying a collective of call center workers under the FLSA); *Russell v. Illinois Bell Telephone Co.*, 2008 WL 4191763 (N.D.Ill. Sept. 15, 2008); *Hens v. ClientLogic Operating Corp.*, No. 05-381, 2006 WL 2795620 (W.D.N.Y. Sept. 26, 2006) (same); *Burch v. Qwest Comm. Int'l, Inc.*, 500 F.Supp.2d 1181 (D. Minn. 2007) (same); *Clarke v. Convergys Customer Mgmt. Group, Inc.*, 370 F.Supp.2d 601 (S.D. Tex. 2005) (same). Accordingly, the Court should likewise grant Plaintiffs' Motion here and conditionally certify their claims under Section 216(b) of the FLSA.

---

[11] *See, e.g., Masson v. Ecolab, Inc.*, No. 04 Civ. 4488, 2005 WL 2000133 at *14 (S.D.N.Y. Aug. 17, 2005) (three opt-ins); *Roebuck v. Hudson Valley Farms, Inc.*, 239 F.Supp.2d 234, 238 (N.D.N.Y. 2002) (three affidavits).

**E. Call Center Representatives Should Be Notified Of This Case Before The Statute Of Limitations Runs**

Notice to potential "opt-in" plaintiffs in this case should be expedited to protect their rights and prevent their statutes of limitation from running.   The statute of limitations for an FLSA claim is two years after the cause of action has accrued, unless a willful violation is alleged, in which case the Plaintiff has three years to bring a lawsuit. *Herman v. RSR Security Services, Ltd.,* 172 F.3d 132, 141 (2d Cir. 1999); *Reich v. Waldbaum, Inc.,* 52 F.3d 35, 40 (2d Cir. 1995) (citing 29 U.S.C. §255(a)).  The statute of limitations on Seward's claims was tolled on April 28, 2008, the date his Complaint was filed. However, potential opt-in Plaintiffs' statutes of limitation are not tolled until the date that each such individual files a written "consent to join" form with the Court. *Grayson v. K-Mart,* 79 F.3d at 1105-06; *see also* 29 C.F.R. § 790.2 1(b)(2).

For each passing day that notice is not provided to potential opt-in plaintiffs, employees with genuine claims are being deprived of their right to seek redress in an appropriate judicial forum. This is particularly true for hundreds or more current and former CCR's whose claims are fixed by the statute of limitations and only extend two (2) or three (3) years back from the date they file their consent to "opt-in" with this Court.  Notice is therefore essential to inform CCR's of the requirements necessary to protect their interests. Without notice, potential members of the class cannot make an informed decision as to whether they should join this case.  Instead, their claims will be diminished or eliminated merely by the operation of time.

**F. Plaintiffs' Proposed Notice Is Fair and Adequate**

Collective "opt-in" actions depend on "employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Hoffman-LaRoche,* 493 U.S. at 170. Court-authorized notice also prevents "misleading communication." *Id.* at 172; *Garner v. G.D. Searle Pharm. & Company,* 802

21

F.Supp. 418, 419 (M.D. Ala. 1991).

Seward's proposal for court-approved notice to potential opt-in plaintiffs meets the requirements of "timeliness, accuracy and information." *Hoffman-LaRoche,* 493 U.S. at 172. The proposed notice accurately informs CCR's of this case and gives them the opportunity to "opt-in" before the statute of limitations extinguishes their claims." And it instructs them how to "opt-in" to the lawsuit while also informing them that IBM is prohibited from discriminating or retaliating against them for participation in this FLSA action. *See* Exhibit 18 (Plaintiffs' Proposed Notice).

Plaintiff proposes that the Notice and Opt-In Consent Form be posted on IBM's intranet and sent via first class U.S. mail to all current and former CCR's employed by IBM at its Atlanta facility within the past three (3) years. Seward further requests that potential opt-in plaintiffs interested in participating in this lawsuit be provided with ninety (90) days from the date of mailing to "opt-in" to this case. This request is consistent with established practice under the FLSA. *See, e.g., Hoffman-LaRoche,* 493 U.S. at 172; *Hipp v. Liberty National Life Ins. Co.,* 164 F.R.D. 574, 576 (M.D. Fla. 1996) (120 day filing period). Because Seward's proposed notice is fair and accurate, it should be approved for distribution.

## V. <u>CONCLUSION</u>

Based upon the foregoing reasons, Seward respectfully requests that the Court grant this Motion as follows:

    a. conditionally certify this case as a Section 216(b) collective action;

    b. require IBM to produce a computer-readable data file containing the names, addresses and telephone numbers of such potential opt-in members so that notice may be issued; and,

    c. authorize notice by posting on IBM's intranet and via U.S. first class mail to all similarly situated persons employed by IBM, who are or were employed as call center representatives or other similarly titled positions from April 28, 2005 to the present to inform them of their right to opt-in to this lawsuit.

Dated: December 1, 2008

Respectfully Submitted,

Erik H. Langeland
ERIK H. LANGELAND, P.C.
500 Fifth Avenue, Suite 1610
New York, NY 10110
(212) 354-6270
elangeland@langelandlaw.com


James B. Zouras
Ryan F. Stephan
(Admitted Pro Hac Vice)
STEPHAN ZOURAS, LLP
205 North Michigan Avenue
Suite 2560
Chicago, IL 60601
(312) 233-1550
(312) 233-1560 *f*
jzouras@stephanzouras.com

Jon A. Tostrud
R. Brent Walton
(Admitted Pro Hac Vice)
CUNEO GILBERT & LaDUCA, LLP
507 C. St., NE
Washington, D.C. 20002
(202) 789-3960
(202) 789-1813 *f*
jtostrud@cuneolaw.com