# EXHIBIT 3C

1 this e-mail?
2    A     I don't know.
3    Q     Would he have been reporting in some
4 fashion to Melody Curtis?
5    A     No.  He was -- but he was team lead,
6 perhaps, at her request.
7    Q     What does that mean?
8    A     Meaning she was searching for someone
9 to -- to create these -- this report, and she found
10 him.
11        I don't know how it worked because I
12 wasn't here at the time.  I wasn't with IBM WorkForce
13 Management at the time.
14    Q     You're saying this -- the e-mail that was
15 forwarded to you by Tom Guinard was drafted during the
16 time you didn't work for --
17    A     No.
18    Q     -- WorkForce Management?
19    A     No.  Tom was picked by Melody prior to my
20 joining to do the DORs.  That's what I was saying.
21    Q     Do you mean before 1996 when you first
22 worked?
23    A     Before 2000 -- before I rejoined in late
24 2004, early 2005.
25    Q     So before you rejoined, Tom Guinard had

1 been selected to be the DOR --
2    A     To -- to work on the DOR project.
3    Q     Okay.
4    A     To be the team lead for the DOR project.
5 Yes, I believe so.
6    Q     And he had been selected by
7 Melody Curtis?
8    A     I believe so.
9    Q     And was she in charge of the entire DOR
10 project?
11    A     No, but I believe that she was on a
12 committee that -- that chose Tom to work on it.
13    Q     Who else was on that committee?
14    A     I don't know.
15    Q     Well, could Melody Curtis fire
16 Tom Guinard if she wanted to?
17        MR. RAY:  Objection to the extent it
18    calls for speculation.
19        THE WITNESS:  I don't know, but she's in
20    the United States and he's in Canada.  I don't
21    know.
22 BY MR. LANGELAND:
23    Q     Did anybody ask you what you meant when
24 you sent out this e-mail?
25    A     Never had any response.

1    Q     Nobody responded?
2    A     (Witness shook head.)
3    Q     Do you know if this was implemented as a
4 policy?
5    A     I never followed up.  I never had any
6 followup come to me.  I have never had any -- I never
7 had any further news about in.
8    Q     You just forwarded it?
9    A     I just sent it out to the managers.
10    Q     And you didn't really analyze what it
11 meant.
12    A     That one -- that one paragraph, I didn't.
13    What I cut and pasted, I didn't, right.
14    Q     Didn't you cut and paste the whole thing?
15    A     I wrote parts of it and then plugged in
16 the cut and paste part and sent it out.
17        I had already written part of -- I had
18 already written part of the note, and I cut and paste,
19 and then sent it out.
20    Q     What parts did you write?
21    A     The beginning and --
22    Q     From where?
23    A     From -- from:  To all through the third
24 paragraph on the second page where it says:  Any
25 seniors, team leads, admin, et cetera.

1    Q     Okay.
2    A     And then I cut and paste from:  As we
3 move down to the two paragraphs that we've been
4 discussing, and then I wrote the rest.
5    Q     And you didn't analyze the two paragraphs
6 that you cut and paste?
7    A     That's right.  It was a very quick thing.
8    Q     What was your understanding of the
9 purpose of the e-mail?
10    A     To advise the managers that there's been
11 a change to the report.
12    Q     And were they supposed to follow the
13 procedure contained in this e-mail?
14    A     It's -- it's only -- it's only advice.
15    Q     So they were free to disregard it if they
16 wanted to?
17    A     It's up to them.
18    Q     Why would you be advising them to do
19 this?
20    A     It was an effort to send them advice if
21 they wanted to improve how their report looked.  I
22 can't give them orders.
23    Q     Okay.  So if they wanted to improve their
24 report, they should not be accumulating unproductive
25 hours.

1    A    Those are not my words, so I can't say
2 that.
3    Q    But that would improve the report; isn't
4 that right?
5        MR. RAY: Which report?
6        THE WITNESS: Not -- yeah. Not
7    necessarily. It depends on what you're asking.
8 BY MR. LANGELAND:
9    Q    You were the one who said report, so what
10 were you talking about?
11    A    It would not have any effect on the main
12 DOR report.
13    Q    No, no, no. Let's go back.
14        Which report were you talking about? You
15 said if they wanted to improve their report, they
16 should follow the advice in this e-mail.
17    A    Right. And this --
18    Q    Which report?
19    A    This e-mail is regarding --
20    Q    Which report?
21    A    -- the DOR report.
22    Q    The DOR, just the DOR?
23    A    The DOR report, yeah.
24    Q    Okay.
25    A    A change in the DOR report.

1    Q    So if they wanted to improve the DOR
2 report, they followed the advice in the e-mail.
3    A    They had that option, yes.
4    Q    If a call center is accumulating
5 unproductive hours, doesn't that mean that IBM is
6 overstaffing?
7    A    I don't know. You would have to take the
8 individual situation and -- and analyze volumes and
9 average handle time and -- and come up with a
10 head-count figure.
11    Q    And how would unproductive hours relate
12 to that?
13    A    How would it relate to the DOR report?
14    Q    No. If you're saying, okay, well --
15 you're looking at a situation and seeing whether or
16 not it's overstaffed.
17    A    We would not be looking at unproductive
18 hours. We would be looking at volumes and average
19 handle times and forecasting when volumes would be
20 coming in and then figuring out what kind of a head
21 count would cover those hours.
22    Q    So unproductive hours would not have
23 anything to do with whether or not a group was
24 overstaffed?
25    A    No. It would not have anything to do

1 with being staffed or overstaffed.
2        It's how they're conducting their
3 business throughout -- throughout the day.
4    Q    That has to do with whether they're
5 staffed properly or overstaffed, how they're
6 conducting the business during the day.
7    A    I'm not sure.
8    Q    Why is anybody concerned with
9 unproductive hours?
10    A    They would prefer that the percentage of
11 time that people are on the phone -- are working the
12 phones, either being on phones or waiting for the next
13 phone call -- be a high percentage rate.
14    Q    Why?
15    A    That would be the most likely way to have
16 good service levels which is the main goal.
17    Q    So if somebody is coming into work and
18 logging on the phone 30 minutes before their start
19 time, isn't that going to decrease the service level?
20    A    I can't see how, no.
21    Q    If they're in AUX during that time, would
22 they be decreasing --
23    A    It may have no effect on the service
24 level at all.
25        It depends on how the calls are being

1 answered, if they're being answered within the
2 requisite time.
3    Q    You can't answer a call if you're in AUX,
4 can you?
5    A    No. You -- you would have to go into a
6 different state.
7    Q    So if you were coming in early and
8 logging on but you were in AUX, that would negatively
9 affect the service levels, wouldn't it?
10        MR. RAY: Objection, asked and answered.
11        THE WITNESS: We have already covered
12    this.
13 BY MR. LANGELAND:
14    Q    Okay. What's your answer?
15    A    If someone comes in early and is in an
16 AUX code, this is all time before their schedule. I
17 don't see how that would affect what happens during
18 the day at all.
19        It -- to me, the service level would
20 probably be the same.
21    Q    So let's say a CSR comes in at -- his
22 scheduled time is at 9:00, and his scheduled departure
23 is at 5:00, and for the first 30 minutes of the day
24 he's in AUX.
25        Would that decrease the service level?

1      MR. RAY:  The same objection, asked and
2  answered now twice at least.
3      THE WITNESS:  Not necessarily.
4  BY MR. LANGELAND:
5      Q      Because --
6      A      Because it depends on how the other
7  people are answering the phone calls, if they're
8  answering them within the service level.
9      Q      Do you know whether it's the practice for
10  CSRs to come in early and boot up their machines
11  before they log in?
12      A      I don't know.
13      Q      You have no idea?
14      A      I don't know.
15      Q      Did you ever attend any meetings where
16  anybody said that was an issue?
17      A      No.
18      Q      Has anybody ever complained to you about
19  having to work pre-shift time.
20      A      No.
21      Q      When you were a CSR, what did you have to
22  do to get ready to take calls?
23      A      Show up on time, log into the telephone
24  and turn on the computer.
25      Q      Okay.  Do you have to launch any

1  applications?
2      A      That's what I mean by turning on the
3  computer.
4      Q      So you just turn on the computer and what
5  would you have to do at that point?
6      A      Some applications would come up
7  automatically, and any that didn't, you would start
8  yourself.
9      Q      Okay.  Which ones would you start
10  yourself?
11      A      I don't remember the names of them.  This
12  is many years ago.
13      Q      Do you know if they still use them?
14      A      I don't know.  We don't -- we don't have
15  that department anymore.
16      Q      How long would it take for you to --
17  strike that.
18          Did the computer have to be up and
19  running before you could log into the phone system?
20      A      No.
21      Q      You could always log into the phone
22  system independently of the computer?
23      A      Yes.
24      Q      And did you do that right when you got
25  there?

