# EXHIBIT 4A

Witness:   Charles Seward

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARLES SEWARD, Individually and on Behalf of All Others Similarly Situated, | ) ) ) 08 CIV 3976 (KMK) ) ) ECF CASE |
| Plaintiff, | ) ) |
| vs. | ) ) |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, D/B/A IBM CORP., | ) ) ) ) |
| Defendant. | ) |

Videotaped deposition of CHARLES SEWARD, taken on behalf of the Defendant, pursuant to the stipulations contained herein, in accordance with the Federal Rules of Civil Procedure, before Thomas R. Brezina, Certified Court Reporter, at 1420 Peachtree Street, Atlanta, Georgia, on the 23rd day of October, 2008, commencing at the hour of 8:05 a.m.

\* \* \*

Hundt Reporting, LLC
703 McKinney Avenue
Suite 207
Dallas, Texas 75202
Tel: (214) 220-1122
Fax: (214) 220-1127

Witness:   Charles Seward

Page 2

INDEX TO EXAMINATIONS
                                          Page
Examination by Mr. Ray            8
Examination by Mr. Zouras       314
Further Examination by Mr. Ray  325

INDEX TO EXHIBITS
Defendant's                         Marked/First
Exhibit Number  Description         Identified

D1   Letter dtd September 21,       17
     1998, from IBM to
     Charles B. Seward

D2   E-mail dtd 10/26/2007          43
     from Juanlyn Williams
     to SCET

D3   E-mail dtd 4/7/2008            44
     from Charles Seward
     to sewardcyk@aol.com

D4   E-mail dtd 10/26/2007          89
     from Juanlyn Williams
     to SCET

D5   E-mail dtd September 26,      115
     2006, from Charles
     Seward Jr to
     sewardcyk@aol.com

D6   E-mail dtd September 29,      117
     2006, from Charles
     Seward to Dan Motta

D7   E-mail dtd May 4, 2007,       123
     from Charles Seward Jr
     to sewardcyk@aol.com

D8   E-mail dtd August 21,         125
     2007, from Charles
     Seward Jr to
     rjleop@verizon.net

Page 3

INDEX TO EXHIBITS
Defendant's                         Marked/First
Exhibit Number  Description         Identified

D9   E-mail dtd October 15,        126
     2007, from Charles
     Seward Jr to
     sewardcyk@aol.com

D10  E-mail dtd October 18,        137
     2007, from Charles
     Seward Jr to
     janiewein@optonlin.net

D11  E-mail dtd April 15,          139
     2008, from Charles
     Seward Jr to numerous
     addresses and cc addressees

D12  E-mail dtd 05/01/2008         139
     from service@paypal.com
     to Charles Seward Jr

D13  E-mail from Gary              144
     Kamprath (with
     forwarding e-mails from
     Isabel Colon, Sharrie
     Brown, and Charles Seward)

D14  E-mail from Kerry Bethea      157
     to Charles Seward
     dtd 8/27/2004

D15  E-mail chain dtd              182
     March 2004

D16  Agreement Regarding           184
     Confidential
     Information, Intellectual
     Property, and Other
     Matters for Charles
     Seward dtd 9/28/98

D17  E-mail dtd 08/10/2007         138
     from Juanlyn Williams
     to SCET

Page 4

INDEX TO EXHIBITS
Defendant's                         Marked/First
Exhibit Number  Description         Identified

D18  Declaration of Charles        208
     Seward dtd July 14,
     2008

D19  E-mail chain dtd              228
     February 2004

D20  E-mail chain dtd              230
     June 2005

D21  E-mail chain dtd              231
     June 2005

D22  E-mail chain dtd              233
     08/30/2005

D23  E-mail chain dtd              234
     September 2006

D24  E-mail chain dtd              236
     April 2007

D25  E-mail from                   237
     Sewardcyk@aol.com to
     Charles Seward Jr
     dtd February 5, 2008

D26  IBM Business Conduct          239
     Guidelines dtd
     December 18, 2007

D27  IBM document entitled         252
     "You and IBM - United
     States Additional
     Compensation" Updated
     28 Feb 2005

D28  IBM document entitled         254
     "You and IBM - United
     States Additional
     Compensation" Updated
     03 Mar 2008

Page 5

INDEX TO EXHIBITS
Defendant's                         Marked/First
Exhibit Number  Description         Identified

D29  IBM document entitled         255
     "You and IBM - United
     States Employee
     relations/legal issues:
     Employee meal break/
     rest break"

D30  IBM document entitled         256
     "You and IBM - United
     States Employee
     relations/legal issues:
     Recording time worked/
     compensatory time"

D31  E-mail dtd 08/03/2007         264
     from Juanlyn Williams
     to SCET, SW I Prime,
     SW II - Rational/Lotus

D32  IBM Course Booklet            271
     Business Conduct
     Guidelines

D33  E-mail chain dtd              272
     February 2008

D34  E-mail dtd 02/12/2006         274
     from Kerry Bethea to
     Charles Seward

D35  Complaint                     286

D36  Plaintiff Charles             288
     Seward's Answers to
     Defendant's First Set
     of Interrogatories
     to Plaintiff

D37  E-mail dtd 10/01/2007         291
     from Juanlyn Williams
     to SCET

D38  2006 PBC for Charles          294
     Seward

Witness:   Charles Seward

3 (Pages 6 to 9)

### Page 6

```
           INDEX TO EXHIBITS
Defendant's                    Marked/First
Exhibit Number   Description    Identified

  D39      2007 PBC for Charles      302
           Seward
  D40      Software Entitlement      312
           Work Instructions dtd
           06/21/2008
  D41      BluePages printout        313
           for Debbie Bigley
  D42      E-mail dtd 08/03/2006     325
           from Gary A. Kamprath
           to DOR Managers and
           Seniors
```

### Page 7

```
APPEARANCES OF COUNSEL:
On behalf of the Plaintiff:
    JAMES B. ZOURAS
    Attorney at Law
    Stephan Zouras, LLP
    205 North Michigan Avenue
    Suite 2560
    Chicago, Illinois 60601
    (312) 233-1550
    fax: (312) 233-1560
    jzouras@stephanzouras.com

On behalf of the Defendant:
    MATTHEW W. RAY
    Attorney at Law
    Jones Day
    2727 North Harwood Street
    Dallas, Texas 75201
    (214) 220-3939
    fax: (214) 969-5100
    mwray@jonesday.com

    ...

Videographer: Mr. Chris Jordan
    Legal Video Services, Inc.
    3455 Peachtree Road, Suite 500
    Atlanta, Georgia 30326
    (770) 640-5050
```

### Page 8

1  THE VIDEOGRAPHER: On video.
2       CHARLES SEWARD
3  having been first duly sworn, was examined
4  and testified as follows:
5       EXAMINATION
6  BY MR. RAY:
7       Q   Can you state your full name for the
8  record, please?
9       A   Charles Seward.
10      Q   Have you ever been deposed before, Mr.
11 Seward?
12      A   No.
13      Q   Have you ever been involved in litigation
14 in any way where you gave sworn testimony in a
15 courtroom, for example?
16      A   I don't recall.
17      Q   Were you a witness at one time in a dispute
18 involving maybe a fight between neighbors where you
19 were subpoenaed to court?
20      A   Yes.
21      Q   And did you give testimony in that case?
22      A   Yes.
23      Q   You understand that today we're deposing
24 you, and I'll be asking you questions, and you'll be
25 giving me answers?

### Page 9

1       A   Yes.
2       Q   And do you understand that you are under
3  oath today?
4       A   That's correct.
5       Q   And that your testimony in the deposition
6  has the same weight and effect as if you were in a
7  courtroom?
8       A   Yes.
9       Q   Do you understand that?
10      A   Uh-huh.
11      Q   I'll go through a couple of the rules, and
12 we just had one. If you could answer me verbally --
13      A   Right.
14      Q   -- as opposed to shaking your head or
15 nodding, it helps the court reporter.
16      A   Yes.
17      Q   If I ask a question today, Mr. Seward, and
18 you don't understand it, will you let me know, and
19 I'll try to rephrase it?
20      A   Yes.
21      Q   If you don't ask me to rephrase it, I will
22 assume you understood my question. Is that fair?
23      A   Yes.
24      Q   If you need a break at any time today, let
25 me know. This is not an endurance test. We can take

Witness: Charles Seward

4 (Pages 10 to 13)

Page 10

1  a break whenever you want. Okay?
2      A   Yes.
3      Q   Are you under any medications today that
4  would impact your ability to testify --
5      A   No.
6      Q   -- truthfully?
7      A   No, sir.
8      Q   One other kind of ground rule is that I'll
9  try not to talk over you if you will try not to talk
10 over me, so let me finish my question, and I'll try to
11 let you finish your answer.
12     A   Yes.
13     Q   Fair enough?
14     A   Yes.
15     Q   Could you give me your date of birth, Mr.
16 Seward?
17     A   April 11th, 1949.
18     Q   And your current address?
19     A   315 Carriage Lake Lane, Stockbridge,
20 Georgia, 30281.
21     Q   How long have you lived at that address,
22 Mr. Seward?
23     A   It was about -- since '98. Ten years.
24 About ten years.
25     Q   Roughly ten years?

Page 11

1      A   Ten years.
2      Q   Have you ever been known by any other names
3  than Charles Seward?
4      A   No, sir.
5      Q   Briefly could you describe your educational
6  background?
7      A   Just technical training. High school,
8  technical training. Computers, computer operations.
9      Q   Has the technical training primarily been
10 through IBM?
11     A   Yes.
12     Q   I may have covered this in my previous
13 questions, but is this the only lawsuit you have ever
14 filed as a plaintiff?
15     A   Yes.
16     Q   Never been sued before?
17     A   No, sir.
18     Q   Have you ever filed any type of
19 administrative complaint against an employer like an
20 EEOC charge, a Department of Labor complaint?
21     A   No.
22     Q   And you are married?
23     A   Yes.
24     Q   How long have you been married?
25     A   Let's see. Fourteen years.

Page 12

1      Q   Do you have children?
2      A   Yes.
3      Q   How many?
4      A   Three.
5      Q   What are their ages?
6      A   Thirteen, 37, and 30 -- no. Wait. Let me
7  back up. Thirteen, 36, and 33.
8      Q   I want to get some background on your
9  employment with IBM.
10     A   Yes, sir.
11     Q   Let's start with your current position at
12 IBM. What is your title? What do you call yourself?
13     A   I'm a senior customer representative.
14     Q   Who do you report to?
15     A   Juanlyn Williams. That's J-A-U-N-L-I --
16 L-Y-N, Williams. Like Juan and then Lyn on the end.
17     Q   Who does Miss Williams report to, if you
18 know?
19     A   Sharon Lofton.
20     Q   And who does Miss Lofton report to, if you
21 know?
22     A   I'm not sure. I -- I'm sorry. I'm not
23 sure.
24     Q   Are you within a particular business unit
25 or division of IBM? For example, GTS, IMBPD?

Page 13

1      A   They -- I believe it references IMBP as the
2  organization. I know they've changed it, but I'm not
3  clear on that new terminology that they have with all
4  the title for the department -- organization.
5      Q   Do you happen to know what IMBP stands for?
6      A   I hear it all the time. I don't. I'm
7  sorry.
8      Q   How long have you reported to
9  Miss Williams?
10     A   Two years -- January 17 of 2009 will be two
11 years.
12     Q   So you started reporting to her in January
13 of 2007; is that correct?
14     A   That's correct.
15     Q   Are you in what's called the SCET group?
16     A   Yes.
17     Q   Do you know what SCET stands for?
18     A   Software Entitlement -- let's see.
19 Software Customer Entitlement. I don't know what the
20 T stands for. Team.
21     Q   Team?
22     A   Software Customer Entitlement Team.
23     Q   Have you been on that team since January of
24 2007?
25     A   That's correct.

Witness: Charles Seward

5 (Pages 14 to 17)

Page 14

1  Q  Before you joined the -- and I'll refer to
2  it as the SCET Team. Is that fair?
3  A  Yes.
4  Q  And you know what I'm talking about?
5  A  Yes.
6  Q  Before you joined the SCET Team, what team
7  were you on?
8  A  It was called the Teach, just like it
9  sounds. Teach Team.
10 Q  How long were you on that team?
11 A  Oh, let's see. Eight years.
12 Q  Did you report to one supervisor that
13 entire time, or did they change?
14 A  They changed. Yes, they changed.
15 Q  Let's work backwards. At the -- let's
16 start in, say, December of 2006, shortly before you
17 transferred over to the SCET --
18 A  Yes, sir.
19 Q  -- Team? Who were you reporting to?
20 A  Kerry Bethea.
21 Q  Do you know roughly how long you reported
22 to Mr. Bethea?
23 A  Three -- three years.
24 Q  I'm correct that Kerry Bethea is a he?
25 A  Yes.

Page 15

1  Q  Do you recall who you reported to prior to
2  Mr. Bethea in the IBM Teach Team?
3  A  Esther Alston.
4  Q  And do you know roughly how long you
5  reported to Esther Alston?
6  A  Roughly two years.
7  Q  And before Miss Alston?
8  A  I'm -- let's see. Linda Wormley, just like
9  it sounds. Wormley, W-O-R-M-L-Y. Wormley.
10 Q  Wormley?
11 A  Yeah.
12 Q  Let me go back in time a little bit now.
13 How long have you worked for IBM?
14 A  Thirty-eight years, seven months.
15 Q  So you started in 1970?
16 A  That's correct.
17 Q  Was there a period of time -- of time in
18 the late 1990s when you left IBM and then returned?
19 A  That's correct.
20 Q  Could you describe the circumstances of
21 that?
22 A  They had a early -- like a bridge
23 retirement, and I left in '92, I believe, July of '92,
24 and then I came back in September of '98.
25 Q  When you -- strike that. When you left in

Page 16

1  what you believe to be 1992, what location were you
2  working in?
3  A  I was in Somers, New York.
4  Q  And then when you returned in September of
5  1998, what location did you return to?
6  A  Atlanta.
7  Q  Did you return to the facility that you are
8  working at now in Atlanta?
9  A  Yes.
10 Q  What do you refer to that facility as?
11 A  Riveredge.
12 Q  Riveredge?
13 A  Uh-huh. All one word.
14 Q  Have you been at the Riveredge facility
15 since September of 1998?
16 A  We were -- we were -- was at the -- let's
17 see. I'm only going to do ballpark. I know we left
18 for about two years, I believe, and we went to the
19 Highlands facility in Smyrna. I believe roughly we
20 were there maybe two years, I think.
21 Q  Do you recall the time -- I didn't mean to
22 talk over you. Do you recall the time frame?
23 A  No. I'm sorry. I don't know exact year
24 and month that we went over there, and then we came
25 back.

Page 17

1  Q  Came back to the Riveredge?
2  A  Yes.
3     (Thereupon, marked for identification,
4  Defendant's Exhibit D1.)
5  BY MR. RAY:
6  Q  I'm going to hand you what's been marked as
7  Exhibit 1, Mr. Seward, and ask you just to take a look
8  at that and see if you recognize it?
9  A  Yes, I sure do.
10 Q  Is that your offer letter from IBM when you
11 returned in 1998?
12 A  That's correct.
13 Q  And it says, I believe there in the first
14 sentence, "I am pleased to confirm your acceptance of
15 the IBM Corporation offer of employment to you as a
16 Teach representative reporting to Linda Wormley in
17 Atlanta, dash, Teach."
18    Did I read that correctly?
19 A  Yes.
20 Q  So when you returned in 1998, did you go
21 into that Teach Team we've been discussing?
22 A  Yes.
23 Q  The next sentence there, Mr. Seward, says,
24 "Your salary will be 19 -- or $1,983 monthly plus
25 benefits," and then the next sentence says, "All hours

Witness:   Charles Seward

6 (Pages 18 to 21)

### Page 18

1  worked in excess of 40 per week will be compensated at
2  a rate of time and one-half."
3      Did I read that correctly?
4  A  That's correct.
5  Q  Did you understand at the time of receiving
6  this letter, that you would receive overtime for work
7  in excess of 40 hours a week?
8  A  Yes.
9  Q  Did you, in fact, receive overtime pay in
10 1998 when you returned, for example? For work in
11 excess of 40 hours per week?
12 A  I don't recall.
13 Q  At some point -- at some point you have
14 alleged in this lawsuit that you have not received
15 overtime pay for work in excess of 40 hours a week;
16 correct?
17 A  Correct.
18 Q  At some point you must have realized that
19 you were not receiving pay -- allegedly not receiving
20 pay for work in excess of 40 hours per week. Do you
21 recall when that point was?
22 A  I -- I don't have the -- a time period.
23 Q  Do you recall if it was when you were in
24 IBM Teach, or when you were in the SCET group?
25 A  In Teach.

### Page 19

1  Q  Do you recall if it was when you were under
2  Mr. Bethea, or one of the previous supervisors?
3  A  I focused in when I was working for
4  Mr. Bethea.
5  Q  But you don't recall a specific time or
6  incident where you started to believe or discovered
7  that you were not, in your view, receiving pay for
8  work in excess of 40 hours a week; is that correct?
9      MR. ZOURAS:  To the extent -- let me just
10 pose an objection. To the extent this calls for
11 a legal conclusion in terms of what compensable
12 work is, I'm going to object. You can -- Mr.
13 Seward can answer, of course, to the best of his
14 ability.
15     THE WITNESS:  Let me -- can you rephrase the
16 question? Are you asking for the time, or like a
17 period? I'm not sure if I understand the
18 question.
19 BY MR. RAY:
20 Q  Fair enough. Let me try to rephrase it.
21 In the lawsuit you are alleging that you have not been
22 paid for work that you had performed in excess of 40
23 hours per week; correct?
24 A  Correct.
25 Q  And what I'm just trying to learn is at

### Page 20

1  what point did you decide or determine that you in
2  fact were not receiving, in your view, overtime for
3  work performed in excess of 40 hours per week?
4  A  At least three years prior to -- I mean,
5  I'm trying to think. I really can't answer that
6  specific time. I know I had -- I -- I'm sorry. I
7  don't have it.
8  Q  Is it sometime during the time you reported
9  to Mr. Bethea?
10 A  Yes. Or -- yes. Yes.
11 Q  And as a follow-up to that, was there some
12 kind of document you received from Mr. Bethea, a
13 conversation you had from Mr. Bethea or someone else
14 that triggered this conclusion in your mind that you
15 were not being paid for work performed in excess of 40
16 hours a week? Were not being paid overtime?
17 A  Just -- humm. Just training on the -- what
18 we call the Avaya system. Prior to that, I had some
19 -- some reservations about it, but when we started
20 having new training on coming in early and bringing up
21 the system early, again, that triggered it even more.
22 Q  Was the Avaya training -- or let me back
23 up. Was the Avaya system a new system at the point
24 we're talking about this training? Or was this
25 continuing training?

### Page 21

1  A  It was not new. It's just -- it was a --
2  revolving. It was getting new releases of it.
3  Q  So sometime during the time that you were
4  reporting to Mr. Bethea and receiving this Avaya
5  training, you --
6  A  Yes.
7  Q  -- you determined that -- or you believe
8  that you were not receiving overtime for work in
9  excess of 40 hours per week?
10 A  That -- that -- during the training was
11 when I -- was not the initiation of my thoughts about
12 that. It was prior to that, but it was amplified
13 after that training with Avaya.
14 Q  And this amplification, was that still
15 during the time period you reported to Mr. Bethea?
16 A  Yes.
17 Q  We'll come back to that in some detail, I
18 believe, but I want to come back to your job duties
19 and your history with IBM. Okay. We started, I
20 think, when we were talking about your jobs, with a
21 discussion of the SCET Team, and you've been on that
22 team, I believe, since January of '07 --
23 A  Yes.
24 Q  -- is that correct?
25 A  Yes. I got to stop --

Witness: Charles Seward

7 (Pages 22 to 25)

Page 22

1  Q  Can you tell me, Mr. Seward, what your job
2  duties are on that team? What do you do?
3  A  Currently?
4  Q  Yes.
5  A  We receive inbound calls from customers
6  after it's -- it has been determined that they did not
7  have -- or the front-end agent for the department
8  could not find valid support contracts for their
9  software systems, software running on their systems.
10  Q  So it -- you said you get the calls if the
11  front-end agent, I think was the term you used --
12  A  Yes, sir.
13  Q  -- can't resolve the problem?
14  A  That's correct. If they call and the
15  customer would like technical assistance, if they
16  cannot find support, if they don't have a contract on
17  file or they can't locate it, then they will transfer
18  the customer to the SCET Team, where we'll investigate
19  if they have a valid contract on file.
20  Q  The first -- the first-line rep who
21  initially deals --
22  A  Yes.
23  Q  -- with the call, are they -- are they also
24  on the SCET Team, or are they on a different team?
25  A  They're under the same manager, but they're

Page 23

1  -- they're called the CET team: Charlie, Edward, Tom.
2  They're what they call front-end agents. The majority
3  of those agents are contractors at this current time,
4  and they're the -- the front end -- they investigate
5  preliminary with the customer, but they work under
6  Juanlyn Williams also.
7  Q  Do they refer -- are they ever referred to
8  as call receive agents?
9  A  Yes. That might be software receive call.
10  That's it. Software receive call agent.
11  Q  Do you know -- I think you said that most
12  of those are contractors at this time?
13  A  Yes.
14  Q  Do you know how many IBM employees, either
15  regular or supplemental, are on that particular team
16  under Miss Williams?
17  A  No, sir.
18  Q  And then we were talking about the SCET
19  Team. Do you know roughly how many employees are on
20  the SCET Team that report to Miss Williams?
21  A  Supplemental -- I'm sorry. I don't know
22  that number.
23  Q  Well, you said that on the SCET Team you
24  receive inbound calls from customers that are
25  forwarded for you from the first-line --

Page 24

1  A  Correct.
2  Q  -- reps? Do you also deal with calls that
3  come in through a queue?
4  A  Yes.
5  Q  Can you describe that for me?
6  A  Basically what that is, is a customer may
7  place a inquiry about support electronically from
8  their remote location. In other words, they do not go
9  through the software receive agent, and then an agent
10  like myself or my peers will go into that queue and
11  investigate a call. Pull one off and investigate the
12  call and contact the customer.
13  Q  On the average do you spend more time on
14  inbound calls from customers or dealing with the
15  queue?
16  A  Inbound.
17  Q  So you're dealing with inbound calls from
18  customers. You also spend some time with this queue
19  that you describe?
20  A  Yes.
21  Q  Any other types of calls or activities that
22  you perform regularly?
23  A  I can't think offhand, no, sir.
24  Q  Have you been -- during the entire time
25  that you have been on the SCET Team have you been

Page 25

1  performing essentially the same duties that you just
2  described?
3  A  Basically, yes, sir. I've been in training
4  also. Like one of those, nine months from the first
5  year we was in training mode.
6  Q  With the exception of the training mode?
7  A  Yes. Basically those are the same duties.
8  Q  And let's talk about the training mode for
9  a minute.
10  A  Yes.
11  Q  When you came over to the SCET Team in
12  January of 2007, you went through training?
13  A  Yes.
14  Q  You went through some classroom type
15  training; correct?
16  A  Yes.
17  Q  How long did that training last?
18  A  Went into it from March -- ballpark was
19  March of that year. Classrooms started, say the first
20  week in March of '07 through April -- to April of that
21  same year.
22  Q  Was it two six-week classes? Does that
23  sound correct?
24  A  Yes. Approximately two six-week classes
25  with some time off in between, and then we were -- we

Witness:   Charles Seward

8 (Pages 26 to 29)

Page 26

1  were like in the training mode when we went on the
2  floor.
3     Q    And what do you mean by training mode when
4  you went on the floor?
5     A    They were -- we was not evaluated in the
6  same -- I don't know how to explain it. The -- you
7  know, they know that we did not know all the -- all
8  the applications, so we were -- we were treated as
9  trainees even though we were on the floor.
10    Q    Now that you are no longer a trainee, can
11 you describe for me the difference between being
12 treated as a trainee and just performing as a regular
13 employee like you do now?
14    A    It's -- can you rephrase the question? I
15 mean --
16    Q    Well, yes. I'm just trying to get a little
17 more information on what it means to be -- or what it
18 meant to you to be treated as a trainee? For example,
19 let me try to help out. Did you have, like, someone
20 assigned to you to help mentor you or help answer
21 questions?
22    A    Yes. Off and on, yes.
23    Q    Were you required to -- did you have the
24 same requirements with respect to logging into the
25 phone, using AUX codes, those types of things when you

Page 27

1  were a trainee?
2     A    When we have scheduled time, yes.
3     Q    Did you always have scheduled time while
4  you were a trainee?
5     A    Yes.
6     Q    And what did you mean -- what do you mean
7  by scheduled time?
8     A    You are assigned your start time that you
9  are supposed to be up and ready and available to
10 receive calls.
11    Q    And so as a trainee -- well, let me back
12 up. When you were in the classrooms, in the classroom
13 training, we talked about --
14    A    Yes.
15    Q    -- did you have scheduled time then?
16    A    To be at the class?
17    Q    Yes.
18    A    Yes. We had a -- a scheduled start time
19 for the class.
20    Q    Did you have to be logged into your tools,
21 computer, phone at the start of the class?
22    A    No.
23    Q    Then after the class ended, you went into
24 this training mode where you were actually on the
25 floor? Is that accurate?

Page 28

1     A    Yes. Yes.
2     Q    And at that point you did have scheduled
3  time?
4     A    Yes.
5     Q    And is what you're saying that during that
6  scheduled time as a trainee, you had to still get
7  there at your scheduled time and do what the other
8  call reps were doing?
9     A    Correct.
10    Q    And we'll come back in some detail to what
11 you have to do to get ready for the shift and those
12 types of things.
13    A    Yes.
14    Q    During the inclass training only, during
15 those classroom moments, are you in this case alleging
16 that you were required to work off the clock? And by
17 that I mean, were you required to work over 40 hours a
18 week and not get paid for it?
19    A    Not when we were in class, no.
20    Q    I want to go back now to your job duties,
21 and we've talked about SCET. Let's go back in time to
22 IBM Teach. Can you describe your job duties in IBM
23 Teach?
24    A    My particular duties were, we receive
25 inbound calls from customers to enroll them into IBM

Page 29

1  training classes performed by IBM and also IBM
2  business partners. Also there is -- was some
3  administrative duties. In my case my administrative
4  duties were -- I was given duties of administrating
5  credit cards.
6     Q    What did that entail?
7     A    Verifying the funds, allocating the funds
8  for the class through the credit card that the
9  customer provided for the enrollment.
10    Q    So did you perform this credit card
11 verification function for more than just your calls?
12    A    That's correct.
13    Q    In 2006 when you were reporting to
14 Mr. Bethea -- you were reporting to Mr. Bethea in
15 2006; correct?
16    A    Yes.
17    Q    Roughly how many people were in IBM Teach?
18    A    I'm sorry. I don't know.
19    Q    Were there -- Mr. Bethea obviously
20 supervised some IBM Teach call center employees;
21 right? He supervised you?
22    A    Yes.
23    Q    Were there other teams that did IBM Teach
24 that were supervised by people besides Mr. Bethea?
25    A    That were Teach? Or --

Witness:   Charles Seward
9 (Pages 30 to 33)

### Page 30

1  Q  That were IBM Teach?
2  A  Yes, because at one -- at one time the
3  department was very large, so there's more than one
4  manager.
5  Q  Do you recall who the other managers were
6  who were involved in IBM Teach?
7  A  Just when -- when Esther Alston was my
8  manager, Kerry Bethea was the manager of the other
9  group of Teach representatives.
10  Q  What about when Mr. Bethea became your
11  manager? Were there still other IBM Teach teams?
12  A  I believe he took over the whole department
13  after Miss Alston left.
14  Q  When -- why did you leave IBM Teach to go
15  into the SCET?
16  A  The Philippines took over our duties.
17  Q  Took over the IBM Teach role?
18  A  Yes, sir.
19  Q  What floor are you on at the Riveredge
20  facility?
21  A  Fifth floor.
22  Q  Fifth floor? And how long have you been on
23  that floor?
24  A  Approximately -- between the two
25  departments, four years.

### Page 31

1  Q  And when you say between the two
2  departments, you mean IBM Teach and --
3  A  Teach, and we went right around the corner
4  to the other location.
5  Q  Do you know what other floors -- well, let
6  me back up. The Riveredge facility actually has two
7  buildings; right?
8  A  Yes.
9  Q  And that's attached at the bottom. Do you
10  know what other floors in either of the buildings have
11  call center type employees? And by that I mean people
12  who are on the phones for the majority of their day?
13  A  Sure. Fourth floor. The whole fifth
14  floor. I believe the eighth -- the eighth floor, I
15  believe. The seventh floor I think is now -- is now
16  vacant, I believe. But are you -- are you asking if
17  -- if they're currently occupied, or were?
18  Q  Well, let's talk about current first.
19  A  I'm saying right now, currently, fourth
20  floor, fifth floor.
21  Q  Currently fourth floor and fifth floor?
22  A  Yes, sir.
23  Q  Previously what other floors?
24  A  Gosh, fourth, fifth, sixth, seventh that I
25  know for sure.

### Page 32

1  Q  I think in your previous answer you
2  mentioned the eighth floor?
3  A  Right. But I'm just going to leave that
4  one alone.
5  Q  You're not sure about that?
6  A  I'm not sure. I'm not going to speak on
7  something I'm not --
8  Q  So currently you're aware of fourth and
9  fifth floor call center type operations?
10  A  Yes.
11  Q  Is that in both buildings, or one of the
12  buildings?
13  A  Both buildings.
14  Q  And you're on the fifth floor?
15  A  Correct.
16  Q  And you have an access card to get in;
17  right?
18  A  Correct.
19  Q  It's a secured facility?
20  A  Correct.
21  Q  You have access to the fifth floor?
22  A  Correct.
23  Q  Do you have access to the fourth floor?
24  A  I don't go on the fourth floor.
25  Q  Do you go on any other floors besides the

### Page 33

1  fifth floor?
2  A  During training I went to other floors.
3  Q  Other than in training?
4  A  No, sir. I don't. I don't go on the --
5  Q  There's a cafeteria, I think, on the first
6  floor?
7  A  First floor, correct.
8  Q  I assume you go to the first floor?
9  A  Yes.
10  Q  Do you know -- on the fourth floor do you
11  know what business unit or what teams are on the
12  fourth floor?
13  A  I know they're technical assistants. I
14  believe it's hardware, but I can't be certain.
15  Q  Let's go back to the fifth floor where you
16  are, and that's the fifth floor of both buildings;
17  right?
18  A  Yes, sir.
19  Q  And I assume that you have access to the
20  fifth floor of both buildings?
21  A  Yes.
22  Q  Is the fifth floor made up of only -- I
23  think you described it as IMBP. Do that I have right?
24  A  Yes. IMBPD.
25  Q  I think there's a maybe an IM --

Witness: Charles Seward

10 (Pages 34 to 37)

### Page 34

1    A    Yes, sir.
2    Q    Are they on the fifth floor?
3    A    Yes. There's other departments, yes.
4    Q    I'm sorry?
5    A    There's other departments on that floor,
6 yes.
7    Q    There are other departments?
8    A    Yes.
9    Q    Do you know what other departments are on
10 that floor?
11    A    It's our Partner World, and then you also
12 have different facets of what we do. We're software
13 entitlement. You got hardware entitlement also.
14    Q    So there's software entitlement, hardware
15 entitlement?
16    A    Yes.
17    Q    There's also the call receive? Is that on
18 the fifth --
19    A    Call receive and also Partner World group.
20    Q    What is the Partner World group?
21    A    IBM has a program where they have different
22 companies which they term business partners which sell
23 IBM services, and again, they're in partnership.
24    Q    Are there -- within this Partner World
25 group on the fifth floor, are there call center type

### Page 35

1 agents? People on the phone?
2    A    Yes.
3    Q    Do you know who the supervisor --
4 first-line supervisors or managers are in that group?
5    A    Wendi Musgrove is her new married name.
6 Musgrove. I'm sorry. I don't know how to spell it.
7 Formerly Wendi Kowen with a K. K-O-W-E-N, maybe.
8    Q    Anyone else that you know of in that group
9 that -- and I'm talking about first-line manager.
10    A    Mike Landery. I think it's L-A-N-D-R-Y.
11 He actually is the first-line manager for a new group
12 which is called the AT&T group. I forgot about that
13 group also. I'm not familiar with that group.
14    Q    Not familiar with the AT&T group?
15    A    No, sir. They're right next to us, but I'm
16 not --
17    Q    Wendi Musgrove's group, are you familiar
18 with that group?
19    A    Yes.
20    Q    Tell me about that group.
21    A    They have been our neighbors off and on for
22 as long as I can remember. Since I started, really.
23 We -- both groups, when we first came to Teach, we had
24 the business partner group was right next door to us,
25 and even when we left that building and came back,

### Page 36

1 they were right next to us. Nice people over there.
2    Q    Do you know who Miss Musgrove reports to?
3    A    I believe Sharon Lofton.
4    Q    Have you ever reported to Miss Musgrove?
5    A    No, ma'am -- no, sir.
6    Q    Do you know what Miss Musgrove tells her
7 employees about expectations with respect to logging
8 in or being phone ready or anything about that?
9    MR. ZOURAS: Let me object as to foundation
10 as to time. If you can answer, by all means.
11    THE WITNESS: I don't know what she tells
12 them, but I know that we were all doing the same
13 thing when it came to logging in, getting in
14 early and getting the systems up, because we was
15 all using the same timing mechanism, Avaya. We
16 all had to use the same -- we were all under that
17 same Avaya structure for logging in, so we all --
18 everybody on the floor had to -- had to do the
19 same -- go through the same process to get to --
20 to clock in.
21 BY MR. RAY:
22    Q    Well, let's talk about that process --
23    A    Yes.
24    Q    -- and then we'll come back to
25 Miss Musgrove.

### Page 37

1    A    Yes.
2    Q    Avaya is the phone system?
3    A    Yes.
4    Q    The call system; right?
5    A    Yes.
6    Q    And how do you log into Avaya?
7    A    Currently, or in the past?
8    Q    Let's talk about currently?
9    A    Currently it's a simple process. We just
10 log in directly on the phone. In other words,
11 everyone is assigned a specific code or a pass code,
12 and that's how you will sign in.
13    Q    How many digits is the pass code?
14    A    Four. Wait a minute. I'm sorry. Five.
15 Yes, five.
16    Q    Five digits?
17    A    Five.
18    Q    So is it as simple as literally dialing
19 five digits and then you're logged in --
20    A    Correct.
21    Q    -- to the system?
22    A    That's what we do currently.
23    Q    From a time standpoint currently, talking a
24 few seconds?
25    A    A few seconds.

Witness: Charles Seward

11 (Pages 38 to 41)

### Page 38

1   Q   And when you say currently, what time
2   period are we talking about? The last four months?
3   The last year? How long has that been the system to
4   log into Avaya?
5   A   The new system, I'm not sure when it -- the
6   new sign-on date was implemented. I'm not sure.
7   Q   Has the system we've been describing, or
8   the system you described where to log into Avaya, you
9   just hit this five-digit pass code --
10  A   Yes.
11  Q   -- has that been in the place the entire
12  time you have been on the SCET Team?
13  A   Yes.
14  Q   Was it in place for a period of time, at
15  least, that you were on the IBM Teach Team?
16  A   I'm not sure. I know it transitioned over
17  to that, but I don't know when.
18  Q   Did it transition over to that sometime you
19  were on IBM Teach? Is that what you're saying?
20  A   Yes.
21  Q   Before it transitioned over, so before the
22  current system --
23  A   Uh-huh.
24  Q   -- how did you log into Avaya?
25  A   We would have to -- we would bring up our

### Page 39

1   host system, our workstation, and once that -- the
2   system is up and running, there was an icon that was
3   on our screen that we would click on, and that would
4   activate the Avaya system. When -- then at that point
5   we could sign on and clock in. Basically, clock in at
6   that time. Where the current system, we did not have
7   to bring the workstation up. In other words, we just
8   could go straight to our phone and log -- clock -- and
9   log in and work -- bring our systems up.
10  Q   But under the previous system you had to
11  actually log out -- or, I'm sorry, boot up your
12  workstation?
13  A   Right. Right. We had to get it up. There
14  was some kind of software in there, I guess, that --
15  that we had to actually click on it that showed that
16  we was working -- we were clocked in. We didn't use
17  the phone. We didn't physically go to the phone and
18  put the code in.
19  Q   Now, you've referred to clocking in.
20  A   Yes.
21  Q   In the context of the Avaya system, explain
22  that for me. Is it your understanding that logging
23  into the phone system is the equivalent of clocking
24  in?
25  A   Yes.

### Page 40

1   Q   Now, you're not -- I won't ask it that way.
2   You also logged out of the Avaya phone system?
3   A   Currently, or prior?
4   Q   Let's talk currently. Fair enough.
5   Currently you also log out of the Avaya system?
6   A   Yes.
7   Q   And is that the equivalent of clocking out,
8   so to speak?
9   A   Correct.
10  Q   How long does it take to log out currently
11  of the Avaya system?
12  A   A second.
13  Q   A second or two?
14  A   That's it.
15  Q   Are you saying that if you looked at your
16  -- when you logged into the Avaya system currently and
17  logged out, under the current system, that would be
18  the time that you are clocked in to work?
19  A   I -- may I expound?
20  Q   Yes. Sure. I'm just trying to understand
21  what you mean by clocking in and clocking out of the
22  Avaya system.
23  A   Okay. I'm trying -- I don't have the
24  ballpark time period that management gave us the
25  leeway of doing it. In other words, there was a

### Page 41

1   really fine -- defined way of coming in currently and
2   clocking in. Now we -- at one point we were not
3   allowed to do the current clocking in on Avaya -- in
4   other words, that few seconds logging on -- even
5   though we was in the process of bringing up our
6   system.
7       We -- but now prior to -- it might have
8   been early last year. We were -- we were given the
9   leeway that we were able -- even though our start time
10  was, say, if I can give an example, 10 o'clock, and we
11  was in the process of -- came in and we was in the
12  process of bringing up our systems, we were told that
13  we can log in now. That was early last year.
14      Prior to that, there was no early log-in
15  time. We could be working, trying to bring up our
16  system and the applications, but we were told not to
17  log in on that -- on the phones until a minute or two
18  before our start time.
19  Q   Okay. Let me ask some questions about
20  that.
21  A   Uh-huh.
22  Q   So early last year you were given the
23  leeway to log into the phone before you logged into
24  your systems?
25  A   Right. Right. Right.

Witness: Charles Seward

12 (Pages 42 to 45)

### Page 42

1  Q  Who gave you that leeway?
2  A  Juanlyn Williams.
3  Q  And when you say early last year, you're
4  talking about the early part of 2007?
5  A  I apologize. I don't -- I don't remember,
6  but I -- I remember distinctly because what would
7  happen is we would be in the process of bringing up
8  our workstations, and we'll forget to log in, and we
9  would be marked late. So folks would come in trying
10 to bring up our workstations, and we would forget, so
11 either a person would log in early and they get
12 reprimanded for logging in early while they're
13 bringing up their workstations, or they forgot
14 altogether, and then they were marked late, and then
15 they would say, you know, vice versa, you know.
16        So finally we got an e-mail from Juanlyn
17 indicating that we could log in early. It's not a
18 problem; don't worry about it, and -- I'm sorry. I
19 don't remember exactly. I know -- I have an e-mail
20 about that, but --
21 Q  Well, I might have the e-mail.
22 A  Okay.
23 Q  So let's -- let's pull that and see if that
24 helps you remember.
25        (Thereupon, marked for identification,

### Page 43

1  Defendant's Exhibit D2.)
2  BY MR. RAY:
3  Q  I'm going to hand you what's been marked
4  Exhibit 2, Mr. Seward, and just first I will ask you,
5  do you recognize that document, and then I will ask
6  you if that happens to be the document that we're
7  talking about? If not, I'll look for possibly another
8  one that may be --
9  A  Yes. I remember -- I kind of remember
10 this, yes.
11 Q  Was this the e-mail that you were talking
12 about, or -- when you were talking about --
13 A  There's another e-mail because there was
14 like -- there was one before this one because people
15 were -- there was some type of confusion about --
16 there's another one. There's another short e-mail
17 because -- because there was a great emphasis on not
18 logging in early, and then --
19 Q  Let me see if I can find that one for you.
20 A  Right. Because we were -- we were bringing
21 up our systems during this. When we were in AUX-3 --
22 Q  Right.
23 A  -- we were -- we were bringing up our
24 systems at this point.
25 Q  Let me give you one of the e-mails that you

### Page 44

1  produced in the litigation. Maybe that'll be the one
2  that you are referring to.
3        (Thereupon, marked for identification,
4  Defendant's Exhibit D3.)
5  BY MR. RAY:
6  Q  I hand you what's been marked Exhibit 3,
7  and I ask you if you recognize that e-mail and if that
8  happens to be the e-mail you were talking about?
9  A  Right. This is -- that's why they were --
10 as I stated before, there was some confusion because
11 folks were working, bringing up their workstations so
12 they can be on time. So what happened was, people
13 were coming in, and they were logging on and bringing
14 up their systems.
15        And they were -- they were told not to
16 log in, you know, until one or two minutes prior to
17 their start time because that would affect their --
18 their numbers, their productivity numbers, or
19 something of that nature. And then -- I'm trying to
20 remember the circumstance why these e-mails went out,
21 because people were coming in and bringing up their
22 system, and they were logging on. While they were
23 bringing up the system, they told them they didn't
24 want it, and then all of the sudden they indicated, go
25 ahead and do it; it's all right to do it.

### Page 45

1  Q  So -- I'm just trying to understand. First
2  let me ask this question. Were either of the e-mails,
3  Exhibit 2 or 3, the e-mails that you were talking
4  about in your previous testimony when you were talking
5  about an e-mail saying it was okay to log in?
6  A  Right. These are it, but I thought this
7  was earlier last year, but -- yes, I think those are
8  the two e-mails.
9  Q  So is there -- and I just want to try to
10 understand what you were saying.
11 A  Uh-huh, yes.
12 Q  There was a period of time where people
13 were logging into their systems and logging into the
14 phone simultaneously, and they were getting
15 reprimanded or disciplined or -- is that accurate?
16 A  That's correct. That's correct.
17 Q  Because it would affect their productivity?
18 A  That's correct.
19 Q  Do you know what period of time that was?
20 A  Basically, last year. Now is not -- this
21 issue doesn't come up. They don't talk about it.
22 Q  Who was being reprimanded?
23 A  That, I can't speak on.
24 Q  Who was doing the reprimanding?
25 A  The manager, Juanlyn Williams. Also Kerry

Witness:   Charles Seward

13 (Pages 46 to 49)

### Page 46

1  Bethea in my old job, in the one prior, in Teach.
2  There's e-mails out there from our lead, indicating
3  that we should not, even though we was in and working
4  and -- not to log in but a minute or so prior to our
5  start time.
6     Q    We'll come back to Mr. Bethea. And I may
7  have some e-mails that talk about log-in times, but --
8  for Mr. Bethea, but I'll come back to him in just a
9  second. But you were talking about people getting
10 reprimanded for -- and I want to make sure I
11 understand what they were getting either disciplined
12 or reprimanded or told not to do for. Were they being
13 disciplined for logging into the Avaya system before
14 logging into the computer systems or their tools?
15    A    It was -- I'm just going to use myself as
16 an example. It's in concert. You being -- you're
17 bringing up the system. You log on, put yourself in
18 AUX-3, and you start bringing up your system. That's
19 basically it. But what happens, I guess, their
20 records are showing that they're at work when they are
21 in AUX-3.
22    Q    So it's simultaneous or -- when --
23    A    Correct.
24    Q    -- you are logging into the system, the
25 computer system, in Avaya?

### Page 47

1     A    Correct.
2     Q    And there was a period of time that -- when
3  that was happening, people were being told not to do
4  that by Miss Williams or Mr. Bethea?
5     A    Correct.
6     Q    And then I think you said currently it's
7  okay to do that?
8     A    Correct.
9     Q    And you're not sure when that change
10 occurred?
11    A    That's correct.
12    Q    Are you aware of any other managers who
13 have disciplined anyone currently or in the past? For
14 that practice of logging into the phone and the
15 computer system simultaneously?
16    A    I -- yes, but I'm not witness of it. I
17 just, with my fellow in, you know Partner World and
18 other entitlement agents. They were under the same
19 guidelines that we were, but I -- I was not witness to
20 it. I wasn't witness. I didn't see the e-mails. I
21 didn't see any of that, but I know that they were
22 under the same process that we were.
23    Q    And who -- who specifically has told you,
24 or discussed with you the processes they were under?
25 And I'm talking about people that were not under

### Page 48

1  Miss Williams or Mr. Bethea?
2     A    The employees at Partner World and also the
3  hardware entitlement group. They were in the same
4  arena also, and there were other groups. I'm not sure
5  what -- what products they use for monitoring their
6  productivity, but I know the hardware group or the --
7  the techs on the fourth floor have -- they basically
8  was in that same arena also. But I know definitely
9  the entitlement received calls. Partner World. We
10 all were under that same Avaya system.
11    Q    Let me start with the techs on the fourth
12 floor.
13    A    Yes.
14    Q    I think you said you never go to the fourth
15 floor?
16    A    No. But we -- they're outside, lunchroom.
17 Some have motorcycles, talk. I know we've been in
18 there -- there was a lot of transition in that group,
19 but over ten years I guess you can talk a lot.
20    Q    Is -- do you know what business unit the
21 techs on the fourth floor are in as you described?
22 Are they in IMBPD or some other one?
23    A    No. No. I never seen that group under our
24 umbrella when we see like, you know, e-mails come
25 across. I don't believe I see that group included

### Page 49

1  with our group. Our group is mainly software and also
2  sometimes other call centers support external
3  customers.
4     Q    Is it your understanding that these techs
5  on the fourth floor are under the Avaya system? Or
6  utilize the Avaya system?
7     A    I won't -- I won't comment on that because
8  I do not know how they're being monitored, but I know
9  they have the same type of, you know, be there and be
10 available at their start time. But I do not know if
11 they're using Avaya. I do not know that, but I know
12 that they are required to be up and running and ready
13 to go at their start time.
14    Q    And when you say be there and be available
15 at their start time --
16    A    Yes, sir.
17    Q    -- the techs on the fourth floor, who
18 has -- how do you know that?
19    A    Just by our conversations. Almost hit a
20 guy. We were both supposed to start about the same,
21 and we was not running, but we were kind of -- walking
22 kind of fast trying to -- because we both had to get
23 our systems up, and the applications, that's the main
24 thing, the applications. We had to have all those
25 applications up. But that was currently. I had more

Witness: Charles Seward

14 (Pages 50 to 53)

### Page 50

1  conversations with them currently within, say, last
2  couple of years, three or four years. I really didn't
3  have that much interaction with them prior to four
4  years ago, maybe.
5     Q   Who have you talked to with respect to
6  these techs on the fourth floor? You've said you had
7  interaction, almost hit a person?
8     A   Uh-huh.
9     Q   Who are these people? Can you identify
10 them?
11    A   I don't socialize with them, sir.
12    Q   So you can't name them?
13    A   I can't name names or -- just sports,
14 talking sports and motorcycles and cars, trucks.
15    Q   And you have discussed with them their
16 expectation or their understanding of their
17 expectation with respect to being ready to go at the
18 start of their shift?
19    A   Well, yes. Yes, many times, that kind of
20 stuff, because they break just like we break, and they
21 had -- they got to be back upstairs before the --
22 their break times are monitored just like ours.
23    Q   What about with respect to the start of
24 their shift as opposed to break times? Have you had
25 discussions with them about what they're supposed to

### Page 51

1  do to be ready for the start of their shift?
2     A   That's interesting, because basically they
3  might have different applications, but they still use
4  some -- a couple of different applications we use, I
5  guess, just to -- to verify support, but they're
6  supposed to have all the applications up and running
7  and ready to receive call at their start time.
8     Q   And have they told you how long that takes?
9     A   No, sir. No, sir.
10    Q   Have they told you whether they're entitled
11 to record that time as time worked?
12    A   I asked now about that, and they said no.
13    Q   You asked who that?
14    A   I asked a couple of agents over there, but
15 I could find out the name, but I don't know their
16 names.
17    Q   I'll leave a blank in the deposition
18 transcript. I assume you-all would want to review it,
19 and if you want to fill it in, you can.
20    A   Okay.
21    Q   Okay. So you can't identify anyone you've
22 talked to about this, but you believe that the fourth
23 floor is the same as the fifth floor with respect to
24 log-in expectations to being I guess phone ready or in
25 the computers?

### Page 52

1     MR. ZOURAS: Let me just object to the form.
2  I think his testimony was, he could not identify
3  anybody by name. He can identify them by
4  position, where they worked, but -- I think we
5  are on the same page.
6     MR. RAY: That's fine.
7     THE WITNESS: Right. I don't know their
8  names.
9  BY MR. RAY:
10    Q   I want to come back to -- I think I got a
11 little off track. We were talking about the Avaya
12 system.
13    A   Yes.
14    Q   And clocking in and clocking out?
15    A   Yes.
16    Q   And first I just want to ask the question,
17 the clock-in, clock-out time as you describe it on the
18 current Avaya system --
19    A   Yes.
20    Q   -- does not equate to the time you're paid
21 for each week; is that right? In other words, that's
22 not automatically moved into payroll and you get a
23 check? It's not a time clock?
24    A   No. No. No. In that sense, no.
25    Q   You actually record time through the

### Page 53

1  eTOTAIS system; right?
2     A   Actually, we do the ILC weekly.
3     Q   You use the ILC system?
4     A   Yes.
5     Q   Do you not use the eTOTAIS system?
6     A   Only if there's overtime or illness, like
7  you're out ill.
8     Q   We'll come back to those two.
9     A   Okay.
10    Q   I want to go back now and talk to you
11 specifically about what has been told to you about
12 arrival times and those types of things, because we've
13 kind of talked around it, but I don't think I've asked
14 the direct question. What -- let's start with
15 Miss Williams. Okay? When you first started in SCET
16 did Miss Williams communicate to you an expectation
17 regarding arrival times, what you needed to be doing
18 -- what you needed to be ready to do at the start of
19 your shift, those types of things?
20    A   Yes. We should be up and ready to receive
21 calls at our start time.
22    Q   And how did she communicate that?
23    A   When we first started training and then we
24 went on the floor. The expectations and overview of
25 the job in our training class, and then when we went

Witness:   Charles Seward

15 (Pages 54 to 57)

### Page 54

1  on the floor, she also expounded on that to be up and
2  ready.
3     Q   Did -- so did she actually talk about this
4  in your training?
5     A   She expounded on what's -- her expectations
6  of us, on being available -- up and available to
7  receive calls at our start time. I will -- may I
8  expound?
9     Q   Sure.
10    A   During the training time there was -- the
11 early training time when we came on the floor, there
12 was a time where she allowed us to look at some of our
13 work before we went into what we call available state,
14 but at one point we were supposed to be up and ready
15 to receive phone calls at our start time. If my start
16 time was 10 o'clock, we were supposed to be up, ready,
17 all your applications. You're supposed to be ready to
18 receive calls at that time.
19    Q   And to be up and ready to receive calls as
20 you described it, what do you need to do?
21    A   You should have all your applications up
22 and ready to be used, signed on. Not just icons up,
23 but you should be -- they should be all up and active.
24 I know -- you can start receiving calls when all your
25 applications up and running, and your phone -- and

### Page 55

1  then you sign -- have to your -- your Avaya sign-on
2  sheet would be completed also.
3     Q   Is there an actual available button on the
4  phone?
5     A   Yes. Yes. Basically what happens, when
6  you log on your five-digit code, I'll put myself in
7  AUX-3 code while I'm bringing up my system.
8     Q   Right.
9     A   And then once my system is up, everything
10 is ready to go, I'll hit available.
11    Q   Let's talk about the applications.
12    A   Yes.
13    Q   Well -- and let me back up. To be up and
14 ready, you need to be -- and do your applications,
15 signed onto the Avaya?
16    A   Yes.
17    Q   And ultimately I guess hit that available
18 button?
19    A   Correct.
20    Q   Earlier we talked a little bit about
21 sequence, but I want to make sure, now that we've
22 talked about this in more detail, I understand it.
23 Recently, and you're not sure when this shift
24 happened, you were allowed to sign into or log onto
25 the Avaya system simultaneously with your

### Page 56

1  applications?
2     A   Yes.
3     Q   But previously you had to log into your
4  applications before you logged into the Avaya switch?
5     A   Correct.
6     Q   And you're not sure when that change --
7     A   No. I don't know when exactly that change,
8  but that's -- the key here is that they didn't -- they
9  did not want us to log in on that phone until a minute
10 or so prior to our start time.
11    Q   And that was communicated to you by
12 Mr. Bethea?
13    A   Yes.
14    Q   And also Miss Williams?
15    A   That's correct.
16    Q   And then sometime during Miss Williams'
17 tenure, it changed?
18    A   Right. We went to these notes here because
19 people was either logging in late or -- and then it
20 was -- say, it doesn't matter if they're -- there was
21 some discussion, but I don't want to put anybody else
22 out there.
23    Q   So at the time that this sequence change
24 that allowed you to log in simultaneously to both the
25 applications and the phone switch, did your

### Page 57

1  practice -- what did your practice become at that
2  point? Did you start logging in simultaneously to the
3  applications?
4     A   Well, me personally --
5     Q   Yes.
6     A   -- I logged in. This way I knew I would
7  not be marked late, but I still had to start bringing
8  up my systems.
9     Q   I may have missed a part of it. Did you
10 start logging into your phone first to make sure you
11 weren't late?
12    A   I -- I just logged in, yes. I logged in,
13 and then when my 10 o'clock -- when all my systems
14 were available, I hit available.
15    Q   So at some point you started as a regular
16 practice logging into the Avaya system first, then the
17 computer system? From a sequencing standpoint?
18    A   Yes.
19    Q   And you're not sure when that process
20 started?
21    A   Basically when she indicated here it did
22 not matter. It did not matter if we logged in, you
23 know. We went into AUX-3, so then, you know, but --
24    Q   And prior to this change that we've been
25 talking about, you would log in, as a regular

Witness:   Charles Seward

16 (Pages 58 to 61)

Page 58

1  practice, to the applications first, then into the
2  phone?
3      A    That one minute before our start time, yes.
4  In other words, I'll be bringing up my system. Give
5  you an example. My start time is 10 o'clock.
6      Q    Right.
7      A    If I come in 20 after nine, say, I'll -- or
8  say I come in 20 minutes to ten, I'll start bringing
9  up my systems. My applications, the workstation as a
10 whole. Then it's almost ten. One minute before ten,
11 five-digit code. I'm in AUX-3. At 10 o'clock I hit
12 available.
13     Q    And that was -- I mean, the sequence you
14 just talked about was logging into your applications
15 first?
16     A    Yes.
17     Q    As opposed to the phone?
18     A    Right.
19     Q    Is that -- that's not what you do
20 currently, or --
21     A    Now, since there's no -- I'll just log in
22 so I will never forget to be late.
23     Q    Okay.
24     A    You see? So it really doesn't matter
25 because there was such emphasis on one minute or two

Page 59

1  minutes before your start time, to log in then. Now
2  they told us they don't -- they -- they don't care.
3  There was some -- something happened where this note
4  went out that freed up this -- whatever it was.
5  Something happened for this note to come out. I
6  forgot what it was or who was involved. Something
7  happened where the management team came out and said,
8  hey, it doesn't matter; just log in anytime you want.
9          MR. ZOURAS:  When you refer to note, can you
10 just tell us --
11 BY MR. RAY:
12     Q    Which exhibit?
13         MR. ZOURAS:  Thank you.
14         THE WITNESS:  Exhibit 2 and 3.
15         MR. ZOURAS:  Thank you.
16         THE WITNESS:  I'm sorry.
17         MR. ZOURAS:  No. You're fine.
18 BY MR. RAY:
19     Q    Okay. We have talked about applications,
20 logging into applications. Let's talk about
21 currently, because I assume they have changed
22 certainly between IBM Teach and SCET. What
23 applications currently do you have to log into to be
24 ready for your day?
25     A    Lotus Notes. Let's see. Lotus Notes, Call

Page 60

1  Center. Next one is -- can I expound a little bit?
2  They just took some -- do you want the ones that
3  during this whole process, or the ones currently?
4      Q    Let's talk currently. Then we'll go
5  backwards. Okay?
6      A    Okay. SB, as Sam Baker, Client.
7      Q    Is SB the same as Client?
8      A    No. Actually, it's an SBClient. It's an
9  application. Let's see. See how I can do this. I'm
10 trying to look at my screen while I'm bringing up all
11 this stuff. Fastpass. That's F as in Frank,
12 A-S-T-P-A-S-S. CC -- wait. CMCICS. PMINQ, QL -- I'm
13 sorry. QSLAM. Contracts On Line. CallOwn, all one
14 word, C-A-L-L-O-W-N. Let's see what else I got here.
15 I'm trying to remember everything off the top of my
16 head. Let's see. BrioQuery. That's B-R-I-O, Query,
17 Q-U-E-R-Y. SW Entitlement reports. I'm trying to
18 think of what else here. Let's see. I said Lotus
19 Notes; right?
20     Q    Yes.
21     A    Can you read them back to me? I know
22 there's additional, but I'm trying to remember
23 everything that we got.
24     Q    Lotus Notes, Call Center, SBClient,
25 Fastpass, CMCICS, PMINQ, QSLAM?

Page 61

1      A    QSLAM, yes.
2      Q    Contracts On Line, CallOwn, BrioQuery, and
3  SW Entitlement.
4      A    Also BP, BP Contracts. Let's see. A
5  couple more. How many is that?
6      Q    I count 16.
7      A    Yeah. I think there's a couple more, but I
8  can't remember the rest.
9      Q    Well, let me ask you real quick -- and the
10 tape is about to end. Do you log into all of these
11 tools first thing in the morning, or do you log into
12 some throughout the day?
13     A    First thing in the morning. They all
14 require a password.
15     Q    So you log into every single one of these
16 tools --
17     A    That's correct.
18     Q    -- you just described?
19     A    None of them come up on their own without a
20 password.
21     Q    Let me finish my question. I think we
22 talked over each other just a little bit. So first
23 thing in the morning every day, currently, because
24 we're going to go backwards, you log into every single
25 one of these before your day starts?

Witness: Charles Seward

17 (Pages 62 to 65)

Page 62

1  A   That's correct. They should be up and
2  running.
3  Q   Have you ever been told that you don't
4  necessarily need to log into every tool until -- you
5  may not need the tool that day?
6  A   Correct. I -- let me back up. I would use
7  -- I would log onto everything that I would normally
8  use first. You're correct.
9      MR. RAY: The tape is about out. Let's take
10 a break, and then we'll let the tape get changed.
11     THE VIDEOGRAPHER: Off video.
12 (Thereupon, a recess was taken.)
13     THE VIDEOGRAPHER: On video.
14 BY MR. RAY:
15 Q   Mr. Seward, before the break we were
16 talking about the tools that you currently use.
17 A   Yes.
18 Q   And you went through, I believe, 16 or 17,
19 and I think you said you are not positive that's all
20 of them. There may be a couple more. I'm not
21 trying --
22 A   Yes.
23 Q   -- to hold you to memorizing every tool.
24 You also said, I think, that you -- in the -- before
25 you start the day, you log into the tools you normally

Page 63

1  use. I think that was the phrase you used.
2  A   Yes. Yes. There's -- there's a -- there
3  are tools that -- that I know I'm going to use. I
4  make sure those guys are up before the other ones are
5  -- I might have, say, a half dozen that I do not --
6  they might time out, if you will, if you do not use
7  them. They'll log themselves off.
8      So they're there. They're up. They're
9  up, but they're not logged on with a password, but I
10 can log onto them if something happens with a customer
11 that I need additional information that that tool
12 might have for me, but those are the guys -- those
13 tools are -- are the tools that I don't use as often.
14 Q   Okay. Let's talk about the tool -- well,
15 let me back up. When you come -- when you first are
16 starting to boot up the computer, I assume you have to
17 turn it on each day?
18 A   Yes.
19 Q   And then what is the first thing you have
20 to actually type a password or take some action to log
21 into?
22 A   Yes. I have to log onto my workstation.
23 Q   And once you log into your workstation,
24 does that then bring up various icons that you can
25 then log into?

Page 64

1  A   Let's see. The first one? Yes.
2  Q   For example, does it bring up a Lotus Notes
3  icon?
4  A   Yes. It shows the icon for Lotus.
5  Q   And let's talk first about the -- the tools
6  you normally use. The ones that you would log into
7  regularly at the start of your shift.
8  A   Yes.
9  Q   I assume that would include Lotus Notes?
10 A   Correct.
11 Q   Which other ones? And if you would like, I
12 could read through the ones you named.
13 A   Okay. I would -- I would -- I would
14 definitely need Lotus Notes, SBClient, Call Center.
15 Let's see. IEE, that's the one I forgot. Well,
16 actually IEE is the Call Center. I'm sorry. So it's
17 Call Center, SBClient, Lotus Notes, Contracts On Line.
18 Software -- let me back up. The terminology is
19 BrioQuery. Let me see. Fastpass, PMINQ, CMCICS.
20 Let's see. SBClient. Could you read it back, the
21 ones I gave you, or the ones I definitely need?
22 Q   The ones you definitely --
23 A   The ones I just read?
24 Q   The ones you normally -- Lotus Notes,
25 SBClient, Call Center, Contracts On Line, BrioQuery,

Page 65

1  Fastpass, PMINQ, CMCICS.
2  A   I forgot something that I need. That'll
3  get me rolling.
4  Q   Do you -- so on a regular day you would --
5  or on a normal day you would -- when you are getting
6  ready to work, you would log into these tools you just
7  described?
8  A   Right. I need those guys to get going.
9  Q   Does every one of these tools you just
10 listed require a password?
11 A   Yes.
12 Q   Do you do them in the same -- or do you log
13 into those tools in the same order each day?
14 A   No.
15 Q   So you come in -- I'm just going to walk
16 through each tool. I want to try to get an
17 understanding of how long this takes.
18 A   Yes.
19 Q   Okay? You turn on your computer, right?
20 A   Yes.
21 Q   And then how long does it take the computer
22 to boot up to the point where you can log into the
23 workstation? And I'm sure there's a range here. I'm
24 not trying to --
25 A   A half a minute or so. What happens at