# EXHIBIT 4C

Witness:   Charles Seward

34 (Pages 130 to 133)

## Page 130

1    A    No, sir.
2    Q    For the ILC?
3    A    No, sir.
4    Q    Did Mr. Bethea tell you not to record that
5    time?
6    A    No, he didn't tell me not to.
7    Q    You understand it's your obligation under
8    the business conduct guidelines to record any time or
9    anything that you record for the company, accurately;
10   right?
11   A    Correct.
12   Q    Did you ever discuss with Mr. Bethea
13   whether you should record that time?
14   A    I possibly -- possibly did it in a
15   incorrect way.
16   Q    What do you mean by that?
17   A    Well, if -- if we were -- we were required
18   to be logged in or ready at our start time, I did
19   express to him a few times about, you know, coming in
20   early before our start time. You know, we don't get
21   -- you know, we don't get compensated for that. I
22   even did that in a class that we had.
23   Q    And this was to Mr. Bethea?
24   A    Directly to Mr. Bethea.
25   Q    Were you talking about it in the context of

## Page 131

1    doing this administrative work before your scheduled
2    shift time?
3    A    No. I zeroed in on early -- coming in
4    early to make sure our system was up so we can log in
5    on time, especially when we had that -- there was that
6    class, I think it was either in 2005 or 2006, and he
7    knew I was dissatisfied with coming -- requiring us to
8    come in early.
9    Q    Let's talk about that.
10   A    Yes.
11   Q    Your conversation with Mr. Bethea. Before
12   we do, I just want to make sure I understand it. You
13   were not talking to him about -- specifically about
14   this admin work?
15   A    That's correct.
16   Q    Did you ever talk to anyone about whether
17   you should be recording time for that admin work?
18   A    You know, as employees we all spoke about
19   it amongst ourselves. You know, about coming in
20   early.
21   Q    Did you ever talk to a supervisor or
22   management-level employee at IBM about whether you
23   should record --
24   A    I --
25   Q    Let me finish the question. Whether you

## Page 132

1    should record -- and I'm talking specifically about
2    the admin work you were describing. Whether you
3    should record time for the admin work you did before
4    your shift?
5    A    No.
6    Q    And I think you said you can't recall
7    specifically when you would have done this admin work.
8    You think it was maybe possibly up through 2006, so
9    just a couple years ago?
10   A    Right. Prior to the downturn of our
11   department. When I say downturn, I'm referring to the
12   lack of volume of work that we were doing. That's the
13   period of time I'm referring to.
14   Q    So when you were doing the admin work, do
15   you have to be logged into the system to do that?
16   A    Yes.
17   Q    Do you have to be logged into Avaya to do
18   it?
19   A    At that time, no.
20   Q    Did you ever tell Mr. Bethea that you were
21   doing that work before your shift?
22   A    I can't recall.
23   Q    Do you know if he knew you were doing that
24   work before your shift?
25   A    I can't speak for him.

## Page 133

1    Q    Let's talk about what you raised a second
2    ago, that -- you said you talked to Mr. Bethea about
3    not getting paid for coming in early to make sure your
4    tools were up. Did I say that right?
5    A    I didn't -- the exact -- basically what
6    happened was, in -- we had a class on a new version of
7    Avaya coming in, and it was expressed to us that we
8    should come in early to make sure everything got up
9    and everything was working correctly, and that's when
10   I expressed that I think it's going to be a problem
11   because we have to come in early and not get paid.
12   And I said that directly to Mr. Bethea, and this was
13   in a classroom environment.
14   Q    Do you recall when this was?
15   A    Jane Jesser conducted the class. Jane, and
16   the last name is J-E-S-S-E-R, maybe.
17   Q    But you don't recall when that was?
18   A    I'm sorry. I don't know an exact date of
19   the class itself.
20   Q    Do you know what year it was in?
21   A    I'm sorry. I'm not -- I'm not sure.
22   Q    Was that the first time that Mr. Bethea had
23   said that you need to come in early to make sure your
24   tools are up and everything is working right?
25   A    Actually, it was the instructor indicating

Witness:   Charles Seward

35 (Pages 134 to 137)

Page 134

1  what we needed to do.
2     Q   The Jesser? Jane Jesser?
3     A   Right. Right. To make sure that the
4  system came up and so that everything would be up and
5  available for our start time.
6     Q   Which system?
7     A   That's the workstation.
8     Q   But this was a training class on Avaya?
9     A   Right. They had a new version of it coming
10 out where we had to do something special. I'm trying
11 to remember if that's when we actually -- it actually
12 came off our workstation and we can actually
13 physically do it on the phone versus having to bring
14 up the whole system. I just can't remember the class.
15    Q   Is -- was the instruction to come in early
16 to make sure everything was working properly, tied to
17 the fact that there was this new rollout of a new
18 version of Avaya?
19    A   No. That -- that was expected -- that was
20 every day.
21    Q   And the instructor said that?
22    A   Yes.
23    Q   Had anyone told you that before?
24    A   We'd been doing it already, so -- but this
25 was really -- how can I explain it? This was actually

Page 135

1  -- we always -- we had been doing it already, because
2  that's the way we had to do it to make sure we would
3  get on-line and up -- available on time.
4     Q   So you'd already -- you were already under
5  the impression as of the time of this training class,
6  that you had to come in, in time to get your tools up
7  and be phone ready?
8     A   Yes, sir.
9     Q   And then this instructor said it?
10    A   Then this instructor amplified it again, so
11 -- you know, and that's when I had said something to
12 Kerry Bethea, because he was in the class with us.
13    Q   And you said to Mr. Bethea you thought that
14 would be a problem because you're not getting paid for
15 it?
16    A   Right.
17    Q   But you had not been getting paid for it?
18    A   That's correct.
19    Q   So why was it suddenly a problem?
20    A   Because it looked like the way the class
21 was explained, we had to be in there earlier than 15
22 minutes, you know, so --
23    Q   Did the instructor say you needed to be in
24 there earlier than 15 minutes?
25    A   No. They said just 15 minutes, at least 15

Page 136

1  minutes, ahead of your start time.
2     Q   And what was Mr. Bethea's response when you
3  raised the issue?
4     A   Didn't say a word. Did not say a word.
5     Q   Who else was in that training class?
6     A   Oh, Sharrie Brown, Sabrina Costafran. I
7  think -- I'm trying to remember everybody who was
8  still in the department at the time. Let's see. Joe
9  Yacowatz. Cathy Barday, B-A-R-D-A-Y. I'm trying to
10 think of who else. I apologize. I don't -- I'm not
11 sure.
12    Q   Was it -- was the training to IBM Teach
13 personnel?
14    A   Yes.
15    Q   Jane Jesser, is she still with IBM? Do you
16 know?
17    A   I believe so, yes, sir.
18    Q   Was she in the Atlanta call center?
19    A   She was one of the lead persons for the --
20 they call it telephony, it's just like it sounds.
21 Telephony group.
22    Q   Was she talking in the context of coming in
23 early about any of the metrics like schedule adherence
24 or the DOR? Anything like that?
25    A   No, sir. Not -- not that I remember. I

Page 137

1  apologize. I don't remember the class. I just
2  remember the situation.
3     Q   Was it in the Atlanta call center? The
4  class?
5     A   It was actually at Hillside. I'm --
6  Highlands.
7     Q   Do you recall how many people were in the
8  class?
9     A   I think our group was broken in two, but
10 I'm not sure.
11    Q   When you say your group, the IBM Teach?
12    A   Yes, sir.
13         (Thereupon, marked for identification,
14 Defendant's Exhibit D10.)
15 BY MR. RAY:
16    Q   Oh, I gave you the wrong one, Mr. Seward.
17 You need the one with the label. I'm handing you
18 what's been marked Exhibit -- is that Exhibit 10?
19         MR. ZOURAS: Yes.
20         THE WITNESS: Yes.
21 BY MR. RAY:
22    Q   And this is an e-mail from you to Janie
23 something --
24    A   Yes.
25    Q   -- dated October 18, 2007, at 7:18 a.m. Do

Witness: Charles Seward

36 (Pages 138 to 141)

Page 138

1  you recognize this e-mail?
2      A   Yes.
3      Q   And who is Janie?
4      A   Jane is a -- again, another high school
5  classmate. We had a -- a reunion in August.
6      Q   This e-mail is -- the time on it,
7  7:18 a.m., which is clearly before your --
8      A   Yes.
9      Q   -- ten-to-seven shift?
10     A   I don't know what -- I know my scheduled
11 time still was ten to seven at that time, but 7:18,
12 either I was in there for a class or -- I'm sorry. I
13 don't know why I was in there that early. I'm
14 thinking that we had some kind of class or -- if I'm
15 in that early, that's possibly what it is.
16     Q   It would be rare for you just to go to work
17 that early?
18     A   Once in a while, if I had like insomnia or
19 something like that, but I'm not going to be -- you
20 know, I'm not going to try to get there too early.
21 Sometimes -- I'm just trying to think here. I mean, I
22 might have had a class.
23     Q   And again for the record I'll just state,
24 these may have been converted to central time, so it
25 very well could be 8:18. We'll clear that up.

Page 139

1      A   Yes. But still would have been way ahead
2  of my start time, so I'm thinking either we were
3  having like a refresher class or something was going
4  on, or maybe that day I got up early or something.
5          (Thereupon, marked for identification,
6  Defendant's Exhibit D11.)
7  BY MR. RAY:
8      Q   I'm going to hand you what's been marked as
9  Exhibit 11, and this is an e-mail. The top e-mail on
10 Exhibit 11 is from your IBM address to your personal
11 address, and then it attaches an e-mail chain. Do you
12 recognize this?
13     A   Yes.
14     Q   And this e-mail is dated April 21 of 2008.
15 Do you see that?
16     A   Yes.
17     Q   Would this still be in your AOL account?
18     A   Yes. I mean, it should be, but -- I know I
19 sent it out. Yes. This should be -- yes. It should
20 be, but I can check or whatever.
21     Q   I didn't think it was possible for it to
22 get louder, but --
23         (Thereupon, marked for identification,
24 Defendant's Exhibit D12.)
25 BY MR. RAY:

Page 140

1      Q   Let me hand you what's been marked Exhibit
2  12. This is an e-mail from your personal address --
3      A   Yes.
4      Q   -- or from your IBM address to your
5  personal address, attaching an e-mail from Service Pal
6  to you at your IBM address. Do you see that?
7      A   Yes. Yes.
8      Q   Do you know what this is?
9      A   It's just telling me that I have a package
10 coming.
11     Q   Did you do some on-line shopping from IBM?
12     A   Not from IBM, but -- from my home, but they
13 sent the notification to my IBM address.
14     Q   Do you know why if you were shopping from
15 home, they would not have just sent the notification
16 to your home address?
17     A   I'm thinking that when I -- it has my job
18 address.
19     Q   Let's talk briefly about the badge --
20 security badge process. To get into your floor,
21 anyway, you have an access card; right?
22     A   Yes.
23     Q   Do they call it a badge?
24     A   Current, or before? Currently, or --
25 because they changed some things already.

Page 141

1      Q   Let's talk current.
2      A   Okay.
3      Q   First let me ask you this question. When
4  you arrive at work, how long does it take you to get
5  from the parking lot to your chair? To your seat in
6  your cubicle? Roughly?
7      A   Six, seven minutes.
8      Q   And currently when you -- you go into the
9  lobby area, and you don't -- do you need a card to get
10 from the lobby into the elevator bank?
11     A   No, sir.
12     Q   Then you're on the fifth floor --
13     A   Yes.
14     Q   -- right? You go up to the fifth floor,
15 and again we're talking currently. Do you need your
16 access card to get into the fifth floor?
17     A   Yes.
18     Q   To get to your cube?
19     A   Yes.
20     Q   And how close is your cube to the elevator
21 bank?
22     A   One minute away.
23     Q   You said there have been some changes
24 because you asked about current or in the past. What
25 were you referring to there?

Witness:   Charles Seward

37 (Pages 142 to 145)

### Page 142

1  A  Well, the -- when we was at Teach, at one
2  point we had to badge in on the -- in the lobby,
3  before we can even get to elevators. Now they got rid
4  of that procedure, and now you can do what -- you go
5  right through the -- the front desk, and then you only
6  have to badge in on the floor that you go onto, but
7  before we used to badge in on the -- in the lobby, and
8  then upstairs on your main floor.
9  Q  And you don't have to badge in to leave?
10  A  No.
11  Q  You can exit the building without using --
12  A  No.
13  Q  Is that correct?
14  A  That's correct.
15  Q  Do you have to badge in to get to the
16  cafeteria?
17  A  No.
18  Q  Is there -- do people ever -- and I don't
19  know if this is the right term. This is my term.
20  Piggyback? Where someone uses their badge and someone
21  comes in behind them?
22  A  I guess that happens, but it's against --
23  you can't do it.
24  Q  You don't do it?
25  A  No, I don't do it, but -- I've seen people

### Page 143

1  get fired for it. Those badges are cleared for
2  certain floors, so somebody could come -- don't belong
3  on your floor can follow you or -- follow you in.
4  Q  Do you see a report of badge activity?
5  A  No.
6  Q  Do you know anyone who does?
7  A  Do I know of anybody who does?
8  Q  Yes.
9  A  No. No. I don't know any of that type of
10  information. That's security. No, sir.
11  Q  We talked about -- I want to go back for a
12  minute to the kind of log-in sequence, and we talked
13  about the fact that in '07 sometime you started, or at
14  least you gained the understanding that you could log
15  in simultaneously -- you could log into Avaya
16  simultaneously with logging into your tools. Did I
17  say that right? That you did not have to wait to log
18  into the phone until the start of your shift?
19  A  That's correct.
20  Q  Prior to gaining that understanding, were
21  there ever times, Mr. Seward, where you were running
22  late and you would log into your phone just to show
23  you were there before you logged into your tools?
24  A  Sure. Sure. You want to be on time, yes.
25  Q  And were -- and again, prior to the time

### Page 144

1  period in '07 when the understanding changed as I just
2  described it; were you aware of other people who did
3  that?
4  A  I would -- nobody wanted to be late. Even
5  though your system might not be up and available, you
6  logged in right away when you walk through the door.
7  I did it once this week. I think I got there just at
8  10 o'clock. I logged in right away and started
9  bringing up my system.
10  Q  I want to talk about an e-mail that I
11  believe you produced that we have not had a chance to
12  talk about yet. I had it right in front of me until I
13  needed it. Is that Exhibit 12 in front of you there,
14  Mr. Seward?
15  A  Yes.
16      (Thereupon, marked for identification,
17  Defendant's Exhibit D13.)
18  BY MR. RAY:
19  Q  I'm going to hand you what's been marked as
20  Exhibit 13, and I'll ask you if you recognize this
21  document?
22  A  Yes.
23  Q  Is this an e-mail that you forwarded to
24  your home address?
25  A  That's correct.

### Page 145

1  Q  And this you would still have on your
2  computer? By "this," I mean Exhibit 13.
3  A  Yes.
4  Q  The -- down at the bottom of the first page
5  of Exhibit 13 it appears to be an e-mail forwarded by
6  Sharrie Brown. If you look at that small print there,
7  you see that? On 4/9/08?
8  A  Yes.
9  Q  Did she forward that to you?
10  A  Yes.
11  Q  And then you then forwarded it to your
12  home?
13  A  That's correct.
14  Q  It says, "FYI, this is the new DOR.
15  Effective date is August '06."
16      Do you see that?
17  A  Yes.
18  Q  And that was from Isabel Colon?
19  A  That's correct.
20  Q  And who is Isabel Colon?
21  A  She was our lead person reporting to Kerry
22  Bethea.
23  Q  So she was in IBM Teach?
24  A  That's correct.
25  Q  And then there's an e-mail attached talking

Witness:   Charles Seward

38 (Pages 146 to 149)

### Page 146

1    about the DOR. What is a DOR?
2    A    Daily operating, or operational, report.
3    Q    And are you provided copies of the DOR? Or
4    DORs?
5    A    No. That's the -- the report that is -- I
6    really can't speak on the D -- I can't talk about the
7    report. I don't produce it.
8    Q    This e-mail that we're talking about,
9    Exhibit 13, that came originally from Isabel Colon, do
10   you know if this was sent to you back?
11   A    Yes. It was, but I didn't have a copy of
12   it. It was sent to the Teach Team.
13   Q    Do you recall receiving it?
14   A    I remember it, but I didn't keep it.
15   Q    And what is -- what did you interpret this
16   e-mail to mean? And take -- if you want to take your
17   time and refresh, it's not a short e-mail. Feel free.
18   A    That we were supposed to come in early and
19   that the time would be adjusted later.
20   Q    What do you mean by time would be adjusted
21   later?
22   A    I believe there's a -- I'm trying to
23   remember this e-mail.
24   Q    Take -- and take your time.
25   A    May I?

### Page 147

1    Q    Yes, of course.
2    A    This is -- see, on the second page,
3    page 2 --
4    Q    Yes.
5    A    -- I think -- this is only my
6    interpretation. In the bottom there you will see the
7    number one in parenthesis, and then below you will see
8    AUX-8.
9    Q    Yes. I see that.
10   A    All right. And then you'll see in the
11   second sentence it says, "Provide WFM." I think
12   that's work force management. I think that's what it
13   stands for, work force management. I think that's
14   what it stands for. With those hours we will manually
15   include them in the -- in the DOR. In other words,
16   they were manually changing the start times.
17   Basically, I can't really comment on this because this
18   is not my document.
19   Q    Right.
20   A    But this is a document where they were
21   indicating that we got to come in early and be ready
22   at 9 o'clock -- be ready at our start time. I'm
23   trying to think what other pertinent thing came out of
24   this. See, in this -- in this document -- this area
25   here, where it says here --

### Page 148

1    Q    Yes, the middle of the page 2?
2    A    Middle of page 2 of the document --
3    Q    Yes.
4    A    -- Exhibit 13.
5    Q    Right.
6    A    It's another amplification where they are
7    telling us, you know, don't log in early. I mean, get
8    your systems up and running, but make sure that you
9    log in on the right time, and don't log in before, or
10   don't do anything. So it's always contradictions,
11   like now they're saying, go ahead, don't worry because
12   there's issues going on. But it was -- it was a known
13   fact, whether it was unwritten or written, that that
14   is what was the procedure, and that's what we were
15   required to do.
16   Q    This e-mail that is Exhibit 13, you read
17   that middle part of page 2 to be saying, don't log in
18   early, but make sure that you are ready to work?
19   A    That's correct, sir.
20   Q    And your, I think, testimony is that that's
21   consistent with what your understanding was anyway at
22   that time --
23   A    Yes.
24   Q    -- is that right?
25   A    That's correct.

### Page 149

1    Q    Now, if you look at that paragraph 1, it
2    says, "Ensure reps log in only as required; i.e.,
3    scheduled to work at nine, be ready at 8:50, but only
4    log in at 9 a.m. to ensure we're not accumulating
5    unproductive hours under default AUX or AUX-0 for
6    which we're not utilizing or occupying the reps in
7    question."
8         Did I read that correctly?
9    A    That's right.
10   Q    Do you understand what that means with
11   respect to the AUX codes?
12   A    Well, how I read this is that it's saying,
13   hey, if the rep is supposed to be to start work at
14   9 o'clock, make sure he's ready prior to that. He's
15   up and ready to go, but don't log in until 9 o'clock.
16   In other words, you're going to be there and you're
17   going to bring up your application. You're going to
18   be ready to work, but you don't -- don't log in until
19   nine, your start time.
20   Q    Was this mandate -- this was near the end
21   of the tenure in IBM Teach?
22   A    I believe so.
23   Q    It appears to be. It looks like -- it
24   says, "This new DOR effective date is August of '06."
25   A    Right.

Witness:  Charles Seward

39 (Pages 150 to 153)

### Page 150

1   Q   Was this same mandate carried over to SCET?
2   A   Well, we went into training. I mean, we
3   went into training mode, so our start time would be
4   8 o'clock, 8:30, things like that, but I believe from
5   what I -- when I was speaking to other reps,
6   especially since this situation has gone forward, this
7   was the norm.
8   Q   Even though SCET was not on schedule
9   adherence?
10  A   This was the norm. That's what I'm saying.
11  Q   Is your understanding?
12  A   That's my understanding, and the key here
13  is, when you look at this, this Exhibit 13, this came
14  from our lead.
15  Q   Team?
16  A   Team lead, for Kerry Bethea. Now, it's
17  important that -- if you look at the documentation, it
18  actually -- it -- it explains itself as it's going to
19  all the teams on the floor. You have -- even talks
20  about different agent groups. You have the CSRs,
21  which is just the -- the people like myself who
22  receive the calls, and then you have the SW CET plus.
23  Those are like the lead people, like the -- the lead
24  person that reports to the manager or the supervisor,
25  if I can use that term.

### Page 151

1        Or if there's a person who is just an
2   admin, they don't receive any calls. They have --
3   they're even instructed here. So this is telling me
4   right there that this is going throughout the floor.
5   You see what I'm saying? Because every team has a
6   senior elite team lead. Every team has administrative
7   folks, if you will, so -- and then it's talking about
8   the SW CET plus. Those are lead people, or people who
9   do not take inbound calls.
10  Q   There were -- there were CET -- were there
11  software CET within IBM Teach?
12  A   Basically what they're saying, the inbound
13  reps, if I can use that term. Persons like myself who
14  take inbound calls. Then you have, quote, unquote,
15  the senior person --
16  Q   Right.
17  A   -- who might repeat -- report to the
18  manager, or they might be a senior person on the
19  floor. They use the term "analyst" in my environment.
20  This -- this no -- from my -- from what I see here, it
21  went through -- throughout the organization, just that
22  this one came from Isabel Colon to us directly.
23  Q   This actual Exhibit 13 doesn't actually
24  show who this note went to, does it?
25  A   That's correct.

### Page 152

1   Q   And obviously it got to Isabel Colon. We
2   know that; right?
3   A   That's correct.
4   Q   And then she sent it out to -- it looks
5   like, at least, Sharrie Brown, who was a call center
6   rep on the phone type; right?
7   A   Yes.
8   Q   Okay. Do you have any knowledge, Mr.
9   Seward, personal knowledge, of this e-mail being
10  forwarded to any other people by other team leads or
11  managers?
12  A   No, I do not have personal knowledge.
13  Q   And let's talk about Gary Kamprath, because
14  it looks like he's the one at the bottom of the e-mail
15  on page 3 there. Do you see that?
16  A   Yes.
17  Q   Do you know Gary?
18  A   Yes, I know Gary.
19  Q   Have you ever talked to him about this
20  e-mail?
21  A   No, sir.
22  Q   Have you ever talked to him about how he
23  analyzes the DOR reports?
24  A   No, sir.
25  Q   Have you ever talked to him about what's --

### Page 153

1   what are the important factors for the DOR reports?
2   A   No, sir.
3   Q   I assume he's never consulted with you on
4   the DOR reporting?
5   A   No, sir.
6   Q   Is that correct?
7   A   That's correct.
8   Q   Do you know whether the DOR reports are by
9   agent or by group?
10  A   I really can't speak on the DOR, sir.
11  Q   Let's talk about schedule adherence.
12  What's your understanding of what that is?
13  A   In the Teach, schedule adherence is that
14  they -- they give you a fluctuation, I believe, of
15  ten percent. They give you a schedule. Basically,
16  schedule adherence is they schedule the agents so that
17  they take their breaks and lunches at certain times so
18  that there will be X amount of folks on-line to
19  service the customer, and schedule adherence is that
20  by keeping your scheduled breaks and lunches keeps
21  those service levels up, if I can use that term.
22       Service levels mean that we are
23  mandated -- say our service level should be
24  85 percent. If everybody walked out of the building
25  at their unscheduled lunchtime and there was nobody

Witness: Charles Seward

40 (Pages 154 to 157)

Page 154

1  manning the calls, the calls would be waiting for
2  minutes or people would be on hold for long times, so
3  that would affect service levels.
4      Q    And SCET was not on schedule adherence?
5      A    They say we are not on schedule adherence.
6      Q    Do you know why SCET would not be on it and
7  other -- another group or groups would?
8      A    My opinion, or --
9      Q    Do you have actual knowledge of why?
10     A    No, sir.
11     Q    And then I'll ask for your opinion?
12     A    Because we're in an admin environment, but
13 they're trying to keep it as an inbound call
14 environment.
15     Q    What do you mean by that?
16     A    It means that sometimes there is a --
17 there's work that you have to do, you have to
18 investigate. If you are telling an employee that,
19 hey, you only have ten percent of your time, it might
20 sound like a lot, but ten percent of your time is you
21 can only have that for admin time.
22          But you might have a call, say, from --
23 I'll give you an example. I'm trying to think of a
24 good one. State of New York. You might -- you might
25 be trying to find out, 45 minutes, an hour for that

Page 155

1  call, because the state of New York might have a
2  zillion accounts. So schedule adherence and -- I
3  think it's a -- they say we don't have schedule
4  adherence, but they still have us on the schedule.
5  They still have you taking inbound calls. It -- this
6  sounds like in the front end -- they're stressing out
7  the agents in the front end to make the numbers look
8  good -- numbers look good on the back end.
9      Q    When you're talking about the
10 administrative environment versus inbound, you're
11 saying the SCET Team is an administrative environment?
12     A    We're an inbound. We do have -- there are
13 times when we need to do some investigative work,
14 which is really admin, so you use AUX-3. Now, you
15 have some folks who have more administrative time than
16 others, but currently in our environment that's the
17 one thing I -- I -- I openly say. Right now we're
18 admin, but they're trying to keep us inbound.
19          The main reason is because there's a
20 transition going on again for outsourcing our work, so
21 we're -- we're correcting a lot of work that's
22 being -- errors, if you will, that's being done by the
23 group out of India, so we have a lot of admin work to
24 do right now.
25     Q    Now, your admin work, tell me what you

Page 156

1  include in admin work. I assume it's research, for
2  one?
3      A    Basically, that's what it is. I mean, the
4  other folks, everybody on the floor have different
5  admin duties, or they have things that they have to
6  do. They audit our work, things like that, but I
7  can't speak on their duties. I can only speak on
8  mine, but normally AUX-3 -- when I use AUX-3 is for
9  investigative type situations or finishing up
10 something that I found.
11     Q    And how much time can you spend -- did you
12 say there was a -- parameters on how --
13     A    They got a parameter now at ten percent.
14     Q    In AUX-3?
15     A    AUX-3.
16     Q    What were you referring to with respect to
17 India? Do you do admin work to support India?
18     A    Basically what's happening right now, they
19 made an announcement two weeks ago, or end of
20 September, they were going to a do a pilot program
21 that the -- they are training new agents in India to
22 take the calls for the front end, that SW CET group.
23     Q    Right.
24     A    So currently they've hired, I don't know,
25 over 20-something agents over in India that have just

Page 157

1  gone through training, and they are currently taking
2  inbound calls, the same calls that the front-end
3  agents take at our location right now. They are
4  calling it a pilot program.
5          (Thereupon, marked for identification,
6  Defendant's Exhibit D14.)
7  BY MR. RAY:
8      Q    Earlier you'd talked about Mr. Bethea
9  telling you not to log in early, and I wanted to give
10 you a e-mail, which is Exhibit 14, and first I'll ask
11 you -- I think the second e-mail chain there is dated
12 8/27/04 from Mr. Bethea to you, and it says, "Charles,
13 once again please do not sign on prior to your start
14 time. If there is a reason this is happening, I need
15 to know."
16          Did I read that correctly?
17     A    Correct.
18     Q    Is this one of the technical -- one of the
19 examples of a time when Mr. Bethea was telling you not
20 to log in early?
21     A    Yes. Yes. Basically -- basically, he
22 knows that we have to come in here and get the system
23 up and -- but, you know, if you log in, even though
24 you're up, you're trying to bring all your systems up
25 and you log in -- that's how I am.

Witness: Charles Seward

41 (Pages 158 to 161)

### Page 158

1  Q   Let's look -- there's actually some log-in
2  times here on this e-mail, and first, the log-in dates
3  appear to be from this little screen shot, August 23,
4  2004, to August 27, 2004.
5  A   Uh-huh.
6  Q   Do you recall the shift you were on then?
7  A   This is probably the 8 o'clock shift.
8  Eight to four or eight to 4:30.
9  Q   Would it be eight to 4:30 because of your
10 lunch?
11 A   I'm thinking eight to 4:30 because I'm
12 looking at the log-out time.
13 Q   Right.
14 A   And, you know, this is a good example what
15 I'm talking about, because this is -- clearly shows
16 how if I -- if I don't have to be in until 8 o'clock,
17 why am I logging in 20 minutes prior? I'm not -- I'm
18 not going out to eat breakfast. I'm in there trying
19 to bring up the system, make sure it gets up on time
20 so I can log in on time, but if I don't do -- if I
21 don't come in early, like this 7:30, seven, 7:33 --
22 see this area? Like, give you an example. I might
23 have just made it on the 7:56 time.
24 Q   Right.
25 A   And this is -- this is what I've been

### Page 159

1  trying to explain to folks: That back in these days
2  here if you did not get that thing -- if you did not
3  come in early and do this, you would not be on time
4  for work.
5  Q   Well, let's look at the second entry there
6  where it's 7:34 a.m. log-in time.
7  A   Yes.
8  Q   My understanding was -- this was back in
9  2004 --
10 A   Yes.
11 Q   -- right? My understanding was that during
12 this time you would log into the computer tools before
13 you logged into the phone?
14 A   Then we're doing -- we're doing work or
15 we're bringing up our software that we need to do our
16 job during the day.
17 Q   But am I right on the sequence?
18 A   I don't know if we was still logging in for
19 that into the workstation or not.
20 Q   Were you still logging into your
21 workstation and tools before you logged into the Avaya
22 system?
23 A   See, I don't -- I don't really know if we
24 were doing it physically at the time on this phone,
25 which I don't think so. I mean, I don't think so.

### Page 160

1  Q   Was this during the period of time when you
2  had to log into the computer system before you could
3  log into the phone?
4  A   Right. This icon on that computer -- that
5  computer had to be up, but again, I don't know the
6  exact time that shift went over to the physical log-in
7  time, but I'm almost positive we was still bringing up
8  our computers to do that.
9  Q   So for that 7:34 a.m. entry, that's
10 triggered by the phone, whether it was through the
11 phone itself or through the system, where you had to
12 log up the system first and click on that icon; right?
13 A   Right.
14 Q   So as of 7:34 a.m. you'd already logged
15 onto all the tools?
16 A   Prior to 7:34? You mean after?
17 Q   No. As of that time? At 7:34 a.m. on that
18 second entry --
19 A   Right.
20 Q   -- you clearly had logged into the phone at
21 7:34 a.m.?
22 A   I'm thinking that we were still going and
23 bringing up our workstation, trying to bring our
24 workstation up and make sure it was up on time. Then
25 you hit the icon to activate the phone or the -- the

### Page 161

1  Avaya to show that we're here.
2  Q   Right. So on that second entry at 7:34
3  a.m., at that point in time you'd logged into your
4  tools and the icon?
5  A   Yes.
6  Q   So you still have 26 minutes until the
7  start of your shift?
8  A   Right. Right.
9  Q   If you had a 15-minute rule of thumb
10 rule --
11 A   Uh-huh.
12 Q   -- which I assume you had during this time,
13 but correct me if I am wrong?
14 A   Right.
15 Q   Is that right? You had a 15-minute rule of
16 thumb?
17 A   To be honest, I can't really comment
18 because I got to know if this is during the time where
19 the icon was on the computer that I'm in work early to
20 make sure that system is up, because even though it
21 shows that the log-in time is 7:34, me personally, I'm
22 thinking that I might have logged in and then started
23 bringing up my computer because it's either/or,
24 counselor. It's either that I've logged in and I
25 started bringing up my workstation or I have been

Witness:  Charles Seward

42 (Pages 162 to 165)

Page 162

1  there earlier and I'm trying to bring up my computer,
2  so the log-in.
3      I just don't know if -- which situation I
4  was in. I'm thinking that I logged in on the phone
5  and started bringing up my system. That's what I'm
6  thinking, but I really can't tell because I don't know
7  when during this time we went from the old system, but
8  I'm thinking that I logged on the phone and started
9  bringing up my computer.
10     Q  Well, let me -- and I may have had some
11 confusion over the sequence. In the 2004 time frame,
12 then, it may be that there were times you logged into
13 the phone first, then the system?
14     A  Yes.
15     Q  Is that true for 2005?
16     A  You know, I can't -- I don't have the
17 record. I really can't speak on that.
18     Q  What about 2006?
19     A  I normally would -- I believe we were
20 logging in on the phone in 2006.
21     Q  And then the system?
22     A  And then the system.
23     Q  And then booting up your tools when the
24 system --
25     A  But let me backtrack there a little bit.

Page 163

1  In 2006 we were told not to log in on our phones until
2  our start time.
3      Q  Right. 2004 you were told that too?
4      A  Yes, right.
5      Q  So -- but you were logging in, at least in
6  this week of August, 20 -- 26 minutes before your
7  start time on August 24?
8      A  Right. Right.
9      Q  And Mr. Bethea would say, stop doing that?
10     A  Right, because they didn't want us logging
11 in. It would mess up our productivity time.
12     Q  There was -- you said you may have very
13 well logged into the phone first during this time
14 period?
15     A  I got -- I don't know if we were logging
16 into the actual workstation or the physical phone. Me
17 personally, I'm just looking at the year and the time,
18 August and 2004. I'm thinking I logged on the phone
19 and started bringing up my system.
20     Q  Did Mr. Bethea know that you were following
21 that sequence?
22     A  I believe so, yes, sir.
23     Q  And he's telling you to log in? Do not log
24 into the phone?
25     A  Right. Bring up your system -- don't

Page 164

1  log --
2      Q  Let me finish the question.
3      A  Right.
4      Q  Don't log into the phone until your start
5  time?
6      A  That's correct. That's what he's saying in
7  the note.
8      Q  And he knew the sequence was, log into your
9  phone first, then the system?
10     A  Yes. He knew it.
11     Q  And is this true also in 2005?
12     A  I believe so, sir, but again, it was -- it
13 was always amplified to us not to log in. Even though
14 you were there bringing up your system, not to log in.
15 You know, I -- that's the way it was across the whole
16 board, on the whole floor. You know, most of the time
17 you logged in like this because you didn't want -- you
18 know, you're trying to bring up your system, and you
19 don't want to forget.
20     Q  Right.
21     A  Basically, that's what it is. Now, you can
22 cut it any kind of way you want.
23     Q  Right.
24     A  But the key here is, don't do it. One
25 minute of, bring up your system, get your stuff ready,

Page 165

1  get ready to take calls, but don't log in until your
2  start time.
3      Q  Was this the same -- let me back up. This
4  e-mail is telling you, do not log in until your start
5  time --
6      A  Yes.
7      Q  -- right? You've said that he understood
8  the sequence to be, log in and then -- log into the
9  phone and then log into the system, and here is the
10 question I want to ask. There's nothing in this
11 e-mail about flipping that sequence?
12     A  I don't understand.
13     Q  There's nothing in this e-mail saying what
14 you just described, which is this. You said that what
15 he was getting at here, and correct me if this is not
16 what you just said. I think you just said that what
17 he was getting at here was, come get your tools up,
18 and then wait to log into the system at your start
19 time?
20     A  Right. Basically, that's what this is all
21 about.
22     Q  Okay. But what I'm saying is, there's
23 nothing in this e-mail about that?
24     A  Right.
25     Q  Do you have any e-mails from Mr. Bethea

HUNDT REPORTING
214-220-1122

Witness:   Charles Seward

43 (Pages 166 to 169)

Page 166

1  where he said that?
2     A    I don't believe so, but I believe there
3  might be some e-mails from Miss Isabel Colon. Also
4  some Sametimes.
5     Q    Do you have those?
6     A    No, I don't.
7     Q    Let me ask you something about current
8  time. Your -- who sits around you?
9     A    Currently?
10    Q    Yes. You're in a cube environment; right?
11    A    Yes.
12    Q    Are you in one of those environments where
13 you have people right behind you?
14    A    To my side.
15    Q    To your sides? Who sits by you?
16    A    Sharon Jenkins.
17    Q    What about the other side?
18    A    It's Ayesha Austin.
19    Q    What about -- what about around you that
20 you see every day? That you're close to?
21    A    Mary Davis; Joyce Spann, S-P-A-N-N; and
22 Darlene Campbell. That's currently.
23    Q    Current? Let's talk current. How long
24 have those -- has that group sat around you, roughly?
25    A    Oh, as long as I've been in that second

Page 167

1  seat. Eight months, maybe.
2     Q    Do they work the same shift that you work?
3     A    No.
4     Q    Do you know what shift Sharon works?
5     A    9:30 to six.
6     Q    What about Ayesha Austin?
7     A    Eight to 5:30, maybe.
8     Q    Mary Davis?
9     A    It fluctuates.
10    Q    Is she a team leader?
11    A    No, but she's -- she's analyst.
12    Q    What about Joyce Spann?
13    A    Just a peer.
14    Q    What time -- what's her schedule?
15    A    Same as mine. Ten to seven, I believe.
16    Q    What about Darlene Campbell?
17    A    Same as mine.
18    Q    Do you get to work typically before, at the
19 same time, or after Joyce Spann?
20    A    I'm sorry?
21    Q    Do you get to work -- do you -- let me
22 change the question. Do you get to your cube for the
23 first time roughly the same time, before, or after
24 Joyce Spann? Or after Joyce?
25    A    It varies. You know, some people get in

Page 168

1  before each other.
2     Q    What about Darlene?
3     A    It varies. Sometimes she will be there
4  before me; some vice versa.
5     Q    Let's go back to Exhibit 14. Okay? And we
6  were talking about the exhibit with the e-mail from
7  Mr. Bethea to you in August 2004. Did -- Mr. Bethea
8  tells you not to sign on prior to your start time;
9  correct?
10    A    Yes.
11    Q    And did you start complying with that after
12 this e-mail?
13    A    I believe so. I might have forgot here and
14 there, but -- I really can't speak on it. I might
15 have missed it, or -- I try to go as close as
16 possible, if you will, but if I can -- can I expound?
17 Can I -- can I answer it? Can I speak about this,
18 or -- I'll answer your question. Go ahead.
19    Q    Well --
20    A    I believe I did. I believe I did. I
21 believe I did. I'm sorry.
22    Q    That's fine. Do you want to add something
23 about the e-mail?
24    A    This note was sent because they did not
25 want to mess up their DOR. They didn't want to mess

Page 169

1  up their productivity numbers. It had nothing about
2  me coming in early, working, bringing up this --
3  bringing up my system and starting work or trying to
4  get the system up. This is so it would not mess up
5  their numbers by logging in here. The reason why they
6  sent this note was because they wanted you to log in
7  one or two minutes before their start time so it would
8  not mess up their numbers.
9         Now, if they want twist it any way they
10 want, let them do it, but that's why he sent that
11 note, and Isabel Colon has sent notes out about
12 signing on a minute or two or whatever before the
13 start time, so it's -- this is interesting.
14    Q    And did you talk to Mr. Bethea about that?
15    A    No. I just -- I -- to be honest, our
16 communications with Mr. Bethea was null and void
17 except for official job duties.
18    Q    Did you tell Mr. Bethea or someone at one
19 point that you didn't trust him as far as you could
20 throw him?
21    A    Who? Me? Oh, I -- I don't trust him.
22 There's no way in the world I could trust this guy.
23    Q    Why not?
24    A    Huh?
25    Q    Why not?

Witness: Charles Seward

44 (Pages 170 to 173)

### Page 170

1  (Thereupon, an off-the-record discussion was
2  held between the deponent and Mr. Zouras.)
3  THE WITNESS: Can I answer?
4  MR. ZOURAS: I think so.
5  THE WITNESS: Because he's a crook.
6  BY MR. RAY:
7  Q  Why is he a crook?
8  A  Because he lies about our numbers. He's
9  lied about our numbers for years, so -- and if you did
10 just as much investigation about my e-mails and if you
11 look at his information, you probably already found
12 that out.
13 Q  What do you mean, he lies about your
14 numbers?
15 A  Well, our productivity numbers are wrong.
16 I mean, we're in there working, and you take X amount
17 of folks working, and you're telling the sponsor
18 you're doing -- look what a great job we're doing with
19 X amount of man-hours. I call it stealing, so you can
20 call it what you want. He wants to make the numbers
21 or whatever you want to do, but he's a crook.
22 Q  Which -- how did you come to learn that in
23 your view he was manipulating the -- giving incorrect
24 information to the sponsors?
25 A  Well, there was a lot of emphasis on these

### Page 171

1  sign-on times and working through our lunches and
2  doing certain things to manipulate the numbers or
3  sending us home early so that availability would stay
4  high. Things like that, that was manipulation, so
5  when you talk about crooking or -- you know -- know
6  what the saying was on our floor? He was cooking the
7  books.
8  Q  Who used that saying?
9  A  Hey, we all used it. It's the truth. If
10 you sitting up there and you see your availability or
11 your service availability is 98 percent and it's not
12 going lower and you're telling your sponsor that I
13 need ten people to do this job and you got the ten
14 people on availability and your availability is 98
15 percent and you're required to do 85 percent and you
16 start sending your people home early so that number
17 can go down, what do you call it?
18 Q  Did -- did you ever see the reports he
19 provided --
20 A  Oh, no, sir. No, sir.
21 Q  -- to the sponsors? Did you ever see any
22 of the contracts with the sponsors?
23 A  No, sir.
24 Q  Have you ever seen a single contract during
25 your employment with IBM with a sponsor?

### Page 172

1  A  No, sir.
2  Q  When you say sending people home early --
3  A  Yes, sir.
4  Q  Did he send you home early?
5  A  Oh, yes. I've went home early a few times,
6  that's correct.
7  Q  How often would you do it?
8  A  Whenever it was needed.
9  Q  Was that -- did it become more common in,
10 for example, 2006 when things were slowing down?
11 A  It happened ongoing, sir. We even had a
12 grab bag.
13 Q  What's a grab bag?
14 A  We put everybody's name in it and see who
15 can go home -- go home early.
16 Q  When he sent people home early, did he
17 change your time card so that you didn't get paid for
18 the time?
19 A  No.
20 Q  So you got paid even though you went home
21 early?
22 A  Yes, sir.
23 Q  And is it your understanding that was true
24 for the others?
25 A  That's correct, and also other departments

### Page 173

1  on the floor.
2  Q  Other departments on the floor that
3  Mr. Bethea --
4  A  Partner World, the other side of
5  entitlement. In fact, it's still going on today.
6  Q  And you view that as cooking the books?
7  A  Well, how would you view it?
8  Q  Well, I'm not the one on that side of the
9  table.
10 A  If you telling the sponsors that you need
11 XYZ to do the job and then you send folks home, say,
12 25 percent of your work force, to lower your service
13 level so the sponsor will only see that 85 percent
14 instead of 98 percent, what do you -- I call it
15 manipulation. Let's use that word, then:
16 Manipulation.
17 Q  But you don't know what's in the contracts?
18 A  No, sir. All I know is that the service
19 level say 85 percent, everybody, and that's what's
20 amplified to us all the time about -- about service
21 levels and productivity, and that's one of the key
22 issues of this e-mail: That he did not want to mess
23 up his productivity numbers.
24 Q  So to -- to cook the books as you say, you
25 would be sending people home quite a bit, not just

Witness: Charles Seward

45 (Pages 174 to 177)

### Page 174

1  sporadically?
2  A  It -- from time to time you might get one
3  person to go or two people. Maybe just one or two
4  heads make a difference.
5  Q  Every week?
6  A  No, I wouldn't say every week.
7  Q  How often would it occur?
8  A  As I indicated, when needed.
9  Q  But I -- how often? You were there. You
10 observed it. Is that once a month? Twice a month?
11 A  Twice a month, maybe.
12 Q  And when you say send home early, how
13 early?
14 A  Say if I was a -- it could be as early as
15 11. Say my quitting time is 4:30. It could be as
16 early as 11 or as late as two.
17 Q  So there were times where you were working
18 a shift where your end time was 4 o'clock, 4:30?
19 A  My quitting time?
20 Q  Your quit time?
21 A  It would be 4:30, say.
22 Q  And he would send you home as early as 11?
23 A  Eleven or two, yes. I mean, something
24 happened. It was a problem with that whole leaving
25 early thing, and it stopped. I don't know if somebody

### Page 175

1  complained or -- I don't know what happened, but all
2  of the sudden --
3  Q  When did it stop?
4  A  It was -- something bad happened. We don't
5  know what happened, and all of the sudden he said he
6  can't do it no more, so that was it.
7  Q  But you don't know when that was?
8  A  I can't remember the date and time, sir.
9  Q  I think you said --
10 A  Said it -- I'm not sure of the date.
11 Q  I think you said people are still doing
12 that across the floor?
13 A  They're still doing it.
14 Q  Does Miss Williams do it?
15 A  No. I don't recall. I think at one time
16 when we first came on board, but not anymore.
17 Q  Which supervisors on your floor do, do it?
18 A  Wendi Musgrove. You know, people talk.
19 Just like I indicated earlier, Wendi Musgrove I
20 believe is still doing it.
21 Q  Anyone else? And I mean supervisors.
22 A  Oh, you mean the actual manager?
23 Q  Manager, yes.
24 A  That I talked to folks and they left early?
25 I just know about Wendi -- Wendi Musgrove. I can only

### Page 176

1  speak of what I know.
2  Q  Let's go back to Exhibit 14, and I want to
3  look at the log-out time.
4  A  Yes, sir.
5  Q  You have log-out times at 4:31, 4:29, 4:33,
6  and 4:29?
7  A  Yes.
8  Q  When you were under Mr. Bethea, what was
9  your understanding of the log-out process or what you
10 needed to do to conclude your day? And by that, Mr.
11 Seward, I mean, were you required to stay on all the
12 tools and the phone right up to your end time, or did
13 you have five minutes where you could go into an AUX
14 code and get everything completed?
15 A  You log out at 4:20 -- at log-out time.
16 Q  And when you logged out -- for example, the
17 first ending was 4:31?
18 A  Yes.
19 Q  When you logged out of the phone system,
20 had you already logged out of all the tools?
21 A  Most likely I would say yes. I was
22 starting to come out of them, yes. I would say --
23 knowing me, I would say I was probably logging --
24 starting to bring down my system when I -- when I hit
25 log-out.

### Page 177

1  Q  Same with 4:29 there? Which is the 8/24
2  entry on Exhibit 14.
3  A  I believe so. I mean, I really can't say
4  at that time, but normally my procedures, probably a
5  minute or two before my quitting time I started
6  bringing down my applications.
7  Q  And is that your current procedures?
8  A  Yes. Probably one and a half minutes prior
9  to my quitting time.
10 Q  You start logging down?
11 A  I start -- I start -- I go into ACW at
12 approximately a minute or two minutes before my
13 quitting time. The reason -- that's just my normal
14 procedure. If I got anything going on, I just clean
15 it up, and if I'm in the middle of a -- a record,
16 updating a record or something like that.
17 Q  And do you know if that is your -- let's
18 just take the people sitting around you. Do you know
19 what their procedure is at the end of the day?
20 A  It's half and half. Some people do it the
21 same way I do it. Some people do it, they just stay
22 on until the last -- until a minute after.
23 Q  And how do you know that? Just based on
24 discussions?
25 A  No. Just so -- you know, some people don't

Witness: Charles Seward

46 (Pages 178 to 181)

### Page 178

1  have kids at home.
2  Q   Are you in this litigation claiming that
3  you were not paid for time at the end of your shift
4  that you worked? After the conclusion of your
5  scheduled time?
6  A   That personally did not happen to me.
7  Q   Do you think it happened to others?
8  A   Yes.
9  Q   And was it because of what you described
10 before? They don't have kids at home, so they just
11 stay on?
12 A   No, sir. Basically -- basically what
13 happens -- but this practice has changed drastically
14 since I came on board because of the big focus on the
15 overtime.
16 Q   What do you mean by that?
17 A   At one time it was -- it was -- it was
18 directed to me that before -- say two years ago when
19 we first came on SCET, if you -- if you was on a call
20 and you got a call say at 6:59, you was supposed to
21 quit, and you ran over to half an hour, 40 minutes, or
22 whatever it took to get rid of the customer, you
23 didn't get paid for it.
24 Q   Who told you that?
25 A   Other employees. But now that's different.

### Page 179

1  It's different, totally different. It's totally --
2  it's totally different. You get -- you can -- you can
3  put your overtime in. You got to put in a form to
4  explain why you want the overtime, but you can still
5  claim your overtime. But before, the old agents that
6  were there before we got there, they said that if you
7  got -- if you got stuck on a call, you was stuck on a
8  call.
9  Q   So for the entire time that you have been
10 in SCET --
11 A   It's been fine. I mean, if you get caught
12 over --
13 Q   You get overtime?
14 A   Yes, you get overtime.
15 Q   But the -- someone -- some of the agents
16 who have been there before you, said that --
17 A   Yes sir.
18 Q   -- previously that was not the rule?
19 A   That was not the case.
20 Q   Did they say when that change occurred?
21 A   They didn't -- I think it was just that
22 focus on overtime, but they didn't give me a time or
23 nothing like that, but they used to complain about
24 that, and that's one of the reasons why you see
25 sometimes a log-out time a half a minute before or

### Page 180

1  whatever, because the person don't want to take a call
2  at the last minute. You see what I'm saying? So --
3  Q   And under your practice you're not of the
4  -- of the position that you've had to work extra time
5  after your shift for which you have not been paid?
6  A   I've done it, and I put in -- I think once
7  or twice I put it in, you know. To be a couple
8  minutes here and there, I don't go putting in for two
9  minutes overtime. I don't do that. Now, if it's 15
10 minutes, say 20 minutes or 25 minutes, you know, I'll
11 put that in. I have.
12 Q   When you say put that in?
13 A   In totals.
14 Q   So if you work 15, 20, 25 minutes overtime,
15 you would put that in totals?
16 A   Right. Right. I try to remember all of
17 that through -- because it's a separate process. We
18 have to -- like three different tools that we use for
19 recording time.
20 Q   And I just want to make sure. I think it's
21 clear, but I want to just make sure that I know your
22 allegations in this case are that before your shift
23 you're required to work off the clock --
24 A   Yes, sir.
25 Q   -- and therefore you're seeking back

### Page 181

1  overtime. Am I correct that you're not claiming that
2  you've been forced to work off the clock after your
3  shift in this case?
4  A   I'm -- I'm stating that -- can you say that
5  again? I want to be sure I understand.
6  Q   Yes. In this litigation --
7  A   Yes, sir.
8  Q   -- are you claiming that you were forced to
9  work off the clock after your shift concluded, your
10 scheduled shift concluded?
11 A   I'm trying -- my litigation is for before
12 the scheduled time. I know those situations happened
13 to me sometimes at Teach, but it hasn't happened to me
14 at SCET. Now, if it's a -- if it's a lapse or if I
15 wasn't aggressive enough for the Teach side, then
16 that's my error, but I'm focusing on it prior to
17 scheduled time here.
18     I'm only referring to not getting paid
19 after the quitting time, and that was -- the other
20 agents spoke about it. That was a common practice.
21 I'm not speaking on my behalf on that because I'm not
22 claiming that currently. That situation I believe has
23 totally been cleared up.
24     MR. RAY: We're at the end of our tape.
25 Let's go off the record.

Witness:   Charles Seward

47 (Pages 182 to 185)

### Page 182

1       THE VIDEOGRAPHER: Off video.
2       (Thereupon, a recess was taken.)
3       THE VIDEOGRAPHER: On video.
4   BY MR. RAY:
5       Q   Mr. Seward, before the break we were
6   talking about post scheduled shift activities, and you
7   made one comment I just want to follow up on just to
8   make sure I understand. I think you said that during
9   your time in IBM Teach there may have been times when
10  you feel like you worked past your scheduled shift but
11  did not receive compensation. Did I hear that
12  accurately?
13      A   Yes. Yes. That has -- that has happened,
14  but I take the ownership of that. You know, I should
15  maybe ask you to voice that out. That's not the gist
16  of my -- my litigation.
17      Q   Do you recall the time period when that
18  occurred?
19      A   I'm sorry.
20      Q   Let me hand you what's been marked Exhibit
21  15.
22      (Thereupon, marked for identification,
23  Defendant's Exhibit D15.)
24  BY MR. RAY:
25      Q   And this is an e-mail dated March 29, 2004,

### Page 183

1   to you from a Fernando Vega. Do you recognize this
2   e-mail? Take your time to look at it.
3       A   I don't remember the e-mail, but I must
4   have received it.
5       Q   And do you know who Fernando Vega is?
6       A   Sure.
7       Q   Who is Fernando Vega?
8       A   He was a second-line manager at the time.
9   No -- yes. Yes.
10      Q   This one is dated actually before, I
11  believe, Exhibit 14, and it says, "Charles, please do
12  not sign on prior to your start time. This creates
13  productivity problems with our daily operating report
14  in addition to your daily sign-on objective."
15      Did I read that correctly?
16      A   Yes.
17      Q   First, what is the daily sign-on objective?
18      A   It's basically saying your scheduled start
19  time.
20      Q   And do you know what he's referring to
21  specifically on the daily sign-on objective? Did you
22  have an objective with respect to daily sign-ons at
23  that time?
24      A   No. I don't know why he's using that
25  terminology, but the sign-on objective is to sign on,

### Page 184

1   on your start time.
2       Q   I want to cover a couple of things, and
3   then we'll hopefully shift gears here.
4       A   This is from Kerry Bethea.
5       Q   Well, the top e-mail on Exhibit 15 -- oh,
6   okay. I see. It's cc'd to Fernando Vega?
7       A   Yes.
8       Q   And it's from Bethea?
9       A   Yes.
10      Q   Okay. Thank you for correcting that --
11  correcting me. Let me hand you what has been marked
12  as Exhibit 16.
13      (Thereupon, marked for identification,
14  Defendant's Exhibit D16.)
15  BY MR. RAY:
16      Q   And all I'm going to ask you, Mr. Seward,
17  is whether that's your signature on the second page of
18  that document?
19      A   Yes.
20      Q   Do you recall -- well, I'm changing my
21  statement. Do you recall signing that document? I
22  believe it was in 1998.
23      A   Yes. That's when I first -- when I came
24  back.
25      Q   We've been talking about your cube and

### Page 185

1   where you are located and some of those things. Do
2   you have a desktop or a laptop?
3       A   Desktop.
4       Q   Have you had a desktop the entire time you
5   have been in SCET?
6       A   Yes.
7       Q   Did you have a desktop when you were in IBM
8   Teach?
9       A   Yes.
10      Q   The entire time?
11      A   Yes.
12      Q   Does anyone in SCET have a laptop, to your
13  knowledge?
14      A   Yes. There are some folks that have
15  laptops.
16      Q   Some of the call center people on the
17  phone?
18      A   Not on the phone, but the analysts or the
19  admin folks or --
20      Q   What about any of the people in SCET who
21  were on the phones? Any of them?
22      A   No, sir.
23      Q   What about in IBM Teach? Did any of the
24  phone reps or the people who were dealing with phone
25  calls, did any of them have laptops?

Witness:   Charles Seward

48 (Pages 186 to 189)

Page 186

1    A    No. No.
2    Q    Do you know if anyone on the fourth floor
3    has a laptop?
4    A    I believe they do, but --
5    Q    Is the SCET group, currently do they -- do
6    the call reps, the people who deal with the phones in
7    SCET, are they scheduled 365 days a year?
8    A    We just -- we're scheduled. If we want to
9    take vacation time.
10   Q    That was a bad question. What I mean is --
11   A    It's open 24/7.
12   Q    That's what I was getting at.
13   A    Yes.
14   Q    Is SCET, does it provide coverage 24/7?
15   A    Currently, yes.
16   Q    365 days a year?
17   A    Yes. Yes.
18   Q    And the shifts are staggered?
19   A    Yes.
20   Q    And do you have an understanding of why
21   they stagger the shifts?
22   A    Just availability and service levels. We
23   have folks who start at seven, and, you know, at seven
24   to four. Then you have a group that comes in, you
25   know -- you know, staggered all the way through

Page 187

1    until -- basically what happens, you have shifts that
2    start at seven, and we go -- our group goes all the
3    way over to 7 p.m., and then there's another group in
4    the back end that will start taking calls after seven.
5    Q    You are paid on an hourly basis --
6    A    Yes.
7    Q    -- is that correct? And you also get some
8    vacation time?
9    A    Correct.
10   Q    How much vacation are you eligible for now?
11   A    Twenty-five days.
12   Q    Twenty-five workdays?
13   A    Yes.
14   Q    You also get some holidays?
15   A    Yes. Six.
16   Q    Are they paid?
17   A    Yes.
18   Q    You get some sick time?
19   A    Yes.
20   Q    Do you know how much sick time?
21   A    No. They don't really give us a -- a
22   minimum or a maximum.
23   Q    Some personal days?
24   A    I haven't asked for any.
25   Q    Do you know if you get a specified number

Page 188

1    of personal days, or is that at the discretion of the
2    management?
3    A    Discretion of the manager.
4    Q    Is there a -- an award or a prize where you
5    get two hours off called two hours prize time?
6    A    Yes.
7    Q    What is that?
8    A    If you -- if you handle a customer a
9    certain way -- at one point if you came in on time for
10   a month straight, they gave you two hours, and there's
11   other perks. I actually used -- I had some
12   accumulated I actually used. I think I had four hours
13   I didn't know about that I went back and took a look
14   at. I had four hours.
15   Q    Where did you look to see?
16   A    That's what I was just telling counselor.
17   In my Lotus Notes there's a -- a database that -- that
18   has all our processes, and in there, there's a icon
19   that you click on to see if you qualified or if you
20   had some accumulated prize time.
21   Q    Let me just have you take a quick look at
22   Exhibit 17.
23        (Thereupon, marked for identification,
24   Defendant's Exhibit D17.)
25   BY MR. RAY:

Page 189

1    Q    And this looks like an e-mail from
2    Miss Williams to the SCET Team dated August 10, 2007.
3    Do you see that?
4    A    Yes.
5    Q    And this lists out agents, it appears, who
6    have earned two hours prize time. Is that your
7    understanding?
8    A    Correct. Correct, yes.
9    Q    And, I mean, it looks like you earned it
10   for January Is that you, Charles S.?
11   A    Yes.
12   Q    And February? Do you see that?
13   A    Yes.
14   Q    Is the two hours' prize time, extra time
15   you can take off and get paid?
16   A    Yes.
17   Q    Do you know if other groups within IMBPD
18   get prize time like this?
19   A    It's a -- I can't really speak on that.
20   Q    The subject of Exhibit 17 is, "Two hours
21   prize time monthly for no late log-in."
22        Do you see that?
23   A    That's correct.
24   Q    And is it your understanding that this
25   prize time was awarded if you didn't have a late

Witness: Charles Seward

49 (Pages 190 to 193)

### Page 190

1  log-in for that month that's listed?
2  A   That's the way I understood it.
3  Q   Is the late log-in, the log-in into the
4  Avaya system? Is that the trigger?
5  A   Yes. Because that tells them your name.
6  Q   In March there on that Exhibit 17 there's
7  Charlie listed but no Charles S.
8  A   That's a -- there's another Charles on the
9  team. They call him Charlie.
10 Q   They call him Charlie? So you didn't
11 receive this for March?
12 A   Yes.
13 Q   Does that mean presumably that you have at
14 least one late log-in for March?
15 A   Right.
16 Q   And you've had some late log-ins; right?
17 A   Yes.
18 Q   When you have late log-ins, Mr. Seward,
19 does -- and I'm talking about less than five, six
20 minutes -- does Miss Williams dock your pay or change
21 your eTOTALs?
22 A   No. She just indicates that we're late.
23 Q   I think when we were talking earlier, and I
24 didn't get a chance to go back to it -- I think it was
25 during the discussion where you said that Mr. Bethea

### Page 191

1  was cooking the books, using your words, that he
2  forced people to work through lunch.
3  A   Yes. We've done that.
4  Q   And have you been forced to work through
5  lunch when -- since you've been on the SCET Team?
6  A   No.
7  Q   When you were on the IBM Teach Team --
8  A   Yes.
9  Q   -- how many times would you say you were
10 forced to work through lunch?
11 A   I never counted, so I couldn't -- I
12 couldn't give you a number.
13 Q   Was it common? Was it once a week?
14 A   Oh, no. Wouldn't be like that. As needed.
15 Say -- give you an example. If service levels were
16 too low, they would ask that you stay on, on --
17 on-line, take calls, and they would call out for
18 lunch.
19 Q   Did you log out as if you were in -- at
20 lunch?
21 A   No. I was still available.
22 Q   Did you get paid for that extra time?
23 A   No. We -- the -- no. We didn't get no
24 overtime. We didn't get no overtime for that.
25 Q   Did they let you leave early --

### Page 192

1  A   Sometimes we left maybe -- sometimes we
2  left earlier, but no. No.
3  Q   Did you ever complain about that?
4  A   You know, you sometimes try and do a team
5  thing. You know, you're trying to meet your numbers,
6  and that's how you approached it. If there was some
7  folks that had medical reasons why they couldn't do
8  it, you know, their blood sugar or whatever, they --
9  they took their breaks, but you really didn't complain
10 because you were trying to meet your service levels or
11 your numbers, so they would call out for lunch and
12 bring lunch. Ask you what you wanted to eat and buy
13 you lunch.
14 Q   But you never -- you didn't think that was
15 inappropriate at the time?
16 A   No, not really. I didn't think so, but it
17 is what it is.
18 Q   Do you have any record of how many times
19 you were asked to do that anywhere?
20 A   I might. I might have -- no. I wouldn't
21 have that type of information. I wouldn't have, you
22 know, tick marks, if you will, for every time, but
23 again, if they have the records for Avaya, it'll show
24 that we didn't take a lunch.
25 Q   I thought that you went ahead and logged

### Page 193

1  out. No, you didn't.
2  A   No, we did not, because it'll show you in
3  Avaya that we didn't take a lunch that day. See,
4  there's a AUX code. Just like you have an AUX-3,
5  there's a AUX code for lunch.
6  Q   But you can't sitting here, tell me how
7  often that occurred?
8  A   No, sir.
9  Q   I asked you just a few minutes ago about,
10 you know, if you log in late, and again, I limited it
11 to a few minutes -- I think I said five or six
12 minutes -- that you were told you were late possibly,
13 but you were not docked pay for it; correct?
14 A   Correct.
15 Q   Do you know if there's a -- a policy or
16 practice, and let's start with Miss Williams, as to
17 how late you would have to be before she would
18 actually ask you to go into eTOTALS or before she
19 would go into eTOTALS and adjust your time?
20 A   I've never seen that happen, but I'm only
21 talking about me. I can't speak for personnel reasons
22 -- personnel issues with other folks.
23 Q   And has she -- and I didn't mean to
24 interrupt you.
25 A   I've seen people adjust times, like they

Witness:  Charles Seward

50 (Pages 194 to 197)

### Page 194

1  work later to make up the late arrival, stuff like
2  that. I seen that done, but I can't say exactly how
3  that arrangement was made in defense of Miss Williams,
4  but I know generally speaking, I never heard anybody
5  getting docked.
6      Q    What about if you needed to leave, for
7  example, to go to a doctor's appointment? You need to
8  be gone for two hours. Do you have to adjust your
9  time for that?
10     A    At -- I'm trying to remember now. There
11 was a time I was asked to do -- I had to go to the
12 doctor's, and I'm trying to think of when that was.
13 But they never followed through to say, hey, you know,
14 adjust your time or whatever. I think in our -- in
15 our department meeting she indicated that we were
16 allowed I think two hours for a doctor, to go see a
17 doctor, and I had -- I had scheduled like a month
18 ahead of time that I had to go see a doctor.
19         I said, I'll be in work, but I'll
20 probably be just a little over an hour late probably,
21 something like that, but I was never asked to adjust
22 it. Never asked to go to totals. Never asked to do
23 anything like that.
24     Q    What about, have you ever had -- and let's
25 talk again with -- about Miss Williams. Have you ever

### Page 195

1  had a situation where you needed to leave a little
2  early for a personal matter and take care of something
3  and you missed an hour to two hours of work?
4      A    No.
5      Q    What about late for a personal matter?
6      A    Maybe once. Maybe once. I'm not -- I'm
7  trying to think of -- it was a -- maybe once, I
8  believe. I'm not sure. I'm not sure. Maybe once.
9      Q    Do you know what Miss Williams' policy is
10 with respect to giving personal time without adjusting
11 time records or time cards?
12     A    I'll just use the word favoritism. She has
13 her own way of doing it.
14     Q    What do you mean by that?
15     A    She -- there's people, I guess, you know,
16 people who have some issues that we don't know about.
17 I mean, that's -- again, it's a management discretion
18 on the personal time, I guess. I did ask about
19 voting, and I still have not heard yet.
20     Q    Had you ever had asked about voting in the
21 past?
22     A    Not with Miss Williams. I asked about
23 voting. As a clear example, I asked about voting,
24 getting -- be able to have that two hours, especially
25 now, where everybody talking about six-hour waiting

### Page 196

1  line. They said, well -- the person who handles the
2  time indicated to me, you don't work until 10 o'clock.
3      Q    Who handles the time?
4      A    Nancy Clark.
5      Q    Is she a Team lead?
6      A    No. She handles all our personal vacation
7  time, et cetera, and I had to -- I submitted my
8  request, and I still haven't to date got any feedback,
9  or -- you know, if I can go vote.
10     Q    Let's talk about Mr. Bethea. Did he -- if
11 you were late, log -- if you logged in a few minutes
12 late, would he require you to change your time cards?
13     A    No.
14     Q    What about personal time with Mr. Bethea?
15     A    No.
16     Q    He would not make you change your time
17 card?
18     A    No, sir.
19     Q    Is that correct?
20     A    I never have been asked to. I had maybe
21 one or two emergencies that I can remember, because
22 there was a couple of emergencies that I had. I had
23 to leave, and I came back, but I had to leave because
24 my wife was out, stranded in the middle of nowhere.
25 But it's -- it's unwritten policy. You know, if you

### Page 197

1  are on that list, yes, you're going to get -- you're
2  going -- I guess get dressed -- you know, get dressed
3  down, but if you are not or whatever, they really --
4  there's almost like, you do what you want to.
5      Q    If you are on the list? What list?
6      A    If you are not considered, you know, one of
7  their favorite employees, I guess, whatever. If you
8  have some history about -- of abusing the situation, I
9  guess that, which is -- which is not, you know --
10     Q    Are you saying that people who are not on
11 the list as you described it, get more leeway to take
12 personal time?
13     A    Oh, yeah. Yes. All you got to do is look
14 at Avaya. Everything is recorded. Everything is
15 recorded, you know. All you got to do is look at your
16 reports.
17     Q    Who are the people not on the list now?
18     A    Oh, I don't -- she has her folks, man. I
19 just don't -- I don't know which is which. Because,
20 see, when you make a statement -- when you name names,
21 you know, you have to have -- privy to all that
22 information to make that statement, but people are not
23 around, they're not around, you know.
24     Q    So you have observed some people who are on
25 the phones under Miss Williams --