# EXHIBIT 4D

Witness:   Charles Seward

Page 198

1    A    Uh-huh.
2    Q    -- who in your view are able to take more
3  time off than others?
4    A    All you got to do is check that Avaya.
5  Avaya has everything, all your log-in times, times
6  you're not -- give you an example. I had -- had to
7  review my vacation time. I was able to give -- I was
8  able to go through my Avaya reports month by month and
9  actually see what days I logged in. If it was a day I
10 didn't log in, obviously I was not at work, so it's --
11 you know, you can use those Avaya reports all kinds of
12 ways.
13   Q    Well, but I'm trying to understand. I
14 mean, there's personal time. I think you said you get
15 -- tell me what you -- earlier you referred to the two
16 hours. What was the two hours?
17   A    For -- if you -- if you are not late.
18   Q    Not the prize two hours?
19   A    Okay.
20   Q    But I think I'd asked, what if you need to
21 go to a doctor?
22   A    Yes. Yes.
23   Q    And am I correct that you could go to the
24 doctor as long as you weren't gone more than two
25 hours? That was acceptable?

Page 199

1    A    Well, it was more clearly defined. I think
2  there was some complaints to HR about it, and then
3  during one of the meetings she put kind of more
4  defined guidelines for it. You know, if it was over
5  -- if you were going to run over two hours, then you
6  were going to have to take a half-day, half-day
7  vacation.
8    Q    Okay.
9    A    But some folks were actually asked to make
10 up time or something. I still remember that. It was
11 something going on, but I'm only speaking for myself.
12   Q    Were you ever asked to make up time?
13   A    No. Well, they said to me something once,
14 but I -- I just looked at them like -- I asked for
15 this time. I requested this time. And after that I
16 never heard anything about any more, so I guess they
17 left it alone.
18   Q    And what I want to try to understand is,
19 are there people, as you said, not on the list, and I
20 assume what you mean by that is like a teacher's pet
21 for people that are close to Miss Williams. Are those
22 people allowed more flexibility on when they come and
23 go, for example?
24   A    I said there are some folks, but, you know,
25 I just don't want to name names because I don't know

Page 200

1  what kind of arrangement she had with them. I don't
2  know how much -- you know, I don't know how to explain
3  it, you know, but it's like -- it's like -- give you
4  an example, if I can expound.
5         As far as I'm concerned, I'll take that
6  prize time, but coming to work and being on time is
7  your job. That's just another way of getting folks out of here
8  when the service levels are up high, whatever. You
9  know, I don't know how to -- it's right there in black
10 and white.
11   Q    But you did take your prize time?
12   A    I sure did. My daughter -- I forgot what I
13 had to do. I took her to -- oh, yeah. My daughter's
14 13th birthday, sleepover, so I used that half-day.
15   Q    I think I saw something in your declaration
16 to the effect of cell phones were not allowed on
17 the --
18   A    Uh-huh.
19   Q    -- on the fifth floor?
20   A    Yes.
21   Q    Is that right?
22   A    That's correct.
23   Q    How do you make a personal phone call?
24   A    You do not use the phones on the walls

Page 201

1  because they claim that those are private, but that's
2  not the case, and they also say you are not supposed
3  to use cell phones on the floor, but everybody uses
4  their cell phone. I don't care how much he says that
5  you're not supposed to be seen walking -- as soon as I
6  get up off my break, I'm down on my phone or looking
7  at my phone, because the phone systems that they use,
8  nobody trusts them.
9    Q    Is -- do you ever make personal phone calls
10 on the -- on the Avaya system?
11   A    No. Never. Never.
12   Q    Does anybody?
13   A    Never. Never. Never.
14   Q    And you do recognize that part of the --
15 that people listen to your calls as part of the
16 performance appraisal process?
17   A    Yes. Yes.
18   Q    There are times that overtime is actually
19 announced by Miss Williams that there's available
20 overtime?
21   A    Yes.
22   Q    Did that happen under Mr. Bethea?
23   A    It probably did, but -- it -- it did, but I
24 can't remember, because there were times when you are
25 low or shorthanded or something comes up, but I can't

Witness:. Charles Seward

**Page 202**

1   really say definitively, like that happened.
2       Q    Earlier we talked about some of the teams,
3   specifically I think under Miss Williams, and we
4   talked about the software receive calls and --
5       A    Yes.
6       Q    Obviously the -- your team, the entitlement
7   team?
8       A    Yes.
9       Q    Have you -- are you familiar with the
10  Rational Lotus Team?
11      A    Yes.
12      Q    What team is that?
13      A    They sit right next to us also. They're
14  primarily contractors. They'll take calls for
15  rational products, which is software package, and also
16  for Lotus. You know, Smart Speak, Organizer, things
17  that you have that you have on your laptop.
18      Q    How many people are on that team?
19      A    Right now, two -- about five or six. Five.
20  Five.
21      Q    And they report to Miss Williams?
22      A    Yes, sir.
23      Q    Are there any other Rational Lotus Teams
24  within -- on the fifth floor that don't report to
25  Miss Williams?

**Page 203**

1       A    Not that I know of, sir.
2       Q    Do you know Sara Cerny?
3       A    Yes.
4       Q    And who is she?
5       A    She's a manager. I believe that's an
6   entitlement team too, but I'm not sure. I think it's
7   hardware. I'm not sure.
8       Q    Do you know what floor she is on?
9       A    She's on the fifth floor also.
10      Q    Do you know who her employee -- who reports
11  to her?
12      A    I know -- I just know, you know, of guys I
13  talked to about football and stuff like that. She
14  moves around. She's liked on the second -- she was in
15  an area right next to us, and now she's on the other
16  side, I think in the 1600 building or 1500 building.
17      Q    Do you know how many people report to her?
18      A    No. No, I don't know the numbers.
19      Q    Do you know what Miss Cerny has told her
20  reports about logging in or expectations with respect
21  to logging in?
22      A    When she was in the -- our side -- being
23  available when -- I really can't speak what she says
24  to those folks. I don't know -- I don't want to say I
25  know. I don't --

**Page 204**

1       Q    You don't know what she told them?
2       A    No. I don't have no idea. I never seen
3   any e-mails. I haven't seen -- heard from her people,
4   anything, comments or whatever. Directives.
5       Q    Is the same true for Lisa Moody?
6       A    Lisa Moody?
7       Q    Do you know Lisa Moody?
8       A    Yes. I know of her. I don't -- I just
9   know of her.
10      Q    Do you know who reports to her?
11      A    No. But she just moved again.
12      Q    Do you know what -- before she just moved,
13  do you know what her team or teams did?
14      A    It was entitlement also.
15      Q    And do you know what she told her
16  employees --
17      A    No.
18      Q    -- about expectations with respect to
19  logging in or being available?
20      A    No, sir.
21      Q    What about Vicki Torres? Do you know Vicki
22  Torres?
23      A    Yes, sir.
24      Q    And do you know what -- who reports to her?
25      A    I know some of the reps, yes, sir.

**Page 205**

1       Q    Do you know the nature of the teams that
2   report to her?
3       A    The hardware entitlement.
4       Q    Do you know that Miss Torres tells her
5   people about --
6       A    No, sir.
7       Q    Let me finish.
8       A    Sorry.
9       Q    What Miss Torres tells her people about
10  being ready, logging in, those types of things?
11      A    No, sir.
12      Q    Karen Troutman?
13      A    No, sir.
14      Q    Do you know Karen Troutman?
15      A    Yes, sir.
16      Q    Do you know what she tells her reports
17  about being available for the phone, logging in,
18  arrival times, those types of things?
19      A    No, sir.
20      Q    Roseanne Davis?
21      A    Yes.
22      Q    Do you know who she is?
23      A    Yes.
24      Q    Do you know what she tells her teams about
25  logging in, being available for the phones, arrival

Witness:   Charles Seward

53  (Pages 206 to 209)

## Page 206

1  times, those types of things?
2     A   No, sir.
3     Q   Do you know what her teams do?
4     A   Yes, sir.  She's also entitlement and also
5  -- yes.
6     Q   What else do they do besides entitlement?
7     A   I think a couple of -- of the agents just
8  got re -- got retrained for front end and back end.
9  In other words, a front-end agent, so they do both
10 jobs.
11    Q   What is back end?
12    A   Back end is our group, entitlement, where
13 we verify support.  Front end, they initially take the
14 customer and --
15    Q   What about Peter Starratt?  Do you know
16 Mr. Starratt?
17    A   Yes, I know Peter.
18    Q   Do you know what his teams do?
19    A   Yes, sir.
20    Q   What do they do?
21    A   They're also hardware entitlement.
22    Q   Do you know what Mr. Starratt has told his
23 teams about arrival times, expectations for log-in,
24 phone availability?
25    A   No, sir.

## Page 207

1     Q   Do you know what GTS is?
2     A   GTS?  No, sir.
3     Q   Do you know whether there are GTS -- do you
4  know if GTS is a business unit of IBM or a division?
5     A   I don't recognize the term "GTS."
6     Q   We talked a little earlier about schedules
7  for these depositions, and we talked about a
8  Mr. Starkey.  Do you happen to know Mr. Starkey?
9     A   No, sir.
10    Q   Ever talk to him?
11    A   No.  Now, let me back up.  I might have
12 seen him and said hello or whatever.  I just don't
13 know by sight or -- no, sir.
14    Q   In the past five years have you supervised
15 any employees?  Have you had supervisory
16 responsibility?
17    A   No.  Temporary.  Temporary, but it was
18 before I worked for Kerry Bethea, so I'm not sure it
19 was the last six years or -- I would say no.  Five
20 years?  No.
21    Q   Have you ever reviewed any policies from
22 any business units other than IMBPD?  And I'm talking
23 about not the firmwide policies that we're going to
24 talk about, but anything specific to other business
25 units, like GTS?

## Page 208

1     A   No, sir.
2     Q   ITB?
3     A   No, sir.
4        (Thereupon, marked for identification,
5  Defendant's Exhibit D18.)
6  BY MR. RAY:
7     Q   I'm going to hand you what's been marked
8  Exhibit 18 and ask you to take a look at that and see
9  if you recognize it.
10    A   Yes, I recognize it.
11    Q   And just turning to the last page of
12 Exhibit 18, is that your signature?
13    A   Yes, sir.
14    Q   I want to ask you specifically about, I
15 believe -- let me find it.  Oh, yes.  If you look at
16 the very last paragraph, it starts on the next-to-last
17 page.  It's paragraph 30.  Do you see that?  It starts
18 with all of the other -- and I want to for now -- and
19 we probably will be coming back to this, but if you go
20 to subparagraph 3 on the last page, it says, "I talked
21 to other call center employees, who informed me that
22 they also were performing off-the-clock work both
23 before and after their shifts and did not receive
24 overtime compensation for these hours consistent with
25 IBM's policies as described above."

## Page 209

1        Did I read that right?
2     A   Yes.
3     Q   And my first question is, which employees
4  did you talk to?
5     A   You want -- you want actual names?
6     Q   Yes.
7     A   I got to go back and take names off a list,
8  but this is just general conversations with other
9  employees.  I didn't just go and just say, give me
10 your name, first and last name.  Do you -- I'm not
11 sure how I'm supposed to answer this.
12    Q   Well, do you recall anyone by name that you
13 talked to about this topic that you -- is in
14 subparagraph 3 of paragraph 30 of Exhibit 18?
15    A   I -- I've talked to -- general conversation
16 with employees at lunch rooms, walking out the
17 building, walking in the building.  I can't give you a
18 specific name.  I mean, I've talked to folks after the
19 fact about this because people have approached me and
20 asked me questions about it.  But prior to this,
21 giving you specific names, what I'm talking about here
22 is general conversation with employees in the
23 building.
24    Q   And when you say after this, are you
25 talking about --

Witness:   Charles Seward

Page 210

1    A    After the case started.
2    Q    Okay. All right. Well, let's first talk
3  about the general conversations. You can't name
4  anyone you've had these -- you can't identify anyone
5  by name that you have had these general conversations
6  with; is that right?
7    A    That's correct.
8    Q    And are these people you've had general
9  conversations with -- well, let me ask that a
10  different way. These people you've had these
11  conversations with, can you tell me what teams they
12  were on and who their supervisors were?
13    A    Well, you got Partner World. That was
14  common practice in Partner World, and the other
15  entitlement teams. Hardware entitlement, you know.
16    Q    And you're software entitlement; correct?
17    A    That's correct.
18    Q    But you can't tell me who told you this was
19  common practice?
20    A    They didn't use the word "common practice,"
21  but they indicated they had to be in and up and
22  running and be able to sign on, start taking calls at
23  their start time.
24    Q    Did they tell you who -- what their manager
25  or supervisors had said about expectations?

Page 211

1    A    No. We never like talked about service
2  levels or productivity type conversations. It was
3  just running in, trying to get in the building and
4  bringing up our systems and getting ready to take
5  calls.
6    Q    Were -- were these general conversations
7  you're describing, before you filed suit?
8    A    Yes. Yes. Yes, sir.
9    Q    And were you asking -- or did you raise the
10  issue in these general conversations? Were you asking
11  people if this is what they were doing, or was it
12  more, oh, I got to go log in?
13    A    No. I was not canvassing or soliciting or
14  nothing like that. Just general conversations, and
15  people get -- they don't use the word "fire" around
16  there, but, you know, there was times when they
17  actually said, you know, if you got ten latenesses,
18  you could be -- how could you say? Walked to the
19  door.
20    Q    And ten lates?
21    A    Ten lates.
22    Q    Ten tardies? And then they would actually
23  give the detail of, for them it meant -- late meant
24  not only not being on the phone, but not being on the
25  computer?

Page 212

1    A    That's correct.
2    Q    They actually told you that --
3    A    Yes.
4    Q    -- in these conversations?
5    A    That's a good example because I'm sure if
6  you do an audit, you'll find those memos.
7    Q    But you can't name a single person who told
8  you that?
9    A    Only employees that I've talked to are
10  after the fact.
11    Q    You can't name a single person on these
12  general conversations before the fact; correct?
13    MR. ZOURAS: For purposes of clarity, before
14  what fact?
15    MR. RAY: Before the lawsuit. He had
16  defined that, but that's fair.
17    MR. ZOURAS: Thank you.
18    THE WITNESS: These are just general
19  conversations with employees in the lunchroom and
20  outside. How can I explain it? I just know a
21  lot of these people by face. I don't even know
22  them by their first name, and it sounds
23  far-fetched, but except for the people in my
24  immediate area, I can go up and walk and say, I
25  talked to that person, I talked to that person,

Page 213

1  but some of them I don't even know by the first
2  name.
3  BY MR. RAY:
4    Q    Let's talk about the conversations after
5  the lawsuit was filed. Who have you talked to after
6  your lawsuit was filed?
7    A    About how -- how the system worked or
8  about -- just generally about coming in early and
9  things like that?
10    Q    Let's start with coming in early and things
11  like that?
12    A    I talked to Reggie McArthur. I talked to
13  Lawrence Moore. I've talked to -- let's see who else.
14  I -- to be honest, I really have not been amplifying
15  this whole thing on the floor with folks that have
16  come up to me, and those two guys are -- but the folks
17  in that arena, they were all in the same boat.
18    Q    Well, I'm just asking right now who you've
19  talked to since the lawsuit was filed?
20    A    Those two and Sharrie Brown and Lisa
21  Bufford, B-U-F-F-O-R-D, and Joe Yacowatz. Joseph
22  Yacowatz, Y-A-C-O-W-A-T-Z.
23    Q    Anyone else?
24    A    That's it.
25    Q    Do you recall when you talked to Miss -- i

Witness:   Charles Seward

55 (Pages 214 to 217)

| Page 214 |
| --- |

1  assume -- let me back up. I assume you talked to them
2  individually?
3      A    No. It was sitting around lunch table,
4  general conversations. General. Not at the house,
5  not walking out the building. You know, whatever. It
6  was just general conversation, sitting -- sitting at a
7  lunch table eating lunch.
8      Q    Tell me about your conversation with Reggie
9  McArthur?
10     A    Just basically, you know -- you know, that
11 we're -- just talked about, because he's been in the
12 department a long time. I think about three years,
13 maybe.
14     Q    Is he in SCET?
15     A    Yes.
16     Q    So you talked about -- he's been in the
17 department for three years. What did you talk about
18 specifically regarding?
19     A    Nothing. Just -- just, you know -- we just
20 talking about, you know, getting in here early and
21 getting the systems up and being ready to take calls
22 and just general questions like, talking about that.
23     Q    When did you have this discussion with
24 Reginald McArthur?
25     A    You know, off and on over maybe a -- I

| Page 215 |
| --- |

1  don't know. Here and there, probably, you know, it's
2  -- I don't have no specific time. Just off and on.
3      Q    Since you filed the lawsuit?
4      A    Yes. We -- we've talked about -- I talked
5  about just getting in there early to get everything up
6  and logging in on time. That's all.
7      Q    Did he say he did that?
8      A    Did what?
9      Q    Came in early to get things logged in?
10     A    No. Actually, it was just me talking most
11 of the time, or -- he really didn't have too much to
12 comment on. He did say that at one time, years ago,
13 they did have to get in there early and get the system
14 up.
15     Q    Who does he report to?
16     A    Juanlyn Williams.
17     Q    But he didn't say anything specifically
18 about current --
19     A    No. It was just general conversation.
20     Q    But he didn't say that he felt like he had
21 to get in early currently to get logged into the
22 computer system?
23     A    No. He did not say that to me, ever.
24     Q    What about Lawrence Moore? Tell me about
25 your conversation --

| Page 216 |
| --- |

1      A    Same.
2      Q    -- or conversations?
3      A    Actually, his conversation was less because
4  he works in the other side of the building. He works
5  in the front end, at the software receive call.
6      Q    Is he a contractor? Do you know?
7      A    Yes. Reggie is a supplemental.
8      Q    What about Sharrie Brown? Is she a
9  contractor?
10     A    No. She's a regular employee.
11     Q    Regular?
12     A    The other three are regular employees.
13     Q    Got it. What about -- let's talk about
14 Sharrie Brown. Is she in SCET?
15     A    Yes.
16     Q    Reported to Miss Williams?
17     A    Yes.
18     Q    Was she also in IBM Teach when you were
19 there?
20     A    Yes. Lisa and Joe also.
21     Q    So they were all in IBM Teach, and they
22 came over to SCET --
23     A    Correct.
24     Q    -- when you did?
25     A    Correct.

| Page 217 |
| --- |

1      Q    Tell me about your conversation with
2  Miss Brown?
3      A    Just the -- just the early arrival, how we
4  all had to -- used to do it all the time in earnest,
5  trying to get here on time and log in on time and get
6  the systems on time so we could take calls on time.
7  Just, you know, because we all were on the same boat.
8  We all worked for Kerry Bethea.
9      Q    So she -- did Miss Brown indicate to you
10 that when she worked for Bethea that she felt like she
11 had to be logged into her tools, logged into the phone
12 at the start of her scheduled shift?
13     A    Sure. We all felt that way.
14     Q    Did she say that with respect to
15 Miss Williams?
16     A    I can't speak on that.
17     Q    What about Miss Bufford? Am I saying that
18 right?
19     A    Yes.
20     Q    What about your conversations with --
21     A    No. In fact, she's very low key. She
22 really didn't have too much to say. She was -- we'll
23 pray about it and let God take care of this.
24     Q    Did Miss Bufford indicate that she felt
25 like she was required when she was under Mr. Bethea,

Witness:   Charles Seward

56  (Pages 218 to 221)

Page 218

1  to come in early and be logged into her tools and her
2  -- and her phone at the beginning of her scheduled
3  shift?
4       A    Yes. We all felt that way.
5       Q    Did she say that with respect to
6  Miss Williams?
7       A    No. We really didn't -- no. I mean, we
8  expounded about it, but we didn't mention her by name.
9  I mean, maybe I should be corrected, but -- but, no.
10  We really didn't speak about Miss Williams. I'm
11  trying -- just general conversation. You know, are we
12  talking about something? Are we really talking about
13  Miss Williams? I can't really say that.
14       Q    You were clearly talking about Mr. Bethea,
15  it sounds like?
16       A    At one point to current, yes. But we're
17  saved in the sense that we can log right on the
18  phones.
19       Q    What about Joe Yacowatz? Tell me about
20  your conversations with him.
21       A    Same. We're all sitting, just like we're
22  sitting here. That's how we're sitting at the lunch
23  table, so it was general conversation.
24       Q    And so it sounds like you're in this
25  conversation. All of these individuals were at the

Page 219

1  table? Reggie?
2       A    No.
3       Q    No?
4       A    Reggie was not there. Usually we're
5  talking about football, and then we will talk about
6  life, liberty, and the pursuit of happiness and, you
7  know --
8       Q    But it sounds like there was a discussion
9  at a lunch table with Sharrie Brown, Lisa Bufford, and
10  Joe Yacowatz?
11       A    Right. We -- we have lunch basically every
12  day almost together. We came over from Teach
13  together, and we still remain connected, so at lunch
14  we usually sit around and hash out things and talk
15  about old times and stuff like that.
16       Q    And in any of these lunch discussions with
17  Brown, Bufford, and Yacowatz did any of those three
18  indicate that they felt like under Miss Williams they
19  were required to be logged into their tools, logged
20  into the phone at the start of their scheduled shift?
21       A    I would say basically, yes. But again,
22  that whole thing with the -- with the AUX codes,
23  AUX-3 -- forgive me. I'm just trying to figure out
24  which one of these exhibits -- Exhibit 4, I know
25  something happened where, you know, everything

Page 220

1  changed. I don't know what happened on the back end,
2  because I wasn't privy to it, but then after that, you
3  can -- you can log in, in AUX-3 anytime you want.
4  They said, there was no problem. Prior to that,
5  counselor, you had to be logged in at your start time,
6  ready to work.
7       Q    Which date is the Exhibit 4?
8       A    Exhibit 4, I'm showing 4/7/08.
9       Q    '08? What about Exhibits 1 and 2? Did
10  that -- or I'm sorry. Two and three?
11       A    Right. Something -- something happened. I
12  don't -- something happened where people were getting
13  marked late but they were required to be there, and they
14  finally said, go ahead; do your AUX-3.
15       Q    Let me -- I asked the question about any
16  conversations with Brown, Bufford, or Yacowatz where
17  they made the comment or indicated to you that they
18  felt like that under Miss Williams they were required
19  to be logged into their tools and the phone at the
20  time of their scheduled shift or the start of their
21  scheduled shift. You said basically, yes, and I would
22  like you to tell me what -- who said something that
23  makes you believe that and what they said?
24       A    Basically said that -- they said that we
25  were required to be there and ready at our start time.

Page 221

1  System ready to take calls at our start time,
2  scheduled start time.
3       Q    Who said that?
4       A    Juanlyn Williams. Now -- let me back up a
5  little bit. Currently, in the last couple of
6  department meetings, she used the term as -- available
7  as soon as possible. Prior to that, it used to be,
8  you're supposed to be ready and ready to take calls at
9  your start time.
10       Q    I'll come back to that. I'm asking right
11  now, which of these people, or if it's all three --
12  Brown, Bufford, or Yacowatz -- said something to you
13  that indicated that they believed that they were
14  required to be phone ready?
15       A    I -- I won't make that -- I won't make the
16  statement that they definitively said this, because I
17  can't -- I can't remember every conversation that we
18  had, but it was to our understanding that we supposed
19  to be available at the start time.
20       Q    But you can't remember anything they
21  actually said?
22       A    Yes. I can't quote them, you know, or
23  paraphrase or quote them or -- but I -- maybe -- no.
24  I wouldn't be able -- I don't want to say, that they
25  said this or on this date or around this date, and I

Witness:   Charles Seward

**Page 222**

1  -- I can't -- I can't make that.
2      Q   We were talking about people you talked to
3  after your lawsuit, and you listed Reggie McArthur,
4  Lawrence Moore, Sharrie Brown, Lisa Bufford, Joe
5  Yacowatz. Anyone else that you can think of?
6      A   I -- I can't recall anybody else.
7      Q   Let me go back to something you said just a
8  minute ago. You said that prior to this change, and
9  we've been talking about Exhibits 2, 3, and 4, I
10 believe, on when this change occurred when you could
11 start going into AUX more freely. You said that
12 Miss Williams would say that you need to be ready at
13 the start of your shift?
14     A   Yes.
15     Q   And did she specifically say that you
16 needed to be logged into all your tools at the start
17 of your shift?
18     A   She didn't say -- she didn't say it like
19 that, logged into all your tools. She indicated you
20 should be available at our start time. She didn't
21 say -- use the verbiage tools, no. Just said, you
22 should be available at your start time.
23     Q   And when did she say that?
24     A   I -- I can't -- she's -- probably has
25 something in her e-mails also. In meetings she's said

**Page 223**

1  that prior to, you know, but I can't pinpoint a date
2  and time for that.
3      Q   Do you know who was present when she said
4  it?
5      A   No. But you can use one of the exhibits
6  right here. It says, "You're required to start
7  working at your scheduled start time."
8      Q   And I'm talking -- we've talked about the
9  exhibits, and so I'm just trying to figure out when
10 she -- other times she said it?
11     A   Okay.
12     Q   And I think you were talking about actual
13 verbal statements?
14     A   Right. Right now, her verbiage is as soon
15 as possible.
16     Q   In the past did she use different verbiage?
17     A   I -- if I remember -- I'm only quoting
18 myself. I remember when we was getting a --
19 expectations during our training that we were -- we
20 were expected to be in -- available at our start time.
21     Q   Did she explain -- did she use those exact
22 words?
23     A   Yes. Basically she's paraphrasing it, yes,
24 sir.
25     Q   And did she explain what available meant?

**Page 224**

1      A   Just available to take calls, inbound
2  calls.
3      Q   She said it that way?
4      A   That way.
5      Q   At your start time?
6      A   At my start time, and also -- trying to
7  think -- trying to remember the class. It was
8  something else with that. I forgot. I'm sorry.
9      Q   But you don't remember her precise words?
10     A   No. I'm paraphrasing.
11     Q   And this was during training?
12     A   Yes, during training.
13     Q   Any other times she said that? That you
14 recall specifically?
15     A   No. Just basically during training, and
16 trying to remember if I got any -- if we received any
17 Sametimes or instant messages, but that's it.
18     Q   Did -- have you talked to anyone -- and I'm
19 talking about the call center reps, the people on the
20 phone -- about your claims in this case who disagreed
21 with them?
22     A   Who disagreed with my case?
23     Q   With you? Disagreed with what you were
24 saying? They said, you know, I don't agree. I don't
25 have to be phone ready. I don't know what they're

**Page 225**

1  talking about.
2      A   No. Basically they -- being in that
3  environment for so -- for the ten years, you realize
4  who you can speak to and who you can't; who is the --
5  on the list and who's not. So I really, unless
6  somebody drops a couple words to me or whatever, I
7  really don't -- I just -- just, there's so many -- I
8  wasn't concerned about it. I really -- about speaking
9  about it or talking with anyone about it, but I held
10 my conversations down to a low roar, to tell you the
11 truth.
12     Q   So no one has specifically told you that
13 they disagree with your basic allegation in the case?
14     A   They have in their actions or their body
15 languages, but they're not stupid enough to say
16 anything.
17     Q   Who has in their body language?
18     A   Just Mary Davis, Ella Ward, Virginia
19 Bryant. Of course, Kerry Bethea. I'm trying to think
20 of anybody else. Which I thought was -- you know,
21 their right, you know, so -- but again, I --
22     Q   Is -- Mary Davis, is she on the phones?
23     A   Yes.
24     Q   Ella Ward?
25     A   No. She's the lead.

Witness:   Charles Seward

Page 226

1    Q    Virginia Bryant?
2    A    No.  She's like a staff assistant to the
3  second-line manager.  She's also -- but, you know,
4  it's -- it's one those unwritten laws.  I mean, you
5  know, just the body language, you know, but I just --
6  if you knew my -- my demeanor, you'd know that I just
7  blow that off and say, hey, how are you?
8    Q    Are Mary Davis, Ella Ward, and Virginia
9  Bryant on the list that you have described?  And by
10  list, I mean the people who are favored by --
11    A    Oh, yeah.  Easily.
12    Q    Are there other reps on the list?
13    A    You know, I don't know the -- the list
14  itself or whatever, but it's a perception.  It's just
15  my perception, so it's -- you know, if you ask me for
16  my perception, I can tell you, but if you want me to
17  name names, I can't do that because I never seen that
18  list.
19    Q    You're not suggesting there's actually a
20  written list, are you?
21    A    No.  She has her favorites.
22    Q    Over the past, say, eight to ten years you
23  have made some complaint either to Mr. Date -- am I
24  saying that right?
25    A    Date.

Page 227

1    Q    Date?
2    A    It's spelled Date --
3    Q    Right.
4    A    -- D-A-T-E, Stanley Date, which is D-A-T-E,
5  but it's pronounced Date.
6    Q    Date?  Is that correct?
7    A    That's correct.
8    Q    And who is Mr. Date?
9    A    He's the human resources representative.
10    Q    Have you also used the Speak Up complaint
11  system within IBM?
12    A    Yes.  I used it I believe, once.
13    Q    Do you recall when that was?
14    A    No, sir, I don't.  Maybe a year and a half
15  ago, two years.
16    Q    Have you used the Open Door?
17    A    Many moons ago.  I -- a long time ago.
18    Q    What is Open Door?
19    A    Open Door policy is when you've spoken to
20  your first line and second line and the issue was not
21  resolved, so you go to the next level, and you go
22  outside of the organization to resolve the issue.
23    Q    Has Mr. Date been responsive to your
24  request to look into things or to address certain
25  things?

Page 228

1    A    Yes and no.
2    Q    Describe why you'd say yes and no?
3    A    It's clearly that he was in -- he was -- I
4  don't know how to explain it.  There were issues.
5  Depends on -- it depends on the situation, what
6  situation you're talking about.
7    Q    Let me hand you what's been marked
8  Exhibit 19.
9      (Thereupon, marked for identification,
10  Defendant's Exhibit D19.)
11  BY MR. RAY:
12    Q    And this is a document that IBM has
13  produced in this litigation, and if you go to the
14  second page of that, I believe that is unedited Speak
15  Up text --
16    A    Uh-huh.
17    Q    -- from your complaint, but I want you to
18  look at it and tell me if that's correct?
19    A    Yes.
20    Q    And this looks like it was back in 2004?
21    A    That's correct.
22    Q    And this was a complaint.  Number 1 there
23  is talking about Mr. Bethea witnessing a disagreement
24  and then low morale, disrespect, those types of
25  things.

Page 229

1    A    Yes, sir.
2    Q    And then Number 2, it says, "Ebony Jones
3  was awarded a new position in sales.  My question is,
4  after two years of over 150 tardy arrivals to work and
5  over 200 tardies for breaks and lunches, what is the
6  guidelines promotion/advancement?"
7      Did I read that right?
8    A    That's correct.
9    Q    And then the third one talks about how do I
10  know how many times an employee is late, those types
11  of things, and apparently it's because it was
12  published to everybody?
13    A    That's correct.
14    Q    And you submitted this particular complaint
15  to the unedited -- or to the Speak Up; right?
16    A    I believe so.
17    Q    And I may have asked this, but what is
18  Speak Up?  Is that a way to submit complaints?
19    A    Yes.
20    Q    Who addressed this?  Who responded to the
21  complaint to you?  Do you know?
22    A    I'm sorry.  I don't know who responded,
23  because it's kind of a long time ago.
24    Q    Yeah.  This looks to be back in about 2004.
25  Does that seem accurate?

## Page 230

1    A    Right, but it was a long time ago.
2  Maybe -- 2003, maybe. I'm not even sure. Oh, okay.
3  I remember the young lady. She was out of New York.
4    Q    Who are you referring to?
5    A    There was a -- I believe that the person
6  that responded to me, she was out of New York. It
7  might have been Miss Geiger, Michele Geiger.
8    Q    Do you recall what the response was?
9    A    No, sir.
10   Q    Did it satisfy you? The response? Were
11 you satisfied with how the complaint was dealt with?
12   A    I'm not sure how this was resolved.
13       (Thereupon, marked for identification,
14 Defendant's Exhibit D20.)
15 BY MR. RAY:
16   Q    I hand you what has been marked as Exhibit
17 20, and this appears to be an e-mail exchange or
18 e-mails forwarded from you ultimately, involving Stan
19 Date. I'm not sure where I see where -- here. Hang
20 on.
21   A    No. This is --
22   Q    It says on the first page there, it's an
23 e-mail from Mr. Date to you, and I'm sure I'm
24 mispronouncing the last name. I think I already did.
25 Dated June 15, 2005, and it says, "Charles, from what

## Page 231

1  I can see, the need for the password is from the
2  deskside support team to install a new application.
3  You can always change it later. Why did you feel it
4  necessary to be cc'ing me?"
5       Do you recall this situation?
6    A    They were asking for passwords. They was
7  asking for all our passwords. I forgot what this was
8  about, but basically -- so I asked -- I asked Stan. I
9  said, hey, is this normal? Are we supposed to give
10 out our passwords to our desktops? I think I already did.
11   Q    Did you -- when you had a question about
12 the way things were handled during that time period,
13 did you feel comfortable just presenting it to Mr.
14 Date?
15   A    Right. I just -- I just e-mailed him, or I
16 think I even -- might have been Sametime, but I just
17 e-mailed him.
18       (Thereupon, marked for identification,
19 Defendant's Exhibit D21.)
20 BY MR. RAY:
21   Q    I hand you what's been marked Exhibit 21,
22 and I'll ask you to take a look at that e-mail, and
23 this appears to be dealing with a subpoena issue. Do
24 you recall this situation?
25   A    Yes, I remember this. This is that one

## Page 232

1  time I said I would have to appear in court for a
2  subpoena. It was a domestic dispute.
3    Q    And there's an e-mail from you dated
4  June 28, 2005, in the middle of page there on Exhibit
5  21 to Mr. Date.
6    A    Yes, because they would not give me time to
7  get off to go to the court.
8    Q    And then Mr. Date at the top there responds
9  that you should talk to Sharon if you had not already;
10 is that right?
11   A    Yes.
12   Q    Was that Sharon Lofton?
13   A    Yes.
14   Q    Did you -- do you recall if you got this
15 resolved?
16   A    I'm pretty sure I did. I just can't
17 remember how I went forward with it, but I had to go
18 and -- I got a subpoena to go to court, and they
19 didn't want give me -- they didn't want me to go to
20 court.
21   Q    Now, going to court for that situation had
22 nothing to do with IBM; correct?
23   A    Right. Right. It was just a -- I --
24   Q    Was it a dispute over whether you would get
25 paid time off?

## Page 233

1    A    No. It was just -- I forgot. It was just
2  -- I didn't want to get -- you know, I told them what
3  was going on, you know, and they just -- this is an
4  example of them -- if I was one of the favorites, I
5  would have been going. No problems.
6    Q    This was under Mr. Bethea?
7    A    Yes, sir. This is a good example.
8    Q    And ultimately they did let you go; is that
9  right?
10   A    Yes. I had to go. I had to be in court.
11   Q    Did you have to use a vacation day?
12   A    No. No. I'm positive I didn't have to use
13 my own time for the -- I think Stan talked to
14 somebody. I forgot who it was. I had to go.
15   Q    Sure.
16       (Thereupon, marked for identification,
17 Defendant's Exhibit D22.)
18 BY MR. RAY:
19   Q    Let me hand you what's been marked Exhibit
20 22, and if you go to the bottom -- or at the bottom of
21 the first page there's an e-mail from you to Mr.
22 MacDonald referring to changing your note ID. Do you
23 recall what this is? Feel free to take a second to
24 look at it.
25   A    Yes. I think this is the same situation

Witness:   Charles Seward

Page 234

1   with the -- they were doing something. They wanted my
2   IDs or something.
3        Q    And there at the top of page 1 of Exhibit
4   22 Mr. Date sends you an e-mail thanking you for
5   cc'ing him on the note, and then he says, "I just
6   wanted to be sure you understand that since your
7   computer and software is owned by and provided to you
8   by IBM to do your work, the asset belongs to IBM, who
9   has the right to any information saved on the
10  computer, and your manager acts as an agent for IBM."
11       Do you recall receiving that?
12   A    Yes.
13       Q    And was that your understanding at the
14  time? That that was IBM's --
15   A    Yes.
16       (Thereupon, marked for identification,
17  Defendant's Exhibit D23.)
18  BY MR. RAY:
19       Q    I'm going to hand you what's been marked as
20  Exhibit 23, and I'll ask you to take a look at that
21  exhibit, and tell me if you recall the issue that you
22  were raising at the top of the first page there to
23  Mr. Campagna? Campagna?
24   A    Campagna.
25       Q    Campagna?

Page 235

1   A    Yes. I remember the note.
2        Q    And what was that situation?
3   A    Situation, we had went through our yearly
4   evaluation, and then like a day or so prior to it
5   being due, they asked us to change the whole section
6   of it.
7        Q    And you were unhappy with that?
8   A    Of course. That was our job performance
9   description of what we was supposed to do for the job,
10  and at the last minute they changed the description of
11  the job.
12       Q    And Mr. -- I think you said earlier,
13  Mr. Campagna is an HR?
14   A    He's an HR representative. He's a staff HR
15  representative out of Texas.
16       Q    And what was the resolution for that issue?
17  Do you recall?
18   A    I don't remember what exactly happened on
19  the end. I would have to go back and take a look at
20  my PBC and see what happened with that.
21       MR. RAY: We're almost out of tape, so why
22  don't we take just a very quick break.
23       THE VIDEOGRAPHER: Off video.
24       (Thereupon, a recess was taken.)
25       THE VIDEOGRAPHER: On video.

Page 236

1   BY MR. RAY:
2        Q    Mr. Seward, I'm going to hand you what's
3   been marked as Exhibit 24.
4        (Thereupon, marked for identification,
5   Defendant's Exhibit D24.)
6   BY MR. RAY:
7        Q    And the top of that e-mail is an e-mail
8   from Mr. Date to you dated April 25, 2007, and then
9   there is some -- a chain, that looks like, of e-mails.
10  On the second page there seems to be a complaint that
11  goes on for a few pages, and I just wanted to ask you,
12  see if you recognize that as your complaint?
13   A    Yes.
14       Q    And earlier in the deposition you talked
15  about complaining about the training that you received
16  in SCET. I believe you referenced that, but is this a
17  complaint about that?
18   A    Yes, sir.
19       Q    Who addressed this complaint, or who
20  responded to you about the complaint? Do you recall?
21   A    I think after this complaint was lodged,
22  the management team backed up a little bit and
23  readdressed -- readdressed the training that was
24  conducted. They put some actions in place to reduce
25  some of the -- some of the training.

Page 237

1        Q    Did -- were you satisfied with how the
2   complaint was resolved or dealt with?
3   A    I would say as a 50/50 -- yes and no,
4   because I felt that there was quite a bit of animosity
5   after the complaint.
6        Q    From whom?
7   A    From the management team and her dream
8   team.
9        Q    Is the dream team different?
10   A    The people on the list, yes.
11       Q    If you could take a look at Exhibit 25.
12       (Thereupon, marked for identification,
13  Defendant's Exhibit D25.)
14  BY MR. RAY:
15       Q    This is an e-mail dated February 5, 2008,
16  from, it appears, your IBM address to your personal
17  address?
18   A    Yes. I made sure I had a copy of this.
19       Q    What is this?
20   A    Oh, God, yes. Geez. This is terrible. I
21  remember this. What happened was, there was a
22  management evaluation, if I could use that word, or
23  like a program -- oh, it's called a manager feedback
24  program where you -- you evaluate your manager and
25  also make any comments that you wish.

Page 238

1       Well, basically in her meeting, which is
2  part of the feedback of this whole program, she's
3  supposed to have a -- hold a meeting with her team and
4  discuss some of the issues that was brought forward by
5  her team, and there were some issues that were really
6  flagrant, and listening to the comments, you probably
7  knew who they were.
8       I think one of them was mine. One of
9  them. But she -- she read the -- she read the
10 comments of the employees almost basically word for
11 word, so it almost said, okay; he must have made that
12 comment, or she made -- you know, it was that bad.
13 That's what that is.
14      Q   Did you make this -- this e-mail is
15 articulating your complaint, and you sent it to
16 yourself. Did you actually submit this complaint
17 through a channel?
18      A   Sure did.
19      Q   Which channel? Do you recall?
20      A   I think I sent it to Date or Campagna, one
21 or the other.
22      Q   And do you recall who got back to you
23 regarding the complaint or to discuss the resolution
24 of the complaint?
25      A   No. I'm sorry. I'm not sure who came, who

Page 239

1  got back with me.
2       Q   Were you satisfied with the resolution of
3  that complaint?
4       A   It was -- it was -- I'm trying to be -- I'm
5  trying to be cordial in my response. It's just very
6  vindictive, you know. The response was, I believe
7  they spoke with her. She was a little bit more low
8  key after that, and then also her demeanor was -- I
9  have no -- really no comment on this.
10      Q   So is it fair to say you were not entirely
11 satisfied?
12      A   No. No. There's no way. God, no. That
13 was terrible. Some people almost cried.
14      Q   You're familiar with the IBM business
15 conduct guidelines?
16      A   Yes.
17          (Thereupon, marked for identification,
18 Defendant's Exhibit D26.)
19 BY MR. RAY:
20      Q   I'm going to hand you what has been marked
21 Exhibit 26 and ask you to take a look at those, and I
22 will represent to you that these are the IBM business
23 conduct guidelines dated December 18, 2007. Are you
24 required with respect to the business conduct
25 guidelines, to -- to verify that you reviewed them

Page 240

1  each year?
2       A   Yes.
3       Q   And that you will comply with them?
4       A   Yes.
5       Q   If you will turn with me on Exhibit 26 --
6  well, let me back up. These are dated 2007. Do you
7  confirm typically in January of the following year,
8  each year?
9       A   Yes.
10      Q   So, for example, January of '08?
11      A   Yes.
12      Q   Did you read these business conduct
13 guidelines?
14      A   Yes.
15      Q   If you will turn with me to section 3.1,
16 which I believe is on page 6. Do you see that?
17      A   Yes.
18      Q   It talks about communications channels?
19      A   Yes.
20      Q   And it starts with, "If you know of any
21 unlawful or unethical situation, you should
22 immediately tell IBM whatever you know or have heard
23 about it. You can do so in one of several ways."
24          Right?
25      A   Correct.

Page 241

1       Q   And during -- let's just limit it to the
2  last five, six years of your employment with IBM.
3  You've recognized that there are ways to bring
4  complaints?
5       A   Correct.
6       Q   You can go to your manager? You can use
7  the Open Door; is that right?
8       A   Correct.
9       Q   And you can use the Confidentially
10 Speaking; right?
11      A   Yes.
12      Q   You can go to your HR rep?
13      A   Correct.
14      Q   And, in fact, you've used all of those --
15      A   Yes.
16      Q   -- methods? All of these communication
17 channels, or with respect to these communications
18 channels, why did you not complain about off-the-clock
19 work? Through one of these communication channels?
20      A   I'm glad you asked that question, because
21 there's an old saying, a fox that guards the chicken
22 coop, which means when you don't trust anybody for
23 three lines of communication. That's why I never went
24 to them.
25      Q   So you don't trust Stan --

**Page 242**

1    A    I don't trust them, because, Number 1, just
2  like your position is to protect IBM, you're
3  protecting their interests right now, and so that's
4  basically what Stanley Date did, Campagna, the
5  immediate first-line managers.  They're only --
6  they're doing what they have to do to protect their
7  jobs and not to be exposed for any other wrongdoings
8  that they have been doing.
9        So when I got to this point, I got to the
10  point where being a veteran and an older employee, you
11  know, you talk to people, and it was just -- it was
12  like talking -- it was like there's nothing wrong
13  there.  There's not a problem here, and so to be
14  honest with you, I was looking at this situation for
15  over two and a half years and thinking that it would
16  clear up or whatever.
17        So -- I just sat there and I said, you
18  know, these folks -- they're so busy being vindictive.
19  I can use all kinds of adjectives.  Favoritism,
20  vindictive, wishy-washy with the results, because you
21  mentioned several times after looking at these
22  e-mails, were you satisfied with the results?  Were
23  you satisfied with the results?
24        No, I was not satisfied with the results,
25  and I guarantee you, once you dig deep enough and you

**Page 243**

1  will see what I'm talking about, this whole thing was
2  -- everything is, you know, you're robbing
3  hard-working people so that they can get their bonuses
4  on their back end.  And the Number 1 thing here is
5  this.  How can I say this?  If I felt totally
6  confident that the HR team would address this issue
7  like I think it should be addressed, I would have
8  never went this route, Number 1.
9        Number 2, the management team does not
10  respect their employees.  Doesn't care about them.
11  Doesn't care if they get a dime or a penny.  That's
12  why we're going this route.
13    Q    Okay.  And I just want to make sure my
14  question is clear, and I understand you filed a
15  lawsuit.  You said just then in your answer that this
16  has been going on for two and a half years and you
17  were hoping it would clear up?
18    A    Well, when I say that -- not to cut you
19  off.  When I say that, that I had contemplated this
20  lawsuit almost two years ago, before I met with this
21  law team that I am with.
22    Q    So you have had this perceived problem, you
23  allege this is a problem, for at least two years;
24  correct?
25    A    Yes.

**Page 244**

1    Q    And throughout this period of time you're
2  not shy about making complaints?  Whether you trust
3  the upper management or whether you trust Mr. Date or
4  not, you have made plenty of complaints, and you
5  openly cc him on issues or bcc him on issues?
6    A    Correct.
7    Q    And my question is, why wouldn't you
8  have -- if indeed you really had this issue two years
9  ago, why wouldn't you have given them a chance?  You
10  gave them a chance with the other problems?
11    A    This -- I want to be perfectly clear.  I do
12  not trust Sandra Lofton.  I'm trying --
13    Q    Do you trust Stanley Date?
14    A    I think he's a good Christian man, but he's
15  also got a job to do.
16    Q    Let's turn to page 9 in section 3.53, IBM
17  proprietary information, and earlier we looked at the
18  confidentiality agreement you signed.  You're aware
19  that IBM takes steps to protect its proprietary
20  information; correct?
21    A    Correct.
22    Q    And that part of the business conduct
23  guidelines, which I'll refer to as BCGs, at times
24  provide that that's one of your responsibilities as
25  well; correct?

**Page 245**

1    A    Correct.
2    Q    Let's turn to section 3.6.
3        MR. ZOURAS:  Page 13.
4        MR. RAY:  Page 13, yes.
5  BY MR. RAY:
6    Q    This section is entitled, "Recording,
7  reporting, and retaining information."
8        Did you read this section?
9    A    Yes.
10    Q    And do you agree that this section provides
11  that it's the employee's responsibility to accurately
12  record their time on their time cards?
13        MR. ZOURAS:  Let me just impose an objection
14  to the extent this calls for a legal conclusion.
15  You can answer if you understand it.
16        THE WITNESS:  Is this a yes or no?
17  BY MR. RAY:
18    Q    However you want to answer it.  I'm asking
19  you -- let me restate the question -- is it your
20  understanding under the business conduct guidelines
21  that it's each employee's responsibility to accurately
22  record their time on their time sheets?
23        MR. ZOURAS:  Same objection.  You can
24  answer.
25        THE WITNESS:  Can I expound?  Or answer and

Witness:   Charles Seward

Page 246

1    expound?
2  BY MR. RAY:
3    Q    Let me just ask you first if you can answer
4  the initial question. Is it your understanding that
5  you are supposed to accurately fill out a time sheet?
6    A    Yes.
7    Q    And you want to expand?
8    A    Yes. It's the same situation where you let
9  go home early or you work through your lunch. Those
10  are all -- those are all directives from the
11  management.
12    Q    And -- well, let's -- let's address that.
13  Isn't it under the BCGs, the employee's responsibility
14  to complain about actions or conduct that they feel
15  violate the business conduct guidelines?
16    A    In this environment you don't complain.
17    Q    That was not my question. My question was,
18  is it the obligation of the employee under the
19  business conduct guidelines to present or make others
20  aware of violations of the business conduct
21  guidelines?
22    MR. ZOURAS: Let me object that the document
23    speaks for itself. To the extent it calls for a
24    legal conclusion, I further object. You can
25    answer if you understand.

Page 247

1    THE WITNESS: No. I'm not going to answer.
2  BY MR. RAY:
3    Q    Let's just go to the sections. Let's go
4  back to section 3.1 on page 6. "If you know of an
5  unlawful or unethical situation, you should
6  immediately tell IBM whatever you know or have heard
7  about it. You can do so in one of several ways."
8    Did I read that correctly?
9    A    Correct.
10    Q    Is it not your understanding, then, Mr.
11  Seward that to the extent that you believe that there
12  was unlawful or unethical conduct occurring, that it
13  was your obligation to report it?
14    A    That is correct. In the last conversation
15  I had with Mr. Date, I explained to him that there is
16  some unethical actions going on, and at that point he
17  indicated that, listen, for your own good, you know,
18  before you send any notes to HR or to -- to the HR
19  president, you go through him, but basically he was
20  telling me, for your own sake, I wouldn't do that
21  anymore.
22    Q    Wait a minute. You said that --
23    A    That's when I stopped talking to him.
24    Q    When was that?
25    A    Oh, gosh, I don't recall, but he should

Page 248

1  have a record of the last time we spoke. And
2  basically he responded to me, he says, you know -- you
3  know, why -- basically, he was saying, you're going
4  over my head. Instead of coming to me, you're going
5  directly to my boss or whatever, and then basically he
6  indicated that -- I'm trying -- I'm paraphrasing, but
7  he basically advised me not to do it. It's not to my
8  best interests to do that again.
9    Q    Did you tell him what unethical situations
10  you were referring to?
11    A    No. I didn't get that far, and at that
12  point I was already -- you know, I had, you know, my
13  information, some of my information together.
14    Q    And Mr. Date's reaction to you was, for
15  your own good, don't report unethical conduct? That's
16  how you took it?
17    A    No. He didn't say, don't report it, but he
18  basically said, you know, don't -- I'm paraphrasing.
19  Basically in his own words is that, you know, don't go
20  through -- don't send nothing up to -- I'm --
21  what's -- gosh, what is the HR? Forgot the
22  gentleman's name now. I sent a note to the president
23  of HR.
24    He said, I wouldn't do that.
25    So by his reaction and his response, I

Page 249

1  said, you know what? I can't talk to him no more.
2    Q    Why would you send it to the president of
3  HR instead of just to Mr. Date to begin with?
4    A    Because it -- you ever go forward with a
5  legitimate concern and it's taken totally personal?
6  Totally -- I don't know. I don't know, you know, how dare
7  you, you know, go and complain about X, Y, and Z. You
8  know, it's not taken for what it's worth and let's fix
9  this problem. They took those type of confrontations
10  personally instead of trying to take it
11  constructively. In other words, that's basically it.
12  I mean --
13    Q    Did Mr. Date ever take it personally?
14    MR. ZOURAS: Hold on. Let me object to the
15    extent this calls for Mr. Seward to delve into
16    the mental state of another person. To the
17    extent that you can answer, go right ahead.
18    MR. RAY: Well, he's already testified that
19    other people were taking it personally, so I
20    assume --
21    THE WITNESS: Yes. They were taking it
22    personal, but for Mr. Date, I can't answer for
23    him, but I'm just going by the actions and the
24    body and the body language and business demeanor,
25    that -- why would I do that, you know? You

Witness:   Charles Seward

64  (Pages 250 to 253)

Page 250

1    know --
2  BY MR. RAY:
3    Q    But you don't remember when this
4  conversation with Mr. Date was?
5    A    No. I had not -- it was a scheduled
6  conference call, and that was the last time I talked
7  to him.
8    Q    Was it this -- was it 2008?
9    A    No. It was -- I'm not sure, sir.
10   Q    You have the ability to -- well, let me
11  back up. You currently use eTOTALS?
12   A    Right.
13   Q    And you understand that eTOTALS goes -- is
14  what drives your paycheck --
15   A    Yes.
16   Q    -- is that correct?
17   A    Correct.
18   Q    And eTOTALS starts with your schedule, your
19  standard schedule, so for you it would be ten to
20  seven, I believe?
21   A    Yes.
22   Q    With a one-hour lunch?
23   A    Yes.
24   Q    So on an average week or normal week, where
25  there's no overtime or there's no vacation or what

Page 251

1  have you, you would get a check for 40 hours?
2    A    Yes.
3    Q    You have the ability to go into eTOTALS
4  and, for example, if you took a vacation day, adjust
5  that, or make an entry that you took a vacation?
6    A    We don't register our vacation on eTOTALs.
7    Q    What do you register on eTOTALS?
8    A    Overtime and sick time.
9    Q    And you have the ability to go in and do
10  that?
11   A    Yes.
12   Q    The ILC system, the claims system?
13   A    Yes.
14   Q    That's supposed to match the eTOTALS data;
15  correct?
16   A    Never happen.
17   Q    Your understanding was not that it was
18  supposed to match?
19   A    No. We never -- we were never -- we don't
20  put our overtime in ILC, I don't believe. No. The
21  only place we put our overtime is on the totals. ILC
22  is for the -- ILC is like a recordkeeping mechanism
23  for the sponsor that we actually support.
24   Q    And your understanding is that ILC does not
25  -- is not supposed to match eTOTALS?

Page 252

1    A    We've never put our overtime -- give you an
2  example. I had an issue where I had to swing an hour
3  around. I put it on the wrong date. I had to delete
4  one and put the hour someplace else. I only changed
5  it on eTOTALS. I never changed it in my ILC.
6    Q    Do you know if other employees have used
7  the eTOTALS to record overtime?
8    A    That's where you're supposed to put your
9  overtime is on eTOTALs.
10   Q    And you've done that?
11   A    Yes. I've done that a couple times, yes.
12   Q    And do you know one way or another whether
13  other employees do that?
14   A    For eTOTALS or --
15   Q    For eTOTALS? Let's stick with eTOTAL?
16   A    If they want to get paid, that's the way --
17  the only way that they get paid the overtime.
18   Q    Give me one second here.
19          (Thereupon, marked for identification,
20  Defendant's Exhibit D27.)
21  BY MR. RAY:
22   Q    I'm going to hand you what's been marked as
23  Defendant's Exhibit 27. You're aware that IBM's --
24  there are policies on the intranet that you can
25  access; correct?

Page 253

1    A    Yes, sir.
2    Q    And have you accessed those policies at
3  times?
4    A    Just -- I've done this on-line at work.
5    Q    Pardon?
6    A    I done this on-line at work.
7    Q    You've checked the policies?
8    A    Right. Not from home, but at work.
9    Q    Have you -- and I think I said intranet, or
10  I tried to.
11   A    Yes.
12   Q    Can you -- there's actually an IBM
13  intranet; correct?
14   A    Yes.
15   Q    Now, can you access the intranet from home?
16   A    I -- not really, no. Well, I never really
17  tried, to be honest with you. I only -- maybe for my
18  retirement compensation. I think that basically goes
19  through there some kind of way, but I really don't
20  access through intranet from home. I do everything at
21  work.
22   Q    The -- the exhibit that I just gave to you,
23  Exhibit 27, is a policy on the intranet entitled
24  additional compensation overtime. This one is dated
25  February 28 of '05. Do you know whether you ever

Witness:   Charles Seward

Page 254

1   reviewed this?
2      A   I've looked at this probably two or three
3   times. Maybe even more, probably.
4      Q   Why do you look at it?
5      A   Because I was trying to figure out -- you
6   know, that's why I know a little bit more about ILC
7   and Avaya and then also eTOTALS. That's why I was
8   able to say what the ILC was.
9      Q   Is -- and then you recognize that the
10  policy on the intranet is that if you go down to the
11  third entry there, "Weekly overtime, that all hours in
12  excess of 40 hours worked exclusive of meal breaks
13  during an employee's regular payroll workweek will be
14  considered as weekly overtime."
15     A   Yes.
16        (Thereupon, marked for identification,
17  Defendant's Exhibit D28.)
18  BY MR. RAY:
19     Q   And let me just quickly give you Exhibit
20  28, which is I believe the same policy, just with a
21  new date on it, and I will just ask you the same
22  question. First of all, do you know whether you've
23  reviewed that version of the policy? It's dated
24  March 3, '08, I believe.
25     A   Probably. This is the one I probably

Page 255

1   reviewed, not the one prior.
2      Q   And I think the language I pointed to you
3   is the same. The third section down on the weekly
4   overtime, do you see that? It says, "All hours in
5   excess of 40 hours worked exclusive of the employee
6   meal breaks during an employee's regular" --
7        THE REPORTER: I'm sorry. You're reading
8      too fast. I can't understand.
9   BY MR. RAY:
10     Q   Sorry. Let me start over. "Weekly
11  overtime. All hours in excess of 40 hours worked,
12  exclusive of the employee meal breaks during an
13  employee's regular payroll workweek will be considered
14  as weekly overtime hours."
15        Did I read that correctly?
16     A   Yes.
17     Q   And you recognize that was the policy on
18  the firm -- or on IBM's intranet?
19     A   Yes, sir.
20        (Thereupon, marked for identification,
21  Defendant's Exhibit D29.)
22  BY MR. RAY:
23     Q   Let me hand you what's been marked as
24  Defendant's Exhibit 29. That's another policy on the
25  intranet. If you could take a second to look at that

Page 256

1   and tell me if you have ever reviewed that document or
2   that on-line version of that document?
3      A   Yes. I've seen this.
4      Q   Is this the meal break/rest break policy?
5      A   Yes.
6        (Thereupon, marked for identification,
7   Defendant's Exhibit D30.)
8   BY MR. RAY:
9      Q   Now let me hand you Exhibit 30 and ask you
10  if you have ever seen or reviewed this policy?
11     A   No, I've never seen that. This is
12  interesting, yes.
13     Q   You've never seen this policy?
14     A   I never seen that one.
15     Q   The first sentence there says, "Nonexempt
16  employees must submit time cards that are complete,
17  accurate, and timely."
18        Did I read that correctly?
19     A   I'm familiar with this, this part here.
20  This part here, this is blatant in our area.
21     Q   The compensatory time?
22     A   Yes.
23     Q   The second page?
24     A   Yes. It was blatant.
25     Q   Have you used compensatory time?

Page 257

1      A   Yes, sir.
2      Q   How often?
3      A   If I work a holiday, they give me a comp
4   time off and half time.
5      Q   Well, let's -- I'll come back to the comp
6   time. Okay? What I want to ask you first, I want to
7   ask about the first page first. Okay? Not -- in the
8   first there, "Nonexempt employees must submit time
9   cards that are complete, accurate, and timely."
10        Did I had read that correctly?
11     A   Yes.
12     Q   Are you familiar with that policy?
13     A   Yes, I'm familiar with it.
14     Q   The next sentence says, "Managers should
15  review these and approve them as appropriate."
16        Did I read that right?
17     A   Yes.
18     Q   Then the next sentence says, "Nonexempt
19  employees should record all time worked and also
20  adjust their time cards for changes to their work
21  schedule or meal breaks."
22        Did I read that correctly?
23     A   Yes.
24     Q   And you understood that to be the policy?
25     A   Yes.

Witness:   Charles Seward

66  (Pages 258 to 261)

## Page 258

1    Q    Now let's talk about compensatory time on
2  the second page.  Tell -- you said that's happened to
3  you?  Compensatory time?
4    A    Sure.  We've taken comp time.  When people
5  work overtime, they're given the option of taking comp
6  time or get paid for the overtime.  That's an ongoing
7  policy.
8    Q    Who is that?
9    A    All the managers.  You name them.  But I'm
10  just going to talk about my immediate managers.  I'll
11  just talk about Juanlyn Williams.  I'm just going to
12  address my immediate manager currently.  Just give you
13  an example, if I work Thanksgiving, instead of getting
14  time and a half, they use the term, it's a -- it's a
15  regular -- we're open 24 by seven.
16        So you have all these guys at home on
17  Thanksgiving, but you're asked -- you have to come in
18  and work, so they're going to let you get -- normally
19  get paid.  They're going to give you half time, and
20  they'll give you a comp day off.  There's no time and
21  a half.  They're treating you like you're supposed to
22  be there.  This is a regular workday.
23    Q    Do they give you regular time and then comp
24  you a half-day, or do they give you a half pay and
25  comp you a full day?

## Page 259

1    A    Give me half time and a day off.
2    Q    So they only pay you half?
3    A    That's correct.  I do not know -- I can
4  tell you this now.  I do not know how they actually do
5  this for the people who come in or they schedule
6  people like every fifth week -- weekend.  They come
7  in, and then give them two days off comp time.  That
8  is blatant.
9    Q    Is -- okay.  I'm still trying to figure out
10  the Thanksgiving Day.  So if they only pay you half
11  time for Thanksgiving Day, do you have to go into
12  eTOTALS and somehow adjust that down to half?
13    A    Right.  You have to go into there and put
14  in half time, and you're only going to get the half
15  time.
16    Q    And then you get a full day off?
17    A    Then you get a day off.
18    Q    Do you get the following Friday off or
19  something?
20    A    Basically, you can choose a day off as you
21  want, but you're not going to get time and a half for
22  working that holiday.
23    Q    Do you -- did you get comp time this year?
24  Or I should say 2007?
25    A    Last year I worked Thanksgiving, I believe.

## Page 260

1  I worked Thanksgiving last year.  I'm not sure, but I
2  forgot what -- I think it's Thanksgiving I worked.
3    Q    Did you then take a day off?
4    A    I got a comp day.
5    Q    Do you recall when you took it?
6    A    No, sir, I don't.
7    Q    Do you know if you took it that Friday
8  after Thanksgiving?
9    A    No.  No.  We had to come in to work.
10  That's a regular workday for us.
11    Q    And how often -- let's use this year.
12  Let's use 2008.  How many times have you gotten comp
13  time?
14    A    I haven't been asked to work any holidays
15  yet.
16    Q    And in 2007 we've talked about
17  Thanksgiving, so excluding Thanksgiving --
18    A    Uh-huh.
19    Q    -- how many times did you get comp time?
20    A    I'm trying to think if it was Thanksgiving
21  or if it was -- I'm not sure.  All I know is I took a
22  comp time, a comp day, but most -- I was only asked to
23  work one holiday last year.
24    Q    One hour or one --
25    A    One holiday, I'm sorry.

## Page 261

1    Q    And then 2006?  Do you recall?
2    A    I'm sorry.  I can't go back that far.  Now
3  we're talking about Kerry Bethea and -- but give you
4  example, in the department, Teach, we didn't have the
5  same work, 24 by seven.  We had Thanksgiving off and
6  the day after Thanksgiving.
7    Q    So did you not get comp time generally in
8  IBM Teach?
9    A    We never had that situation where we worked
10  through a holiday.  We wasn't required to work
11  holidays.  Like Thanksgiving would be a holiday for
12  us, where the new department, SCET, is a 24-by-seven
13  operation.
14    Q    I think you said when talking about comp
15  time, all the managers used it?
16    A    I -- I mis -- I just -- I spit that out,
17  but I'm only going to talk about my immediate area
18  where I can actually see folks taking comp days.
19    Q    And who have you seen take comp days?
20    A    Oh, Mary Davis, Darlene Campbell.  I've
21  taken a comp day.
22    Q    In 2007?
23    A    I'm trying to think.  I'm talking about
24  currently, like this year, and people I've known that
25  -- now, remember, now, they're saying that they're

Witness:    Charles Seward

Page 262

1   taking comp time. I can't verify, because I can't
2   look at their personal information. Okay. So I'm
3   just going by folks that have worked a holiday
4   normally are given the opportunity to take the
5   overtime or a comp day, where by law they should just
6   be compensated, paid overtime.
7          But they use the terminology, and I keep
8   on -- we asked about this. You know, even though
9   we're scheduled 24 by seven, okay, they use that as
10  saying that, oh, you're supposed to be here. So it's
11  not really like a holiday, because we're scheduled to
12  be open 24 by seven, and they use that as an excuse to
13  give you half time, and then you can take a comp day
14  off.
15     Q    And I may have missed something. Did you
16  -- did you recall any other time other than for
17  Thanksgiving of '07 that you got comp time?
18     A    I'm sorry. For me? No. I only remember
19  working one holiday.
20     Q    I think you said Mary Davis has taken comp
21  time?
22     A    Yes. Mary Davis.
23     Q    Do you recall -- let me just stick with
24  her. Do you recall the circumstances?
25     A    Usually -- see, when a senior people in the

Page 263

1   department, there's like a -- what we call analysts.
2   They're scheduled, like, each one takes a weekend,
3   like it might go six weeks, and it's my turn. Then --
4   and they go through the list of analysts, and then
5   maybe that's six weeks later they might just do
6   another weekend. What happens, instead of overtime
7   they will get a Friday and a Monday off or something
8   like that. They take the comp time.
9          Now, I heard them talking that they have
10  the choice of getting overtime or comp time, but I
11  always knew that there was something -- half time.
12  When you give up a holiday and you only get half time?
13  It was like, I never worked like that before. Never
14  worked like that before in all my years with IBM and
15  all my part-time jobs, if you worked a holiday, it was
16  like time and a half, sometimes double time. It
17  depends on the -- the company.
18     Q    Do you know if any of the comp time, like
19  what Mary Davis took or Darlene Campbell, was during
20  the same week that they worked a holiday?
21     A    Worked a holiday or weekends, something
22  like that.
23     Q    Do you know if any of it was during the
24  same week? That they actually took the comp time the
25  same week they earned the comp time?

Page 264

1   A    Normally they do that because they're so
2   dead from working weekends, they might take the
3   following week. Say like they worked that weekend and
4   they might take Monday off, or they might take that
5   following weekend and make it a four-day weekend or a
6   three-day weekend. They do it that way. I'll be
7   honest with you. May I say something? I don't know
8   if I ever saw this statement.
9          (Thereupon, marked for identification,
10  Defendant's Exhibit D31.)
11  BY MR. RAY:
12     Q    Let me hand you what's been marked as
13  Defendant's Exhibit 31 and ask you, first of all, this
14  was an e-mail?
15     A    Uh-huh.
16     Q    It's actually -- I think it was produced as
17  a Team, but the underlying document is an e-mail to
18  the SCET Team. Do you recognize that e-mail?
19     A    Yes. There's a reason why I remember this
20  e-mail.
21     Q    This is an e-mail from Miss Williams dated
22  August 3rd of '07; correct?
23     A    Yes.
24     Q    And it says, "Team, IBM's business conduct
25  guidelines must be adhered to at all times."

Page 265

1          Did I read that right?
2     A    Yes.
3     Q    And then it goes down to totals and vendor
4   time card reporting, and then it says, "Every employee
5   records information of some kind and submits it to the
6   IBM company or in behalf of the IBM company. Each
7   employee must accurately and honestly fill in the
8   reports."
9          Did I read that right?
10    A    Yes.
11    Q    Did you understand that to mean that your
12  time cards and your vendor time card reporting, while
13  you were not a vendor -- let me back up. Does vendor
14  time card reporting refer to ILC, in your view?
15    A    There was some issues going on. That's why
16  we saw that e-mail.
17    Q    Did you understand this to mean that you
18  needed to record your time accurately for totals?
19    A    This was -- this was something with
20  overtime. I think somebody got fired around this time
21  for inaccurately reporting overtime.
22    Q    Did you understand Exhibit 31 to be a
23  mandate from Miss Williams that you and other
24  employees under her record their time and totals
25  accurately?