# EXHIBIT 4E

Witness: Charles Seward

68 (Pages 266 to 269)

Page 266

1  A  Yes.
2  Q  We've gone through the BCGs, and we've gone
3  through some policies. We went through this e-mail
4  that addresses recording time accurately, time worked
5  accurately?
6  A  Yes, sir.
7  Q  You, I believe, have never -- or at least
8  my understanding based on your lawsuit is you've never
9  recorded time in totals or eTOTALS that you worked
10 before a shift to get ready for the shift. Logging
11 onto the computer, those types of things. Is that
12 accurate?
13 A  I think there were some times we had
14 before-shift meetings that we did record that time.
15 Other than that, I would say no.
16 Q  So the record is clear, eTOTALS is the
17 successor to totals; right?
18 A  Yes, sir.
19 Q  And eTOTALS is basically totals, but it's
20 Web-based?
21 A  That's correct.
22 Q  Why throughout, say, the last three
23 years -- and let's go back to April of 2005.
24 A  Uh-huh.
25 Q  Why did you never record time that you

Page 267

1  worked? Not talking about preshift meetings, but time
2  you worked, or spent, rather, logging into the
3  computer, getting your tools up, getting ready for
4  your scheduled start?
5  A  Uh-huh.
6  Q  Why didn't you ever record that time?
7  A  Basically, management was not going to pay
8  us for that time. It was just -- it was timed at --
9  two reasons. Number 1, they're saying this is the
10 norm. This is part of your job. Your
11 responsibilities is to be signed on, your applications
12 logged on, and be in available when your time comes.
13 They do not say, or we do not -- they do not imply to
14 us that we're supposed to claim this time to bring up
15 our systems. That's why I never did it.
16 Q  Do you know if anyone ever did it?
17 A  The only time I even thought about it doing
18 it, sir, was when we had preshift meetings, and even
19 then we got comp time to get out early or something
20 like that. If we came in early, they let us go home
21 early or something like that.
22 Q  The same day?
23 A  Same day. Normally it's the same day.
24 Q  Did -- are you aware of anyone ever
25 recording time that they spent logging onto the

Page 268

1  computer tools before their shift started?
2  A  No. Nobody amplified that to me, no, sir.
3  Q  Are you aware of anyone ever being
4  disciplined for recording such time?
5  A  Normally -- in this environment that was a
6  no-no.
7  Q  Who told you it was a no-no?
8  A  It's just -- you just didn't do it. You
9  just didn't do it.
10 Q  You just said you're unaware of anyone
11 doing it?
12 A  I mean, I never seen nobody put in overtime
13 for coming in early. Well, unless they were -- I'll
14 give you an example. There was an e-mail went out
15 requesting if anybody wanted to do any overtime. Now,
16 in that situation, yes, and people going to log in,
17 and they're going to put their overtime in every week.
18    But if it's a normal workweek and they're
19 coming in early, they bring up their systems and hit
20 available -- I don't know, because I really can't
21 speak on what other people are doing or how they
22 approaching what I've been doing. I don't know. I do
23 know that, just from general conversation, they --
24 everybody has to do this to be on time.
25 Q  So do you believe that logging into the

Page 269

1  computer, getting ready for your scheduled start
2  time --
3  A  Yes, sir.
4  Q  -- logging into the tools and those types
5  of things, you believe that that is compensable work;
6  right?
7  A  Yes, sir.
8  Q  And you've believed that for a while?
9  A  Right.
10 Q  And IBM's policies that we just went
11 through make pretty clear that it's the employee's
12 obligation to keep their time cards accurate; right?
13 A  Yes.
14 Q  And you had the ability to adjust your
15 eTOTALs and enter overtime; right?
16 A  Yes, sir.
17 Q  And is it correct to say that your -- you
18 never recorded that time of logging into your computer
19 tools, those types of things, because that was what
20 you viewed to be the norm?
21 A  Well, they -- they was not going to do
22 that.
23 Q  Did any manager ever tell you not to record
24 that time as overtime? And by that time I'm talking
25 about time spent before the shift logging into your

Witness:   Charles Seward

69 (Pages 270 to 273)

Page 270

1  tools —
2      A    They —
3      Q    — getting ready for your shift to start?
4      A    They wouldn't come right out and say that.
5      Q    Did any manager or supervisor ever tell you
6  to inaccurately record your time?
7      A    I can't be specific.
8      Q    Did you ever ask anyone if you could record
9  or if it was appropriate to record time in eTOTALS or
10 adjust your eTOTALs for time spent logging into your
11 tools and computer getting ready for your scheduled
12 start?
13     A    No.
14     Q    Did — when you reviewed the BCGs —
15     A    Yes.
16     Q    — the business conduct guidelines — and I
17 think you do that annually; right?
18     A    That's correct.
19     Q    Do you actually go through a booklet with
20 some questions and have to answer questions to show
21 you've read it?  Do you recall that?
22     A    You do it on-line. The old system was —
23 you had to go through on-line and — and then indicate
24 that you read them clearly.
25         (Thereupon, marked for identification,

Page 271

1  Defendant's Exhibit D32.)
2  BY MR. RAY:
3      Q    Let me hand you what's been marked as
4  Exhibit 32. I'll just ask you to look at that and
5  tell me —
6      A    Oh, yeah. I remember this.
7      Q    — does that look familiar?
8      A    Yes. I remember this.
9      Q    Is that what's on-line? Exhibit 32?
10     A    Yes. Right. It was a — it was live — I
11 believe it was live. She was speaking live from
12 India.
13     Q    From where?
14     A    India.
15     Q    India?
16     A    Yes. Give examples.
17     Q    And I assume you've read this?
18     A    Yes.
19     Q    If you look at page 7 there, Mr. Seward, I
20 think the top of it says, "Example one, the story."
21         Do you see that?
22     A    Yes.
23     Q    And if you read — if you want to take a
24 second and just read that silently, I just want to ask
25 a question about it.

Page 272

1      A    Uh-huh.
2      Q    Do you recall reading that?
3      A    Yes, sir.
4      Q    And that's a specific example of off the
5  clock?
6      A    Basically what I'm talking about —
7      Q    Right.
8      A    — and why I'm saying — never mind.
9      Q    And this is an example in the — in the
10 actual training of something you should report; right?
11     A    Yes.
12     Q    And we've already gone through the fact
13 that you never reported it?
14     A    Yes.
15         (Thereupon, marked for identification,
16 Defendant's Exhibit D33.)
17 BY MR. RAY:
18     Q    I'm going to hand you what's been marked
19 Exhibit 33.
20     A    Oh, yeah.
21     Q    This is an e-mail on the first page of
22 Exhibit 33 from Miss Williams to you directly dated
23 February 26, 2008. Do you recognize that?
24     A    I sure do.
25     Q    And it says, "Charles, each employee owns

Page 273

1  their ILC, and they're responsible for submitting
2  their ILC once a week."
3         Did I read that correctly?
4      A    Correctly.
5      Q    When I showed you this exhibit, you seemed
6  to recall it. What were the circumstances?
7      A    Well, what happens, at one time — this is
8  an example of — something happened with the —
9  somebody complained. An employee complained about
10 this. What happened was, they had — Juanlyn Williams
11 had us submitting our ILC like six weeks ahead. In
12 other words, two weeks from now I could take two or
13 three vacation days.
14         So basically they were — they had formal
15 complaints from employees because the analyst would go
16 in — if you was not around, the analyst would go in
17 there and submit your hours. Now, under ILC
18 guidelines the way I read them, the manager can
19 appoint XYZ to go in and input your hours if you are
20 not available, say. Now, in some cases prior to this
21 time period the agent would go in or the analyst would
22 go in and submit five weeks of ILC. So what happened,
23 somebody put a formal complaint in, and so now we do
24 it weekly.
25     Q    The ILC?

Witness: Charles Seward

70 (Pages 274 to 277)

Page 274

1  A  The ILC. And basically what this ILC is,
2  the way I understand ILC, they use these hours to bill
3  the sponsor for the job that we're doing for them.
4  You don't report any overtime on this to the sponsor.
5  They do all the overtime -- as far as I know, we don't
6  really put overtime on ILC. We put our overtime on
7  eTOTALS. The sponsor doesn't see eTOTALS.
8  Q  What is your -- what is the basis of your
9  understanding that ILC does not incorporate overtime?
10  A  The way I understand it, the only place we
11  put our overtime is on eTOTALs.
12  Q  And what's your basis for that?
13  A  We just -- this information goes to the
14  sponsor. The overtime does not.
15  Q  Is that your only basis for it?
16  A  That's the only basis I know.
17     (Thereupon, marked for identification,
18  Defendant's Exhibit D34.)
19  BY MR. RAY:
20  Q  Let me hand you what's been marked Exhibit
21  34, and this is an e-mail, or at least the second one
22  there is an e-mail from Kerry Bethea to you dated
23  February 12, 2006.
24  A  Uh-huh.
25  Q  This was -- do you recall receiving this,

Page 275

1  by chance? It's a couple years ago.
2  A  Oh, this is totals, right. Again, this is
3  totals where we put our sick time and overtime.
4  Q  And totals predated eTOTALS?
5  A  Yes.
6  Q  And Mr. Bethea is communicating to you that
7  it's your responsibility to make sure totals and ILC
8  are accurate; correct?
9  A  That's correct.
10     MR. RAY: We have another one to go through.
11     THE WITNESS: He's young.
12     MR. ZOURAS: That's right.
13  BY MR. RAY:
14  Q  Let's go back to Exhibit 18, Mr. Seward,
15  which is your declaration in the case.
16  A  I'm sorry.
17  Q  That's all right.
18  A  I thought I had them in order. Yes, sir.
19  Q  Okay. We've talked about totals and
20  eTOTALS and about how the process works. Paragraph 6
21  on Exhibit 18 says, "Typically totals defaults to
22  reflect the scheduled time as the time actually worked
23  unless an exception is entered," and I think we talked
24  about that. Then it says, "I did not have access to
25  enter an exception on the totals timekeeping system."

Page 276

1     Is that accurate, or did I misunderstand
2  what we talked about earlier?
3  A  Maybe I -- I worded it wrong, but we could
4  not enter anything out there unless the manager said,
5  go ahead and do it.
6  Q  It had to be approved?
7  A  Yes. Yes, sir. And even now it -- they
8  want us to fill out a form, an actual form, before --
9  before we can go into eTOTALs.
10  Q  But it -- so it has to be approved for
11  overtime --
12  A  Yes.
13  Q  -- correct? But you did have the physical
14  ability to go into totals?
15  A  ETOTALS, yes.
16  Q  What about totals?
17  A  Totals? I didn't use totals that much, so
18  I would say I had -- I had access to it. It's just --
19  there was times where the manager actually put the
20  time in, but I -- I don't want to speak on that, and I
21  got to look at my notes. I really can't speak on
22  this.
23  Q  But you -- just so we're clear, you have
24  access to eTOTALS?
25  A  Currently, yes.

Page 277

1  Q  And in the eTOTAlS system the employee is
2  actually responsible for going in and making sure
3  their time card is correct?
4  A  Yes. But the manager also did it.
5  Q  The manager can adjust it?
6  A  He did it.
7  Q  He?
8  A  Kerry Bethea.
9  Q  Okay. That's under the totals system?
10  Didn't totals --
11  A  Yes. Yes.
12  Q  And when you say Mr. Bethea did it, what do
13  you mean by that?
14  A  He would go -- he would go into totals and
15  update employees' records.
16  Q  Did he ever go into totals and inaccurately
17  update your records?
18  A  I can't say, sir.
19  Q  And am I correct that you said you also had
20  access to totals?
21  A  I had access, but Kerry Bethea updated
22  that.
23  Q  But you could update it?
24  A  I should have been able to, yes.
25  Q  Talking about this approval situation.

Witness: Charles Seward

71 (Pages 278 to 281)

Page 278

1    A    Yes, sir.
2    Q    We talked earlier, if someone is held on a
3    phone call at the end of their shift under
4    Miss Williams, they can record that or submit that
5    overtime to Miss Williams?
6    A    Yes.
7    Q    It didn't have to be preapproved, so to
8    speak?
9    A    Oh, no. Well, they'll submit that form to
10   Miss Williams, and then they will update the totals.
11   She will approve it as current.
12   Q    Number 7 here, it says, "I was dissuaded by
13   management from requesting that a manager enter
14   exceptions showing overtime hours worked on the totals
15   system."
16        Who in management dissuaded you?
17   A    Yes. Kerry Bethea didn't want us going in
18   there and putting any type of -- any type of overtime.
19   I'm trying -- the best way to explain this. Give --
20   well, if we worked through lunch, they didn't want us
21   going in there and changing that, going in there and
22   recording that time. They wanted either early -- take
23   an hour, leave early an hour, or take an hour another
24   day.
25        We -- when we left early -- we never

Page 279

1    manipulated the ILC or totals when we left early from
2    work. It was like we were there. There was even
3    situations, but I can't address it -- the situation
4    where people left and their phones are still in
5    available -- they're active, but they're not there.
6    They left the building.
7    Q    Well, you've forgotten to log out before;
8    right?
9    A    I've forgotten maybe once or twice, but I'm
10   talking about normally when the service levels are too
11   high and we leave early.
12   Q    This is what we talked about earlier when
13   you send people home early?
14   A    Yes, sir. Yes, sir.
15   Q    Well, let me go. So paragraph 7, "I was
16   dissuaded by management from requesting that a manager
17   enter exceptions showing overtime hours worked on the
18   totals system," and you referred to Mr. Bethea,
19   talking about the lunch, those types of things?
20   A    Yes.
21   Q    What about Miss Williams? Has she ever
22   dissuaded you from entering time -- exceptions showing
23   overtime hours worked on the eTOTAlS system or the
24   totals system?
25   A    No. No. It's -- how do I explain it? I'm

Page 280

1    good.
2    Q    Pardon?
3    A    I'm good.
4    Q    I didn't know if you were --
5        MR. RAY: How much time do we have?
6    BY MR. RAY:
7    Q    I want to make sure I understand your
8    allegations in the case. We've talked about working
9    off the clock before the shift, and we've talked at
10   length, I think, about that.
11   A    Yes.
12   Q    We've talked about post shift and your view
13   on that, at least with respect to you, after your
14   shift ends. Now I want to talk about during the
15   shift. Are you alleging that you were -- during your
16   scheduled hours. Are you alleging that you worked off
17   the clock once you were actually within your schedule
18   by, for example, not getting paid, having to work
19   through your lunch, part of your lunch, anything like
20   that?
21   A    That happened when we was in Teach, but not
22   currently with Miss Williams.
23   Q    Not with Miss Williams?
24   A    No. I don't believe we had any type of a
25   situation where we called out for lunches and worked

Page 281

1    through our lunches.
2    Q    And we talked about how often that occurred
3    in IBM Teach.
4    A    Right. I really can't put a hold on how
5    often that happened.
6    Q    And sometimes I guess comp time was
7    provided for that; is that correct?
8    A    For working through lunches? Something
9    like that?
10   Q    Yes.
11   A    Yes. Or you leave early or some type of
12   comp time. Even -- even when we worked a holiday,
13   they would give us late arrivals the next day, say.
14   So, for example, if we worked Thanksgiving or a
15   holiday, the way I remember it, we didn't have to come
16   in until maybe -- you know, maybe three hours -- you
17   know, three hours past our regular start time,
18   something like that. That's -- I consider that comp
19   time.
20   Q    On the days that you worked -- that you
21   worked through lunch in IBM Teach, and I think you
22   said sometimes you could leave early, were there days
23   where you actually left early the same day that you
24   worked through lunch?
25   A    No, no, no. I don't remember leaving

Witness: Charles Seward

72 (Pages 282 to 285)

## Page 282

1  early.
2  Q  What about the same week? Say you worked
3  through lunch on a Tuesday. Any weeks where you
4  worked --
5  A  I really can't. It's been so long -- I
6  can't. I know that we'll get some time off, but I
7  don't know when I actually took it.
8  Q  If you could turn -- do you have Exhibit 18
9  in front of you?
10  A  Yes.
11  Q  I'd like you to take a look at paragraph 30
12  again, and look in a different section of it. And in
13  section -- subsection two -- oh. Subsection two says,
14  "IBM informed me and the other call center employees,
15  both verbally at meetings and via mass e-mails
16  directed to all call center employees nationwide, that
17  we were required to work off the clock without
18  overtime compensation as described above."
19      Did I read that right?
20  A  That -- I don't -- verbally at meetings,
21  yes.
22  Q  "Mass e-mails directed to all call center
23  employees nationwide"?
24  A  The mass e-mails -- that one I don't
25  recall. I apologize. I'm trying to remember why I

## Page 283

1  have that statement there. I must have an e-mail or
2  something to back up that statement.
3  Q  If you have such an e-mail --
4  A  Uh-huh.
5  Q  -- I assume it will be produced. I would
6  think it would have been --
7  A  Yes.
8  Q  -- the highlight of the production from the
9  plaintiff's standpoint?
10  A  Uh-huh.
11      MR. RAY: So we'll just request on the
12  record if you have that, produce --
13      THE WITNESS: I'm trying to think. I have
14  to look at my e-mails. I have to go look and see
15  if I have a hard copy of anything. There must be
16  some type of e-mail that I have that directs that
17  -- because I know we -- we had a special class or
18  a training that actually stated the complete
19  opposite of this in the first couple of weeks in
20  May.
21  BY MR. RAY:
22  Q  Of this year?
23  A  Yes, sir. Like May maybe -- middle of May.
24  We had an on-line training session where they
25  emphasized recording your overtime. I'm trying to

## Page 284

1  remember. Off the clock? I got to -- I got to take a
2  look.
3  Q  Let me -- in that same sentence it talks
4  about verbally at meetings. Are those the meetings
5  we've already talked about where I think Miss Williams
6  or Bethea would -- you don't remember the exact words,
7  but would say, be ready or something to that effect?
8  Whatever your testimony was. I'm not trying to
9  restate it, but I do want to make sure there's not
10  other meetings I haven't already talked about?
11  A  No, sir. I'm trying -- maybe if I can get
12  a copy of Avaya showing that we were logged in. I'm
13  trying to remember where -- when we was with
14  Mr. Bethea, they didn't want us to indicate the
15  overtime.
16  Q  Mr. Bethea?
17  A  Yes. I'm trying to remember the situation.
18  I apologize. I just can't remember. Not the time,
19  but the situation.
20  Q  Where Mr. Bethea --
21  A  Uh-huh.
22  Q  You don't -- tell me what Mr. Bethea did or
23  you recall?
24  A  We wasn't -- they didn't want us recording
25  any overtime unless it was really dire need. That's

## Page 285

1  why -- if I could be blunt, that's why you see so much
2  comp time being taken. Because they didn't want to
3  give up the cash.
4  Q  When you were under Mr. Bethea?
5  A  Either/or. Either with Miss Williams or
6  Mr. Bethea. That's a high physical item, if you will,
7  because basically what happens, sir, you have a lot of
8  IBMers, and you have a lot of contractors. The
9  contractors don't have a lot of vacation time, so one
10  of the ways they can get some time off is --
11  Q  Comp time?
12  A  -- comp time.
13  Q  That's the contractors?
14  A  Yes, sir. And then the same thing with the
15  IBMers. You might not have a lot of IBMers with 25
16  days of vacation to deal with, and one of the ways
17  they get time off is comp time.
18  Q  Well, let me ask on Miss Williams, because
19  we talked about the comp time issue before, and --
20  when we talked about your specific experience with
21  comp time, and you listed a couple of people who --
22  that you believe have taken comp time. Any others you
23  can recall? I'm talking about IBM employees --
24  A  Sure.
25  Q  -- not contractors?

Witness: Charles Seward

73 (Pages 286 to 289)

Page 286

1    A   Sure. Nancy Clark. Nancy Clark. This is
2  exempt or nonexempt or both?
3    Q   No, no. Nonexempt only?
4    A   Nonexempt? Okay. Kim -- I can't think of
5  her last name. I'm sorry. I don't know Kim's --
6  basically, everybody that's worked a holiday.
7  Normally they have their choice of taking comp time or
8  the overtime. Most folks took the comp time. I'm
9  looking at Michelle Hood. Michelle Hood, and last
10 name is H-O-O-D. I'm trying to think of Kim's last
11 name, but I can't remember it. We got Nancy Clark.
12 You might look at Mary Davis. Darlene Campbell, Mary
13 Davis. The other two people I can think of, but I
14 really don't know if they are exempt or nonexempt.
15   Q   I'm sorry. I missed that.
16   A   I'm not sure if they're exempt or
17 nonexempt, so I can mention their names, but I'm not
18 sure if they're exempt or nonexempt. That is, Sandra
19 King and Duane Montgomery.
20   Q   Any more that you can think of?
21        (Thereupon, marked for identification,
22 Defendant's Exhibit D35.)
23        THE WITNESS: No, sir.
24 BY MR. RAY:
25   Q   Let me hand you what's been marked as

Page 287

1  Exhibit 35, Mr. Seward, which is the complaint that
2  was filed in this lawsuit. Can you take a second to
3  review that and let me know if you are familiar with
4  it?
5    A   Yes, sir, I'm familiar.
6    Q   On page 4, paragraph 25 -- are you there?
7    A   Yes.
8    Q   It says, "In accordance with Defendant
9  IBM's companywide employment policies, Defendant IBM
10 did not pay Plaintiff Seward or other similarly
11 situated employees overtime compensation during their
12 employment."
13        Did I read that right?
14   A   Correct.
15   Q   We looked at some, just a handful, of IBM's
16 policies today. Is there a policy that you have
17 reviewed that supports that paragraph? That employees
18 would not be paid for all work performed?
19   A   No, sir.
20   Q   If you could turn to paragraph 38, the
21 second sentence there, it says, "Plaintiff and all
22 other call center employees are also similar because
23 defendant only paid them for time worked while they
24 were logged into defendant's phone system rather than
25 paying them for the -- for all of the hours they

Page 288

1  actually worked."
2        Do you see that?
3    A   Yes, sir.
4    Q   And is it correct that the employees' pay
5  actually is not driven by when you are logged into the
6  phone system?
7    A   That is correct.
8    Q   It's driven by eTOTALS or totals; is that
9  correct?
10   A   Correct.
11        (Thereupon, marked for identification,
12 Defendant's Exhibit D36.)
13 BY MR. RAY:
14   Q   Let me hand you what's been marked Exhibit
15 36, and I'll ask you if you recognize those documents?
16   A   Yes.
17   Q   Or that document, rather? These are your
18 answers to interrogatories that were submitted in this
19 case; correct?
20   A   Yes, sir.
21   Q   And if you look at the next-to-the-last
22 page there, there's a signature from you. Is that
23 your signature?
24   A   Yes, sir.
25   Q   And it says, "Under penalties as provided

Page 289

1  by law pursuant to" -- and I'll exclude the statutory
2  cites -- "The undersigned hereby certifies that the
3  statements set forth in this instrument are true and
4  correct except as to matters therein stated to be on
5  information and belief, and as to such matters, the
6  undersigned certifies as aforesaid that he fairly
7  believes the same to be true."
8        Did I read that right?
9    A   Yes, sir.
10   Q   And did you review these interrogatories
11 answers before you signed that statement?
12   A   Yes.
13   Q   And if you look at the answer to
14 interrogatory Number 1, which I believe starts on the
15 fifth page up along there. Oh, here we go. I'm
16 sorry. It starts on the fourth page. See where it
17 says response there in the middle of the page?
18   A   Yes.
19   Q   And then the second full paragraph starts
20 with "Notwithstanding"? Do you see that?
21   A   Yes.
22   Q   And then if you go to the second sentence
23 of that -- no. I'm sorry. The fourth sentence of
24 that paragraph where it starts, "The requirement."
25        Do you see that?

Witness: Charles Seward

74 (Pages 290 to 293)

Page 290

1    A    Yes.
2    Q    "The requirement to work uncompensated
3    overtime was a companywide practice."
4         Do you see that?
5    A    Yes.
6    Q    On what do you base that it's companywide?
7    A    Just by speaking to the other reps on the
8    team and also speaking to our Dallas representatives.
9    They also indicate they have to be in there early, but
10   they've all been laid off.
11   Q    And who in Dallas did you speak to?
12   A    You just talking on the phone. They have
13   -- they recorded all my calls, but when I say country
14   -- companywide practice, Avaya is used -- the same
15   sign-on system requirements is used in Dallas, in
16   Atlanta. That's what I'm basing it on.
17   Q    Do you know if there's call centers outside
18   of Dallas and Atlanta?
19   A    Indiana.
20   Q    Is that --
21   A    Raleigh, Endicott.
22   Q    I'm sorry. I didn't mean to interrupt.
23   Raleigh, Indiana?
24   A    I'm not sure of any other locations.
25   Q    Do you know if Avaya is used in Raleigh?

Page 291

1    A    I believe so, but I can't speak on that for
2    a fact. I don't want to talk out of my hat.
3    Q    It says, "Defendant's managers include but
4    are not limited to Gary Kamprath," and then it goes on
5    to list others.
6         Is Gary Kamprath your manager?
7    A    No, sir. Kerry Bethea, Juanlyn Williams,
8    and Sharon Lofton.
9    Q    What about Deborah?
10   A    No. She's part of the management team.
11        MR. RAY: Let's take a break. We're out of
12   tape. And if we could take about a five-minute
13   break so that I can get organized, I'll try to
14   rip through this.
15        THE VIDEOGRAPHER: Off video.
16        (Thereupon, a recess was taken.)
17        THE VIDEOGRAPHER: On video.
18        (Thereupon, marked for identification,
19   Defendant's Exhibit D37.)
20   BY MR. RAY:
21   Q    Mr. Seward, I'm going to hand you what has
22   been marked as Exhibit 37, and this is a team meeting
23   document of some sort. It seems to be attached to an
24   e-mail from Miss Williams to the SCET Team, and I'll
25   just ask you if you recognize this?

Page 292

1    A    Yes.
2    Q    And this is dated September 26, '07, it
3    looks like, on the third page there. Did you attend a
4    meeting where this PowerPoint or this presentation was
5    given?
6    A    I can't confirm that I was at the meeting,
7    no, sir.
8    Q    Did you -- and via e-mail it looks like she
9    sent you this?
10   A    Yes. I looked at it, sir.
11   Q    Here's -- and I don't have many questions
12   on this, but if you could turn to the ninth page, I
13   think there's a bar graph entitled, "MTD overview, L,
14   slash, late log-in."
15        Do you see that?
16   A    Yes.
17   Q    Do you know how large the SCET group was at
18   that time? In late '90 -- or, I'm sorry, late 2007?
19   A    The actual S --
20   Q    The actual SCET group?
21   A    No, sir. I don't know how many actual
22   entitlement people we had. I'm sorry.
23   Q    And then it says, "Late log-ins, 646."
24   A    Yes.
25   Q    Do you see that?

Page 293

1    A    Yes, sir.
2    Q    And is that -- do you recall what would
3    have been discussed about that?
4    A    Yes, sir.
5    Q    And what is that?
6    A    Normally, because it's -- it was mentioned
7    like two or three meetings in a row, you know, let's
8    focus on it, let's focus on it, let's focus on it,
9    let's focus on it, and even though I know they were
10   very lax, if I can use that word, I -- I didn't
11   believe -- I wasn't the type of person like to be
12   late, so I know I had maybe one a month or something
13   like that -- maybe I had three or something like that,
14   but normally maybe one a month. Maybe one or two a
15   month, maybe, at the most, but it was a high -- the
16   number was very high.
17        And Miss Williams amplified that the
18   sponsor, I think, was looking at this also, but the
19   late arrivals of people coming in late, you see the
20   numbers, and I think they got worse before they got
21   better. They might be still there. I haven't seen
22   it. I haven't seen these numbers for a while.
23   Q    So the -- the late arrivals during that
24   time frame -- well, let me back up. Did you -- were
25   you told what the late arrivals were for the SCET Team

Witness:   Charles Seward

75 (Pages 294 to 297)

Page 294

1   generally? Like on a monthly basis? Is that
2   something --
3       A    Well, at the meeting she would actually
4   quote a number, like 600 lates or 500 lates or, you
5   know, something like -- something of that nature. I'm
6   trying to remember if her number she was giving us was
7   for the year or per month, but it looks like it was
8   for the year, probably. When you add these numbers
9   up, that makes sense. It was pretty high. I remember
10  that. It was very high.
11          (Thereupon, marked for identification,
12  Defendant's Exhibit D38.)
13  BY MR. RAY:
14      Q    Let me ask you about your PBCs. Let me --
15  first I'll give you your 2006 PBC, which is Exhibit
16  38. I'll ask you to take a look at that and tell me
17  if you recognize it?
18      A    Yes, sir, I do.
19      Q    And the process for PBCs is, you actually
20  fill out part of that yourself; right?
21      A    Yes.
22      Q    Excuse me. And do you fill that out at the
23  first of the review year, or at the end of the review
24  year?
25      A    We have a -- our goals, our business goals.

Page 295

1   We will fill that out -- it basically is a can --
2   expectations. You can put it in, you sign off on it,
3   and then later in the year you go over your PBC, your
4   final rating.
5       Q    There on the first page -- I think I've
6   given you your 2006 one -- of Exhibit 38 --
7       A    Yes.
8       Q    -- it has PBC manager, Bethea Kerry, who we
9   talked about at some length, and then it has BluePages
10  manager, Williams Juanlyn. Do you know why she was
11  listed as your BluePages manager at that time?
12      A    Let me see. This is -- because we was in
13  transition. There was something going on with Kerry
14  Bethea. He was out of the picture, but yet he still
15  gave us an evaluation. I mean, he was out of
16  management. We didn't know what going on, but
17  Miss Williams were like -- because we officially -- we
18  were told officially we was not going to be under
19  Miss Williams until January 17, 2007.
20      Q    If you look at the business goals there on
21  the first page, there's an asterisk with a little
22  paragraph. Then there's a list of things. Do you see
23  that?
24      A    Yes.
25      Q    Are those the things that you input or --

Page 296

1       A    It's canned. We -- we are given those --
2   the manager provides that whole list.
3       Q    Okay. And if you go -- I'm going to ask
4   you about a couple of these here, just to have -- make
5   sure I understand it. If you go down to the one, two,
6   three, four, fifth line, that says, "Maintain
7   20 percent or less ACW data."
8           Is that after call work?
9       A    Yes.
10      Q    Is that saying maintain 20 percent or less
11  in that particular AUX code?
12      A    That is correct.
13      Q    And that's IBM Teach?
14      A    That's Teach.
15      Q    And then later it's reduced?
16      A    It reduced to ten percent.
17      Q    So your business goals were different
18  between IBM Teach and SCET Team; right?
19      A    Right. That's a big question with us. How
20  come it's less?
21      Q    And then it says, "Achieve audit readiness
22  in the following areas: QMS, safety and security, and
23  BCG."
24          Did I read that right?
25      A    Yes.

Page 297

1       Q    And what is audit readiness specifically
2   with respect to BCG?
3       A    Just that we read the document in case of a
4   BCG and that we signed off and that we understood it.
5   The other -- the other bullet here, QMS, safety and
6   security, when you say audit readiness, if they came
7   through and -- and audited our QMS knowledge -- QMS is
8   a document where we check for processes on trying to
9   find out entitlement or how to do certain inquiries on
10  the customer.
11          Security and safety is then locking up
12  your desk and your workstation and badging in and no
13  tailgating when people come in behind badges. That's
14  security. That's what that is.
15      Q    If you go down a couple more, it says,
16  "Contribute to team meeting productivity objective of
17  75 percent."
18      A    Uh-huh.
19      Q    Can you explain what that is?
20      A    The sponsor and the -- and IBM arrive at a
21  number for productivity. That means how much work --
22  how much revenue we generate. Being a -- being --
23  being -- representatives of being available, in
24  available state, it all ties in together. So the
25  service level that they have or productivity objective

Witness: Charles Seward

76 (Pages 298 to 301)

Page 298

1   is, how much work do they have? They have a list of
2   things that got to get done. How many calls we take
3   in, how fast we receive those calls, how fast we
4   respond to the cost -- customer, how much money we're
5   generating. They have a way of calculating how much
6   revenue is generated. They have all those things.
7       Q   Who calculates that productivity?
8       A   It's between IBM and the sponsor.
9       Q   But who -- did someone provide you how --
10  does Miss Williams, for example, provide you updates
11  on how you're doing compared to that number?
12      A   The productivity number?
13      Q   Yes.
14      A   They give us that number. They really
15  don't give us that number ongoing, because that's
16  basically -- that's -- that's like an internal number.
17  In other words, they know the numbers and how much
18  money we're generating or how much revenue we're
19  generating. They know how much -- how many reps are
20  in available with what the -- what they have lined up
21  with the -- with the sponsor.
22      Q   Does the -- do you know all of the factors
23  going into that productivity number?
24      A   I have an idea, but I don't know all the
25  factors.

Page 299

1       Q   And you don't know who within IBM actually
2   calculates it? Takes all the factors and said, this
3   is our productivity?
4       A   That's when you start doing with the DOR,
5   and between the management team and the sponsor,
6   again, we're not privy to, you know, productivity
7   service -- we see service level agreements more than
8   we do productivity. Productivity is almost --
9   confidential almost. We don't see who -- you know,
10  the numbers that the -- the agents are generating.
11      Q   If you could turn to the second page there,
12  at the very top it says, "Actively monitor the
13  controls expectations across CRM to obtain a
14  90 percent or better weighted average control screen."
15      A   Yes.
16      Q   What does that mean?
17      A   That means -- they monitor our calls. They
18  monitor the quality of our calls with the customer,
19  uh-huh, and -- and there's like a -- like a checklist,
20  you know, how we greet the customer, acknowledging the
21  customer, you know, repeating, verifying information
22  that we're speaking with the customer. These are all
23  the checklists of all that, where in the current
24  department, I think 95 is the -- is the weighted
25  expectation.

Page 300

1       Q   If you go back to the first page -- I
2   missed one. The third one down under business goals,
3   it says, "Meet 7.5 sign-on hour objective daily."
4       A   Yes.
5       Q   What does that mean?
6       A   That is a -- if you -- if you look -- in my
7   case I only took a half an hour lunch.
8       Q   Right.
9       A   So take that half an hour, that makes it
10  eight hours.
11      Q   Then you have two 15-minute breaks?
12      A   But this -- I'm trying to remember exactly.
13  7.5, each sign-on objective -- see, in this department
14  it's been awhile since we've been over there. You
15  have X amount of time administrative, and then -- know
16  what this is -- I take that back. I'm refreshing
17  myself. It's been awhile. This is minus the two
18  15-minute breaks. Your hour lunch is on your own, so
19  if you take the two 15-minute breaks, add that to
20  there, you get your eight hours.
21      Q   I got it. Okay. If you turn back to the
22  second page there, there's a -- the first bolded
23  section there is business results, and under business
24  conduct guidelines -- or, I'm sorry, if you go down
25  the one, two, three, four, the fifth sentence, it

Page 301

1   starts, the line there says, "Business conduct
2   guidelines," but then it says, "Productivity occupancy
3   results, 53 percent."
4           What is that referring to?
5       A   Again, that's that number that -- that's
6   management input.
7       Q   Did -- when you first came into SCET in the
8   early part of 2007, you went through training, which
9   we talked about?
10      A   Yes.
11      Q   And then we've looked at your complaint
12  about training that you thought it was --
13      A   Yes, sir.
14      Q   Did you struggle somewhat in performing
15  your duties once you actually got on the floor?
16      A   Yes, I did because the training was
17  terrible. It was terrible, and the more you complain
18  about it, the more you was chastised and/or the body
19  language or -- it was problems. There was people
20  walked out of that class. We started with 15 people.
21  I think we ended up with nine.
22      Q   Did -- who completed the training that were
23  IBM employees as opposed to independent contractors?
24      A   Sharrie Brown, Joe Yacowatz, Lisa Bufford,
25  Sharrie Brown. Let me see. Lisa, Sharrie, Joe

Witness:   Charles Seward

### Page 302

1   Yacowatz, and myself. There was no other IBMers in
2   that class. No, sir.
3           (Thereupon, marked for identification,
4   Defendant's Exhibit D39.)
5   BY MR. RAY:
6       Q   Let me hand you what's been marked Exhibit
7   39, which I believe is your 2007 PBC. Is that what it
8   appears to be to you?
9       A   Yes.
10      Q   And this was when you first -- or the first
11  year you were on SCET Team?
12      A   Yes.
13      Q   I want to go look at the business goals
14  again, and you'd already mentioned that they were
15  different, but if you go down to productivity you see
16  the first line there is, "Research 15 to 20 PMRs per
17  day."
18      A   Yes.
19      Q   What is that?
20      A   PMR is a -- PMR stands for problem
21  management record, and basically what that is, is it's
22  created in a front end when they first come. That
23  record is created by the front-end agent or the
24  software entitlement agent on the front. I mean, not
25  entitlement agent, but software agent in the front,

### Page 303

1   and they assign a number, and that number is tracked
2   through the whole process to see if we can find them
3   support.
4       Q   When you are researching a PMR, what AUX
5   code would you be in?
6       A   Usually the customer's on-line, so I have
7   the customer with me, so I constantly go back and
8   forth on the phone. Please hold; I'm checking. I
9   have like -- you see all the databases I have. I'm
10  going through, probably -- normally each product might
11  have three to four databases. If it's not there, they
12  don't have it.
13      Q   Let's go down under that same section,
14  productivity, to the fourth line up. It says,
15  "Maintain 7.5 productive hours per day."
16          Do you see that?
17      A   Yes.
18      Q   And is that the same 7.5 standard we talked
19  about on your 2006?
20      A   Yes.
21      Q   Is that right?
22      A   That's correct.
23      Q   And then the next one is, "Contribute to S,
24  slash, L objective." Is that service level objective?
25      A   Yes, sir.

### Page 304

1       Q   And that's 80 percent of calls answered in
2   20 seconds or less?
3       A   Yes.
4       Q   If you go to the second page, the fourth
5   line down says, "Maintain current skills, IDP, BCG,
6   and ILC requirements"?
7       A   Yes, sir.
8       Q   I just want to ask you specifically about
9   ILC.
10      A   Yes.
11      Q   And was that just to make sure your claims
12  were accurate? Your claims reported?
13      A   That's what it is. It's just basically
14  saying, you know -- may I expound?
15      Q   Sure.
16      A   Basically what happens here is my --
17  Juanlyn Williams said that was part of her PBC
18  requirements, to make sure those ILCs were submitted
19  on time and that she made that part of our PBC.
20      Q   If you could turn to page 3 of that PBC,
21  which is Exhibit 39, the overall assessment is --
22  well, first of all, there's a rating --
23      A   Yes.
24      Q   -- PBC3, amongst the lowest contributors
25  this year. Needs to improve.

### Page 305

1       A   Yes.
2       Q   And Miss Williams provided that rating?
3       A   Yes.
4       Q   And then she provides a summary there;
5   right --
6       A   Yes.
7       Q   -- of what she -- I guess her overall
8   assessment?
9       A   Yes.
10      Q   And you disagreed with that assessment?
11      A   I sure did.
12      Q   And that's on page 4, I believe?
13      A   Yes.
14      Q   And was this -- you provide a summary here
15  with your comments and your reaction to it. Did you
16  also escalate this to anyone?
17      A   No. I -- I just -- I answered this the
18  best that -- to my ability, and I didn't escalate it.
19      Q   The PBC provides you an opportunity to
20  comment, obviously --
21      A   Yes.
22      Q   -- right? And you did here?
23      A   Yes.
24      Q   Why not insert a comment about off the
25  clock in your PBC? Same reasons you --

Witness:   Charles Seward

78 (Pages 306 to 309)

Page 306

1   A   Same. It's -- you know, I mean, this was a
2   -- I consider this as an exercise. Just,
3   Miss Williams, she's -- she denies that she said it,
4   but she proclaimed that we were all going to be
5   threes, and there was no way you can change that.
6   Q   She said all the people in training would
7   be threes?
8   A   There's no way you're going to be higher
9   than a three, but she still to this day says she never
10  said that. She said it a couple times. If I can
11  expound, when we had our feedback meeting where she
12  would explain our duties and responsibilities and what
13  she is expecting of us, one of the -- one of the key
14  items that she expressed to us was that there was no
15  way we're going to be any higher than a three.
16  Q   I'm shifting gears here.
17  A   Sure.
18  Q   Obviously in this lawsuit you're seeking
19  damages? You're seeking to recover something --
20  A   Yes.
21  Q   -- correct? Have you prepared any
22  calculations of your damages?
23      MR. ZOURAS: Let me impose an objection to
24  the extent this calls for a legal conclusion and
25  calls for a legal opinion as well. To the extent

Page 307

1   that you can, you can answer.
2       THE WITNESS: To be honest, I prayed about
3   it. I'm going to let the courts decide or the
4   powers that be, decide. I have no idea what the
5   numbers are. I have none, and I'm under oath, so
6   I have no idea what -- what the numbers are, so
7   that's not -- to be honest with you, that has not
8   come across my mind. It's -- it comes across
9   from other people, what are you trying to do?
10  But numberswise that has not come across.
11  BY MR. RAY:
12  Q   Do you know George Lambousis?
13  A   No.
14  Q   Have you ever received any e-mails from
15  Mr. Lambousis?
16  A   No, sir.
17  Q   Earlier we had talked about how long it
18  took you to log in, or log into your tools, and we'd
19  gone through your tools in the normal tools, and we'd
20  talked about it currently, and we had gone back in
21  time, and I think -- I asked you about log-in times
22  there, and you said you used a 15-minute rule of thumb
23  for yourself.
24  A   Yes.
25  Q   I'm not sure that I ever asked the

Page 308

1   question, and I just want to make sure I do while I
2   have you: Was there a period of time -- has there
3   ever been a period of time -- let's go back to the
4   early part of 2005.
5   A   Yes.
6   Q   Okay? Say January of '05, where it took
7   you substantially longer to log into the tools you
8   needed to start your day than what it takes you
9   currently? And I think you testified currently it was
10  seven to eight to 12 minutes if there was an issue?
11  A   I would say at that time, 20 minutes.
12  Twenty minutes or so, to be honest. Twenty minutes.
13  If the system was dogging out, it would be longer, but
14  normally I'm going to -- I'm going to say 20 minutes
15  or so.
16  Q   During what period of time did it take 20
17  minutes?
18  A   When you first come in and try to bring up
19  the system, I believe later in 2005. I'm not sure. I
20  -- I really can't -- I think they upgraded the system,
21  but I really can't --
22  Q   So late -- in the latter part of 2005 it
23  took up to 20 minutes?
24  A   I'm saying early in 2005.
25  Q   Okay. Early --

Page 309

1   A   I'm just trying to remember when they did
2   the training, when they brought in new versions or
3   releases of Avaya, Avaya. I'm just trying to -- but I
4   can't really remember the time -- you know, the events
5   of when Avaya came on, how each release came on, how
6   it got better, a little bit better, a little bit
7   better, a little bit better.
8   Q   In the -- okay. Well, so in the early part
9   of 2005 you think it was -- could have been 20
10  minutes?
11  A   Twenty minutes or so, yes, sir.
12  Q   Now, what about late 2005? You don't know,
13  or --
14  A   I don't know, sir.
15  Q   What about 2006?
16  A   I think it -- I think we got some training
17  in the middle of the year, but I don't know when.
18  That they had a new, better version of Avaya and --
19  coming on faster, but I'm not sure when. I give you
20  an example. It was the class that Miss Jesser was
21  teaching. I think from that point on, the system got
22  faster. You know, it got faster getting on.
23  Q   So in 2006 you can't pinpoint how long it
24  took?
25  A   No. I can talk about now and -- generally

Witness: Charles Seward

79 (Pages 310 to 313)

## Page 310

1  speaking, in Teach before the slowdown, before we was
2  getting ready to go -- the work was going over -- from
3  20 minutes.
4  Q  When does the 20 -- I'm still trying to
5  figure out when the 20 minutes applies?
6  A  Before we started slowing down. I'm not
7  sure exactly when -- I -- I'm looking at when the -- I
8  guess whoever it was that decided the responsibilities
9  of Teach was going to go overseas.
10     Prior to that, we were busy, and during
11  that time I can still remember, you know, taking some
12  time to get logged on, so if we can find that time
13  line of when the Filipinos came on line or prior --
14  really, actually they came on in October or November
15  of that year, but prior to that, from the beginning of
16  the year going through the year, it started slowing
17  down.
18  Q  I'm a little confused about the 20 minutes,
19  because you said you used a 15-minute guideline?
20  A  Right.
21  Q  A rule of thumb, I think you said? So if
22  you were only using a 15-minute rule of thumb and it
23  took 20 minutes, you would always be --
24  A  No.
25  Q  Not always, but you could be --

## Page 311

1  A  I'm saying currently I'm using that 15
2  minutes. Currently.
3  Q  Currently?
4  A  Well, 15 minutes rule of thumb, but prior
5  to Teach going over to the Philippines, I'm saying 20
6  minutes, but normally I was usually in there a half an
7  hour earlier, but I'm going to say when I was actually
8  working, bringing up the system, I'm saying 20
9  minutes.
10  Q  Now, when you say currently you are using
11  15 minutes, you're talking about, but you're starting
12  at your shift start time --
13  A  Yes, sir.
14  Q  -- right? And that's the time period you
15  talked about that you have actually been measuring at
16  seven to eight minutes to 12 minutes?
17  A  Yes, sir.
18  Q  Before I mark this as an exhibit, just so
19  we don't kill ourselves on paper -- I may mark it as
20  an exhibit. Let me just ask you --
21  A  Oh.
22  Q  -- if you recognize that document?
23  A  Yeah, we do.
24  Q  And what is that?
25  A  That is a -- the -- this is what's in Q --

## Page 312

1  QMX. Say, give you an example. It gives us our
2  duties, the processes on how we do our job scenarios;
3  what databases or applications to use. It -- it gives
4  us -- in here it gives you guidelines on your
5  etiquette with the customer.
6  Q  Did you provide that to your lawyers?
7  A  Yes. They have a copy of this, I believe.
8  Q  Can you hand me that back?
9  A  Yes.
10  Q  I just want to mark it as an exhibit. I'm
11  going to hand you back what's been marked as
12  Defendant's Exhibit 40.
13  A  Yes.
14     (Thereupon, marked for identification,
15  Defendant's Exhibit D40.)
16  BY MR. RAY:
17  Q  And just so the record is clear, this is
18  the software entitlement work instructions; is that
19  right?
20  A  Yes.
21  Q  Are these current instructions?
22  A  It appears, yes, sir.
23  Q  Where do you get these? Are these on the
24  intranet?
25  A  Again, this is one of those -- when I gave

## Page 313

1  you the list of applications that I had to bring up,
2  this actually resides within Lotus Notes. There's a
3  database within Lotus Notes where you can actually
4  access this information.
5  Q  And you did provide that to your lawyers?
6  A  I believe I did give them a description of
7  my job, yes.
8  Q  Is there anything in this Exhibit 40 that
9  talks about or that you believe addresses your
10  specific claims in the case about logging in?
11  Expectation on arrival time? That you recall? The
12  document -- I'm not asking you for a test. I'm just
13  asking if you recall?
14  A  I'm not sure, sir.
15     (Thereupon, marked for identification,
16  Defendant's Exhibit D41.)
17  BY MR. RAY:
18  Q  I'm going to hand you what's been marked as
19  Exhibit 41, and this appears to be a BluePages
20  printout for Debbie Bigley. Do you know Debbie
21  Bigley?
22  A  No, sir. Not personally, no.
23  Q  And do you know if you were the one who
24  printed this out and provided it to your counsel?
25  A  Yes. I should have, yes.

HUNDT REPORTING
214-220-1122

Witness:   Charles Seward

80 (Pages 314 to 317)

Page 314

1  Q  And is there some relevance -- have you
2  ever reported to Miss Bigley?
3  A  No.
4  Q  Has Miss Bigley ever talked to you about
5  expectations regarding arrival times --
6  A  No.
7  Q  -- or log-in time?
8  A  No. I'm sorry. No.
9  Q  Is she in Dallas?
10 A  Yes.
11    MR. RAY:  I'm sure I missed something
12 crucial, but I'm about out of time here, so --
13    MR. ZOURAS:  I find that very hard to
14 believe.
15    MR. RAY:  -- I will pass the witness.
16    MR. ZOURAS:  I have just some brief
17 follow-up.
18        EXAMINATION
19 BY MR. ZOURAS:
20 Q  Charlie, you were asked some questions by
21 Mr. Ray about the number of SCET employees that there
22 may have been at any given time. Do you have any
23 estimate as to how many people are in that department
24 currently?
25 A  The actual -- just the entitlement group,

Page 315

1  right?
2  Q  Yes. And I'm not looking for the exact
3  number? I mean, is it 50? 100? 200? I mean, can
4  you give a rough idea?
5  A  I have to get clarification. Are you
6  talking about everyone that's reporting to Miss -- the
7  front-end agents plus the back end, or just
8  entitlement?
9  Q  Well, let's take both.
10 A  Okay. Both. Let's see, 23 -- I would say
11 ballpark, 40.
12 Q  And has that been consistent throughout
13 your tenure, or has that changed?
14 A  It's been consistent. Probably a little
15 bit more than less.
16 Q  All right. How many -- again, rough idea.
17 How many people work on your floor currently?
18 A  Everybody, or all of the different --
19 Q  Yes.
20 A  -- entitlement?
21 Q  Yes.
22 A  All the way across? Gosh, I have -- I
23 couldn't even --
24 Q  Again, is it in the hundreds? Is it 12?
25 Is it something else?

Page 316

1  A  Across the whole floor? Let's say two and
2  a quarter. 225.
3  Q  All right. Thank you. And is -- to the
4  best of your knowledge -- you're on the fifth floor,
5  right?
6  A  Yes, sir.
7  Q  To the best of your knowledge, is that true
8  with respect to the fourth floor as well?
9  A  For security reasons plus my own decision,
10 I never been on the fourth floor.
11 Q  Okay. So you're not sure one way or
12 another?
13 A  No, sir.
14 Q  We talked about the chain of command. I
15 know you report to Miss Williams now. What's her
16 official title?
17 A  Software -- software entitlement manager.
18 I'm not sure of her exact title. It's on my PBC. No,
19 it doesn't have her title on it.
20 Q  That's okay. That's okay. Is there a team
21 leader you report to?
22 A  Yes. Ella Ward.
23 Q  And how many people does she oversee?
24 A  That's the -- that's over entitlement team.
25 I -- I would say 24.

Page 317

1  Q  And Miss Williams oversees how many people
2  approximately? Again, a rough idea?
3  A  I'm saying -- that between 40 and 50.
4  Q  That's the same number you gave me before?
5  A  Yes, it is. Because they have the front
6  end, which has about 23 people, and then you have the
7  back end. We're in that 20-something range, so it's
8  in between that 40 and 50 folks.
9  Q  All right. Okay. And we discussed who
10 else shares, you know, office space on your fifth
11 floor currently?
12 A  Yes, sir.
13 Q  Outside of the SCET group?
14 A  Yes, sir. The software side, yes.
15 Q  Who oversees those people?
16 A  The other groups?
17 Q  Yes.
18 A  Those are -- Jackie -- Vicki Torres, Wendi
19 Musgrove.
20 Q  Okay.
21 A  Miss Roseanne Davis. I can't -- Sara
22 Cerny. I'm trying to go around -- Pete Starratt.
23 I'm trying to go around each man.
24 Q  That's okay. That's okay. And are these
25 people all pretty much at the same level as

Witness: Charles Seward

81 (Pages 318 to 321)

Page 318

1  Miss Williams?
2  A  I can't speak on that, but I believe so.
3  Q  All right. Do they all report to the same
4  individual, or are there different chains of commands?
5
6  A  Some report to a Jeff Granger, and some of
7  them -- some report to Sharon Lofton.
8  Q  And who does Miss Williams report to again?
9  Miss Lofton?
10 A  Sharon -- yes, Miss Lofton.
11 Q  Do you know who Miss Lofton reports to?
12 A  I got it now. It's on my -- Melody Curtis.
13 Q  Okay. Is Miss Lofton on the same floor as
14 you?
15 A  Yes.
16 Q  How about Miss Curtis?
17 A  No. She's in Texas.
18 Q  You mentioned somebody else along with
19 Miss Lofton.
20 A  Jeff Granger.
21 Q  Is Mr. Granger on the same floor as you?
22 A  Yes.
23 Q  Have you ever received e-mails from
24 Miss Lofton or Mr. Granger?
25 A  I would say from Miss Lofton, yes.

Page 319

1  Mr. Granger, I'm not sure if I have any e-mails from
2  him.
3  Q  E-mails received from Miss Lofton, would
4  they go to everybody in -- well, who would -- who
5  would they go to?
6  A  They would go to the team -- the reporting
7  managers under her.
8  Q  And would those people then forward them on
9  to you guys?
10 A  Normally that would be case if it was
11 something that we need to see, yes, sir.
12 Q  We discussed earlier about how you've just
13 talked about having to boot up your machine at length,
14 and you came in early to do that, and, you know, we
15 had a lot of questions about, you know, whether or not
16 you believed you were able to report that time to
17 receive payment and so forth. You said you discussed
18 some of these issues with different people like Reggie
19 and Miss Moore, I think it was?
20 A  Or Lawrence Moore.
21 Q  Lawrence Moore and Miss Brown and
22 Miss Bufford?
23 A  Yes. Bufford, B-U-F-F-O-R-D.
24 Q  And Mr. Yacowatz as well?
25 A  Yes.

Page 320

1  Q  And when you discussed these issues with
2  them, did any of these folks ever say to you that they
3  were operating under a different belief as to what
4  they could, you know, report in terms of time worked?
5  A  No, sir. No. They -- they understood,
6  because we worked in that environment together.
7  Q  You never -- and throughout -- you've been
8  there for 30 years, of course, but at least in the
9  last three or four years, you've never come to any
10 belief that other people on your floor were operating
11 under some different policy when it came to these
12 issues as you?
13    MR. RAY: Objection; leading.
14    THE WITNESS: No. It's -- everybody,
15 especially under the -- this -- the immediate
16 group, I know that speaking with other agents
17 from other floors, that was a different arena.
18 I'm not sure how -- what kind of software device
19 they use for signing on or anything like that,
20 but I know in my immediate area under --
21 especially under these two-second lines, this was
22 the norm, that you have to get in here and log in
23 on time, for sure, and --
24 BY MR. ZOURAS:
25 Q  Let me ask you this. Did any management

Page 321

1  personnel, be it Mr. Bethea, Miss Williams, or anybody
2  else, ever tell you that you could report that time?
3  The time spent booting up your computer before your
4  shift?
5  A  No, sir.
6  Q  And I'm including, you know, in writing,
7  verbally, and some other form of communication?
8  A  No, sir.
9  Q  Exhibit 13, remember that? You had that
10 earlier?
11 A  Yes.
12 Q  This was an e-mail, I think, that was
13 forwarded to you by Miss Colon?
14 A  Isabel Colon.
15 Q  Colon? Do you have an understanding as to
16 why Miss Colon forwarded you that e-mail?
17 A  It was directed to -- they forwarded it to
18 the team, so -- I believe I deleted my original.
19 Q  And that's what I'm getting at. You would
20 have received this e-mail before Miss Colon --
21 A  Yes.
22 Q  -- sent it to you?
23 A  Yes.
24 Q  Do you know why she sent it to you again?
25 A  No. Basically what happened was, it was a

Witness: Charles Seward

82 (Pages 322 to 325)

### Page 322

1  fellow employee who -- you know, we was sitting around
2  talking at lunch, like I indicated before, and she
3  said, you know, I got an e-mail. I remember when we
4  used to -- I'll say -- I think I still have that
5  e-mail, and the employee said that to me. That's how
6  I got that e-mail.
7  Q  I remember this.
8  A  Because I -- because I deleted it. I know
9  I deleted it.
10 Q  Thank you. You're right. The first time
11 that you received it --
12 A  Yes.
13 Q  -- do you know who the other recipients
14 were of that e-mail?
15 A  Yes. Team and on the floor. They changed
16 the way they were doing the DOR throughout the
17 organization, so they sent out the notice to the
18 leads, and the leads sent them over to us, as they
19 understood them.
20 Q  So I want to be very specific about when
21 you are saying "us," who are you including in us as
22 the recipients of this e-mail?
23 A  I'm aware of the Teach Team. Normally in
24 our environment when you get an e-mail like that, it
25 went out to the whole floor. Meaning -- when I say

### Page 323

1  the whole floor, I mean everybody in the organization
2  on our floor. Now, I'm not sure what happened in
3  Dallas, how they are treating it, but I do know -- I
4  do not know. I'm just saying, I just don't want to
5  talk off the hat.
6  Q  No, no. I appreciate that. Your
7  understanding is that this went to the floor, and
8  that's the 200 and a quarter or so folks you mentioned
9  before?
10 A  Yes. Gary --
11     MR. RAY:  Objection; calls for speculation.
12 BY MR. ZOURAS:
13 Q  Who are you including when you refer to the
14 floor?
15 A  The departments that Gary supported.
16 Q  And what departments did Gary support?
17 A  He supported the Sharon Lofton arena and
18 also Jeff Granger arena.
19 Q  And those arenas were on your floor, the
20 fifth floor?
21 A  That's correct.
22 Q  Do you know if Mr. Kamprath supported any
23 personnel beyond your floor?
24 A  I can't speak on it, but I believe so.
25 Q  What leads you to that belief?

### Page 324

1  A  Because I believe he was reporting to a
2  manager out of Dallas, but now he's -- I'm not sure
3  when this happened, because there was no announcement.
4  He's -- he's now considered a focal on their staff
5  position reporting to Al Mitchell.
6  Q  Do you know what his title was at the time
7  of this e-mail? Made --
8  A  What does it say there?
9  Q  Is it pretty much what it says on the
10 e-mail itself?
11 A  Right, yes.
12 Q  US work force management?
13 A  Yes, sir. Now, at that time when he sent
14 that e-mail, I'm not sure who he actually reported to,
15 but now he's currently reporting to an Al Mitchell.
16 Q  And who -- what title does he have?
17 A  Al Mitchell?
18 Q  Yes.
19 A  He's a -- he's a manager that reports to --
20 reports to Brian Babin, B-A-B-I-N.
21 Q  Where is Mr. Mitchell based?
22 A  Atlanta.
23 Q  And where is Mr. Babin based?
24 A  He should be in Atlanta, but he might be in
25 Dallas. I'm not sure, sir.

### Page 325

1  Q  I take it you don't have any routine direct
2  contact with these people; is that right?
3  A  I might run into them if they're in town
4  for a meeting or something. I might run into them.
5  Q  Are they in your building?
6  A  I can't speak to that. Al Mitchell is in
7  Atlanta somewhere.
8      MR. ZOURAS:  Okay. That's all I have.
9  Thank you.
10     MR. RAY:  Let's -- think I've saved a few
11 minutes.
12     (Thereupon, marked for identification,
13 Defendant's Exhibit D42.)
14         EXAMINATION
15 BY MR. RAY:
16 Q  I want to revisit -- take Exhibit 13 -- was
17 it Exhibit 13, the Kamprath e-mail, back out, and I'm
18 going to hand you what's been marked Exhibit 42, and
19 that e-mail, Mr. Seward, is not the one you produced,
20 but one we produced. And if you look at the first
21 page there, at the top it is Sharrie Brown forwarding
22 it to you?
23 A  Yes.
24 Q  Do you see that?
25 A  Yes.

Witness: Charles Seward

83 (Pages 326 to 329)

Page 326

1  Q  And then on August 3, 2006, Isabel Colon
2  sends it to a variety of people, including you. Do
3  you see that?
4  A  Yes.
5  Q  Below that there's an e-mail from Mr.
6  Kamprath. Do you see that?
7  A  Yes.
8  Q  And it is sent not to anyone at your level
9  but, rather, to DOR managers and seniors. Do you see
10 that?
11 A  Yes.
12 Q  Okay. Who are the DOR managers and
13 seniors?
14 A  The DOR managers are -- normally, in my
15 recollection, DOR managers are the first-line
16 managers. The seniors are the lead person, like
17 Miss Colon was Kerry Bethea's senior. They use the
18 term "senior." Sometimes they also use the word
19 "lead." Lead person or senior.
20 Q  And the DOR -- but the term "DOR managers,"
21 who would be the managers? Are those managers subject
22 to DOR reporting? Is that your understanding?
23 A  I would think so, but I -- I really can't
24 address it.
25 Q  You actually don't know who Mr. Kamprath

Page 327

1  sent that to, do you, other than Miss Colon?
2  A  No, sir.
3  Q  Is that correct?
4  A  That's correct. I do not know except for I
5  know I received it at one time.
6  Q  You know that Miss Colon, who was your
7  senior --
8  A  Yes.
9  Q  -- sent it to the people under her; right?
10 A  That's correct.
11 Q  You have no idea or no knowledge as to
12 whether anyone else at your level, meaning someone on
13 the phones, received this e-mail --
14 A  That's correct.
15 Q  -- is that correct?
16 A  That's correct.
17    MR. RAY: I pass the witness.
18    MR. ZOURAS: I have nothing further.
19    THE VIDEOGRAPHER: Off video.
20    (Deposition concluded at 4:07 p.m.)
21    ---

Page 328

CERTIFICATE

I hereby certify that the foregoing transcript was reported, as stated in the caption; that the witness was duly sworn and elected to reserve signature in this matter; that the colloquies, questions and answers were reduced to typewriting under my direction; and that the foregoing pages 1 through 327 represent a true, correct, and complete record of the evidence given.

The above certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript, unless said disassembly or photocopying is done under the auspices of Hundt Reporting, LLC and the signature and original seal is attached thereto.

I further certify that I am not a relative or employee or attorney of any party, nor am I in any way interested in the result of said case.

Pursuant to Article 8B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure: That I am a Georgia Certified Court Reporter, here as an independent contractor for Hundt Reporting, LLC; that I was contacted by the offices of Hundt Reporting, LLC to provide court reporting services for this deposition; that I will not be taking this deposition under any contract prohibited by O.C.G.A. 15-14-37 (a) or (b); that I have no written contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition; and that I will charge my usual and customary rates to all parties in the case.

This, the 3rd day of November, 2008.

THOMAS R. BREZINA, CCR-B-2035

Page 329

ERRATA SHEET
Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e), any changes in form or substance which you desire to make to your deposition testimony shall be entered upon the deposition with a statement of the reasons given for making them.

To assist you in making any such corrections, please use the form below. If supplemental or additional pages are necessary, please furnish same and attach them to this errata sheet.

---

I, the undersigned, CHARLES SEWARD, do hereby certify that I have read the foregoing deposition and that said transcript is true and accurate, with the exception of the following changes noted below, if any:

Page____ /Line____ /Should Read:_____
_____
Reason:_____
Page____ /Line____ /Should Read:_____
_____
Reason:_____
Page____ /Line____ /Should Read:_____
_____
Reason:_____

Witness: Charles Seward

84 (Pages 330 to 331)

Page 330

1  Page____/Line____/Should Read:_____
2  _____
3  Reason:_____
4
5  Page____/Line____/Should Read:_____
6  _____
7  Reason:_____
8
9  Page____/Line____/Should Read:_____
10 _____
11 Reason:_____
12
13 Page____/Line____/Should Read:_____
14 _____
15 Reason:_____
16
17 Page____/Line____/Should Read:_____
18 _____
19 Reason:_____
20
21 Page____/Line____/Should Read:_____
22 _____
23 Reason:_____
24
25

Page 331

1  Page____/Line____/Should Read:_____
2  _____
3  Reason:_____
4
5  Page____/Line____/Should Read:_____
6  _____
7  Reason:_____
8
9  Page____/Line____/Should Read:_____
10 _____
11 Reason:_____
12
13 Page____/Line____/Should Read:_____
14 _____
15 Reason:_____
16
17 Page____/Line____/Should Read:_____
18 _____
19 Reason:_____
20
21 _____
         CHARLES SEWARD,
22 Sworn to and subscribed before me,
23 _____, Notary Public.
24 This _____ day of _____, 2008 ____.
25 My Commission Expires: