# EXHIBIT 5A

```
                                                                    1

  1                UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK
  2

  3   CHARLES SEWARD,              )
      Individually and on Behalf   )
  4   of All Others Similarly      )   08 CIV 3976 (KMK)
      Situated,                    )
  5                                )   ECF CASE
                   Plaintiff,      )
  6                                )
          vs.                      )
  7                                )
      INTERNATIONAL BUSINESS       )
  8   MACHINES CORPORATION,        )
      D/B/A IBM CORP.,             )
  9                                )
                   Defendant.      )   Volume I of II
 10   _____ )   Pages 1-65

 11

 12

 13          Videotaped deposition of CATHY BARDAY,

 14      taken on behalf of the Defendant, pursuant to

 15      the stipulations contained herein, in

 16      accordance with the Federal Rules of Civil

 17      Procedure, before Daniel M. Gershwin, Certified

 18      Court Reporter, at 1420 Peachtree Street, NE,

 19      Atlanta, Georgia, on the 23rd day of October,

 20      2008, commencing at the hour of 4:32 p.m.

 21

 22
                      HUNDT REPORTING, LLC
 23                   703 McKinney Avenue
                         Suite 207
 24                   Dallas, Texas 75202
                      Tel: (214) 220-1122
 25                   Fax: (214) 220-1127
```

Page 2

```
 1              INDEX TO EXAMINATIONS
 2                                           Page
 3  Examination by Mr. Rossman                  4
 4
 5              INDEX TO EXHIBITS
 6  Defendant's                    Marked/First
    Exhibit Number   Description    Identified
 7
    D1       Declaration of            26
 8           Cathy S. Barday
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1  APPEARANCES OF COUNSEL:
 2  On behalf of the Plaintiff:
 3      JAMES B. ZOURAS
        Attorney at Law
 4      Stephan Zouras, LLP
        205 North Michigan Avenue
 5      Suite 2560
        Chicago, Illinois 60601
 6      Tel: (312) 233-1550
        Fax: (312) 233-1560
 7      E-mail: Jzouras@stephanzouras.com
 8
 9  On behalf of the Defendant:
10      E. MICHAEL ROSSMAN
        Attorney at Law
11      Jones Day
        325 John H. McConnell Boulevard
12      Suite 600
        Columbus, Ohio 43215-2673
13      Tel: (614) 469-3939
        Fax: (614) 461-4198
14      E-mail: Emrossman@jonesday.com
15      MATTHEW W. RAY
        Attorney at Law
16      Jones Day
        2727 North Harwood Street
17      Dallas, Texas 75201-1515
        Tel: (214) 220-3939
18      Fax: (214) 969-5100
        E-mail: Mwray@jonesday.com
19
20              ---
21
22  Videographer: Mr. Chris Jordan
        Legal Video Services, Inc.
23      3455 Peachtree Road, Suite 500
        Atlanta, Georgia 30326
24      Tel: (770) 640-5050
25
```

Page 4

```
 1           THE VIDEOGRAPHER: On video.
 2           CATHY BARDAY,
 3  having been first duly sworn, was examined and
 4  testified as follows:
 5           EXAMINATION
 6  BY MR. ROSSMAN:
 7      Q    Ma'am, would you please state and spell
 8  your full name for the record.
 9      A    Yes. Cathy S. Barday, C-A-T-H-Y, S as in
10  Sierra, B-A-R-D-A-Y.
11      Q    Ma'am, my name is Mike Rossman, and I'm
12  an attorney for IBM in the lawsuit that was filed by
13  Charles Seward, and we're here today to take your --
14  your deposition.
15      A    May I ask a question? Your last name is
16  spelled R-O-S-S-M-A-N?
17      Q    Yes, it is.
18      A    Thank you.
19      Q    Now, do you understand you just took an
20  oath, and that would have the same effect as an oath
21  that you would take in a court of law?
22      A    Yes, I do.
23      Q    And there's a couple ground rules I'd
24  like to go over.
25           Have you actually -- have ever had your
```

Page 5

```
 1  deposition taken before?
 2      A    Yes, I have.
 3      Q    Well, you may have heard these before,
 4  but just a couple quick rules.
 5           If you don't understand a question that I
 6  ask, I'd appreciate if you would -- would let me know,
 7  and I'll -- I'll try to rephrase it.
 8      A    (Nods head affirmatively.)
 9      Q    If you don't understand my question, I'm
10  going to assume that -- that you understand, you know,
11  what it is that I have asked.
12           And the second rule is you need to give
13  audible responses, so yes or no. You can't nod your
14  head, for example, or say uh-huh (affirmative) or
15  unh-unh (negative).
16      A    All right.
17      Q    And that's because the -- the deposition
18  is being recorded. Now, we're using a video as well,
19  but it's being recorded by a stenographer who's going
20  to prepare a transcript. So it's just easier if you,
21  you know, say yes or no to the questions to get that
22  down as opposed to some other type of response.
23           I'd ask also that we don't speak over
24  each other, so I won't -- I'll try not to jump in
25  when -- when you're giving an answer to a question,
```

Page 6

1  and I'd appreciate if you'd let me finish the question
2  before you start to give your answer for the same
3  reason, just so that the transcript that's prepared at
4  the end of the deposition is clear.
5      Now, if you need a break, just let me
6  know. We don't have that much time here tonight, but
7  tonight or tomorrow if you need a break, just let me
8  know. The only thing I'd ask is if there's a question
9  pending on the table that you finish the question
10 before we would actually -- actually take a break.
11 Does that sound good?
12     A    Yes.
13     Q    All right. Now, ma'am, is there any
14 reason that -- that you can't go forward today with
15 this deposition?
16     A    No.
17     Q    For example, have you taken any
18 medication that -- that would impair your ability to
19 understand my -- my questions or to answer them?
20     A    No.
21     Q    Now, what is your -- what's your date of
22 birth, please?
23     A    4-21-46.
24     Q    And what's your address?
25     A    4780 Highway 20 Northeast, Conyers,

Page 7

1  Georgia 30012.
2      Q    How long have you lived at that address?
3      A    Approximately ten years.
4      Q    Now, have you ever been known by any
5  other names?
6      A    A maiden name.
7      Q    And what was your maiden name?
8      A    Schweda.
9      Q    Schweda.
10          Can you spell that for us.
11     A    Yes. S-C-H-W-E-D-A.
12     Q    Okay. And how long have you been
13 married? Longer than ten years?
14     A    Yes.
15     Q    Can you describe your -- your education
16 for me. Where'd you go to high school, for example?
17     A    I went to Soddy-Daisy High School.
18     Q    Okay. And did you attend any school
19 after high school?
20     A    Yes, I did.
21     Q    And what was that?
22     A    Berry College, Mount Berry, Georgia.
23     Q    Did you get a degree?
24     A    I did.
25     Q    What was your degree in?

Page 8

1      A    Bachelor of arts and minored in
2  educational psychology.
3      Q    Okay. Did you -- did you get any
4  master's degrees after that or any additional college?
5      A    Yes, I did.
6      Q    What additional college did you have
7  after that?
8      A    University of Georgia.
9      Q    And what'd you get at the University of
10 Georgia?
11     A    Did not complete the degree, but it was
12 in German and French.
13     Q    Oh, German and French. Really?
14     A    Yes.
15     Q    How -- how long were you at the
16 University of Georgia?
17     A    Two years, approximately.
18     Q    Were you -- what -- what -- what degree
19 were you working towards? Was it a master's or
20 another bachelor's?
21     A    A master's.
22     Q    Why didn't you complete the program?
23     A    Job offer.
24     Q    Who was the job offer with?
25     A    Jackson High School in Jackson, Georgia.

Page 9

1      Q    Now, you said that you'd been -- you'd
2  been deposed before.
3      A    Yes.
4      Q    Now, what was the -- how many times have
5  you been deposed before?
6      A    Once.
7      Q    And what was the case?
8      A    Federal case, money laundering.
9      Q    So it was a -- it was a criminal case?
10     A    It was, (nods head affirmatively).
11     Q    And what was your -- how did you come to
12 be deposed in that case?
13     A    Internal auditor.
14     Q    You were the internal auditor?
15     A    Yes.
16     Q    Who was the defendant?
17     A    A bank in Dalton, Georgia.
18     Q    And did you -- did you work for the bank
19 or who'd you work for at that time?
20     A    The bank.
21     Q    The bank that was the defendant in the
22 case?
23     A    I did, (nods head affirmatively).
24     Q    When was the deposition?
25     A    I don't recall.

Page 10

1  Q  Was it more than ten years ago?
2  A  Yes.
3  Q  You weren't a defendant in that case;
4  were you?
5  A  No.
6  Q  Now, have you ever been the plaintiff in
7  a lawsuit before this present suit?
8  A  No.
9  Q  Have you ever filed any type of
10 administrative charge against -- against an employer,
11 a charge with the EEOC, for example, or the DOL or the
12 National Labor Relations Board?
13 A  Repeat that. I don't understand. The
14 National --
15 Q  Labor Relations Board?
16 A  No, no.
17 Q  No administrative charges?
18 A  No.
19 Q  Now, you currently work for IBM; is that
20 correct?
21 A  I do.
22 Q  Now, what is your -- what's your present
23 position?
24 A  Volume analyst.
25 Q  What does a volume analyst do?

Page 11

1  A  Process cash transactions.
2  Q  Anything else?
3  A  No.
4  Q  What does that mean in -- in layman's
5  terms, process cash transactions? What do you -- what
6  do you do on a day-to-day basis?
7  A  Manufacturer owners submit manual
8  invoices for payment. I confirm those and set up the
9  line. I also do cash advances for suppliers that
10 need -- and dealers who need additional funds for
11 financing inventory or what have you, et cetera, or
12 they reschedule because they are unable to pay. And I
13 process those, make sure that everything is proper on
14 the documents such as signatures, amounts, approvals.
15 Q  Now, how long have you held this volume
16 analyst position?
17 A  Approximately a year and a half.
18 Q  A year and a half.
19    So when did -- you started in, what,
20 about --
21 A  Mid-2007 roughly.
22 Q  Mid-2007.
23 A  (Nods head affirmatively.)
24 Q  Who's your current supervisor?
25 A  Kimberly Ramirez.

Page 12

1  Q  And has she been your -- the supervisor
2  the whole time you've been a volume analyst?
3  A  Yes, she has.
4  Q  Where -- where are you -- where do you --
5  what's your work location? Where do you work?
6  A  You mean address --
7  Q  The address --
8  A  -- or floor?
9  Q  -- uh-huh (affirmative).
10 A  4111 Northside Parkway, Atlanta, Georgia.
11 Q  And is that the same address you've
12 worked at the whole time you've been a volume analyst?
13 A  Yes, it is.
14 Q  What was your position before you were a
15 volume analyst?
16 A  Pardon me. Teleservices representative.
17 Q  What does a -- what did you do as a
18 teleservices representative?
19 A  Answer phone calls.
20 Q  For what purpose?
21 A  To satisfy customers.
22 Q  What were the customers calling about?
23 A  Enrollment in classes, customer number
24 problems, customer complaints, and sometimes misrouted
25 calls.

Page 13

1  Q  And that's the position you held up till
2  mid-2007 when you became a volume analyst?
3  A  No.
4  Q  There was a position in between?
5  A  No. There was a position initially when
6  I joined IBM.
7  Q  Okay. So what was your -- well, let me
8  see. You were a -- you were a teleservices
9  representative till mid-2007; is that correct?
10 A  (Nods head affirmatively.)
11 Q  And then you immediately went into the
12 volume analyst position or was there another position
13 in between?
14 A  There was not.
15 Q  Okay. Who -- at the time you left the
16 volume -- or I'm sorry. At the time you left the
17 teleservices representative position, who was your
18 supervisor?
19 A  Kerry Bethea.
20 Q  Is that a man or a woman?
21 A  Man.
22 Q  Okay. And how long had Mr. Bethea been
23 your supervisor?
24 A  Since, say, approximately two thousand
25 and -- approximately 2005, 2006. I'm not sure of the

Page 14

1  exact year because we had personnel changes in that
2  department.
3      Q    Okay. Which department were you in?
4      A    Teach.
5      Q    Now, Mr. Bethea, he was your first-line
6  supervisor; is that correct?
7      A    Yes.
8      Q    Who was your second-line supervisor?
9      A    Sharon Lofton.
10     Q    And Ms. Lofton -- by second line, I mean
11 Ms. Lofton would have been above Mr. Bethea?
12     A    Yes. He was first line. She was second
13 line.
14     Q    Okay. And who -- who's your current
15 second-line supervisor?
16     A    Kendall Clark.
17     Q    Now, why did you move from the
18 teleservices representative position to the volume
19 analyst position?
20     A    Because the Teach department was
21 outsourced to the Philippines.
22     Q    Okay. Did you ever report to Juan Lyn
23 Williams?
24     A    No.
25     Q    Who was your supervisor prior to

Page 15

1  Mr. Bethea, your first-line supervisor?
2      A    Van Anzer Grady, called Van Grady.
3      Q    And when did you start reporting to Van
4  Anzer Grady?
5      A    Approximately -- approximately 2000.
6      Q    Okay. So from 2000 until 2005, 2006 it
7  was Van Grady; after that it was Kerry Bethea; and
8  then when you moved to the volume analyst position,
9  that's when it became Ms. Ramirez?
10     A    Kim Ramirez, correct.
11     Q    Now, in your teleservices representative
12 position, you said you answered calls?
13     A    Yes.
14     Q    So you were handling inbound calls?
15     A    And outbound.
16     Q    You made outbound.
17          When -- when would you make an outbound
18 call?
19     A    There would be sales campaigns, and we
20 would be given a list of customers to do cold calls.
21     Q    How often would those sales campaigns
22 take place? Was it like an annual thing or just
23 periodically or --
24     A    Periodically.
25     Q    Okay. So was it you were primarily then

Page 16

1  answering inbound calls?
2      A    Yes.
3      Q    How were the calls routed to you, the
4  inbound calls?
5      A    At what point? There were different
6  routing methods, depending on what point in time
7  you're speaking of.
8      Q    All right. Let's -- let's talk about
9  right before you left your position.
10     A    Before I left, they were on the Avaya
11 telephone system.
12     Q    How long had Avaya been in place?
13     A    Roughly for about three years.
14     Q    Okay. How about prior to Avaya?
15     A    It was the telephone. You signed onto
16 the telephone. You had a telephone set at your desk.
17 And when you logged onto that with your user ID and
18 password, it would put you in AUX, and then you'd just
19 hit the button and go available, and calls would come
20 in live to that phone.
21     Q    That's the Avaya system you're
22 describing?
23     A    No. That was on the telephone.
24          The Avaya system was you would log in but
25 you had an icon come up on your computer screen that

Page 17

1  you had to click to get on.
2      Q    So you -- you logged onto the Avaya
3  system through the computer?
4      A    Yes. You clicked an icon on your
5  desktop, on your computer, to get on, but you logged
6  on the Avaya system that way.
7      Q    Okay. Well, let me -- let's do it this
8  way. So the Avaya system was in place from, like you
9  said, about the 2004 or 2005 time frame?
10     A    (Nods head affirmatively.)
11     Q    And was the -- can you describe for me
12 during that time frame, so the 2004, 2005 under Avaya,
13 from the time period it started until the time you
14 left the position, can you just describe for me at the
15 beginning of the day the process you would go through
16 to begin work. What would you need to do?
17     A    You mean from arriving in the parking
18 lot? Okay.
19     Q    Uh-huh (affirmative).
20     A    I would arrive in the parking lot usually
21 about 6:00 a.m, then walk from the parking lot to the
22 building. If it was before 7:00, had to use a badge
23 to access, then had to walk from there past the
24 security desk, do another badge in to get to the
25 elevator, wait for the elevator or take the stairs,

Page 18

1  get up to the floor, badge in that door, and then get
2  to my desk.
3     Q     Did you -- when you got to your floor,
4  you said you had to badge in.
5     A     Yes.
6     Q     Was that true regardless of the time of
7  day?
8     A     To enter, yes.
9     Q     Okay. All right. So you've entered the
10 floor, and then what happens?
11    A     Well, you badge to get in and get to your
12 desk and then unlock your desk, assemble your
13 supplies, and you had to be fast because I also had to
14 work a queue, direct queue, in relation to doing my
15 calls, and that meant that customers who had web
16 fallouts had to be satisfied, and there was -- those
17 had to be satisfied during that day.
18    Q     I'm sorry. You said customers that had
19 fallouts?
20    A     Web fallouts. They would try to enroll
21 on the internet.
22    Q     Oh, I see.
23    A     And if they had a problem, then that had
24 to be resolved.
25          I would sign on and commence to work. I

Page 19

1  didn't go to the cafeteria. I ate on my way to work
2  in the car.
3     Q     Okay. Well, let me -- did you have a
4  regular shift, say, between 2005 and 2007? Was
5  there -- did you work a fixed shift?
6     A     You mean assigned hours?
7     Q     Yes.
8     A     Yes, I did.
9     Q     What were your assigned hours?
10    A     Initially 7:00 to 4:30, and then those
11 changed several times.
12    Q     Okay. So at the beginning of 2005, say,
13 it was 7:00 to 4:30?
14    A     7:00 to 4:30, (nods head affirmatively).
15    Q     What were some of the other assigned
16 hours that you had between 2005 and --
17    A     When?
18    Q     -- 2007, the time you left?
19    A     8:00 to 5:00, 9:00 to 6:00, 6:30. I
20 don't recall all of them, but they were varied. And
21 the net effect was I worked later and later.
22    Q     Okay. What -- what was the -- the
23 address that you were working at as a teleservices
24 representative?
25    A     Riveredge.

Page 20

1     Q     Is that the same address you're at now?
2     A     No, I'm not at Riveredge now.
3     Q     Okay. What was the address of the
4  Riveredge building?
5     A     Riveredge, Atlanta, Georgia, Riveredge
6  Parkway.
7     Q     And how long was your commute typically
8  to get to Riveredge?
9     A     Depends on the weather and traffic, but
10 are you asking for an average commute?
11    Q     Yeah, an average commute.
12    A     About two hours.
13    Q     But I take it from what you're saying
14 there was a lot of factors that could affect that?
15    A     Yes.
16    Q     Make it longer or shorter?
17    A     Yes. And I'd get up earlier. If the
18 weather was bad, I'd get up earlier.
19    Q     And did you have a goal in terms of how
20 early you wanted to arrive, I mean, before the start
21 of your shift?
22    A     Did I have a goal? No.
23    Q     So you just wanted to -- so if your shift
24 was 7:00, you didn't -- you didn't have any idea in
25 your mind when you wanted to arrive there?

Page 21

1     A     I knew I had to be there in time to sign
2  on, assemble my supplies, get up to the floor, so I
3  needed to be on time.
4     Q     Okay. Now, what did you need to sign
5  onto?
6     A     At what point in time, what year?
7     Q     Between 2005 and 2007.
8     A     When the Avaya system was there?
9     Q     Yes.
10    A     Need to sign onto Avaya.
11    Q     Was Avaya the first thing you would sign
12 onto?
13    A     Yes.
14    Q     And how would you sign onto Avaya?
15    A     Via computer.
16    Q     Was your computer on when you got to
17 work?
18    A     No.
19    Q     How long would it take to turn on your
20 computer?
21    A     15, 20 minutes.
22    Q     Would it always take 15 or 20 minutes?
23    A     No. Many times longer.
24    Q     Would it ever take shorter?
25    A     No.

Page 22

1  Q     So 15 or 20 minutes was the minimum
2  amount of time that it took you to log onto your
3  computer?
4  A     Yes.
5  Q     Were you just turning the computer on or
6  were there other -- or were there applications you had
7  to open up as well?
8  A     No. Log on the computer and wait for the
9  computer to sign itself on, go through all of its
10 various gyrations, get the screen, and then be able to
11 get to the Avaya icon and click on it to open it up.
12 Q     And that 15 to 20 minutes, that was true
13 the entire time that you were using the Avaya system?
14 A     As long as Avaya was available and the
15 computer was available. There were days -- well,
16 there were weeks where the system was down, we could
17 not get on, system problems.
18 Q     How would you do your job if the system
19 was down?
20 A     We were told to take calls manually, go
21 back to the old phone system and take calls manually
22 on paper.
23 Q     We'll come back to that.
24        Okay. Assuming Avaya was available, you
25 know, you could get into the computer, were there

Page 23

1  other tools you needed to open on the computer to do
2  your job?
3  A     Yes.
4  Q     What tools were those?
5  A     Well, you had to have the internet
6  access. You had to have ePOS. You had to have the --
7  I believe it was called the CMR to do customer
8  numbers, look up.
9  Q     Anything else?
10 A     Probably, but I don't recall.
11 Q     How long would it take you to open up the
12 internet?
13 A     If it was available?
14 Q     Yes.
15 A     About ten minutes.
16 Q     And when would you -- when would you open
17 that up?
18 A     After I opened Avaya.
19 Q     How long would it take to actually open
20 up Avaya?
21 A     15 to 20 minutes.
22 Q     So I just want to make sure I understand
23 what you're saying. You would get to work, turn on
24 your computer; that would take 15 to 20 minutes?
25 A     (Nods head affirmatively.)

Page 24

1  Q     And then you would log onto Avaya, and
2  that would take another 15 or 20 minutes?
3  A     No. The process from logging onto the
4  computer and clicking on the Avaya icon, that process,
5  15 to 20 minutes.
6  Q     Okay. So how -- you would turn your
7  computer on, and how long before the Avaya screen
8  popped up or the Avaya icon popped up?
9  A     Five to ten minutes.
10 Q     Okay. And then it'd be another five
11 minutes or so after you clicked on Avaya till that was
12 actually available?
13 A     Yes.
14 Q     Okay. Now, when you were waiting for
15 Avaya, would you also click on -- try to open up these
16 other applications at the same time or would you wait
17 for Avaya?
18 A     (Shakes head negatively.) Wait for
19 Avaya.
20 Q     Okay. So you would turn on your
21 computer, get Avaya up, and then you're saying it
22 would take you another ten minutes after that to get
23 internet access?
24 A     The system would not let you sign onto
25 other applications until Avaya was up.

Page 25

1  Q     Okay. So I think ePOS, was that
2  another --
3  A     (Nods head affirmatively.)
4  Q     -- application --
5  A     Application, uh-huh (affirmative).
6  Q     -- you were talking about?
7        What is ePOS?
8  A     It had to do with customer numbers and
9  customer accounts, and I don't recall more than that
10 of it at this point because I've been away from it.
11 Q     Okay. When -- when would you open up
12 ePOS?
13 A     After I did the internet.
14 Q     Okay.
15 A     It was Avaya, internet, ePOS, and
16 anything else I'd need.
17 Q     How long would ePOS take to boot up?
18 A     Five -- about five minutes.
19 Q     Another thing you mentioned was CMR?
20 A     Yeah. CMR, about five minutes, (nods
21 head affirmatively).
22 Q     And would that be -- would you be booting
23 up ePOS and CMR at the same time or you --
24 A     No. One, one, one (indicating).
25 Q     Okay. And then you -- do you -- do you

Page 26

1  recall if there were any other applications besides --
2  A   No, I don't.
3  Q   -- ePOS and CMR?
4  A   I said I didn't recall, and I don't.
5  Q   Okay.
6       (Thereupon, an off-the-record discussion
7    was held.)
8       (Thereupon, marked for identification was
9    Defendant's Exhibit D1.)
10 BY MR. ROSSMAN:
11 Q   Now, ma'am, I've just handed you a
12 document that's been marked as Exhibit 1. It is the
13 Declaration of Cathy S. Barday. Would you please take
14 a look at that declaration for me.
15 A   Yes.
16 Q   Now, is that your signature on the back
17 of this document?
18 A   Yes.
19 Q   And had you reviewed this document before
20 you signed it?
21 A   No.
22 Q   You had not reviewed the document before
23 you signed it?
24 A   You just handed it to me.
25     MR. ZOURAS: I think he means at the time

Page 27

1  you signed it.
2  BY MR. ROSSMAN:
3  Q   The original of the document that you
4  signed, the original document, had you reviewed that
5  document before you signed it?
6  A   Oh, I'm sorry. I thought you meant did I
7  just now.
8      MR. ZOURAS: Right.
9  BY MR. ROSSMAN:
10 Q   No. I -- I assume that you hadn't signed
11 the copy that I just handed you, ma'am. I was asking
12 you whether or not you had signed the original of the
13 document, whether you had reviewed the original before
14 you signed the original.
15 A   (Reviews document.) Yes.
16 Q   Now, ma'am, would you look at paragraph 8
17 of Exhibit 1. There's a statement in there that IBM
18 directed us to be ready to start taking phone calls
19 precisely at the time our scheduled shift started.
20 A   Where? I'm sorry.
21     MR. ZOURAS: Paragraph what?
22     MR. ROSSMAN: Paragraph 8.
23     THE WITNESS: Where?
24     MR. ZOURAS: He said paragraph 8.
25     MR. ROSSMAN: It should be on the first

Page 28

1  page.
2      MR. ZOURAS: (Indicating.)
3      THE WITNESS: Right there? Okay. Thank
4    you.
5  A   I'm there, yes.
6  BY MR. ROSSMAN:
7  Q   Who at IBM directed you to be ready to
8  start taking phone calls precisely at the time your
9  scheduled shift started?
10 A   Our manager.
11 Q   Which manager?
12 A   Kerry Bethea.
13 Q   When did Mr. Bethea say that to you?
14 A   He's -- he didn't say. He wrote it.
15 Q   Where did he write it?
16 A   In a Lotus Note.
17 Q   Do you remember when you received that
18 Lotus Note?
19 A   No, I don't recall the exact time.
20 Q   Do you still have a copy of that Lotus
21 Note?
22 A   No.
23 Q   Do you recall who received that Lotus
24 Note?
25 A   All the employees.

Page 29

1  Q   And how do you know that all employees
2  received it?
3  A   Because in the Lotus Note it tells you
4  who it's sent to.
5  Q   And that's all employees who reported to
6  Mr. Bethea at that time?
7  A   In the Teach area that he managed, yes.
8  Q   What do you recall about that document?
9  A   That it said that we needed to be
10 available at our assigned time, and to do that we
11 needed to do whatever it took to be on time and be
12 available. If that meant coming 15 to 30 minutes
13 before to get logged on, then we needed to do that;
14 and that he was aware that some people could sign on
15 faster, they were more adept, than others.
16 Q   So is it fair to say then that you showed
17 up earlier than some of your co-workers?
18 A   No.
19 Q   No, you didn't?
20 A   No, it's not fair to say that. That was
21 your question. Is it fair to say? No.
22 Q   Is it true that some of your co-workers
23 arrived later than you did to work?
24 A   Yes.
25 Q   Some of the co-workers who had the same

Page 30

1  assigned hours as you arrived later than you?
2  A   Only if they were late.
3  Q   Now, you don't recall when you -- when
4  you received this e-mail from Mr. Bethea?
5  A   I don't.
6  Q   Do you know why Mr. Bethea sent the
7  e-mail?
8  A   I don't.
9  Q   What was the reaction? What was your
10 reaction to the e-mail?
11 A   My reaction? I thought we needed to be
12 available at our assigned time, but I thought it was
13 unfair.
14 Q   Now, prior to receiving that e-mail, did
15 you -- did you arrive at work closer to the start of
16 your scheduled shift? I mean, did this e-mail cause
17 you to start to come to work earlier?
18 A   No.
19 Q   And in order to be ready to take phone
20 calls at the start of your scheduled shift, you need
21 to be logged into the -- to the systems we discussed?
22 A   Yes.
23 Q   Was there anything else you needed to do?
24 A   Have a pencil and paper.
25 Q   Okay. Now, other than that e-mail, did

Page 31

1  anyone -- was there any other occasion when someone at
2  IBM directed you to be ready to start taking phone
3  calls precisely at the time your scheduled shift
4  started?
5  A   Was there someone else?
6  Q   Uh-huh (affirmative).
7  A   No.
8  Q   And did Mr. Bethea on any other occasions
9  direct you to be ready to start taking phone calls
10 precisely at the time of your scheduled shift?
11 A   Do you mean me personally or the team?
12 Q   You personally.
13 A   No.
14 Q   Did you discuss the e-mail with any of
15 your co-workers?
16 A   Yes.
17 Q   Who did you discuss it with?
18 A   Charles, Sabrina, Shari, Lisa.
19 Q   Who's Charles?
20 A   Charles Seward who was here a short while
21 ago.
22 Q   Who's Sabrina?
23 A   Sabrina Carstarphen, no longer with IBM,
24 a previous employee.
25 Q   And who's Shari?

Page 32

1  A   Shari Brown currently I believe is still
2  an employee of IBM in the same area that Charles works
3  in to the best of my knowledge.
4  Q   And who is Lisa?
5  A   Lisa also still works in the area that
6  Charles is in now, Entitlement.
7  Q   What's her last name?
8  A   I don't recall.
9  Q   Any other employees that you recall
10 discussing the e-mail with?
11 A   Ron Porter, James Garnet, Lewis -- the
12 last name -- I don't recall his last name. He came
13 from the sales center.
14 Q   And these were all employees who at the
15 time reported to the same supervisor you did?
16 A   To Mr. Bethea, that's correct.
17 Q   And were these separate conversations or
18 you had conversations with -- with these employees all
19 at once?
20 A   We ate lunch together.
21 Q   Okay. Well, what do you recall about the
22 conversation or conversations you had about this
23 e-mail?
24 A   That the tone was unhappy, that my
25 co-workers thought it was unfair, that it caused

Page 33

1  hardship because of child care and transportation
2  issues, and that IBM was causing us to work and not
3  get paid.
4  Q   Did you ever complain to anyone at IBM
5  about -- I mean, other than the co-workers you just
6  discussed. Did you ever complain to anyone at IBM
7  about Mr. Bethea's e-mail?
8  A   Not about the e-mail, no.
9  Q   Did you ever complain about anything?
10 A   I did.
11 Q   What'd you complain about?
12 A   Not getting paid for hours worked.
13 Q   Who'd you complain to?
14 A   HR, human resources.
15 Q   And when was this?
16 A   In 2006, approximately.
17 Q   And at that point in time, had you
18 already received the e-mail that you testified about?
19 A   Yes.
20 Q   Okay. Do you remember when in 2006 it
21 was?
22 A   I don't.
23 Q   You don't remember the season, early or
24 late in the year?
25 A   I don't, (shakes head negatively).

Page 34

1  Q    Do you remember who you complained to?
2  A    I do.
3  Q    Who was that?
4  A    It was HR partner.
5  Q    Do you remember the person's name?
6  A    I don't, (shakes head negatively).
7  Q    Was it through -- how did you -- how did
8  you lodge the complaint? Was it through e-mail or
9  telephone call or face to face? How was it?
10  A    (Shakes head negatively.) It wasn't
11  related to the memo.
12  Q    Right.
13  A    And I think you're tying it to the memo.
14  It wasn't.
15  Q    No. I -- ma'am, I'm not tying it to
16  anything. I just want to know how you voiced the
17  complaint.
18  A    I wanted to clarify. Okay.
19       I was assigned to work on a project and,
20  by Mr. Bethea, worked in excess of 40 hours, closer to
21  44 hours on that project and -- worked overtime and
22  asked to be paid for that overtime. His response was
23  "in your dreams."
24  Q    That was Mr. Bethea's response?
25  A    It was.

Page 35

1  Q    Okay. So at that point after Mr. Bethea
2  said that to you, then you went to HR?
3  A    I thought about it, and approximately a
4  month later, yes, I went to HR.
5  Q    Okay. What -- what was the project that
6  Mr. Bethea had you working on?
7  A    Call analysis.
8  Q    And what did that entail?
9  A    Researching different type calls that
10  came in for sales potential.
11  Q    And how much time did you spend on the
12  project?
13  A    44 hours plus, but 44 was what I was
14  asking for.
15  Q    Okay. So I'm just trying to understand.
16  You -- you worked 44 hours the week you -- you spent
17  44 hours on this project itself?
18  A    I spent probably 120 hours on it, but 44
19  qualified for overtime.
20  Q    Okay. So you kept track -- did you keep
21  track of your hours somehow?
22  A    On a pad, uh-huh (affirmative).
23  Q    On a pad.
24       Do you still have that pad?
25  A    No.

Page 36

1  Q    Okay. Did you submit the pad to HR?
2  A    Yes.
3  Q    Now, how did -- how did you actually come
4  into contact with HR?
5  A    Well, I inquired to see if there was a
6  policy where I could address my grievance, which was
7  getting paid for the 44 hours, and I learned there was
8  an open door and -- or that we could contact the HR
9  partner directly. I didn't know who it was and had to
10  find out who it was through a series of phone calls.
11  And this was all done via phone. I never met the
12  person face to face because the person was in North
13  Carolina.
14  Q    Okay. So what was the result of your
15  complaint?
16  A    (Shakes head negatively.) No result, no
17  pay.
18  Q    Were you given any reason?
19  A    Yes. If you want to proceed against IBM,
20  be aware there are consequences, probably the loss of
21  your job. You will not prevail.
22       So I thought that over carefully, weighed
23  the pros and cons, and decided that I was in Rome and
24  I couldn't quarrel with the Pope and win, I needed the
25  job at the time. So I had more to lose than to gain,

Page 37

1  so I didn't go further.
2  Q    Who -- who were you saying told you there
3  would be consequences?
4  A    The HR partner.
5  Q    Whose name you don't remember?
6  A    No. But it was a female, and she was
7  based out of Cary-Raleigh, North Carolina, and then
8  moved on to Durham she told me. Again, I never met
9  her.
10  Q    How many times did you speak with her?
11  A    She -- approximately, this is
12  approximately, ten to twelve times. She called me at
13  home, and I called her at home. She advised do not
14  call her at work.
15  Q    She advised you not to call her at work?
16  A    Yes. We're -- and probably rightfully
17  so. We're not supposed to use our phones for -- that
18  would be considered personal business.
19  Q    She -- she advised you that you should
20  not be making calls from work or that you should --
21  A    That I should call her from home when I
22  get home and she would call me at home but not -- she
23  would not call me at work and I should not contact her
24  at work.
25  Q    Okay. At what point did she -- did she

Page 38

1  tell you in your words that there would be
2  consequences?
3     A    We were probably about the tenth, twelfth
4  call roughly.
5     Q    And how did that come up?
6     A    I asked her how I could get paid for the
7  44 hours.
8         And she said, well, this is the first
9  chain. She said, but for us to take it further, we
10 have to contact the second line, we have to go more
11 public with it. But she said, be aware when that
12 happens -- and the manager doesn't know when you go to
13 HR partner. HR will not let the manager know unless
14 you give approval. That's part of IBM's open-door
15 policy, give an employee the right to address
16 grievances confidentially, hopefully for a good
17 solution.
18        But she told me that she would have to go
19 to him and there would be consequences and be aware of
20 that. She said, I want you to know the whole
21 situation.
22        And I said, well, let me give it thought.
23        She said, but I have to have your okay to
24 proceed.
25        I said, all right, I'll think it over,

Page 39

1  let me have some time to sleep on it, weigh it, and
2  I'll get back with you.
3     Q    Did she mention what the consequences
4  would be?
5     A    Loss of employment. She said, be aware
6  it could be loss of employment, yes.
7     Q    Did you pursue the matter any further?
8     A    I did not.
9     Q    What did -- what do you recall from the
10 earlier calls with the HR partner?
11    A    What do you mean by earlier calls?
12    Q    Well, you said that the call in which, in
13 your words, she mentioned consequences occurred
14 several calls into your interaction with her.
15    A    That's right.
16    Q    What do you recall about the calls that
17 took place before the call?
18    A    Prior to that --
19    Q    Uh-huh (affirmative).
20    A    -- they were fact finding on her part.
21 She would ask me questions.
22    Q    What types of questions did she ask?
23    A    What department I worked in, how long had
24 I been there, how were my reviews, did I have a good
25 employment record, just a lot of detail things about

Page 40

1  me work-related.
2     Q    Why did it take ten to twelve calls to
3  get the facts about the situation?
4     A    Well, I would get home late. We might
5  have a ten- or fifteen-minute call, she had to go
6  somewhere to a meeting, so the duration of our calls
7  was not an hour. Sometimes it would be ten to fifteen
8  minutes. That's why it took a lot of calls.
9     Q    Did you have calls with her after you say
10 she told you there would be consequences?
11    A    I did not, (shakes head negatively).
12    Q    Did you have calls with anyone else about
13 that matter?
14    A    I did not, (shakes head negatively).
15    Q    Did you ever discuss that matter with
16 anyone at work?
17    A    No.
18    Q    Did you ever lodge any other complaints
19 at IBM?
20    A    No.
21    Q    And I think you said you no longer have
22 the note pad on which you say that you wrote down the
23 hours that you worked during this project?
24    A    No.
25    Q    Do you have any other notes or documents

Page 41

1  related to --
2     A    (Shakes head negatively.)
3     Q    -- to either your calls with the HR
4  partner or related to the overtime you say you worked?
5     A    No. When I left, I left.
6     Q    And this took place in 2006?
7     A    Yes, it did.
8     Q    But you don't remember the time period in
9  2006?
10    A    I don't.
11    Q    But it was mid-2007 before you moved to
12 your current position; is that correct?
13    A    Correct.
14    Q    In your new position, have you worked
15 overtime?
16    A    Yes.
17    Q    Have you been paid for that overtime?
18    A    Yes.
19    Q    Have you ever had any problems getting
20 paid for all the hours you worked in your new
21 position?
22    A    No.
23        MR. ROSSMAN: Can we take a quick break?
24        MR. ZOURAS: Yeah.
25        THE VIDEOGRAPHER: Off video.

Page 42

1    (Thereupon, a recess was taken from
2    5:26 p.m. to 5:34 p.m.)
3    THE VIDEOGRAPHER: On video.
4  BY MR. ROSSMAN:
5    Q    Ma'am, what did you do to prepare for
6  your deposition today?
7    A    Rephrase that question, please.
8    Q    Did you do anything to get ready to come
9  here to testify today?
10   A    Well, I drank some water, I drank half a
11 cup of coffee but -- and then I got my transportation
12 here. No.
13   Q    Did you review any documents?
14   A    No.
15   Q    Did you speak with anyone?
16   A    Yes. I told my boss that I was going.
17   Q    So you didn't speak with anyone else to
18 prepare for your deposition today?
19   A    No.
20   Q    Now, at any point after the Avada [sic]
21 system came into place, are you aware of any time
22 where someone could be available for calls simply by
23 logging into the phone?
24   A    You said after the Avaya system was --
25   Q    Avaya.

Page 43

1    A    -- in place?
2    Q    I'm sorry. Yes.
3    A    Yes. If the Avaya was not available, we
4  had to go back and log on the phone and take calls
5  manually or if your computer would not boot up or you
6  had let your password expire or the password had
7  expired and you weren't aware of it. So password
8  issues or system problems, (nods head affirmatively).
9    Q    Setting aside system problems or password
10 problems --
11   A    Uh-huh (affirmative).
12   Q    -- were there any times when you
13 personally would make yourself available for calls
14 simply by logging into the phone after Avaya came in?
15   A    No.
16   Q    Are you aware of any instance in which
17 your co-workers would make themselves available --
18   A    No.
19   Q    -- simply by logging into the phone?
20   A    No.
21   Q    Now, how often did these system problems
22 occur?
23   A    At what point in time are you speaking
24 of? Initially --
25   Q    Well -- okay. When Avaya first came in,

Page 44

1  what, around 2005 or so?
2    A    Roughly, yes.
3    Q    So let's say the first six months. How
4  often were there system problems?
5    A    We were down probably three -- three to
6  four months out of the six, more downtime than uptime,
7  much, much more. And IT lived in our department.
8    Q    How about after that first six months,
9  say the next six months?
10   A    The next six months, about 50/50. And
11 thereafter it started smoothing out better.
12   Q    Okay. So the latter part of 2006, 2007?
13   A    Was much improved over the initial
14 startup.
15   Q    Were there still instances where you had
16 system problems?
17   A    Oh, yes. Oh, yes. And -- and downtime
18 and -- yes. It would just crash.
19   Q    Okay. And then you also mentioned
20 password problems.
21   A    Yes.
22   Q    What were the -- what types of problems
23 were those?
24   A    Well, each application required a
25 different password, so you didn't have warning on each

Page 45

1  application that your password was going to expire.
2  You would try to log on: Your password has expired.
3    Q    Have you ever had any -- any problems
4  with Kimberly Ramirez as manager?
5    A    No.
6    Q    Is she a good manager?
7    A    Good is relative.
8    Q    Do you think she's a good manager?
9    A    Fair manager.
10   Q    Fair manager?
11   A    Fair in the sense of just.
12   Q    What about Kerry Bethea, would you
13 describe him as just?
14   A    Dishonest.
15   Q    Is it fair to say you dislike Mr. Bethea?
16   A    No.
17   Q    You don't dislike him?
18   A    No.
19   Q    Did you believe that he was dishonest
20 prior to the incident with the 44 hours of overtime
21 that you mentioned earlier?
22   A    Yes.
23   Q    Why?
24   A    I was his team lead, and part of that
25 duty was to render monthly reports of employees'

### Page 46

1 sign-on and sign-out time.
2     (At this time, Mr. Matthew W. Ray joined
3   the deposition proceedings.)
4   A    The numbers -- should -- am I all right
5 to keep talking?
6 BY MR. ROSSMAN:
7   Q    Yeah.
8   A    And that report rendered measurements of
9 our service call volume.
10   Q    Uh-huh (affirmative).
11   A    Those measurements affected our standing
12 as a call center. We were rated excellent,
13 satisfactory, meeting call measurement requirements,
14 not meeting call measurement requirements. There were
15 different times that the reports reflected that we
16 were not meeting the requirements. He altered the
17 figures.
18   Q    How did he do that?
19   A    He told me to change the numbers on the
20 report. I told him that he was cooking the books. I
21 said, what you're doing is dishonest and you're going
22 to IBM jail.
23     He said, no, I'm not, you just don't
24 understand it. He said, just give it to me.
25   Q    So did you, yourself, change these

### Page 47

1 reports?
2   A    No.
3   Q    What were the reports called; do you
4 remember?
5   A    Yes. They were called the DOR.
6   Q    And how were these DOR reports when you
7 would -- you would generate these DOR reports in the
8 first instance, I guess?
9   A    No. They -- they're two part. I would
10 go and look at each person's sign-in and sign-out
11 records prepared by them. Those were sent to the
12 manager and copied to me. If an employee failed to
13 copy to me, he would forward to me. And I would look
14 at the daily sign-in/sign-out and compare to a
15 system-generated report that was prepared by Jane
16 Jessup. And she was part of the IT department.
17   Q    What was the -- the system report? What
18 was that?
19   A    It was called the DOR report also.
20   Q    Oh, the system was the DOR report?
21   A    The system was the DOR report. There was
22 a manual version, and there was a system version. You
23 had to reconcile both of them to satisfactorily
24 reflect that our call center or our service center,
25 Teach, met the measurements, the quality measurements.

### Page 48

1   Q    And what exactly was being measured? The
2 sign-in and sign-out to what?
3   A    The sign-in, the sign-out, which
4 reflected how fast we answered a call, whether calls
5 were dropped, whether an employee was staying in AUX.
6 There were AUX codes for break, bathroom, sign-on,
7 sign-out, if you were working on a project, if you
8 went into other, which means that you could be on a
9 call and then you needed to go ask someone something
10 because that call was a little bit more complex, well,
11 you go into other, but you were supposed to get right
12 back and complete that call as fast as possible.
13   Q    So what was the cause of the difference
14 between the manual reports and the system-generated
15 reports?
16   A    Human input.
17   Q    So on the manual reports the individual
18 employees would be reporting --
19   A    The individual employees would put the
20 actual time that they arrived and signed on the
21 system. It wasn't supposed to look like that. Kerry
22 wanted the report to reflect your assigned work hours.
23 Putting the assigned work hours would make the
24 measurements come out favorably. If you put in early
25 start time, that caused a variance. That means you

### Page 49

1 expended more time than you could justify for the call
2 input.
3   Q    So more time -- the same amount of calls
4 over a longer period of time is what you're saying?
5   A    (Nods head affirmatively.) Which
6 affected the quality measurement.
7   Q    How did the employee-generated reports --
8 was there a system for that or -- or was this paper?
9 I mean, what was it?
10   A    It was -- it was like an Excel
11 spreadsheet.
12   Q    Uh-huh (affirmative).
13   A    And -- and then some people didn't want
14 to do that. They just put it on the tablet and put
15 their times.
16   Q    And what exactly were people reporting on
17 these sheets?
18   A    What time they signed on. And it was on
19 a day-by-day basis. What time you sign on, what time
20 you took for your first break. And your break times
21 were assigned. Your lunches were assigned. What time
22 you went to lunch, what time you returned, any
23 bathroom breaks that you took, and when you signed
24 off.
25   Q    And why were these reports being

Page 50

1 generated; do you know?  The manual reports I mean.
2    A     Why -- why were the DOR reports started?
3    Q     The -- the manual DOR reports.
4    A     The manual DOR reports were started
5 because the system-generated DOR reports were
6 reflecting measurements, and the measurements appeared
7 to be favorable.  It was decided to see if that was
8 actual.  Someone must have questioned.  I don't know
9 who, but someone must have questioned because a memo
10 went out from our manager, Kerry Bethea, Lotus Notes
11 memo, that we needed to start signing on the system on
12 an Excel spreadsheet or we could do it on paper to
13 start with and submit it monthly to him and to the
14 team lead showing the actual daily sign-on/sign-out
15 times.  And the reason given was for quality
16 monitoring and to be able to measure to the system-
17 generated reports measuring accuracy, measuring
18 timeliness.  The two should agree.
19   Q     And this -- so this was a memo from
20 Mr. Bethea?
21   A     It was.  But it wasn't a memo that he
22 thought of.  It came -- per him it came from higher
23 up.
24   Q     How do you know it came from higher up?
25   A     He said it did.  I asked him why we were

Page 51

1 starting to do this because it was a lot of extra work
2 on me to do.  And he said because it was required by
3 the quality management and the internal auditors
4 wanted it.
5    Q     When was this?
6    A     That was around the early part of 2005,
7 perhaps the latter part of 2004, but I don't remember
8 the exact times.  But we did those reports for at
9 least a year.
10   Q     Do you remember when you ended the
11 reports?
12   A     The DOR?  The DOR ended --
13   Q     The manual DOR, right.
14   A     Oh, the manual DOR?
15   Q     Yeah.
16   A     Oh, we kept the manual DOR right up to
17 about six months before we got outsourced.
18   Q     So you were still doing the manual DOR up
19 until 2006?
20   A     Submitted manual DOR.  Well, I wasn't.
21 There were -- there was a change.  I wasn't team lead.
22 I became a senior teleservices representative, but the
23 team lead who followed also did it.  Because I had to
24 then submit my daily DOR.
25   Q     Well, that's what I'm saying.  So you

Page 52

1 were submitting a daily DOR up until when?
2    A     Up until about six months before we got
3 outsourced.
4    Q     Okay.  So about six months before you
5 moved to your new -- new position?
6    A     No.  Before we got outsourced.
7    Q     When were you outsourced?
8    A     We were outsourced in October of two
9 thousand and -- I want to say 2007.  I -- I -- I may
10 have the year wrong, but it was in October.  We were
11 told -- we were -- we called in on a Friday and told
12 we had been outsourced and that we needed to stay
13 until January, if needed, to complete and help out the
14 call center in the Philippines.  If they had problems,
15 they could call us, and we would help them get through
16 their calls.  Not all of us would stay but on a
17 need-be basis.
18   Q     Was that October 2006 when you were
19 outsourced?
20   A     It was October I want to say 2006, (nods
21 head affirmatively).
22   Q     Because I think you said you started
23 your -- your --
24   A     In two --
25   Q     -- analyst position --

Page 53

1    A     In two thousand and --
2    Q     And seven?
3    A     Exactly.
4    Q     Okay.  So six months before the
5 outsourcing, so that would have been, what, April,
6 March, April?
7    A     About that time.
8    Q     Of 2006?
9    A     About that time frame, yes.
10   Q     Okay.  And do you know how long the
11 system-generated DORs were created?
12   A     I don't know when they started.  I know
13 they were in existence at the time that we started and
14 they continued thereafter.  And Jane Jessup or Cathy
15 Whelan would know.  Jane Jessup -- I don't know if
16 she's still with IBM -- would know because she was the
17 person that was the guru of those reports.
18   Q     Now, I may have asked you this, but when
19 did you start being the -- the team lead for Kerry?
20   A     I became team lead for -- you didn't ask
21 me that.  I became team lead approximately 2004, 2005,
22 that time frame.
23   Q     And when did you stop being team lead?
24   A     I was team lead approximately a year,
25 (nods head affirmatively).

Page 54

```
 1   Q    So 2005, 2006?
 2   A    (Nods head affirmatively.)
 3   Q    Why did you stop being a team lead?
 4   A    Because Teach was restructured per Kerry.
 5  He was restructuring Teach, and he needed a different
 6  type person for that. And he thought that with my
 7  experience I would better serve the department as a
 8  senior teleservices representative doing more
 9  specialized work such as working queues and what have
10  you.
11   Q    As a team lead, how did your duties
12  differ from the teleservices reps in your department?
13   A    I only logged on the phone when there was
14  an overflow of calls. When I was a teleservices
15  representative, I was logged on all day long. And
16  then I did administrative reports such as the DOR,
17  filled in when Kerry was away, ran the department when
18  he was away. And he was out -- he had illness and --
19  and was out very frequently.
20   Q    So as a team lead then you didn't log
21  onto the system every day?
22   A    I didn't have to, no.
23   Q    Okay. So when you were a team lead, can
24  you describe for me how your day would begin?
25   A    I would come in the same time. Didn't
```

Page 55

```
 1  change my hours. My hours were the same. And then --
 2   Q    Your scheduled hours?
 3   A    My scheduled hours.
 4        And then I had to observe, make sure
 5  folks were going to be staffed. I had to do reports
 6  on anybody that was absent and submit those. Those
 7  had to be submitted to Kerry and to the fish bowl, the
 8  quality control, because that -- they had to adjust
 9  our call volumes to account for bodies that were not
10  there. I had to work on any customer sat issues,
11  start the paperwork on those, and then work on any
12  sales reports. We were going to do campaign
13  call-outs. I had to get that ready on the Excel
14  spreadsheet, get it ready to send out, pick out the
15  calls, those type functions. And any problems that
16  rose up, any customer sat issues. If a customer
17  called on the phone and complained, I had to handle
18  that. I had to put on my headset, go over there, plug
19  into their phone, find out the details, and try to
20  resolve that.
21   Q    Okay. So when you were -- there was no
22  requirement that you be call ready, I guess, at the
23  beginning of your shift when you were a team lead?
24   A    Not when I was a team lead, no. But I
25  had to have my headphone ready to plug in, had to have
```

Page 56

```
 1  it at my desk and ready to plug in if somebody needed
 2  help.
 3   Q    So when you were team lead, how much
 4  before the start of your shift would you show up?
 5   A    The same time, 6:30.
 6   Q    Why?
 7   A    Because I had reports I had to render,
 8  and I had to be there before the first employee
 9  arrived to make sure that they were signed on and that
10  we had the calls in the queue handled. We had calls
11  in the queue before -- we'd have -- we might have 30,
12  40, 50 calls in the queue, and I had to make sure
13  somebody was there at 7:00 when those calls started to
14  handle those calls. If they didn't show up, then I
15  would have to sign on and take those calls.
16   Q    So was your shift then 6:30 to whenever?
17   A    To whenever, yes, 8:30, 9:00 o'clock,
18  yes.
19        MR. ROSSMAN: Can we stop for a second?
20        THE VIDEOGRAPHER: Off video.
21        (Thereupon, an off-the-record discussion
22     was held.)
23        THE VIDEOGRAPHER: On video.
24  BY MR. ROSSMAN:
25   Q    So did you --
```

Page 57

```
 1   A    Are we back?
 2   Q    We're back. Okay. You ready?
 3   A    (Nods head affirmatively.)
 4   Q    All right. So when you were a team lead,
 5  Mr. Bethea's team lead, did you work any unpaid
 6  overtime?
 7   A    Yes.
 8   Q    When?
 9   A    Every week.
10   Q    How?
11   A    After he left, I had to stay there until
12  the last employee got off the phone.
13   Q    Uh-huh (affirmative). So how much unpaid
14  overtime did you work?
15   A    In the course of -- let's see. Every day
16  at least an hour in the evening, not counting the
17  mornings. In the evening, at least an hour or more.
18   Q    So at least, you're saying, five hours a
19  week?
20   A    For the evening only, not counting the
21  morning, my extra hours in the morning, my extra time.
22   Q    So you worked extra hours, you're saying,
23  as a team lead in the morning and the evening?
24   A    (Nods head affirmatively.) Sometimes
25  more if we had a call -- for example, we had a call
```

Page 58

1  that was not our call. It was a man that wanted -- he
2  was writing a master's thesis on the RISC 6000, and he
3  wanted information, and he had been transferred round
4  about the company, and he wanted an answer now. He
5  wanted help. I stayed on that call till 9:30.
6      Q      So as a team lead, how much unpaid
7  overtime will you average in a week?
8      A      Anywhere from, I'd say, eight to fifteen
9  hours on an average.
10     Q      Eight to fifteen a week?
11     A      Average.
12     Q      Okay. Did you ever complain to anyone
13 about that overtime?
14     A      No.
15     Q      Why not?
16     A      (Shakes head negatively.) Where would I
17 go with it?
18     Q      Well, I mean, you said you complained
19 about the 44 hours on special projects.
20     A      That's right. And I -- I --
21     Q      And you were a team lead before you did
22 the special project; right?
23     A      I was. But I was -- I also -- to be the
24 team lead, I was told that it would involve more
25 duties. I received a raise to be a team lead, and I

Page 59

1  got a band -- higher band adjustment.
2      Q      Were you salaried at that time?
3      A      I was.
4      Q      Were you considered exempt at that time?
5      A      I was.
6      Q      So you weren't overtime eligible when you
7  were a team lead?
8      A      Yes, I was.
9      Q      So you were -- what band were you?
10     A      I was a band 3, and then I went to a
11 band 4.
12     Q      Okay.
13     A      I was not -- the band 6 is where it --
14 I -- I never made a band 6 (indicating).
15     Q      When you became a senior rep, did you
16 receive a reduction in pay?
17     A      No.
18     Q      Were you demoted in band?
19     A      No. There was a talk of that, though.
20     Q      Did -- when you complained about the 44
21 hours, was that -- that was when you were a senior
22 rep; right?
23     A      Right. Yes.
24     Q      What was it about that occasion that led
25 you to complain as opposed to the prior occasions when

Page 60

1  you say you didn't get paid for your overtime?
2      A      His reaction and the amount of work I had
3  done. I -- I felt justly that I should be paid for
4  the work that I had done, and then the work I had done
5  was used by IBM for a sales campaign. It was -- the
6  sales center used it, and they received commission on
7  the calls that they made, so they were compensated for
8  the work that I had done.
9      Q      How many weeks was that project?
10     A      How many weeks did I work on that?
11     Q      The project where you say you incurred
12 the 44 hours.
13     A      It was three months.
14     Q      Three months. So you incurred 44 hours
15 of overtime over three months.
16            But you're saying that as a team lead you
17 would incur eight to fifteen hours a week?
18     A      Because I had to stay until the last
19 person left and satisfied the call. That could be
20 7:00 or 8:00 at night, depending on their schedule.
21     Q      But you complained, you say, for the
22 first time after incurring 44 hours over three
23 months --
24     A      I did.
25     Q      -- whereas before you say you had been

Page 61

1  incurring eight to fifteen a week, but you never
2  complained about that.
3      A      But I received a raise and I received a
4  band increase.
5      Q      But your band stayed the same.
6      A      And I also received an award at the end
7  of that year, a financial award. I was cited for an
8  award and received a monetary award, so I was
9  compensated.
10            I didn't receive anything when I was
11 doing that research project, (shakes head negatively),
12 nothing.
13     Q      But your band had stayed the same, right,
14 and your pay had stayed the same?
15     A      When I was doing the research project, my
16 band was a band 3.
17     Q      I thought you said -- I thought it was a
18 band -- you were a band 4 I thought you said.
19     A      I was -- when I did my research project
20 or when I was a team lead?
21     Q      When you were a team lead, I thought you
22 were a four.
23     A      I was a three when I started. I became a
24 four.
25     Q      And then were you demoted to a three