# EXHIBIT 6A

Witness:   James Starkey

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CHARLES SEWARD,                    )
Individually and on Behalf )
of All Others Similarly    )  08 CIV 3976 (KMK)
Situated,                          )
                                   )  ECF CASE
                Plaintiff,         )
                                   )
      vs.                          )
                                   )
INTERNATIONAL BUSINESS             )
MACHINES CORPORATION,              )
D/B/A IBM CORP.,                   )
                                   )
                Defendant.         )
————————————————————————————)

            Videotaped deposition of JAMES STARKEY,

taken on behalf of the Defendant, pursuant to the

stipulations contained herein, in accordance with the

Federal Rules of Civil Procedure, before Thomas R.

Brezina, Certified Court Reporter, at 1420 Peachtree

Street, Atlanta, Georgia, on the 24th day of October,

2008, commencing at the hour of 11:45 a.m.

                    *   *   *

              Hundt Reporting, LLC
              703 McKinney Avenue
                  Suite 207
             Dallas, Texas 75202
             Tel: (214) 220-1122
             Fax: (214) 220-1127

Witness:  James Starkey

Page 4

INDEX TO EXHIBITS

| Defendant's Exhibit Number | Description | Marked/First Identified |
|---|---|---|
| D9 | IBM document entitled "You and IBM - United States Additional Compensation" | 85 |
| D10 | 2005 PBC for James H. Starkey | 120 |
| D11 | Work History Detail Report for James Starkey | 127 |
| D12 | E-mail dtd June 17, 2008, from Steven Coy to 7000 | 131 |
| D13 | Remote Call Monitoring Evaluation dtd 6/6/2008 | 133 |
| D14 | One-page note of Edwin Lewis dtd February 17, 2006 re: Jim Starkey | 135 |
| D15 | One-page note of Edwin Lewis dtd February 22, 2006, re: Jim Starkey | 136 |
| D16 | E-mails dtd 06/26/2008 between Jim Starkey and Steven Coy | 138 |
| D17 | E-mail dtd 11/28/2007 from Jim Starkey to jhxvi@aol.com | 140 |
| D18 | E-mail dtd 03/26/2008 from Jim Starkey to Debbie & Bob White | 143 |
| D19 | E-mail dtd 06/09/2008 from Jim Starkey to Starkey_T@bellsouth.net | 144 |

INDEX TO EXHIBITS

Page 3

INDEX TO EXAMINATIONS

| | Page |
|---|---|
| Examination by Mr. Ray | 7 |
| Examination by Mr. Zouras | 151 |
| Further Examination by Mr. Ray | 156 |

INDEX TO EXHIBITS

| Defendant's Exhibit Number | Description | Marked/First Identified |
|---|---|---|
| D1 | Consent to Join Collective Action of James Starkey dtd 6/13/08 | 10 |
| D2 | Complaint | 11 |
| D3 | E-mail from George to Team (undated) | 63 |
| D4 | IBM Business Conduct Guidelines dtd December 18, 2007 | 72 |
| D5 | IBM Course Booklet Business Conduct Guidelines | 76 |
| D6 | Series of computer-generated documents regarding James Starkey dtd June 19, 2008 | 77 |
| D7 | eTOTALS Time Recording System instructions | 82 |
| D8 | IBM document entitled "About Your Job" dtd September 2007 | 83 |

Page 5

| Defendant's Exhibit Number | Description | Marked/First Identified |
|---|---|---|
| D20 | E-mail dtd 07/03/2008 from Jim Starkey to Ken B. Jones | 145 |
| D21 | Agreement Regarding Confidential Information and Intellectual Property dtd 7/9/84 | 151 |

Witness:   James Starkey

Page 6

1  APPEARANCES OF COUNSEL:
2  On behalf of the Plaintiff:
3       JAMES B. ZOURAS
        Attorney at Law
4       Stephan Zouras, LLP
        205 North Michigan Avenue
5       Suite 2560
        Chicago, Illinois 60601
6       (312) 233-1550
        fax: (312) 233-1560
7       jzouras@stephanzouras.com
8
9  On behalf of the Defendant:
10      MATTHEW W. RAY
        Attorney at Law
11      Jones Day
        2727 North Harwood Street
12      Dallas, Texas 75201
        (214) 220-3939
13      fax: (214) 969-5100
        mwray@jonesday.com
14
15
16
17         ---
18
19
20  Videographer: Mr. Chris Jordan
        Legal Video Services, Inc.
21      3455 Peachtree Road, Suite 500
        Atlanta, Georgia 30326
22      (770) 640-5050
23
24
25

Page 7

```
1          THE VIDEOGRAPHER:  On video.
2               JAMES STARKEY
3   having been first duly sworn, was examined
4   and testified as follows:
5               EXAMINATION
6   BY MR. RAY:
7        Q    Can you state your full name for the
8   record, please?
9        A    James Harry Starkey.
10       Q    Have you ever been deposed before, Mr.
11  Starkey?
12       A    Deposed?
13       Q    Yes.  This is a deposition.
14       A    Oh.
15       Q    I assume you have not been deposed before
16  today.  Do you understand that I'll be asking you
17  questions and you will be giving answers?
18       A    Uh-huh.
19       Q    You understand that you're under oath?
20       A    Yes.  I just did that.
21       Q    Have you ever testified under oath before,
22  Mr. Starkey, like in a courtroom, for example?
23       A    No.
24       Q    Any kind of hearing where you were asked to
25  testify as a witness?
```

Page 8

```
1        A    No.
2        Q    As I mentioned, I'll be asking you
3   questions today, primarily about your work at IBM, and
4   you'll be giving me answers to those question.  If you
5   could answer verbally, yes or no, as opposed to
6   nodding your head --
7        A    Okay.
8        Q    -- it helps the court reporter.
9        A    Yes.
10       Q    And if you -- if I ask you a question today
11  that you don't understand, will you let me know?
12       A    Yes.
13       Q    And if I -- if you don't ask me to rephrase
14  it, I'll assume you understood my question.
15       A    Okay.
16       Q    Fair?  Fair enough?
17       A    Yes.
18       Q    If you need a break today at any time, Mr.
19  Starkey, just let me know.
20       A    Okay.
21       Q    You can take a break whenever you need one.
22       A    All right.
23       Q    Okay?  Are you on any medications today,
24  Mr. Starkey, that would impact your ability to respond
25  truthfully to my questions?
```

Page 9

```
1        A    No.
2        Q    What is your date of birth?
3        A    February 14, 1956.
4        Q    And what is your current address?
5        A    2525 Hendry -- H-E-N-D-R-Y -- Court, and
6   that's in Conyers, Georgia.
7        Q    How long have you been at that address?
8        A    Six years.
9        Q    Have you ever been known by any other
10  names?
11       A    No.
12       Q    Can you briefly describe your educational
13  background?
14       A    I guess I have an associate's degree and
15  then quite a few classes after that, but my degree
16  would probably still be considered an associate's.
17       Q    Associate's degree from what college?
18       A    Springfield Technical Community College in
19  Springfield, Massachusetts.
20       Q    Are you married, Mr. Starkey?
21       A    Yes, sir.
22       Q    How long have you been married?
23       A    Four years.
24       Q    Any children?
25       A    Yes.
```

Witness:   James Starkey

4 (Pages 10 to 13)

| Page 10 | Page 12 |
|---|---|
| 1    Q    How many? | 1   remember who it was. |
| 2    A    Two. | 2    Q    Did they send you the link that you have |
| 3    Q    What are their ages? | 3   been referring to? |
| 4    A    Twenty-seven and 25. | 4    A    Yes. Yes. |
| 5    Q    Do you know what a declaration or an | 5    Q    And then did you access the link to the Web |
| 6   affidavit is? | 6   site? |
| 7    A    Not exactly. | 7    A    Yes. |
| 8    Q    Do you know whether you've signed a | 8    Q    And was the Exhibit 1 there, that form |
| 9   declaration or an affidavit in this case? | 9   that's Exhibit 1, the first document I showed you -- |
| 10    A    As far as this, I haven't signed anything | 10    A    Uh-huh. |
| 11   that I know of. | 11    Q    -- was that actually on the Web site? |
| 12      MR. RAY: One wasn't produced for him, and | 12    A    Yes. It was something I believe you |
| 13   you produced some for others. I just didn't know | 13   printed out, because -- and sent back, because then |
| 14   if there was one out there. Okay. | 14   -- you couldn't sign it on-line to do it. |
| 15      (Thereupon, marked for identification, | 15    Q    So you printed it, signed it, and send it |
| 16   Defendant's Exhibit D1.) | 16   in; is that right? |
| 17   BY MR. RAY: | 17    A    Yes. Yes, sir. |
| 18    Q    I'm going to show you what has been marked | 18    Q    All right. Let's -- we'll come back to |
| 19   as Exhibit 1, Mr. Starkey, and ask you if you | 19   those exhibits in a little bit, but let's talk a |
| 20   recognize that document? | 20   little bit about your history with IBM. |
| 21    A    Oh, yes. This is off a Web site. | 21    A    Okay. |
| 22    Q    Is that your signature at the bottom? | 22    Q    How long have you been an employee at IBM? |
| 23    A    Yes. | 23    A    About 24 and a half years. |
| 24    Q    What Web site are you referring to? | 24    Q    Had there been any breaks in service during |
| 25    A    It's a Web site that explains this lawsuit, | 25   that 24-and-a-half-year period? And by that I mean |

| Page 11 | Page 13 |
|---|---|
| 1   I guess. | 1   have you left to go work somewhere else -- |
| 2    Q    What is your understanding of what this | 2    A    No. |
| 3   lawsuit is about? | 3    Q    -- and come back? Where did you start your |
| 4    A    That working prior to signing in, we're | 4   employment for IBM? |
| 5   supposed to be paid for. | 5    A    Burlington, Vermont. |
| 6    Q    Have you reviewed the lawsuit? | 6    Q    And currently you're in Atlanta, obviously? |
| 7    A    The actual wording? No. | 7    A    Yes, sir. |
| 8      (Thereupon, marked for identification, | 8    Q    And which call center are you -- are you at |
| 9   Defendant's Exhibit D2.) | 9   a call center -- |
| 10   BY MR. RAY: | 10    A    Yes. |
| 11    Q    Mr. Starkey, I'm going to hand you what has | 11    Q    -- in Atlanta? Which one? |
| 12   been marked as Exhibit 2, and I will represent to you | 12    A    Server support, Intel server support. |
| 13   that that is the complaint that was filed in this | 13    Q    What is the -- do you know the physical |
| 14   case, and I just want to ask you to take a look at it | 14   address of the call center you're at? |
| 15   and tell me if you have ever seen it? | 15    A    I believe it's 1500 Riveredge, if I recall |
| 16    A    I think this was on the link from the Web | 16   correctly. |
| 17   site as well, if I recall, and I have skimmed over it. | 17    Q    Is it referred to as the Riveredge |
| 18    Q    Do you still have a record of the link to | 18   location? |
| 19   that Web site? What the link is? | 19    A    I believe so. |
| 20    A    At home I do. | 20    Q    How long have you been at the Riveredge |
| 21    Q    How did you become aware of this lawsuit? | 21   location? |
| 22    A    I believe somebody else sent me some | 22    A    I believe seven years. |
| 23   information about it. | 23    Q    Any breaks in service during the seven -- |
| 24    Q    Do you recall who? | 24   that seven-year period? |
| 25    A    Somebody else that I work with, but I don't | 25    A    No, sir. |

Witness:  James Starkey

Page 14

1    Q    What floor are you currently on?
2    A    Ninth.
3    Q    Have you been on the ninth floor during
4  that seven-year period?
5    A    Yes.  All of it.  Oh, wait a minute.  No.
6  Actually when we started here, our office was in
7  Kennesaw, Georgia.
8    Q    Can you spell Kennesaw for me?
9    A    K-E-N-N-E-S-A-W, I believe.  It's about
10  20 miles north of here.
11    Q    How long were you in Kennesaw, Georgia?
12    A    I would say about a year and a half, and
13  then they moved down here.
14    Q    So have you been in the Riveredge facility
15  for roughly five and a half years?
16    A    Uh-huh.  I forgot about -- that we started
17  there originally.
18    Q    Since you've been in the Riveredge facility
19  have you always been on the ninth floor?
20    A    Yes, sir.
21    Q    Who is your current supervisor?
22    A    Steven Coy.
23    Q    And how long have you reported to Mr. Coy?
24    A    I believe about a year and a half, yes.
25    Q    Do you know who Mr. Coy reports to?

Page 15

1    A    I believe Vicki -- what the heck is her
2  last name?
3    Q    Could it be Reidy?
4    A    Reidy, the second-level manager.  He may
5  also report to George Lambousis.  I'm not sure.
6    Q    You don't know the relationship from a
7  management level between Mr. Coy and Mr. Lambousis; is
8  that correct?
9    A    Well, Mr. Lambousis runs the place, so he
10  -- the other managers are just personnel managers.
11    Q    What do you mean by personnel managers?
12    A    Mr. Lambousis does not manage people.  He,
13  in my opinion, has problems with people and doesn't
14  deal well with them, so they have other managers that
15  deal with the personnel there and some of the vendors
16  as well, and they take care of the day-to-day IBM
17  paper work and stuff like that.
18    Q    And do you report to Mr. Lambousis?
19    A    I don't, no.
20    Q    Do any of the employees who are on the
21  phones report to Mr. Lambousis, to your knowledge?
22    A    I believe what we call the test team does.
23    Q    What is the test team?
24    A    It's the next level of support up from me.
25    Q    Do you know how large that team is?

Page 16

1    A    Well, it's -- it's split up between here
2  and Raleigh, North Carolina, but altogether I would
3  say about 30 people.
4    Q    Do you know whether the test team directly
5  reports to Mr. Lambousis?
6    A    At this time I'm not sure.  They did as of
7  a few months ago.  I believe they still do.
8    Q    I want to go back to the distinction
9  between Mr. Lambousis, who I think you said runs the
10  place, and the personnel managers.  Is Mr. Coy a
11  personnel manager?
12    A    Yes, sir.
13    Q    So what is your understanding of Mr. Coy's
14  responsibilities as a personnel manager?
15    A    Well, he does the appraisals of the
16  personnel.  He does the -- all the IBM stuff, like
17  your -- what do you call it?  Like your training
18  plans, promotions, raises, that kind of thing.  He
19  doesn't -- he doesn't really have much to do with the
20  technical day-to-day operation.
21    Q    What about, would Mr. Coy handle human
22  resources functions?  That's not a good question.  Let
23  me strike that.  Would -- if you had a complaint about
24  the way you were being treated -- for example, someone
25  was being rude to you or someone said something

Page 17

1  inappropriate -- would you go to Mr. Coy or
2  Mr. Lambousis or someone else?
3    A    I -- you could go to Mr. Coy, certainly.  I
4  probably would not, just because I don't trust the
5  man, but certainly he is in that chain of command.
6    Q    Is there an HR person that is over the
7  group you work in or responsible for the group you
8  work in?
9    A    I believe there's -- one of the other
10  managers is very good with the HR type stuff, so they
11  kind of call her the HR person, but, I mean, certainly
12  Steve Coy has something to do with them.
13    Q    Who is the manager you're referring to?
14    A    Oh, gee.  Of course you ask me, and I can't
15  think of it.
16    Q    It's not Juanita Carver?
17    A    Juanita Carver.  Sorry.
18         MR. ZOURAS:  Well, if you already know the
19  answer, then why bother asking?
20         MR. RAY:  I didn't know.  That was the only
21  name that popped in my head.
22         THE WITNESS:  Well, her and Steve Coy are
23  really the only two personnel managers up there
24  on day shift at the Atlanta facility.
25  BY MR. RAY:

Witness:  James Starkey

**Page 18**

1    Q    I'll come back to Mr. Coy in a second, but
2  I want to understand your group and the size of your
3  group and what you do and those types of things.  What
4  group are you in, or what business unit?  Are you in
5  GTS?
6    A    I am not sure.  There are so many names for
7  that kind of stuff.  We've got more titles, but
8  basically, overall it's Intel server support is what
9  they call it.
10    Q    Is that the same thing as System X?
11    A    Yes.  That's the newest version of Intel
12  servers, and I am part of a high-end group that is
13  within that.
14    Q    What is a high-end group?  What do you mean
15  by that?
16    A    They're -- there's groups inside there that
17  are broken up specifically to handle different machine
18  types.
19    Q    And you handle high-end machines?
20    A    Correct.
21    Q    What is a high-end machine?
22    A    Blade centers.  Blade centers.
23    Q    What is a blade center?
24    A    It's a type of high-end server.  There's
25  just so many of them now that we have to -- not

**Page 19**

1  specialize, but we're not responsible for all the
2  different servers that are in there.
3    Q    How long have you been in this high-end
4  group?
5    A    About five years.
6    Q    And during that five years have you been
7  part of the Intel server support team?
8    A    Yes.
9    Q    Do you know how many people report --
10  roughly report to Mr. Coy?
11    A    I don't.  I mean, I would say about half
12  the people in there are -- they're split up between
13  him and Juanita.
14    Q    Half the people in where?
15    A    In our ninth floor Intel server center.  I
16  don't know numbers exactly, no.
17    Q    Does the Intel server center take up the
18  entire ninth floor?
19    A    Yes, sir.
20    Q    So there's no other groups or teams on the
21  ninth floor except the Intel server?
22    A    Yes.  They're all server.
23    Q    Are they on any other floors?  And by that,
24  are there people on the Intel server team, support
25  team, that are on other floors besides the ninth

**Page 20**

1  floor?
2    A    No.  No.  I believe we're all on the ninth
3  floor.
4    Q    Is that the ninth floor of both buildings
5  there --
6    A    No.
7    Q    -- at Riveredge?
8    A    No.  Just -- there's 1500 and 1600, and
9  this would be building 1500.
10    Q    Do you know roughly how many people are on
11  the Intel server support team?
12    A    I was told about a year ago, about 170.
13    Q    In Atlanta?
14    A    Correct.
15    Q    At Riveredge?
16    A    Correct.  Between all shifts that are
17  there.  That may have increased since then.
18    Q    Is it possible it's decreased, or do you
19  believe it's increased?
20    A    I would say if anything, it's increased.
21    Q    What shifts are there?  Is it a 24/7
22  operation?
23    A    Yes.
24    Q    And I think you said on the day shift you
25  have Mr. Coy and Miss Carver?

**Page 21**

1    A    Correct.
2    Q    Do you know who the managers are on the
3  other shifts?
4    A    They're pretty much the 24 hours.  There
5  are no night shift managers that are on the floor or
6  anything.  They all leave by 5 or 6 o'clock.
7    Q    So there's no managers after 5 or 6 o'clock
8  on the ninth floor?
9    A    Correct.  There aren't any there.
10    Q    You said -- when I asked you a question
11  earlier, you said Mr. Lambousis basically runs the
12  place?
13    A    Uh-huh.
14    Q    Is he -- when you say the place, are you
15  talking about Intel server support?
16    A    Yes, sir.
17    Q    Do you know if he has responsibility for
18  any other teams?
19    A    No, I don't believe he does.  It's just
20  Intel server support.
21    Q    And when you say he runs the place, what
22  does -- what does that mean?  What is he doing?
23    A    They call him the technical manager.  He
24  would probably handle customer complaints on the
25  technical end.  What else would he do?  I don't know.

Witness:   James Starkey

Page 22

1   I don't really have much interaction with him.  I
2   hardly ever see the guy, even though he's in an office
3   there on the ninth floor.
4        Q     You just answered my next two questions.
5        A     Okay.
6        Q     He's on the ninth floor?
7        A     Yes, sir.
8        Q     And your interaction with him is limited?
9        A     Very limited.
10       Q     Do you -- what is your interaction?  Do you
11   recall any situations where you did interact with him?
12       A     Just when I was hired and passing in the
13   hallway.
14       Q     Do you know if your interaction or your
15   experience with Mr. Lambousis is similar to other
16   people in -- on that team?
17       A     Other people seem to interact with him more
18   on the, I would say nonwork-related items, like
19   Lambousis is a big football or baseball fan or
20   something like that, so they're always talking about
21   that kind of thing, but technically I'm not aware of
22   other relationships involving with that.
23       Q     I think you said about the -- that you have
24   been on the Intel server support team for about five
25   years and you've been part of the high-end group

Page 23

1   during that time period -- during that five-year
2   window?
3        A     Well, I was part of the Intel server group
4   for, I would say, seven years, and once we moved from
5   Kennesaw down to here is when they started the three
6   different teams: 3000, 5000, and 7000.
7        Q     And you're 7000?
8        A     Yes, sir.
9        Q     And you've reported to Mr. Coy for roughly
10   a year and a half --
11       A     Correct.
12       Q     -- of that time?  Who did you report to
13   immediately prior to Mr. Coy?
14       A     Juanita Carver.
15       Q     How long did you report to Miss Carver?
16       A     Probably about three years.
17       Q     And then who did you report to before Miss
18   Carver?
19       A     A George Pullon.  P-U-L-L-O-N, I believe.
20   He's no longer there.
21       Q     Did you possibly report to Ed Lewis at any
22   time?
23       A     Oh, I did, yes, for two months, three
24   months.  I forgot he was up there.
25       Q     Was that before you reported to

Page 24

1   Miss Carver?
2        A     Yes.
3        Q     Was that --
4        A     It was in -- it was like a break in there.
5   It was Miss Carver then Ed Lewis and then back to her.
6        Q     So it went Carver, Lewis, Carver is what
7   you're saying?
8        A     Correct.
9        Q     It was sometime during that time you --
10       A     Yes.
11       Q     Can you describe for me just generally what
12   you do in your role on the high-end team?
13       A     Well, there's a couple aspects of it.
14   Customers will call in with a -- a problem with their
15   server not acting right or whatever, and I help them
16   get it acting right if it's just a problem.  If there
17   is a damaged or defective part, I either get that to
18   them, for them to replace it or dispatch a technician
19   to replace it, and I guess the other aspect would be,
20   I help our technicians in the field with any problems
21   they have in effecting a repair.
22       Q     So do you deal with incoming customer
23   calls?
24       A     Yes, sir.
25       Q     Are the customers internal or external?

Page 25

1        A     Both.  Both.
2        Q     When you are helping the technicians in the
3   field are you dealing primarily with incoming calls or
4   out -- making outgoing calls to the techs?
5        A     Oh, no.  They're incoming.  The Techs call
6   us.
7        Q     How are calls routed to you?  Do you know?
8        A     The phone system is set up to dispatch them
9   to me, depending on the machine type.
10       Q     Do you know what the name of the phone
11   system is?
12       A     No, I don't.
13       Q     Have you heard the word Avaya?  Does that
14   sound familiar?
15       A     No.  I'm not familiar with it.
16       Q     What is your current shift?
17       A     Twelve noon to 9 p.m., Monday through
18   Friday.
19       Q     How long have you had that shift?
20       A     Pretty much the whole time I've been at the
21   facility here in Atlanta.  There was a period of three
22   or four months where I was on a -- a more day shift,
23   like 9 a.m. to 5 p.m. or something like that.
24       Q     Do you recall when that time period was?
25   When you were on the nine-to-five shift?

Witness:  James Starkey

Page 26

1    A    I would guess somewhere around March 2005
2    to July 2005.
3    Q    Who were you reporting to at that time?
4    Was that Miss Carver?
5    A    Ed Lewis.
6    Q    Ed Lewis?
7    A    Uh-huh.
8    Q    Are you in a cubicle?
9    A    Yes.
10   Q    Do you have a laptop or a desktop?
11   A    Desktop.
12   Q    Have you always had a desktop while you've
13   been at the Riveredge facility?
14   A    Yes, sir.
15   Q    Where does Mr. Coy sit in relation to you
16   on the ninth floor?
17   A    There's a -- if you think of the building
18   as -- if the top floor is square, which I guess it
19   really isn't, but there's an inner square area that
20   surrounds the bathrooms and the elevators, and there
21   are some offices inside that square, so he is in that
22   area away from the windows, around the corner from me.
23   Q    Can you see him from your cube?
24   A    No, unless he's walking by.
25   Q    But you don't have a direct line of sight?

Page 27

1    A    No, sir.
2    Q    And I think you said Mr. Coy and
3    Miss Carver typically leave at 5 or 6 o'clock --
4    A    Uh-huh.
5    Q    -- roughly?  Is that a yes?
6    A    Yes.
7    Q    Earlier, Mr. Starkey, you said that you
8    didn't trust Mr. Coy.
9    A    I've never developed a relationship with
10   him.
11   Q    Do you trust him?
12   A    It would depend what that entails.
13   Certainly for business stuff, probably, yes.  He would
14   be fine for that, but if it was a personal matter or
15   something, no.
16   Q    Has he done something that has -- something
17   concrete that's led you to not trust him on personal
18   issues?
19   A    Well, one -- one thing that bugs me about
20   him is he has no idea what we do.  He strictly goes by
21   reports of numbers, and I find that not acceptable for
22   a manager, for one thing.  Other than that, it's just
23   that he's never spoken to me on a personal level.  I
24   have no -- no idea what kind of man he is or anything
25   other than I get yelled at once in a while because

Page 28

1    some number of my thing is off or something like that,
2    so I -- I don't know him.
3    Q    What about -- I'm sorry.  I didn't mean to
4    interrupt.
5    A    Yes.  Just, I don't know him, so I wouldn't
6    trust him to go to him with a personal matter.
7    Q    What about Miss Carver?  Do you have the
8    same relationship with her that you had with Mr. Coy?
9    A    Her -- she was even worse.  I did not like
10   working for her at all.
11   Q    Why not?
12   A    She -- well, actually one thing she did is
13   she lied about something I did.  Made up a falsehood.
14   What else?  Oh, she had me on this team that they
15   started up there -- I think it was her and Lambousis
16   that started it -- about if you have had too many sick
17   days or something like that, that they put you on this
18   list so that every time you are out, you have to have
19   this page filled out that is a IBM document by your
20   doctor and submit that or you got to put it down as a
21   vacation day.  Very embarrassing and childish, I
22   think.
23   Q    Is that still a practice -- process or
24   practice that --
25   A    Oh, yes.  Oh, yes.

Page 29

1    Q    You said that she lied about something you
2    did.  What is that?
3    A    Back in -- I'll say it's February of 2005.
4    I believe that's when it was.  My wife got sick, and I
5    had to leave two nights during a week because of
6    problems with her, and at that time Ed Lewis was just
7    made my manager about a month before.
8        Ed at that point put me on first shift,
9    and he said it was because he was told by Juanita and
10   George that I had a problem with sick days and leaving
11   early and that I had been spoken to about it and like
12   that, had a meeting or whatever.  And I -- that had
13   never happened, and I believe later on Ed found out
14   that he was lied to about this, and that's when he got
15   me back on my regular shift again.
16   Q    Did you raise or escalate that situation to
17   anyone?  Did you go talk to someone about the fact
18   that Miss Carver had, in your view, provided incorrect
19   information?
20   A    Oh, I tried to.
21   Q    Who did you raise it with?
22   A    A program that's called -- at that time was
23   called Speak Up.
24   Q    What is Speak Up?
25   A    It's a -- basically, an anonymous way to

Witness:  James Starkey

Page 30

1  document or talk about a problem with HR or something
2  like that. I mean, they know who you are, but they
3  will work on it without letting anyone else know what
4  your -- or who did -- who had the question or anything
5  like that.
6      Q    Did they tell you or come back to you with
7  a resolution of the situation?
8      A    No. There were two items that I mentioned
9  in that Speak Up, one of them being that the manager
10  had lied about what I did. And I'm trying to think.
11  I can't remember what the other issue was. All they
12  addressed was the other issue. They ignored my
13  comment about the lying going on by a manager and that
14  this was unacceptable and like I never wrote it at
15  all. It just was ignored.
16      Q    You don't recall what the other issue was?
17      A    No, I don't. I believe it was about
18  getting back onto my regular shift.
19      Q    And you were put back on your regular shift
20  ultimately?
21      A    Ultimately, but that was because of Ed
22  Lewis.
23      Q    Let's talk about Mr. Lewis. You've talked
24  about your views generally of Mr. Coy and Miss Carver.
25  What about Mr. Lewis?

Page 31

1      A    I felt he could be, you know, a very good
2  manager, had he stayed. We had -- of all the managers
3  there, we had more of a -- a personal discussions,
4  talking that type of thing that none of the other managers
5  have encouraged.
6      Q    We talked a little bit about your job
7  duties, customer calls, both internal and external,
8  helping technicians when they're calling in. Do you
9  ever work anything called the queue?
10      A    Rarely.
11      Q    What is the queue?
12      A    The queue is the -- is the customers have
13  the ability to create one of our tickets or cases
14  on-line, and when they do that and submit it, it goes
15  to this queue, and there are specific people assigned
16  that check this queue all the time for these type of
17  calls and pull them out of the queue. The only time I
18  would be required to do this if I -- nobody's calling
19  in and it's dead time or if they're overwhelmed or one
20  of them is out sick or on vacation or something.
21      Q    We talked a little bit about your cube and
22  where you sit. Who sits immediately around you?
23      A    The guy behind me is -- great. Right out
24  the window. The guy in front of me, I can't even
25  pronounce his name. Apple -- some Indian name or

Page 32

1  something. He's from Africa, I believe. I couldn't
2  even guess how to pronounce his name. Oh, the guy
3  behind me is Jerry -- Jerry. I can't think of his
4  last name off the top of my head.
5      Q    Do -- the two people you've described,
6  Jerry and this other person, do they work the same
7  shift as you?
8      A    No. Actually, both of those people come in
9  at 3 p.m.
10      Q    Have you been in the same cube since you've
11  been at Riveredge?
12      A    No.
13      Q    How long have you been in your current
14  cube?
15      A    Probably three years.
16      Q    I'm going to -- or I will run through some
17  names with you, and I just want to see if you know who
18  they are.
19      A    Okay.
20      Q    And then I may have follow-up questions.
21  Michael McDonald?
22      A    No.
23      Q    William Moore? Maybe Bill Moore?
24      A    That's a billing -- I don't think so.
25      Q    Greg Murphy?

Page 33

1      A    No.
2      Q    Diana Olson?
3      A    No.
4      Q    Melissa Trikler?
5      A    That one rings a bell, but I don't know
6  what -- where I know her from.
7      Q    Jim Waters?
8      A    Jim Waters?
9      Q    Yes.
10      A    Here? Atlanta? He's a name -- he's a
11  manager I had many, many, many years ago in
12  Burlington.
13      Q    Do you know a Jim Waters in Atlanta?
14      A    Not that I recall here.
15      Q    Hiawatha Anthony?
16      A    No.
17      Q    Janelle Betterson?
18      A    No.
19      Q    Juanita Carver?
20      A    Oh, yes.
21      Q    Steve Coy, obviously?
22      A    Yes.
23      Q    Greg DuBose?
24      A    No.
25      Q    Denise Hines Anderson?

Witness:  James Starkey

| | Page 34 |
|---|---|
| 1 | A   No. |
| 2 | Q   Eugene Howard? |
| 3 | A   No. |
| 4 | Q   Richard Howard? |
| 5 | A   No. |
| 6 | Q   Kenneth Hunter?  Or Ken Hunter? |
| 7 | A   I think so. |
| 8 | Q   Do you know what he does for the company? |
| 9 | A   I believe he's one of the -- what we call |
| 10 | the test team, the next level of support. |
| 11 | Q   Is he on the ninth floor?  Do you know? |
| 12 | A   No.  I think he's in Raleigh.  If it's him, |
| 13 | he would be in Raleigh. |
| 14 | Q   Robert Labory? |
| 15 | A   No. |
| 16 | Q   And I think you said earlier you're not |
| 17 | familiar with the term "GTS"? |
| 18 | A   No. |
| 19 | Q   You're not; is that correct? |
| 20 | A   No.  Not for our facility.  We have so many |
| 21 | different names for it that -- |
| 22 | Q   Are you familiar with the term "IMBPD"? |
| 23 | A   No.  Never heard that one. |
| 24 | Q   You're paid on an hourly basis? |
| 25 | A   Yes. |

| | Page 35 |
|---|---|
| 1 | Q   Do you -- what is your vacation -- |
| 2 | eligibility for vacation currently? |
| 3 | A   Five weeks a year. |
| 4 | Q   You also receive paid holidays? |
| 5 | A   Yes.  Twelve paid holidays a year. |
| 6 | Q   What about sick leave?  Do you have a |
| 7 | specific amount of sick leave? |
| 8 | A   Actually, no.  I believe it's -- if you |
| 9 | were out six months, then it goes into some type of |
| 10 | extended insurance plan, but certainly if you are out |
| 11 | more than -- if someone else were out more than four |
| 12 | or five days, they get put on this list that I told |
| 13 | you about. |
| 14 | Q   Right. |
| 15 | A   I'm already on it. |
| 16 | Q   Do you have a specific allocation for |
| 17 | personal days you can take? |
| 18 | A   No.  That's the manager's discretion. |
| 19 | Those of us on this list are not entitled to it. |
| 20 | Q   Do you know if people who are not on the |
| 21 | list are entitled to them? |
| 22 | A   Oh, yes.  Yes.  They give them out all the |
| 23 | time.  They were forced into today, I believe, giving |
| 24 | me a personal day. |
| 25 | Q   When you say they were forced into it |

| | Page 36 |
|---|---|
| 1 | today, what do you base that on? |
| 2 | A   Because I'm not entitled to them when you |
| 3 | are on the list, but yes, that's what the code was for |
| 4 | today when I looked on the schedule. |
| 5 | Q   Do you know who put that code on the |
| 6 | schedule? |
| 7 | A   No. |
| 8 | Q   How long a lunch do you get? |
| 9 | A   One hour. |
| 10 | Q   Is it scheduled, or can you take it when |
| 11 | you want it? |
| 12 | A   Scheduled. |
| 13 | Q   What about breaks?  How many breaks? |
| 14 | A   Two 15-minute breaks, I believe you can |
| 15 | take. |
| 16 | Q   Are they scheduled? |
| 17 | A   No.  That you can -- unless -- you're not |
| 18 | supposed to take them during peak times, but other |
| 19 | than that, that's fine.  I never put them down anyway. |
| 20 | Q   When you say you don't put them down -- |
| 21 | A   I never code out for them. |
| 22 | Q   Do you take them? |
| 23 | A   Well, I -- I just consider -- once in a |
| 24 | while between calls there's certainly a few minutes |
| 25 | where I'm -- before the next call.  That's enough of a |

| | Page 37 |
|---|---|
| 1 | break.  I can't see signing out for 15 minutes and |
| 2 | going in the break room or something.  I just never do |
| 3 | that. |
| 4 | Q   Do you code out for lunch? |
| 5 | A   Yes. |
| 6 | Q   You have a -- do you have an access badge |
| 7 | to get into the floor? |
| 8 | A   Yes. |
| 9 | Q   Is the only place you have to use that |
| 10 | badge to actually get into the ninth floor once you're |
| 11 | up there?  Or do you have to use it in the lobby? |
| 12 | A   It used to be in the lobby all the time, |
| 13 | but now it's -- after 7 p.m., I believe, from 7 p.m. |
| 14 | until 7 a.m. you still have to use it in the lobby, |
| 15 | but other than that, no. |
| 16 | Q   And then whether you use it in the lobby or |
| 17 | not, once you get up to the ninth floor, you have to |
| 18 | use it -- |
| 19 | A   Yes. |
| 20 | Q   -- to actually get in; is that right? |
| 21 | A   Always. |
| 22 | Q   Do you know if you have access to any other |
| 23 | floors with that badge? |
| 24 | A   I'm told I do.  I never tried it. |
| 25 | Q   So you've obviously been on the first |

Witness:  James Starkey

**Page 38**

1  floor?
2    A    Uh-huh.
3    Q    And the ninth floor; is that right?
4    A    Yes.
5    Q    But you've never been to any of the other
6  floors of the facility?
7    A    Not on my own.  I've been to the fourth
8  floor one time for -- kind of to see what they do, and
9  I don't know whether I was given access for that day
10  or if I have permanent access.  I've never tried to
11  use it again.
12    Q    Do you know what is on the fourth floor?
13  Do you know what operations are going on there?
14    A    Not really.  I knew, for instance, three
15  years ago or so, but I'm not positive what it is now.
16    Q    What was it three years ago?
17    A    The -- one of our higher-end server type
18  teams, the -- the real IBM computers, S series, P
19  series, was the same type of call center type things
20  are done in that department.
21    Q    Do you know where that group is now?
22    A    I believe they're still there.  I'm just
23  not positive that that's what's there.
24    Q    What about the fourth -- or the fifth
25  floor?

**Page 39**

1    A    I don't know what's there.
2    Q    What about the third floor?
3    A    No.  I don't know -- I think the seventh
4  floor, we have at least some offices there, for rooms
5  there for training, but other than that, I don't
6  really know what's on most of the other floors.  I
7  could find out.  I just never have been interested to
8  know.
9    Q    Let's talk about what you do at the
10  beginning of the day, and let's talk about your
11  12-to-nine shift.  I know that there's a window in
12  there back in 2005, when you had a different shift,
13  but unless I --
14    A    Okay.
15    Q    -- identify that, let's just assume we're
16  talking about 12 to nine, because that seems to be the
17  majority of the time.
18    A    Okay.
19    Q    Fair enough?  And I'm going to back up and
20  start way back at the beginning of your day.  First of
21  all, how far do you live from the Riveredge facility?
22    A    Forty miles, the way I come in.
23    Q    So what time do you typically leave your
24  house to go to the Riveredge facility?
25    A    About 10 a.m.

**Page 40**

1    Q    What is the average time it takes you to
2  commute from your house to the facility?
3    A    Going in, about an hour.
4    Q    And I assume that can vary, depending on --
5    A    Exactly.
6    Q    -- whether there's an accident?
7    A    Oh, yes.  Weather, accidents, all sorts of
8  things.
9    Q    But the -- you would say the average time
10  is about an hour?
11    A    About an hour.
12    Q    Do you car pool with anybody?
13    A    No, sir.
14    Q    So you arrive at the facility on a typical
15  average day roughly at 11 a.m.?
16    A    Yes, sir.
17    Q    And your shift starts at noon?
18    A    Yes, sir.
19    Q    What do you do during that hour?
20    A    Generally sign onto my computer, read the
21  paper, start reading e-mails that have come in, stuff
22  like that.
23    Q    Ever search the Internet?
24    A    I guess so, yes.
25    Q    When you are -- if you look at the

**Page 41**

1  Internet, personal reasons or business reasons or
2  both?  And I'm still talking about this 11-to-noon
3  window, before your shift starts.
4    A    I would be looking for both.  For instance,
5  if I read an article in the paper that had a link on
6  it that it was something that interested me, I can
7  look there.  I mean, that's no rules against that.  If
8  it was something in an e-mail that had a -- for
9  instance, a training link or a document, I certainly
10  would look there too.  Book mark it.
11    Q    When you say you sign on, what does that
12  entail?
13    A    Well, turning on the computer.  That
14  automatically brings up a program called Sametime, and
15  that's announcing to the floor, basically, that you
16  are there, and at that time that's generally all I
17  bring up.  There's a couple other -- I have, you know,
18  a set pattern of things that I bring up, and there's
19  probably four other Web pages I bring up before that,
20  work related, like my e-mail, and just some of the
21  other pages I use.
22    Q    Do you do that -- obviously, you do that
23  after you turn on the computer?
24    A    Yes, sir.
25    Q    Do you -- let's walk through what you

Witness:  James Starkey

12 (Pages 42 to 45)

Page 42

1   typically bring up before your shift starts, and then
2   I will come back and ask you about some timing.
3       A    Okay.
4       Q    You typically go into -- open your e-mail?
5       A    Uh-huh, yes, sir.
6       Q    What else?
7       A    A couple of Web pages, like I say,
8   internal, that are work related, only because they're
9   part of my pattern to open those first so that they're
10  in the same place every time on the bottom of the
11  screen.
12      Q    Anything else?
13      A    No, not at that time.
14      Q    And when you say that time, what do you
15  mean?
16      A    When I first get there.
17      Q    And then at some other point in time you
18  open other tools?
19      A    Yes.
20      Q    When do you start to open other tools?
21      A    Generally about a quarter of 12.
22      Q    And what other tools do you open starting
23  generally at a quarter till 12?
24      A    There's a tool called PIMS for parts. NSS
25  for creating calls. The Lotus Notes application,

Page 43

1   where I document very little but something about the
2   calls so that I'll have a record of them. What else?
3   The ICPM program, which is our main call documentation
4   program, and then another tool that -- I don't know
5   what it's called. It was created there. It's a macro
6   that does a bunch of things for us. I'm trying to
7   think. So that's pretty much it. I mean, all in all
8   there's probably 15 different applications open.
9       Q    You went through PIMS --
10      A    Yes.
11      Q    -- NSS; Lotus Notes, that Lotus Notes
12  application where you record things?
13      A    Yes. That's -- Lotus Notes is where I --
14  my e-mail is and stuff like that.
15      Q    ICPM?
16      A    Correct.
17      Q    And then a macro?
18      A    Correct. Those are the ones I open up
19  about a quarter to 12.
20      Q    And then there are other tools you use --
21  might use; correct?
22      A    There's a System X Web page that we use a
23  lot. That's the same thing the customers would see,
24  and that's how we get to the information for each
25  server type. What's another one? Something new

Page 44

1   called GLOSSE.
2       Q    GLOSSE?
3       A    GLOSSE, G-L-O-S-S-E.  That's another
4   information type site, internal, and what else?
5       Q    When do you typically open the System X Web
6   site?
7       A    That's one of the ones I open up when I
8   first get there. For instance, if I'm reading an
9   e-mail and I need to access something that's -- what
10  do I want to call it? -- internal and I would have to
11  put a password or something in, I've got that open so
12  I don't have to do that again. It's already open.
13      Q    What about this GLOSSE? When do you open
14  it?
15      A    When I first get there.
16      Q    So when you first get there, you turn on
17  your computer. That brings up Sametime automatically?
18      A    Uh-huh, yes, sir.
19      Q    You open your e-mail?
20      A    Uh-huh.
21      Q    A couple of Web pages, one of those being
22  the System X Web site?
23      A    Yes.
24      Q    And then this GLOSSE and -- GLOSSE?
25      A    Yes.

Page 45

1       Q    Is that right?
2       A    Yes.
3       Q    And then at roughly 11:45 you open PIMS,
4   NSS, this Lotus Notes application where you record
5   things about the calls?
6       A    That's ICPM.
7       Q    Oh, is that ICPM?
8       A    Yes.
9       Q    So ICPM?
10      A    Uh-huh.
11      Q    And the macro?
12      A    Right.
13      Q    Anything else that you open before your
14  scheduled shift starts?
15      A    Not that I can think of. I guess there are
16  others, depending on the day or if something in the
17  e-mail type of thing that I need to have open, per se,
18  something that just came up. Something called -- we
19  have there called retain tips, which come down almost
20  every day, about known issues. So if it was something
21  new to do with them, I would have those open in case a
22  call came in relating to them.
23      Q    As -- so it sounds like there may be on a
24  given day -- let me back up. It sounds like kind of
25  the standard is what we walk through?

Witness:  James Starkey

Page 46

1   A   Yes.
2   Q   And then there may be days where you might
3   open something else?
4   A   Oh, yes.
5   Q   And then after your shift starts, there
6   certainly are other tools you would open if you need
7   them?
8   A   Correct.
9   Q   Let me -- I want to walk through these two
10  pieces of time when you first arrive, and I want to
11  get an understanding of how much time things take.
12  A   Okay.
13  Q   So to turn on your computer and it pops up
14  and Sametime comes up, open your e-mail, open a couple
15  of Web pages, including System X Web site, and open
16  this GLOSSE, how long does that take on average?
17  A   Seven, eight minutes.
18  Q   How long does it take when you just turn on
19  your computer before it boots up and pops up the
20  Sametime?
21  A   Four minutes.
22  Q   And then the e-mail?  To log into your
23  e-mail?
24  A   A minute.
25  Q   And then the Web pages that you open, how

Page 47

1   long does that take?
2   A   Twenty seconds each.
3   Q   Do you open two, it sounds -- a couple,
4   I --
5   A   Four.  There's four that I normally have
6   open.
7   Q   And then is GLOSSE a Web page?
8   A   Yes.  It's an internal Web page.
9   Q   Is that one of the four that you open?
10  A   Yes.
11  Q   If you get in normally, on an average day,
12  it sounds like you get in around noon?
13  A   About 11 a.m.
14  Q   I have an hour off.  Around 11; correct?
15  A   Correct.
16  Q   Why sign in -- why not just sign into
17  everything right when you get in, including PIMS, NSS,
18  ICPM, and the macro?
19  A   I guess one of the reasons I don't is some
20  of the applications time out after a certain period of
21  time, so if I opened them up right away, they might
22  time out before noon, and then I got to sign back onto
23  them again.
24  Q   And then the counter to that question, the
25  other side of that question is, why not wait until

Page 48

1   closer to your start time to log into everything?  To
2   turn on the computer, just do it all at once?
3   A   Just because it's become a habit, really.
4   I get there so early because, like you said, you never
5   know what the traffic is going to be or anything, and
6   it's simply not accepted to be late.  I'd rather get
7   there way early than ever be late.
8   Q   Let's go through the timing, starting
9   around 11:45.  How long does it take?  Do you -- let
10  me back up.  Do you typically do the same sequence?
11  In other words, at the 11:45 time frame?  Do you
12  typically go into PIMS first, then NSS, then ICPM, and
13  then the macro?
14  A   Yes, sir.
15  Q   So for PIMS how long does it take to log
16  into that?
17  A   Two minutes.
18  Q   NSS?
19  A   Forty-five seconds.
20  Q   ICPM?
21  A   Ninety seconds.
22  Q   And then the macro?
23  A   Twenty seconds.  That one is real fast.
24  Q   I show that total as roughly four and a
25  half minutes to go into PIMS, NSS, ICPM, and the

Page 49

1   macro?
2   A   About that.  That sounds about right.
3   Q   When you first sign in -- I want to go back
4   to roughly 11 o'clock.
5   A   Okay.
6   Q   You sign in, turn on the computer, the
7   e-mail, the Web pages, the four Web pages.  I think
8   you said that you sometimes read the paper, sometimes
9   read e-mails, and sometimes look at the Internet?
10  A   Correct.
11  Q   And I think you said on the Internet it
12  could be both personal or business?
13  A   Correct.
14  Q   And then on the e-mails could that be both
15  personal and business too?
16  A   No.  That would be -- I would not open my
17  personal e-mail from work.
18  Q   Well, you get personal e-mails to your IBM
19  address; correct?
20  A   Very rarely.  I don't give that address out
21  to very many people.
22  Q   We will come back to that.  So when you are
23  reading e-mails, generally would be business --
24  A   Yes.
25  Q   -- except for rare exceptions?

Witness:   James Starkey

Page 50

1  A  Yes, sir.
2  Q  From the time you get there at roughly 11
3  until 11:45, excluding the time you're actually
4  signing on and logging on, as we've talked about, do
5  you typically work on personal things, or do you
6  typically work?
7  A  It's really a little bit of both, but it's
8  -- like I say, I might open a Web page to read the
9  local paper or see what's in the headlines type of
10  thing.
11  Q  Have you ever talked to Lambousis or any of
12  your managers, be it Coy, Carver, or Lewis, about your
13  activities from 11 to 11:45? From what you're doing?
14  A  The only conversation I've had with them
15  is, do not -- not to sign onto the phone system --
16  that's our -- like our time recording -- until my
17  actual start time.
18  Q  Do you know whether Lambousis, Coy, Lewis,
19  or Carver know that during this 11-to-11:45 time frame
20  you're actually performing some work functions?
21  A  I'm sure they do.  They know I'm there.
22  Q  How would they know what you're doing?  How
23  would they know if you are looking at a personal Web
24  site versus --
25  A  They would not.  I -- I believe they have

Page 51

1  ways to see what's on my screen.  I've been told they
2  do, anyway, but they could simply stand behind me and
3  I couldn't see them, unless I turned around.  The
4  normal way that people -- I'm right in front of the
5  break room, so people go by all the time, but my
6  screen is not turned so that someone just walking by
7  would actually see what I've got on the screen.
8  Q  Do you know if any of your managers or
9  Lambousis, for example, have ever stood behind you and
10  watched what you're doing?  And I'm talking about this
11  11-to-11:45 time frame.
12  A  I know they have been back there on rare
13  occasions talking to someone, not specifically to look
14  at my machine, but they could obviously just look over
15  and see what's on it.
16  Q  Do you know if they have?
17  A  I don't know.
18  Q  Do you know if they've ever -- you
19  described a monitoring tool where they could check to
20  see what's on your screen if they wanted to.
21  A  Correct.
22  Q  Do you know if they've ever used that from
23  this 11-to-11:45 time frame?
24  A  I don't know.  I just know it's -- it's a
25  tool that's been put on there so that they can see

Page 52

1  we're not looking at inappropriate Web sites or
2  whatever.
3  Q  You said you have had discussions about not
4  signing onto the phone system.
5  A  Yes.
6  Q  Tell me about those discussions?  First of
7  all, who were they with?
8  A  Oh, back -- way back, to even George Pullon
9  that -- when I first got there, let's say at 11, I
10  would activate the phone system and say -- when I
11  first got there, but I wouldn't sign into one of the
12  codes that's saying I'm active, and I was told to stop
13  doing that because it throws their numbers off.  Don't
14  sign in until I'm actually going to start taking
15  calls.
16  Q  How do you sign into the phone system?
17  A  You have a -- a five-digit number that's
18  like a code for you, and it brings up your -- the
19  things you are qualified for, to answer calls on so
20  that the right calls get to your phone.
21  Q  Right.
22  A  And you just sign in with that number, and
23  that logs you into the phone.
24  Q  When you sign into the phone, do you -- and
25  you're ready to take calls, do you have to actually

Page 53

1  hit a button that says "available" on the phone?
2  A  Yes.  Yes.
3  Q  So if you sign into the phone but don't hit
4  that available button, does it knock you into some
5  kind of AUX code?
6  A  Yes.  It records the time as something
7  else.  It's not available time, so to speak.
8  Q  So when do you typically log into the phone
9  system or activate the phone system?
10  A  At 12 noon.
11  Q  How long have you been following that
12  practice?
13  A  Ever since I've been on that shift.
14  Q  Once you activate the phone system and then
15  hit the available button, then you can receive calls
16  through the phone system?
17  A  Correct.
18  Q  So I think you said going all the way back
19  to Pullon, people had told you, don't log into the
20  phone until the start of your shift?
21  A  Correct.
22  Q  Have you had those discussions with
23  Mr. Coy?
24  A  Not that specific one.  I know the rules,
25  so I don't break them.

Witness:   James Starkey

| Page 54 |
|---|

1   Q    What about with Miss Carver?
2   A    I believe I had that conversation with her
3  a couple times.
4   Q    What about Mr. Lewis?
5   A    No, I don't believe so.
6   Q    Do you know what -- under what
7  circumstances you would have had that discussion with
8  Miss Carver in light of the fact that you'd been -- it
9  sounds like you follow this practice for the last five
10  years?
11   A    I think I started doing it again.  Someone
12  else had told me that they were doing it because they
13  wanted -- they wanted people to know when they were
14  first there, so they started logging into an inactive
15  code on phone, and I think I started doing that again,
16  and after a couple weeks I was called in and told not
17  to do that anymore.  Go back to only logging in when
18  my actual start time is.
19   Q    What -- I want to start with Mr. Coy.  What
20  has he told you about his expectation with respect to
21  arriving on time?  You've made a couple of comments
22  that you don't want to be late.
23   A    Apparently some of his employees that he's
24  responsible for, certainly last spring, occasionally
25  came in late or something, and there were a whole

| Page 55 |
|---|

1  series of notes about not coming in late and
2  conditions of employment, and stuff like that, rather
3  nasty notes about being late, and then this doesn't
4  mean you people who come in on time, and I don't like
5  getting notes like that anyway.  It's -- if it doesn't
6  concern me, then don't yell at me.
7   Q    That's from Mr. Coy?
8   A    Yes.
9   Q    What does late mean?
10   A    Late would mean certainly after my noon
11  start time or whomever -- whatever start time you're
12  supposed to be there.  Late would also be arriving too
13  soon to your start time to be signed on and take calls
14  immediately at your start time.
15   Q    So are you saying that late would also mean
16  if you are not phone ready at your start time?
17   A    Correct.
18   Q    Who -- where do you get your understanding
19  of -- of that definition of late?
20   A    It's in the letters that have been sent
21  around and talking to people who have been late and
22  what they've been told, and it's documented somewhere
23  in our procedures that you will be signed on and ready
24  to go before your start time.
25   Q    Has -- have you had any discussions with

| Page 56 |
|---|

1  any of the management team?  And by that I included
2  Lambousis, even though you don't report to him, but
3  Lambousis, Coy, Carver, or Lewis?  About that
4  particular procedure you just described?
5   A    I have not had a -- a one-to-one type
6  conversation, no.
7   Q    Have -- have you had -- have you been at a
8  meeting where it's been discussed?
9   A    Oh, yes.
10   Q    And what exactly is the discussion?
11   A    Just that there's been a problem with
12  people coming in late, and the expectations are that
13  you will be signed on your machine at your start time
14  and ready to take calls.
15   Q    Can you be ready to take calls without
16  logging into the computer tools?
17   A    You know -- oh, yeah.  You could receive
18  calls then.
19   Q    You could receive calls simply by logging
20  into the phone and hitting available; right?
21   A    Exactly.
22   Q    Do you know if people do that?  Do you know
23  anyone who might do that?
24   A    Not that I am aware of.  You would be
25  making the customers wait while you start opening the

| Page 57 |
|---|

1  screens, which would be certainly unacceptable.
2   Q    Well, do you typically when you log into
3  the phone -- it sounds like you log in right about
4  noon every day?
5   A    Correct, 12 noon.
6   Q    Do you typically immediately get a call?
7   A    Oh, absolutely.
8   Q    You're backed up?
9   A    Yes.
10   Q    Is it possible as an experienced rep, to
11  handle calls without being in the computer tools?
12   A    No.
13   Q    In other words, is it possible -- let me
14  ask it a different way.  Is it possible for an
15  experienced rep to log into the phone, start booting
16  up the tools, take the call, talk to the customer,
17  take notes, and not reveal that they're logging -- or
18  booting up at the same time?
19       MR. ZOURAS:  I'm going to object to the
20  extent this is asked and answered.  You can
21  answer it to the best that you can.
22       THE WITNESS:  It -- it wouldn't really be
23  possible, because you have to first create a call
24  into the system.  That's the first thing that you
25  absolutely have to do.  You have to get the

Witness:   James Starkey

**Page 58**

1 machine -- type of the machine the customer's
2 calling in on. That's usually displayed on your
3 phone, but you have to get a phone number, which
4 brings up all the information that we know about
5 on that customer. Their address, basically. And
6 you have to create a call. For instance -- and
7 that's, you know, the first thing you have to do
8 just in case, for instance, you lost the customer
9 or something, so you would be able to get back to
10 them right away.
11 BY MR. RAY:
12   Q   So the first thing you do is get
13 information -- when the phone rings, the first thing
14 you do is get information on the customer about their
15 phone number --
16   A   Yes, sir.
17   Q   -- the machine type, those types of things?
18   A   Yes, sir.
19   Q   And how do you create a call?
20   A   In the NSS application.
21   Q   What is the next step when you are on a
22 phone? After you create the call?
23   A   To open -- to transfer the call from NSS to
24 this ICPM tool.
25   Q   And what was the ICPM tool?

**Page 59**

1   A   That's basically our main documentation, of
2 what we discuss with the customer and what we did with
3 the call.
4   Q   So when the customer calls in, you need the
5 NSS application to create the call?
6   A   Correct.
7   Q   You fill out -- does the NSS application
8 have a form?
9   A   Yes. It takes you through steps, yes.
10   Q   So you've -- you go through the steps of
11 the NSS application. Are you only in the actual
12 application during the actual while call, or do you go
13 into some other application while you're still talking
14 to the customer?
15   A   Oh, we certainly go into other
16 applications, depending on what his problem is.
17   Q   When you said transfer to the ICPM tool, is
18 that done after you're completed with the call with
19 the customer?
20   A   No. That's during.
21   Q   So you move the information from the NSS
22 application over to the ICPM tool?
23   A   Yes.
24   Q   Is that done at the end of the call or
25 during the call?

**Page 60**

1   A   During the call. During the case creation
2 part of the call.
3   Q   What is the purpose of having the
4 information moved over to the ICPM tool?
5   A   Well, the ICPM tool is more Windows based.
6 It's more modern. Not very, but easier to work with
7 than the NSS one, which is a very basic -- old, very
8 old program.
9   Q   So you move it over to the ICPM tool while
10 you're talking to the customer?
11   A   Correct.
12   Q   And then you deal with whatever the issue
13 is that the customer has?
14   A   Right.
15   Q   And do you -- so it sounds like with any
16 customer call, you're always going to use the NSS
17 application?
18   A   Pretty much, yes.
19   Q   And you're always going to use the ICPM
20 tool?
21   A   Absolutely.
22   Q   With -- with every -- or virtually every
23 customer call, will you also use PIMS?
24   A   Yes.
25   Q   And what is PIMS?

**Page 61**

1   A   It's a parts -- parts lookup type tool.
2 It'll tell us if we have the correct part numbers and
3 if they're available nearby to where the customer is.
4   Q   Are there customer calls where you don't
5 need to use PIMS?
6   A   Yes. Yes. There's a few.
7   Q   But just a few?
8   A   Yes. It's -- if they've got a problem
9 with -- a RAID array has gone down or something, it
10 doesn't require a part to fix it.
11   Q   And then we had talked about the Web pages.
12 Do you always use those Web pages on every call?
13   A   Oh, yes. Pretty much.
14   Q   How long are the typical customer calls?
15 Is there an average?
16   A   Their -- as I understand it, their
17 standard, from receiving the call to ending the call,
18 is 20 minutes.
19   Q   So these are fairly lengthy calls? Well,
20 let me back up. The standard for beginning and
21 ending, what is the beginning?
22   A   When you pick up the phone.
23   Q   And then the ending is when you hang up?
24   A   Correct.
25   Q   So the average call time is 20 minutes for

Witness:  James Starkey

Page 62

1 a call you're handling?
2     A    Well, actually it doesn't end when you hang
3 up.  It ends when you -- because you might get rid of
4 the customer and then can finish filling out the forms
5 to dispatch the call.
6     Q    Is there an average time, or do you know
7 what the average time is for the time that you're
8 actually on a call with a customer?
9     A    I don't know what that would be.  They do.
10 I don't know.  They got more numbers they track than I
11 can keep track of.
12     Q    Let me go back and just ask you again --
13 you've been doing this for a while?
14     A    Uh-huh.
15     Q    Have you ever logged into the phone and hit
16 the available button before you had logged into all
17 the tools that you typically log into before your
18 scheduled start time?
19     A    Not that I'm aware of.
20     Q    And you're not aware of anyone else who's
21 ever done that?
22     A    I'm not aware of it, no.
23     Q    Do you get any type of report on when you
24 log into the phone system?
25     A    Do I personally get it?

Page 63

1     Q    Yes.
2     A    I might be able to request it.  I never
3 have.  It's not given to me automatically.  I've seen
4 a report about people who don't log in on time, so I
5 know there is such a thing.
6     Q    If you are running late -- have you ever
7 been late?
8     A    At this facility, once.
9     Q    When was that?
10     A    Six years ago.
11     Q    Other people have been late, obviously?
12     A    Oh, yes, sir.
13         MR. RAY:  Why don't we take a break and
14 change the tape here.
15         THE VIDEOGRAPHER:  Off video.
16         (Thereupon, a lunch recess was taken from
17 12:50 p.m. until 1:14 p.m.)
18         THE VIDEOGRAPHER:  On video.
19         (Thereupon, marked for identification,
20 Defendant's Exhibit D3.)
21 BY MR. RAY:
22     Q    Mr. Starkey, I'll hand you what has been
23 marked as Exhibit 3, which is an e-mail that was
24 produced in this litigation by the plaintiff.  First
25 I'll ask you if you recognize this document?

Page 64

1     A    Oh, yes.  I've seen these.
2     Q    This particular e-mail is not dated.  You
3 said you have seen these.  Have you seen more than one
4 version of an e-mail like this?
5     A    Oh, yes.  Probably at least once a year or
6 so they send out something like that.  George does.
7     Q    When you say they, were you referring to
8 George Lambousis?
9     A    George or other managers.
10     Q    Which other managers have sent something
11 like that?  Exhibit 3?
12     A    Well, for instance, George would send
13 something to the -- to the floor, everybody, and the
14 other managers will only send them probably to the
15 people they're responsible for.  So if George sends
16 something out, most of the times they're re-sent out
17 to their team, so you get it twice.
18     Q    Well, this e-mail from -- it's from George,
19 although it doesn't actually say it's coming from
20 George Lambousis.  It's just says George.
21     A    Well, I think the original e-mail had a --
22 a little symbol after George that he uses in his
23 signature.
24     Q    Do you have the original e-mail?
25     A    I can get it, yeah.

Page 65

1     Q    Do you have other e-mail -- you described
2 other e-mails like this.  Do you have other e-mails
3 like this?
4     A    I have other e-mails from George.  They may
5 not be about this particular subject, but other
6 subjects that he's sent out where he's somewhat
7 entertaining in his bad spelling and English and stuff
8 like that, that we kind of all chuckle behind his
9 back, so we all keep them.
10     Q    You said that sometimes the managers would
11 forward things that George had sent them?
12     A    Uh-huh.
13     Q    Is it regarding the topic of when you are
14 supposed to be logged in or the expectation of being
15 ready for your shift or to take --
16     A    Oh, absolutely.
17     Q    Do you have any copies of those e-mails?
18     A    I would have to look.  I don't know off the
19 top of my head.
20     Q    Do you keep -- do you have folders in your
21 e-mail box?
22     A    Uh-huh.
23     Q    And do you have --
24     A    Yes.
25     Q    -- specific folders that those types of

Witness:   James Starkey

| Page 66 |
|---|
| 1  e-mails would be in? |
| 2     A    I would have to look.  I'm sure I have some |
| 3  saved, like don't delete this or something like that. |
| 4     Q    Let's look at this e-mail.  First of all, |
| 5  on the to line here, your name is on it, and it's one, |
| 6  two, three, four, five -- it's about in the middle of |
| 7  the first page there on the left side.  You see |
| 8  Starkey? |
| 9     A    There I am. |
| 10     Q    So you received this e-mail directly from |
| 11  Mr. Lambousis? |
| 12     A    Yes, sir. |
| 13     Q    Up at the top on the second page, Mr. |
| 14  Starkey, it says, "Forward," or, "FW, colon, note from |
| 15  manager back in 2005." |
| 16        Do you see that? |
| 17     A    Uh-huh. |
| 18     Q    Do you know who wrote that? |
| 19     A    I'm not sure.  I -- I would assume it's the |
| 20  subject line for whatever e-mail this was sent with. |
| 21     Q    That's not attached? |
| 22     A    Right.  That's what I would assume. |
| 23     Q    If you go down to the text, it starts -- |
| 24  the subject on the particular e-mail on page 2 says, |
| 25  "Reminder." |

| Page 68 |
|---|
| 1  2005? |
| 2     A    Oh, no, sir. |
| 3     Q    And the last sentence there, Mr. Starkey, |
| 4  says, "I am actively monitoring the policy for |
| 5  adherence and ask that you come forward to management |
| 6  quickly with any questions, comments, or concerns." |
| 7        Do you see that? |
| 8     A    Uh-huh, yes. |
| 9     Q    Did you ever go to management with any |
| 10  comments, questions, or concerns? |
| 11     A    Oh, no. |
| 12     Q    Why not? |
| 13     A    First of all, it was pretty cut and dry. |
| 14  There was no need to go there.  It's -- most of his |
| 15  notes -- this one doesn't say it, but always have the |
| 16  statement in it, this is a condition of employment. |
| 17     Q    This one doesn't say -- |
| 18     A    This one doesn't.  Usually that's his key |
| 19  word here:  You will be fired if you do not adhere to |
| 20  this.  This one doesn't say that, so I don't question |
| 21  George.  I try to stay away from him. |
| 22     Q    We talked a little bit about the other |
| 23  floors at the building. |
| 24     A    Yes, sir. |
| 25     Q    And certainly you reviewed and you received |

| Page 67 |
|---|
| 1     A    Yes, sir. |
| 2     Q    And it says, "Team."  Do you have an |
| 3  understanding of what the team is there? |
| 4     A    In his interpretation it would be all of us |
| 5  other than the vendors. |
| 6     Q    And when you say all of us, you're talking |
| 7  about the Intel support team? |
| 8     A    Correct. |
| 9     Q    And then he in the first sentence there |
| 10  says he's been hearing different interpretations, and |
| 11  then the second sentence is, "The expectation is that |
| 12  your workstation is powered up, you're logged onto the |
| 13  necessary applications, and you are in an available |
| 14  state on your phone at your start time." |
| 15        Did I read that right? |
| 16     A    Yes, sir. |
| 17     Q    And that's your understanding of the |
| 18  expectation of you? |
| 19     A    Absolutely. |
| 20     Q    Was -- assuming that this e-mail was sent |
| 21  in 2005 sometime, per the note at the top, was this a |
| 22  change in the expectation in 2005, or had that always |
| 23  been the expectation? |
| 24     A    It's always been the expectation. |
| 25     Q    And has that expectation changed since |

| Page 69 |
|---|
| 1  this e-mail from Mr. Lambousis.  Do you have any |
| 2  personal knowledge of what any other managers or |
| 3  groups expect with respect to arrival times, being |
| 4  logged into the tools, et cetera, before the scheduled |
| 5  shift or at the scheduled shift? |
| 6     A    Here?  No.  I don't know about other |
| 7  floors.  I know about other managers in IBM that I've |
| 8  had, but not here. |
| 9     Q    Not in Atlanta -- |
| 10     A    No. |
| 11     Q    -- is that correct? |
| 12     A    Correct.  I know people in other |
| 13  departments.  I've just never had a -- any reason to |
| 14  ask. |
| 15     Q    So you've never had a discussion -- well, |
| 16  let me back up.  Have you had discussions in your |
| 17  group, the Intel server support?  Am I saying that |
| 18  right? |
| 19     A    Yes. |
| 20     Q    The Intel server support group -- have you |
| 21  had discussions in the Intel server group about the |
| 22  expectation to be -- |
| 23     A    With co-workers?  Yes.  Yes, sir. |
| 24     Q    What were the tone of those discussions? |
| 25     A    Basically, to follow the rules and not make |

Witness:   James Starkey

**Page 70**

1  him angry.  He's not nice when he's angry.
2  Q  Has he ever been angry with you?
3  A  Not to my face.
4  Q  Are you aware of him being angry with you
5  behind your back?
6  A  Well, that other instance that I mentioned
7  before where he made up that story about me, obviously
8  he's not -- I'm not one of his favorite people.
9  Q  And I may be remembering this wrong, but I
10  know that you talked about Miss Carver making up a
11  story about you.
12  A  It was both of them that Ed Lewis said told
13  him that.
14  Q  So when you're talking about Mr. Lambousis
15  making up a story about you, it was about the issue of
16  your inability to be on time?
17  A  Correct.
18  Q  Has Mr. Lambousis ever communicated to you,
19  via e-mail or otherwise, about the availability of
20  overtime in your group?
21  A  Yes.  I'm sure I've gotten notes from him
22  about that, about we're behind or something like that,
23  and they're going to be asking for overtime.  It was
24  more of -- more of an order than a request, but --
25  Q  And you have worked overtime --

**Page 71**

1  A  Yes, sir.
2  Q  -- in your department?  To your knowledge,
3  have others in your group worked overtime?
4  A  Yes, sir.
5  Q  When you -- you're familiar with the
6  eTOTALS system?
7  A  No. No.
8  Q  How -- when you work overtime, how is that
9  reported?
10  A  Well, the phones of course would record it,
11  but I do have to fill out a time card every week, so
12  to speak.
13  Q  Do you know if you fill out a time card --
14  do you fill out your time card in a tool that's Web
15  based?
16  A  Yes.
17  Q  You don't know if that happens to be called
18  eTOTALS?
19  A  Actually that's probably what it's called.
20  I never really paid attention, but that's probably
21  what it's called.
22  Q  Is it your understanding that when you work
23  overtime, it's your responsibility to fill out that
24  time card and reflect the overtime?
25  A  Oh, yes.

**Page 72**

1  Q  Has that always been your understanding
2  while you've been in Atlanta?
3  A  Yes, sir.
4  Q  Do you also fill out a ILC?  Claims
5  reporting?
6  A  No.
7  Q  Are you familiar with the business conduct
8  guidelines?
9  A  Yes.
10  Q  You have to confirm that you have reviewed
11  those each year?
12  A  Each year.
13  Q  Do you typically do that in January of each
14  year?
15  A  Typically, yes.
16  MR. RAY:  Do you have your copy from
17  yesterday, or do you want another copy?
18  MR. ZOURAS:  Is it the same one?
19  MR. RAY:  The same one.
20  MR. ZOURAS:  No, I don't need one.
21  MR. RAY:  Save the trees.
22  MR. ZOURAS:  Right.
23  (Thereupon, marked for identification,
24  Defendant's Exhibit D4.)
25  BY MR. RAY:

**Page 73**

1  Q  I'm going to hand you what's been marked as
2  Exhibit 4, Mr. Starkey.  Just a second here.  If you
3  could take a look at that, Mr. Starkey, and tell me if
4  you recognize it?
5  A  Oh, I recognize it.  I'm not sure it's --
6  I'm not sure if it's IBM confidential or not.
7  Q  Why do you say that?
8  A  Well, I'm not sure -- I'm not sure if it's
9  IBM -- if it was IBM confidential, it should not be
10  out of the building.
11  Q  That was produced by IBM in this
12  litigation.
13  A  Okay.
14  Q  When you -- we talked about the fact that
15  you certify that you have reviewed the business
16  conduct guidelines --
17  A  Yes, sir.
18  Q  -- each year.  Do you read them each year?
19  A  No.  Only anything that is -- I think they
20  document anything that has been changed, like they
21  highlight it or something.  That is what we read every
22  year.
23  Q  Can you take a look at section 3.1 of those
24  guidelines?
25  A  Communication channels?

HUNDT REPORTING
214-220-1122

Witness:  James Starkey

Page 74

1    Q    Yes.  If you could take a second to review
2  that?
3    A    Uh-huh.
4    Q    Are you familiar with the fact that IBM has
5  mechanisms or channels in place for you to make
6  complaints?
7    A    Correct.
8    Q    And you've known that since you've been in
9  Atlanta?
10   A    Correct.
11   Q    And I believe earlier you talked about
12  using the confidentiality -- Confidentially Speaking
13  program; right?
14   A    Open Door.
15   Q    Oh, did you use Open Door?
16   A    Yes.  This Confidentially Speaking I
17  believe is a new version of that.
18   Q    So when we talked about the issue with
19  Miss Carver making up the story, as you said, you used
20  the Open Door approach?
21   A    Correct.
22   Q    Have you ever gone to anyone at HR to make
23  a complaint about anything?
24   A    No.
25   Q    If you could turn with me to section 3.6,

Page 75

1  which I believe is on page 13.
2    A    All right.
3    Q    And if you could just read that first
4  sentence and then that first paragraph, and then I
5  will ask you a question.
6    A    Correct.
7    Q    And there in the -- in the second
8  paragraph, the third sentence says, "As another
9  example, employees who are required to record hours
10  worked, must record them accurately, and those
11  eligible for overtime must record all hours worked,
12  including all overtime hours, which must be management
13  approved in line with IBM guidelines."
14       Did I read that right?
15   A    Correct.
16   Q    So it's your understanding under the
17  business conduct guidelines that it's your obligation
18  as an employee to report your time accurately,
19  including overtime?
20   A    Correct.
21   Q    Has that always been your understanding
22  since you've been in Atlanta?
23   A    Yes.
24   Q    When you certify that you have reviewed the
25  business conduct guidelines, do you actually take a --

Page 76

1  look through a booklet and take a little quiz?
2    A    I think you do.
3    Q    I'm going to show you a document here that
4  I'll ask you if you recognize it, so take your time
5  and --
6       (Thereupon, marked for identification,
7  Defendant's Exhibit D5.)
8  BY MR. RAY:
9    Q    I'm handing you what's been marked as
10  Exhibit 5.
11       MR. RAY:  I have an extra one if you want.
12       MR. ZOURAS:  All right.  Are you attaching
13  these to the deposition?
14       MR. RAY:  Yes.
15       THE WITNESS:  Oh, I remember this.
16  BY MR. RAY:
17   Q    Did you review this booklet?
18   A    It was -- it was not a booklet.  It was
19  on-line.
20   Q    Did you review it on-line?
21   A    Yes, sir.
22   Q    Then I believe at the end there's actually
23  a quiz.  Did you take the quiz?
24   A    Oh, yes.
25   Q    I assume you passed the quiz?

Page 77

1    A    Yes, sir.
2    Q    We'll come back to that in a second.  We
3  talked earlier, Mr. Starkey, about the fact that you
4  have had overtime?
5    A    Yes, sir.
6    Q    And I want to just walk through some
7  documents that reflect overtime and ask you a few
8  questions.  I'm going to hand you what's been marked
9  as Exhibit 6.
10       (Thereupon, marked for identification,
11  Defendant's Exhibit D6.)
12  BY MR. RAY:
13   Q    My first question, Mr. Starkey, is the
14  first page of Exhibit 6 has a -- a summary of salary,
15  overtime, earnings in -- that looks like dated
16  June 19, '08.  Have you ever seen a form like this?
17   A    No, I've never seen anything like this.
18   Q    If you could flip over with me to -- or
19  actually stay on the first page.  For earnings year
20  2007 do you see that down at the bottom?
21   A    Yes.
22   Q    It says, "Salary, 49,524"?
23   A    Uh-huh.
24   Q    Is that, to your recollection, what your
25  salary was in 2007?

Witness:   James Starkey

Page 78

1    A    I guess so.  I don't know specifically.
2    Q    And then there's overtime there of $922.94?
3  Do you know if that's accurate for 2007?
4    A    I would assume so.
5    Q    Add comp of 5,289.99, do you know what that
6  is for?
7    A    That's probably second shift premium.
8    Q    What is the second shift premium?
9    A    Oh, the amount?
10   Q    Yes.
11   A    Gee, I think it's ten percent.
12   Q    And then variable pay, what is variable
13  pay?
14   A    That's kind of like a bonus pay that you
15  get every March, I believe it is, based upon your
16  previous year's appraisal and how the -- how the --
17  certain factors within the company do.
18   Q    And then the bonus, the next line, is that
19  a different payment?  Different type of bonus?
20   A    I'm not sure what that is.
21   Q    Could the bonus line be the bonus you were
22  referring to?
23   A    No.  This is -- I think in 2007, this was a
24  -- like an award I got.  I think that's what they're
25  referring to.  It's the only thing I can think of.

Page 79

1  It's not on any other year.
2    Q    Do you know what that award was for?
3    A    Documentation.
4    Q    Solid documentation?
5    A    Solid documentation.
6    Q    Total earnings for 2007 show 59,237.79.  Do
7  you know if that's accurate?
8    A    I would assume so.  I don't know.
9    Q    If you could turn with me to the sixth page
10  of that document, and on the bottom right hand corner
11  it has a 1373, if that helps.
12   A    Yes.
13   Q    And I'll represent to you that this
14  information was taken off of what we referred to
15  earlier as eTOTALS.  My first question to you is, do
16  you recognize this format?
17   A    Not particularly.  I've never seen this
18  type of thing before.
19   Q    It shows for the week, if you look at the
20  second section down up in the upper left, it says,
21  "For week ending date 2006, slash, five, slash 19."
22       Do you see that?
23   A    Yes, sir.
24   Q    And then it says, "40 regular hours;
25  overtime hours, eight, colon, 22; total hours, 48,

Page 80

1  colon, 22."
2        Do you see that?
3    A    Correct.
4    Q    I assume you don't remember sitting here
5  today, whether you had overtime during the week of
6  May 19 of 2006?
7    A    No.
8    Q    My question is, when you -- I think you
9  said earlier, you would go in and change your time
10  card if you had overtime; correct?
11   A    Correct.
12   Q    Do you typically when you do that, record
13  your overtime to the minute?  In other words --
14   A    Oh, yeah.
15   Q    Is the answer yes?
16   A    Yes.  If it was -- like if I took a call at
17  the end of the day and it went to, let's say, 11
18  minutes after, I'll put 11 minutes down.
19   Q    And have you ever had any overtime rejected
20  that you entered into the system?
21   A    Not rejected.  I've had it questioned, but
22  not rejected.
23   Q    And what type of question?
24   A    What -- what was this for and making sure
25  it's valid or something like that.

Page 81

1    Q    Do you recall specific instances of that?
2    A    No.
3    Q    Have you ever -- after being asked to
4  explain what the entry was, has it ever been reversed?
5    A    That, no.  I've been asked, for instance,
6  not to do it again or something like that.  For
7  instance, sometimes when I get in, let's say a
8  customer calls in and it's before my start shift but
9  they can see that I'm there.  I have accepted those
10  calls before and been told not to do that.
11   Q    How would the call be routed to you if you
12  had not logged into the phone?
13   A    It's routed to me this way by another agent
14  who got the call, because I'm -- they can see me on
15  Sametime, but I'm not active on the phone, so they
16  say, customer so-and-so is calling back.  I'm pretty
17  much already logged in, so I just quickly finish that
18  and talk to the customer, or I did.
19   Q    And they -- so how does the other agent
20  tell you that there's a call for you?
21   A    Sametime.
22   Q    Through Sametime?
23   A    Yes.
24   Q    And then you on occasion accepted the call?
25   A    Yes.