# EXHIBIT 6B

Witness:  James  Starkey

| Page 82 |
|---|

1  Q    And management has said, don't do that?
2  A    That's correct.
3  Q    Don't take calls until after the start of
4  your shift?
5  A    Correct. There are agents here already
6  that are -- their shift is already active.  Let them
7  do it.
8  Q    With respect to overtime that you have
9  recorded on your time cards, has a manager ever told
10  you not to record overtime for work you've recorded?
11  A    Not really, no.  You know, asked me to work
12  overtime and tell me not to record it, no.
13      MR. RAY: Let's go off the record for just
14  one minute.
15      THE VIDEOGRAPHER: Off video.
16      (Thereupon, an off-the-record discussion was
17  held.)
18      THE VIDEOGRAPHER: Stand by.  On video.
19      (Thereupon, marked for identification,
20  Defendant's Exhibit D7.)
21  BY MR. RAY:
22  Q    Mr. Starkey, I'm going to hand you what's
23  been marked as Exhibit 7, and I'll ask you to take a
24  look at that document and tell me if you recognize
25  that?

| Page 83 |
|---|

1  A    I guess it's the instructions on how to use
2  this thing.  Use the screens, yes.
3  Q    Do you know if you have ever reviewed this?
4  I believe this document is on the intranet.
5  A    I'm sure I reviewed it when they first came
6  out with this.  I want to say this particular format
7  has only been out there for three years or so.  We
8  used something else before that, so yeah, I would have
9  probably gone -- skimmed over this at least when they
10  first came out with the application.
11  Q    When you say this particular application
12  has only been in place for --
13  A    I believe about three years.
14  Q    Three years?  Before this application do
15  you know what was used?
16  A    That application was just called totals.
17  Q    Was it basically the same process as
18  eTOTALS in the sense that you were responsible for
19  updating any overtime --
20  A    Yes.
21  Q    -- is that right?
22  A    Yes.
23      (Thereupon, marked for identification,
24  Defendant's Exhibit D8.)
25  BY MR. RAY:

| Page 84 |
|---|

1  Q    I'm going to hand you what's been marked as
2  Exhibit 8, and I'll just ask you if you recognize that
3  particular document?
4  A    That's the standard about IBM's policies
5  and stuff.  It's regarding your job.
6  Q    Have you ever reviewed this document?
7  A    If not this one, then one very similar to
8  it.  They -- they update and change these all the
9  time, and we're not notified about it.
10  Q    You're not notified about it?
11  A    No.
12  Q    How do you know they're updated and
13  changed?
14  A    Because every once in a while, every couple
15  of years at least, I try to print out some of this
16  stuff and keep it at home in case I'm ever terminated
17  and want to get access back in and know what my rights
18  were at that time and stuff, and I see that the
19  documents have changed.  That's why I keep doing it.
20  Q    And you think this particular document,
21  Exhibit 8, has been changed without notification to
22  you?
23  A    Oh, yeah.  Over -- since, let's say, 2001,
24  it's -- it's -- there's changes in there.
25  Q    This document, Exhibit 8, is dated on the

| Page 85 |
|---|

1  front page, September 2007.
2  A    Yes, sir.
3  Q    Do you know if it's been changed since
4  then?
5  A    No, I don't.
6      (Thereupon, marked for identification,
7  Defendant's Exhibit D9.)
8  BY MR. RAY:
9  Q    I'm going to hand you what's been marked as
10  Exhibit 9, and this is -- I will represent to you this
11  is off the IBM intranet, and do you recognize this
12  document?
13  A    Not specifically, no.
14  Q    Have you ever checked IBM policies on the
15  intranet?
16  A    Not really.
17  Q    Are you aware that IBM's policies are on
18  the intranet?
19  A    Yes.
20  Q    You just don't typically check them?
21  A    No.
22  Q    Ever check them?
23  A    Not unless -- I suppose if I had something
24  that particularly applied to me or I needed to know, I
25  would definitely look, but other than that, no.

Witness:  James Starkey

Page 86

1    Q    There in the third section down on the
2   first page of Exhibit 9, you see weekly overtime?
3    A    Yes, sir.
4    Q    It says, "All hours in excesses of 40 hours
5   worked exclusive of the employee meal breaks during an
6   employee's regular payroll workweek will be considered
7   as weekly overtime hours."
8        Do you see that?
9    A    Correct.
10    Q    Do you have an understanding as to whether
11   that's IBM's stated policy on the Web site?
12    A    I would say so. I would definitely say
13   that's what they would say.
14    Q    Have you ever, Mr. Starkey, tried to record
15   as time worked, the time you spend logging into your
16   computer getting ready for your day? Logging into
17   your tools?
18    A    I -- I did try that at one time and was
19   told that that is not recordable time because that is
20   time in preparation to do my work, not -- not work,
21   not overtime or work. It's like putting on my clothes
22   in the morning. It's something I have to do before I
23   go to work.
24    Q    When did you try to enter that time?
25    A    Well, that was back when we -- when I first

Page 87

1   came to Atlanta.
2    Q    Who was your supervisor at the time?
3    A    George Pullon.
4    Q    Who told you that that time was not to be
5   entered?
6    A    George Pullon.
7    Q    You considered the time that you are
8   logging into your tools and to prepare for your -- the
9   start of your shift, to be work time; correct?
10        MR. ZOURAS: Let me just object to form and
11   foundation as to when. If you can answer it as
12   phrased, go right ahead.
13        THE WITNESS: Say that again. I guess I
14   didn't understand.
15   BY MR. RAY:
16    Q    You consider currently the time that you
17   spend logging into your computer and into your tools
18   to get ready for the start of your shift, to be
19   compensable work time; correct?
20    A    Yes, sir.
21    Q    And how long have you had that opinion?
22    A    Well, since I've been here at this position
23   in Atlanta.
24    Q    So for the last five years?
25    A    Seven.

Page 88

1    Q    Seven years. I've got my dates wrong.
2    A    Yes.
3    Q    So for the last seven years you've been of
4   the view that the time you spend logging into your
5   tools and getting ready for your workday or your
6   scheduled start time, is compensable work time?
7    A    Yes, sir. When I worked in Burlington we
8   had a paid overlap between shifts for interfacing and
9   stuff. There was none of this type of thing.
10    Q    And earlier you said that you actually
11   tried to record that time and Mr. Pullon told you not
12   to?
13    A    Correct.
14    Q    Did you try to record that time literally
15   the first day in Atlanta?
16    A    No, not the first day. I don't -- I don't
17   particularly remember exactly -- when exactly it was.
18    Q    After Mr. Pullon told you not to record the
19   time, did you escalate that issue with anyone?
20    A    No.
21    Q    Why not?
22    A    I just assumed that was the way things
23   worked. I have no knowledge of the laws and stuff
24   like that, so I just assumed that's got to be -- got
25   to be. That's what I have to do to work this job.

Page 89

1    Q    Did you ever discuss with Mr. Coy,
2   Mr. Lambousis, Miss Carver, or Mr. Lewis whether you
3   could enter time for the time you spent logging into
4   your computer tools to get ready for the start of your
5   shift?
6    A    I mentioned it to Juanita, I know.
7    Q    And what was her response?
8    A    Basically, it's a condition of employment.
9   I don't remember the exact words.
10    Q    Did she say that you could not record that
11   time?
12    A    It was not said in that way. It was -- I
13   was angry about something, and I said, this is the not
14   the IBM I started working for, and I rattled off stuff
15   like having to work before we, you know, log on.
16   We're not paid for that, and there were several other
17   times, and I said -- you damn right; this is not the
18   IBM you started working for. So in other words, she
19   did not deny it.
20    Q    In that discussion did you specifically ask
21   or discuss whether you could record time for that time
22   you spend --
23    A    Not -- not ask if I could, no.
24    Q    Did you raise the fact -- well, you
25   answered, not ask. How did you raise it, if you did?

Witness:    James Starkey

---

**Page 90**

1      MR. ZOURAS: I'll object that it's asked and
2  answered, but you can answer.
3      THE WITNESS: Like I say, I was angry about
4  something that she had told me. I mean, I had
5  probably been with the company longer than she
6  has, and I just said that this was not fair, and
7  I rattled off like the sick time thing and not
8  being able to record all the time we work here
9  and stuff like that.
10     And she said, that's just the way it is.
11 BY MR. RAY:
12     Q    When was that conversation?
13     A    2006, I would guess.
14     Q    Did you escalate that issue at that time?
15     A    No.
16     Q    And by that issue -- let me finish my
17 question. By that issue I mean the issue of not being
18 able to record time for time you spend logging into
19 the tools to get ready for your --
20     A    No.
21     Q    -- scheduled start time? Let me finish my
22 question --
23     A    Oh, I thought you were finished.
24     Q    -- before you answer. Okay. Is the answer
25 no to my question?

---

**Page 91**

1      A    No.
2      Q    Let me ask it again so --
3      A    Okay.
4      Q    Now I think we have a double negative.
5      MR. ZOURAS: Let's try it again.
6  BY MR. RAY:
7      Q    Yes. After your conversation with Miss
8  Carver in 2006 did you escalate the issue of whether
9  you could record time for the time spent logging into
10 your computer, into the tools in preparation for your
11 scheduled start time, to anyone else?
12     A    No, I did not.
13     MR. ZOURAS: I don't really have an
14 objection, but did we establish a definition of
15 escalate? I apologize if we have. Is that --
16 are you using that, or -- I mean, is that -- I
17 know what you mean, and obviously the witness
18 does too.
19     MR. RAY: It's fine.
20 BY MR. RAY:
21     Q    And by my last question, Mr. Starkey, I
22 mean did you raise that issue with anyone else?
23     A    No.
24     MR. ZOURAS: Thank you. It's not a big
25 deal.

---

**Page 92**

1  BY MR. RAY:
2      Q    If you could go back to the business
3  conduct guidelines and turn to page 6, the
4  communication channels?
5      A    Uh-huh.
6      Q    There in the first sentence it says, "If
7  you know of an unlawful or unethical situation, you
8  should immediately tell IBM whatever you know or have
9  heard about it. You can do so in one of several
10 ways."
11         Do you see that?
12     A    Yes.
13     Q    You've talked about raising it with -- or
14 the discussion you had with Mr. Pullon way back?
15     A    Correct.
16     Q    Right? And then you talked about your
17 discussion with Miss Carver?
18     A    Correct.
19     Q    Under the business conduct guidelines did
20 you feel you had an obligation to escalate it or to
21 raise it with other people?
22     A    No. As it was explained to me, it was not
23 work time, and I'd always trusted IBM before to --
24 they're always fair. They always been more than fair
25 in my career until I got to this place, and it just

---

**Page 93**

1  seemed, okay, that's the way things are; I'm not going
2  to get fired over a little thing like this. And I
3  don't know if I used -- I know -- I just don't trust
4  some of these things that if I use them, that I won't
5  get repercussions from them.
6      Q    Have you ever used one of these channels,
7  and I know you talked about the Open Door earlier,
8  where you did get -- have repercussions?
9      A    In Burlington. Burlington, Vermont.
10     Q    When -- during what period of time was
11 that?
12     A    Oh, I don't know. Twenty years ago.
13     Q    I thought you said you'd always been
14 treated fairly until you got here, which I assume
15 means Atlanta?
16     A    Well, I'm talking about IBM has always
17 treated me fairly. There have been managers that have
18 not.
19     Q    We talked about the discussion with Mr.
20 Pullon when you tried to record the time --
21     A    Right.
22     Q    -- for preparing for your start time, and
23 then we talked about the conversation with Miss Carver
24 where you raised several issues, including that issue.
25     A    Yes, sir.

Witness:  James Starkey

25  (Pages 94 to 97)

| Page 94 | Page 96 |
|---|---|

**Page 94**

1    Q    Any other conversations with any managers
2  about whether you could record time for logging into
3  your computer, preparing for your scheduled start
4  time?
5    A    No.  No.  It's better not to rock the boat.
6    Q    Pardon?
7    A    It's better not to rock the boat.
8    Q    Why do you say that?
9    A    It's -- don't make waves.  I mean, there
10  were a lot of discussions going on a couple years ago
11  when somebody else had one of these cases that was one
12  -- a similar case where someone was doing something
13  before work and it was deemed not legal, and, I mean,
14  there was rumor all over the floor at that time.
15    Q    What was the rumor?
16    A    Not a rumor; a -- conversations, a furor
17  all over the room when people are saying, well, what's
18  this about this?  And it's like, you know, I'm not
19  going to make waves over it because it's just too easy
20  to get fired these days.
21    Q    Do you know if anyone got fired with
22  respect to the incident you just described?
23    A    No.  There have been a lot of people fired,
24  but I'm not privy to over what.
25    MR. RAY:  Let's -- can we take a break?  How

**Page 95**

1  much time do we have on the tape?
2    THE VIDEOGRAPHER:  Thirty-five minutes.
3    MR. RAY:  Can I take a quick break?
4    MR. ZOURAS:  Of course.
5    THE VIDEOGRAPHER:  Off video.
6    (Thereupon, a recess was taken.)
7    THE VIDEOGRAPHER:  On video.
8  BY MR. RAY:
9    Q    Mr. Starkey, before the break we were
10  talking about your discussions about whether you could
11  record time for this prescheduled start time work;
12  booting up your computer, those types of things.
13    A    Yes.
14    Q    And you had talked about a discussion with
15  Mr. Pullon, I believe?
16    A    Uh-huh.
17    Q    And I believe that you had tried to record
18  overtime for this time you spent booting up your
19  computer, getting ready for your scheduled start time,
20  and Mr. Pullon said, you can't record that time; it's
21  not considered time worked, or something to that
22  effect?
23    A    Correct.
24    Q    Why did you try to record that time in the
25  first instance?

**Page 96**

1    A    Just seemed I was at work.  I was -- that
2  was part of work to me.
3    Q    You viewed it as time worked?  Compensable
4  time worked?
5    A    I just assumed you should put it down.
6    Q    And after Mr. Pullon told you, you could
7  not put it down, did he have you actually reverse
8  those out of your time sheets?  Those entries?
9    A    I don't remember.  I believe so.
10    Q    And then you had the conversation with
11  Miss Carver in roughly 2006 --
12    A    Right.
13    Q    -- about the same topic, and you've already
14  talked about it?
15    A    Correct.
16    Q    Have you ever talked to Mr. Coy about that
17  issue?  Whether you could record time --
18    A    No.
19    Q    Let me finish my question just because the
20  record will be messed up.  Have you ever had a
21  conversation with Mr. Coy about that issue of whether
22  you could record time for time spent booting up to get
23  ready for your shift starting time?
24    A    No.
25    Q    What about Mr. Lambousis?

**Page 97**

1    A    Absolutely not.
2    Q    What about Mr. Lewis?
3    A    No.  I would have, through, given enough
4  time.  Like I say, he was not there that long.  He's
5  the only one I've had a relationship with that I could
6  discuss that with.
7    Q    Do you know if any other people in your
8  group have had similar discussions?
9    A    No, I don't know.
10    Q    And by similar discussions I'm talking
11  about the discussion with management about whether you
12  could record time for booting up --
13    A    No.
14    Q    -- to get ready for your scheduled shift?
15    A    I haven't heard of anyone else discussing
16  that.  I'm not sure -- I'm not sure it would come up
17  in a normal conversation, but --
18    Q    Is there anything -- or are you aware of
19  anything in writing about that issue, like an e-mail,
20  where that particular issue was addressed?  And by
21  that issue I'm referring to whether you could record
22  time for booting up your tools to get ready for your
23  scheduled start time?
24    A    Not about recording it.  Only that it's
25  expected to be done before you sign in.

Witness:   James Starkey

| Page 98 | Page 100 |
|---|---|
| 1    Q    And we looked at — and when you say sign<br>2  in, you're talking about logging into the phone?<br>3    A    Yes, sir.<br>4    Q    And logging into the phone -- is it your<br>5  understanding that logging into the phone somehow<br>6  impacts your compensation or your time sheet? .<br>7    A    Yes.<br>8    Q    How does logging into the phone impact your<br>9  time sheet?<br>10    A    It's like a time card.<br>11    Q    So if you log into the phone at 11:45, with<br>12  your noon shift --<br>13    A    Uh-huh.<br>14    Q    -- is it your understanding that you would<br>15  automatically get an extra 15 minutes for that shift?<br>16    A    Not unless I put it down on my eTOTALS<br>17  card.<br>18    Q    You still have to go into eTOTALS?<br>19    A    Correct. But that would justify it. For<br>20  instance, there was one time I logged on. I logged<br>21  onto the phone and must have hit the wrong key or<br>22  something like that, the wrong button for my code. So<br>23  for like the first hour, I was not actually logged in,<br>24  and it was a slow day anyway, and so nobody noticed it<br>25  right off, that I wasn't getting calls. All of the of | 1    Q    Have you witnessed people getting<br>2  chastised?<br>3    A    No. Usually it's done behind closed doors.<br>4    Q    How do you know if it's done behind closed<br>5  doors, that it's occurring?<br>6    A    Well, it just isn't done to go out and yell<br>7  at somebody in front of everybody else, but, I mean,<br>8  it's like he said, you know, I got to be more careful<br>9  because I'm getting in trouble for being late. So<br>10  they were spoken to about it.<br>11    Q    Do you think it's inappropriate for a<br>12  manager to talk to someone about being late?<br>13    A    No. No. But in front of other people,<br>14  yes.<br>15    Q    Well, that's what I'm trying to figure out<br>16  because you used the word "chastised," and then you<br>17  said that was going on behind closed doors, and then<br>18  you said it would be inappropriate in front of other<br>19  people.<br>20    A    Right.<br>21    Q    So I'm missing something here?<br>22    A    I was told afterwards by the people who<br>23  were spoken to.<br>24    Q    That it was done behind closed doors?<br>25    A    Correct. |
| Page 99 | Page 101 |
| 1  the sudden they said, how come you're not logged in?<br>2  So they watch that pretty closely.<br>3    Q    If people -- there are people who are late<br>4  in your group; right?<br>5    A    Oh, yes.<br>6    Q    Do you know if when people are late --<br>7  well, let me back up. You said you were only late<br>8  once in the last five years.<br>9    A    Oh, at least. No more than once.<br>10    Q    So with respect to the people who are --<br>11  who have been late, do you know if they are required<br>12  to take out time in their eTOTALS?<br>13    A    Well, they're chastised about it. I don't<br>14  believe they're taking time out, but they would<br>15  certainly be required to stay that much longer at end<br>16  of the shift.<br>17    Q    And who are you aware of who's been late<br>18  and then required to stay after the shift?<br>19    A    Well, I was back in Burlington, but here --<br>20  I know there's a guy that's late a lot that sits near<br>21  me, and he said -- I asked how come he was still there<br>22  20 minutes after his shift?<br>23          And he said, oh, because I came in late.<br>24    Q    And who chastises people for being late?<br>25    A    Their manager, whoever that may be. | 1    Q    When you had the discussion with Mr. Pullon<br>2  where you had tried to record the time for preparing<br>3  for your scheduled start time by booting up those<br>4  types of things, was there anyone else present?<br>5    A    Not that I know of.<br>6    Q    What about when you had your conversation<br>7  with Miss Carver about the same issue?<br>8    A    That was a -- that was a -- no. That was a<br>9  shut-door sit-down. No. They don't like other people<br>10  there. As a matter of fact, Miss Carver -- I started<br>11  leaving the door open after my little altercation with<br>12  her. She's black. She's a woman. I'm not going in<br>13  and close the door in a black woman's office. She<br>14  could say anything she wanted to. I'm leaving the<br>15  door open, or I want somebody else in here, but that<br>16  particular time, no, there was no one else there.<br>17    Q    So now have you had other discussions with<br>18  her in her office where you leave your door open?<br>19    A    Yes.<br>20    Q    Does she object to you leaving the door<br>21  open?<br>22    A    She has not pushed it. She knows why I'm<br>23  leaving it open.<br>24    Q    Have you told her why you're leaving it<br>25  open? |

Witness:   James Starkey

Page 102

1    A    Yes, in not so many words.
2    Q    What words did you use?
3    A    I used more like, I'm doing it to cover
4  myself --
5    Q    So you --
6    A    I leave the door open.
7    Q    I'm sorry to interrupt you. So you leave
8  the door open because you're concerned that
9  Miss Carver will make false accusations about you?
10   A    She -- concern that she could.
11   Q    Do you leave the door open in meetings with
12  Mr. Pullon?
13   A    No.
14   Q    Couldn't he make false accusations?
15   A    He could.
16   Q    Is there something about Miss Carver that
17  you think makes her more likely to make false
18  accusations?
19   A    I just don't trust her.
20   Q    You also don't trust Mr. Coy; right?
21   A    I don't know Mr. Coy. I don't trust him
22  with personal issues. Talking personal issues with
23  someone you don't even know?
24   Q    Let's talk about the end of the shift. I
25  think you said earlier that if you get held on a call

Page 103

1  or that you had been held on a call, and you were able
2  to record that overtime?
3    A    Yes, sir.
4    Q    Is that standard practice?
5    A    Yes.
6    Q    If you are on a call at the end of your
7  shift, you can go into eTOTALS and record that time?
8    A    Yes, sir.
9    Q    Have you ever had a manager tell you not to
10  do that?
11   A    No. No.
12   Q    Has that been standard practice since
13  you've been in Atlanta?
14   A    Yes.
15   Q    What about lunch breaks? Have you ever
16  been asked to skip a lunch break?
17   A    Yes.
18   Q    And were you able to record that time?
19   A    Yes.
20   Q    Have you ever been asked to skip a lunch
21  break and not record the time?
22   A    No.
23   Q    Do you believe that you have ever worked
24  off the clock through a lunch break where you had to
25  work but you were not paid?

Page 104

1    A    I don't think so, no.
2    Q    What about after your shift? Do you think
3  there's time you've spent after your shift where you
4  worked but were not able to record that time in
5  eTOTALS?
6    A    There have been times I've worked a couple
7  of minutes after where I didn't record it, but that's
8  my -- was my choice, not because someone told me not
9  to.
10   Q    How often does that occur? Has that
11  occurred?
12   A    Once a month.
13   Q    But nobody told you not to record it?
14   A    No.
15   Q    I want to go back to before this shift,
16  because you live far away, so you get in fairly early
17  on average?
18   A    Correct.
19   Q    And we talked about how you log into a few
20  things and then might do some business, might do some
21  personal work, and then at about 11:45 you then start
22  logging into some other tools to get ready for the
23  start of your shift?
24   A    Right.
25   Q    How much time on average a day are you

Page 105

1  spending logging into your computer tools to get ready
2  for the start of your shift? Where you combine those
3  two events?
4    A    Twelve minutes.
5    Q    Is there -- you talked about a macro. Does
6  the macro then automatically open several tools?
7    A    It can, depending on what -- what you're
8  asking it to do.
9    Q    Can you create a macro where you literally
10  type in one password and it opens every tool you need,
11  including --
12   A    No.
13   Q    You can't do that?
14   A    No.
15   Q    You can't create a macro that would open,
16  for example --
17   A    I wish it could.
18   Q    Right. You can't create a macro that would
19  open PIMS?
20   A    No.
21   Q    Or NSS; is that right?
22   A    No. If you can, I -- I certainly don't
23  know how to do it, and I don't know anybody else there
24  who does, so --
25   Q    So the logging in function, roughly 12

Witness:   James Starkey

28 (Pages 106 to 109)

| Page 106 |
|---|
| 1  minutes when you combine everything? |
| 2     A    Correct. |
| 3     Q    And then on a daily basis you do some |
| 4  personal stuff, some business stuff.  Any estimate as |
| 5  to what your average time spent actually doing |
| 6  business-type activities or performing work before |
| 7  your scheduled start time? |
| 8     A    Well, if I get there at 11 -- I would say |
| 9  20 minutes. |
| 10    Q    Twenty minutes a day? |
| 11    A    Twenty minutes.  Reading e-mails and |
| 12 checking previous cases and stuff like that. |
| 13    Q    Going back to Exhibit -- I believe it's |
| 14 Exhibit 3, Mr. Starkey.  That's the e-mail from |
| 15 Mr. Lambousis, and it pretty clearly sets out the |
| 16 expectation; right?  It says, "The expectation is that |
| 17 your workstation is powered up and you're logged into |
| 18 the necessary applications and you are in an available |
| 19 state on your phone at your start time." |
| 20       Right? |
| 21    A    Correct. |
| 22    Q    What does available state on your phone |
| 23 mean? |
| 24    A    The -- logged in. |
| 25    Q    So logged in and then hit that available |

| Page 107 |
|---|
| 1  button? |
| 2     A    Correct.  That's what they call it. |
| 3     Q    There's nothing in this e-mail about doing |
| 4  other duties before you start your shift?  Like |
| 5  reading e-mails? |
| 6        MR. ZOURAS:  I'm going to object that the |
| 7     e-mail speaks for itself, but you can answer it, |
| 8     of course. |
| 9        THE WITNESS:  No.  It doesn't say that. |
| 10 BY MR. RAY: |
| 11    Q    Are there other e-mails that you have seen |
| 12 that require you to read e-mails or do other work |
| 13 other than the log-in function? |
| 14    A    Specific, no. |
| 15    Q    Has anyone ever told you that you should be |
| 16 reading e-mails or doing other work other than |
| 17 powering up, logging on, logging onto your phone, |
| 18 booting up your tools? |
| 19    A    Yes. |
| 20    Q    Who is that? |
| 21    A    I believe that was Carver. |
| 22    Q    And what specifically did Miss Carver say |
| 23 about that? |
| 24    A    That you should review the e-mails that you |
| 25 got before you start work to see if there's anything |

| Page 108 |
|---|
| 1  that applies to something you're working on or some |
| 2  new procedure that came out today or something like |
| 3  that before talking to customers. |
| 4     Q    And did she say that to you personally, or |
| 5  was this in a meeting? |
| 6     A    To me personally. |
| 7     Q    When was that? |
| 8     A    I'll go with 2006. |
| 9     Q    Do you feel confident it's 2006? |
| 10    A    Well, that's -- |
| 11    Q    I'm not asking you to guess. |
| 12    A    That's when she was my manager, so it was |
| 13 sometime in 2006. |
| 14    Q    So she said that to you individually? |
| 15    A    Correct. |
| 16    Q    Do you know if she said it to anyone else? |
| 17    A    I don't know if she specifically said it, |
| 18 but everybody knows that's what you're supposed to do. |
| 19    Q    Why do you say everyone knows that? |
| 20    A    Because I'll hear someone say, hey, did you |
| 21 see this e-mail about they changed the procedure to do |
| 22 this, or something like that, I'll hear before a shift |
| 23 starts or get a pop-up on my Sametime that says, you |
| 24 know, make sure you check this to -- you know, it |
| 25 applies to us and what we're doing. |

| Page 109 |
|---|
| 1     Q    So you've seen examples of people checking |
| 2  the e-mail before their shift starts? |
| 3     A    Oh, absolutely. |
| 4     Q    Now, the -- do you know, have you talked to |
| 5  them as to whether a manager told them to do that? |
| 6     A    No. |
| 7     Q    Do you have any knowledge as to whether a |
| 8  manager told them to do that? |
| 9     A    No.  I don't have personal knowledge that I |
| 10 know of, no. |
| 11    Q    How many times in a week is there, in fact, |
| 12 an e-mail about a procedure change or something that |
| 13 you need to know before you do it? |
| 14    A    At least -- at least two or three times. |
| 15    Q    And then how long does it typically take to |
| 16 read those types of e-mails? |
| 17    A    To read it?  Oh, 30 seconds, probably, to |
| 18 read it, but if there's documents that have to be |
| 19 brought up or something that has to be read or |
| 20 something, I mean, that would certainly vary. |
| 21    Q    When you -- is it your rule of thumb to |
| 22 start 15 minutes before your shift, finalizing your |
| 23 log-in of tools? |
| 24    A    Yes, sir. |
| 25    Q    Can -- do you have time during that 15 |

Witness:  James Starkey

Page 110

1  minutes to read these e-mails that you have described?
2  New procedures, new processes?
3     A    No.  Screens are open, and you would not be
4  able to see the screen that the e-mails are on.
5     Q    Well, earlier when we were talking about
6  how long it takes to actually log into the tools that
7  you log into at the 11:45 time, I think it was roughly
8  four and a half minutes.
9     A    Uh-huh.
10    Q    That leaves another ten minutes.
11    A    Well, it was four and a half minutes when I
12  first got in there to open a few.
13    Q    Well, let me go through them, and I may
14  have it wrong.  At 11:45 my understanding is that you
15  log into PIMS?
16    A    Correct.
17    Q    Which takes two minutes?  NSS, which is 45
18  seconds?
19    A    Correct.
20    Q    ICPM, which is 90 seconds?
21    A    Correct.
22    Q    Macro, which is 20 -- the macro, which is
23  20 seconds?
24    A    Correct.
25    Q    Those are the ones that I have.

Page 111

1     A    Oh, there's ones open before that when I
2  first got there.
3     Q    Right.
4     A    But when -- as you're opening those, they
5  got to come up.  You got to put passwords in, stuff
6  like that, so it's not like you're going to look at
7  the screen that the e-mail is on during that
8  particular period of time.
9     Q    Well, let's talk about that.  For PIMS what
10  do you have to do to log in?
11    A    There are about four screens you have to go
12  through and put in your IDs, your passwords.
13    Q    Is that -- I'm sorry.
14    A    That's -- take it just to the part
15  that's -- it's got a whole bunch of functions in it,
16  so you just take it to the part that you use the most
17  right off the bat.
18    Q    Is that within the two minutes you
19  estimated to open PIMS?
20    A    Yes.
21    Q    NSS, how long -- you estimated 45 seconds.
22  Does that include everything you have to do?
23    A    Yes.
24    Q    ICPM, you estimated 90 seconds.
25    A    Yes.  Everything you have to do with that

Page 112

1  should be up.
2     Q    And then macro, 20 seconds?
3     A    Correct.
4     Q    Everything you have to do in 20 seconds?
5  Okay.  I'm still only getting four and a half minutes
6  for that 11:45 tool opening process.
7     A    Oh.  And you're saying in that period of
8  time, to go back?
9     Q    Yes.  What I'm asking is --
10    A    Yes.  You could read some of it in that
11  period of time, certainly.
12    Q    Well, what do you do during that period of
13  time?  If you -- if it's your approach to start
14  logging in at 11:45 and it only takes four and a half
15  minutes or so --
16    A    From that point.
17    Q    Yes.  Then you still have ten minutes?
18    A    Well, I probably go check the queue and see
19  if that's behind when I start, see who's missing that
20  day, and if I've already brought up anything that has
21  to do with e-mails that have to be done during the
22  day, just make sure those screens are open and review
23  what they said.
24    Q    You ever go to the break room during that
25  time?

Page 113

1     A    No.
2     Q    Ever do anything personal during that time?
3     A    I might run to the bathroom before a shift
4  starts.
5     Q    Are cell phones allowed on your floor?
6     A    Cell phones?
7     Q    Yes.
8     A    They're there.  Whether -- they're
9  certainly not encouraged, but we have them.
10    Q    Do you ever make personal calls from the
11  floor?
12    A    Not from the work floor, no.
13    Q    Where would you make personal calls?
14    A    I'd probably go out in the hallway.
15    Q    Do you ever go make a personal call during
16  that minute -- the minutes in between the time you log
17  up, during the 11:45 time -- to noon time period?
18    A    Not -- I wouldn't.  I mean, somebody could
19  call me, I suppose, but I wouldn't initiate a call at
20  that time.
21    Q    You said that you sometimes check the queue
22  before your start time?
23    A    Yes.  I want to see if it's behind.
24    Q    Has anyone told you that you need to do
25  that before your scheduled start time?

Witness:   James Starkey

Page 114

1    A    No. It's just part of the things that you
2  are supposed to do.
3    Q    But has anyone told you to do that --
4    A    No.
5    Q    -- before your scheduled start time?
6    A    No.
7    Q    What about when you said, see who is
8  missing? What did you mean by that?
9    A    Who is -- how many people are out sick that
10 day?
11   Q    Has anyone told you that you need to do
12 that before your scheduled start time?
13   A    Oh, absolutely.
14   Q    Who told you that?
15   A    It's in an e-mail that comes around every
16 day as to how many people are out and who's there, and
17 so I check who's out to find out if I'm supposed to be
18 one of the people checking the queue and stuff like
19 that. What my assigned job will be.
20   Q    How long does it take to check that?
21   A    A minute, 15 -- a minute, 15 seconds.
22   Q    How long does it take to check the queue?
23   A    That's what I mean. Oh, check the queue?
24 It would be about a minute to a minute, 15 seconds, I
25 would think, unless it's way behind.

Page 115

1    Q    And then how long does it take to check
2  that e-mail about who's missing?
3    A    About two minutes.
4    Q    What other things would you do during that
5  time frame? And I'm talking about the time frame
6  between 11:45 and noon?
7    A    I don't know. It just seems to me that's
8  pretty much what covers it. Different things happen
9  different days.
10   Q    Your shift is 12 to nine; correct?
11   A    Correct.
12   Q    Do you typically log out right at nine?
13   A    Typically.
14   Q    Do you ever leave early?
15   A    Do I ever leave early? No.
16   Q    Have you ever tried to record time -- your
17 time worked in eTOTALS for time between 11:45 and noon
18 performing the -- these other functions? And by other
19 functions I mean not boot the -- the bootup functions
20 but checking the queue? Checking who's there?
21   A    No, I don't.
22   Q    Have you ever had a discussion with anyone
23 as to whether that would be appropriate to record?
24   A    No.
25   Q    You work Monday through Friday?

Page 116

1    A    Yes, sir.
2    Q    Have you ever had one of the ten-hour-a-day
3  shifts?
4    A    Not here in Atlanta, no.
5    Q    Do you know if anyone on the ninth floor
6  works those shifts?
7    A    Yes. They just started that, I want to say
8  the beginning of October. A few people were allowed
9  to, but it's discouraged.
10   Q    Have you prepared any calculations, Mr.
11 Starkey, about the amount of overtime that you think
12 you're entitled to?
13   A    No, sir.
14   Q    Have you discussed this lawsuit with any of
15 your peers?
16   A    Yes.
17   Q    Who have you discussed it with?
18   A    Oh, specific names?
19   Q    Yes.
20   A    Oh. Tom Hoitenga. I don't know if I could
21 spell that unless it's in here. We call him Tommy
22 Ho-Ho. There it is: H-O-I-T-E-N-G-A.
23   Q    Tommy Hoitenga?
24   A    Yes. I'm not going to try and pronounce
25 it. And Ray Liles, L-I-L-E-S. Phil Ravenscraft. I

Page 117

1  think that's pretty much it off the top of my head.
2    Q    Did you talk to them individually or in a
3  group?
4    A    Individually.
5    Q    Let's start with Tommy. When did you
6  discuss the case with Tommy?
7    A    I know we talked about it when it first --
8  we learned about the Web site.
9    Q    I think I asked you this. Do you recall
10 how you learned about the Web site?
11   A    Someone else sent me the link.
12   Q    But you don't recall who?
13   A    And then, I mean, he knows where I am
14 today, and told him what's going on down here.
15   Q    Did you talk to Tommy about the allegations
16 in the lawsuit?
17   A    No, not specifically. He's familiar with
18 the same things I was.
19   Q    Did he indicate one way or another whether
20 he agreed with the allegations?
21   A    Well, he agreed, but like any of us, was
22 afraid to bring anything up or put his name on
23 anything for fear of getting fired.
24   Q    Did he tell you that?
25   A    Oh, yeah.

Witness:   James Starkey

31 (Pages 118 to 121)

Page 118

1    Q    Anything else you recall about your
2  discussion with Mr. -- with Tommy?
3    A    No.
4    Q    What about your discussions with Ray Liles?
5  When was that?
6    A    Last week. I told him about this, so I
7  know he went to the site and signed up for it, if I
8  recall.
9    Q    Was he aware of it before your conversation
10  with him?
11    A    I think he was.
12    Q    And I assume since he signed up, that he
13  agreed with the allegations that --
14    A    Yes.
15    Q    Did you discuss that specifically?
16    A    No, I don't believe so. I mean, he said,
17  yeah, it's a viable thing. He didn't specifically
18  state the exact wording.
19    Q    Is Mr. Liles on the same team as you? The
20  Intel --
21    A    Yes.
22    Q    -- server support?
23    A    They both are.
24    Q    They both are?
25    A    On the Intel server team.

Page 119

1    Q    And when you say both, Tommy and Mr. Liles?
2    A    Right.
3    Q    What about Phil, is it Ravenscraft?
4    A    Ravenscraft.
5    Q    Ravenscraft?
6    A    Yes, he's on the same team.
7    Q    Tell me about -- first, when was your
8  conversation with him?
9    A    A couple weeks ago. I asked him if he knew
10  about the Web site, basically, and said, yes, I've
11  looked at it before, and I told him I was going to
12  have to come down here for this deposition thing.
13    Q    What was his reaction to the deposition
14  thing?
15    A    He didn't -- he did not realize that it had
16  gone that far.
17    Q    Did he indicate one way or another whether
18  he agreed with the lawsuit?
19    A    No.
20    Q    Other than Tommy, Mr. Liles, and Phil
21  Ravenscraft did you talk to anyone else about the
22  lawsuit?
23    A    Not that I can recall other than my manager
24  yesterday, finding out if I had the day off.
25    Q    Anyone else?

Page 120

1    A    Uh-uh.
2    Q    Have you ever had any training,
3  Mr. Starkey, on wage and hour issues? And by that I
4  mean overtime, vacations, those types of things?
5    A    No. Other than what's in these documents.
6    Q    You've had the on-line things with eTOTALS?
7    A    Correct.
8    Q    And you've also had the tutorial on the
9  business conduct guidelines?
10    A    Correct.
11    Q    Do know a gentleman by the name of Gary
12  Kamprath?
13    A    No.
14         MR. RAY: Are we to 13? No, we're at ten.
15         (Thereupon, marked for identification,
16  Defendant's Exhibit D10.)
17  BY MR. RAY:
18    Q    I'm going to hand you what's been marked as
19  Exhibit 10, Mr. Starkey, and ask you first, do you
20  recognize that document?
21    A    Oh, yes.
22    Q    What is that?
23    A    It's our yearly evaluation form.
24    Q    And this one is for the assessment period
25  May 1, 2005, to December 31, 2005; correct?

Page 121

1    A    Yes. That's what it looks like, yes.
2  January of 2005 to December 2005.
3    Q    And your PBC manager there is Juanita
4  Carver? Do you see that?
5    A    Yes.
6    Q    And then your BluePages manager is Steven
7  Coy. Do you see that?
8    A    Yes.
9    Q    Do you know what that means?
10    A    No, I don't. I didn't even think he was
11  there at that time.
12    Q    Has Mr. Lambousis ever given you a PBC?
13    A    No, not that I'm aware of.
14    Q    I want to turn first to the business goals
15  there. There's an asterisk with a couple sentences
16  there, and then there's a -- looks like a list of
17  things. It starts with contribute. Do you see that?
18    A    Uh-huh.
19    Q    Do you fill out the business goals, or does
20  someone else?
21    A    We're told what to put in there. We're
22  given a -- a list to put -- copy and paste into it.
23    Q    The first entry there is, "Contribute to
24  the achievement of established objectives in all
25  operational areas, financial plans, and service

Witness: James Starkey

**Page 122**

1  delivery objectives while demonstrating IBM values in
2  all areas of achievement."
3      Did I read that right?
4  A   You read it right.
5  Q   I don't always.  What does established
6  objectives in operational areas refer to?
7  A   Well, I brought this up before.  I have no
8  idea what that means.  Most of these are written in
9  some language I don't understand.
10  Q   Do you know what it's referring to there
11  with respect to the financial plans?
12  A   No, I don't.
13  Q   What about the service delivery objectives?
14  A   Yes.  It might mean what we do.  I'm not
15  really sure.
16  Q   Do you have a -- a goal with respect to the
17  number of phone calls you handle a day?
18  A   Actually, no.  They just started saying
19  it's supposed to be ten to 15 or something like that.
20  Until now, no, it's never been said.
21  Q   And when you say until now, how recent was
22  that?
23  A   Last week.  First time I saw it.
24  Q   Do you have a goal with respect to average
25  call time?  How long you're on a call?

**Page 123**

1  A   According to them, it's 20 minutes.  I
2  don't have one myself, no.
3  Q   The next section there is, "Maintain a
4  business controls and process audit-ready posture in
5  my areas of responsibility."
6      Do you know what that means?
7  A   No.
8  Q   The next one is, "Support growing the
9  value-added services business by identifying leads for
10  possible maintenance conversion of services on behalf
11  of my clients."
12      Do you know what that means?
13  A   Not really.  I think you guys wrote this
14  stuff.
15      MR. ZOURAS:  You're not looking at me, are
16  you?
17      THE WITNESS:  Lawyers.
18      MR. ZOURAS:  Okay.  Thank you.
19  BY MR. RAY:
20  Q   Do you identify leads of some type, like
21  sales leads?
22  A   That's the new product -- process that they
23  just started pushing, about doing something like that.
24  Like, maybe that is what that means.  Supposed to
25  identify with customers if they need more equipment or

**Page 124**

1  services or something like that.  I haven't really
2  looked into it all yet.
3  Q   Do you have a goal for how many leads you
4  identify?
5  A   No.
6  Q   Let's --
7  A   I haven't heard of one.
8  Q   Pardon?
9  A   I haven't heard of one.
10      MR. RAY:  Let's take a quick break and let
11  him change the tapes, and then feel free if you
12  want to get something to drink?
13      THE VIDEOGRAPHER:  Off video.
14      (Thereupon, an off-the-record discussion was
15  held.)
16      THE VIDEOGRAPHER:  On video.
17  BY MR. RAY:
18  Q   Mr. Starkey, we were going through your
19  2005 PBC, which is Exhibit 10 to your deposition, and
20  we were walking through the business goals, and I
21  believe the last two -- ones there are as
22  self-explanatory as those goals can be, so let's move
23  to the business results section.  The first one there
24  is passed all security audits.  What are the security
25  audits?

**Page 125**

1  A   Basically, it's you've locked your desk,
2  you have not left your computer going, you have not
3  left any papers on your desk that have IBM
4  confidential on them or anything like that.
5  Q   If you go to the second page there, your
6  rating is PBC two, solid contributor?
7  A   Uh-huh.
8  Q   Is the highest rating, PBC one?
9  A   I believe so.
10  Q   On the overall assessment it said, "Jim is
11  a solid contributor to the team.  He achieved average
12  call volumes with adjusted solve rate close to team
13  average."
14      Do you happen to know what that means?
15  A   No.
16  Q   "Jim turned in a perfect score on NSI with
17  five surveys."
18  A   That's -- they survey the customers as to
19  how they care for our service, how we did.
20  Q   Let's turn to page 3 if we could.  Page 3
21  at the top is actually a continuation from page 2 at
22  the bottom, which is development impact on goals.  Did
23  you fill in this section at the top of page 3?
24  A   Yes.  This is what I put in.
25  Q   And it says, all the -- the first paragraph

Witness:   James Starkey

Page 126

1  says, "All the charts I have seen throughout the year
2  have shown me with 100 percent customer satisfaction
3  rating -- ratings, consistently in the top call
4  takers, and the least amounts of AUX-5 time."
5       First, what does the top call takers
6  refer to?  Is that a number of calls?
7       A    Number of calls you received, yes.  They
8  send around a -- well, they used to.  Actually, they
9  don't anymore, but they send around a -- what they are
10  every week, I guess.
11      Q    And then the -- the final phrase there in
12  that sentence I read, said, "The least amount of AUX-5
13  time."
14      A    Oh, that's luncheon breaks.
15      Q    Then if you go down to the fifth paragraph,
16  I believe, it says, "I volunteered for any overtime I
17  could."
18      A    Uh-huh.
19      Q    What are you referring to there?
20      A    Once in a while you'll get a note from
21  somebody saying that they can't work a weekend day or
22  something like that, and they're looking for somebody
23  to fill in or a note from the supervisor saying they
24  need somebody.  They want to put a couple extra people
25  on this day or something like that, and I will say,

Page 127

1  yes, fine, I'll work if you want me.
2       Q    And you do record that time?
3       A    Absolutely.
4       Q    And no one has ever told you, you could not
5  record that time?
6       A    No.
7       Q    Is that right?
8       A    Absolutely not.  They -- they have no
9  problem with that.
10      Q    It's correct to say they don't have a
11  problem with it?
12      A    Correct.
13          (Thereupon, marked for identification,
14  Defendant's Exhibit D11.)
15  BY MR. RAY:
16      Q    I'm going to hand you what has been marked
17  as Exhibit 11, and this is a work history detail
18  report that IBM actually produced in this case.  Have
19  you ever seen this document?
20      A    No.
21      Q    What I'd like to do is I'd like to ask you
22  to look at the first page, starting on the left side
23  with the dates June 1 of '05 and working up, and I
24  just want you to look at those dates and the managers
25  over on the far -- far right and see if that looks

Page 128

1  accurate on the chronology, so -- and I'll walk
2  through it with you.  On June 1 of '05 it shows your
3  manager as Carver.
4       A    Carver.
5       Q    And then starting February 1 of '06 it
6  changes to Lewis, and then it changes back to Carver
7  in June of '06.  Does that -- is that consistent with
8  your recollection of the timing?
9       A    I would say it wasn't June of '06.  It was
10  later than that.  It was like August or September, but
11  I guess I could be wrong.
12      Q    And then -- okay.  And then it goes from
13  Miss Carver all the way up to Mr. Coy, showing in July
14  of '07.
15      A    Yes.
16      Q    Under department name, the first entries
17  going all the way down to March of '06 have X
18  somewhere in it.
19      A    Uh-huh.
20      Q    And then it turns to server SSR support.
21  Is that all under the Intel --
22      A    Yes.
23      Q    -- server support team?
24      A    Yes.
25      Q    If you turn to the third page of this

Page 129

1  Exhibit 11, Mr. Starkey, there's an education detail
2  report, and I just want to ask you -- I'll just walk
3  through a few of these to see if you recall taking
4  training on these areas.  The first entry is January
5  the 3rd of '08.  It says, "Defense industry
6  initiative"?
7       A    Uh-huh, yes.
8       Q    What kind of training was that?
9       A    It's like -- it's like the business conduct
10  guidelines but it more refers to dealing with the --
11  the government and the defense industry, I guess.
12      Q    Is that an on-line training, or do you
13  actually go --
14      A    Yes, on-line training.  It's not -- we
15  really don't deal with them, I guess, but we have to
16  still do it.
17      Q    Do you recall how long that training was?
18      A    How long?
19      Q    Not long?
20      A    Not long.  I'll take a guess at two hours.
21      Q    And then the next entry is June 27, '07,
22  call center communication, I assume.  Do you recall
23  what that was?
24      A    No.
25      Q    If you turn to the last page, there's an

Witness:   James Starkey

## Page 130

1   awards detail report. Do you see that?
2       A    Education? Yes.
3       Q    It's the last page of Exhibit 11.
4       A    Yes.
5       Q    And there's some entries on there for a
6   thanks award?
7       A    Yes.
8       Q    What's a thanks award?
9       A    That is a -- it's something we are given,
10  all the employees -- I want to say there's 12 of
11  them -- we can give out every year to someone who's
12  helped us. It has to be another IBM employee. It
13  can't be a vendor, and they're roughly $25 of -- it
14  has to be a thing, though. It's not a check or
15  anything like that. It's a hardware device, but we
16  can give them out to co-workers and stuff like that
17  who have helped us.
18      Q    Hardware device? What is that?
19      A    Well, I mean, it's not a check. It's
20  T-shirts, sweaters, pens, pencils, little stuff.
21      Q    If you look there at March 15, '07, there's
22  an entry for a thousand dollars, and --
23      A    Yes.
24      Q    -- then a description of bravo. What does
25  that mean?

## Page 131

1       A    That was that award I got for my
2   documentation. Some of these are interesting.
3           (Thereupon, marked for identification,
4   Defendant's Exhibit D12.)
5   BY MR. RAY:
6       Q    I'm going to hand you what's been marked
7   Exhibit 12, and I'll ask you to take a minute and
8   review that document.
9       A    Oh, yeah. I've seen these before.
10      Q    This is an e-mail from Mr. Coy dated
11  June 17, 2008, to 7000. Is that the subgroup of
12  the --
13      A    Correct. The high-end team.
14      Q    The support team? I think you're talking
15  over me a little bit, so if we could --
16      A    The 7000 would be the -- the higher-end
17  servers.
18      Q    Okay. It says, "Team, it appears we still
19  have a problem with many of you logging in late from
20  breaks and lunch. This is ridiculous that I have to
21  send this note to a highly skilled professional team."
22           First, do you have any idea for how many
23  people percentagewise were logging in late from breaks
24  and lunch?
25      A    I have no idea.

## Page 132

1       Q    He refers to you as a highly skilled
2   professional team. Does your team generally consider
3   itself to be a highly skilled professional team?
4       A    Do we consider ourselves that?
5       Q    Well, let me ask, do you consider yourself
6   to be a member of a highly skilled professional team?
7       A    I'll go with skilled professional team, not
8   highly skilled.
9       Q    And then if you go down to the fourth
10  sentence, it says, "Going forward, anyone who has more
11  than ten minutes of late log-in time will need to
12  adjust your time sheet or work with your team lead for
13  making up the time if it is needed for call volume."
14           Did I read that right?
15      A    Yes.
16      Q    Is that consistent with prior practice, or
17  was that a change?
18      A    That's a change.
19      Q    What was prior practice?
20      A    Adjust your time sheet was never -- I never
21  heard that one before. Like I say, making up the
22  time, as far as I know, that was always acceptable,
23  but adjusting your time sheet, that -- that's not
24  something that's normal, or hasn't been. There's
25  their condition of employment words again.

## Page 133

1       Q    What is your understanding of what that
2   means?
3       A    You don't do it, you're fired. They love
4   to throw that one around.
5       Q    Who is "they"?
6       A    Management and the team leads.
7       Q    Who are the team leads that you would deal
8   with?
9       A    Myself? One of them is this Charles
10  Coleman that's on this paper.
11      Q    Anyone else?
12      A    Another one called Dan Smith. Are really
13  the two that I deal with. If they are not available
14  and someone else is and I need a team lead or
15  something, I can use any of them.
16      Q    What do you use team leads for?
17      A    Many things. One of the things I would
18  normally use them for is if I get into a situation
19  that's not standard, and I just want to pacify them
20  and get their approval before I do this or do that or
21  some -- sending out certain parts needs team lead
22  approval.
23           (Thereupon, marked for identification,
24  Defendant's Exhibit D13.)
25  BY MR. RAY:

Witness:  James  Starkey

35 (Pages 134 to 137)

---

Page 134

1    Q    Let me hand you what's been marked as
2  Exhibit 13. Do you recognize this document?
3    A    I've seen it before, yes.
4    Q    What is this?
5    A    They listen in on -- or actually I guess
6  they record your phone conversations with the
7  customer, and then they -- when they get time or
8  whatever, they play them back and they monitor the
9  call and rate you on how you did with the customer,
10 downgrade you or whatever, you know, to work on this.
11 Specific aspects of your call.
12    Q    Have you ever worked from home?
13    A    No.
14    Q    Has there ever been a request by you to
15 work from home?
16    A    Absolutely.
17    Q    What was the reaction to that request?
18    A    Absolutely not.
19    Q    Did they -- who -- who responded to that
20 the request?
21    A    Actually, that -- the last time I asked
22 about that was just earlier this spring when the gas
23 prices started going through the roof. They had
24 mentioned about making some changes, and that
25 particular question was asked of the second-level

---

Page 135

1  manager, that -- Vicki Reidy.
2    Q    And what was the response?
3    A    No.
4    Q    Who raised the question with her? Was it
5  you?
6    A    I did. I specifically asked her.
7    Q    Let me hand you what's been marked Exhibit
8  14.
9        (Thereupon, marked for identification,
10 Defendant's Exhibit D14.)
11 BY MR. RAY:
12    Q    Have you ever seen this document before?
13    A    No.
14    Q    And do you -- this is a note from
15 Mr. Lewis, it appears, dated February 17, 2006?
16    A    Correct.
17    Q    Do you recall having any conversation with
18 Mr. Lewis about leaving without giving him notice?
19    A    Yes.
20    Q    Can you tell me about that situation?
21    A    This -- this was after -- that I obviously
22 had left early and that he had heard this -- that
23 there had been that meeting where I had been -- this
24 has been discussed with me before that never happened,
25 so he was extremely on the negative. I am also --

---

Page 136

1  well, listed his handicaps. I cannot walk great
2  distances, and I could not find any managers quickly.
3  I sent notes to them and everything. It was an
4  emergency, and I left. I was not going to walk around
5  looking for people, and I told them that, and he had
6  to write this up, I guess.
7    Q    Is this about the time that you changed
8  your schedule temporarily?
9    A    I didn't. They changed it.
10    Q    That your schedule was changed?
11    A    Correct. As punishment for doing this.
12        (Thereupon, marked for identification,
13 Defendant's Exhibit D15.)
14 BY MR. RAY:
15    Q    I hand you what's been marked Exhibit 15.
16 This is a memo or a note from Mr. Lewis dated
17 February 22, 2006, which is about five days after
18 Exhibit 14 is dated. If you could take a second to
19 read that?
20        (Thereupon, an off-the-record discussion was
21 held.)
22 BY MR. RAY:
23    Q    Have you ever seen this note before that's
24 Exhibit 14?
25    A    No.

---

Page 137

1    Q    This says, "Today I sat down with James
2  Starkey to discuss the need to change his schedule."
3        Do you recall having that discussion with
4  Mr. Lewis?
5    A    Yes.
6    Q    This second sentence says, "Mr. Starkey has
7  a tendency to have emergency needs that he can --
8  cannot give much notice to us to backfill."
9        Do you agree with that statement?
10    A    No.
11    Q    Is this the information that was provided
12 to Mr. Lewis by Miss Carver that you believe was
13 inaccurate?
14    A    Yes.
15    Q    And it goes on to say that your schedule
16 would be changed; correct?
17    A    Correct. It's also provided -- asked to
18 come up with records that showed I'd ever left before
19 in my career, and he couldn't.
20    Q    You asked for that?
21    A    Yes.
22    Q    And then you were on that -- that reduced
23 -- or that changed schedule for a fairly short period
24 of time?
25    A    About four or five months, yeah.

---

Witness:   James  Starkey

36 (Pages 138 to 141)

## Page 138

1        (Thereupon, marked for identification,
2  Defendant's Exhibit D16.)
3  BY MR. RAY:
4      Q    I hand you what's been marked as Exhibit
5  16.  The top e-mail of Exhibit 16 is an e-mail from
6  Mr. Coy to you dated June 26, 2008.
7      A    Uh-huh.
8      Q    And then at the bottom there's an e-mail
9  from you to Mr. Coy talking about the pending birth of
10  your grandchild?
11      A    Uh-huh.
12      Q    And the top e-mail says, "Jim, this is
13  certainly an exciting time.  I'm sure you want to be
14  there.  Do what you need to do.  I'm okay with it."
15      A    Correct.
16      Q    What did you do?  Do you recall?
17      A    Actually, nothing.  If I recall, she had
18  the baby on a weekend.  There was no need to leave or
19  whatever.
20      Q    Under those circumstances was it your
21  understanding that if you had to leave during your
22  shift, that you would be paid for that, or that you
23  would need to back it out of eTOTALS?
24      A    To me, I would have to use vacation time.
25        MR. RAY:  Let's take just a quick break.

## Page 139

1  I've got --
2        THE VIDEOGRAPHER:  Off video.
3        (Thereupon, a recess was taken.)
4        THE VIDEOGRAPHER:  On video.
5  BY MR. RAY:
6      Q    Mr. Starkey, I want to go through a few
7  e-mails with you.  Before I do, I just want to ask, do
8  you sometimes do personal business -- meaning personal
9  e-mails or checking the Internet for personal
10  reasons -- during your shift?
11      A    Uh-huh, I do.
12      Q    Is there -- do you have an understanding as
13  to whether that's acceptable or if there's a policy
14  against that?
15      A    No.  No policy against it except for
16  pornography or certainly sites like that.
17      Q    Sure.  Are there times during your shift
18  when you are not on lunch or not on the break where
19  you have downtime where you have time to send an
20  e-mail or check an Internet site for personal reasons?
21      A    Yes, absolutely.
22      Q    When we talked about the beginning of the
23  shift, I asked the question as to when you first
24  logged into the phone and became phone available at
25  the start of your shift, whether there was a call for

## Page 140

1  you, and I want to go back and revisit that.  What
2  percentage of the time is there an immediate call when
3  you log into the phone and become phone ready at the
4  beginning of your shift?
5      A    At 12 o'clock, like 99 percent of the time
6  that phone is going to ring as soon as I hit the
7  button.
8      Q    When you log in at noon, there have already
9  -- well, let me back up.  Is it a 24/7 operation?
10      A    Yes.
11      Q    365 days a year?
12      A    Yes.
13      Q    Is there something about noon that -- your
14  reaction to my question was that at noon it's
15  99 percent of the time.  Is that a particularly heavy
16  volume --
17      A    Yes.
18      Q    -- time?
19      A    It is because with the three-hour time
20  difference, California is just coming on-line with
21  their normal start of business at noon -- our noon.
22        (Thereupon, marked for identification,
23  Defendant's Exhibit D17.)
24  BY MR. RAY:
25      Q    I'm going to hand you what's been marked as

## Page 141

1  Exhibit 17 and ask you to take a look at that e-mail,
2  and this is an e-mail from you to jhsvt at AOL
3  dot-com?
4      A    That's me.
5      Q    Is that your personal e-mail address?
6      A    Uh-huh.
7      Q    Is that a yes?
8      A    Yes.  Yes.  I'm sorry.
9      Q    Do you have e-mails on that e-mail address
10  relating to your work?  Relating to your work at IBM?
11      A    Say that again, please.
12      Q    Do you have any e-mails on that jhsvt at
13  AOL dot-com address relating to your work at IBM?
14      A    No.
15      Q    Do you forward yourself e-mails, for
16  example, regarding expectations with respect to
17  logging in or booting up?
18      A    No.
19      Q    Do you forward yourself e-mails from work
20  regarding your performance at IBM?
21      A    Not that I ever know of.
22      Q    So to your knowledge sitting here, there's
23  no e-mails on that jhsvt at AOL dot-com relating
24  directly to you your work at IBM?
25      A    Not that I'm aware of.

Witness:   James Starkey

Page 142

1    Q    Let's go back to Exhibit 17, if we could.
2    A    Seventeen?
3    Q    I believe it's 17.  This is an e-mail dated
4  November 28, 2007, at 4:39 p.m., and you've walked
5  through some financial issues here.  Do you recall
6  this e-mail?
7    A    Uh-huh.  Yes, I do.
8    Q    Did this take you awhile to prepare it?
9    A    No.
10    Q    Do you know roughly how long it took you to
11  prepare it?
12    A    Ten minutes.
13    Q    Do you know if this was on a break time, or
14  if this was just during your down time?
15    A    I would guess it was at lunch.  4:39, it
16  was probably at lunch.
17    Q    Are there times at lunch that you stay in
18  your cube and do personal work or personal business?
19    A    Uh-huh.
20    Q    Just for information, on the top there it
21  says, "To," and there's a second e-mail address,
22  Starkey, underscore, T?
23    A    That's my wife.
24    Q    Is that your wife?
25        (Thereupon, marked for identification,

Page 143

1  Defendant's Exhibit D18.)
2  BY MR. RAY:
3    Q    I hand you what's been marked -- sorry
4  about that.  I hand you what's been marked Exhibit 18,
5  and I ask you if you recognize that document?
6    A    Uh-huh.
7    Q    And that's an e-mail from you on your IBM
8  account on March 26, 2008, at 10:56 a.m.  Do you see
9  that?
10    A    Correct.
11    Q    And it's sent to Debbie and Bob White.  Who
12  are they?
13    A    Just friends of ours.
14    Q    And this has to do with a break controller
15  of some sort?
16    A    Uh-huh.
17    Q    I assume this is a personal e-mail?
18    A    Uh-huh.
19    Q    The time stamp there is 10:56 a.m.?
20    A    Correct.
21    Q    And I'll represent to you that I don't
22  know, frankly, if that's 10:56 a.m. eastern or central
23  time because when these were printed, they were
24  printed, I believe, in the central time zone, so I'm
25  not --

Page 144

1    A    Should be eastern.
2    Q    I don't want you to assume a time on that,
3  and I don't want to misrepresent anything here.  Are
4  you ever logged in as early as two hours before your
5  shift?
6    A    Not unless I'm in a class that day or
7  something like that.
8    Q    Do you know on this day whether you were in
9  a class?
10    A    I have no idea.  I would -- March?  No.  I
11  have no idea.  I doubt it.
12        (Thereupon, marked for identification,
13  Defendant's Exhibit D19.)
14  BY MR. RAY:
15    Q    This is an e-mail -- or I've handed you
16  what's been marked as Exhibit 19, and this is an
17  e-mail from you dated June 9, 2008, at 2 -- 10:52 a.m.
18  from your IBM account, it appears, to your wife's
19  address; is that correct?
20    A    Correct.
21    Q    And you agree that this is a personal
22  e-mail?
23    A    Correct.
24    Q    Do you know where you got this cartoon on
25  Exhibit 19?

Page 145

1    A    Somebody probably sent it to me.
2        (Thereupon, marked for identification,
3  Defendant's Exhibit D20.)
4  BY MR. RAY:
5    Q    I hand you what's been marked as Exhibit
6  20, Mr. Starkey, and this is a -- an e-mail dated July
7  the 3rd, 2008, at 11:59 a.m. again from your IBM
8  account to a Ken Jones; is that correct?
9    A    Correct.
10    Q    Who is Ken Jones?
11    A    Another employee on -- well, he was on the
12  ninth floor.  I think he's moved to another department
13  now.
14    Q    This is an e-mail attaching M, slash, C, or
15  Scooter links.  Do you see that?
16    A    Yes.
17    Q    Is this personal, or is this business
18  related?
19    A    I would say it's personal.
20    Q    And there are several Web sites or links to
21  Web sites listed there?
22    A    Correct.
23    Q    Have you visited those Web sites that day?
24  Do you know?
25    A    I just have a -- what do you call it?  A --

Witness:   James Starkey

**Page 146**

1  they're saved Web sites, so I just copy and post it on
2  here.
3      Q    Are those Web sites that you occasionally
4  visit at IBM when you are logged in at IBM?
5      A    Not that I know of.
6      Q    When you say they're saved, are they saved
7  on your Internet at IBM or at your -- on your Internet
8  at home?
9      A    Well, I know they're on my one at home.  I
10 don't know if they are on my work one or not.
11     Q    This was sent at 11:59 a.m.?
12     A    Uh-huh.
13     Q    Do you know if this was sent right
14 before -- like a minute before your start time or --
15 do you recall?
16     A    It would have to be.  I don't recall the
17 exact day, no, but before 12 noon, it would have to
18 be.
19     Q    Is it correct to say that that 11:45 to
20 noon time frame that we talked about earlier when you
21 are logging your final log-ins and getting your tools
22 up, that sometimes you do, do personal things?
23     A    I guess so.  That sure looks it.  I don't
24 know what happened that day.
25         MR. RAY:  Let's go off the record just for

**Page 147**

1  one minute.
2         THE VIDEOGRAPHER:  Off video.
3         (Thereupon, an off-the-record discussion was
4  held.)
5         THE VIDEOGRAPHER:  On video.
6  BY MR. RAY:
7      Q    Mr. Starkey, you've testified about your
8  approach to commuting and getting to work roughly an
9  hour before your start time as a standard practice.
10     A    Yes, sir.
11     Q    Do you know what other practices or what
12 other employees do with respect to arriving at work?
13 In other words, do you know any other employee who
14 arrives as early as you do or other employees who
15 arrive closer to their start time?
16     A    I never thought about it.  I don't know of
17 anybody who gets there as early as I do, but I'm one
18 of the furthest once out too.  I would say most people
19 get there right about 20 of or a quarter of their
20 start time.
21     Q    Just based on observations?
22     A    Yes, sir.
23     Q    Have you ever had any discussions with
24 anyone about when they typically arrive?
25     A    No.

**Page 148**

1      Q    With respect to other employees in your
2  group on the ninth floor, do you know what any of them
3  are doing before their shift?  In other words, do you
4  know if anyone -- any of them are doing personal
5  e-mails, checking Web sites, those types of things?
6      A    I don't know.
7      Q    Ever had any discussions with anyone about
8  that?
9      A    No, not that I can recall.  Never came up.
10     Q    Have you ever -- are you aware of anyone
11 ever logging in for someone else?
12     A    I'm not aware of it.
13     Q    Never heard of that happening?
14     A    No.  I've never heard of it happening here,
15 no.
16     Q    With respect to overtime, we've talked
17 about a couple of instances or a couple of situations.
18 One is when someone can't work a weekend day and they
19 ask for volunteers, and you've talked about that, and
20 then we've also talked about the end of the shift when
21 you get on a call that's held over.
22     A    Uh-huh.
23     Q    And in both of those situations you go in
24 and update or modify your eTOTALS to reflect time
25 worked; right?

**Page 149**

1      A    Yes, sir.
2      Q    Do you have to get preapproval to go into
3  eTOTALS, or can you simply go into eTOTALS and enter
4  that time?
5      A    Oh, you can just go in any old time.  You
6  have to have a password.
7      Q    And do you have a password?
8      A    Yes.
9      Q    In the last five years have you had any
10 responsibility for supervising anybody?  Have you had
11 any direct reports?
12     A    Not in the last five years.
13     Q    Have you had any supervisory
14 responsibilities during the time you've been at the
15 Riveredge facility?
16     A    No.
17     Q    Have you ever seen any policies from any
18 other business units from yours?  And from that I'm
19 excluding the IBM policies we looked at earlier that
20 cover everybody.  But have you ever seen anything, for
21 example, from IMBPD about overtime or any of their
22 practices?
23     A    No.
24     Q    Do you know if anyone else within the Intel
25 server support group has ever tried to record their

Witness:   James Starkey

Page 150

1  time for logging into their tools to get ready for
2  their scheduled start time?
3      A   No, I don't.
4      Q.  Are you required to turn your computer off
5  at the end of your shift?
6      A   Yes, sir.
7      Q   And log out of all tools?
8      A   Yes, sir.
9      Q   Has that always been the practice while
10 you've been in Riveredge?
11     A   Oh, yes, sir. Part of that security thing.
12     Q   We've talked about the other floors and
13 your floor a little bit. Do you know what business
14 units have call center employees in Atlanta?  In the
15 Riveredge facility?
16     A   I don't know. I could find out, but I've
17 just never been interested to particularly find out.
18     Q   Have you ever heard of schedule adherence?
19     A   Yes. It sounds like one of the buzz words
20 that would be in one of these documents.
21     Q   Do you know what it means?
22     A   Well, adherence to your schedule, I would
23 assume, or to the schedule of the facility.
24     Q   Has — have any of your managers or
25 supervisors ever told you that you're being monitored

Page 151

1  for schedule adherence?
2      A   No. I don't believe they ever told me
3  that, no.
4      Q   You just assumed that they're looking at
5  whether you're working your schedule --
6      A   Oh, yeah.
7      Q   -- is that right?
8      A   Absolutely.
9      Q   Have you ever heard of a D-O-R?
10     A   D-O-R? Not that I can recall.
11     Q   Or a DOR?
12     A   No.
13         (Thereupon, marked for identification,
14 Defendant's Exhibit D21.)
15 BY MR. RAY:
16     Q   I hand you what's been marked Exhibit 21,
17 Mr. Starkey, and my only question for you is, on the
18 second page is that your signature?
19     A   I would guess so. God, that's a lot of
20 years ago.
21         MR. RAY: I'll pass the witness.
22         EXAMINATION
23 BY MR. ZOURAS:
24     Q   Very briefly, Jim, if you could turn to
25 Exhibit 1, the very first one, right there on top?

Page 152

1      A   Oh, okay.
2      Q   That would seem to indicate that you agree
3  to join this lawsuit on June 13, 2008; right?
4      A   That's correct.
5      Q   That was about four months ago?
6      A   Yes.
7      Q   Since that time has anyone at IBM told you
8  that you should record time that you spend working
9  before your shift, as you described today?
10     A   No.
11     Q   Have you received any e-mails to that
12 effect?
13     A   No.
14     Q   Have you attended any meetings where that
15 issue was discussed?
16     A   No.
17     Q   Has — during the last four months has
18 anyone at IBM asked you if you are, in fact,
19 performing any work before your shift?
20     A   No.
21     Q   To the best of your knowledge has IBM
22 investigated that issue?
23         MR. RAY: Objection --
24         THE WITNESS: Don't know.
25         MR. RAY: -- to form.

Page 153

1  BY MR. ZOURAS:
2      Q   I wanted to clarify something. You very
3  briefly mentioned that when you were working -- was it
4  at Burlington?
5      A   Yes, sir.
6      Q   Was that a call center?
7      A   No.
8      Q   What kind of a facility was that?
9      A   It's a manufacturer -- one of our last
10 manufacturing, like a -- they make chips, memory and
11 logic chips up there.
12     Q   What did you do there?
13     A   I was a test equipment technician.
14 Prepared high-end electronic equipment to test chips.
15     Q   You mentioned something about how you were
16 paid for overlap when you worked --
17     A   Correct.
18     Q   -- in Burlington. What did you mean by
19 that?
20     A   We worked 12-hour shifts, and the — I
21 worked the night shift, so the first shift would come
22 in at seven, and we left at 7:15, so they created a
23 15-minute window for interfacing.
24     Q   What happened during the interfacing?
25     A   Just if you were working on a tool or

Witness:  James Starkey

40 (Pages 154 to 157)

Page 154

1 something, what you were doing on it, what the problem
2 seemed to be, and transfer the test equipment that you
3 were using over to the next person or whatever.
4     Q    During your experience at the call center
5 had you ever seen or experienced anything comparable
6 to that?
7     A    No.
8     Q    Very briefly, can you turn to the George
9 Lambousis e-mail?  It's number 3, I believe.
10     A    Three?
11     Q    Are we out of order?
12     A    I know.  I didn't know I was going to keep
13 them in order.  Probably the last one.  No, that would
14 be too easy.
15     Q    It looks like this.
16     A    Okay.  Well --
17     Q    We can use my copy.
18     A    All right.  Go ahead.
19     Q    Let's just do that.  Exhibit 3, I think you
20 mentioned that this is something that you would
21 have -- correct me if I am wrong, but you would have
22 received this once before, and this would have been
23 forwarded to you again by one of your team leads; is
24 that right?
25     A    The -- George will send out a note,

Page 155

1 something like this one, and then my managers, of
2 course they will get it, and for whatever reason, they
3 resend it.
4     Q    How quickly would they resend it after it
5 was originally sent to you?
6     A    Well, if they're in, within a couple of
7 hours.  If not, it would be the next day.
8     Q    And Mr. Lambousis -- or strike that.  Has
9 Mr. Lambousis directly sent you and other members of
10 the team, e-mails at other times?
11         MR. RAY:  Objection to form.
12         THE WITNESS:  What?
13 BY MR. ZOURAS:
14     Q    You can answer.
15     A    Oh, absolutely.  Sends e-mails every once
16 in a while.
17     Q    How often would you -- on average would you
18 receive an e-mail from Mr. Lambousis?
19     A    On any particular subject?
20     Q    Yes.
21     A    Average, once a month.
22     Q    And has that been true -- well, how long
23 has that been true?
24     A    Pretty much since I've been there, I'd say.
25 Just don't hear much from him.

Page 156

1     Q    And Mr. Lambousis has been there the entire
2 time you've been there?
3     A    Oh, yes.
4     Q    Now, if Mr. Lambousis instructed you to do
5 something, do you believe you have to comply with that
6 instruction?
7     A    Oh, yes.
8     Q    You recognize him as a -- as an authority
9 over you?
10     A    Oh, yes.
11         MR. ZOURAS:  I have nothing further.
12
13         MR. RAY:  Just a couple follow-ups to that.
14             FURTHER EXAMINATION
15 BY MR. RAY:
16     Q    You don't report to Mr. Lambousis?
17     A    No.
18     Q    And you've never reported to Mr. Lambousis?
19     A    No.  I mean, he's in my chain of reporting,
20 so in that manner I report to him.
21     Q    What do you mean by that?  He's in your
22 chain of reporting?
23     A    He would be -- he's in the -- the call
24 center, so if I had some kind of technical question,
25 my manager certainly isn't qualified for that, but he

Page 157

1 would be.
2     Q    You said in response to your counsel's
3 question that you view him as having authority over
4 you?
5     A    Yes.
6     Q    Why is that?
7     A    He's an IBM manager.
8     Q    Do you view all managers at IBM as having
9 authority over you?
10     A    By their position, yes.
11     Q    And do you view him as having authority
12 over you by his position?
13     A    Yes.  I don't respect the man.  I respect
14 his position.
15     Q    Is it your understanding that you're
16 represented today by Mr. Zouras?
17     A    I didn't exactly know that, no.
18         MR. RAY:  I assume that's your position --
19         MR. ZOURAS:  It certainly is.
20         MR. RAY:  -- for purposes of whether I can
21 question for attorney --
22         MR. ZOURAS:  Oh, it certainly is, yes.
23         THE WITNESS:  I didn't know I needed a
24 representative.
25 BY MR. RAY:

Witness:  James Starkey

41 (Pages 158 to 161)

## Page 158

1  Q   Is it your understanding that you are
2  represented by Mr. Zouras in this lawsuit?
3  A   I guess so, yes.  Yeah.
4  Q   What did you do to prepare for your
5  deposition today?
6  A   Nothing.
7  Q   You didn't review any documents?
8  A   Uh-uh.
9  Q   Is that correct?
10  A   Correct.  I wouldn't know which ones to
11  review.
12  Q   And you — I don't want to know the
13  substance of any conversation, but you also didn't
14  talk to counsel about the case?
15  A   No, sir.
16  Q   And you didn't talk to anyone else about
17  what you might testify about today?
18  A   No, sir.
19  MR. RAY:  I'll pass.
20  MR. ZOURAS:  I have nothing further.
21  MR. RAY:  Fair enough.
22  THE VIDEOGRAPHER:  Off video.
23  (Deposition concluded at 3:47 p.m.)
24         ---
25

## Page 159

CERTIFICATE

I hereby certify that the foregoing
transcript was reported, as stated in the caption;
that the witness was duly sworn and elected to reserve
signature in this matter; that the colloquies,
questions and answers were reduced to typewriting
under my direction; and that the foregoing pages 1
through 157 represent a true, correct, and complete
record of the evidence given.

The above certification is expressly
withdrawn and denied upon the disassembly or
photocopying of the foregoing transcript, unless said
disassembly or photocopying is done under the auspices
of Hundt Reporting, LLC and the signature and original
seal is attached thereto.

I further certify that I am not a
relative or employee or attorney of any party, nor am
I in any way interested in the result of said case.

Pursuant to Article 8B of the Rules and
Regulations of the Board of Court Reporting of the
Judicial Council of Georgia, I make the following
disclosure:  That I am a Georgia Certified Court
Reporter, here as an independent contractor for Hundt
Reporting, LLC; that I was contacted by the offices of
Hundt Reporting, LLC to provide court reporting
services for this deposition; that I will not be
taking this deposition under any contract prohibited
by O.C.G.A. 15-14-37 (a) or (b); that I have no
written contract to provide reporting services with
any party to the case, any counsel in the case, or any
reporter or reporting agency from whom a referral
might have been made to cover this deposition; and
that I will charge my usual and customary rates to all
parties in the case.

This, the 3rd day of November, 2008.


THOMAS R. BREZINA, CCR-B-2035

## Page 160

ERRATA SHEET
Pursuant to Rule 30(e) of the Federal Rules
of Civil Procedure and/or O.C.G.A. 9-11-30(e),
any changes in form or substance which you desire
to make to your deposition testimony shall be
entered upon the deposition with a statement of
the reasons given for making them.

To assist you in making any such
corrections, please use the form below.  If
supplemental or additional pages are necessary,
please furnish same and attach them to this
errata sheet.

         ---

I, the undersigned, JAMES STARKEY,
do hereby certify that I have read the foregoing
deposition and that said transcript is true and
accurate, with the exception of the following
changes noted below, if any:
Page____/Line____/Should Read:_____

Reason:_____

Page____/Line____/Should Read:_____

Reason:_____

Page____/Line____/Should Read:_____

Reason:_____

## Page 161

1  Page____/Line____/Should Read:_____
2
3  Reason:_____
4
5  Page____/Line____/Should Read:_____
6
7  Reason:_____
8
9  Page____/Line____/Should Read:_____
10
11  Reason:_____
12
13  Page____/Line____/Should Read:_____
14
15  Reason:_____
16
17  Page____/Line____/Should Read:_____
18
19  Reason:_____
20
21  Page____/Line____/Should Read:_____
22
23  Reason:_____
24
25

HUNDT REPORTING
214-220-1122

Witness:   James Starkey

Page 162

1  Page_____/Line_____/Should Read:_____
2  _____
3  Reason:_____
4
5  Page_____/Line_____/Should Read:_____
6  _____
7  Reason:_____
8
9  Page_____/Line_____/Should Read:_____
10 _____
11 Reason:_____
12
13 Page_____/Line_____/Should Read:_____
14 _____
15 Reason:_____
16
17 Page_____/Line_____/Should Read:_____
18 _____
19 Reason:_____
20
21           _____
              JAMES STARKEY,
22
    Sworn to and subscribed before me,
23
    _____, Notary Public.
24
    This_____day of_____, 2008_____.
25  My Commission Expires: