# EXHIBIT 7A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARLES SEWARD, Individually and on Behalf of All Others Similarly Situated, | ) 08 CIV 3976 (KMK) |
| | ) ECF CASE |
| Plaintiff, | ) |
| vs. | ) |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, D/B/A IBM CORP., | ) |
| Defendant. | ) |

Videotaped deposition of EUGENE SCOTT, taken on behalf of the Defendant, pursuant to the stipulations contained herein, in accordance with the Federal Rules of Civil Procedure, before Thomas R. Brezina, Certified Court Reporter, at 1420 Peachtree Street, NE, Atlanta, Georgia, on the 11th day of November, 2008, commencing at the hour of 8:14 a.m.

Hundt Reporting, LLC
703 McKinney Avenue
Suite 207
Dallas, Texas 75202
Tel: (214) 220-1122

Fax: (214) 220-1127

INDEX TO EXAMINATIONS

| | Page |
|---|---|
| Examination by Mr. Rossman | 5 |
| Examination by Mr. Walton | 172 |
| Further Examination by Mr. Rossman | 177 |

INDEX TO EXHIBITS

| Defendant's Exhibit Number | Description | Marked/First Identified |
|---|---|---|
| D1 | Consent to Join Collective Action of Eugene Scott dtd 4-22-2008 | 24 |
| D2 | Printout of earnings for Eugene Scott for 2005, 2006, and 2007 dtd June 12, 2008 | 24 |
| D3 | Individual Separation Allowance Plan dtd 8/16/07 for Eugene Scott | 76 |
| D4 | PBC of Eugene Scott for year 2006 | 81 |
| D5 | E-mails between Eugene Scott and Juanlyn Williams 11/08/2005 | 115 |
| D6 | E-mail dtd 06/18/2007 from Eugene Scott to Juanlyn Williams | 117 |

INDEX TO EXHIBITS

| Defendant's Exhibit Number | Description | Marked/First Identified |
|---|---|---|
| D7 | E-mail dtd 09/25/06 from Juanlyn Williams to Eugene Scott | 126 |
| D8 | E-mails between Eugene Scott and Juanlyn Williams dated September and October 2006 | 128 |
| D9 | E-mail dtd 11/03/2005 from Juanlyn Williams to Eugene Scott | 130 |
| D10 | E-mail dtd 07/08/2005 from Juanlyn Williams to Team | 132 |
| D11 | Agreement Regarding Confidential Information, Intellectual Property, and Other Matters for Eugene Scott dtd 3-16-98 | 161 |
| D12 | Declaration of Eugene Scott dtd 5-5-2008 | 162 |

| Plaintiff's Exhibit Number | Description | Marked/First Identified |
|---|---|---|
| P1 | Hand-drawn sketch entitled "5th Floor" | 174 |

APPEARANCES OF COUNSEL:

On behalf of the Plaintiff:

R. BRENT WALTON
Attorney at Law
Cuneo, Gilbert & LaDuca, LLP
507 C Street, NE
Washington, DC 20002
(202) 789-3960
fax: (202) 789-1813
bwalton@cuneolaw.com

On behalf of the Defendant:

E. MICHAEL ROSSMAN
Attorney at Law
Jones Day
325 John H. McConnell Boulevard
Suite 600
Columbus, Ohio 43215-2673
(614) 469-3939
fax: (614) 461-4198
emrossman@jonesday.com

\- - -

Videographer: Mr. Chris Jordan
Legal Video Services, Inc.
3455 Peachtree Road, Suite 500
Atlanta, Georgia 30326
(770) 640-5050

THE VIDEOGRAPHER: On video.

EUGENE SCOTT

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ROSSMAN:

Q Sir, would you please state your name for the record?

A Eugene Scott.

Q That's S-C-O-T-T?

A That's correct.

Q Have you ever been deposed before, sir?

A One time between my mom and dad, divorce.

Q Okay. Is that -- how long ago was that?

A Many, many years ago.

Q Okay.

A Too far to remember.

Q Yes. Well, let me just go over a couple of kind of ground rules, if you will. We're here. I'm going to be asking you questions about the Seward versus IBM lawsuit, and we've got a court reporter here, who's going to take down your answers and a videographer over here that's going to videotape the whole thing. Do you understand that you have taken an oath and that oath will have the same effect as if you

Page 6

were in a court of law?
A Uh-huh.
Q The second rule is that because this is being transcribed, we'd ask that you give verbal answers, so --
A Okay.
Q -- instead of nodding your head, you know, if you could say yes or no.
A Absolutely.
Q Yes. And the same thing with, you know, the uh-uhs and the uh-huhs. They become kind of hard to --
A I know. Yes and no.
Q -- put down. If you don't understand a question, let me know, and I'll try to rephrase it. If you don't ask -- if you don't ask me, I'm just going to assume you understand it.
A All right.
Q And we'd ask that we try not to speak over each other because it's difficult to take down what two people are saying at the --
A Oh, I know.
Q -- same time, and if you need a break at any time, just let me know.
A Okay.

Page 7

Q Is there any reason why you can't go forward with your deposition today?
A No reason.
Q No medication you're taking, for example, that would --
A Hinder? No.
Q What's your date of birth, please?
A 8/5/67.
Q And what's your current address?
A 358 Copeland Lane, Marietta, Georgia, 30060.
Q How long have you been at that address?
A Thirty-five-plus years.
Q Can you describe your education for me?
A High school diploma. Incomplete voc-tech training, only nine months. Self-taught computer technician.
Q What did you do to prepare for your deposition today?
A Nothing.
Q Did you look at any documents?
A No.
Q Did you speak with anyone?
A I spoke with one of the attorneys last night. Pretty much told me about the ground rules.

Page 8

Q Have you ever been involved in a lawsuit before?
A No.
Q Have you ever filed any administrative charge against an employer?
A Such as like sexual harassment?
Q Well, either sexual harassment -- anything with like the EEOC, for example, or the National Labor Relations Board? Anything --
A I had filed a -- a grievance against an employer within IBM for sexual harassment, but the charges never went to lawsuit. I was moved to another manager, and the manager was -- resigned.
Q When did you file that?
A This was eight years ago.
Q And was it -- it was an internal IBM grievance?
A Internal issue.
Q Who was the manager that was involved?
A I can't remember his last name. His first name was Dana.
Q And what were -- what were your allegations against Dana?
A He did something inappropriate. What had happened is he stuck his finger down the back of my

Page 9

pants and tugged up on my pants, which -- it went literally down the -- the part of my -- the crack, and I felt that was very inappropriate for a manager and filed grievances within IBM.
Q What happened with the grievance?
A They just tran -- like I stated before, they moved me to another manager, and then he was allowed to resign.
Q Was there an investigation as far as you know?
A Internally, I don't know the output. They would not talk about it.
Q But the bottom line is, you moved to a different manager?
A Different manager, same department.
Q And this Dana --
A Dana, yeah.
Q -- left the company?
A Yes. He's gone.
Q Would Dana's last name, if you recall, have been Trahan?
A Trahan. Yes. You hit it right on the nail. Dana Trahan.
Q And was he a manager just for a short time, or was it a --

Page 10

A I'm not exactly sure how long he was manager within IBM or the -- the extent of his managerial position.
Q Yes. I'm sorry. I should have been more clear. How long was he your manager?
A He was not my manager for very long because I got promoted pretty rapidly within that particular call center to another division within the same call center.
Q Okay. And what was the -- what was the call center you were working on -- at the time?
A Back then?
Q Yeah.
A With Dana? It was called IBM For You.
Q And what did you do there?
A In -- basically, I was the company operator. Anybody that dialed the IBM For You number and said, hey, I want to talk to Mr. Smith in Arkansas, we looked him up and did the connection.
Q Oh, okay. Now, you -- you left IBM in July of 2007; is that correct?
A It was actually August the 1st.
Q And what -- you started in 1998; is that correct?
A That sounds about right.

Page 11

Q What -- why don't we start with your positions and work backwards? At the time you left the company, what -- what were you doing?
A It was called software entitlement.
Q You were on the software entitlement team?
A Uh-huh.
Q What did entitlement do?
A Entitlement looked up support contracts for customers that were calling in for support but was not able to be found when they initially called the -- the support group, and if they didn't find one, they transferred them to us. Instead of staying on the phone with the customer trying to find their stuff, we did the research. If no contract was found, we transferred them over to sales. If a contract was found, we re-entitled the -- what we call a PMR ticket with the correct customer number and support and then transferred them to support, letting the technician know they do have it.
Q So a PMR ticket? Is that what you said?
A A problem management record.
Q And if they didn't have a contract, you would transfer them over to the sales. What was the purpose of that?
A Well, if they were calling in for support

Page 12

and they needed support on -- for a down situation, they had to have a support contract before they could get any support. If -- they had to go to sales to get a support contract, or they had to show proof that they did purchase it, which may not have went through our system at the time.
Q So you-all in entitlement wouldn't do any selling yourself? You'd transfer them over to another group?
A No. No. We basically would prep the sales for the sales rep to take, and then we provide them information that they needed to proceed with getting the customer a support contract.
Q Was the information that you were gathering as part of entitlement, was it just related to the contract, or was there other information you were gathering too?
A You mean for the -- for the specific machine -- I'm sorry. Rephrase that again.
Q I guess what I'm saying is, you were -- your role was -- was it --
A Research only.
Q It was research only? And it was research only about the contract situation --
A Right.

Page 13

Q -- with the customer?
A We were I guess called like the second-line support for the front -- front end, as they called it, so if the front end was stumped, they brought them to us to find the contracts.
Q Okay.
A And then we were allowed to spend more time with customers on the phone, where they could get back to taking their inbound calls.
Q And you may have said this already, but who was the -- what group was the front-end group that would field the calls initially?
A They actually -- they called that receive call.
Q Okay.
A Or they just called it the front end in most cases for slang. The front end.
Q Okay. So just -- just so I'm clear, the calls would go to the front end? If necessary, they would come to entitlement to make --
A Right.
Q -- sure that there was in fact entitlement?
A That is correct.
Q And then from you-all it would either go to sales if there wasn't entitlement, or it would go back

Page 14

to the front end?
A Not to the -- back to the front end. If we found support for the customer, the call was then transferred to the technical support team.
Q Okay. Were there multiple tech support teams that you would transfer them to, or was it just one?
A Different machines had different tech support connections. IBM's had a good five or six lines. We never handled the PC side of it. We only handled the mid-range to high-end machines.
Q And the calls that you were receiving, I guess -- well, maybe not. Were these all from external IBM customers?
A No. These were actually transferred internally from the front end, but we were on the phone themselves taking their inbound calls, so basically we were like tech support to the tech support people.
Q Okay. I guess I wasn't clear with that, though. The customers, though, that were calling in, they were all external to IBM?
A Right.
Q Okay. How long were you with entitlement?
A About three, four years.

Page 15

Q So back 2004, say?
A Maybe 2003, about halfway in between that. I was there -- I was there a good while with entitlement, coming from actually the front end.
Q You started with the front -- well, you were at the front end before entitlement?
A Right.
Q How long were you with the front end?
A About two years.
Q So 2001, 2000?
A Yes. Before Y2K.
Q Oh.
A I meant right after Y2K.
Q Okay. Who -- when you were -- well, at the end of your employment with IBM, who was your first-line manager?
A Juanlyn Williams.
Q Now, how long had Juanlyn Williams been your manager?
A She was my manager for software entitlement probably short or minus a year before she was my front-end manager as well. She actually moved from front end to software entitlement and then started controlling both divisions.
Q Oh, okay. So was there ever a time -- so

Page 16

the -- but the bottom line is, the whole time you were in entitlement, she was your first-line manager?
A Yes. Except for one other manager, but she took a -- a temporary assignment for one year. She was technically our manager, but she was never there.
Q Oh.
A The department pretty much ran itself.
Q Do you remember when -- so Juanlyn took this temporary assignment?
A No. I can't remember her name.
Q Was it Stewart?
A Yes. It was a -- it was a black manager. I can't remember her -- I want to say that's her last name.
Q Yeah. I don't --
A You don't have her listed?
Q Well, I've got a -- I'm looking at a -- a printout of a work history for you.
A Uh-huh.
Q And it's only got the last names of the managers, so it says C --
A Yes. Stewart -- Stewart something. Cynthia Stewart.
Q Cynthia Stewart?
A There we go. Threw the C in there.

Page 17

Q So Juanlyn -- this has Juanlyn Williams becoming your manager -- well, this says around 2003. Does that make any sense?
A Yes. That's when they dissolved the other department that we were in, which was sales order support, and moved it to Canada.
Q Okay.
A And then positions opened up within the call center, and me and one other was laterally moved to that division.
Q And then this has Stewart starting at about April 2004?
A That's when I -- that's when I was assigned to her, and then she took a temporary assignment and then decided to stay on that permanently, and then Juanlyn took the position over as manager after that.
Q Okay. Who was your -- at the time you left IBM, who was your second-line manager?
A There were two. When I first got into the call center, it was -- I think he's on your list.
Q Actually, I have only the first lines on here.
A Okay. Second line? Who was the guy that we talked about?
Q Kamprath?

A No. A gentleman. There's another -- you'd mentioned it before on the phone with me. I just can't remember him right now, but he was -- he was the second-line manager for about a year or so, and then the other second line came into play. I apologize. I can see their faces, but I can't see their names.

Q Well, if it comes to you, you let me know. Did you have a -- a team lead at the time you left IBM?

A A team lead? We had what we called a senior.

Q A senior?

A Yes, a senior. And then they had some other ones below her that helped with administrative work. The main one was Dwayne Montgomery.

Q Dwayne Montgomery was the main one below the senior?

A Yes. He -- he didn't really, say, have the power, but he assisted the -- the reps on the floor and did some reports for the manager that couldn't -- that couldn't quite get those -- those works done, so she had them do those particular tasks.

Q Who was the senior? Do you recall?

A I apologize. Like I said, I can see her -- see her face, but I can't put the name to her.

Q What was the difference between a senior and a first-line manager?

A Senior -- senior pretty much did what I called grunt work for the manager. Basically, she really didn't have any control over anybody. She just acted like a glorified secretary to the manager.

Q So the manager was the person with HR responsibility over you?

A Right. You know, other tasks could be dished out to the senior or some of the -- the admin team that she needed to have done and then -- you know, took those reports and then turned those in to the second line or whatever person she needed to report those to.

Q Were you on the entitlement team at the time that Cynthia Stewart was your first line?

A Yeah. As a matter of fact, she was the one that hired me in to the entitlement group.

Q Okay. And then does November of 2004 sound about right for the time that Juanlyn --

A Took over.

Q -- took over?

A Yeah. Because there was a little bit of slack time between -- between that temporary assignment and her taking over, where it was just us

doing our job, which really didn't need to be managed. We just kind of did ourselves, self-sufficient.

Q So you -- during that time when there was no manager, you had the seniors around, I guess?

A Yeah. There were seniors, and there were -- the second-line manager would float in from time to time to see if anything administrative needed to be done, but other than that, it was just business as usual. We took inbound calls, handled complaints, sent sales. That's it.

Q What building were you at, at the time you left IBM?

A 1600 Riveredge.

Q How long had you been at Riveredge?

A Off and on, seven years. Two years in the sales team in a different building.

Q Well, let's say at the beginning of 2005 where were you at? Do you remember?

A Riveredge.

Q And were you at Riveredge from 2005 until the time you left IBM?

A Yeah.

Q What -- what floor were you at?

A The fifth floor.

Q It was the fifth floor the -- between

2005 --

A Yes. The fifth floor of Riveredge 1500 and 1600 were joined.

Q Oh, okay.

A So different divisions. There's, you know, one call center on this side, and there's a different call center on the other side, but the buildings were interconnected. From --

Q At the fifth floor?

A -- actually the fourth floor up to the sixth floor, there was just a bridge that connected the two buildings.

Q Oh, okay. Do you know what IBM business unit you were in?

A I'm sorry?

Q Do you know what IBM business you were part of?

A Global services. And that was recently done. Within the last three -- three to four years of me being there, they switched us over and put us under the IBM global services umbrella.

Q What does global services do?

A That's a hard one to answer. Global services is huge. It's worldwide, so you'd understand if I couldn't give you details of that. Global

Page 22

services was just a big division, whether it be sales or technical support. It was just pretty much everything.

Q What other -- do you know what other call centers were in global services?

A No. IBM is too big for me to -- you know, to know all of them. I knew the ones that I only worked with, and the ones that I had in the past, but there were many, many others I did not know of or have to come in contact with.

Q Were you a -- let's just stick with that 2005, the time you left the company. During that time frame were you a regular IBM employee or a sub --

A Yes. I was regular.

Q Now, we talked a little bit about what your duties were on entitlement. Did you handle e-mail inquiries as well as phones?

A Well, yes. That was all of it. There was a lot to do with -- with entitlement. It was not only just handling e-mail requests, phone requests. We had multiple tools that we had to use to do our research, which is a time-consuming process.

Q Well, how -- okay. So inquiries could come to you over the phone?

A If we have been dealing with a customer

Page 23

like the day before that, we would -- we were to provide them our direct line extension. We did have voice mail set up. Whether they e-mailed us, faxed us, or called us directly on the phone.

Q Well, I'm talking about how you would get customers. Some of them would be transferred to you from the front end?

A From the front end initially.

Q And would -- would you also get initial e-mail inquiries, or would it only be --

A Only if they were customers that we had worked with before and maybe they were calling back nine months later to see if their support contract -- or e-mailed us to see if their support contract is about to lapse.

Q Do you have a sense on -- on where most of your customer contacts were coming from?

A The front end.

Q The front end? What percentage would come through e-mails?

A Maybe two to five percent.

Q So was it small?

A Very rare.

MR. ROSSMAN: Would you mark that for me, please.

Page 24

(Thereupon, marked for identification, Defendant's Exhibit D1.)

BY MR. ROSSMAN:

Q I'll just hand you a document that's been marked as Exhibit 1. It's a consent to join collective action. Is that your signature at the bottom of that document?

A Yes, it is.

Q And did you read and understand this document before you signed it?

A Yes, I did.

Q What's your understanding of the claims in this case?

A That there was overtimes that was due us setting up each day that we came in that was not documented by IBM or paid to us as a result of setting up our equipment before our shift starts.

MR. ROSSMAN: You can mark that one for me, please.

(Thereupon, marked for identification, Defendant's Exhibit D2.)

BY MR. ROSSMAN:

Q I'll just hand you a document that has been marked as Exhibit 2.

A Uh-huh.

Page 25

Q And what this is, is a printout of earnings that you received during 2005, 2006, and 2007. Do you recall receiving overtime payments in 2005?

A Only when authorized by the manager, and that was usually for an hour or two for just a couple of days to cover slack time for another call center.

Q So you did receive overtime in 2005?

A I received some. That was authorized, and that usually meant working later, not earlier.

Q So if you worked over your shift, you would get overtime?

A Right.

Q And did you ever work any time over your shift in 2005 and not receive full payment for it?

A Yes.

Q When was that?

A Well, the -- it's various times. Customers would call -- call in, say, close to my time of departure and start just raising Cain, and at that particular time there was no manager, no senior, no second line on the floor that could assist this customer, and that we had to do everything we could to scramble to find a manager, which could bring me anywhere from 15 to 40 minutes over my scheduled time. Usually it was shorter than most, but if it was more

Page 26

than that time, I would try to document that.
Q You would try to document it if it was over what?
A Next day I would report an hour overtime.
Q When you reported work over, were you paid for it?
A Yes.
Q But there were some times where you worked over and didn't report it?
A If it was five minutes, ten minutes, you know, you leave. You got to get out. There's rush hour traffic, especially around here. You get home, go back to work, just forget about -- you just forgot all about the 15 minutes or so, and then at the end of the week you get so busy in that department, you just plumb forgot it.
Q So was there anyone who ever told you not to report time if you worked over?
A I was told by various managers, even from the first day that I started, that because of something called schedule adherence, we had to be on the phones at the time that we're supposed to be there and log in with the phones and log out with the phones. The setup time for that was not documented or recorded.

Page 27

Q But what I'm talking about is when you worked over.
A When I worked over?
Q When you worked over, you said you reported it when you remember, I think?
A When it was in excess of one hour. If it was ten or 15 minutes, chances are everybody forgot that. Nobody had a chance to report that, or they were just wanting to get out of the building.
Q Did you ever report time working over and not get paid for it?
A Uh-uh.
Q So every time that you reported one --
A Yes.
Q -- you would get --
A Now, to add to that, the times that I did report overtime that was not authorized, I did get chastised by the manager. Pulled into the office and said, why are you reporting an hour overtime? We're not authorized. So we got literally in trouble for reporting overtime. Got a verbal reprimand.
Q But you were paid for it?
A We were paid for it, but yeah, they said, you need quit doing overtime if it's not authorized, and this came from every manager I worked with.

Page 28

Q And do you recall receiving overtime in 2006?
A Yes.
Q And do you recall receiving overtime in 2007?
A No. They didn't authorize any -- much -- much overtime that time, and if they did, it was only an hour.
Q You don't recall receiving overtime payments in 2007?
A Like I stated, it was only, if it was, for just an hour, and usually they only picked a few people to get select for overtime. They didn't need everybody.
Q When you say the management chastised you for reporting working over, I mean, what did they tell you to do?
A Well, you want the -- the story line that I got? Was every time that I did report overtime, I did get paid for it. She did approve it, but she said, you know, we're not authorized to have overtime, and this is going to make me look bad, and you need to handle your customers a lot better. Can't handle a customer that's calling me up and cussing me out. No, you just got to take it. Got to take it -- take it.

Page 29

I can't hang up on them. Say, I'm sorry, I got to go; bye. Then I would be in trouble for customer abuse, and I would be in -- in the process of getting myself fired.
Q But she was telling you to handle your customers better?
A Well, she was saying, you need to handle your customers better. Well, you can't handle a customer that's cussing you out. You know, what are you going to do? Hang up on them? IBM doesn't -- IBM doesn't go for that.
Q She was telling you not to work it, though?
A No. She was telling me that I had to wrap my calls up faster with the customer, which, like I stated, if it was in that position, that's not an easy task, even for a manager.
Q She was instructing you, though -- whether you thought it was fair or not, she was instructing you to end your calls at your scheduled time?
A She was -- no. That's not exactly the way it was stated.
Q Well, I just want to make sure I understand. How was it stated?
A It was stated -- she was implying indirectly that I'm not handling my customers to get

them off the time that I am supposed to be off the phones, and in some cases we tried to help each other by transferring them to another rep that is still on the -- that's still supposed to be there, but that never happens, or usually never happens. Maybe one will take it as a favor. The other one will say, I'm busy, and then we're still stuck with this customer.

Q Did -- was -- your operation in entitlement, was it a 24/7 operation?

A No. Call center ended at 7 p.m.

Q Seven p.m.?

A And that's just because we had to cover -- cover time slots for people calling in for support in California, on the Pacific coast, so we had to be there and available as if it was 5 o'clock to them over there.

Q What was your -- at the end of your employment what was your schedule?

A Eight to five.

Q And had it been eight to five? From 2005 forward had it always been eight to five?

A It was a flexible schedule. Sometimes it would be 11 to seven. It could be ten to six, but eight to five was considered privileged schedule. Most people wanted to have a morning schedule so that

they could leave early in the afternoon to take care of business, personal business.

Q Was that the schedule you usually got?

A Not always.

Q How often would you work -- between 2005 and --

A Oh.

Q -- 2007?

A Once I got the eight-to-five schedule, it was mine, it was locked in.

Q Okay.

A But you had to basically kind of earn your way up to it, you know. When a slot became open, you know, you could apply for that time slot, and the manager decided whether you got it or not. You just moved into it.

Q And when did you get the eight-to-five schedule, if you recall?

A It was eight to five.

Q Beginning when?

A I was -- I had started at 11 to seven when I first got into the front-line call center and then worked into the eight-to-five slot.

Q So would the entire time that you were in entitlement, were you eight to five?

A Yes.

Q And the entire time you were in entitlement, did it -- did entitlement's hours end at 7 o'clock?

A That -- technically, yes, but if you had a customer on the phone, same thing applied. You stayed with them until you -- until it's done or until the customer has agreed to hang up or agreed to get called back tomorrow. If they didn't agree to get called back tomorrow, you're stuck with them.

Q But in your case when you were in entitlement, though, I mean, you were -- your shift ended at five?

A My shift ended at five unless it was run over by an irate customer.

Q Well, your scheduled shift?

A Right. Right. My scheduled shift was eight to five.

Q Did Juanlyn Williams ever directly tell you not to report time that you worked over?

A Juanlyn Williams never directly said to not report overtime. That came from the first day that I started within IBM as a standing rule. You need to be here early. You need to -- to get your machine up and running. You need to have all your applications ready

to go, and then when it's time for you to log in at 8 o'clock or whatever your time is to start, that you are there ready to roll.

Q So -- but just sticking with the times that you worked over, did Juanlyn Williams ever tell you not to report the time that you worked over?

A No.

Q Did any manager ever tell you not to report the time that you worked over?

A No.

MR. ROSSMAN: Can we go off for just one second?

THE VIDEOGRAPHER: Off video.

(Thereupon, an off-the-record discussion was held.)

THE VIDEOGRAPHER: On video.

BY MR. ROSSMAN:

Q Were you salaried or hourly?

A Technically salary, but everything was recorded on an hourly basis.

Q What does that mean?

A It means that every hour that we worked was reported with a program called totals, which usually can be set in advance to have your employee time, but they called it salary. I don't know why. It's still

Page 34

hourly.
Q Did you ever receive less than your salary?
A Uh-uh.
Q So you always --
A Always -- always a 40-hour workweek.
Q And you always received your full salary every week?
A Always 40 hours a week.
Q And you might receive more if you reported overtime; correct?
A If overtime was offered, yes.
Q Were you ever late?
A IBM's definition of late is one minute. Yes.
Q Were you ever more than one minute late?
A Yes. But anything more than one minute, you had to call in, in advance to what they call the ill sick line and then report that you are running late, which then sent an e-mail to the manager stating that you are coming in late, whether she was in the office or not.
Q Were you sometimes ten or 15 minutes late?
A Uh-huh. Depending on traffic or accidents.
Q When you were late, be it one minute late or ten or 15 minutes or even more late, did you ever

Page 35

report that into totals?
A No. Because in most cases I always stayed ten or 15 minutes later to make the difference up.
Q Even it up in most cases?
A Yes.
Q Were there cases where you didn't even it up?
A No.
Q How often were you late? Do you recall?
A Very infrequent. It -- it usually had to do with the traffic. If I was late more than twice in one week, I would start showing up an hour earlier or try to leave the house an hour earlier to circumnavigate any traffic issues.
Q So were there times where you were late more than once in a week?
A Yes. There were a couple times. It's usually anywhere from a minute or two logging into the phone to five minutes.
Q Did you ever -- did you receive a lunch break?
A Yes. One hour.
Q And was that a scheduled lunch break?
A Yes. Each -- each person had a different lunch schedule. They could not let everybody go at

Page 36

the same time. There would be no coverage on the phones. So some people would have their lunch about 10:30 in the morning, and then some would have them as late as 2 o'clock in the afternoon.
Q Were there ever days where you did not get a lunch?
A No. Lunches were mandatory if -- we had to log the phones for lunches all the time.
Q Where did you take your lunch?
A Either right there in the break room if I had lunch provided, brought it in, or the cafeteria, which was downstairs on the first floor.
Q Were you allowed to take your lunch at your desk?
A They frowned upon it, but they didn't chastise you for it. In some cases people took their lunches at their desk in means of handling personal stuff: E-mails, checking their bank account, surfing the Web. You know, that was their time, but they would rather we not eat at our desk. They said it attracted bugs.
Q Did you yourself ever eat at your desk? Lunch, I mean?
A Yes. Maybe once or twice. Very rarely. I went to the cafeteria in most cases.

Page 37

Q Did you ever take less than your full hour for lunch?
A No.
Q Did you have a laptop or a desktop?
A Desktop.
Q The whole time you were employed?
A Yes.
Q You said at least from 2005 onward you were on the fifth floor at Riveredge?
A Uh-huh.
Q Can you describe your work environment?
A There were mostly cubicles, and they were divided out in sections like little groups, allowing a walkway between them, between the different sections of the cubicles.
Q Where did Juanlyn Williams sit?
A Usually right in the middle of that section. It was kind of like an -- like a boxed-in area section, and there was a little section, a large cubicle section in the center of it. That's where she sat. And each section had one of those sections where supposedly a manager controlled that particular section, but she controlled two divisions, so she just had one.
Q How big was the area?

Page 38

A About three-fourths the size of this table for the managers' office or whatever, cubicle.
Q So Juanlyn Williams was -- that's her area that you were describing?
A Uh-huh.
Q And three-fourths the size of this table? I don't know -- this may be about, what? Seven, eight feet?
A Half the size of that table from here over, maybe a little bit smaller, but long -- lengthwise, yes, about the right size.
Q How big was the -- the total area you were in?
A It's huge. It's a huge building. I don't know the -- the footage, but there were, at least in my section, two -- four of those sections.
Q So it was a big, wide-open room --
A Yes.
Q -- if you will?
A The ceilings were kind of low. As a matter of fact, I could probably reach up and touch the ceiling, you know, but yeah. I mean, they were close-knit. I would say about four feet wide between them.
Q Between the section --

Page 39

A From each section, yeah, and the sections next to it, the same way, and around it was probably a little bit more space. Some less, just to fit -- to accommodate the cubicles.
Q How many people were in your section?
A That's a good question. I had two -- there were two sections that we had. Ours was kind of like a half section because they needed to put cubicles there, and then there was the big section itself where Juanlyn sat. About 15 to 20 in software entitlement.
Q And then the other section that Juanlyn had, what was that again?
A The front end. Called that receive call. I would say about 20 per section, maybe a little less.
Q Did she have more than one receive call section?
A Yeah. She had two that were receive call and one section that was called rational.
Q But they both did the same basic function?
A Sort of. They were front line. Rational was a different division or different product that still would send customers our way if they did not have a rational support contract.
Q Yeah. I asked a bad question. The front end and the rational, they were both --

Page 40

A Pretty much the front end in general.
Q They were both front end, but one dealt with rational only?
A Right.
Q And what did the other front end? They were more generalists? They would deal with other types --
A The large -- the other systems, the other large systems. The AS/400s, the RISC 6000s, the System/390s, and the PC main servers that were not -- were commercial versus -- versus regular desktops for personal issues.
Q And did Juanlyn sit in your section, or did she sit in one of the other sections?
A She sat in the main section. I sat in the half section.
Q Could you see her from your cubicle?
A If I stood up, I could probably -- yeah, I could see a part of her head, but the cubicles weren't -- weren't seven foot tall, you know. You can -- you can -- I can easily look over the cubicles and see other people.
Q If you stood up?
A Yes.
Q And was she -- was she elevated, or was she

Page 41

down at the same level as everybody else?
A At the same level as everybody else.
Q And she was in a cube like everybody else?
A Yeah. Three-fourths of it was encompassed, and just a small section was open.
Q Do you know what hours she worked?
A They varied. Some days she'd come in, in the morning. Some days she would come in the afternoon and stay until the shift closes.
Q Now, your pay was never docked for being late; correct?
A No.
Q Did you receive breaks? Aside -- not your hour lunch, but shorter breaks?
A Breaks? Those breaks themselves could be taken away, depending on the business needs. Bathroom breaks, which we did have to log the phone. At that time those were called unscheduled breaks, where we had to run to the restroom, or if we had an emergency phone call that we had to address.
Q So did you receive scheduled breaks?
A Yes.
Q And did you receive two of those?
A Yes.
Q And they were 15 minutes or so?

A That's correct.
Q And those were paid breaks?
A Yes.
Q And you also -- I mean, the unscheduled breaks, you just had to take them?
A Yes. Nature call and emergencies, you just had to do it, you know, but they did document those and record those. If you took too many unscheduled breaks within a day, then it's a no-no.
Q Did -- do you smoke?
A No.
Q Did other people on the team smoke that you know of?
A Pretty much. Eighty percent of the call center.
Q Would people take unscheduled breaks to go smoke?
A No. Usually they took their breaks and went downstairs in the open atrium was -- the only place you were allowed to smoke was outside, and they would either do it then or on their lunch or whenever their break was available to them.
Q Did you have to badge in to Riveredge?
A Yes. That was the security issue. You had to -- you had to badge in to get into the building.

Q Let me ask you this. Where did you -- how long did it take you to drive in to Riveredge?
A Drive in? Even though I live a short distance from Riveredge, it took me 45 minutes --
Q And --
A -- because of traffic.
Q I'm sorry. I didn't mean to --
A Because --
Q -- speak over you.
A Because of traffic, 45 minutes is usually about correct unless, you know, you got some guy out there decide he was going to make a -- a fast right turn, you know, and cause an accident, backs traffic up.
Q Were you -- did you take the highway, or do you take the service roads?
A Back roads.
MR. ROSSMAN: Why can't -- can we go off the record for a second?
THE VIDEOGRAPHER: Off video.
(Thereupon, an off-the-record discussion was held.)
THE VIDEOGRAPHER: On video.
BY MR. ROSSMAN:
Q So we were talking about driving in and

talking about how that would vary, depending on traffic, and then you get to the -- I imagine there's a big parking lot at Riveredge?
A Yes. They had -- they had a -- an open space on the ground, and they had a two-tier deck further away. I usually tried to park as close as I can, if I can, depending on what time I get there, to get in the building. They had a rule that you cannot cut through the cafeteria to get into the building. You have to walk around the building, which takes about five minutes. Depending on you getting parked, like say if I pulled exactly in -- and I'm using this as a hypothetical time -- at 8 o'clock, park my car, by the time I got into the building, five minutes had passed. And up to my floor, five minutes.
Q So where -- okay. So where would you have to badge in when you were coming in?
A On the floor itself, at the door near the elevators. That was the only way that you can get in.
Q So fifth floor, you're talking about?
A On the fifth floor.
Q Did you also have to badge in at the front door? Front door to the building?
A Only after hours, meaning like if I showed up there at 8 o'clock at night, the main doors -- you

had to badge in to get them to open.
Q But if you were there -- so if you got there during regular working hours?
A They were open, and then we would badge in at the elevator on the floor itself.
Q During the day, then, I guess if you left the floor, you'd have to badge in to get back out?
A No.
Q Okay. If you went down to the cafeteria to eat when you came --
A And come back, yes. Yeah. You can't get into the -- through the floor itself unless you badge in, or if you are sneaky you tailgated somebody getting into the door. In some cases somebody may have gone down to the cafeteria without their badge and is waiting for somebody they know to come along and let them in.
Q Did you ever tailgate yourself?
A It happens.
Q Is that something that management discouraged?
A Yes. They always discourage it, but management does it too. You know, I have had a manager call my phone extension, say, hey, can you let me in?

Q Most times, though, did you use your own badge to get in?
A Yeah. If it -- if I was running late, I would try to get somebody to let me in, if I didn't have my badge or I lost it. But on the same note, we could also go down to security and request a temporary badge, and that's what was required: If we didn't have a badge, to go get one. So if we were running a tad late, we kind of snuck in and at lunchtime we went down and got a temp.
Q Why would you not want to use your badge if you were late?
A Left it at home, lost it.
Q So if you just didn't have your badge?
A Yes. So you can't -- you got to have a badge. It's a security issue. Whether it's temporary, it has to be on your collar at all times.
Q So if you had your badge, which I -- was probably most times --
A Uh-huh.
Q -- you would use your own badge?
A Right.
Q Most of the time?
A Every time I had it.
Q So the only time that you didn't use your

badge --
A Was if I didn't have it.
Q Now, when you would arrive at work, would you usually go straight to the floor?
A Yes.
Q And what would you do?
A Well, first I'd get my keys out and unlock my desk. Pull out the materials that I need for what we call hard copy research. Turn my computer on, wait for it to boot up. Pull my headset out, plug it into the phone, wait until my computer completed booting up. Then start going through and loading up all the applications that were required and additional ones that were not required, which still pertained to the job itself.
Q And then you log into the phones at some point?
A When my time was -- when it was my time to log in, 8 o'clock, no minute less.
Q Well, unless you were late; right?
A Yes. Even if you were there and you log in one minute late or one minute after, you just forgot to do it, you were late.
Q Why did you log into the applications before you logged into the phones?

A That was required.
Q Who required it?
A IBM said we have to be there early and get our systems up and running before our shift.
Q Who said it?
A IBM.
Q Who at IBM?
A All of -- the management team.
Q Which managers told you that?
A Every one of them. I've got four, and you've got my work history. Every manager told me from the day I started, from Peter Zurita on up, said we had to be there early and get our systems logged on.
Q Was there ever a time when Juanlyn Williams told you, you should log into the phones before logging into your systems?
A No.
Q No time in 2007 when she told you that?
A No. It messed up what they called schedule adherence.
Q What's schedule adherence?
A Schedule adherence is the amount of work that you done the minute you log into your phones, which was at your set time. They tracked your breaks,

they tracked your unscheduled breaks, your lunch, and when you left, and then they based your performance on that time slot.
Q So did you receive reports showing schedule adherence?
A We had access to it.
Q What do you mean, you had access to it?
A Our reports printed up the next day in a -- bear with me just a second. In our Lotus Notes, an application that was applied to the Lotus Notes, allowed us to see if we were late, if we took our lunch, or if we went over our lunch. We were able to see that, and the report would be printed up or made available to the manager. Same application.
Q Did you yourself check those reports?
A Periodically.
Q How often is periodically?
A Periodically. It's --
Q Once a quarter, or --
A Once in a blue moon, you know. It was not something that was a big priority to go in and look at each time I come in to check the report of the previous day. If I logged in at 8 o'clock, why do I need to look at it again? I knew I was there at eight. That's all that really mattered is me logging


Page 50

in at 8 o'clock by the phones.

Q So when did -- did you ever see anything in writing saying you needed to be -- you needed to log into your systems before logging into the phone?

A Not -- not in written -- not -- nothing documented. Everything that was told to me, even from training class, was told, you need to be there early to get your systems up.

Q So you -- but you never saw it in writing, and you never saw any official policy telling you to log into your systems before logging into the phone?

A Never read any policies, and if they did -- if they did have it, it was either buried in some kind of huge document that most people never read. They read through the first and the last part and then agreed to it and signed it and turned it in to the manager. Probably what we call our conduct guidelines.

Q But you yourself never saw anything telling you -- strike that. You yourself never saw anything in writing telling you to log into your systems before logging into the phones?

A I never saw anything that was documented, no.

Q Now, you said -- you mentioned training.

Page 51

What training are you talking about?

A For each -- for each division within IBM you would receive several weeks of training, whether it be seven to eight weeks, to prepare you for the task at hand, and each trainer, whether it's the same trainer you had before or somebody different, depending on the department, would provide that training to you.

Q So what department training did you receive? Entitlement?

A Well, that, yes. Sales order support training, which actually was side by side. It was a little different. IBM For You training, which was four -- ten to 14 weeks paid training.

Q Those were the three groups that you worked in?

A Well, there's also, I'm sorry, receive call training. Software entitlement. I'm sorry. Let me -- let me do them from the beginning to make it easier.

Q Yeah. Let's --

A For You was classroom training. Sales order support was the next group I went to, was side by side training. Software receive call was classroom training. Entitlement was classroom training and side

Page 52

by side.

Q What do you mean by side by side training?

A Meaning we sat next to a rep who was already on the floor doing that specific job.

Q How -- so with the entitlement training how long was the classroom portion?

A It could be anywhere six to eight weeks, and we had to be there early so that we can get systems up and running. Same scenario: Have to be there early.

Q For the -- for the classroom portion?

A Yeah, because the classrooms were not -- although they were not necessarily on the same floor -- classroom training could be on a different floor, but we were -- we were there. We had to be there early and had to get our systems up and running, get the tools and applications up and running, and then the teacher would start the class. We didn't have to log the phones because it was not necessary. We were not taking inbound calls at the time, until the last couple weeks.

Q How many hours were you working during the classroom portion of the entitlement training?

A Typical eight-hour day, the same as regular schedule.

Page 53

Q Who taught it?

A Various people.

Q By the side by side training, how long did that last? For entitlement?

A Not very long. They don't want you to interrupt the rep that's already on the phone, but they want you to hear what they're doing, how they're talking to the customer. We had headsets that plugged into the phone adjacent to theirs so that we could hear the customers, what -- the dialogue and how to handle a certain customer a certain way, et cetera, et cetera.

Q And do you recall who you worked with during the side by side portion --

A No.

Q -- of the entitlement training?

A No. That's like a needle in the haystack. People came and went.

Q Did you receive written materials during either the classroom or the side by side portion of the entitlement training?

A Yes.

Q During which portion?

A All of it.

Q Both?

A (Witness nodded affirmatively)
Q And you were expected to review those materials?
A Uh-huh. Some of the materials in training class eventually became what we call our study guides or cheat sheets to handling customers, which we deemed those as hard copy research. Those were the ones that I was telling you we would pull out, which came from our training classes, to assist us with quick solutions.
Q And you did in fact review the written materials you received as part of the entitlement training?
A Uh-huh, yes.
Q And you took this training, I take it, at the start of your work in entitlement?
A Yes.
Q And during the entitlement training did someone tell you, you needed to log into the systems before you logged into the phone?
A Meaning logging into the computers before we logged into the telephones? Yes. We had to turn our PCs on when we got to our desks, boot up and get ready to start business as usual. When everything was up and running, we logged into the phones. Meaning

that all applications were running that pertained to the business at hand.
Q Who told you that?
A Trainers.
Q But you don't recall who the trainers were?
A No. They're -- they're different people. Some people that did the training were actual reps that were on the floor in that department that were deemed to be a pretty good teacher or information provider, and they were used to train classes.
Q So it might have been another rep who told you to log into the computer before logging into the phones?
A A rep or the trainer. She was deemed the trainer. She was the trainer, or he was the trainer, and that was the case in every one of my training classes. We always had to be there early. Always had to set up. Just can't come walking into the class and sit down to nothing. Got to have everything up and ready to go and start your class.
Q The class -- when did the class start? What time?
A Depending on -- most of them were eight-to-five classes. We always showed up early. Teachers show up early. We would get in there and

start logging into the computers, depending on where we were assigned. The room itself kind of looked like this, with the terminals and small cubicles up against the walls, with the center being open to small tables so that we could pivot around and scoot up to the table to listen to her talk on the -- him or her talk on the -- in front of us or chalkboard.
Q Now, after your entitlement training did any manager tell you, any entitlement manager tell you to log into the phones prior to -- I'm sorry. Tell you to log into the computer prior to logging into the phones?
MR. WALTON: Objection; asked and answered. You can still answer it.
THE WITNESS: We were not told to log in. It was required. That was something that was given to us from day one, the first day we started at IBM. You always had to have our PCs turned on, all the applications made available before we logged into our scheduled time, even if we were sitting there waiting until 8 o'clock. We had to get everything ready. Eight o'clock came around, bam. We were at our desk the whole time.
BY MR. ROSSMAN:

Q But what I'm asking you is very simple. When you were in entitlement, during the time period that you were in entitlement -- I'm not talking about the training but when you were actually working in entitlement -- did any manager tell you to log into the systems before logging into the phone?
MR. WALTON: Objection; asked and answered. He already testified that every manager has told him to do that.
MR. ROSSMAN: Please don't testify for your clients.
THE WITNESS: Yes.
BY MR. ROSSMAN:
Q Which ones?
A All of them. From the day I started until the most recent, that was a recommend -- a requirement.
Q So Juanlyn Williams told you that?
A Juanlyn Williams, Samantha Stewart, Dana Trahan, Peter Zurita, and all the other managers I worked for.
Q Okay. I'm talking about the time you were in entitlement.
A Yes.
Q Who were your managers in entitlement?