# EXHIBIT 7C

Page 122

1    Q    Oh, per day?
2    A    Per day. Meaning you're allotted maybe 30
3  to 45 minutes of after call work. It sometimes went
4  over, and chances are you had to go tell the manager,
5  hey, I just had too many customers that gave me way
6  too much information, and I had to do a lot of
7  research to try to find this and even -- even -- maybe
8  even call the sales center for help to see if they
9  found anything on their side.
10   Q    Do you think that was a realistic
11 expectation? Thirty, 40 minutes a day of after call
12 work?
13   A    No, uh-uh. That job is extremely detailed.
14 Everything had to be 100 percent. You had to do the
15 -- the thorough searches with all the tools, which did
16 take a lot of time. That's why I was saying the 25
17 PMRs, they're not realistic, because they started
18 tapering down because we had more and more and more
19 tools added to us over the weeks and months that,
20 okay, now you got to use this, and now you got to use
21 that. So, no. We had a lot of -- a lot of tools to
22 go through, and sometimes an after call work could go
23 over 30 minutes. Could go over an hour in some cases.
24   Q    Do you think this was another area where
25 Juanlyn was more stringent on you than she was on

Page 123

1  other people?
2    A    Probably. Probably. Nancy herself was
3  kind of the same situation, you know. Had a customer
4  couldn't -- couldn't get the -- the research done, and
5  it was taking a long time and had to go into an AUX
6  code to finish research and actually get one of the --
7  the admin -- one of the four admins to help assist.
8  That is not uncommon, and yeah. I may not hear that
9  somebody had been chastised, but that was the norm.
10 Somebody who took too long would eventually get
11 reprimanded.
12   Q    But you yourself were more likely to be --
13 I don't know if you more likely to be reprimanded, but
14 you were --
15   A    I felt --
16   Q    Juanlyn targeted you with after call work?
17 Do you believe that?
18   A    Not with after call work. She targeted me
19 in general.
20   Q    Okay.
21   A    You know, like I said, I did not know of
22 what she said to each and every rep, you know. She
23 may have been equilateral across the board, but it
24 seemed to me that I was being singled out a lot.
25   Q    How about AUX codes? Were there limits on

Page 124

1  when you were in entitlement, how much time you could
2  spend in an AUX code?
3    A    AUX codes for regular breaks were 15
4  minutes, and you were allowed two unless you forgot
5  your break during the day. They were kind of lenient
6  on when you can take those 15 minutes. It was not set
7  in stone that you can take -- you have to take it
8  exactly at 8:30, but they want you to take close to
9  that time. If you skipped it, well, it was no big
10 deal. Fifteen minutes. You were still working. You
11 know, that's something that they can take away from
12 you, and we were made aware that yes, we can take away
13 your two 15-minute breaks at any time.
14   Q    Who said that?
15   A    They did.
16   Q    Who is "they"?
17   A    IBM.
18   Q    Who at IBM?
19   A    In -- in the training classes the managers,
20 they said -- even I heard that from Peter Zurita.
21 State that, you know, by law, you know, you get your
22 one-hour lunch for eight hours of work; right? The
23 two 15-minute breaks, they could take away at any time
24 depending on the needs of the business, and that was
25 the verbiage they used. We need you on the phones.

Page 125

1  We need you to get off your break and go get back on
2  the phones.
3    Q    Were there limits on the other AUX codes
4  besides the break AUX codes?
5    A    After call, unscheduled breaks, like
6  bathroom breaks, you can't have three or four of them
7  in a day unless you're just sick, and usually if you
8  walked up to the manager and said, look, I'm sick but
9  I'm here and I may have to go to the bathroom a lot,
10 you know, she'll let it slide, or he'll let it slide.
11 It's just compassion. At that point, you know, this
12 person is sick and -- or they've got stomach problems.
13 They're going to have to go to the bathroom a little
14 bit more.
15   Q    Are you familiar with the term "DOR
16 report"? D-O-R?
17   A    I've heard of it, but it doesn't ring a
18 bell.
19   Q    You don't know what it is?
20   A    No. If you got some -- an example, I might
21 know. If you got an example of it I might remember
22 what it is.
23   Q    But offhand you don't remember what it is?
24   A    No. Too much to try to keep going up in
25 your head when you are at work.

Scott

Page 126

```
 1   Q    Well, was it a -- was it -- do you recall
 2 getting DOR reports yourself?  Was it something you
 3 saw?
 4   A    I don't remember.  Honestly, I don't
 5 remember.  Do you know what it stands for?  D-O-R?
 6   Q    I do not.
 7   A    Because I know D must be daily something,
 8 and R, report, but I don't know what the O stands for.
 9        (Thereupon, marked for identification,
10 Defendant's Exhibit D7.)
11        THE WITNESS:  Thank you.
12 BY MR. ROSSMAN:
13   Q    This is a -- Exhibit 7.  It's another
14 e-mail from Juanlyn.  This has to do, I guess, with
15 security violations.
16   A    Ignore it.  Honestly, ignore it.  It's --
17 it's -- you have to lock your desk up, because they
18 say you have IBM confidential material in your desk.
19 I never left any IBM confidential material in my desk,
20 and you have two locks, one at the top and one at the
21 bottom, and in some cases I'll lock one, forget to
22 lock the other.  But they had this one guy named Terry
23 Smith, who was one of the ones that was terminated,
24 would go around every morning and pull the drawer --
25 pull the drawers, and if one of them opened up, that
```

Page 127

```
 1 was a security violation, whether there's IBM
 2 confidential material in it or not.  It's futile.
 3 It's a joke.
 4   Q    Was that Terry's job?  To go around and --
 5   A    Yes.  That's what she gave him.
 6   Q    Do you think --
 7   A    She -- he actually even nailed the manager
 8 for a security violation.
 9   Q    He nailed Juan --
10   A    Not -- I am not the only one.  The manager
11 got nailed for that too, twice.
12   Q    Do you think this is a -- this security
13 violation area, is that another area where she treated
14 you differently than other employees?
15   A    No.  It used to be as a joke, and if you
16 want this off the record or not, as a joke, when you
17 left your computer on or you forgot to log out you
18 didn't lock your desk, had this big old tall piece of
19 paper that said, "Forgot to log out," and they would
20 put it right in their chair.  And in the morning
21 you -- they would come in like, oh, man, and then they
22 would go and find out what was done, but usually they
23 turn the -- their monitor or computer off and -- or
24 log their phone out for them, which they turned around
25 and logged right back in again.  But it would say, oh,
```

Page 128

```
 1 yeah, you were here all night, but you weren't.
 2   Q    Was there ever a situation where somebody
 3 else would turn your computer on?
 4   A    No.  That's illegal.
 5   Q    That never happened?
 6   A    No.  If anybody did, they would be
 7 terminated.
 8   Q    But what I'm saying is more, you know, not
 9 somebody trying to break into your computer
10 necessarily.  Was there ever someone assigned to go
11 around --
12   A    No.
13   Q    -- and turn on people's computers?
14   A    You're responsible for your own PC and your
15 own equipment and your own phones.  If you didn't have
16 it on or if you showed up late, that's all on you.
17 Nobody's responsible.  You could not call ahead and
18 say, hey, can you turn my monitor on or, hey, can you
19 log my phone in for me?  I'm right down here in the
20 lobby.  No.  It was illegal.
21   Q    Did you share a cube with someone?
22   A    No.
23   Q    Your cube was your cube?
24   A    Yeah.  Get out of my space.
25        (Thereupon, marked for identification,
```

Page 129

```
 1 Defendant's Exhibit D8.)
 2 BY MR. ROSSMAN:
 3   Q    This document I'm just handing you is
 4 Exhibit 8.  It's another Juanlyn e-mail.  This one is
 5 called time makeup.
 6   A    Yeah.  That was --
 7   Q    What is the -- what is the issue here?
 8   A    I had to go somewhere, and I stayed later
 9 to make up the time for loss -- lost time within the
10 work hour parameters and made it up, and she wanted to
11 know which days that I was referring to, and I gave to
12 her in detail.
13   Q    She was dissatisfied with the amount of
14 detail she initially got?
15   A    She always did that.  She said, I don't
16 understand; please -- please be more specific.  She
17 would tell me verbally, go back and send it to me in
18 your Lotus Notes.  She would -- sometimes I would send
19 a Lotus Note that she felt was vague and told me to
20 redo it and send it to her.
21   Q    Do you think she treated you differently
22 with this sort of thing she did other people?
23   A    Yeah.  Because me -- just from talking to
24 me, you know, off the record, you know, I'm more
25 technical, and I put a lot of technical details in it,
```

Page 130

1 and she didn't like that, and I said, well, you know,
2 that's the way I write.
3        She says, well, you're going to have to
4 change that. You need to redo it.
5        (Thereupon, marked for identification,
6 Defendant's Exhibit D9.)
7        THE WITNESS: Thank you.
8 BY MR. ROSSMAN:
9    Q    Here is Exhibit 9. It's another Juanlyn
10 e-mail. This one is November 3, 2005. It's called
11 breaks, lunch, using appropriate AUX codes. Who are
12 the -- this e-mail appears addressed to you, but there
13 are a number of other --
14   A    Uh-huh. That's a group sending. That's
15 not just singling me out. That's everybody.
16   Q    Well, who's Ella Ward?
17   A    That was the senior. Ella Ward was the
18 senior, because you asked me who the senior was for
19 that. Ella Ward was the senior.
20   Q    And Mary Davis, who's that?
21   A    Mary Davis was the teacher. She --
22   Q    And Dwayne? I'm sorry.
23   A    Dwayne Montgomery was one of the four.
24   Q    The four favorites?
25   A    Yeah.

Page 131

1    Q    And who is Bethea?
2    A    Bethea? Oh, Kerry Bethea? Kerry was
3 actually filling in as receive call manager before
4 they decided to let Juanlyn take it all, but he was
5 just copied on that, and then he sent that note to the
6 front-end management, or front-end people, as well, so
7 this is -- this is more of a group e-mail, not just
8 singling me out.
9    Q    Oh, I see. The -- the -- this is directed
10 to you, but would the text have gone to everyone in
11 the group?
12   A    Yes, everybody. Not me. Just because it
13 says to me, that means she sent a group, and if you
14 was to go into Ella Ward's e-mail, it would say to
15 Ella Ward, and I would be down there in the cc
16 section.
17   Q    I see. And this -- what they're talking
18 about here is what we had talked about earlier with
19 lunches?
20   A    Uh-huh.
21   Q    The rule or expectation was that lunches
22 would be taken off the floor?
23   A    They didn't want us to eat lunch at our
24 desks for the simple fact that, you know, people would
25 drop by and socialize. It's a bunch of nonsense.

Page 132

1 They promptly started ignoring that afterwards, you
2 know. They still let people eat at their desk, you
3 know, on their lunches, or on their breaks, whatever.
4 You know, this is kind of immaterial. You know, it's
5 just like throwing water in an ocean. Doesn't really
6 mean anything.
7        (Thereupon, marked for identification,
8 Defendant's Exhibit D10.)
9        THE WITNESS: Thank you.
10 BY MR. ROSSMAN:
11   Q    All right. Here is Exhibit 10. It's
12 another Juanlyn e-mail. The subject is "July OT is
13 available"?
14   A    Yes. Remember when I was telling you that
15 we had the massive backlogs and stuff that we had to
16 do when I first got there? There were in excess of
17 10,000 backlogs.
18   Q    And what is a backlog exactly?
19   A    Backlog means that somebody called in for
20 support but could not show that they had support, so a
21 PMR was created and put on what they call a queue, and
22 it ranged from reg one to reg 20, because only --
23   Q    What does that mean?
24   A    Reg was the name of the queue, regular one
25 through regular 20, and they created these queues to

Page 133

1 put all these backlogs, and we had backlogs to
2 process, from 20 all the way up to one, which is the
3 most recent.
4    Q    Why wouldn't -- why wouldn't these people
5 have just been sent to the sales group?
6    A    Because they would have all been sales
7 errors, because 99 percent of them had the support
8 contracts. The people in the front end were not doing
9 their job right. Hence, this department was created
10 at this particular time frame. Ella Ward was not the
11 senior back then.
12   Q    But I guess what I'm trying to understand
13 is, how did the backlog get created? I mean --
14   A    It was created -- the backlog was created
15 from the front end, and if, say, reg one was filled,
16 they started logging the PMRs to reg two, or you could
17 actually take -- if this was the PMR record, they
18 could make a copy of it. This would still be handled
19 by the technician, and they were given free support
20 for the time being, but a copy of it was sent to reg
21 one or two, three, four, five, et cetera. When one
22 filled up, we went in there and processed the oldest
23 first and started freeing up these PMR records.
24   Q    But why -- I guess what I'm trying to say
25 is, why -- was it just that there were too many calls

Page 134

1 coming in?  I mean, why would a customer go to the
2 backlog as opposed to going directly to --
3     A    Customer never went to the backlog.  It was
4 totally foreign to them.  They didn't even know none of
5 this going on.  This is behind the scene.  This is
6 backlogs for the -- for the research department only,
7 software entitlement.  So we went to look at all these
8 backlogs to see if they were potential sales leads.
9 If they were not, we re-entitled the PMR and we closed
10 out the second one.  Gone.  Customer still got their
11 support.  We just closed out a bunch -- and most of
12 them were just that.  They had support.  We closed
13 them.
14         So we could go through 100 of those a
15 day, whereas when this one said the backlog is over
16 500, it's during a time when support was being called
17 on, on a regular basis and they started filling these
18 up, and then we had to go and start whittling them
19 down.  That's when they say, OT starts immediately,
20 meaning you could work extra hours, and she would come
21 at us verbally and say, do you want to do morning?  Do
22 you want to do night?
23         Well, if I'm eight to five, there's only
24 one hour before, you know, seven to seven, so I said,
25 I'll do night, and I stayed there from seven or even

Page 135

1 8 o'clock, you know, but that particular overtime was
2 reported.  That was authorized.
3     Q    Now, you testified you worked in
4 entitlement, receive calls, sales order support, and
5 IBM For You?
6     A    That's correct.
7     Q    You never worked in any other call group?
8     A    No.
9     Q    So setting those four groups -- call groups
10 aside, do you know what the rules were in any other
11 call group in terms of logging in?
12     A    They were generic right across the board.
13     Q    How do you know that?
14     A    Because it was the same as day one when I
15 started -- you had to show up early -- to the time I
16 left.
17     Q    But how do you know those rules applied in
18 any other call group that you didn't work?
19     A    That's the way it's always been.  We were
20 always told we had to log -- be there early to -- to
21 set up our systems before we logged our phones.
22     Q    But what I'm trying to understand is that
23 -- those statements that were made to you, how do you
24 know that they applied to other groups that you didn't
25 belong to?

Page 136

1     A    Well, even if it was a sales environment,
2 you still got to show up early and make yourself
3 available to the customer right off the bat, although
4 they were a little lax in the sales.  Sometimes they
5 could get away with not bringing up all their
6 applications.
7     Q    So you're just assuming that those -- that
8 the rules that apply -- that you say applied to you,
9 applied to other groups as well?
10     A    In the call center environment, yes.
11     Q    And why are you making that assumption?
12     A    Because that's the way it was.  You can
13 call Dallas receive call and ask them that question,
14 yes, and they're going to give you the same answer,
15 whether it was Atlanta or Dallas.
16     Q    Did you ever call someone in Dallas and ask
17 that question to them?
18     A    Didn't have to.  We had internal -- like
19 instant messaging called Sametime.
20     Q    But how do you know any other group that
21 you didn't work was required to log into their tools
22 before logging into the phone?
23     A    There was no other way you could do it,
24 period.  No other way.  You had to be there early to
25 log your equipment on first, and then when your tools

Page 137

1 and applications are all made available and ready with
2 no bugs, defects, crashes, you logged into your phone,
3 and that was your day.
4     Q    So you're not aware of any other group in
5 which employees were allowed to log into the phone at
6 their start time?  Go into an AUX code and then open
7 up their tools?
8     A    I was not in their departments, but all the
9 departments that I was in, that applied.
10     Q    But it might have been the case in other
11 groups that they were allowed to log into the phone
12 first, go into an AUX code, and then log into their
13 tools?
14     A    Not that I'm aware of.
15     Q    But it might have been the case?
16     A    I'm not going to say yea or nay.  I don't
17 know.  I can't give a definitive answer on another
18 department.  There's so many departments within IBM.
19 I don't supervise what goes on in those departments.
20     Q    So that's the bottom line?  You don't know
21 what the rules were in those other departments?
22     A    Yeah.  And if it was the same as mine,
23 then, you know, that's common ground.  Everybody did
24 the same thing across the board.
25     Q    And if it was different than your group,

Scott

Pages 134 - 137

Page 138

1 then it was different?
2     A    I wouldn't know about it.  If it was not my
3 department or not a department I worked in, I wouldn't
4 know.
5     Q    Now, after you left IBM For You, after you
6 left sales order support, do you know whether or not
7 the rules as you described them changed in terms of
8 log-in or log-out?
9     A    No.
10     Q    What do you base that statement on?
11     A    Because it was pretty much stated when you
12 start your shift, you need to be there early.
13     Q    But after you were -- after you went out of
14 IBM -- I guess after you were out of sales order
15 support, they moved to Canada; right?
16     A    Yes.  That went to Canada, and then it went
17 to receive call.  I was laterally moved to receive
18 call.
19     Q    Did IBM For You -- what happened to that
20 after you left?
21     A    It went -- it went three different places.
22 It went to Puerto Rico.  It went to India.  Went to
23 Canada, back to India, back to Canada.
24     Q    Do you know when it went to -- it went to
25 Puerto Rico and then --

Page 139

1     A    I think.  It was a Spanish-speaking nation.
2 I don't know exactly which one it was; whether it was
3 Puerto Rico or not.  All I know is that I heard a lot
4 of people complaining, verbally or word of mouth, that
5 you call in for IBM For You and they would not
6 understand what you were saying or couldn't speak any
7 English.
8     Q    Now, you were promoted out of IBM For You;
9 is that correct?
10     A    Yes.
11     Q    So --
12     A    Actually, back up for a second.  I'm sorry.
13 I was converted from a supplemental to a regular IBMer
14 within a short period of time, and then say maybe nine
15 months, maybe even a year -- I'm not exactly sure --
16 then I was promoted to sales order support.  I stayed
17 there for a good while.  It moved from one building to
18 the other building, and then that's when it got
19 outsourced to Canada.
20     Q    That's when sales order support got out --
21     A    Yes.  Because the person who owned -- or
22 the vice president of sales order support was in
23 Canada, but they treated IBM as IBM North America, not
24 IBM Canada or IBM US, so he wanted it up in Canada, so
25 everybody that was in that department got the axe.

Page 140

1     Q    Was anybody offered a move to Canada?
2     A    Yeah.  As a matter of fact, Karen Slater,
3 Curtis Pierce, and myself were offered positions
4 within Canada, but I didn't want to move to Canada.
5 I'm a hot person, hot natured.  I'd rather stay here
6 in the South, and they all opted to stay in the South.
7     Q    What -- just out of curiosity, what part of
8 Canada was it in?
9     A    Toronto.
10     Q    Toronto?  That's my city, actually.  It is
11 cold.
12        MR. WALTON:  That's exactly.  Toronto is
13 nice.
14        THE WITNESS:  I didn't want to go up there.
15 I mean, and I was reluctant to even go train
16 these people.
17 BY MR. ROSSMAN:
18     Q    Yeah.
19     A    Like, you know, why do I want to train you?
20 You're taking my job away.  I didn't go.
21     Q    What -- do you know when -- I mean, if you
22 don't know, I'm sure I can find it somewhere else, but
23 do you know when IBM For You was outsourced?
24     A    No.  Honestly, it's too far to go -- to
25 think back because, you know, after -- after I moved

Page 141

1 to sales order support, I just -- okay.  I forgot
2 everything that was there.  That's the past.  Here I
3 am now.  Focus on the moment and move forward.  I just
4 didn't care what happened to IBM For You, you know,
5 when they said, oh, yeah, it's moving to India.  Okay.
6 Fine.  You know, no big deal.  I'm not there no more.
7        MR. ROSSMAN:  Sorry to do this.  We have not
8 been going very long, but can we go off the
9 record.
10        THE VIDEOGRAPHER:  Off video.
11        (Thereupon, a recess was taken.)
12        THE VIDEOGRAPHER:  On video.
13 BY MR. ROSSMAN:
14     Q    Now, when you would log into the phones in
15 the -- in the morning, how long would it take before
16 calls -- you received your first call?
17     A    It varied, depending on the department.  If
18 it was receive call --
19     Q    Well, actually let's stick with the
20 entitlement.
21     A    Entitlement?  They could be almost
22 instantly, or we would not get a call for maybe a
23 minute or so or five minutes or so, which usually gave
24 me time to either organize my desk a little bit more
25 or put away personal stuff that I -- I over --

Page 142

1 overlooked or make room for the hard copies and the
2 stuff I need to use to -- to work on my desk -- work
3 at my desk.
4    Q    Were you --
5         (Thereupon, an off-the-record discussion was
6 held.)
7         THE VIDEOGRAPHER: On video.
8 BY MR. ROSSMAN:
9    Q    When you were in entitlement -- let me just
10 stick to that -- was there -- were you allowed to use
11 the company phones to make personal calls?
12    A    No. We were not allowed to use the phones
13 to make personal calls unless it's, like, a critical
14 emergency. They had phone banks there. We had our
15 cell phones.
16    Q    They had personal phone banks?
17    A    Yes. They were in the break rooms,
18 adjacent to the break rooms, close to the call center
19 itself, so a lot of people would go into unscheduled
20 break and go make a personal phone call if, you know,
21 say, they got a -- they went and looked at their
22 e-mail while they were on-line or something and saw
23 that, oh, they're going to cut your power off. So
24 they would, like, run to the phone banks to make a
25 quick phone call, or they would go in an AUX code and

Page 143

1 make a -- make a call with their cell phone.
2    Q    Was there -- could you use cell phones on
3 the call floor, or did you have to go to the break
4 room somewhere?
5    A    Cell phones were not permitted to be used
6 unless they were a typically emergency situations.
7    Q    What about on break?
8    A    You use your cell phone on break as many as
9 you want, anywhere you want.
10    Q    So you could sit at your desk and use your
11 cell phone?
12    A    Yeah.
13    Q    Did -- and I may have asked you this
14 before, but did -- are you familiar with the claim
15 system?
16    A    Claim system?
17    Q    Yes.
18    A    I don't know. If it's part of totals.
19    Q    It's separate from totals.
20    A    I know that claims sounds like what the
21 vendor made us start doing was making a duplicate
22 record of our -- of our time.
23    Q    When was it? When was it you did that?
24    A    We had to do it every week, three weeks in
25 advance.

Page 144

1    Q    But was it part of --
2    A    It was required.
3    Q    Which group were you in when you used it?
4    A    Sales order support. I'm sorry; not sales
5 order support. Software entitlement.
6    Q    Oh, it was part of entitlement?
7    A    It was part of entitlement.
8    Q    And when would you fill out your claim
9 information?
10    A    It had to be done before the end of
11 business day every Thursday because Friday the report
12 would go up to the second-line manager, and if
13 everybody was not adhering to signing their -- their
14 claims, you know, trouble rolled downhill. It went
15 from the second line to the first line, from the first
16 line to the team.
17    Q    What was your understanding of the purpose
18 of claim?
19    A    It's what the vendors wanted us to do.
20 They wanted a duplicate record of a time card.
21    Q    And you filled that out looking backwards,
22 or you predicted what you were going to order?
23    A    They wanted it done two weeks in advance.
24 They wanted us to fill out -- so if the next week
25 rolled up, we had to fill it out for the week that was

Page 145

1 four weeks out.
2    Q    So if you were filling one out -- let's say
3 you were back in your group today and you had to fill
4 one out today. You would be predicting what you're
5 going to work four weeks out in advance?
6    A    It would probably already be ongoing. I
7 would already have weeks that I had already signed.
8 Say if I was still there, I would have to sign for the
9 fourth week, predicting where I would be, and in no
10 way that any of that particular time card was used as
11 a means of payroll. Only totals.
12    Q    If you -- let's say you filled out your
13 claim information and it was -- you know, you
14 predicted what you were going to work and then you
15 actually ended up working more or less. Would you
16 then have to go back in and redo the claim?
17    A    No. All they cared about was making sure
18 that we signed those claims and had them done before
19 the end of the week.
20    Q    Do you have any idea what the vendor used
21 it for?
22    A    No clue.
23    Q    And what -- who was the vendor?
24    A    I don't know that either. I mean, I heard
25 the names mentioned, but that's just something that

Page 146

1 you really don't concentrate or try to retain. It's
2 like, okay, well, they're the vendor. Big deal. I'm
3 doing my job.
4    Q    Were you supporting nonIBM software
5 packages?
6    A    Uh-uh, no. Everything was IBM products or
7 products that we just obtained or absorbed, such as
8 rational is an example.
9    Q    So when you say vendor, you're not talking
10 about -- what are you talking about?
11    A    A vendor is -- is -- is the people that
12 supply the funds for the software entitlement group to
13 do the research for the -- the customers, and in most
14 cases software entitlement was there to fix a lot of
15 the mistakes that IBMers made over the years, and
16 report errors in work, so a lot of eyes were focused
17 in on this particular group, and hence, a lot of
18 pressure.
19    Q    Now, we talked about the beginning of the
20 shift, the log onto the computer and the log onto the
21 phones, and we talked about at the end of the shift
22 you may have gotten --
23    A    Hung up.
24    Q    -- hung up on a call and sometimes you
25 reported that in totals, and sometimes you did not?

Page 147

1    A    If it was like an hour, yes, but if it is
2 like ten or 15 minutes, you know, chances are, I'll
3 forget about it the next day because I was so focused
4 in getting at what my tasks were: Getting in, getting
5 set up, starting with a new day. It's like a clean
6 slate every day. Come in, clean slate. Start over.
7 Today is a new day.
8    Q    Were there any other -- setting those two
9 situations aside, are you claiming in any other way
10 that you did work for IBM for which you were not fully
11 compensated?
12    A    Only those two ways. All other authorized
13 overtime was recorded and documented and paid.
14    Q    Did you ever see any other employees'
15 totals time card?
16    A    No. That's IBM confidential.
17    Q    Did you ever see any other employees'
18 paychecks?
19    A    That's also IBM confidential. If they
20 decided to show it to us, that was on them, but I
21 never shared my pay -- pay schedule with anybody.
22 Nobody shared theirs with me. The only other times
23 that I've ever seen somebody's money was -- was when
24 they asked for me to help them pick certain stocks
25 within the 401(k), where to move their moneys.

Page 148

1    Q    Oh, you talked about that already.
2    A    Yeah. It's just -- you know, they thought
3 that I was just the -- the stock guru. You know, hey,
4 go ask Eugene where to put the money. He's like up to
5 30,000, you know, and everybody knew who had what, so
6 it really was not a big deal. You know, hey, he's got
7 30,000 in his 401. Oh, she got 25 or ten.
8    Q    How do people know what other people had in
9 their 401s? Just talked about it?
10    A    Talking about it. And they said, well, if
11 Eugene is going to help you, he's going to know what
12 you're making. You know, stockwise, not their pay
13 rate.
14    Q    But the choices they were making?
15    A    Right. Whatever moneys that they took out
16 of their pay to go into the 401(k) stock plan, you
17 know, I saw it. I told them, okay. Well -- I had to
18 actually tell them how to move what to what, because
19 they didn't know how to do it. A lot of people lost a
20 lot of money because they didn't know how to move
21 their stocks around.
22    Q    Juanlyn never asked you for stock advice,
23 did she?
24    A    Actually, she did.
25    Q    She did?

Page 149

1    A    She actually asked me. She said, where
2 should I put this? I went -- and she showed me, and I
3 said, well, this right here is in the red. You don't
4 want that there. You need to move it. So I told her
5 to take that particular stock out and move it to this
6 one. That was a double digit plus in black. She did.
7 She said, thank you.
8    Q    Her attitude towards you didn't change
9 after that?
10    A    No. She was grateful for me giving talks
11 -- a stock tip, but, you know, anybody would be
12 grateful, you know, telling them where to put their
13 money and make money from it.
14    Q    But it didn't have any effect on how she
15 treated you?
16    A    No.
17    Q    What are business conduct guidelines?
18    A    Business conduct guidelines? They give you
19 a list of stuff, the do's and don'ts. You know, no
20 sexual harassment. You can't discuss IBM business
21 outside of IBM. Stuff like that.
22    Q    So these are IBM's policies or
23 expectations?
24    A    Yeah. They're policies pertaining to
25 customers' confidential information. You know, you're

Page 150

1  not allowed to take IBM confidential stuff home.
2  That's illegal.  You can't use IBM -- IBM's tools to
3  contact a particular customer that you might have a
4  beef with.  You know, those kind of things.  Stuff
5  that pertained that was strictly IBM.  Since we're in
6  the call center, we have access to these people's
7  personal business information, and that's what the
8  business conduct guidelines come into.
9     Q    Were you certified on those?
10    A    Everybody had to sign those.
11    Q    And what was the -- was it a certification
12 that you had to give?
13    A    Yes, it's a certification.  They had you to
14 go in and certify -- basically what you did was you go
15 in and read everything.  You could print it off, but
16 it had to stay in your desk.  It could not go outside,
17 which I never bothered to print those because why
18 waste paper and put it in your desk, you know, and
19 then when it's time to move, you're just going to
20 trash it, put it in the IBM confidential trash bin.
21 You know, why waste it?
22         So it was always on-line, and then when
23 she said, okay, it's time to renew your guidelines,
24 and everybody just went in there, scrolled down to the
25 bottom because it was the same stuff over and over and

Page 151

1  over, and clicked yes, I read this, and then you were
2  certified.
3     Q    Did you read them initially?
4     A    Yes.
5     Q    And then --
6     A    Way back when.
7     Q    But you didn't read them each subsequent
8  year?
9     A    Yeah.  Usually -- usually we were told in
10 advance that nothing's changed.  You know, you could
11 just go ahead and recertify, get that out of the way.
12    Q    If there were -- I'm sorry.  I didn't mean
13 to jump over you, but if there were changes, were
14 those pointed out to you?
15    A    Yes.  And they were made aware of everybody
16 verbally and that we needed to go and check it, or she
17 would hold a shift meeting and point out that this has
18 changed in the conduct guidelines, and it would be
19 highlighted, and everybody had a copy.
20    Q    The conduct guidelines were always
21 available on-line?  On the --
22    A    Yes.
23    Q    -- IBM's Web site?
24    A    Yes.
25    Q    The intranet, I guess?

Page 152

1     A    Intranet, yes.
2     Q    How about the -- were there other policies
3  that were available on the intranet?
4     A    Yes.  There was a bunch of information that
5  was available to IBMers within the intranet.
6     Q    Did you have to be certified on any other
7  policies besides the business conduct guidelines?
8     A    There were, but there -- it would be
9  useless to list them all because there were like 15
10 that software entitlement had to -- to qualify.  Go in
11 there and say that you read this and that, whereas the
12 front end only had maybe five.  We had, of course,
13 more processes.  Those qualifications were due to the
14 processes we were using in the call center.
15    Q    Did you -- aside from any discussions that
16 you have had with counsel, have you discussed this
17 lawsuit with anyone?
18    A    Only with fellow IBMers.
19    Q    Who were the IBMers you've discussed it
20 with?
21    A    Katheryn Taylor.  It was a friend of mine
22 that I spoke with in Boulder, Colorado.  Cobey Hefler,
23 he's still with IBM but in Dallas, Texas.  I mentioned
24 -- mentioned that, and he confirmed that the practices
25 of prelogging in is the same as it is here -- here

Page 153

1  when I was in Atlanta as it is there, and I said,
2  well, if you are interested, let me get your phone
3  number, but his cell phone got disconnected.
4     Q    Never got back in touch with you?
5     A    I can probably contact Katheryn through
6  Yahoo dot-com and get his new cell phone number.
7     Q    Cobey?
8     A    Cobey.
9     Q    Where does he work?  Do you know?
10    A    He -- I don't know exactly what his job
11 title is, because they were outsourcing as well back
12 then, so he may have a different position, but he was
13 in Dallas, Texas.
14    Q    But you don't know what group he was in?
15    A    At the time that I knew Cobey, he was in
16 sales order support, and then we became friends.
17    Q    When was this conversation you had with
18 him?
19    A    Probably right after I signed the papers
20 with IBM.
21    Q    How did you -- well, after you signed which
22 papers?
23    A    The severance package papers.  I called him
24 up on his cell phone.  He was busy at the time.  He
25 said, okay.  But then I heard from him and sent a

Page 154

1 message to him via Katheryn, because they used to
2 date.
3    Q    You sent a message to Katheryn because --
4    A    And she relayed it to him.
5    Q    "Him" being Cobey?
6    A    And then she -- he replied back through
7 Katheryn again.
8    Q    How did you first hear about this lawsuit?
9    A    Gave me a call.  I got a phone call.
10    Q    You got a phone call from your counsel?
11 Just out of the blue?
12    A    Uh-huh.  I wasn't even aware of anything.
13        MR. WALTON:  For the record, it was -- I've
14    never spoken to you.
15        THE WITNESS:  Not him.  The -- Erik?
16 BY MR. ROSSMAN:
17    Q    Erik Langeland?
18    A    I guess, yes.  He gave me a call on the
19 phone and stated that there was possible litigation
20 against IBM for this and asked if he could do a quick
21 phone survey with me on the phone and asked some
22 questions, and I agreed, and he told me what was going
23 on, and I said, okay, yeah, this is what exactly was
24 going on, and I'll opt in.
25    Q    Did you -- when did this call take place?

Page 155

1 Do you remember?
2    A    It was probably about -- I don't know;
3 probably two or three weeks, maybe even a month, after
4 I was released from IBM.  I can't be definite, so
5 don't quote me on it, but I know it was after I was --
6 after I'd signed papers with IBM for severance.
7    Q    And that would have been -- those papers
8 were signed in August of 2007?
9    A    Uh-huh.
10    Q    Do you recall if that conversation took
11 place in 2007 or 2008?
12    A    I know it was the latter part of 2007.
13    Q    Do you have any idea how -- how he got your
14 number?
15    A    Actually, no, I don't.  Because the people
16 that he listed, none of those individuals had my
17 number.  I never give -- I never give out my cell
18 phone number just because I don't want people calling,
19 but --
20    Q    Was it a call on your cell phone that you
21 received?
22    A    Initially it was a call on my cell phone,
23 and I said, you know, I don't want to use up my
24 minutes here; call me on my home number, and I gave
25 him my home number, or I told him that I'm going to

Page 156

1 use the magicJack, which is tied to my PC, to make a
2 phone call to him.  We started corresponding after
3 that.
4    Q    And you talked to Katheryn Taylor and Cobey
5 and this person in Boulder, Colorado, after --
6    A    Katheryn Taylor was in Boulder, Colorado.
7    Q    Oh, she was the person in Boulder?
8    A    Right.  And then she -- when they started
9 dating, she moved to Dallas.
10    Q    So you started talking to -- you talked to
11 Katheryn and to Cobey after you talked to Langeland?
12    A    Uh-huh.
13    Q    How did you -- describe the conversation
14 with Katheryn.
15    A    I just told her -- I said, hey, I found out
16 that there's a -- there's a lawsuit going against IBM
17 regarding the time card issues of working, setting the
18 stuff up.
19        She says, oh, yeah.  That happened here
20 in Colorado as well.  Said, we had to set up our
21 systems before we started -- started our work, before
22 we got our time, and then we logged into the phones
23 just like everybody else did.
24    Q    Did she say whether or not she got paid for
25 that time?

Page 157

1    A    She didn't -- she said, no, she didn't get
2 paid for the preshift -- or prework that she had done.
3 It was just assumed she got her eight hours, and that
4 was it.
5    Q    Where -- she works -- Katheryn works in
6 Boulder?  At the time she went --
7    A    At the time, Boulder, Colorado.  They've
8 since shut that down and outsourced it.
9    Q    Do you know, does she still work for IBM?
10    A    No.
11    Q    Do you know if Cobey still works for IBM?
12    A    I want to say yes, but I'm not -- it's not
13 a definite.  I haven't talked to him in many months,
14 so I don't know if he's with IBM or not.
15    Q    How did you -- did you call up Katheryn?
16 How did you come talk to her?
17    A    Well, we're on instant messaging, AIM and
18 Yahoo, and every now and then if she catches me
19 on-line she'll shoot a hi and then will say, hey, give
20 me a call.  So I use the magicJack, and we would
21 chitchat.
22    Q    Anybody else you've talked to about the
23 lawsuit?
24    A    None that I can get ahold of.
25    Q    Anybody else that you can recall, though?

Page 158

1    A    No. Not -- no one that I talked directly
2 with. I tried to get ahold of Terry Smith, but he
3 won't return his phone calls.
4    Q    Anyone else?
5    A    That's it.
6    Q    Did you just have one conversation with
7 Katheryn Taylor about the lawsuit, or were there
8 multiple?
9    A    Maybe two.
10    Q    How about --
11    A    But they were in passing. It was not like
12 it was a drawn-out conversation. She answered. Said,
13 hey, are you still doing the lawsuit thing?
14         And I said, well, yeah. It's still
15 going.
16    Q    Did she express any interest to you about
17 the law -- did she say whether she wanted to join the
18 lawsuit?
19    A    She did express an interest the first time,
20 but they have not been able to get in contact with
21 her.
22    Q    Who is "they"?
23    A    The attorneys here.
24    Q    How about Cobey? Did you just have the one
25 conversation with him?

Page 159

1    A    And it was in passing. It was not
2 something that was long, drawn-out, and he really
3 didn't care one way or another. That's just how Cobey
4 was.
5    Q    How did you know -- how did you know
6 Katheryn?
7    A    When I was in sales order support is
8 actually when I started talking to both Cobey and
9 Katheryn. A lot of times customers would call in for
10 something called cumulative tapes, and she actually
11 processed the orders, so if a customer had a rush on a
12 cumulative and didn't want to forgo me putting it
13 through the system, that I could actually contact her
14 directly, and she would put it through and get his
15 cumulative out the next day.
16         So I kind of knew a little side steps to
17 getting something for a customer if it was an
18 emergency situation. If not, I would just do business
19 as usual, but we would converse through Sametime, back
20 and forth. It's like AIM, AOL instant messaging, but
21 it was using the intranet. We would talk back and
22 forth.
23    Q    Was her position a call center position?
24    A    Sort of. It was more of a processing call
25 center.

Page 160

1    Q    So she was more of a support person than --
2    A    Yes. It was not a very big organization --
3 maybe four or five people and a manager -- but, you
4 know, all they did was just process these cumulative
5 and parts requests.
6    Q    I'm sorry. What was the cumulatives again?
7 What were those?
8    A    The cumulatives were basically, as an
9 example, you buy software, like a game, but when you
10 install it, it starts to act funny, so you go out to
11 the Web site and you download a patch. Well, those
12 are called cumulatives according to IBM, and
13 basically, they were ordering the latest cumulatives
14 patches for that particular operating system.
15    Q    What -- what did Cobey do?
16    A    Cobey helped us process orders for software
17 licenses and the actual software itself for major
18 platforms: AIX, AS/400, and System/390. He would
19 actually be the one that would take the information
20 from the order, attach a machine to a software license
21 to the customer.
22    Q    So was he a call center employee?
23    A    In a roundabout way, but not the same call
24 center. He didn't take inbound calls like we did, but
25 he had to be available on the phone to receive calls

Page 161

1 from us directly, and in some cases we would be
2 dialoguing directly on the phone while we were
3 processing orders. I would send something over, and
4 he would turn around and process it, or punch it
5 through, as we call it. Pushing the order through.
6    Q    So he was a support person too?
7    A    Yes. Support to the sales order support
8 processing side of it.
9    Q    And Katheryn, do you know if she -- she
10 didn't take inbound calls either, did she?
11    A    I don't actually know if she had an inbound
12 call. I know that she was overseeing orders for the
13 parts department, so if you called in for a laptop and
14 you needed a new battery, well, she would receive the
15 request for the part, and she would process it, and
16 then have them go out into the warehouse, get the
17 part, put it in a box, and ship it.
18         (Thereupon, marked for identification,
19 Defendant's Exhibit D11.)
20         MR. ROSSMAN: Is that 11?
21         THE REPORTER: Yes, sir.
22 BY MR. ROSSMAN:
23    Q    Just handed you a document marked Exhibit
24 11. It is an agreement regarding confidential
25 information, intellectual property, and other matters,

Page 162

1 and I just have one question, which is, on page 3 is
2 that your signature on the document?
3    A    Yes. Well, that was way back in the day.
4        (Thereupon, marked for identification,
5 Defendant's Exhibit D12.)
6 BY MR. ROSSMAN:
7    Q    Now I've just handed you a document marked
8 Exhibit 12. It's labeled the declaration of Eugene
9 Scott. Is that your signature on this document?
10    A    Yes, it is.
11    Q    In paragraph 7 it says, "I and other call
12 center employees regularly worked approximately 45
13 hours per week without meal or rest breaks."
14        Did you yourself ever work 45 hours a
15 week without a meal or rest break?
16    A    I have.
17    Q    When was that?
18    A    Too far back to remember.
19    Q    Do you remember which group you were in?
20    A    Sales order support was one of them.
21    Q    How about when you were in entitlement?
22 Did you ever work 45 hours without a meal or rest
23 break?
24    A    During the beginning when the call -- the
25 entitlement group was in its infant stage, there were

Page 163

1 overtime hours that I've worked and skipped lunch
2 because the backlog was in excess of 10,000, so
3 getting those processed was a chore. Even though we
4 did 100 a day, you know, a lot of them we just went
5 through and found out they had -- and closed it.
6 Still we worked almost -- tediously for hours and
7 hours. Sometimes I skipped lunch. Sometimes I didn't
8 take breaks except to go to the bathroom. I just
9 worked, worked, worked.
10    Q    Did anyone tell you, you needed to work
11 through lunch?
12    A    They gave us an option if we wanted to work
13 through lunch, but they would let us log that as
14 overtime.
15    Q    Okay. So the times you -- you worked
16 through lunch, you -- it was, Number 1, your own
17 choice?
18    A    Yes. We got -- we get to document those as
19 overtime.
20    Q    Okay. And you were paid -- you were
21 properly paid when you worked --
22    A    Right. So five hours would be one hour for
23 each day for lunch if I skipped lunch, and what they
24 would allow us to do, which is kind of condescending
25 to the thing about the meal breaks not being taken or

Page 164

1 not taking them at your desk, they kind of like pushed
2 that under the rug and let people bring a sandwich or
3 something at their desk while they were still working.
4 You brought your own stuff in.
5    Q    Paragraph 5 you're referencing what you're
6 describing as a policy regarding arriving at work
7 before shifts. Again, did you ever see that in
8 writing anywhere?
9    A    Didn't see it in writing, but it was --
10 it's -- it's like a standing order. You always knew
11 you had to show up early to get your systems up and
12 running.
13    Q    An order you received from your particular
14 managers?
15    A    Yes.
16    Q    And same question with Number 6? Did you
17 ever see a written policy to the effect of paragraph
18 Number 6?
19    A    Policies to stay after shifts. The
20 standing policy is the customer comes first.
21    Q    Was what Juanlyn Williams' policy, though?
22    A    No. That's IBM's policy. Customer comes
23 first.
24    Q    Did Juanlyn Williams follow that policy?
25    A    Yes.

Page 165

1    Q    But didn't Juanlyn Williams tell you to cut
2 calls short?
3    A    Yes. It's an oxymoron.
4    Q    So she really didn't follow that policy,
5 did she?
6    A    She -- she would -- she would say -- if we
7 were not authorized for overtime and we had to stay
8 and get overtime and report it in totals, we got
9 called into the office. Why? Why? Why? Then she
10 would say, you know we're not authorized. Even though
11 she would go ahead and sign off on it, we still got
12 the -- the -- you know, the Miranda act, as you call
13 it. Times when we worked over, you know, you got to
14 assist the customer. Customer comes first regardless.
15 I don't care if you are with them ten minutes, five
16 minutes, or two hours, customer came first.
17    Q    That's your -- that's your statement?
18    A    That's IBM's statement. The customer comes
19 first. You assist the customer. You help the
20 customer. You don't drop the ball. You don't hang up
21 on the customer.
22    Q    But again that's what Juanlyn was
23 instructing you to do essentially; correct?
24    A    Yes. Like I said, it was kind of -- it was
25 kind of --

Page 166

```
 1    Q    I mean, she's -- I'm sorry.
 2    A    She's contradicting herself.
 3    Q    Yes.  To be clear, I mean, she was, in
 4  fact, instructing you to hang up on the customer
 5  rather than work over?
 6    A    But then that would have been another can
 7  of worms.  If I'd have hung up on the customer and he
 8  called back and wanted to speak to Eugene Scott's
 9  manager, hey, this jerk hung up on me, smack you in
10  the face.  So like I said, it's an oxymoron.
11    Q    Do you believe you worked on average, five
12  hours per week off the clock?
13    A    Yes.
14    Q    How do you arrive at that figure?
15    A    From the pre -- from logging in my systems
16  beforehand, and I always ended up getting customers
17  after my time.  Always.  Whether it was 20 minutes, 30
18  minutes, 40 minutes, I always ended up with a customer
19  or somebody had an emergency and transferred their
20  customer over to me, and I handled it off -- and had
21  to work over.
22    Q    How much of that -- that five hours that
23  you claim is attributable -- attributable to logging
24  into the systems before your shift?
25    A    I wouldn't know percentagewise.  I mean,
```

Page 167

```
 1  like I said, depending on what happens to the system
 2  when you turned it on.  With IBM systems, you have to
 3  not -- log on.  You had to log in a system password,
 4  but you had to log in a Microsoft password to log into
 5  the network.  Then you had to wait for applications to
 6  start becoming available.  The systems were not top of
 7  the line as you would mostly think IBM would be.  No.
 8  Every PC in that system call center were
 9  third-generation PCs.
10    Q    I thought you said between the time you
11  showed up to the time you logged into the phone --
12    A    It could be 15, 20 minutes.
13    Q    I think you said ten to 15 minutes the
14  first time.
15    A    Ten or 15 minutes, depending on if I had
16  cut any corners, but it could run -- it could run a
17  maximum of 15 minutes.
18    Q    Was it ever less than ten minutes?
19    A    Only if I cut a corner or didn't pull an
20  application up like I should.
21    Q    Did you ever cut corners?
22    A    Only when I was late.
23    Q    Did you ever get in trouble for cutting
24  corners when you were late?
25    A    No, because the manager was never there.
```

Page 168

```
 1    Q    So the manager wouldn't know one way or
 2  another if you cut a corner?
 3    A    Uh-uh.  I mean, in most cases it was not --
 4  the application that I am bringing up was not
 5  sequential or was of need at that particular time.  I
 6  still had to log into it and use it, but it was one
 7  that's, okay, I can skip this, so I can log on.  But
 8  in most cases all the applications do have to be up
 9  and running so that if I was to hit available and
10  beep, get a phone call, I'm ready to go.
11    Q    Which ones could you wait to log onto until
12  after you logged onto the phones?
13    A    Usually the ViewBlue one.  You know,
14  that -- that was not a major one because some -- in
15  some cases the Internet Explorer that the application
16  ran on would be full of cache files, and in some cases
17  we had to clear them out.  But if we had -- if we got
18  there in enough time, we could actually do that before
19  we actually logged the phones.  We're still, you know,
20  trying to make our applications work more efficiently,
21  and then when 8 o'clock rolled around, you know, we
22  hit avail.
23    Q    So if we assume about ten to 15 minutes
24  logging onto applications before your shift, is it
25  correct, then, that most of that five hours would have
```

Page 169

```
 1  been -- the five hours that you reference in paragraph
 2  9 would have been time spent helping customers at the
 3  end of your shift?
 4    A    In my case, yes.  I couldn't -- I couldn't
 5  vouch for other -- other reps and other departments.
 6    Q    And again, that time after your shift,
 7  sometimes you recorded it and sometimes you did not?
 8    A    If it was in excess of an hour, yes.
 9    Q    And nobody told you that -- you weren't
10  aware of any policy related to that hour?  That was
11  your choice on whether or not to record it?
12    A    Oh, if it was an hour, I'm reporting it
13  because that's money.
14    Q    But you could have reported it if it was
15  less than an hour?
16    A    If it was less than an hour, usually -- as
17  I stated, it could have been ten, 20, 30 minutes that
18  I just plumb forgot to log it in on the next day
19  because business starts up.  You go, go, go.
20    Q    Yes.  No.  I understand, you know, may have
21  forgotten about it, but what I'm saying is, there
22  wasn't any policy prohibiting you from reporting that
23  even if it was as little as five or ten minutes?
24  There was no policy prohibiting you from reporting --
25    A    No policy prohibiting, but you got
```

Scott

Page 170

1 reprimanded for reporting overtime that was not
2 authorized, and in most cases everybody didn't want to
3 go through that drama, didn't want to deal with the
4 manager saying no, no, no.
5    Q    But you don't know if other employees
6 reported it or not, though; right?
7    A    Only the ones that I've came in contact and
8 in my call center.
9    Q    Which ones did you talk about? Which ones
10 did you talk to in your call center about reporting
11 overtime?
12    A    You're asking a vague question. That's
13 just about anybody in the call center.
14    Q    But you don't remember any specific
15 conversations that you had?
16    A    No. I wouldn't be able to spit out names
17 of everyone that was in the call center.
18    Q    Did anyone specifically tell you that
19 off-the-clock work was part of your job?
20    A    In a roundabout way, yes. That we have to
21 assist the customers -- if we have a customer on the
22 phone and you have to take care of that customer, even
23 if you are over your time, which in -- that itself
24 says, yeah, you have to stay and help the customer
25 regardless.

Page 171

1    Q    Who was it who told you that?
2    A    It's just every -- that's just a standing
3 thing with every manager. You don't drop your
4 customer into oblivion. You don't disconnect a call.
5 If you got a call on the -- caller on the phone, you
6 handle his issue if he's upset. You have to take care
7 of his situation.
8    Q    Although again, though, that was not
9 Juanlyn's philosophy?
10    A    It's overall. It's IBM's philosophy.
11    Q    But that's not what Juanlyn was telling
12 you, though, when you brought this -- when she called
13 you into your office about -- called you into her
14 office about unauthorized --
15    A    She was calling me into the office --
16 you're talking about overtime that I reported. Those
17 times she -- she said something. Well, yeah, you're
18 not -- we're not authorized that. You are aware of
19 that? You know, big scold. Can't emphasize that
20 more.
21    Q    Right.
22    A    Big scolding for reporting it.
23    Q    But her response to you was to handle your
24 customers better; correct?
25    A    That's exactly --

Page 172

1    Q    In her words, now? You know, and words
2 were, you should handle --
3    A    Handle your customers better or do a better
4 job of handling your customers was her words exactly.
5    Q    So that it doesn't run over?
6    A    Yes. That's what she's saying. Handle
7 that so that the time doesn't run over so that you can
8 get out of here at 5 o'clock and go home, but that
9 never happened.
10    MR. ROSSMAN: I have got no further
11    questions.
12                EXAMINATION
13 BY MR. WALTON:
14    Q    I have just a couple of questions because I
15 wasn't necessarily clear when you were describing this
16 schematic of the fifth floor.
17    A    Uh-huh.
18    Q    And I know that off the record you started
19 to put together --
20    A    Right.
21    Q    -- this.
22    MR. WALTON: And why don't we have -- we'll
23    leave it as an exhibit. Why don't you have him
24    mark that?
25    THE WITNESS: It's not to scale. The one I

Page 173

1 actually started --
2    MR. WALTON: Have the court reporter mark
3    it.
4    MR. ROSSMAN: Yes, although -- wait. Hold
5    on. Is this drawing finished, or do you need to
6    do more work on it?
7    MR. WALTON: No, it's not done yet.
8    THE WITNESS: It's not to scale, and that's
9    only just a section of the call center. The one
10    that's more detailed, that's what the cubicles
11    kind of look like. The scribble lines were open
12    areas. The one in the center was the manager's
13    desk. The one that has the little L hanging off
14    of it, that's the senior's desk.
15    MR. ROSSMAN: Wait. Wait. Now I'm getting
16    confused. Why don't we do this? Let's go off
17    the record and you can finish the drawing, and
18    then we will mark it, and you can ask whatever
19    you want to ask about it.
20    MR. WALTON: Well, I was going to have
21    him -- like I was going to ask specific questions
22    and have him mark --
23    MR. ROSSMAN: Oh, as you're going through?
24    MR. WALTON: Yeah.
25    MR. ROSSMAN: So it is ready now for you to

Scott                                          Pages 170 - 173

Page 174

1    ask the questions?
2         MR. WALTON:  As soon as the court reporter
3    marks the exhibit.
4         MR. ROSSMAN:  Okay.
5         THE WITNESS:  Like I said, it's the
6    scribble.  It's not -- you know, that was just a
7    small section, but there were other cubicles
8    directly connected to it.
9         MR. WALTON:  Why don't we just stop --
10        MR. ROSSMAN:  Let's just mark it.
11        MR. WALTON:  -- for a minute, and let's mark
12   it, and I'll have you draw on it some more.
13        THE VIDEOGRAPHER:  Just so you know, I have
14   like five minutes, a tape change.  Will you be
15   longer than that?
16        MR. WALTON:  I don't anticipate being five
17   minutes.
18        MR. ROSSMAN:  Let's get it marked.
19        MR. WALTON:  Yeah.
20        (Thereupon, an off-the-record discussion was
21   held.)
22        (Thereupon, marked for identification,
23   Plaintiff's Exhibit P1.)
24   BY MR. WALTON:
25   Q    Now, Eugene, can you mark on the -- you

Page 175

1    wrote on here, fifth; correct?
2    A    Fifth floor.
3    Q    That stands for the fifth floor?  Can you
4    write -- finish it out and write floor on there?
5    A    Okay.
6    Q    Can you put a star where your cubicle is?
7    Thank you.  And can you put an M for where the
8    manager?  Thank you.  And you mentioned a second, or a
9    senior?  Put an S for a senior, and is the first lead
10   on the floor?
11   A    Yes.  They -- they were in a cubicle, a
12   little bit different from this one.  Instead of the
13   manager being in the center, it was kind of moved off
14   to one side.  That's why I said it was half cubicle,
15   because from that point on there was only one cubicle,
16   and everything else here was open.
17   Q    And open lines are scribbly lines?  I mean
18   open areas are scribbly lines?
19   A    Scribbly.
20   Q    Thank you.  Can you draw a one where the --
21   is it first lead, or is it -- first line?  Is that --
22        MR. ROSSMAN:  First line.
23   BY MR. WALTON:
24   Q    First line?  Can you draw a one where the
25   line?

Page 176

1    A    First-line manager?
2    Q    Yeah.
3    A    Okay.
4    Q    And a two for the where the second?  All
5    right.  And the space in between the boxes, is that
6    the four-foot area that you are describing?
7    A    Yes.  That's just the walkway.
8    Q    That's the walkway on the floor?
9    A    Yes.  Put walkway.
10   Q    And where is the break room?  And where
11   would it -- where do you enter the fifth floor where
12   you badge in?
13        THE VIDEOGRAPHER:  Two minutes.
14   BY MR. WALTON:
15   Q    And the E you put there is the elevator?
16   A    Elevator.
17   Q    Is the elevator where you would then go
18   down to the first floor; right?  Any other floor next
19   to the building; correct?
20   A    Yes.
21   Q    I think I'm -- in context with your
22   testimony earlier, I think I now understand it.
23        MR. WALTON:  Do you have any follow-up?
24        MR. ROSSMAN:  Maybe just a couple.
25        THE WITNESS:  Take a quick gander?

Page 177

1         FURTHER EXAMINATION
2    BY MR. ROSSMAN:
3    Q    All right.  So you were the star; right?
4    A    Yes.
5    Q    And the -- the one is your first line?
6    A    First-line manager, Juanlyn Williams.
7    Q    And the S is?
8    A    Is the senior.
9    Q    Who sat right next to Juanlyn?
10   A    That's correct.
11   Q    And this drawing is not to scale?
12   A    No, it is not.
13   Q    And this is only a part of the fifth floor?
14   A    Yes.  That's just --
15   Q    So this would be the entitlement area?
16   A    No.  The two -- the two or three main
17   blocks here on your far right to your image.
18   Q    So the three blocks that are on the far
19   right of the --
20   A    Were receive call and part of rational.
21   Q    Who was in the cubes immediately around
22   Juanlyn?
23   A    Entitlement.
24   Q    And --
25   A    Entitlement.

Scott                                          Pages 174 - 177

Page 178

```
 1     Q      Your area was all entitlement as well?
 2     A      And then part of that one next to it.  Only
 3  half of it was used for entitlement; half for
 4  rational.
 5     Q      So that's the cube that is directly below
 6  yours with a big box kind of --
 7     A      Yes.  They had a center thing as well for
 8  like a manager to sit, but they never used them.  They
 9  were empty.
10     Q      They were always empty?
11     A      They were empty, and in some cases some
12  people got the lucky opportunity to sit in there at a
13  manager's desk, but they were not a manager.
14        MR. WALTON:  I have nothing further.
15        MR. ROSSMAN:  Nothing further from me.
16        THE VIDEOGRAPHER:  Off video.
17        (VIDEO CAMERA OFF.)
18        MR. WALTON:  Reserve signature?  Read and
19  sign?  I guess that's what we've been doing?
20        MR. ROSSMAN:  That's what I'd do.
21        (Deposition concluded at 1:14 p.m.)
22             - - -
23
24
25
```

Page 179

```
 1        CERTIFICATE
 2
 3        I hereby certify that the foregoing
    transcript was reported, as stated in the caption;
 4  that the witness was duly sworn and elected to reserve
    signature in this matter; that the colloquies,
 5  questions and answers were reduced to typewriting
    under my direction; and that the foregoing pages 1
 6  through 178 represent a true, correct, and complete
    record of the evidence given.
 7        The above certification is expressly
    withdrawn and denied upon the disassembly or
 8  photocopying of the foregoing transcript, unless said
    disassembly or photocopying is done under the auspices
 9  of Hundt Reporting, LLC and the signature and original
    seal is attached thereto.
10        I further certify that I am not a
    relative or employee or attorney of any party, nor am
11  I in any way interested in the result of said case.
        Pursuant to Article 8B of the Rules and
12  Regulations of the Board of Court Reporting of the
    Judicial Council of Georgia, I make the following
13  disclosure:  That I am a Georgia Certified Court
    Reporter, here as an independent contractor for Hundt
14  Reporting, LLC; that I was contacted by the offices of
    Hundt Reporting, LLC to provide court reporting
15  services for this deposition; that I will not be
    taking this deposition under any contract prohibited
16  by O.C.G.A. 15-14-37 (a) or (b); that I have no
    written contract to provide reporting services with
17  any party to the case, any counsel in the case, or any
    reporter or reporting agency from whom a referral
18  might have been made to cover this deposition; and
    that I will charge my usual and customary rates to all
19  parties in the case.
        This, the 16th day of November, 2008.
20
21
22
23
24
        THOMAS R. BREZINA, CCR-B-2035
25
```

Page 180

```
 1        E R R A T A   S H E E T
 2        Pursuant to Rule 30(e) of the Federal Rules
    of Civil Procedure and/or O.C.G.A. 9-11-30(e),
 3  any changes in form or substance which you desire
    to make to your deposition testimony shall be
 4  entered upon the deposition with a statement of
    the reasons given for making them.
 5
 6        To assist you in making any such
    corrections, please use the form below.  If
 7  supplemental or additional pages are necessary,
    please furnish same and attach them to this
 8  errata sheet.
 9
10             - - -
11
12        I, the undersigned, EUGENE SCOTT,
    do hereby certify that I have read the foregoing
13  deposition and that said transcript is true and
    accurate, with the exception of the following
    changes noted below, if any:
14
15  Page_____/Line_____/Should Read:_____
16  _____
17  Reason:_____
18
19  Page_____/Line_____/Should Read:_____
20  _____
21  Reason:_____
22
23  Page_____/Line_____/Should Read:_____
24  _____
25  Reason:_____
```

Page 181

```
 1  Page_____/Line_____/Should Read:_____
 2  _____
 3  Reason:_____
 4
 5  Page_____/Line_____/Should Read:_____
 6  _____
 7  Reason:_____
 8
 9  Page_____/Line_____/Should Read:_____
10  _____
11  Reason:_____
12
13  Page_____/Line_____/Should Read:_____
14  _____
15  Reason:_____
16
17  Page_____/Line_____/Should Read:_____
18  _____
19  Reason:_____
20
21  Page_____/Line_____/Should Read:_____
22  _____
23  Reason:_____
24
25
```

Page 182

1  Page_____/Line_____/Should Read:_____

2  _____

3  Reason:_____

4

5  Page_____/Line_____/Should Read:_____

6  _____

7  Reason:_____

8

9  Page_____/Line_____/Should Read:_____

10  _____

11  Reason:_____

12

13  Page_____/Line_____/Should Read:_____

14  _____

15  Reason:_____

16

17  Page_____/Line_____/Should Read:_____

18  _____

19  Reason:_____

20

21       _____

         EUGENE SCOTT,

22

   Sworn to and subscribed before me,

23

   _____, Notary Public.

24

   This_____day of_____, 2008_____.

25  My Commission Expires: