# EXHIBIT 8B

Page 50

1    Q    When did she work there?
2    A    She left probably 2006, Johnson, Kim Gunn
3  Johnson.  She's probably on there.
4    Q    And she was a scheduler?
5    A    Yes.  She did scheduling.  She would also --
6  there was no way -- back to the eTOTALS, there was no
7  ever official training, but if you had questions, she
8  was the person to ask.
9    Q    Was she a manager?
10    A    No, team lead.
11    Q    She was a team lead.  Was she your team lead?
12    A    No.
13    Q    So when did Ms. Johnson tell you not to record
14  the time you spend logging into the machine and logging
15  into tools in TOTALS?
16    A    It would have been when we first, 2003, when
17  we first started using TOTALS.
18    Q    And how did the conversation come up?  What do
19  you recall about it?
20    A    Just in telling us how to record time, showing
21  us how to record time in TOTALS.
22    Q    I thought you said you figured TOTALS out
23  yourself.
24    A    Well, they show you how to log in, and they
25  show you the basics.  You know, other than -- they show

Page 51

1  you other than, you know, additional hours, here's how
2  you record additional hours, but they don't tell you
3  how to -- you know, meal breaks, lunch breaks,
4  illnesses.  They just show you the basics.  If you
5  change your days, you have to change it in TOTALS.
6  They don't tell you any of that.  If you change your
7  hours, they don't tell you.
8    Q    So were other people present when Ms. Gunn,
9  Ms. Gunn Johnson, I guess, told you not to record your
10  time in TOTALS?
11    A    There was probably three or four people there,
12  all the new hires for that day.
13    Q    Who were those other people that were there?
14    A    I don't remember who was hired my time.
15    Q    And how did the subject of recording log-in
16  time come up?
17    A    Just in showing, you know, this is how you put
18  your start time, stop time.
19    Q    And what specifically did Ms. Gunn Johnson
20  say?
21    A    That, you know, whenever your shift starts,
22  that's the time you put on TOTAL.  If you come in
23  early, you don't put that on there.
24    Q    Was that a question you had about whether or
25  not log in times should be recorded?

Page 52

1    A    No.
2    Q    Was it a question somebody else had?
3    A    I don't recall it being a question.  I think
4  it was just more of a statement.
5    Q    Aside from Ms. Gunn Johnson, did anyone tell
6  you not to record log-in time into TOTALS?
7    A    I mean, it's been reported.  I don't know
8  anybody specific or times, but it's the general -- the
9  general feeling is what we're told, the general
10  attitude.
11    Q    Have you ever seen any sort of statement in
12  writing that you should not record log-in time in
13  TOTALS?
14        MR. LANGELAND:  You mean, aside from
15    this?
16    A    (By the Witness)  No.  Other than what we're
17  told here, that's the only --
18    Q    Okay.  Would you please turn back to Exhibit
19  5?  And again, this is the Lambousis e-mail.  Can you
20  point out to me where Mr. Lambousis says don't record
21  log-in time in TOTALS?
22    A    I mean, it doesn't state that specifically.
23    Q    So can you tell me where in Exhibit 5 you
24  understand Mr. Lambousis to be saying don't record
25  log-in time in TOTALS?

Page 53

1    A    I mean, it doesn't -- how can we say this?  I
2  mean, it's mentioning start times.  So that's when
3  you -- that's when you start, is when you officially
4  start getting paid.  So they're saying they want all
5  this stuff ready to go prior to your start time.
6        And we're not -- we're told -- it's not here,
7  but we're told don't log in 15, 20 minutes early
8  because it throws the numbers off; log in no more than
9  five minutes prior.  I mean, I don't have anything that
10  says that in writing, but that's what we're told to do.
11    Q    So --
12    A    That's where this came about, is because
13  people were logging in 15, 20 minutes early.
14    Q    In Exhibit 5, Mr. Lambousis doesn't mention
15  TOTALS, does he?
16    A    No.
17    Q    And in Exhibit 5, Mr. Lambousis doesn't talk
18  about recording time, does he?
19    A    No.
20        THE VIDEOGRAPHER:  Five minutes till
21    the tape change.
22        MR. ROSSMAN:  Okay.
23  BY MR. ROSSMAN:
24    Q    So you would agree with me then you've never
25  seen in writing any statement that you should not

Page 54

1  record log-in times in TOTALS?
2          MR. LANGELAND: Objection, objection.
3          You can answer.
4      A   (By the Witness) I mean, it's -- I don't know
5  if it's ever in writing or not.  It could have been an
6  e-mail.  I mean, it's -- it's been reinforced.  So I
7  would assume it's been in e-mail.  That's how they
8  reinforce everything.
9      Q   But you don't recall any e-mails you may have
10 seen to that effect?
11         MR. LANGELAND: Objection.
12     A   (By the Witness) I mean, I recall receiving
13 something.
14     Q   Who sent them?
15     A   I don't know who sent them.  It gets forwarded
16 by team leads.
17     Q   When did you receive them?
18     A   I mean, it's been multiple times.
19     Q   What year?
20     A   I mean, every year.
21     Q   How many have you received?
22     A   I mean, there's been at least, let's say,
23 three or four.
24     Q   But you don't recall who sent them, and you
25 don't recall the date?

Page 55

1      A   No.
2          MR. LANGELAND: Objection.  He
3  testified it was team leads.
4          MR. ROSSMAN: He just said no.
5      A   (By the Witness) I mean, it comes -- it gets
6  forwarded by the team lead, and it just says -- you
7  know, he just puts in there, you know, please adhere or
8  thanks, and I read the message, and, you know, I don't
9  look at the path of the e-mail.
10     Q   Which team lead sent you the e-mails?
11     A   They would be coming from Fred Nutter.  Now,
12 other team leads -- primarily from him.  Other team
13 leads do send out information to the entire floor.  It
14 kind of depends on who -- if it's specific to my group,
15 then it comes from him.  If it's specific to the
16 platform, it would come from another team lead.
17     Q   So your testimony is that Mr. Nutter has sent
18 you e-mails saying do not log -- do not record log-in
19 time into TOTALS?
20         MR. LANGELAND: Objection.
21     A   (By the Witness) He's one of them.
22         THE VIDEOGRAPHER: Two minutes.
23 BY MR. ROSSMAN:
24     Q   And your testimony is you don't recall who the
25 originator of those e-mails were, correct?

Page 56

1          MR. LANGELAND: Objection.
2      A   (By the Witness) I don't know who the
3  originator -- I didn't check to see who the originator
4  was.
5      Q   Do you have any of these e-mails?
6      A   No.
7          MR. ROSSMAN: Why don't we go ahead and
8  change the tape.
9          THE VIDEOGRAPHER: Off video.
10         (VIDEO CAMERA OFF.)
11         (The luncheon recess was taken from
12 12:34 to 1:36 p.m.)
13         (VIDEO CAMERA ON.)
14         THE VIDEOGRAPHER: On video.
15 BY MR. ROSSMAN:
16     Q   Mr. Liles, you're on the ninth floor, I
17 believe you testified?
18     A   Yes.
19     Q   And are you in a cubicle or an office?
20     A   Cubicle.
21     Q   Can you -- how high are the partitions?  Can
22 you see over them when you're sitting down?
23     A   Yeah, in front you can, yes.
24     Q   Who sits around you currently?
25     A   Like names?

Page 57

1      Q   Sure.
2      A   Scott Parker sits behind me.  They just moved
3  a guy over to the left -- I mean, to the right.  It
4  depends on which way you're facing.  I'm facing -- you
5  know, the wall, basically, is here.  So I come in here.
6  So ever on the right is -- they just moved in a guy,
7  Ronnie Bowen.  The guy in front of me is James Young.
8      Q   Where does your supervisor sit?
9      A   The team lead is down at the end of the row.
10 He's one, two, three, four cubicles down.
11     Q   So can you see him from where you sit?
12     A   Not if he's sitting down, no.
13     Q   And then how about your manager?
14     A   She has an office.
15     Q   Can you see her from where you sit?
16     A   No.
17     Q   Have you, since 2005, have you changed
18 cubicles?
19     A   Yes.
20     Q   How many times?
21     A   Twice.
22     Q   In your last cubicle, could you see your team
23 lead?
24     A   Yes.
25     Q   Where was your team lead?

1    A    Right behind me.
2    Q    Oh, really.  How long -- when did you switch
3 to your current cube?
4    A    The same time I went to days, so two years
5 ago.
6    Q    And how long were you in the cubicle next to
7 the team lead?
8    A    Approximately a year and a half.
9    Q    Where was that cube in relation to where your
10 manager has her office?
11    A    The previous cube?
12    Q    Correct.  Well, was Jones your manager at that
13 time?
14    A    No.
15    Q    Okay.  So where was -- where was your manager
16 in the previous cube in relation to your cube?
17    A    I mean, she has an office in the corner.  So
18 kind of in the middle of the floor, I guess, is my
19 cube.
20    Q    Could you see her from your previous cube?
21    A    Not -- if she was in her office, I could see
22 her walking the floor.
23    Q    And then your cube, I guess, before the one we
24 were just talking about, the one next to your team
25 lead, where was that -- well, strike that.  When were

1 you in the cube prior to the cube next to your manager?
2 Do you remember the dates?
3         MR. LANGELAND:  Objection.
4    A    (By the Witness)  Not specifically.
5    Q    Okay.  When you were in that earlier cube,
6 where did your team lead sit in relation to you?
7    A    I mean, previously where I was located, I had
8 a team lead sit basically right behind me, and the
9 manager was just around the corner.
10    Q    So your -- not your current cube, but
11 your previous cube, your team lead was right behind
12 you, and the cube before that, your team lead was also
13 right behind you?
14    A    No.
15         MR. LANGELAND:  Objection.  I'm sorry.
16    Not to interrupt you, but if you want to
17    make a clear record, I don't think this is
18    clear at all.
19         MR. ROSSMAN:  Okay.
20 BY MR. ROSSMAN:
21    Q    We'll call your current cube "cube one," the
22 previous cube "cube two," and the cube before that
23 "cube three."  When you were in "cube three," where did
24 your team lead sit?
25    A    Down at the end of the row.

1    Q    Could you see your team lead from that cube?
2    A    I was facing the opposite direction.  I was
3 facing forward.  He was down -- I was at the front of
4 the row.  He's down at the back.  I'm facing forward.
5 So if he walked by, yes; if he's at his desk, no,
6 because I'm looking the opposite direction.
7    Q    Do you currently have a laptop or a desktop?
8    A    Desktop.
9    Q    Have you always had a laptop or a desktop?
10 Which have you -- strike that.  Have you always had a
11 desktop at IBM?
12    A    Yes.
13    Q    How many people are currently on the server
14 team?
15    A    At IBM, I would guess about 80 to 90.
16    Q    Are they all at Riveredge?
17    A    Yes.
18    Q    Has that number fluctuated over time?
19    A    It's gotten bigger.
20    Q    Do you recall about how many people were on
21 the server team in 2005?
22    A    Probably 40 to 50 IBM.
23    Q    The 80 to 90 that you mentioned that are
24 currently on the team, are those all IBM?
25    A    Yes.

1    Q    And does the server team -- is that a 24/7
2 operation?
3    A    Yes.
4    Q    Do they run equal numbers of people throughout
5 the day, or are there more at certain teams?
6    A    There's more peak hours, 8:00 to 5:00.
7    Q    Currently, about how many people do they run
8 at peak hours?
9    A    I mean, the majority.  It's a mix of IBM and
10 contractors.  So I don't know how many are one and how
11 many are the other.
12    Q    I believe you testified you get an hour lunch;
13 is that correct?
14    A    Yes.
15    Q    Is that lunch scheduled?
16    A    Yes.
17    Q    Have you ever had to work through lunch?
18    A    I have.  It's scheduled in that you have a
19 lunch window, and if for some reason, you can't make
20 the lunch window -- we have a sign-out board.  So X
21 number of people are available to be on lunch.  So if
22 your window comes up and there's a slot, then you can
23 go to lunch.  If not, you wait until there's an
24 available slot.
25    Q    How long is the lunch window?

1    A    Well, it's -- your window starts four hours
2  after you've been working.
3    Q    Have there -- has there ever been a shift
4  since 2005 where you did not get a lunch at all?
5    A    No. Well, I take that back. Yes.
6    Q    When was that?
7    A    It just -- it depends. If they're
8  shorthanded, they will tell us to not take a lunch and
9  mark the overtime as -- mark the lunch as overtime.
10    Q    When you -- the times when you've not gotten a
11  lunch, were you fully compensated for all the time that
12  you worked?
13    A    Yes.
14    Q    Now, how about breaks; do you get breaks
15  throughout the day?
16    A    Two 15-minute breaks.
17    Q    And are those scheduled as well?
18    A    No.
19    Q    Do you always get your breaks?
20    A    Yes.
21    Q    And those are paid breaks, I take it, those
22  15-minute breaks?
23    A    Yes.
24    Q    Does your team lead work the same hours as
25  you?

1    A    No.
2    Q    What hours does your team lead work?
3    A    He's like 9:00 to 6:00, so 15-minute
4  difference.
5    Q    How about your manager; does she work the same
6  hours as you?
7    A    No.
8    Q    What hours does she work?
9    A    Typically, 7:00 to 4:00.
10    Q    Are you ever late for work?
11    A    On occasion.
12    Q    When you're late, do you ever record that in
13  TOTALS?
14    A    No. We don't record it in TOTALS.
15    Q    Have you ever been disciplined for being late?
16    A    No.
17    Q    Have you ever been disciplined for not being
18  logged into the phones at the start of your shift?
19        MR. LANGELAND: Objection.
20        You can answer.
21    A    (By the Witness) Define disciplined. I mean,
22  I -- we've been talked to, I mean. They talk to you,
23  no like action, but you do get talked to sometimes.
24    Q    Have you ever -- strike that. Are you allowed
25  to make personal calls during the day?

1    A    Not from your phone and only on your lunch or
2  break.
3    Q    So not -- you can't make them from your work
4  phone?
5    A    You're not supposed to.
6    Q    You're not supposed to?
7    A    Right.
8    Q    Have you ever done it?
9    A    On occasion.
10        MR. LANGELAND: Objection.
11  BY MR. ROSSMAN:
12    Q    On the occasions where you did make a call
13  from your work phone, is there any way for your team
14  lead or a manager to know whether you were making a
15  business call or a personal call?
16    A    Yes.
17    Q    How?
18    A    They monitor all the calls, outgoing. I mean,
19  they would -- I guess they could look at the number.
20  They see all the numbers.
21    Q    Okay. So they could look at the numbers. Is
22  that different from the monitoring that you mentioned?
23    A    I mean, it's all monitored. I mean, the only
24  way they would know is if they knew that was your
25  number. I mean, every outbound call, every inbound

1  call is tracked regardless, personal, business.
2    Q    Have you ever seen any other employee's TOTALS
3  information?
4    A    No.
5    Q    So never seen anyone else's time card?
6    A    I mean, I've helped them put stuff in there.
7    Q    So you've showed them how to use TOTALS?
8    A    Told them how to use it, yes, if they had a
9  question.
10    Q    And how often have you done that?
11    A    I mean, several times.
12    Q    Okay. Let me be more clear. How often have
13  you actually seen what another employee is entering
14  into TOTALS?
15    A    I mean, I don't see it as in looking
16  specifically at it to see what their hours are or what
17  their days. It's more of, you know, how do I change
18  this so -- I'm behind them, but I'm not like, you know,
19  reading, other than looking for telling them where to
20  click at and make sure that they're clicking on the
21  right entry.
22    Q    So it's fair to say you've given employees
23  advice on how to use TOTALS?
24    A    Yes.
25    Q    But you've not entered hours for them?

1    A    I haven't entered hours, no.

2    Q    And you've not reviewed other employee's time

3  cards?

4    A    No.

5    Q    So you don't know what other employees enter

6  into TOTALS in terms of their hours?

7        MR. LANGELAND:  Objection.

8    A    (By the Witness)  No.

9    Q    Have you ever seen other employee's paychecks?

10    A    No.

11    Q    So you don't know, I take it, whether or not

12  other employees have been paid for all of their

13  overtime?

14        MR. LANGELAND:  Objection.

15    A    (By the Witness)  No.  I don't know.

16    Q    Aside from the server team, are you aware of

17  any other -- well, setting aside the server team, do

18  you have knowledge of whether any other call group at

19  IBM, what their rules are -- let me start over.  It's a

20  bad question.

21        We've discussed the server team.  Do you have

22  knowledge of what the policies are in any other call

23  group in terms of logging onto tools before or after

24  the start of a shift?

25    A    No.

1    Q    Do you know what IBM business unit you're part

2  of?

3    A    I know it's Division 48.  I don't know if

4  that's what you're looking for.

5    Q    What is Division 48?

6    A    That's just a number.  They call it -- or I

7  guess maybe ISC.

8    Q    Besides the server team, are there other teams

9  on the ninth floor of Riveredge?

10    A    Yes.

11    Q    What teams are those?

12    A    I believe the CRU is there, part of the CRU,

13  customer replacement unit team, and then there's some

14  people that I don't know what they do, but they're part

15  of management.

16    Q    Do you know of any other call teams at

17  Riveredge on the other floors?

18    A    Yes.

19    Q    What teams are those?

20    A    I mean, they have printer support, SSRs for

21  desktop, I guess, entitlement.  Part of entitlement is

22  in Atlanta.  There's NAMC.  There's other people

23  working there.

24    Q    But you've never worked on any of those other

25  teams?

1    A    No.

2    Q    Could you turn back to Exhibit 5 for a second,

3  the Lambousis e-mail?  Did this e-mail come directly to

4  you, or did it come through a team lead or somebody

5  else?

6    A    This would have came directly to.

7        MR. ROSSMAN:  Would you mark that one

8  for me, please?

9        (Defendant's Exhibit No. 6 was marked.)

10  BY MR. ROSSMAN:

11    Q    Now I've just handed you a document that's

12  been marked as Exhibit 6.  It's an e-mail, I believe,

13  dated November 12, 2007; is that correct?

14    A    Yes.

15    Q    Did you send this e-mail?

16    A    Yes, I did.

17    Q    Had TOTALS changed in some way -- well, strike

18  that.  What prompted you to send this e-mail?

19    A    Because Juanita, at the bottom, is sending out

20  every week to sign and submit your time cards so she

21  can approve it, and that's not -- previously, we never

22  had to do that.

23    Q    So previously, you submitted a time card only

24  if you worked overtime?

25    A    Yes.  TOTALS would automatically approve it.

1    Q    Now, the practice that, I guess, is reflected

2  in this e-mail of submitting a time card every week, is

3  that the current practice?

4    A    Yes.

5    Q    So just so I understand this, prior to

6  November 12th, management's expectation was if you

7  worked overtime, you would submit a time card?

8    A    Well, I wouldn't go by that date.  That's the

9  date I sent that, but this started before that.

10    Q    Okay.  So sometime around --

11    A    Then, eventually, I asked a question.

12    Q    Okay.  So just to be clear, sometime around

13  November of 2007?

14    A    I mean, probably it had been going on, let's

15  say, three or four months prior to that.

16    Q    Three or four -- okay.  Well, what prompted

17  you at this point then to send the e-mail?

18    A    Because if you don't, you will get this

19  e-mail.  So it was finally, you know, what's changed --

20  you know, I'm a curious person.  So I was like, okay,

21  what's changed, has something changed that I'm not

22  aware of.  So I decided to ask.

23    Q    Okay.  So at some -- you know, a couple of

24  months prior to this e-mail before that time.  So this

25  e-mail came in November.  So say up until the summer of

1  2007, management's expectation was if you worked
2  overtime, you'll submit a TOTALS time card?
3      MR. LANGELAND: Objection.
4   A   (By the Witness) Yes.
5   Q   And then going forward, you were expected to
6  submit a TOTALS time card regardless of whether or not
7  you worked overtime?
8   A   Yes.
9      MR. LANGELAND: Objection. His
10     testimony was not that --
11     MR. ROSSMAN: I just asked him a
12     question, and he answered the question.
13     MR. LANGELAND: That's not what his
14     testimony was.
15     MR. ROSSMAN: I didn't characterize his
16     testimony. I asked him a question.
17     MR. LANGELAND: You did. You said
18     what's management's expectation. So you
19     asked him what management's expectation was,
20     and he has already testified management's
21     expectation was you don't record the
22     preshift --
23     MR. ROSSMAN: Please don't testify for
24     your client.
25     MR. LANGELAND: I'm not testifying for

1   him. That's what his testimony was. You
2   don't record the preshift overtime.
3  BY MR. ROSSMAN:
4   Q   Prior to, say, July of 2007, your
5  understanding of management's expectation was that you
6  would submit a TOTALS time card if you worked overtime,
7  correct?
8   A   Yes.
9   Q   Your understanding of management's expectation
10 prior to July of 2007 is you would submit a TOTALS time
11 card regardless of whether or not you worked overtime?
12  A   I mean, I don't know what their expectation
13 is, but prior to whenever this started, you never had
14 to -- if you just had straight 40 hours, you never had
15 to mess with TOTALS.
16  Q   Okay.
17  A   Now even if you have straight 40 hours, you
18 still have to go in there, submit it. TOTALS -- as
19 soon as you submit it, TOTALS will say approved or it
20 will say submitted, no further action. I asked -- the
21 reply back, which we don't have here, was that they're
22 auditing -- they want you to submit it so they can
23 audit it. Whether they could go in and audit prior to
24 that, I have no knowledge of that.
25     MR. ROSSMAN: Can you mark that one,

1   please?
2      (Defendant's Exhibit No. 7 was marked.)
3  BY MR. ROSSMAN:
4   Q   I just handed you a document that's been
5  marked Exhibit 7. It's an e-mail dated February 21st,
6  2008. Did you send this e-mail?
7   A   Yes.
8   Q   You're referring, I guess, in the fourth
9  concern, if you will, you're referring to people
10 sitting in AUX. What is AUX?
11  A   It's basically additional -- it's nonavailable
12 time.
13  Q   And what was your concern with people in AUX?
14  A   That they're sitting there doing nothing when
15 there's customers calling and they could take a call
16 versus sitting there doing nothing.
17  Q   How did you know that your coworkers were
18 sitting there doing nothing?
19  A   I could see it.
20  Q   Were there specific coworkers you were
21 concerned about?
22  A   Yes.
23  Q   Who?
24  A   James Young, he's a contractor.
25  Q   Anyone else?

1   A   He's the one I see do it all the time. This
2  was -- this was spawned basically because he had a call
3  and wouldn't take it because he was sitting there, and
4  that's just not right. That's not the way we do things
5  there.
6   Q   Your first concern was with people talking and
7  laughing in a loud tone?
8   A   Yes.
9   Q   Were there specific people you had a concern
10 with with regard to that?
11  A   Just people on the row, you know, when they're
12 not on a call. Maybe someone comes down the row, wants
13 to talk to them and they're telling jokes in a manner
14 that your customer hears them or you have a hard time
15 hearing your customer.
16  Q   Were there any specific individuals, though,
17 that you were referring to with paragraph 1?
18  A   There would have been, yes.
19  Q   Who is that?
20  A   There's Jacqueline Rogers, and I think this
21 one came up. There was a guy talking -- I don't know
22 who was talking to Joe McCarthy, but they were getting
23 kind of loud.
24  Q   How about your second concern? Are there
25 specific individuals you had in mind?

Page 74

1    A    It's a lot of people.
2    Q    Who?
3    A    I don't -- I mean, Rodney Kelly would be one
4 name.  Ronnie Bowen.  There's the usual -- we call it
5 the usual offenders, people that usually will do that.
6    Q    Who are the usual offenders?  The people you
7 just mentioned or others?
8    A    The people I mentioned.
9    Q    Then how about your third concern; were there
10 specific people you had in mind?
11    A    Same previous offenders, Rodney Kelly, Ronnie
12 Bowen.  Let's see.  There's some new guys the past
13 couple of years.  I'm trying to think of their names.
14    Q    So what is DSA?
15    A    It's Dynamic System Analysis.
16    Q    And, I mean, what exactly is the nature of
17 your concern here?
18    A    That it's -- DSA, you use to basically capture
19 a screen shot -- not a screen shot but, in a sense, a
20 screen shot of the system configuration, show you what
21 they have in it, how things are set up on the hardware
22 level.
23         My concern there was people telling them to do
24 it when there wasn't a need for them to do it, and
25 you're just wasting their time.  It gets them off the

Page 75

1 phone so you don't have to deal with them anymore.
2    Q    What does that mean, so they do not have to
3 dispatch the call?  What are you referring to there?
4    A    So they don't have to -- I mean, they know --
5 they know, based on their talking to the customer that
6 it's going to require a technician to come out there
7 and fix the problem.  So they will give them something
8 to do to buy their time and then say, do this, call me
9 back, and then when they call them back, it goes back
10 to the second thing there where they don't reply back.
11 So then it becomes my -- then I have to dispatch the
12 call myself.
13    Q    With your fourth concern, the AUX concern,
14 what was the -- I'm sorry.  You said that was James
15 Young?
16    A    James Young, yes.
17    Q    What was Mr. Young doing during that 15 or 20
18 minutes?
19    A    Nothing.
20    Q    Surfing the Internet or something?
21    A    I mean, I don't know what he was doing on his
22 computer other than -- but he was just sitting there.
23 I mean, he was sitting there.  He may have been
24 surfing.  I don't know.  But he was probably refreshing
25 the screen every couple of minutes to see if an order

Page 76

1 has come through or not.
2    Q    Would the customer have been on the line with
3 him?
4    A    No.
5    Q    Did you get a response from Mr. Nutter to your
6 e-mail?
7    A    I don't believe I -- not directly to me, no.
8 On this one, I don't recall if I -- that I got anything
9 or he ever did anything.
10    Q    Did you raise other concerns with Mr. Nutter
11 other than the concerns you raised in the February 21st
12 e-mail?
13    A    No.
14    Q    Are there different AUX codes?
15    A    Yes.
16    Q    What are those AUX codes that you recall?
17    A    1 is after-call time.  So you just got off the
18 customer call.  You go to AUX-1 to document your call,
19 order your parts.  So it's customer related.  2 is
20 training or available in the office doing other duties.
21 3, let's see, is helping out another coworker.  Hardly
22 ever use 4.  I forget what 4 is.  5 is breaks or lunch.
23         6 is SSR, which is the field technician
24 support, and 7 is like root cause, research, things of
25 that nature.  8 is if you're calling back in SSR, field

Page 77

1 technician, if you have to call them back, you do an
2 AUX-8; and AUX-9 is if you're calling a customer back
3 or if you're working on a customer-related problem
4 without the customer on the phone.
5    Q    Now, all these AUX codes, then they will block
6 incoming calls?
7    A    Yes.
8    Q    Do you know if IBM tracks employee's AUX time?
9    A    Yes.
10    Q    How do you know that?
11    A    Because they used to give us reports.  They
12 don't do that anymore.  But if you have excessive time,
13 that will tell you.
14    Q    During what time period did you receive
15 AUX-related reports?
16    A    It's been probably, let's say, since I've
17 been -- well, actually, as an IBMer, we never received
18 any.  I received those as a contractor.
19    Q    Okay.  And then I think the other thing you
20 said was you would -- a manager might talk to you if
21 you had excessive AUX time?
22    A    Yes.
23    Q    Have you personally ever been talked to?
24    A    Yes.
25    Q    On what occasions?

1    A    The only one time, it was -- they had me
2  doing -- I used to work weekends, and I was the weekend
3  vocal.  They had some new guys.  So I had to help out
4  the new guys.  So I had excessive AUX time, and so they
5  asked about it, and it was a matter of, well, you had
6  all these new guys, so I had to assist them and not
7  take calls, and that was the end of it.
8    Q    Is there any expectation on the server team in
9  terms of the number of calls you field in a day?
10    A    No.
11    Q    Is there any expectation in terms of how long
12  the calls you field should last?
13    A    The call as far as with a customer?
14    Q    Yeah.
15    A    No.
16    Q    I may have asked you this already.  But what
17  does SDPO stand for?
18    A    Same day parts order.
19    Q    Now, AUX-1 is the after-call time?
20    A    Yes.
21    Q    And what sort of duties are included in
22  after-call time?
23    A    You're finishing documenting your call,
24  ordering your part and closing or pending your call.
25    Q    Is there any reason you couldn't log into PIMS

1  after going into AUX-1?
2    A    Well, I mean, you're logged in prior to taking
3  your calls, so --
4    Q    Do you need to log -- do you need to order
5  parts on every call?
6    A    Order, no.
7    Q    Do you need to use PIMS for every call?
8    A    99 percent of them.
9    Q    Has anyone ever told you that you could not
10  wait until after a call and log into PIMS?
11    A    You need it during a conversation.
12    Q    What do you need it during the conversation
13  for?
14    A    To check parts' availability and make sure
15  that the number they're giving you is a correct part.
16    Q    Do you know what a DOR report is?
17    A    No.
18    Q    Are you familiar with the term "schedule
19  adherence"?
20    A    No.
21    Q    Are you familiar with the term "solve rate"?
22    A    Yes.
23    Q    What is solve rate?
24    A    That's a measurement of your CRUs and solves
25  versus field dispatches.

1    Q    I'm sorry.  What was the first term you used,
2  CRUs?
3    A    CRUs.  It's when you send out a part to a
4  customer without a technician.  They replace the part
5  themselves and return it.
6    Q    And how does IBM -- I mean, what's the purpose
7  of solve rate -- strike that.  Is there an expectation?
8  Are you giving an expectation about solve rate?
9    A    Yes.
10    Q    What is that expectation?
11    A    It changes every year.  I think it's somewhere
12  around 58 percent.
13    Q    So 58 percent you're expected to solve
14  yourself?
15    A    Overall, yes.
16    Q    What is NSI?
17    A    That's your -- I think it's like Net
18  Satisfaction Index.  It's your customer satisfaction
19  surveys.
20    Q    And you're given an NSI rating?
21    A    We have -- as a group, there's a matrix we
22  have to achieve.
23    Q    Are you personally measured on NSI, or is it
24  the group as a whole?
25    A    It's officially group overall.

1    Q    Are you familiar with the term "ACDN volume"?
2    A    Yes.
3    Q    What does that mean?
4    A    ACDN is how many times your phone rings.
5    Q    Are you familiar with IBM Business Conduct
6  Guidelines?
7    A    Yes.
8    Q    What are those?
9    A    I mean, I don't have them specifically off the
10  top of my head, but it's basically a guideline of how
11  we're supposed to conduct ourselves.
12    Q    And you're required to be certified on those?
13    A    Every year.
14    Q    And you, in fact, have been certified on those
15  every year?
16    A    Yes.
17    Q    Describe the certification process for me.
18    A    You receive a e-mail saying to do it, and they
19  give you like a link to a Web page, and you -- I don't
20  know if you have to actually answer any questions, but
21  it's just a presentation covering the guidelines, and
22  then you certify at the end that you've taken it.
23    Q    So are you acknowledging -- I mean, what are
24  you acknowledging, that you've read them?
25    A    Right, that you've covered the course.  At the

Page 82

1 end of the presentation, that's when you — you know,
2 you have to go through the presentation to get to the
3 certification.
4    Q   Do you actually read the guidelines
5 themselves?
6    A   I mean, not verbatim.  Every year they're
7 pretty much the same, but, yeah, I do read them, I
8 mean.
9    Q   And it's your understanding that IBM expects
10 you to adhere to the Business Conduct Guidelines?
11    A   Yes.
12       MR. ROSSMAN:  Mark that one, please.
13       (Defendant's Exhibit No. 8 was marked.)
14 BY MR. ROSSMAN:
15    Q   I've just handed you a document that's been
16 labeled Exhibit 8.  On the first page, it says, "IBM
17 Course Booklet."  Is this something you've ever seen
18 before?
19    A   Yes.
20    Q   What is this?
21    A   This is basically a printout of the course
22 that we take online.
23    Q   The course related to the Business Conduct
24 Guidelines?
25    A   Yes.

Page 83

1    Q   Do you recall taking this actual course?
2    A   Yes.
3    Q   Is this the course you took this year?
4       MR. LANGELAND:  Objection.
5       You can answer.
6    A   (By the Witness)  I mean, I will say it looks
7 like it.  I mean, it changes every couple of years.
8       MR. ROSSMAN:  Mark that one for me,
9    please.
10       (Defendant's Exhibit No. 9 was marked.)
11 BY MR. ROSSMAN:
12    Q   I've just handed you a document labeled
13 Exhibit 9.  It's a printout of IBM's Business Conduct
14 Guidelines, dated December 18, 2007.
15       So I take it, Exhibit 9 is the type of
16 Business Conduct Guidelines you would be certified on?
17       MR. LANGELAND:  Objection.
18       You can answer.
19    A   (By the Witness)  Usually, it's the Web-based
20 Exhibit 8.  I think we do both of these.
21    Q   Both 8 and 9?
22    A   Yes.  I'm not sure which one is the one that
23 you send off.  You know, at the end of them, you know,
24 you certify that you did it.
25    Q   Would you turn to page 6 of Exhibit 9?  I'm

Page 84

1 looking specifically at 3.1 on page 6, the section
2 labeled "Communication Channels."  Are you there?
3    A   Yes.
4    Q   The first sentence of that paragraph reads,
5 "If you know of an unlawful or unethical situation, you
6 should immediately tell IBM whatever you know or have
7 heard about it.  You could do it in one of several
8 ways."
9       Is it — do you understand that it's IBM's
10 expectation that you would report any unlawful or
11 unethical situations at work that you become aware of
12 to the company?
13       MR. LANGELAND:  Objection.  It's a
14    legal conclusion.
15       MR. ROSSMAN:  Asking him what his own
16    understanding is?
17       MR. LANGELAND:  I mean, as to what he's
18    got to report, whether there's been a
19    violation of the FLSA.  That's for sure.
20 BY MR. ROSSMAN:
21    Q   Is it your understanding that IBM expects you
22 to report any unlawful or unethical conduct at work
23 that you become aware of?
24    A   Yes.
25    Q   Would you please turn to page 13?  I'm looking

Page 85

1 at section 3.6.  Are you there?
2    A   Yes.
3    Q   The first sentence of 3.6 is a stand-alone
4 paragraph.  It says, "You must record and report all
5 information honestly" -- I'm sorry.  "You must record
6 and report all information accurately and honestly."
7       Is it your understanding that IBM expects you
8 to maintain accurate and honest records?
9    A   Yes.
10       MR. ROSSMAN:  Mark that for me, please.
11       (Defendant's Exhibit No. 10 was marked.)
12 BY MR. ROSSMAN:
13    Q   I've just handed you a document marked Exhibit
14 10.  It's a document that's entitled, "Employee
15 Relations, Legal Issues, Recording Time
16 Worked/Compensatory Time."
17       The first sentence reads, "Nonexempt employees
18 must submit timecards that are complete, accurate and
19 timely."  Is it your understanding that IBM expects you
20 to submit time cards that are complete, accurate and
21 timely?
22    A   Yes.
23    Q   Did you ever complain to anyone at IBM that
24 you believe you had not been paid for all hours worked?
25    A   No.

Page 86

1     MR. LANGELAND: Objection.
2  BY MR. ROSSMAN:
3    Q   So that's a no?
4    A   No. Yes; it's a no.
5    Q   Are you familiar with the claims system?
6    A   No.
7    Q   Do you believe you've been fully paid for any
8  work you may have done after the end of your shift?
9        MR. LANGELAND: Objection.
10   A   (By the Witness)  Repeat the question.
11   Q   Do you believe you have been fully paid for
12  any work you may have done after the end of your shift?
13       MR. LANGELAND: Objection.
14   A   (By the Witness)  I'm going to say they pay --
15  one more time.
16   Q   Do you believe you have been fully paid for
17  any work you may have done after the end of your
18  scheduled shift?
19       MR. LANGELAND: Objection.
20   A   (By the Witness)  Yes.
21   Q   Yes, you believe you've been fully paid?
22   A   Yes.
23   Q   Now, earlier when you were talking about
24  logging into the computer and logging into various
25  tools, you described the time that you say that takes.

Page 87

1  What are you doing during that time?
2    A   Waiting.
3    Q   Do you read the paper or anything else?
4    A   No.  I just wait, stare at the computer.
5        MR. ROSSMAN: Can we go off the record
6  for a second?
7        THE VIDEOGRAPHER:  Off video.
8        (VIDEO CAMERA OFF.)
9        (A recess was taken from 2:28 to 2:38 p.m.)
10       (VIDEO CAMERA ON.)
11       THE VIDEOGRAPHER:  On video.
12  BY MR. ROSSMAN:
13   Q   Now, other than any conversations you may have
14  had with counsel, have you discussed this lawsuit with
15  anyone?
16       MR. LANGELAND: Objection.
17       You can answer.
18   A   (By the Witness)  I've pointed people to it.
19   Q   Who have you pointed to it?
20   A   Phil Craven, I mentioned it to him, Shelley
21  Faith.  Those are people recently.
22   Q   A couple dozen, you say?
23   A   No.  Those are people recent that I've
24  mentioned it to.
25   Q   Okay.  So Phil and Shelley.  Anyone else --

Page 88

1    A   No.
2    Q   -- recently or not recently?
3    A   No.
4    Q   All right.  Aside from those two, have you
5  discussed the lawsuit with anyone else, again, not
6  counting your counsel?
7        MR. LANGELAND: Objection.
8        Go ahead.
9    A   (By the Witness)  I mean, other than my wife
10  and -- I mentioned it to her.
11       MR. LANGELAND: Objection.
12  BY MR. ROSSMAN:
13   Q   What do you recall about the conversation or
14  conversations you had with Phil Craven?
15   A   It was basically done via Instant Messenger.
16  It was like here's the Web site, you know, you should
17  send them your information so you can be involved, I
18  mean.
19   Q   What was Mr. Craven's reaction?
20   A   He just thought it was cool.
21   Q   And it was Shelley -- what was Shelley's last
22  name?
23   A   Faith.
24   Q   Faith.  And what do you recall about the
25  communication you had with Ms. Faith?

Page 89

1    A   I just discussed the premise of the case, what
2  it's about.
3    Q   Hat did you tell her the case was about?
4    A   That we're required to be in early but not get
5  paid to be in early.
6    Q   And what was Ms. Faith's reaction?
7    A   She thought it was interesting.
8    Q   Did she say anything else?
9    A   That was about it.  And I've discussed it
10  originally with Jim Starkey.
11   Q   Okay.  What do you recall about your
12  communication with Mr. Starkey?
13   A   He's the one that pointed me to it.
14   Q   Pointed you to the Web site?
15   A   Yes.  That was about the extent of it.
16   Q   Now, how many hours do you allege that you
17  worked without pay in 2008?
18       MR. LANGELAND: Objection.  You're
19  going to make him do a calculation?
20   A   (By the Witness)  I mean, I -- I mean, I would
21  have to figure out how many days I've been there so
22  far.
23   Q   How would you --
24   A   I mean, every day, you would figure -- you
25  would figure, let's say -- let's say average an hour a

Page 90

1 week.
2    Q    An hour a week, you say?
3    A    Yes.
4    Q    How do you get to an hour a week?
5    A    Just 15 -- 10, 15 minutes each day.
6    Q    How about in 2007?
7    A    I mean, it would be the same.
8    Q    Now, in your calculations, what would you do
9 with days that you were late?
10    A    I mean, that's where I average like an hour a
11 week versus -- I mean, some might be more.  Some might
12 be less.  I mean, the only times late is if it's
13 scheduled or, you know, a couple of minutes because you
14 were in traffic.  I mean, that doesn't happen very
15 often.
16        MR. ROSSMAN:  I don't have any further
17    questions.
18        MR. LANGELAND:  Okay.  I have a few
19    questions.
20                EXAMINATION
21 BY MR. LANGELAND:
22    Q    Turning your attention to Exhibit 3, how much
23 overtime were you paid for preshift work in 2005?
24    A    Preshift is not recorded.  We're not allowed
25 to enter that information.

Page 91

1    Q    So the amount of 2,551.14 that's included here
2 for overtime in 2005 does not include anything for
3 preshift overtime; is that correct?
4        MR. ROSSMAN:  Objection, leading.
5 BY MR. LANGELAND:
6    Q    You can answer.
7    A    It's correct.
8    Q    Okay.  How much time for preshift work is
9 included in this 2005 overtime figure?
10        MR. ROSSMAN:  Objection.
11    A    (By the Witness)  It's no time included.
12    Q    Okay.  And how much time for preshift overtime
13 is included in the 2006 figure?
14        MR. ROSSMAN:  Objection, leading,
15    foundation.
16    A    (By the Witness)  Nothing's included.
17    Q    Do you see the figure there that says 1,686.70
18 for overtime for 2006?
19    A    Yes.
20    Q    How much of that is for preshift overtime?
21    A    None.
22        MR. ROSSMAN:  Objection, leading,
23    foundation.
24 BY MR. LANGELAND:
25    Q    For 2007 for the overtime figure, how much

Page 92

1 preshift overtime is included?
2        MR. ROSSMAN:  Objection, leading,
3    foundation.
4    A    (By the Witness)  None.
5    Q    For 2008, how much preshift overtime is
6 included?
7        MR. ROSSMAN:  Same objections.
8    A    (By the Witness)  None.
9    Q    Why didn't you include or why isn't there
10 anything included for preshift overtime?
11    A    It's all based off the phone log-in.  We're
12 not allowed to log in, at the most, five minutes prior.
13 So even if you were instructed to be there, you know,
14 15 minutes early, you can't log in to track your hours.
15 So they pay you based off the log-in on the phone.
16    Q    With regard to preshift overtime, what was
17 management's expectation?
18        MR. ROSSMAN:  Objection.
19    A    (By the Witness)  That it doesn't exist.
20    Q    And how did you know that?
21    A    You're not -- again, it's based off the phone
22 log-in.  So you can't -- you can't record those
23 hours -- you can record the hours, but it's not going
24 to match up with the phone.  So they would disallow
25 those hours.

Page 93

1    Q    And what was the policy with regard to
2 entering preshift overtime in eTOTALS?
3        MR. ROSSMAN:  Objection, foundation.
4        MR. LANGELAND:  Why?  He wouldn't know
5    what the policy is?
6        MR. ROSSMAN:  You're assuming there was
7    a policy.
8 BY MR. LANGELAND:
9    Q    Was there a policy with regard to entering
10 preshift overtime in eTOTALS?
11    A    It's -- we don't enter it.
12    Q    Well, was there a policy?
13    A    Not like black-and-white policy.
14    Q    Okay.
15        MR. ROSSMAN:  I'm sorry.  What did you
16    say?
17        THE WITNESS:  It's not in -- it's not
18    like in writing.  It's we're told.
19    Management tells you.  Your team leads tell
20    you.  You don't enter that time.
21 BY MR. LANGELAND:
22    Q    So who else followed the policy regarding
23 preshift overtime?
24        MR. ROSSMAN:  Objection, foundation.
25    A    (By the Witness)  I mean, it's covered.

1 Everybody does it, all the coworkers. I mean,
2 nobody -- everybody's aware that it's not -- the time's
3 not entered.
4   Q   How do you know?
5   A   Just general conversation with coworkers, team
6 leads' instructions, management instructions.
7   Q   Is there any practice with regard to whether
8 you can enter preshift overtime in eTOTALS?
9   A   I don't understand.
10   Q   How is it commonly handled -- how is preshift
11 overtime commonly handled?
12       MR. ROSSMAN: Objection, foundation.
13   A   (By the Witness) It's not handled because we
14 don't do it. I mean, we're instructed not to enter
15 that. So it's never handled, I guess.
16   Q   Did Mr. Lambousis ever tell you to input
17 preshift time in eTOTALS?
18   A   No.
19   Q   Did Ms. Reidy every tell you to input preshift
20 time in eTOTALS?
21   A   No.
22   Q   What about Mr. Ovesen?
23   A   No.
24   Q   Were you aware that IBM's policy to not pay
25 for preshift work was unlawful activity?

1       MR. ROSSMAN: Objection, foundation,
2 assumes facts not in evidence.
3   A   (By the Witness) No.
4   Q   Have your records in eTOTALS been honest?
5   A   They have been honest in that they reflect the
6 phone log-in.
7   Q   And what about the preshift overtime?
8   A   It's not in there.
9   Q   Why not?
10   A   Because you're not allowed to log in to show
11 the time.
12   Q   Okay.
13   A   TOTALS is based on -- is referenced to the
14 phone log-in.
15   Q   Have your records in eTOTALS been complete?
16   A   They have been complete to show the same as
17 the phone log-in.
18   Q   And why didn't you show the preshift time?
19   A   Because it's not -- it's not -- they're not
20 able to log in on the phone. So it's not going to show
21 up. It's basically if it doesn't show up there, it
22 never happened unless it's scheduled on the schedule,
23 you know, an hour early or something.
24       MR. LANGELAND: Okay. I don't have any
25   other questions.

1       MR. ROSSMAN: I might have a couple.
2              FURTHER EXAMINATION
3 BY MR. ROSSMAN:
4   Q   Now, when your attorney was asking you
5 questions, I believe you stated that TOTALS is
6 referenced to phone logs; is that correct?
7   A   Yes.
8   Q   What do you mean by that?
9   A   Meaning if you have an hour overtime, they're
10 going to look at your phone log-in to see if you were
11 actually there for that hour. That just keeps someone
12 from saying they were working when they really were not
13 working.
14   Q   How do you know that?
15   A   It's just a general assumption.
16   Q   That's your assumption?
17   A   Yes.
18   Q   Did anyone ever tell you that?
19   A   They have compared phone log-ins to eTOTALS.
20   Q   Who?
21   A   Manager.
22   Q   How do you know that?
23   A   They've discussed it with me.
24   Q   Who?
25   A   Juanita Carver has, and Jeff Jones has

1 questioned a couple of times. You know, the question
2 was you show you were here, you know, this many hours,
3 but, you know, your eTOTALS says you were here this
4 many hours, so how come there's a difference.
5   Q   When -- you're saying Ms. Carver questioned
6 your overtime?
7   A   Yes.
8   Q   When?
9   A   I don't know specifically. It was like one
10 time.
11   Q   And what happened on that occasion?
12   A   I explained to her what the circumstances
13 were, and that was the end of it.
14   Q   What were the circumstances?
15   A   It was that -- after logging out and getting
16 ready to leave, I was asked to do some other things.
17 They said don't worry about logging in, just go ahead
18 and, you know, put it down on your TOTALS that you
19 worked.
20   Q   And were you paid on that occasion?
21   A   Yes.
22   Q   Fully paid?
23   A   Yes.
24   Q   Now, you said Mr. Jones also questioned your
25 overtime?

Page 98

1    A    They've -- I mean, they've looked at it in
2  comparing payrolls to phone logs.
3    Q    Mr. Jones questioned your overtime?
4    A    I mean, I wouldn't say he questioned the
5  hours, but he did go over it with me.
6    Q    When was that?
7    A    It would have been like in 2006 when he was my
8  manager.
9    Q    Was it more than one occasion or one occasion?
10   A    Just once.
11   Q    And what was the circumstance?
12   A    Just a manager review, employee review.
13   Q    So it was during your review?
14   A    Yes.
15   Q    And what did Mr. Jones say during your review?
16   A    He would just look at -- I mean, I don't know
17 exact conversation.  It was just seeing, I guess,
18 how -- I think it was in reference to, you know, if
19 you're there, your attendance.
20   Q    He was questioning your attendance?
21   A    He was just -- not questioning it, but just
22 pointed it out.
23   Q    I don't understand.  What was he saying about
24 your attendance?
25   A    I mean, they can see, you know, based on the

Page 99

1  phone log-in if you've been late, things like that, and
2  so he was -- basically, it was more of a compliment,
3  hey, you know, you've -- you know, for this amount of
4  -- for this time, at this point in the review, you
5  know, you've only shown, you know, two, three minutes
6  late for the entire time.
7    Q    So you had previously had a problem with
8  tardiness?
9    A    There's never been a problem, no.
10   Q    You improved your punctuality, and you were
11 getting a compliment on that?
12   A    It wasn't an improvement, no.  It was based --
13 it was just that he's happy that I'm coming in on time
14 and not being late all the time.
15   Q    Okay.  That conversation didn't have anything
16 to do with time reporting, did it?
17   A    It wasn't directly to payroll, no.
18   Q    Now, your counsel asked you several questions
19 about what he was terming "preshift overtime."  What
20 work are you referencing when you use the term
21 "preshift overtime"?
22   A    That's the getting the tools and everything up
23 and running.
24   Q    And I believe you mentioned in response to
25 your counsel's questions something about management

Page 100

1  telling you not to enter preshift time?
2    A    Yes.
3    Q    Now, the instances in which you claim that
4  management told you that, are those the ones we covered
5  earlier during your testimony?
6         MR. LANGELAND:  Objection.
7         If you remember them.
8    A    (By the Witness)  Not really.  I don't
9  remember.
10   Q    You don't remember.  Well, then we can ask
11 again, I guess, if you want.  When were you told don't
12 enter preshift time?
13   A    I mean, it's all the time.  It's reiterated,
14 you know, be here -- be here early, don't log into your
15 phone until right before your shift starts but be ready
16 when your shift starts.
17   Q    Who told you not to enter preshift time?
18   A    George Lambousis, Juanita Carver, Jeff Jones,
19 the team leads, Jay Stewart, Fred Nutter, Pete Debly
20 has told us that.
21   Q    When did Lambousis tell you not to enter
22 preshift time?  Was that in his e-mail, Exhibit 5 that
23 we looked at earlier?
24   A    It's --
25         MR. LANGELAND:  Objection, leading.

Page 101

1    A    (By the Witness)  That's one of them.  I mean,
2  that's inferred in that one.  There's been other
3  conversations, other e-mails to just reiterate, you
4  know, telling you don't log in until, you know, no more
5  than five minutes prior to your shift.
6    Q    Okay.  I'm not -- okay.  I want to know when
7  he told you not to enter preshift time.
8         MR. LANGELAND:  Objection.  I think he
9  answered that.
10   A    (By the Witness)  When they say don't log into
11 your phone --
12   Q    Okay.
13   A    -- because your phone log-in is your official
14 time card.
15   Q    If your phone log-in is your official time
16 card, why do you need to enter time into eTOTALS?
17   A    That's the payroll tracking.
18   Q    Did anyone ever tell you that your phone
19 log-in was your official time card?
20   A    Not in those specific words.
21   Q    Nobody ever told you that, did they?
22        MR. LANGELAND:  Objection.
23   A    (By the Witness)  Not in those specific words.
24   Q    What words did they use?
25   A    I mean, it's inferred.  Your time that you're

Page 102

1 there is recorded. So you have to use the phone. So
2 that's where they look for the hours. If I claim 30
3 minutes overtime, my phone needs to show 30 minutes
4 overtime unless it's scheduled that I'm somewhere else,
5 not available to log into the phone.
6    Q   Who is Jay Stewart?
7    A   He's a former team lead.
8    Q   When was he your team lead?
9    A   He's not officially -- was never official my
10 team lead. He's one of the team leads.
11    Q   He was never your team lead?
12    A   Not officially. If a team lead -- you know,
13 there's nine team leads. If any of the team leads tell
14 you to do something, it's no different than if your own
15 team lead tells you to do something.
16    Q   When did Mr. Stewart tell you not to record
17 preshift work?
18    A   It was probably like in 2006.
19    Q   And what do you recall about that instance?
20    A   It was a few minutes after start, and he had
21 mentioned -- he sent me a Same Time saying, well, how
22 come you're not available. I replied back saying,
23 because I'm, you know, getting my applications and
24 everything running. He said I should do that prior to
25 shift time.

Page 103

1    Q   Did he say anything one way or another about
2 recording your time?
3    A   It was not specific to not recording the time,
4 no.
5    Q   Did Mr. Lambousis ever make any statement to
6 you specifically about recording your time?
7    A   No.
8    Q   Did Ms. Carver ever make any statement to you
9 specifically about recording preshift time?
10    MR. LANGELAND:  Objection.
11    A   (By the Witness)  The statements from her is
12 log in no more than five minutes to start time.
13    Q   How about Mr. Jones?
14    A   Same thing.
15    Q   How about Mr. Nutter?
16    A   Don't log in till five minutes prior.
17    Q   And by "log in," they mean it was don't log
18 into the phone?
19    A   Yes.
20    MR. ROSSMAN:  I have no further
21 questions.
22    MR. LANGELAND:  I have no further
23 questions.
24    THE VIDEOGRAPHER:  Off video.
25    (Deposition concluded at 2:58 p.m.)

Page 104

1         C E R T I F I C A T E
2
3    I hereby certify that the foregoing
transcript was reported, as stated in the caption; that
4 the witness was duly sworn and elected to reserve
signature in this matter; that the colloquies, questions
5 and answers were reduced to typewriting under my
direction; and that the foregoing pages 1 through 103
6 represent a true, correct, and complete record of the
evidence given.
7    The above certification is expressly
withdrawn and denied upon the disassembly or
8 photocopying of the foregoing transcript, unless said
disassembly or photocopying is done under the auspices
9 of Hundt Reporting, LLC, and the signature and original
seal is attached thereto.
10    I further certify that I am not a relative or
employee or attorney of any party, nor am I in any way
11 interested in the result of said case.
    Pursuant to Article 8B of the Rules and
12 Regulations of the Board of Court Reporting of the
Judicial Council of Georgia, I make the following
13 disclosure: That I am a Georgia Certified Court
Reporter, here as an independent contractor for Hundt
14 Reporting, LLC; that I was contacted by the offices of
Hundt Reporting, LLC to provide court reporting services
15 for this deposition; that I will not be taking this
deposition under any contract prohibited by O.C.G.A.
16 15-14-37 (a) or (b); that I have no written contract to
provide reporting services with any party to the case,
17 any counsel in the case, or any reporter or reporting
agency from whom a referral might have been made to
18 cover this deposition; and that I will charge my usual
and customary rates to all parties in the case.
19    This, the 19th day of November, 2008.
20
21
22
23    _____
    Chama S. Perloe, CCR-A-457.
24
25

Page 105

1         ERRATA SHEET
2    Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure and/or OCGA 9-11(30)(e), any changes in
3 form or substance which you desire to make to your
deposition testimony shall be entered upon the
4 deposition with a statement of the reasons given for
making them.
5    To assist you in making any such corrections,
please use the form below. If supplemental or
6 additional pages are necessary, please furnish same and
attach them to this errata sheet.
7         - - -
8    I, the undersigned, RAYMOND J. LILES, do hereby
certify that I have read the foregoing deposition and
9 that said transcript is true and accurate, with the
exception of the following changes noted below, if any:
10
Page____Line____should read:_____
11 _____
12 Reason:_____
13
14 Page____Line____should read:_____
15 _____
16 Reason:_____
17
18 Page____Line____should read:_____
19 _____
20 Reason:_____
21
22 Page____Line____should read:_____
23 _____
24 Reason:_____
25

Page 106

1  Page_____Line_____should read:_____
2  _____
3  Reason:_____
4
5  Page_____Line_____should read:_____
6  _____
7  Reason:_____
8
9  Page_____Line_____should read:_____
10  _____
11  Reason:_____
12
13  Page_____Line_____should read:_____
14  _____
15  Reason:_____
16
17  Page_____Line_____should read:_____
18  _____
19  Reason:_____
20
21
          _____
22         RAYMOND J. LILES,
23  Sworn to and subscribed before me,
    _____, Notary Public.
24
    This _____ day of _____ 2008.
25  My commission expires: