Matthew W. Lampe (*pro hac vice*)
mwlampe@jonesday.com
Wendy C. Butler (WB-2539)
wbutler@jonesday.com
Craig S. Friedman (CF-1988)
csfriedman@jonesday.com
JONES DAY
222 East 41st Street
New York, New York 10017
(212) 326-3939

Matthew W. Ray (*pro hac vice*)
mwray@jonesday.com
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
(214) 220-3939

Attorneys for Defendant
International Business Machines Corporation

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- X

| | |
|---|---|
| **CHARLES SEWARD, Individually and on Behalf of All Others Similarly Situated,** ) ) ) | No. 08 CV 3976 (KMK) |
| **Plaintiff,** ) ) | **ECF CASE** |
| -against- ) ) | **DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO PROCEED AS A COLLECTIVE ACTION AND TO FACILITATE NOTICE UNDER 29 U.S.C. § 216(B)** |
| **INTERNATIONAL BUSINESS MACHINES CORPORATION,** ) ) ) | |
| **Defendant.** ) ) | |

-------------------------------------------------- X

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

RELEVANT FACTUAL BACKGROUND........................................................................ 3

    I.      IBM'S OVERTIME POLICY AND THE REPORTING OF OVERTIME ........... 3

    II.     THE RIVEREDGE FACILITY AND ITS VARIOUS TEAMS............................ 4

    III.    PROCEDURAL HISTORY ................................................................................. 8

ARGUMENT....................................................................................................................... 9

    I.      THIS COURT SHOULD DENY NOTICE BECAUSE PUTATIVE
           CLASS MEMBERS ARE NOT SIMILARLY SITUATED................................ 11

        A.    Pre-Shift Work Is Not A Uniform Requirement At Riveredge ................ 11

        B.    Seward's Limited Evidence ..................................................................... 12

             1.    No Common Written Evidence ..................................................... 13

             2.    Seward's Testimony Establishes No Common Condition............. 14

    II.     THIS COURT SHOULD DENY NOTICE BECAUSE
           SEWARD HAS NOT PRESENTED EVIDENCE OF
           A COMMON, UNLAWFUL POLICY ............................................................ 16

    III.    SEWARD'S PROPOSED NOTICE IS DEFECTIVE ......................................... 21

        A.    Defects In The Proposed Notice ............................................................. 21

        B.    Posting On IBM's Intranet Would Be Inappropriate............................... 22

        C.    Seward's Request For Telephone Numbers Is Inappropriate................... 24

CONCLUSION................................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

Page

### CASES

*Barfield v. New York City Health & Hosps. Corp.,*
  2005 WL 3098730 (S.D.N.Y. Nov. 18, 2005) .................................................10

*BPH & Co., Inc. v. NLRB*, 333 F.3d 213 (D.C. Cir. 2003) ..........................................24

*Burch v. Qwest Comms., Int'l., Inc.*, 500 F. Supp. 2d 1181 (D. Minn. 2007) .............................20

*Clarke v. Convergys Customer Mgmt. Group.*, 370 F. Supp. 2d 601 (S.D. Tex. 2005) ...............20

*D'Anna v. M/A-Com, Inc.*, 903 F. Supp. 889 (D. Md. 1995) .......................................10

*Dedvukaj v. Equilon Enters., LLC*, 301 F. Supp. 2d 664 (E.D. Mich. 2004) ..............................15

*Delgado v. Ortho-McNeil, Inc.*, 2007 WL 2847238 (C.D. Cal. Aug. 7, 2007) .....................22, 24

*Engers v. AT&T*, 2007 WL 1557163 (D.N.J. May 24, 2007) .........................................22

*Francis v. A&E Stores, Inc.*, 2008 WL 4619858 (S.D.N.Y. Oct. 16, 2008) ...............................16

*Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941 (W.D. Ark. 2003) .............................10

*Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862 (S.D. Ohio 2005) ..................................15

*Hens v. Clientlogic Operating Corp.*, 2006 WL 2795620 (W.D.N.Y. Sept. 26, 2006) ..............20

*Hinojos v. Home Depot, Inc.*, 2006 WL 3712944 (D. Nev. Dec. 1, 2006) ..................................14

*Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989) ......................... 3, 9-10, 10, 19, 21, 22

*Houston v. URS Corp.*, 2008 WL 5336143 (E.D. Va. Dec. 17, 2008) ........................................24

*Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363 (S.D.N.Y. 2007) ...............................22

*Mike v. Safeco Ins. Co.*, 274 F. Supp. 2d 216 (D. Conn. 2003) ................................................9, 10

*NLRB v. J. P. Stevens & Co., Inc.*, 464 F.2d 1326 (2d Cir. 1972) ..........................................23-24

COI-1413015v11

*Parks v. Eastwood Ins. Svcs., Inc.*, 2002 WL 34370244 (C.D. Cal. July 29, 2002) .....................24

*Reab v. Elec. Arts, Inc.*, 214 F.R.D. 623 (D. Colo. 2002) .............................................22

*Richards v. Comp. Scis. Corp.*, 2004 WL 2211691 (D. Conn. Sept. 28, 2004) .........................15

*Russell v. Ill. Bell Tel. Co.*, 575 F. Supp. 2d 930 (N.D. Ill. 2008) .................................20

*Russell v. Wells Fargo & Co.*, 2008 WL 4104212 (N.D. Cal. Sept. 3, 2008) .......................22, 23

*Salinas v. O'Reilly Auto., Inc.*, 2005 WL 3783598 (N.D. Tex. Nov. 17, 2005) ...................17, 19

*Seever v. Carrols Corp.*, 528 F. Supp. 2d 159 (W.D.N.Y. 2007) ...........................................17, 19

*Sharer v. Tandberg, Inc.*, 2006 WL 2988104 (E.D. Va. Oct. 17, 2006) ......................................23

*Sherrill v. Sutherland Global Servs.*, Inc., 487 F. Supp. 2d 344 (W.D.N.Y. 2007) ...................20

*Songer v. Dillon Resources, Inc.*, 569 F. Supp. 2d 703 (N.D. Tex. 2008) ...........................10, 15

*Vogt v. Texas Instruments, Inc.*, 2006 WL 4660134 (N.D. Tex. Sept. 19, 2006) ........................24

*Wacker v. Personal Touch Home Care, Inc.*,
    2008 WL 4838146 (E.D. Mo. Nov. 6, 2008) ...................................................... 12-13, 15

*West v. Border Foods, Inc.*, 2006 WL 1892527 (D. Minn. July 10, 2006) ....................11, 17, 19

## STATUTES

29 U.S.C. § 216(b) ..........................................................................................1, 2, 3, 9, 21

29 U.S.C. § 255..................................................................................................21

## RULES

Federal Rule of Civil Procedure 26 ............................................................................8

## INTRODUCTION

International Business Machines Corporation's ("IBM's" or the "Company's") Riveredge facility in Atlanta, Georgia consists of two buildings that house a number of business operations. At this location, IBM employs a variety of individuals, including phone-based employees ("call center representatives" or "CCRs")[1] who field and service calls related to technical issues, contracts, and other matters. These employees work on dozens of teams, which are subject to different expectations and work rules, including those relating to pre-shift overtime. Most Riveredge CCR teams do not work pre-shift overtime – i.e., they are structured and operated such that employees begin work only at the start of their scheduled shifts. A small number of teams do, however, report before the start of their scheduled shifts, so they can be "call ready" – prepared to field calls – when their shifts begin. In these instances, employees arrive early to boot up their computers and open computer applications. Under IBM policy, this pre-shift overtime is fully compensable.

Against this backdrop, Named Plaintiff Charles Seward ("Seward") and a few co-workers (Cathy Barday ("Barday"), Raymond Liles ("Liles"), Gary Salles ("Salles"), Eugene Scott ("Scott"), and James Starkey ("Starkey")) challenge what they claim is a uniform IBM policy of not paying pre-shift overtime. In boilerplate declarations signed at the outset of this case, they alleged that IBM directs its employees "both verbally at meetings and via mass e-mails" that they are "required to work 'off the clock' without overtime compensation." (Seward Dec. ¶ 30; see also Barday Dec. ¶ 30; Salles Dec. ¶ 33; Scott Dec. ¶ 13.) On the basis of these assertions, Seward requests conditional certification of a class that would include all CCRs at Riveredge.

This Court should deny Seward's request. To begin with, Seward cannot possibly prove that he is "similarly situated," 29 U.S.C. § 216(b), to Riveredge's CCRs as to his denial of pre-

---

[1] These are not IBM job titles, but since Seward has adopted them, IBM will use them here for simplicity.

shift overtime claim because his purported class does not share the baseline requirement of working pre-shift. In fact, a small minority of teams are subject to an early-reporting requirement. Given that the working condition allegedly giving rise to unpaid overtime is not common to all Riveredge CCRs, Seward's certification bid cannot even get off the ground.

Moreover, Seward fails to proffer evidence of an unlawful policy sufficient to justify conditional certification. Indeed, following the limited discovery ordered by the Court on the issue of conditional certification, Seward has been forced to admit that IBM's policy on pre-shift overtime is just the opposite of what he originally alleged. As Seward now concedes:

> Consistent with federal law, IBM's written policies confirm that all of this pre-shift work time is compensable time. In fact, IBM's "Employee Compensation Policies – Manager Training", states that "common examples" of off-the-clock work that "must" be compensated include:
>
> **Allowing or requiring work to be done *before* or after a shift**
>
> - **employee *arrives early* and starts working;**
>
> - **employee logs on to computer *before* start of shift**

(Motion To Proceed As A Collective Action And To Facilitate Notice Under 29 § U.S.C. 216(B) ("Motion") at 8 (citing and quoting Exhibit 15, with emphasis and boldface supplied by Seward).) Additionally, Seward has now flatly recanted his declaration claims of "mass emails" and verbal instructions directing employees to work pre-shift "without overtime compensation." (*See, e.g.*, Seward Dep. 282:24-25 ("[M]ass e-mails – that one I don't recall.").)

In the end, Seward and his handful of witnesses can muster nothing more than anecdotal assertions that isolated, rogue managers <u>violated</u> Company policy by not allowing particular employees to record pre-shift working time. But without evidence of an overarching Company policy providing a basis for group adjudication of his claim, Seward cannot satisfy Section

216(b)'s "similarly situated" standard. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165,

170 (1989) (collective action procedures should be limited to circumstances in which "[t]he

judicial system [would] benefit by efficient resolution in one proceeding of common issues of

law and fact arising from the same alleged discriminatory activity"). For this reason, as well,

this Court should deny Seward's Motion.

## RELEVANT FACTUAL BACKGROUND

### I.     IBM'S OVERTIME POLICY AND THE REPORTING OF OVERTIME

IBM policy provides that non-exempt employees will be paid for all hours worked and

will receive overtime when they work more than 40 hours in a workweek. (Seward Dep. 252:22-

255:19; Exhs. 27, 28 (policy providing that "[a]ll hours in excess of 40 hour worked, exclusive

of the employee meal breaks, during an employee's regular payroll workweek will be considered

as weekly overtime hours."); Seward Dep. 271:3-272:11; Exh. 32 at 7 (training materials

providing that "off the clock" work is improper because it "intentionally creates a false record of

employee time" and "may also cause a violation of overtime pay or other applicable labor

laws"); Seward Dep. 17:6-18:8; Exh. 1 (offer letter providing "[a]ll hours worked in excess of 40

per week will be compensated at a rate of time and one half".)

IBM's policies not only require the payment of overtime as a general matter, they

expressly provide that employees will be fully compensated for any pre-shift overtime. As

Seward himself recognizes, IBM requires that managers compensate employees for work that

they are "allow[ed] or require[ed]" to perform before the start of their scheduled shifts. (Motion

at 8 & Exhibit 15.) This includes any situation where an "employee arrives early and starts

working." *Id.* Importantly, IBM policy expressly provides that an employee must be fully

compensated where he or she "logs on to [a] computer before [the] start of [his or her] shift." *Id.*

To account for employees' overtime, including any pre-shift overtime, IBM uses an exception-based timekeeping system known as eTOTALS.[2]  (Seward Dep. 250:10-17; Boniche Dec. ¶¶ 3-10.)  By default, this system credits employees with the hours that they are scheduled to work.  (Seward Dep. 250:18-21; Boniche Dec. ¶ 3.)  If an employee works additional hours, before or after their scheduled shift, IBM expects and requires the employee to report this time in the eTOTALS system.  (Boniche Dec. ¶ 5.)  Indeed, IBM's Business Conduct Guidelines, which employees are required to read and acknowledge annually, expressly provide that it is the employee's obligation to accurately record all hours worked, including overtime.  (Seward Dep. 239:2-240:14; Exh. 26 at §3.6.)

For their part, Seward and his witnesses are fully aware of their obligation to report overtime for payment, and they know how to do so.  (Liles Dep. 85:19-22 (acknowledging that IBM expects him to submit time cards that are "complete, accurate, and timely"); Seward Dep. 252:8-9 ("That's where you're supposed to put your overtime is on eTOTALS."); Scott Dep. 58:18-25 (conceding that he had "access to totals" and used it to "report overtime"); Starkey Dep. 71:13-72:3 (conceding that, when he works overtime, it is his responsibility "to fill out that time card and reflect the overtime").)  Seward and his affiants have regularly used eTOTALS to report overtime and receive overtime pay.  (Liles Dep. 27:5-8; Seward Dep. 251:7-8, 252:6-17; Starkey Dep. 71:8-25, 77:2-5, Exh. 6; Scott Dep. 58:18-25, Exh. 2.)

## II.   THE RIVEREDGE FACILITY AND ITS VARIOUS TEAMS

IBM's Riveredge facility is made up of two buildings, connected at the center, each with nine floors.  (Moody Dec. ¶ 3.)  Call center representatives at this facility are divided into dozens of different teams, each of which is overseen by its own managers and team leads.  (*Id.* at ¶ 3.)  Seward and his witnesses are current or former CCRs at Riveredge, and during the time period

---

[2] The predecessor system was known as TOTALS.  (Boniche Dec. ¶ 11.)

relevant to this case, they worked on a handful of the teams at the facility.  Barday and Seward

(for some of the period) worked on the IBM Teach team, reporting to manager Kerry Bethea.[3]

(Barday Dep. 13:15-14:21, 74:7-11; Seward Dep. 14:6-25.)  Seward, along with Scott, also

worked on the Software Customer Entitlement Team, reporting to Juanlyn Williams.  (Seward

Dep. 12:8-13:25; Scott Dep. 11:1-4, 14:24-15:4.)  Starkey and Liles worked on Server System

Support (also referred to as "System X"), reporting to Juanita Carver and George Lambousis.

(Liles Dep. 10:24-11:6; 14:2-23; Starkey Dep. 13:8-11, 15:3-15:9; 18:1-19:8; 23:12-14.)  Salles

worked for the Intel Smart Center Think Products Support Team, reporting to Denise Hines-

Anderson.  (Salles Dec. ¶ 1; Hines-Anderson Dec. ¶¶ 2-3.)

The various teams at Riveredge operate under distinct rules and business models.  (*See*,

*e.g.*, Seward Dep. 296:17-20 (admitting that the two teams he worked on had different business

goals).)  One difference relates to the start of employees' scheduled shifts and, specifically, to

when employees boot up their computers and log on to computer applications.  Most teams are

operated and structured such that this work occurs only after the start of employees' scheduled

shifts.  For example, employees on Michael MacDonald's SSR Team for Retail Store Systems

Competency Center, as well as employees on Hiawatha Anthony's Direct Access Storage

Devices Team, do not log out of their computers at the end of the day.  (MacDonald Dec. ¶¶ 2,

10; Anthony Dec. ¶¶ 2, 9.)  Consequently, employees on these teams do not "boot up" on a daily

basis, and there is no need or requirement that they arrive early to do so.  (*Id.*)

Employees on Viki Torres' Entitlement Queue Team are likewise not subject to an early

reporting requirement.  (Torres Dec. ¶ 9.)  These employees do not need to be ready to accept

calls at the start of their shifts because they spend the vast majority of their time returning phone

calls left on a call queue, and they have a two-hour window in which to do so.  (*Id.* at ¶ 5-6.)

---

[3] IBM transferred the IBM Teach workload to the Philippines in 2006.  (Barday Dep. 14:17-21, 52:7-21.)

Thus, there is no business need (or requirement) that they arrive early to ready themselves to field calls. (*Id.*) This is likewise the case for Hiawatha Anthony's Direct Access Storage Devices Team (one-hour window to return external calls, 30 minutes for internal calls) and Jim Waters's Retail Store Systems Competency Center Team (one-hour window). (Anthony Dec. ¶¶ 2, 5-7; Waters Dec. ¶¶ 2, 6.)

Further, employees on Lisa Moody's Depot Support Administration Team do not report early. (Moody Dec. ¶¶ 2, 5-8.) While these employees field incoming calls, they work staggered, overlapping shifts. (*Id.* at ¶ 5.) The purpose of this is to provide coverage on the phones at all times, allowing incoming employees to perform necessary preparatory tasks after the start of their shifts. (*Id.*) In fact, Moody structures her team such that her employees have up to a thirty-minute window – after the start of their scheduled shift – to log into their computers, get their computer tools up and running, and do any other necessary tasks before they take their first call. (*Id.* at ¶ 7.) Like Moody's Depot Support Administration Team, through the use of staggered shifts, many other teams have no reason to—and do not—require employees to report early. (*See* Betterson Dec. ¶¶ 2, 5-7 (PSHigh Products Team; LCPU Products Team); Davis Dec. ¶¶ 2, 5-7 (Software Receive Call Team; Software Customer Entitlement Team; Hardware Call Handle Team); MacDonald Dec. ¶¶ 2-3, 6 (SSR Support Team for Retail Store Systems Competency Center; MPM Printer Team); Murphy Dec. ¶¶ 4-6, 8 (Banking Competency Center Team; SSR Support Team for Retail Store Systems Competency Center; Systems Storage Group Team); Starratt Dec. ¶¶ 2, 4-6 (Hardware Customer Entitlement Team); Torres Dec. ¶¶ 2-3, 7 (Entitlement Queue Team; User Support Group Team, Multi-Vendor Services Team; Pended QSAR Team).)

Individual managers at Riveredge do have the discretion to require employees to report early, and some CCRs have been required to do so. (*But see* Seward Dep. 97:18-100:9 (conceding that his current practice is "just working after my start time").) For example, George Lambousis has responsibility for the System X Team, the team on which Seward's witnesses Liles and Starkey worked. (Lambousis Dec. ¶¶ 2-3.) In 2005, Lambousis sent an e-mail to employees on that team setting out his team's "policy on start time." (Motion Exh. 13; *see also* Lambousis Dec. ¶ 4.) Lambousis wrote that "your workstation is powered up, you are logged on to the necessary applications, and you are in an available state on your phone at your start time." (*Id.*) Lambousis took the occasion to clarify his policy because System X had acquired several new team members who came from areas that did not maintain a call-ready requirement. (Lambousis Dep. 62:22-64:13; Exh. 4; Lambousis Dec. ¶ 5.) Lambousis had no reason to and did not send his e-mail to other teams, over which he has no authority. (Lambousis Dec. ¶ 6; *see also* Anthony Dec. ¶ 14; Betterson Dec. ¶ 12; Davis Dec. ¶ 13; MacDonald Dec. ¶ 14; Moody Dec. ¶ 14; Murphy Dec. ¶ 15; Starratt Dec. ¶ 12; Torres Dec. ¶ 15; Waters Dec. ¶ 13.)

Another illustration relates to an August 2006 e-mail issued by Gary Kamprath. Kamprath is a technical support employee who prepares Daily Operating Reports ("DORs") for certain Riveredge teams on the fifth floor. (Kamprath Dec. ¶¶ 3, 5.) The DORs measure how busy a team is while on the phone. (*Id.* ¶ 5.) Kamprath is not a manager, and he does not supervise other employees. (*Id.* at ¶ 12.) In August 2006, Kamprath sent an e-mail regarding a change to the DORs to the fifth-floor managers who receive these reports. (Kamprath Dec. ¶¶ 3, 6-7; Motion Exh. 14.) In the e-mail, Kamprath provided "recommendations" regarding, among other things, when employees should log into the phone system. (Motion Exh. 14.) (The time spent while logged into the phone system is the time during which the DOR measures activity.

(Kamprath Decl. ¶ 8).)  The e-mail recommended that the recipients "[e]nsure reps log in, only as required (ie scheduled to work at 9:00, be ready at 8:50), but only log in at 9:00 am. . . ." (*Id.*) Most managers subject to DOR reports did not follow the recommendation that reps be call-ready before their shifts, as these managers did not believe that early reporting was necessary for their respective teams.  (Davis Dec. ¶¶ 5-7, 14; Moody Dec. ¶¶ 5, 7-8, 15; Starratt Dec. ¶¶ 4, 13; Torres Dec. ¶¶ 6, 16.)  Seward alleges that his managers forwarded Kamprath's e-mail to him and that they did require him to be call-ready.  (Seward Dep. 321:9-14; 326:20-321:16.)  Seward is quick to concede, however, that the phone log-in time mentioned by Kamprath does not determine his pay and that it is eTOTALS that tracks time for payroll purposes.  (Seward Dep. 287:20-288:10; *see also* Boniche Dec. ¶ 9.)  In all events, Kamprath did not forward his recommendations to managers who were not subject to DOR reporting, as he had no responsibility for supporting those teams.  (Kamprath Dec. ¶¶ 3, 6; *see also* Anthony Dec. ¶ 13; Betterson Dec. ¶¶ 12; MacDonald Dec. ¶ 14; Murphy Dec. ¶ 15; Waters Dec. ¶ 14.)

## III.   PROCEDURAL HISTORY

Seward initiated this action on April 28, 2008, at the time proposing a class that would include "current and former Call Center Employees employed by Defendant IBM in Georgia and throughout the United States."  (Complaint, Docket Entry No. 1, at ¶ 12.)  On September 16, 2008, this Court held a Fed.R.Civ.P.26 conference, and the Court ordered limited discovery on the issue of whether Seward is similarly situated to the members of his putative class.

During discovery, Seward produced to IBM boilerplate declarations from himself, Barday, Salles, and Scott.  IBM subsequently deposed Seward, Barday and Scott, and these individuals recanted material portions of their declarations.  For example, Seward offered declaration testimony that he received written instructions to work off the clock in "mass emails directed to all call center employees nationwide."  (Seward Dec. ¶ 30.)  At deposition, Seward

8

was dumbfounded.  "[M]ass e-mails – that one I don't recall.  I apologize.  I'm trying to remember why I have that statement there.  I must have an e-mail or something to back up that statement."  (Seward Dep. 282:22-283:2.)  Seward went on to state that, if he had such an e-mail, he would produce it.  (*Id.* at 283:3-10.)  He never did.  (*Compare also* Scott Dec. ¶ 13 *with* Scott Dep. 50:5-8 ("Not – not in written – not – nothing documented.").)

Further, in his declaration, Seward claimed that he received verbal instructions to work off-the-clock.  (Seward Dec. ¶ 30.)  When asked at deposition whether a manager had instructed him not to report pre-shift work or to inaccurately record his time, he conceded "[t]hey wouldn't come right out and say that" and "I can't be specific."  (Seward Dep. 269:23-270:7.)

IBM attempted to depose Seward's remaining affiant, former-employee Salles.  (Salles Dec. ¶ 1.)  It was unsuccessful because Salles avoided service of IBM's subpoena, despite eleven attempts.  (Batzle Dec. ¶¶ 1-14.)  When IBM's process server called Salles to explain that he needed to serve a subpoena, Salles responded "good luck" and hung up.  (Batzle Dec. ¶ 8.)  Likewise, Seward's attorneys were unable to arrange Salles' deposition.  (Ray Dec. ¶¶ 3-4.)

On December 1, 2008, Seward served IBM with the instant Motion.  In it, Seward seeks conditional certification of call center representatives only at the Riveredge facility.  (Motion 1 n.1.)  He bases his conditional certification claim on one theory – that he and his fellow putative class members are similarly situated with respect to "unpaid time worked pre-shift."  (*Id.* at 1, 3.)

## ARGUMENT

A plaintiff may obtain conditional certification and notice by making a threshold showing that he is "similarly situated" to his proposed class members.  29 U.S.C. § 216(b).  The plaintiff bears the burden of proof on this issue, *see Mike v. Safeco Ins. Co.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003), and courts have considerable discretion in determining whether the plaintiff's showing warrants conditional certification, *see Hoffmann-La Roche Inc. v. Sperling*, 493 U.S.

165, 169 (1989). However, neither the Supreme Court nor the Second Circuit has given district courts detailed guidance as to the exercise of this discretion. *See Mike*, 274 F. Supp. 2d at 220 n.6 ("There is no decision by . . . the Second Circuit regarding the proper procedure for determining whether . . . to allow a plaintiff to proceed [with] a collective action."). Without such guidance, some district courts have held that a plaintiff may obtain notice if he makes "a modest factual showing sufficient to demonstrate that [he] and potential plaintiffs together were victims of a common policy or plan that violated the law." *Barfield v. N.Y.C. Health & Hosps. Corp.*, 2005 WL 3098730, at *1 (S.D.N.Y. Nov. 18, 2005) (internal citations omitted).

In all events, the Supreme Court has described issuance of notice as a tool for "case management." *Hoffmann-La Roche*, 493 U.S. at 174. It has further suggested that courts should deny a request for notice if the plaintiff fails to demonstrate that group adjudication would promote the efficient resolution of common claims. *Id.* at 170 (notice appropriate only where the judicial system would benefit by the "efficient resolution in one proceeding of common issues of law and fact"); *see also Songer v. Dillon Resources, Inc.*, 569 F. Supp. 2d 703, 706-07 (N.D. Tex. 2008) (noting attorneys' and the courts' "responsibility" to refrain from "stirring up unwarranted litigation") (internal cite and quotes omitted); *D'Anna v. M/A-Com, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995) (the court must ensure that the employer is not "unduly burdened by a frivolous fishing expedition"). Thus, a motion for notice should be denied where, as here, the evidence demonstrates that putative class members are not similarly situated with respect to the plaintiff's allegations. *See Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) ("It would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that . . . class members are not similarly situated.").

COI-1413015v11

I.   **THIS COURT SHOULD DENY NOTICE BECAUSE PUTATIVE CLASS MEMBERS ARE NOT SIMILARLY SITUATED**

In this case, putative class members are not similarly situated with respect to Seward's claims, and notice would not serve purposes of efficiency and judicial economy. To the contrary, notice would needlessly stir up wasteful litigation among hundreds of individuals who were subject to neither uniform rules regarding the need for pre-shift work nor an overarching Company compensation policy that is even arguably unlawful. For these reasons, the Court should exercise its discretion to deny Seward's Motion.

A.   **Pre-Shift Work Is Not A Uniform Requirement At Riveredge**

While IBM strenuously denies that any employees are precluded or discouraged from reporting pre-shift overtime, the undisputed evidence confirms that this is a moot issue for most Riveredge teams because most teams do not work pre-shift. *See, e.g., West v. Border Foods, Inc.*, 2006 WL 1892527, at *7 (D. Minn. July 10, 2006) ("neither the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if we were to overlook facts which generally suggest that a collective action is improper").

For example, on some teams, such as the Direct Access Storage Devices Team and the SSR Support Team for Retail Store Systems Competency Center, employees do not even log out of their computers each night. (Anthony Dec. ¶¶ 2, 9; MacDonald Dec. ¶¶ 2, 10.) Since their systems are always on, these employees do not need to arrive early to boot up. (*Id.*)

Similarly, some teams do not field incoming calls. Rather, they respond to messages that customers have left for IBM. Since these employees do not answer phones beginning at specified time periods, there is no need for them to report early in order to prepare to do so. The Entitlement Queue Team, the Retail Stores Systems Competency Center Team, and the Direct

Access Storage Devices Team fall into this category.  (Torres Dec. ¶¶ 6-7, 9; *see also* Anthony Dec. ¶¶ 2, 4, 6; Waters Dec. ¶¶ 2, 4, 6.)

Further, many teams eliminate the need for pre-shift work through staggered start times. Teams in this category include:

- Banking Competency Center Team
- Depot Support Administration Team
- Direct Access Storage Devices Team
- Entitlement Queue Team
- Hardware Call Handle Team
- Hardware Customer Entitlement Team
- LCPU Products Team
- MPM Printer Team
- Pended QSAR Team
- PSHigh Products Team
- Davis's Software CET Team
- Davis's Software Receive Call Team
- SSR Support Team for Retail Store Systems Competency Center
- Systems Storage Group Team
- USG Team

(Anthony Dec. ¶¶ 2, 8; Betterson Dec. ¶¶ 2, 5-7; Davis Dec. ¶¶ 2, 5-7; MacDonald Dec. ¶¶ 2-3, 6, 8; Moody Dec. ¶¶ 2, 5-8; Murphy Dec. ¶¶ 4-6, 8, 10; Starratt Dec. ¶¶ 2, 4-6; Torres Dec. ¶¶ 3, 7-9; Waters Dec. ¶¶ 2, 5-6, 8.)

In sum, pre-shift overtime is not a uniform practice throughout Riveredge.  Thus, whether such overtime is paid is not germane to wide swaths of call center representatives at the facility, and Seward's "similarly situated" showing fails at this most basic of levels.

### B.     Seward's Limited Evidence

Seward's evidence is not to the contrary.  In fact, it does not address facility-wide practices at all, but rather just the few areas in which he and his witnesses worked.  Particularly in the face of IBM's showing, this is insufficient to support any claim that employees facility-wide are subject to pre-shift overtime.  *See, e.g., Wacker v. Personal Touch Home Care, Inc.,*

2008 WL 4838146, at *4 (E.D. Mo. Nov. 6, 2008) ("Where there is no evidence of a company-wide policy, company-wide certification is inappropriate.").

### 1.    No Common Written Evidence

As an initial matter, Seward has absolutely no common documentary evidence to support his bald claim (Motion at 5) that "IBM specifically directs, trains, and requires its [call center representatives], *in writing*, to arrive at work before the start of their scheduled shift."  In this regard, Seward places great reliance (Motion 6-7) on a 2005 e-mail from George Lambousis. (Motion Exh. 13.)  But this e-mail covers just one team: the System X Team on which Starkey and Liles work.  (Lambousis Dec. ¶¶ 2-3; *compare* Anthony Dec. ¶ 14 (not part of System X and never received such an e-mail); Betterson Dec. ¶ 12 (same); Davis Dec. ¶ 13 (same); MacDonald Dec. ¶ 14 (same); Moody Dec. ¶ 14 (same); Murphy Dec. ¶ 15 (same); Starratt Dec. ¶ 12 (same); Torres Dec. ¶ 15 (same); Waters Dec. ¶ 13 (same).)  Indeed, Lambousis issued this e-mail precisely because System X had seen an influx of new employees from areas in which employees were <u>not</u> expected to report early, and Lambousis wanted to confirm that his policy was different.  (Lambousis Dec. ¶ 5.)  Thus, if anything, the Lambousis e-mail only underscores the unique nature of the System X call-ready requirement.

Similarly, Seward invokes (Motion at 7-8) an August 2006 e-mail from Gary Kamprath; Seward claims that the team lead on his IBM Teach team forwarded the document to him and a handful of teammates.  (Motion Exh. 14; Seward Dep. 326:1–327:16 (conceding that he has "no idea" whether other call center representatives received the Kamprath e-mail).)  Again, however, this document is not common to putative class members.  Kamprath is responsible for a type of reporting called DOR reporting.  (Kamprath Dec. ¶ 3.)  Thus, Kamprath limited his e-mail to managers of teams that were subject to DOR reporting, and he did not send his e-mail, therefore, to managers such as Hiawatha Anthony, Gennelle Betterson, Michael MacDonald, Greg

Murphy, Jim Waters, and the numerous other managers of teams that did not utilize these reports.  (Kamprath Dec. ¶¶ 3, 6; *see also* Anthony Dec. ¶¶ 13-14; Betterson Dec. ¶¶ 11-12; MacDonald Dec. ¶¶ 13-14; Murphy Dec. ¶¶ 14-15; Waters Dec. ¶¶ 12-13.)  Moreover, Kamprath is not a manager, and his e-mail does not purport to set forth <u>any</u> policy.  (Kamprath Dec. ¶¶ 9-10, 12.)  Instead, Kamprath set forth only "recommendations." (Motion Exh. 14.)  And multiple recipients of Kamprath's e-mail testified, without dispute, that they did not follow any recommendations from Kamprath to have their CCRs report early to work.  (Davis Dec. ¶ 14; Moody Dec. ¶ 15; Starratt Dec. ¶ 13; Torres Dec. ¶ 16.)  Thus, like the Lambousis e-mail, the Kamprath communication provides no support to a claim that Riveredge's CCRs as a whole are subject to an early reporting requirement.

### 2.    Seward's Testimony Establishes No Common Condition

Without common documentary evidence, Seward turns (Motion at 6-7) to testimony in his attempt to show that early reporting is a common condition of employment at Riveredge. Again, however, Seward falls well short of the mark.

As an initial matter, three of Seward's witnesses – Scott (who worked with Seward on the Software Customer Entitlement team) and Liles and Starkey (who worked together on System X) – flatly admitted that they have no idea what policies and practices prevailed outside of their own teams.  (Liles Dep. 66:21-25 (admitting that he is unaware of other teams' practices); Scott Dep. 137:20-138:4 ("If it was not my department or not a department I worked in, I wouldn't know."); Starkey Dep. 69:1-7 ("I don't know about other floors.").)  Plainly, these individuals provide no probative evidence beyond their own teams and their own situations. *See Hinojos v. Home Depot, Inc.*, 2006 WL 3712944, at *2 (D. Nev. Dec. 1, 2006).

Further, two of Seward's other witnesses – Barday and Seward himself – offer (Motion at 5-6) only anecdotal hearsay accounts of what they picked up from co-workers in casual

conversation.  *See, e.g., Songer*, 569 F. Supp. 2d at 707 (disregarding statements lacking a foundation in "personal knowledge"); *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 865 (S.D. Ohio 2005) (similar); *Richards v. Comp. Scis. Corp.*, 2004 WL 2211691, at *1 (D. Conn. Sept. 28, 2004) (similar).  For example, Seward's testimony is that unidentified individuals informed him they were subject to a call ready requirement.  (Seward Dep. 47:18-20 ("They were under the same guidelines that we were, but I – I was not witness to it.  I wasn't witness.  I didn't see the e-mails."); *id.* at 50:9-11 (testifying that he cannot provide names of hearsay declarants because "I don't socialize with them, sir"); *id.* at 51:21-52:8 ("Right.  I don't know their names.").)  Likewise, Barday claims that "friends" told her they were required to come in early.  (Barday Dep. 109:12-17 ("I have friends who worked in that area."); *id.* at 110:20-25 ("I have a friend that worked there . . . ."); *see also id.* at 113:22-114:6 ("There were [others], but I don't remember names . . . .").)  Courts rightfully hold that such assertions are not admissible evidence, and they provide no foundation for a request for conditional certification and notice.  *See, e.g., Songer*, 569 F. Supp. 2d at 707; *Harrison*, 411 F. Supp. 2d at 865-67; *Richards*, 2004 WL 2211691 at *1.  In all events, Seward and Barday's anecdotal accounts of alleged third-party conversations do not even arguably rise to the level of facility-wide evidence.  *See, e.g., Wacker*, 2008 WL 4838146 at *4 (requiring "evidence of a company-wide policy").

Finally, Seward offers (Motion at 6) Salles' boilerplate declaration.  But even setting aside the fact that Salles fails to identify whom IBM purportedly directed "to be ready to start taking calls precisely at the time our scheduled shift started" (Salles Dec. ¶ 9), any reliance on Salles' testimony is improper.  *See, e.g., Dedvukaj v. Equilon Enters., LLC*, 301 F. Supp. 2d 664, 667-68 (E.D. Mich. 2004) (holding that "it is unreasonable to rely on affidavit 'evidence' from an individual who has made himself unavailable for discovery and for whom there is even no

indication he will be available for trial"). In particular, IBM could not depose Salles because he openly avoided service of IBM's subpoena. (Batzle Dec. ¶¶ 5, 8, 10.) He is a former IBM employee, and his current whereabouts are unknown to both the Company and apparently to Seward's counsel, who could not coordinate his deposition. (Ray Dec. ¶ 3.) Thus, particularly since (*supra* at 2-3) Seward and other witnesses recanted material declaration allegations at deposition, permitting Seward to use Salles' untested declaration would be inequitable.

In sum, Seward's bid for conditional certification fails at the threshold: he wants to certify a class on a pre-shift overtime claim, yet he has made no showing that his putative class is subject to a uniform pre-shift overtime requirement; and the evidence indisputably shows that it is not. Seward has failed to support his contention that Riveredge CCRs are similarly situated for purposes of his claims, and, for this reason, the Court should deny his Motion.

## II.    THIS COURT SHOULD DENY NOTICE BECAUSE SEWARD HAS NOT PRESENTED EVIDENCE OF A COMMON, UNLAWFUL POLICY

Additionally, this Court should deny conditional certification for the independent reason that Seward has produced no evidence of an arguably common, unlawful policy that could justify group adjudication. Specifically, even if Seward could establish that all call center representatives at Riveredge work pre-shift overtime – which he cannot – this would not justify conditional certification since there is nothing unlawful about requiring employees to work overtime. Rather, as Seward concedes, he must make "a modest factual showing sufficient to demonstrate that [he] and potential plaintiffs together were victims of a common policy or plan that <u>violated the law</u>." (Motion at 16 (emphasis added) (citing *Francis v. A&E Stores, Inc.*, 2008 WL 4619858, at *2 (S.D.N.Y. Oct. 16, 2008).) On this score, as well, Seward's evidence fails, since Seward proffers nothing more than anecdotal claims that individual managers <u>violated</u> IBM corporate policy through individual and unauthorized actions. In such cases, courts rightly deny

notice, since the claims of putative class members amount to individualized grievances, unbound by an overarching corporate policy or directive, and thus class member claims could not be efficiently resolved in one action. *See, e.g., Seever v. Carrols Corp.*, 528 F. Supp. 2d 159, 174 (W.D.N.Y. 2007) (denying notice where "there is little indication . . . that the FLSA violations alleged by plaintiffs were anything other than unilateral acts by a few 'rogue' managers"); *West*, 2006 WL 1892527 at *9 (denying notice, noting that "the alleged violations are contrary to Defendants' official written policy, which precludes . . . off-the-clock [work]"); *Salinas v. O'Reilly Auto., Inc.*, 2005 WL 3783598 at *6 (N.D. Tex. Nov. 17, 2005) (denying notice where plaintiff's evidence "merely shows that a handful of . . . managers committed possible FLSA violations in a variety of different ways"). This Court should reach the same conclusion.

The plain starting point of this analysis is Seward's concession (Motion at 8) that IBM maintains an express, lawful policy <u>requiring</u> compensation for the very work at issue in this case – pre-shift work, including, but not limited to, time spent logging in to computers and computer systems. This policy provides:

- Any time worked beyond an employee's regularly scheduled hours is "off the clock" work and employee must be compensated

- Managers must compensate employees for all work time that they knew or should have known about

- Common examples

    . . .

    o Allowing or requiring work to be done before or after a shift

        ▪ employee arrives early and starts working

        ▪ employee logs on to computer before start of shift

COI-1413015v11

(Motion Exh. 15.)

Against this backdrop, Seward has adduced absolutely no evidence that IBM maintains some sort of contrary, unlawful policy or practice. Indeed, Seward's so-called "smoking gun[s]" (Motion at 6) – the 2005 Lambousis e-mail and August 2006 Kamprath e-mail discussed above (*supra* at 7-8) – do not even address the issue of pay, let alone suggest that pre-shift overtime should not be paid. (Motion Exhs. 13-14.) The Lambousis e-mail reflects the System X group's policy as to arrival time (Motion Exh. 13), and the Kamprath e-mail reflects a "recommendation" on that subject. (Motion Exh. 14). Neither e-mail suggests that employees would not be paid for their pre-shift work in violation of Company policy. For his part, Seward completely mischaracterizes these e-mails in his declaration, where he claims that they amounted to "mass emails" informing employees that they "were required to work 'off the clock' without overtime compensation." (Seward Dec. ¶ 30; *see also* Barday Dec. ¶ 30; Salles Dec. ¶ 33; Scott Dec. ¶ 13.) And it is no wonder that he recanted this declaration assertion when asked about it in his deposition. (Seward Dep. 282:24-283:2 ("[M]ass e-mails – that one I don't recall. I apologize. I'm trying to remember why I have that statement there.").) To be sure, Seward has included no such e-mails with his Motion papers, and he has produced none in discovery, even though he promised to do so if he had them. (*Id.* at 283:1-10.)

Further, Seward gains no traction with his various attempts to confuse and mischaracterize the record. For example, he claims (Motion at 4) that IBM maintains a "production matrix," that it "tracks the exact times that [call center representatives] are 'logged in' and 'logged out' of their telephone systems," and that it does not "take pre-shift time into account when preparing these matrices." (*See also* Motion at 10 (suggesting that CCRs "clock[] in" through the phone system).) Setting aside the undisputed evidence that many Riveredge

teams do not use production matrices (*see, e.g.*, Anthony Dec. ¶ 10; Betterson Dec. ¶ 9; Davis Dec. ¶ 9; Moody Dec. ¶ 10; Starratt Dec. ¶ 8), the simple fact is that neither production matrices nor phone log-ins have anything to do with tracking work hours <u>for payroll or overtime purposes</u>. (*See* Boniche Dec. ¶ 9.)  As Seward and his witnesses acknowledge, IBM tracks employee time for pay purposes using its eTOTALS system, <u>not</u> through telephone log-ins and log-outs. (Seward Dep. 287:20-288:10; *see also* Liles Dep. 85:19-22; Scott Dep. 58:18-25; Starkey Dep. 71:22-72:3.)  The eTOTALS system is wholly separate from the Company's telephone systems, or reports used to track call volume and employee productivity (*see* Boniche Dec. ¶ 9), and Seward's invocation of the latter is a red herring.

Similarly, Seward contends (Motion at 12) that that CCRs who record pre-shift overtime in eTOTALS "are subject to discipline including termination."  But, again, Seward has produced no evidence of an IBM policy to this effect.  And the one manager that Seward references – Lambousis from System X – testified to just the opposite:

> Q:   So then what happens with that time, the five – the four to six minutes, I believe we talked about, boot-up time before they take a call, are employees paid for that time?
>
> A:   If an employee puts that time in eTOTALS, they would be paid for it.

(Lambousis 67:19-24.)

Seward and his witnesses, then, are limited to the very type of claims that courts find insufficient to support notice: anecdotal claims, limited to their own circumstances, that managers would not permit certain CCRs to record and receive compensation for time worked. *See, e.g., Seever*, 528 F. Supp. 2d at 173-74; *West*, 2006 WL 1892527 at *9; *Salinas*, 2005 WL 3783598 at *6.  Such varied claims cannot be efficiently adjudicated in a single action, and they do not justify conditional certification.  *See Hoffmann-La Roche*, 493 U.S. at 173-74.

In addition, on the facts presented, Seward's cases are distinguishable.  Indeed, none of the defendants in those cases presented affirmative evidence that the purported condition allegedly leading to off-the-clock work – i.e., an early reporting requirement – varied throughout the class.  IBM, however, has shown that while some Riveredge CCRs are subject to early reporting, most are not.  Since none of Seward's cases address such a situation, they are inapposite from the outset, and do not suggest that notice should issue here.

But the cases are distinguishable on many other fronts.  For example, in *Sherrill v. Sutherland Global Servs., Inc.*, 487 F. Supp. 2d 344, 349 (W.D.N.Y. 2007), the defendant did "not oppose plaintiff's motion to conditionally certify a collective action."  IBM, obviously, has opposed Seward's Motion.  Further, in *Clarke v. Convergys Customer Mgmt. Group.*, 370 F. Supp. 2d 601 (S.D. Tex. 2005), the employer presented no evidence of a written policy requiring compensation for pre-shift work.  IBM has such evidence, and it is undisputed.

Finally, *Russell v. Ill. Bell Tel. Co.*, 575 F. Supp. 2d 930 (N.D. Ill. 2008); *Burch v. Qwest Comms., Int'l., Inc.*, 500 F. Supp. 2d 1181 (D. Minn. 2007); and *Hens v. Clientlogic Operating Corp.*, 2006 WL 2795620 (W.D.N.Y. Sept. 26, 2006), involved employer policies that were quite different than IBM's policies.  In those cases, employers maintained general policies on the payment of overtime.  *See Russell*, 575 F. Supp. 2d at 935 (providing for "payments of all time worked"); *Burch*, 500 F. Supp. 2d at 1184 (providing for overtime "for each hour worked in excess of the scheduled shift" and for "each hour worked in excess of 40 hours"); *Hens*, 2006 WL 2795620 at *4 (providing payment for "actual hours worked plus overtime pay").  Arguably, such policies were ambiguous as to whether time spent logging on to computers was working time and as to whether the company required compensation for such tasks.  Here, however, there can be no mistake.  As Seward himself concedes (Motion at 8), IBM policy unmistakably

provides that computer log-in time is compensable and must be paid, even if it occurs pre-shift. Again, this Court should deny Seward's Motion.

## III.   SEWARD'S PROPOSED NOTICE IS DEFECTIVE

As the foregoing makes clear, this Court should deny Seward's Motion in its entirety. Notably, however, his proposed notice (Motion Exh. 18) is defective both as to its content and Seward's proposed manner of delivery.

### A.   Defects In The Proposed Notice

Any notice issued in a Section 216(b) case must be "accurate" and must provide sufficient information to allow "informed decisions about whether to participate." *Hoffmann-La Roche*, 493 U.S. at 170. Seward's proposed notice (Motion Exh. 18) fails this standard for numerous reasons, including the following:

First, it fails to accurately describe the scope of this case. Specifically, in its "Who Can Join the Class" section, the notice fails to specify that only call center representatives at Riveredge would be eligible to join.

Second, Seward's proposed time period is improper. Seward has requested that notice issue to persons who worked as call center representatives between April 28, 2005 (three years before the Complaint was filed) and the present. (Motion at 22.) But, in FLSA actions, opt-in plaintiffs can assert claims going back no more than three years before they file their opt-in consent forms. See 29 U.S.C. § 255. Thus, persons who worked as a call center representatives at Riveredge more than three years before the notice were to issue should not receive the notice.

Third, the proposed notice's description of the claims is overbroad. It does not specify that the only proposed class claim is denial of pre-shift overtime.

Fourth, the notice improperly suggests that merely returning the notice will lead to a recovery. For example, it suggests that a putative class member needs to immediately return an

opt-in consent form to "maximize your recovery." (Motion Exh. 18 at 3.)  Further, it inadequately describes IBM's defenses in the case. (*Id.* at 1.)

Fifth, the proposed notice fails to advise putative class members that this Court has taken no position on the merits. *See Hoffmann-La Roche*, 493 U.S. at 174 ("[T]rial courts must take care to avoid even the appearance of judicial endorsement of the merits of the action.").)

In light of these defects, and others, the appropriate course if this Court were to grant some form of conditional certification – which it should not – should be to order the parties to meet and confer regarding the content of the notice. *See, e.g., Iglesias-Mendoza v. La Belle Farm, Inc.,* 239 F.R.D. 363, 369-70 (S.D.N.Y. 2007) (granting the parties "thirty days . . . to negotiate and present to the court a mutually agreeable class notice") (cited at Motion at 14).  If the parties were unable to reach agreement within the specified time, they should be ordered to submit any disagreement to the Court for resolution. *See id.*

## B.    Posting The Notice On IBM's Intranet Would Be Inappropriate

Seward's suggestion (Motion at 22) that his proposed notice should "be posted on IBM's intranet" is wholly improper, and this Court should reject it summarily.

Initially, courts throughout the country recognize that first class mail is the preferred method for issuing notice.  "[I]t provides a controlled method by which individual notification can be provided through a reliable process which ensures that proper notice is received by the potential class members." *Reab v. Elec. Arts, Inc.*, 214 F.R.D. 623, 630 (D. Colo. 2002); *see also Russell v. Wells Fargo & Co.*, 2008 WL 4104212, at *5 (N.D. Cal. Sept. 3, 2008) ("[F]irst class mail will be sufficient to assure . . . actual notice . . . ."); *Delgado v. Ortho-McNeil, Inc.*, 2007 WL 2847238, at *3 (C.D. Cal. Aug. 7, 2007) (other forms of notice are "inappropriate"); *Engers v. AT&T*, 2007 WL 1557163, at *4 (D.N.J. May 24, 2007) ("Because Defendants will provide names and addresses of virtually all potential group members, broad solicitations are

neither needed nor appropriate."); *Sharer v. Tandberg. Inc.*, 2006 WL 2988104, at *3 (E.D. Va. Oct. 17, 2006) (rejecting request for alternate forms because "proper notice can be given by first-class mail"). Here, Seward has requested that notice issue "via first class U.S. mail" (Motion at 22), and he has not attempted to articulate why an alternative form of distribution should be required. For this reason alone, Seward's request for an intranet posting should be denied.

In any event, an intranet posting would add absolutely nothing to the quality of any notice in this case. IBM's intranet is an internal IBM website, accessible only by <u>current</u> IBM employees. (Boniche Dec. ¶ 10.) This, of course, is the same group of people for whom IBM's contact information is necessarily accurate. *See Russell*, 2008 WL 4104212, at *5 (finding defendant is "unlikely to have obsolete contact information for its current employees"). At best, then, a posting on IBM's intranet would amount to a redundant communication to current employees, and "do nothing to notify those class members who are no longer employed." *Id.*

Further, on the Company intranet, the notice would be accessible to all current employees (Boniche Dec. ¶ 10), which would include thousands of employees who are not putative class members and have nothing to do with this case. This would generate distraction and confusion, all to the detriment of IBM and its operations. And to the extent that such non-class members subsequently attempted to opt-in to this matter, substantial – and wholly unnecessary – burdens would confront the parties and this Court.

Moreover, a posting on IBM's intranet would be punitive and unfair, particularly at the present stage in the litigation. In the labor and employment context, a job-site notice posting is no trivial matter. Necessarily involving an appropriation of the employer's property for judicial purposes and designed to create discussion in the workplace, a posting has long been utilized as a remedy that follows an adjudication of guilt on unfair labor practice charges. *See, e.g., NLRB v.*

*J. P. Stevens & Co., Inc.*, 464 F.2d 1326, 1329 (2d Cir. 1972); *see also BPH & Co., Inc. v.*

*NLRB*, 333 F.3d 213, 218 (D.C. Cir. 2003) (the purpose of a posting is to "cure the lingering

effects of the settled unfair labor practice conduct") (internal cites and quotes omitted).  But, as

Seward notes (in boldface type), resolution of his "**Motion does not involve a determination on**

**the merits of his claim**."  (Motion at 16.)  As such, and in the absence of any articulated need on

the part of Seward, this Court should not subject IBM to such a remedy.

### C.    Seward's Request For Telephone Numbers Is Inappropriate

Finally, IBM should not be required to furnish Seward with telephone numbers of

putative class members.  (Motion at 22.)  Since first-class mail is the preferred method for

issuing notice, Seward has not and cannot demonstrate a need for phone numbers in this case.

*See*, *e.g.*, *Delgado*, 2007 WL 2847238 at *3 (holding that "production of telephone numbers . . .

is inappropriate"); *Parks v. Eastwood Ins. Svcs., Inc.*, 2002 WL 34370244, at *5 (C.D. Cal. July

29, 2002) ("[T]he production of telephone numbers for all putative class members is unwarranted

and presents a greater risk of improper solicitation."); *see also Houston v. URS Corp.*, 2008 WL

5336143, at *7 n.9 (E.D. Va. Dec. 17, 2008) (allowing production of phone numbers only "[t]o

the extent the notice mailed to putative collective action members is returned undeliverable");

*Vogt v. Texas Instruments, Inc.*, 2006 WL 4660134, at *4 (N.D. Tex. Sept. 19, 2006) (similar).

Again, this Court should not grant the extraordinary remedies requested by Seward.

<u>CONCLUSION</u>

For the foregoing reasons, this Court should deny Seward's Motion in its entirety.  In the

alternative, if this Court were to grant notice – which it should not – the Court should (a) order

the parties to meet and confer regarding the content of notice and, if they are unable to reach an

agreement, to submit briefs and proposed notices for this Court's resolution, (b) order that notice

issue by first class mail only, (c) order than notice be limited to putative class members who

COI-1413015v11

worked for IBM within the three year period preceding the issuance of notice, and (d) deny

Seward's request for putative class members' telephone numbers.

Dated: January 16, 2009

JONES DAY

By: _____

Matthew W. Lampe (*pro hac vice*)
mwlampe@jonesday.com
Wendy C. Butler (WB-2539)
wbutler@jonesday.com
Craig S. Friedman (CF-1988)
csfriedman@jonesday.com
JONES DAY
222 East 41st Street
New York, New York 10017
(212) 326-3939

Matthew W. Ray (*pro hac vice*)
mwray@jonesday.com
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
(214) 220-3939

Attorneys for Defendant
International Business Machines
Corporation

25