1      A      I would do both at the same time at my
2  starting time.
3      Q      And about how long would it take for your
4  computer to boot up and for you to launch the
5  applications?
6      A      A couple of minutes.
7      Q      Two minutes?
8      A      Longer, probably, three minutes, maybe.
9      Q      It would take three minutes in 1996 for
10  you to boot up your computer?
11      A      Three or four.
12      Q      Three or four minutes?
13      A      Yeah.
14      Q      And launch all your applications?
15      A      Yes, because the computers were very slow
16  back then.
17      Q      That's why, because they were slow back
18  then.
19          Okay.  And you don't remember the names
20  of the applications.  Do you remember how many?
21      A      I don't remember, no.
22      Q      What is a comparison report?
23      A      A comparison report is a report done by
24  the manager group each day that compares a person's
25  schedule to the actual log-in/log-out report.

1          (Thereupon, marked for identification,
2      Plaintiff's Exhibit Number P-3.)
3  BY MR. LANGELAND:
4      Q      I'm turning your attention to Exhibit 3.
5          Is that a comparison report?
6      A      Yes.
7      Q      Who is Nancy Clark?
8      A      Nancy Clark is the person who is
9  designated by the manager to create this report.
10      Q      She is a senior?
11      A      I don't believe she was a senior.  I
12  believe that she's the designee for this report.
13      Q      And there is a designee in each group?
14      A      Yes.  Most -- most often, it's the
15  senior.
16      Q      And how do you know that?
17      A      Because we receive the reports.
18      Q      They send these reports to you?
19      A      Yeah.
20      Q      For how long have they been doing that?
21      A      A good year.
22      Q      And the comparison report gives the
23  scheduled start time?
24      A      Yes.
25      Q      It also gives the log-in time started?

Page 178

```
 1    A    Yes.
 2    Q    Can you look in the column that says:
 3  Avaya/CMS, Log-in, Time Started?
 4    A    Yes.
 5    Q    And by looking at the column, do you see
 6  that the log-in times are before the start time?
 7         MR. RAY:  Objection to the extent it
 8    mischaracterizes the document.
 9  BY MR. LANGELAND:
10    Q    In most instances --
11    A    In most -- in most instances that I'm
12  looking at, I see actual log-in time before the
13  scheduled start time.
14    Q    And, in some cases, it's say 10 minutes
15  beforehand?
16    A    I see 3 minutes beforehand, 4 minutes
17  beforehand and, et cetera, on down the line.
18    Q    There's a 9:49 for a 10:00 a.m. start
19  time; is that right?
20         Do you see that one?
21    A    Yes.
22    Q    Do you have any idea whether they're paid
23  overtime for that time?
24    A    I don't know.  It's not my -- not my
25  area.
```

Page 179

```
 1    Q    Has a manager ever sent you an e-mail
 2  saying, hey, this was overtime that was worked?
 3    A    I wouldn't receive that.  Someone else in
 4  my department would receive that.
 5    Q    Okay.  So that would go to --
 6    A    Tonya.
 7    Q    -- Tonya.
 8         And has she ever told you, hey, I
 9  received this e-mail because people were working
10  before their shift time -- their scheduled start time?
11    A    It wouldn't be phrased that way.  If
12  overtime had been scheduled, we would get a
13  notification from the manager to schedule -- to put
14  overtime in on a particular day.
15    Q    And have you ever heard that they have
16  done that because the -- the Avaya log-in time was
17  before the scheduled start time?
18    A    No.
19    Q    And you receive these comparison reports
20  how often?
21    A    It's a daily report that they can send to
22  us either daily or at the end of the week for the
23  whole week.
24    Q    And do you look at them?
25    A    Not me personally, but the group -- my
```

Page 180

```
 1  WorkForce Management group that I'm in looks at them.
 2    Q    Who looks at them?
 3    A    Tonya McKay, Derrick Dunston and
 4  Phyllis Farrell.
 5    Q    Who's Phyllis Farrell?
 6    A    She's our -- our working partner in
 7  Dallas.
 8    Q    Dallas.
 9         Have you ever told any manager that you
10  think that there should be overtime paid because these
11  start times precede the scheduled start time?
12    A    I don't get involved in that at all.
13    Q    But you're supposed to ensure that proper
14  reports are being done, aren't you?
15         MR. RAY:  Objection, vague.
16  BY MR. LANGELAND:
17    Q    Are you subject to the Business Conduct
18  Guidelines?
19    A    Yes.
20    Q    Can you submit a false report?
21    A    No.
22    Q    Can anybody in IBM submit a false report
23  according to those guidelines?
24    A    It's reasonable to assume that the
25  guidelines say no.
```

Page 181

```
 1    Q    So if a guy was working, you know, a CSR
 2  was working 15 minutes before their designated start
 3  time and they weren't getting paid for that, wouldn't
 4  that be a false report?
 5         MR. RAY:  Objection, lack of foundation.
 6    You can answer.
 7         THE WITNESS:  I'm -- I am not sure how to
 8    answer the question.  Please repeat the
 9    question.
10  BY MR. LANGELAND:
11    Q    If a CSR is showing up for work early,
12  say 15 minutes, but not being paid for it, isn't that
13  a false report?
14    A    Define "showing up."
15         Do you mean -- define what you mean by
16  "showing up."
17    Q    Let's say they log in -- let's say a
18  person comes in and logs in at 9:49 a.m. for a start
19  time of 10:00 a.m., and they aren't being paid for
20  that 11 minutes, shouldn't they be?
21    A    But their start time is not until like
22  9:00 o'clock?
23    Q    No, it's at 10:00.
24    A    But their start time isn't until 10:00
25  o'clock.
```

Page 182

```
 1    Q     Right.
 2    A     You know, I'm sorry.  That's a manager
 3  thing.  I just do not get involved in that.
 4    Q     What does it mean when it says:  Send
 5  update to WFM to update records (15 minutes or more)?
 6    A     The -- we -- we do things in 15 minute
 7  increments, and that actually doesn't apply anymore.
 8          You don't -- you can disregard that.
 9  This is a -- this is an early -- what's the date on
10  this?
11    Q     June 25, 2008.
12    A     Okay.  This is actually a -- we don't go
13  by that anymore.
14          At one time we thought it would be easier
15  if we did everything in 15-minute increments, but it's
16  not.
17          We can -- we can put -- we can put any
18  amount in there at all in the schedules.
19    Q     What was the purpose of this comment:
20  Send update to WFM to update records (15 minutes or
21  more)?
22    A     It's -- it's not all one message.  You're
23  talking about two things.
24          The first item is enter an update and
25  copy and do a note to WFM at -- and it gives our Lotus
```

Page 183

```
 1  Notes address.  That's where to send it to.
 2          And where it says to update records,
 3  parenthesis, 15 minutes or more, that -- that was at a
 4  one time -- I just answered this.
 5          It was at one time we were going to put
 6  everything into 15-minute increments, but the managers
 7  wanted to record everything, even if it's a -- even if
 8  it's only 10 minutes.
 9          So we now record whatever the manager
10  puts down there.
11    Q     What do you mean?
12          What do you record?
13    A     Whether it's -- even if it's less than 15
14  minutes, we will enter that -- those number of
15  minutes.
16    Q     What is "it's"?
17          What is the number of minutes that you're
18  entering?
19    A     The difference between the scheduled
20  start time and the log-in.
21    Q     So before, you disregarded any --
22    A     No, we never actually did disregard.
23  We've always put everything in there.
24          What we disregarded was the 15 minutes or
25  more statement, and that's not on any of the -- any of
```

Page 184

```
 1  the newer -- newer copies of this report.
 2          This is -- even though this report is
 3  dated this summer, it's been some time since that's
 4  even appeared on any copies of reports that -- you
 5  know, any blanks that we have sent out to them.
 6    Q     So after 6/25/2008, this form has
 7  changed?
 8    A     Before that time.
 9    Q     So why did this person use --
10    A     I don't know.  But it's a moot point
11  because we've always entered exactly what -- what the
12  numbers were.
13    Q     Where did you enter it?
14    A     We take -- we take any entries here -- in
15  this case, there's only one entry, and that's an
16  absence for medical for the first person.
17          We enter that into the person's schedule
18  for the day to show that they were absent for the day,
19  and that's the only -- that's the only entry for this
20  report.
21    Q     Where does it show that that person was
22  absent because of medical, and are you referring to
23  this --
24    A     The very first person.
25    Q     Dionis Heard?
```

Page 185

```
 1    A     Yes.
 2    Q     Okay.
 3    A     If you read across, it has scheduled
 4  start time never actually logged in according to the
 5  time in, according to the log-in/log-out.
 6          And the reason that was entered is
 7  medical so --
 8    Q     Okay.
 9    A     -- this person is absent for that day.
10    Q     So you don't enter anything -- see where
11  it says 2:57 is the log-in time for --
12    A     It will --
13    Q     -- Reginald McArthur -- let me finish.
14    A     Sorry.
15    Q     So the start time for Reginald McArthur
16  is 2:57, and his scheduled start time is 3:00 p.m.
17          You don't do anything with that data?
18    A     No.
19    Q     Okay.  So what do you mean when you say:
20  Send update to WFM to update records (15 minutes or
21  more)?
22          You're saying you enter all of the time
23  as it's shown here --
24    A     (Witness nodded head.)
25    Q     -- but now you're saying you don't enter
```

Page 186

1 it anywhere.
2       A       The only items entered on this report
3 into our -- into our records is the last column, and
4 that will be either a number of minutes, the
5 difference between the schedule and the start time
6 or -- or a full absence or whatever the item is,
7 that's what we're entering into it.
8            There were -- in this case, there were
9 no -- no lates. There was no late. There's a
10 one-minute late and a two-minute late, but there's --
11 but we don't include one or two minutes because
12 there's a five-minute leeway.
13           And the only absence is the medical, and
14 that's the -- so that's the only entry that we're
15 making from this report into our records.
16      Q       And what records -- where do you enter
17 it?
18      A       The Totalview schedule, into his schedule
19 to show that he was absent on that day.
20      Q       So you don't show, for example, that this
21 person logged in -- Reginald McArthur logged in three
22 minutes before his scheduled start time.
23           That doesn't go anywhere.
24      A       It doesn't go into my software.
25      Q       Right. You don't --

Page 187

1       A       I don't use that.
2       Q       You don't use that for anything.
3       A       No.
4       Q       And you don't enter -- for example,
5 anytime somebody logs in early, earlier than their
6 start time, that's not something that you track.
7       A       No. We're looking for late, not early.
8            This is -- this is an absence comparison
9 report.
10      Q       Okay. And this --
11      A       It's part of absence reporting.
12      Q       But this shows that a number of these
13 people show up early, isn't that correct, or logged in
14 early, earlier than their start time?
15      A       Logged into the telephone.
16      Q       Okay. So they had to be there, right?
17      A       It shows that they were in attendance
18 at -- at the time that they logged in, yeah.
19      Q       This doesn't show what time they arrived;
20 is that correct?
21      A       They don't -- that's right. It only
22 shows what time they logged into the telephone.
23      Q       And so if they've been instructed not to
24 log into the telephone until two or three minutes
25 before their designated start time, this wouldn't

Page 188

1 accurately reflect the time that they came in.
2       A       It doesn't reflect any time at all that
3 they are there. It only reflects when they log into
4 the telephone.
5       Q       Do you have any idea whether people are
6 paid for these minutes?
7       A       Not my area. I don't know.
8       Q       You could pull up these reports for all
9 of the groups since you started making the reports;
10 isn't that right?
11           MR. RAY: Objection. Which groups?
12           MR. LANGELAND: All the groups we've been
13      talking about.
14           MR. RAY: In IMBPD.
15           MR. LANGELAND: Yes.
16           THE WITNESS: Yeah. In IMBPD, we have
17      not thrown out any reports.
18 BY MR. LANGELAND:
19      Q       Are there places other than IMBPD that
20 use a comparison report?
21      A       I would be unaware. I don't know.
22      Q       Just one other question on this: When
23 you were referring to this suggestion that, you know,
24 you only update the records for 15 minutes or more
25 that really means if a person is 15 minutes or more

Page 189

1 late; is that correct?
2       A       No. You can disregard that. That was
3 never used.
4       Q       Okay. But isn't that what it would be
5 intended for because you're only tracking lates; am I
6 right?
7       A       No. We're tracking lates or absences.
8       Q       But absences wouldn't have a --
9       A       You're asking if someone was less than 15
10 minutes late, would we then not report that.
11           Is that what the question is?
12      Q       Yes.
13      A       No. We never -- we never used this
14 15-minute item. It should be ignored.
15      Q       Do you know if IBM has conducted any
16 surveys about hours worked by CSRs?
17      A       I don't know.
18      Q       Have they conducted any surveys about
19 off-the-clock work to your knowledge?
20      A       I don't know.
21      Q       Conduct any surveys about non-productive
22 time for CSRs?
23      A       I don't know.
24      Q       Have they conducted any surveys about
25 call center productivity?

Page 190

1    A    Surveys about call center productivity?
2  I don't know.
3    Q    You don't know Gary Lambousis, I think
4  you testified?
5    A    No.
6       MR. RAY: I think it's George Lambousis.
7  BY MR. LANGELAND:
8    Q    I'm sorry. George?
9    A    No, I don't know the name.
10   Q    And Vicki Reidy you don't know?
11   A    No.
12   Q    Are any of the CSRs independent
13 contractors?
14      I think you testified they were.
15   A    Not independent contractors. We -- we
16 get them from an employment agency, so they work for
17 the employment agency, not IBM.
18   Q    Are you aware of any call centers in New
19 York?
20   A    I know you mean by that IBM call centers,
21 and I'm not familiar with that area, no.
22   Q    Do you know Stacy Hal (phonetic)?
23   A    No.
24   Q    Do you know of any studies about inbound
25 call patterns that IBM has done?

Page 191

1    A    Studies of IBM -- of inbound call
2  patterns.
3       I run reports that will gather history on
4  a particular group's volume history.
5    Q    And what do you use that then for?
6    A    To generate -- it's part of an analysis
7  to determine what head count would be appropriate for
8  a group.
9    Q    Turning your attention back -- I'm
10 sorry -- just to your e-mail on the new DOR which is
11 Exhibit 2 --
12   A    Sure.
13   Q    -- did any manager ever come back to you
14 and tell you this should not -- this is wrong?
15   A    No.
16   Q    Did anybody tell you that CSRs should not
17 show up 10 minutes before their scheduled start time?
18   A    I received no feedback.
19   Q    So nobody told you this is an inaccurate
20 statement of the policy?
21      MR. RAY: Objection to the extent it
22    assumes facts not in evidence.
23      THE WITNESS: And I received no feedback
24    about this.
25

Page 192

1  BY MR. LANGELAND:
2    Q    Did anybody change or clarify what you
3  said in that e-mail?
4    A    No.
5    Q    Were there any follow-up e-mails that
6  said what this really means is...
7    A    There has been no -- no followup, no
8  feedback.
9    Q    Were you disciplined for the e-mail?
10   A    Excuse me?
11   Q    Were you disciplined for sending the
12 e-mail?
13   A    No.
14   Q    Were you reprimanded in any way?
15   A    No.
16   Q    Were you informed that call center
17 employees had to get overtime if they showed up early?
18   A    I received no feedback, no inquires about
19 this whatsoever.
20   Q    Do you know what the following e-mail
21 distribution lists are: MBPD-CRM-Atlanta-All Reg
22 Employees 1?
23   A    I'm not familiar. You do your own
24 distribution lists, so I would only know my own
25 distribution lists.

Page 193

1    Q    So there isn't an IBM distribution list
2  for all CRM -- I'm sorry -- all CSR --
3    A    No. It's -- each Lotus Note user makes
4  their own distribution list.
5    Q    To your knowledge, is there one that goes
6  to all of the CRSs in -- I'm sorry -- CSRs in Atlanta?
7    A    I don't know. I don't have one. I did
8  not construct one for myself.
9    Q    I see.
10      Do you know who Janelle Betterson
11 (phonetic) is?
12   A    No.
13   Q    Leonard Butler?
14   A    Yes.
15   Q    Who is that?
16   A    He is a -- he has been a manager in -- in
17 our call center previously. I'm not sure what his
18 title is.
19   Q    Does he still work for IBM?
20   A    I believe so.
21   Q    Do you know where?
22   A    No.
23   Q    Do you know Juanita Carver?
24   A    No.
25   Q    I think you said Sarah Cerny was a

Page 194

1  manager?

2     A     Yes.

3     Q     Do you know Steven Coy?

4     A     No.

5     Q     Charene Dailey (phonetic)?

6     A     Yes.

7     Q     Who is that?

8     A     She's a manager from Manpower, so she is

9  the manager over some of our contractors.

10    Q     Does she work for Manpower?

11    A     Yes.  Charene Dailey?

12    Q     Yes.

13    A     Yes.

14    Q     When you're referring to the CSRs as

15 about 250 --

16    A     (Witness nodded head.)

17    Q     -- does that include CSRs that work for

18 Manpower?

19    A     Yes.

20    Q     Who is Stanley Dait (phonetic)?

21    A     He is an HR person.  That's pretty much

22 all I know.

23    Q     Where does he work?

24    A     I don't know where his office is.

25    Q     Is he in Atlanta?

Page 195

1     A     I don't know.

2     Q     How do you know who he is?

3     A     When he first started in HR -- he toured

4  our call center, and so I was introduced to him.

5     Q     If you have HR issues, do you talk to

6  him?

7     A     I believe I could.

8     Q     Who is your HR rep?

9     A     I'm not aware if I have one.

10    Q     Who is Rosanne Davis?

11    A     She's one of the managers at Atlanta in

12 IMBPD.

13    Q     Kerry Bethea you said has been promoted?

14    A     Yes, was a manager.  Now, he's -- I

15 believe -- I believe the title is Program Manager.

16 I'm not sure what the exact title is.

17    Q     What are program managers?

18    A     Someone who liaisons with -- between the

19 group that we've established and the sponsor.

20    Q     Do you know what they do?

21    A     That's the extent of my knowledge.

22    Q     Okay.

23    A     Yeah.

24    Q     So that person, I guess, would talk to

25 the sponsor about their service levels, how well you

Page 196

1  guys are doing as a call center?

2     A     I know that he's the middleman between --

3  he's the liaison between the sponsor and the group.  I

4  don't know the details of his daily work.

5     Q     Does a program manager still have

6  authority to direct CSRs to do certain things?

7     A     He would work through the manager.

8     Q     So he would direct the manager?

9     A     The manager does not report to the

10 program manager.  The program manager is off to the

11 side.

12           He could work with the manager if there

13 were any issues of procedure or whatever.

14    Q     And do you know if the CSRs have to

15 follow the direction of the program manager?

16    A     No.  They follow the manager.

17    Q     They don't have to follow the program

18 manager's direction?

19    A     They report to the manager.

20    Q     Right, but do they have to follow the

21 direction of the program manager?

22    A     Not that I'm aware of.

23    Q     Who is Otho Draper (phonetic)?

24    A     Don't know.

25    Q     Pete Draper?

Page 197

1     A     No.

2     Q     Daniel Dryer?

3     A     No.

4     Q     Sue Gallow?

5     A     No.

6     Q     Jeff Granger I think you testified was

7  a --

8     A     He's a second-line manager in Atlanta,

9  yeah.

10    Q     Does he have a particular responsibility

11 for any of the groups that we talked about?

12    A     Yeah.  He would take some groups and

13 Sharon Lofton takes the other groups.

14    Q     Okay.  Which groups does he take; do you

15 know?

16    A     Call handle and CET.

17    Q     Who is Denise Heinz Anderson?

18    A     I don't know.

19    Q     Michael Landry?

20    A     He's -- he's a manager.

21    Q     First-line manager?

22    A     Yes, that's right.

23    Q     And he reports to Granger?

24    A     And I could have included his name along

25 with all of the others.

Page 198

```
1     Q     Okay.
2     A     Along with Sarah Cerny and Viki Torres
3  and all the others.  He's a name -- if I didn't
4  mention it before, I could have.
5     Q     Okay.  He reports to Granger?
6     A     He reports to Sharon Lofton.
7     Q     Who is Mike McDonald?
8     A     Don't know.
9     Q     Lisa Moody I think you testified is a
10 first-line manager?
11    A     That's right.
12    Q     Who does she report to?
13    A     Jeff Granger.
14    Q     How about Greg Murphy?
15    A     No.
16    Q     Wendy Cowan Musgrove (phonetic)?
17    A     She's a manager, first-line, reporting to
18 Sharon Lofton.
19    Q     Anthony Perez?
20    A     A first-line manager reporting to
21 Sharon Lofton, but he's in Dallas.
22    Q     Why would a first-line manager from
23 Dallas report to Sharon Lofton?
24    A     It's a very small group that ties into
25 Wendy Cowan's -- Wendy Musgrove's group, and so it
```

Page 199

```
1  seemed more opportune to have them both report to the
2  same manager.
3     Q     The CSRs in Dallas, do they perform the
4  same functions as the CSRs in Atlanta?
5        MR. RAY:  Objection to the extent it
6        calls for speculation.
7        THE WITNESS:  As part of the IMBPD,
8        they -- if they worked in -- they would have
9        similar skills and, therefore, most likely
10       similar duties.
11 BY MR. LANGELAND:
12    Q     Do you track the same things in the DOR
13 for Dallas that you do for Atlanta?
14    A     Yes.
15    Q     So that's call volume and --
16    A     Average handle time, yeah.
17    Q     Do the Dallas call reps -- do they deal
18 with the same type of groups that we've been talking
19 about, in other words, software?
20    A     In general, yeah.
21    Q     Do the two call centers somewhat marry
22 each other?
23    A     Yes.  They're -- in some cases, depending
24 on the group, they're-- they are the safety net for
25 each other.  If one center goes down, then the other
```

Page 200

```
1  is still up.
2     Q     So Dallas is a backup for Atlanta and --
3     A     And vice versa, yeah.
4     Q     And the person who is head -- is there
5  one person who is the head of both Atlanta and Dallas
6  in terms of the management?
7     A     Yes.  Melody Curtis.
8     Q     Are you aware of any kind of special
9  differences with any of the Dallas call center
10 employees?
11    A     A difference between employees?
12    Q     Is there any special difference between
13 them and the people who are employed as call center
14 employees in Atlanta?
15    A     Not in general.
16    Q     Okay.
17    A     About -- about the same.
18    Q     Who is Greg Riggs (phonetic)?
19    A     Don't know.
20    Q     Peter Starratt you've already --
21    A     Yeah.  He's a first-line manager
22 reporting to Jeff Granger.
23    Q     How about Kevin Sullivan?
24    A     Don't know the name.
25    Q     And Karen Troutman is a first-line
```

Page 201

```
1  manager reporting to Granger.
2     A     Yes.
3     Q     Who is Randall Whompler (phonetic)?
4     A     Randy Whompler was in our IMBPD call
5  center in Atlanta previously.
6        He is now elsewhere, although, I believe
7  still with IBM.
8     Q     What does he do; do you know?
9     A     I don't know, no.
10    Q     James Waters?
11    A     Don't know.
12    Q     Kathryn Waylon (phonetic)?
13    A     Yeah.  Kathy Waylon is -- was formerly in
14 our IT department.  We discussed her earlier -- or no,
15 no, we didn't discuss her earlier -- and she is now
16 performing the same -- did I say IT?
17    Q     Yes.
18    A     I meant Telephony, not IT.
19    Q     And is that what you meant with
20 Jane Jesser as well?
21    A     No.  She was IT, and she is -- and she is
22 not with AT&T, still performing the same duties.
23    Q     Who, Kathryn Waylon?
24    A     Yeah.
25    Q     What does she do with Telephony?
```

Page 202

1    A      I am not in a position to really define a
2 job description for what Telephony does except to say
3 that anything that would have to do with telephones
4 and then the switch, we go through them.
5    Q      Okay.  And who is the, you know, head of
6 that group in Atlanta?
7    A      I don't know who she reports to.
8    Q      Who is in Atlanta that deals with
9 Telephony issues?
10    A      I go -- I go to Kathy Waylon, and I'm
11 sorry, since -- there's been a change, and I don't
12 know who she reports to.
13    Q      Has there ever been any complaints that
14 the Avaya system is slow or anything of that nature?
15    A      Avaya slow?
16    Q      Yes.
17    A      Avaya is the interface for CMS and, yes,
18 I can think of one instance where -- where there would
19 be a complaint about Avaya CMS being slow.
20    Q      What was the complaint?
21    A      My own queries going through Dallas would
22 be -- would be slow.
23    Q      What kind of queries are you talking
24 about?
25    A      Queries for the DOR, as a matter of fact,

Page 203

1 a query pulling information on Dallas groups would
2 come back slow as opposed to the same query for an
3 Atlanta group.
4    Q      Okay.
5    A      That's my own.  I'm not aware of any
6 others.
7    Q      What about -- who is Olivette Whipple
8 (phonetic)?
9    A      That's -- that's the name I was going to
10 refer to at a later time, and that was what her name
11 was.
12        That's who Melody Curtis reports to.
13    Q      Okay.  What about Deb Wooton?
14    A      Deb Wooton is a recent addition.
15        Excuse me, I should say that Melody
16 Curtis reports to Deb Wooton who reports to her, to
17 Olivette Whipple.
18    Q      So Olivette Whipple is, basically, the
19 head of all call center IMBPD?
20    A      She -- she is responsible for more than
21 just the Atlanta/Dallas call centers.
22        I don't know -- I don't know what.  I've
23 never found out, never inquired.
24    Q      By "responsible for more," what do you
25 mean?

Page 204

1    A      I don't know.  I know that -- I know that
2 she covers more than just Atlanta/Dallas.
3    Q      Do you mean more call centers?
4    A      I presume.
5    Q      Do you know where any of them are?
6    A      No.
7    Q      Is she the head of all call centers?
8    A      I don't know.
9    Q      Do you know what her title is?
10    A      No.
11    Q      Who does she report to?
12    A      It's on the tip of my tongue.  I don't
13 remember the name.
14    Q      Do you know what computer systems the
15 CSRs use?
16    A      Computer systems.  If you mean the
17 operating system, it's Windows.
18    Q      And what kind of hardware is it; do you
19 know?
20    A      IBM hardware.
21    Q      Who would be the person most
22 knowledgeable about the Avaya phone system?
23    A      My contact would be Kathy Waylon in
24 Telephony.
25    Q      And what about e-TOTALs?

Page 205

1        Who would be the most knowledgeable about
2 that?  Do you have any --
3    A      I don't know.
4    Q      And what about the ILC?
5        Who would be the most knowledgeable
6 person about the ILC?
7    A      I don't know.  I would have to ask my
8 manager.
9    Q      Do you know Charlie Seward?
10    A      Yes.
11    Q      How do you know him?
12    A      He's someone who has worked in Atlanta in
13 our Atlanta call center.
14    Q      Okay.  Have you had personal contact with
15 him?
16    A      A nodding acquaintance in the hall.
17    Q      Have you ever spoken to him?
18    A      Rarely.
19    Q      Do you know why he brought the lawsuit?
20    A      I'm sorry.  Say it again.
21    Q      Do you know why he brought the lawsuit?
22    A      No.
23    Q      You have no idea what it's about?
24    A      Oh, about being paid for time not logged
25 in?

1      Am I saying that correctly?
2    Q    Right.  I mean, we talked about
3  off-the-clock work before.
4    A    Yeah.
5    Q    And I don't want to put words in your
6  mouth.
7    A    I don't want to characterize his -- his
8  intentions.
9    Q    I mean, do you have any understanding
10  what the lawsuit is about?
11    A    Yes.
12    Q    Okay.  What is it?
13    A    Being paid for time not logged in.
14    Q    What does that mean?
15    A    Being -- working but not logging in.
16    Q    Okay.  And that's what the lawsuit is
17  about is about CSRs who work but aren't logged in?
18    A    I'm not sure.  I'm sorry.  I'm not sure.
19    Q    Okay.  I just wanted to know what your
20  understanding of it was.
21      Do you know Ray Liles?
22    A    No.
23    Q    Jim Starkey?
24    A    No.
25    Q    Eugene Scott?

1    A    Yes.  He's a former employee that I had a
2  nodding acquaintance with, you know, in the halls.
3    Q    Any discussions with him?
4    A    Not -- not in the last few years.
5    Q    Ever?
6    A    Topical -- just topical small-talk.
7    Q    About how many discussions have you had
8  with him?
9    A    Since he's worked here?
10    Q    Yeah.
11    A    A few, a few.
12    Q    Okay.  Were you friends?
13    A    Not particularly, a nodding acquaintance,
14  you know.
15      He knew my name.  I know his name, and we
16  say hi --
17    Q    Okay.
18    A    -- how you doing?  How's the weather?
19    Q    Okay.  What about Cathy Barday?  Do you
20  know her?
21    A    Yes.
22    Q    Have you had conversations with her?
23    A    We've -- we have worked -- she worked --
24  I mean, she worked in Teach which is a -- which is a
25  group that we no longer have.

1      So in the same way as the other two.  I
2  know her.  I know her name and face and say hello to
3  her.
4    Q    Do you know if she ever did the DOR?
5    A    I do the DOR.
6    Q    Do you know if she ever provided any data
7  for the DOR?
8    A    Oh, okay.  No, I'm not sure who -- who
9  provided that.
10      You're talking about the off-phone,
11  back-office portion of the DOR that I would get from
12  the manager groups.
13    Q    Right.
14    A    I'm not sure who from Teach was sending
15  that.
16    Q    So you don't know.
17    A    No.
18    Q    Do you know Gary Sallis (phonetic)?
19    A    No.
20    Q    Any reason anybody would -- any manager
21  would say no one should be in AUX 3 at their start
22  time without prior approval?
23      MR. RAY:  Objection, vague.
24      THE WITNESS:  No one should be in AUX 3
25    prior to what?

1  BY MR. LANGELAND:
2    Q    At their start time without prior
3  approval.
4      MR. RAY:  The same objection, vague,
5    calls for speculation.
6      THE WITNESS:  I would refer you to the
7    manager on that.
8  BY MR. LANGELAND:
9    Q    What would happen if somebody was in
10  AUX 3?
11      MR. RAY:  Objection, vague and calls for
12    speculation.
13  BY MR. LANGELAND:
14    Q    What is AUX 3?
15    A    AUX 3 is the -- is the AUX code that you
16  use, the state that you use when you're doing
17  back-office non-phone work that's measured by the
18  DORs, and nothing would happen if they were in that
19  state.
20    Q    But you couldn't receive calls if that
21  were the case; am I right?
22    A    That's right.
23    Q    Okay.  Is there any reason the manager
24  would want people to be available and available to
25  take calls right at their start time?

Page 210

1          MR. RAY:  Objection to the extent it
2     calls for speculation, and it's vague.
3          THE WITNESS:  Only -- only to the extent
4     that you want them working.
5 BY MR. LANGELAND:
6     Q     Right.  And by "working," you mean
7 receiving calls?
8     A     Yeah, either on a call or waiting for the
9 next call, yeah.
10    Q     Why do you want them to do that?
11         MR. RAY:  I'll object just to the extent
12    it calls for speculation.
13         THE WITNESS:  In order to answer phone
14    calls within -- within goals.
15 BY MR. LANGELAND:
16    Q     And if you're in AUX 3, you can't do
17 that; is that correct?
18    A     You're doing a different kind of work.
19         Instead of phone calls, you're doing a
20 different productive work.
21    Q     But you can't.
22    A     You can't take phone calls, right.
23         (Thereupon, marked for identification,
24    Plaintiff's Exhibit Number P-4.)
25         MR. RAY:  Is this a part of another

Page 211

1 document?
2         MR. LANGELAND:  No.
3         MR. RAY:  Do you know when this was
4 produced?
5     I see a Bates number on it P443.
6         MR. LANGELAND:  Do I know?  I don't know
7 exactly when it was produced, no.
8         THE WITNESS:  August the 23rd.  It's in
9 the bottom right-hand corner.
10         MR. RAY:  No.  When it was produced in
11 the litigation.
12         THE WITNESS:  Oh, I'm sorry.
13         MR. RAY:  I thought this was attached to
14 something else.
15         MR. LANGELAND:  I mean, it could have
16 been in a series of other e-mails.
17         MR. RAY:  I know P423 was produced last
18 Friday, so this was produced after that.
19         Okay.  You can go ahead and ask
20 questions, and we'll reserve if we have any
21 objection which I don't as long as it was even
22 produced last night.
23         But I'm just not sure I have seen it as
24 an independent page.
25         MR. LANGELAND:  It was produced before

Page 212

1     then.
2          MR. RAY:  Before last night?
3          MR. LANGELAND:  I believe this was
4     produced before last night.
5          MR. RAY:  Well, even if it was produced
6     last night, as long as it was produced before
7     the deposition, I'm not going to have an
8     objection.
9          MR. LANGELAND:  I'm sure it was.
10 BY MR. LANGELAND:
11    Q     All right.  Turning your attention to
12 Exhibit 4, what is this document?
13    A     This is a log-in/log-out report.
14    Q     So this shows when the call center
15 employee logged in and logged out?
16    A     Yes.
17    Q     And by logging in, we're talking about
18 logging into the Avaya phone; am I right?
19    A     Yes.
20    Q     By the way, if we -- for example, if you
21 look at July 2, 2008 where it says 8:50 a.m. -- do you
22 see that?
23    A     Yes.
24    Q     If his start time on that date -- his
25 regular start time was 9:00 o'clock -- could we go to

Page 213

1 a record somewhere and find out if he had been paid
2 overtime for those 10 minutes?
3     A     I don't know.  That's not my area.
4     Q     So you don't know if we compared this to
5 ILC, whether or not we could find out whether --
6     A     No.  I have no knowledge in that area.
7     Q     And we would not know if e-TOTALs would
8 reflect the additional time?
9     A     I don't know.
10    Q     Do you know if e-TOTALs records are kept?
11    A     I don't know anything about e-TOTALs.
12    Q     How long have you kept these
13 log-in/log-out reports?
14    A     This is not a report of my particular
15 function.  This is from the CMS database.
16    Q     I see.
17    A     And I don't know how long records are
18 kept on that.
19    Q     What is -- strike that.
20         What is a log-in, slash, log-out agent?
21    A     It's a log-in/log-out report for one
22 particular agent.
23    Q     I see.  When it says:  Logout reason, 0,
24 what does that mean?
25    A     That's never been used to my knowledge.

Page 214

1  I've never seen -- I've never seen it used.
2      Q      Do you have any understanding of what
3  this means, this 320 column?
4      A      Uh-huh, yes.  320 and 51s are skills
5  through which they're receiving their phone calls.
6      Q      So explain that to me.
7      A      It's -- 320 is a skill.  I don't know the
8  name of it.  It's probably some software CET incoming
9  call skill that comes through skill 320 to -- to
10  people who have that skill in their profile so that
11  they can answer those questions.
12      Q      I see.  And each particular skill would
13  have a number?
14      A      Yes.
15      Q      And would there be other people other
16  than Charles Seward that would have this skill of 320
17  to your knowledge?
18      A      Yes.
19      Q      And it would be everybody on his group, I
20  take it?
21      A      I don't know if everyone, but it would be
22  other people in his group, yes.
23      Q      But that might be -- other people in
24  other groups might have a skill 320, too?
25      A      No.  That would be only -- only in his

Page 215

1  group.
2      Q      Why is that?
3      A      That's -- because they're the ones --
4  only those people in that group are trained to accept
5  calls from skill 320.
6      Q      And what about 51?
7              What does that mean?
8      A      It's another skill, the same as 320.
9      Q      And would that also be limited to his
10  particular group?
11      A      Yeah.
12      Q      And you don't know what the particular
13  skills are that are designated by 320?
14      A      No.  I'd have to -- no, I don't.  You'd
15  have to look up what the name is.
16      Q      And where would you look that up?
17      A      In -- in CMS.
18      Q      CMS would have a list --
19      A      The same place where this is run has a
20  list of what the skills' names are.
21      Q      And where it says:  Extension, is that
22  simply his telephone extension?
23      A      Yes.
24      Q      When it says:  Riveredge, slash -- I'm
25  sorry -- underscore ACD3, what does that mean?

Page 216

1      A      Riveredge uses -- Atlanta in Riveredge
2  uses -- our ACD is No. 3.
3      Q      What is ACD?
4      A      ACD is the switch.  It's the Atlanta
5  switch.
6      Q      What is that?
7      A      It's the Atlanta telephone base.
8      Q      Okay.  How many others are there?
9      A      Usually one for any particular city that
10  you're in.
11              There's one for -- that's called Dallas.
12  The one for Atlanta is called Riveredge.  Toronto
13  would have its own, you know, its own ACD.
14      Q      What else have you seen?
15      A      That's all.
16      Q      You've only seen Dallas?
17      A      Three ACDs, yeah.
18      Q      What is messaging.ibm?
19              Do you see that in the lower --
20      A      I don't know what that is.  That's not
21  part of this report.
22              The bottom of this report stops where it
23  says:  Double Click to Run Format Table.  And anything
24  below that is just the bottom that's being shown of
25  the computer screen.

Page 217

1      Q      Okay.  How does On Demand work; do you
2  know?
3      A      I don't know.
4      Q      What about Avaya CMS Super?
5      A      That's Avaya CMS Supervisor, and that's
6  the interface.  That's the gooey to what you're seeing
7  here to get to this log-in/log-out report or any other
8  CMS report.
9      Q      What about AT&T?
10              Do you see that tab?  It's the second
11  one.
12      A      Oh, I don't know what that is.
13      Q      Okay.
14              (Thereupon, marked for identification,
15          Plaintiff's Exhibit Number P-5.)
16  BY MR. LANGELAND:
17      Q      Do you know what this document is?
18      A      No, I don't.  I've never seen it before.
19  I'm not sure there is a document.
20      Q      So you don't produce anything like this?
21      A      No.  I'm not familiar with this.
22      Q      Okay.  But this shows the number of calls
23  taken by Charles Seward, I take it?
24      A      It looks like, yeah.
25      Q      Are there any variables on here that you

1  track?

2      A      We track -- we go through CMS again which
3  is the same place where you get the log-in/log-out
4  reports, and we can track number of calls.

5              There is -- there are CMS reports that
6  can pull some of this.  I -- I don't know what
7  software this came from.

8      Q      Do you know what these columns mean, for
9  example, ATT?

10             Do you know what that means?

11             MR. RAY:  I'll just object to the extent
12      he says he doesn't recognize the report.

13             He can talk generally about what certain
14      things mean in a vacuum but not with respect to
15      this report.

16             THE WITNESS:  I'm not sure what the ATT
17      is referring to.

18  BY MR. LANGELAND:

19      Q      Do you know what ACW greater than
20  objective of 20 percent means?

21      A      Yes.  That would mean being -- having the
22  time that you spent in after-call work be -- let me
23  just say that ACW stands for after-call work.

24      Q      Why are you interested in that variable?

25      A      I'm not.  I'm not interested in this

1  variable.

2      Q      Why does anybody --

3      A      It's --

4             MR. RAY:  Object to the extent it calls
5      for speculation.  You can testify to the extent
6      you can.

7             THE WITNESS:  So I don't know.

8  BY MR. LANGELAND:

9      Q      But you guys look at after-call work or
10  you don't?

11      A      After-call work is automatically part of
12  what we measure as average handle time, so I don't
13  have to ever look, specifically, at after-call work.

14      Q      Okay.  So what makes up average handle
15  time?

16      A      Talk time, hold time, transfer time,
17  after-call work.

18      Q      And what is after-call work?

19      A      That is putting -- that is an automatic
20  state that you get once you hang up on a phone call in
21  order to finish paperwork before your next call comes.

22      Q      Are you interested in minimizing that
23  figure for any reason?

24      A      No.  We measure it as part of the call.

25      Q      But if that -- that is lower, your

1  average handle time is better; is that correct?

2      A      Your average handle time is shorter.

3      Q      Yes.

4      A      Yeah.

5      Q      And that's what you want, right, is
6  shorter average handle time?

7      A      That would -- the objective is to handle
8  the calls as quickly as possible, but also as
9  thoroughly as possible.  So, in that sense, yes, you
10  would want your average handle time to be as short as
11  possible, but not to the extent that it would hurt the
12  quality of the call.

13      Q      Right.

14      A      But, in general, yes, you would want your
15  average handle time to be shorter.

16      Q      Do you see the Sign-on Hours column here?

17      A      I see it.

18      Q      Do you have any idea what that means?

19      A      No, I don't.

20      Q      And what about Call OBSV?

21      A      Calls observed.  I'm sorry.  I don't know
22  what that means.

23      Q      What is CBT, slash, Errors?

24      A      Don't know.

25      Q      I guess Cust Sats, slash, Cust Commend is

1  commendations, I take it?

2      A      I'm not familiar with the term, and I
3  don't use it where I work.

4      Q      All right.  This seems to track late
5  lunch breaks, late from lunch and breaks?

6             MR. RAY:  Objection just to the extent it
7      calls for speculation.

8             THE WITNESS:  I've never seen this report
9      before, and I'm not sure how it's generated.

10  BY MR. LANGELAND:

11      Q      Do you know what it means when it says:
12  Audits?

13             MR. RAY:  The same objection.  It's all
14      speculative.  He says he has never seen this
15      before.

16             MR. LANGELAND:  I mean, what's his
17      understanding?

18             MR. RAY:  What is the report?  You're
19      asking him what a report he's never seen means
20      by a word.

21             He can answer what audits are generally,
22      but not in the context of this report.  He's
23      made that clear, but go ahead.

24             THE WITNESS:  I don't know what it means.

25

Page 222

1 BY MR. LANGELAND:
2    Q    Do you do any audits?
3    A    No.
4    Q    Your department doesn't do any audits?
5    A    No.
6    Q    Have you heard of anybody doing audits?
7    A    No.  When you say the word "audit," I'm
8 not sure exactly what you mean.
9        I -- I will say that I will look at a
10 report -- no, no, we don't audit.  I don't think --
11 no, I don't know what the column means.
12   Q    Okay.
13       MR. LANGELAND:  Let's take a break for a
14   minute, and I'm pretty close to being done.
15       (Thereupon, a recess was taken.)
16 BY MR. LANGELAND:
17   Q    Have you ever heard that the start time
18 entered in the ILC has to match the scheduled start
19 time for the employee?
20   A    The ILC doesn't have a start time.
21   Q    It doesn't?  Okay.
22       But does it have to match --
23   A    It just has the number of hours.
24   Q    Total numbers of hours, okay.
25   A    Yeah.

Page 223

1    Q    And does that have to match the scheduled
2 time?
3    A    I've never heard either way.
4    Q    You've never seen any e-mail to that
5 effect or anything?
6    A    No.
7        MR. LANGELAND:  And can we mark this?
8        (Thereupon, marked for identification,
9        Plaintiff's Exhibit Number P-6.)
10 BY MR. LANGELAND:
11   Q    Exhibit 6 is a document that your counsel
12 provided to me today.
13       Have you seen this document before?
14   A    Yes.
15   Q    When?
16   A    I -- I wrote it or I'm sorry.  I'm sorry.
17 I'm the recipient of the letter.
18   Q    And who does it come from?
19   A    Adam Hutchinson from the Canadian
20 WorkForce Management team.
21   Q    And what's Adam Hutchinson's position?
22   A    Similar to mine.  He reported directly to
23 Tom Guinard whom I was taking direction from.
24   Q    And he sent this e-mail to whom?
25   A    To two of his compatriots, me and

Page 224

1 Patrick Fleischmann.  Patrick Fleischmann is our
2 coworker in Toronto.
3    Q    And who is Vanessa Cook?
4    A    She's an assistant to -- she was an
5 assistant to Tom Guinard, and she's the mathematician.
6        She's the one who could -- was good on
7 spreadsheets.
8    Q    So did she develop the spreadsheets for
9 the DOR?
10   A    She and Tom together.  I don't know what
11 the mix was.
12   Q    What's the STJ team?
13   A    Saint John.
14   Q    There's a call center there?
15   A    Yes.
16   Q    How many people in that call center?
17   A    I don't know.
18   Q    And did you testify who -- I'm sorry if I
19 asked you this but Tom Guinard, did you testify who he
20 reported to?
21   A    I testified that I wasn't sure who he
22 reported to.
23   Q    The e-mail says that this is going to
24 help ensure accurate data; is that right?
25   A    Yes, to ensure accurate data.  Yes, I see

Page 225

1 that.
2    Q    Why would you be interested in that?
3    A    This is a -- this is a time when the DOR
4 report was changing, and this was a chance to give
5 recommendations to the managers on how to have -- how
6 to tighten up their reports, have the most accurate
7 and best reporting.
8    Q    Why do you want to have tight reports?
9    A    In order to have accurate reports.
10   Q    And why would you want that?
11   A    Accurate reports itself is a goal.
12   Q    Just for the sake of having an accurate
13 report?
14   A    In order -- accurate reporting in order
15 to report on up to management.
16   Q    Okay.  But isn't the purpose so that the
17 call centers run more efficiently?
18       MR. RAY:  Objection to the extent it's
19   been asked and answered.
20       Go ahead.
21       THE WITNESS:  I'm sorry.  I don't get
22   your question.
23 BY MR. LANGELAND:
24   Q    I'm just wondering why when it says:  As
25 we move to a team-based view of the DORs, effective

1  August 1st, 2006, please find below some
2  recommendations which should help us ensure accurate
3  data at a team view.
4          Why would you be interested in it?
5      A   To me it's a -- it's a self-evident
6  statement that you would want to have accurate data,
7  and this is a list of items to -- to help that.
8          I can't tell you why, specifically,
9  you're looking to ensure accurate data.
10     Q   What do people use the DORs for?
11     A   Managers use the DOR to determine how
12 busy the agents are --
13     Q   Okay.
14     A   -- on a daily and weekly basis.
15     Q   All right.  So they use it to staff the
16 call center appropriately?
17     A   No.  But if the numbers don't look
18 appropriate, it would be an indication that a head
19 count sizing should be done.
20     Q   So it's an indication --
21     A   It's an indicator, yeah.
22     Q   Okay.  If reps are only logging in at
23 their start time even if they're showing earlier, is
24 that ensuring that there's accurate data?
25         MR. RAY:  Objection, vague.  It calls for

1          speculation, assumes facts not in evidence.
2          THE WITNESS:  I don't see the
3          relationship between the two.
4  BY MR. LANGELAND:
5      Q   So this says to help ensure accurate data
6  for the DOR -- for the new DOR, right?
7          I mean, that's -- that's the purpose of
8  the recommendations?
9      A   Yes.
10     Q   But then it also says:  CSR should
11 continue to -- ensuring reps log in only as required,
12 i.e., scheduled to work at 9:00, be ready at 8:50, but
13 only log in at 9:00 a.m. to ensure we are not
14 accumulating unproductive hours.
15         That doesn't seem accurate, does it?
16         MR. RAY:  Objection to the extent it's
17         argumentative, and it's been asked and answered
18         several times when we were looking at this
19         previously.
20         THE WITNESS:  Your question is:  Is it
21         less -- your question is:  Is it less accurate?
22 BY MR. LANGELAND:
23     Q   Isn't this e-mail telling you to shave
24 off 10 minutes of time?
25     A   No.  It's telling you to be ready to work

1  by 9:00 o'clock.
2      Q   But not log in before.  Show up at 8:50
3  and don't log-in until 9:00.
4      A   It says be ready to begin your day when
5  you're scheduled.
6          And begin the day, I mean log on to
7  the telephone and turn on your computer.
8      Q   Okay.  But you should arrive 10 minutes
9  before then.
10         MR. RAY:  Objection to the extent it
11         mischaracterizes both his testimony and the
12         document, and to the extent this line of
13         questioning has already been asked and
14         answered.
15         THE WITNESS:  I believe it is saying that
16         this is a general statement, and that it's not
17         saying anything about 8:50, specifically, but
18         rather please be prepared to start your day
19         when the -- when your schedule begins at
20         9:00 o'clock.
21         And by that, I mean, logging into the
22         telephone and starting the computer.
23 BY MR. LANGELAND:
24     Q   Why should you start your scheduled day
25 at your scheduled start time?

1          Why would that be important?
2      A   Because the schedules are generated with
3  a view towards incoming volumes.  And in order to
4  answer the calls within the service level, you should
5  have most -- you should have a lot of the percentage
6  of your daily schedules adhered to.
7      Q   Why did you choose to only include the
8  first two paragraphs in your e-mail?
9      A   In a quick review -- and I mean quick --
10 it didn't seem to apply as much to my groups and I.
11         And I had already written most of my
12 version of the letter, but I hadn't included anything
13 directly about the CSRs themselves.
14         So I just quickly took the first two
15 which is what I cut and paste into -- into my note.
16     Q   Do you have any idea what this means:
17 No. 3:  Ensuring all sponsored activities not done
18 while in ACW or directly linked to a call is captured
19 in the DORs as a volume with a handle time?
20     A   I'm not sure what that meaning means, and
21 I didn't use that wording in my note.
22     Q   What's ACW?
23     A   After-call work.
24     Q   Paragraph 4 says:  In situations where
25 the service level for the month or targeted

Page 230

1 achievement period have been achieved, reps that are
2 not cross-trained and can't assist other missions may
3 be offered a voluntary send home to manage cost and
4 ensure occupancy remains relatively high.
5          Is that right?
6    A     That's what it says. I did not use that
7 wording.
8          That's a Canada -- that's a Canada thing
9 to offer voluntary send home. We don't do that in the
10 U.S.
11   Q     And why does it say that "to manage
12 cost"?
13         What cost is it referring to?
14         MR. RAY: Objection to the extent it
15 calls for speculation.
16         THE WITNESS: The costs saved by sending
17 a CSR home.
18 BY MR. LANGELAND:
19   Q     Why -- why do you save money then?
20         How do you save money, by sending a CSR
21 home?
22   A     Yes.
23   Q     How?
24   A     If they volunteer to -- you know, it's
25 not my area. It's not even my country. I'm not

Page 231

1 involved in it. I don't know what that means.
2    Q     So this only applies to Canada?
3    A     And I did not -- and I did not include it
4 in my wording to Atlanta.
5    Q     I'm wondering why?
6    A     It didn't apply.
7    Q     They don't voluntarily send people home
8 in Atlanta?
9    A     They don't offer -- that's right. They
10 don't offer voluntary send home.
11   Q     Okay. When it says -- what does it mean
12 when a service level for the month or target period is
13 threatened?
14         What does that mean?
15         MR. RAY: Where is that in the document?
16         MR. LANGELAND: Paragraph 4 in the
17 parenthesis.
18         MR. RAY: I'll just object for lack of
19 foundation and to the extent it calls for
20 speculation.
21         THE WITNESS: And that's part of
22 voluntary send home which is something that I
23 have never been involved in, so I don't know.
24 BY MR. LANGELAND:
25   Q     Can service level be threatened in

Page 232

1 Atlanta?
2    A     Define "threatened," I guess.
3    Q     What do you think it means?
4    A     I will assume that it means service level
5 not being met.
6    Q     Okay. Has that ever happened in Atlanta?
7    A     It has -- yes.
8    Q     Okay. How could a service level not be
9 met?
10   A     If you fail to answer calls within a
11 certain percentage -- I have to start over.
12         If you don't answer a certain percentage
13 of calls within the agreed number of seconds.
14   Q     Is that the only one?
15   A     Yes. That's what a service level is.
16   Q     Okay. So if people are in -- the more
17 people are unavailable to answer calls but are
18 working, the more in danger it is, the service level;
19 is that right?
20   A     No, not necessarily. It depends on how
21 the group is answering the incoming calls, if they're
22 answering them within the service level.
23   Q     What do you mean by that?
24   A     If the group is answering the calls
25 within the service level, then it's not threatened.

Page 233

1    Q     No, no. I understand that.
2          But let's say the group is not available
3 to take the calls. Then how can they be meeting the
4 service level?
5    A     If a group is not available to take -- if
6 a whole group is not available to take calls?
7    Q     Yes.
8    A     Would the service level suffer?
9    Q     Yes.
10   A     I don't know. It would depend on the
11 circumstance because there are -- there can be calls
12 taken in our sister center in Dallas.
13   Q     So you're saying if there's a backup for
14 that, then it might not affect the service level?
15   A     That's right.
16   Q     But let's assume we're just in Atlanta
17 and there is a half an hour of -- for everybody in the
18 group, there is a half an hour of time that they can't
19 take a call every day.
20   A     Every day a half an hour?
21   Q     Yes. Would that affect the service
22 level?
23   A     All at the same time?
24   Q     Yes.
25   A     It may not affect the daily service level

Page 234

1 if the average of the whole day meets the service
2 level.
3          You would probably miss the service level
4 during that -- during that period -- during that
5 interval.
6     Q     And you might miss it for the day?
7     A     I don't know.  You just don't know.  It
8 depends on the volumes, and when they come in.
9          MR. LANGELAND:  Okay.  I don't have any
10    other questions.
11         MR. RAY:  I just have a few questions.
12              EXAMINATION
13 BY MR. RAY:
14    Q     Mr. Kamprath, can you take the exhibits
15 that you have there in front of you and turn to
16 Exhibit 4?
17         And I believe Mr. Langeland asked you
18 some questions about that exhibit which is entitled
19 Log-in/Log-out Agent?
20         Do you see that?
21    A     Yes.
22    Q     Seward, Charles.
23    A     Yes.
24    Q     There on log-in time -- or there is a
25 column for log-in time.

Page 235

1          Do you see that column there?
2     A     Yes.
3     Q     And there is various entries there,
4 correct?
5     A     Yes.
6     Q     What is your understanding of what that
7 column is capturing?
8     A     This is the time of day that -- that the
9 agent is pressing a button on the phone to log into
10 the telephones.
11    Q     And do you know how long it takes the
12 agent to log into the telephone?
13    A     Oh, just a second.
14    Q     And can you tell, Mr. Kamprath, by
15 looking at these log-in times whether the agent is
16 working yet?
17    A     No, only that he's in attendance and has
18 logged in.
19    Q     To the phone.
20    A     To the phone.
21    Q     Do you supervise any CSRs in IMBPD?
22    A     No.
23    Q     Have you ever supervised any CSRs in
24 IMBPD?
25    A     No.

Page 236

1     Q     Do you supervise anyone?
2     A     No.
3     Q     Do you have any authority, managerial
4 authority over CSRs and IMBPD?
5     A     No.
6     Q     Any authority over managers in IMBPD?
7     A     No.
8     Q     You've talked about the DOR reporting.
9          Is the DOR reporting that you're
10 responsible for limited solely to the IMBPD?
11    A     Yes.
12    Q     Do you have any understanding whatsoever
13 of e-TOTALs?
14    A     No.
15    Q     Do you have any knowledge of how any
16 manager within IMBPD manages overtime, meaning whether
17 they require their approval, et cetera, before a CSR
18 is working?
19    A     No, sir.  That's not my area.
20         MR. RAY:  That's all I have.
21         MR. LANGELAND:  I've just got a couple of
22    followups.
23              RE-EXAMINATION
24 BY MR. LANGELAND:
25    Q     Turning your attention to Exhibit 4 --

Page 237

1     A     Yes.
2     Q     -- are you aware of any direction that
3 CSRs have gotten from anybody that tells them not to
4 log-in until just before their start time?
5          I'm sorry, their scheduled start time.
6     A     Any direction --
7     Q     Yes.
8     A     -- to -- no.
9     Q     You're not aware of any direction at all?
10    A     No.
11    Q     And once a -- somebody is logged into the
12 phone, does that mean they can start taking calls?
13    A     Technically, you need to -- you can
14 receive phone calls, but you really should have your
15 computer turned on.
16         You should turn on your computer then to
17 have the application that you use for the phone call.
18    Q     Okay.  So in order, actually, to be at
19 all useful, you have to have the computer up and
20 running?
21    A     Both the telephone and the computer, yes.
22    Q     So until both the telephone and the
23 computer are up and running, the CSR can't really do
24 his job.
25         MR. RAY:  Objection to the extent -- lack

Page 238

1      of foundation.  It calls for speculation.
2           THE WITNESS:  The CSR needs to log on to
3      the telephone and turn on the computer to do a
4      majority of his work.
5  BY MR. LANGELAND:
6      Q      How long does it take for the computer to
7  boot up for a CSR?
8           MR. RAY:  Objection, calls for
9      speculation.
10          THE WITNESS:  A few --
11          MR. RAY:  Lack of foundation.
12          THE WITNESS:  A few minutes.  It probably
13     varies by group.
14  BY MR. LANGELAND:
15     Q      How do you know?
16     A      I don't know.
17     Q      So if they're not supposed to log on
18  until their start time to the phone, they have to be
19  there a few minutes beforehand, don't they --
20          MR. RAY:  Objection.
21  BY MR. LANGELAND:
22     Q      -- in order to start their computer?
23          MR. RAY:  I didn't mean to interrupt.
24     Objection, assumes facts not in evidence.
25     Plus that's a hypothetical.

Page 239

1           THE WITNESS:  No.  I'm saying log into
2      the telephone and turn on your computer at the
3      start time.
4  BY MR. LANGELAND:
5      Q      Right.  So that means that you're not
6  going to be productive for the first however long it
7  takes for your computer to boot up; is that right?
8           MR. RAY:  Objection just to the extent
9      calls for speculation and, again, lack of
10     foundation.
11          You can answer.
12          THE WITNESS:  It sounds reasonable.
13  BY MR. LANGELAND:
14     Q      Right, because you need the computer to
15  do your job if you're a CSR, right?
16          MR. RAY:  The same objection.
17          THE WITNESS:  Yes, yes.
18  BY MR. LANGELAND:
19     Q      Have you ever done any studies as to how
20  long it takes for the computer to boot up?
21     A      No.
22     Q      When you say "a few minutes," it takes a
23  few minutes for that computer to boot up, do you know
24  how long it takes?
25     A      I don't know.  I'm not there.

Page 240

1      Q      Are you speculating?
2      A      I'm speculating.
3           MR. LANGELAND:  That's all I have.
4           MR. RAY:  I just have a couple quick
5      follow-up questions just to clarify.
6                RE-EXAMINATION
7  BY MR. LANGELAND:
8      Q      On the log-in -- take a look at Exhibit 4
9  please, Mr. Kamprath.
10          On the log-in time there, I think you
11  testified that that represents when the CSR logs into
12  the telephone, correct?
13     A      Yes, that's right.
14     Q      And then there was a question asked
15  whether the CSR was able to take calls once they've
16  logged into the telephone, correct?
17     A      Yes.
18     Q      Will the phone switch transfer calls to a
19  CSR who's only logged into the phone?
20     A      Not automatically.  He would first have
21  to take a separate step to become available for the
22  phone calls.
23     Q      Okay.  And are you aware, Mr. Kamprath --
24  well, let me back up.
25          You testified that you don't supervise

Page 241

1  CSRs.
2      A      That's right.
3      Q      Don't manage them, right?
4      A      That's right.
5      Q      Can't really see them from your fish
6  bowl --
7           MR. LANGELAND:  Objection.
8  BY MR. RAY:
9      Q      -- right?
10     A      That's right.
11          MR. LANGELAND:  You're leading him.
12  BY MR. RAY:
13     Q      Can you see the CSRs from your fish bowl?
14     A      No.
15     Q      Have you ever heard of CSRs who log into
16  their phone and log into the computer and take calls
17  while the computer is booting up?
18     A      No.
19     Q      Do you know whether it happens one way or
20  another?
21     A      No, I don't know.
22          MR. RAY:  That's all I have.
23          MR. LANGELAND:  I don't have anything
24     else.
25          (It was stipulated and agreed by and

Page 242

1    between counsel for the respective parties and
2    the witness that the signature of the witness
3    to the deposition be reserved.)
4        (Deposition concluded at 6:00 p.m.)
5        - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 243

1      C E R T I F I C A T E
2       I hereby certify that the foregoing
    transcript was reported, as stated in the caption;
3    that the witness was duly sworn and elected to reserve
    signature in this matter; that the colloquies,
4    questions and answers were reduced to typewriting
    under my direction; and that the foregoing pages 1
5    through 242 represent a true, correct, and complete
    record of the evidence given.
6       The above certification is expressly
    withdrawn and denied upon the disassembly or
7    photocopying of the foregoing transcript, unless said
    disassembly or photocopying is done under the auspices
8    of D'Amico Gershwin, Inc. and the signature and
    original seal is attached thereto.
9       I further certify that I am not a
    relative or employee or attorney of any party, nor am
10   I in any way interested in the result of said case.
       Pursuant to Article 8B of the Rules and
11   Regulations of the Board of Court Reporting of the
    Judicial Council of Georgia, I make the following
12   disclosure: That I am a Georgia Certified Court
    Reporter, here as an independent contractor for
13   D'Amico Gershwin, Inc.; that I was contacted by the
    offices of D'Amico Gershwin, Inc. to provide court
14   reporting services for this deposition; that I will
    not be taking this deposition under any contract
15   prohibited by O.C.G.A. 15-14-37 (a) or (b); that I
    have no written contract to provide reporting services
16   with any party to the case, any counsel in the case,
    or any reporter or reporting agency from whom a
17   referral might have been made to cover this
    deposition; and that I will charge my usual and
18   customary rates to all parties in the case.
       This, the 20th day of November, 2008.
19
20
21
22
       _____
       DEBBIE CHANDLER, RPR, CCR B-1701
23
24
25

Page 244

1      E R R A T A   S H E E T
2      Pursuant to Rule 30(e) of the Federal Rules
    of Civil Procedure and/or O.C.G.A. 9-11-30(e), any
3   changes in form or substance which you desire to make
    to your deposition testimony shall be entered upon the
4   deposition with a statement of the reasons given for
    making them.
5
6      To assist you in making any such
    corrections, please use the form below.  If
7   supplemental or additional pages are necessary, please
    furnish same and attach them to this errata sheet.
8
9       - - -
10
       I, the undersigned, GARY A. KAMPRATH,
11   do hereby certify that I have read the foregoing
    deposition and that said transcript is true and
12   accurate, with the exception of the following changes
    noted below, if any:
13
14   Page_____/Line_____/Should Read:_____
15   _____
16   Reason:_____
17
18   Page_____/Line_____/Should Read:_____
19   _____
20   Reason:_____
21
22   Page_____/Line_____/Should Read:_____
23   _____
24   Reason:_____
25

Page 245

1
2    Page_____/Line_____/Should Read:_____
3    _____
4    Reason:_____
5
6    Page_____/Line_____/Should Read:_____
7    _____
8    Reason:_____
9
10   Page_____/Line_____/Should Read:_____
11   _____
12   Reason:_____
13
14   Page_____/Line_____/Should Read:_____
15   _____
16   Reason:_____
17
18   Page_____/Line_____/Should Read:_____
19   _____
20   Reason:_____
21
22   Page_____/Line_____/Should Read:_____
23   _____
24   Reason:_____
25

Page 246

1 Page_____/Line_____/Should Read:_____
2 _____
3 Reason:_____
4
5 Page_____/Line_____/Should Read:_____
6 _____
7 Reason:_____
8
9 Page_____/Line_____/Should Read:_____
10 _____
11 Reason:_____
12
13 Page_____/Line_____/Should Read:_____
14 _____
15 Reason:_____
16
17 Page_____/Line_____/Should Read:_____
18 _____
19 Reason:_____
20
21          _____.
            GARY A. KAMPRATH,
22
    Sworn to and subscribed before me,
23
    _____, Notary Public.
24
    This_____day of_____, 20_____.
25 My Commission Expires: