**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **CHARLES SEWARD, Individually, and on Behalf of All Others Similarly Situated,** | **08 Civ. 3976 (VB) (PED)** |
| Plaintiff, | |
| - *against* - | <u>**REPORT AND RECOMMENDATION**</u> |
| **INTERNATIONAL BUSINESS MACHINES CORPORATION D/B/A IBM CORP.,** | |
| Defendant. | |

**TO:   THE HONORABLE VINCENT L. BRICCETTI,**
**UNITED STATES DISTRICT JUDGE**

## I. INTRODUCTION

This case involves a claim by Plaintiff Charles Seward against International Business Machines Corporation ("IBM") for unpaid overtime wages under the Fair Labor Standards Act ("FLSA"). Seward, who worked as a call center representative ("CCR") at IBM's Riveredge facility in Georgia, alleges that he was not compensated for work that he was required to perform before the start of his shifts.

Seward seeks to proceed with his claim as a collective action, on behalf of himself and other similarly situated CCRs who also worked in IBM's Riveredge facility and who, according to Seward, also had the primary job duty of fielding incoming telephone calls. Seward's central allegation is that IBM required CCRs to report to work prior to the start of their shifts to perform tasks—specifically, "booting up" their computers—off the clock in order to be "call ready" at the start of their shifts. He claims that he is similarly situated to other CCRs because they performed similar job duties, were subject to a uniform requirement that they work off the clock prior to the start of their shifts, and were paid by IBM only for their scheduled hours. <u>See</u>

generally Docket No. 146 (Friedman Decl.), Ex. A (Amended Complaint).  IBM denies all of

these allegations.  See generally Docket No. 41 (Answer to Amended Complaint).

     On July 21, 2009, this Court (Karas, J.) granted Seward's motion for conditional

certification to proceed as a collective action under the FLSA, 29 U.S.C. § 216(b), permitting

Seward to send notice of his lawsuit to other CCRs who are or were employed by IBM at the

Riveredge facility within three years prior to the date of the notice.  See Docket No. 73.

     There are currently thirty-nine opt-in plaintiffs in this case, in addition to Seward.  See,

e.g., Docket No. 147 (Ray Decl.) at ¶ 7.  IBM now moves for decertification of this collective

action.

     This Motion comes before me pursuant to an Order of Reference dated October 4, 2011.

See Docket No. 162.

     This Court heard oral argument on the Motion on December 13, 2011.

     For the reasons set forth below, I respectfully recommend that this Motion be

GRANTED.

## II. BACKGROUND

### A.    Plaintiff's Motion for Conditional Certification

     On February 16, 2009, Seward moved for conditional certification to proceed as a

collective action under the FLSA, 29 U.S.C. § 216(b), see Docket No. 44 (Plaintiff's Motion for

Conditional Certification), which requires the plaintiff to make a "modest factual showing" that

he and others in the proposed class are similarly situated.  See Myers v. Hertz Corp., 624 F.3d

537, 554-55 (2d Cir. 2010) (internal quotations omitted); Iglesias-Mendoza v. La Belle Farm,

Inc., 239 F.R.D. 363, 367-68 (S.D.N.Y. 2007).  If the court grants this motion, then the plaintiff

is permitted to mail notice to the proposed class members to inform them of their right to "opt

in" to the class. See Myers, 624 F.3d at 555; Iglesias-Mendoza, 239 F.R.D. at 367. The plaintiff's burden of proof at the notice stage of certification is "fairly lenient." See Iglesias-Mendoza, 239 F.R.D. at 367 (internal quotations omitted).

Seward argued in his certification motion that he and other CCRs who worked in IBM's Riveredge facility were similarly situated because they shared the same primary job duty—answering inbound telephone calls from IBM's customers—and were subject to a common management policy requiring them to work pre-shift boot-up time. See Docket No. 45 (Plaintiff's Memorandum of Law in Support of Motion for Conditional Certification) at 4–9. In opposition, IBM argued that there was no uniform policy or practice of managers requiring CCRs in the Riveredge facility to boot up their computers before the start of their shifts. See Docket No. 47 (Defendant's Memorandum of Law in Opposition to Motion for Conditional Certification) at 11–14.

On July 21, 2009, this Court granted Seward's motion for conditional certification, permitting Seward to send notice to other CCRs employed by IBM at the Riveredge facility. See Docket No. 73. On the record, Judge Karas noted that Seward had "barely, and I want to underscore that, satisfied the minimum burden of showing that he is similarly situated to the proposed class members." See Friedman Decl., Ex. B (Excerpt from Transcript of July 21, 2009 Hearing) at 32:1–3. He further found that the manager declarations that IBM had submitted were "very compelling," particularly with regard to demonstrating different, team-dependent expectations and requirements. Id. at 35:11–16. Judge Karas noted that, "[i]f the record doesn't change substantially, . . . [the] plaintiffs are going to have a hard time in the second stage" of the certification process. Id. at 40:3–5.

**B.    Defendant's Motion for Decertification**

3

Following Judge Karas's ruling, a court-approved notice was sent to 663 current or former CCRs from the Riveredge facility. See Ray Decl. at ¶ 5. As noted above, there are currently thirty-nine opt-in plaintiffs in the case, in addition to Seward. See id. at ¶ 7. After deposing twenty-seven of the opt-in plaintiffs, and obtaining written discovery from all of them, see Docket No. 163 (Plaintiff's Memorandum of Law in Opposition to Motion for Decertification ("Opp.")) at 3, IBM now moves to decertify the conditionally certified class.

IBM argues, as it did at the conditional certification stage, that Seward is not similarly situated to the opt-in plaintiffs because there was no uniform requirement that CCRs begin working prior to the start of their shifts or be call ready when their shifts began. See Docket No. 145 (Defendant's Memorandum of Law in Support of Motion for Decertification ("Mot.")) at 1, 5. IBM claims that the plaintiffs worked on several different teams and for several different managers, many of whom had no expectation that CCRs arrive early, given the functions or structures of their teams or the specific job duties of particular plaintiffs. See id. at 5. IBM also argues that its defenses are highly individualized and cannot be resolved collectively. See id. at 5–6. In light of these dissimilarities and individualized issues, IBM contends that it would be unfair and prejudicial to all parties to allow this action to proceed collectively. See id. at 6.

In response, Seward argues that he is similarly situated to the opt-in plaintiffs since they all performed similar job duties, worked in the same facility, were subject to the same "policies, practices, and procedures," and all have performed similar tasks off the clock. See Opp. at 5–6, 8, 10. Seward also claims that IBM's proposed defenses can be tried on a collective basis, that proceeding as a collective action comports with the remedial purposes of the FLSA, and that the Court has "procedural tools at its disposal," including the use of representative testimony and bifurcation, to make a collective trial manageable. See id. at 13, 23.

4

C.    **Pertinent Facts in the Record**

　　　　1.    IBM's Timekeeping System and Formal Overtime Compensation Policies

　　　　IBM uses "eTotals," formerly known as "Totals," as its timekeeping system for hourly,

non-exempt employees, including Seward and the opt-in plaintiffs. See Docket No. 156

(Boniche Decl.) at ¶¶ 3, 7, 11.  The data entered into eTotals is used to generate payroll for these

employees. See id. at ¶ 8.  The eTotals system defaults to an employee's scheduled hours. See

id. at ¶ 3.  However, employees have the ability to manually enter any overtime worked. See id.

at ¶¶ 5–6.  After overtime has been entered by an employee, the employee's manager will be

notified of this "exception" and can either approve or disapprove of the overtime.  See, e.g.,

Docket No. 164 (Langeland Decl.), Ex. AA (Cerny Depo.) at 72:4–11, 72:20–23 (noting that

"overtime is management approved" but that employee entered overtime into eTotals herself);

id., Ex. C (Coy Depo.) at 35:3–7 (noting that, if CCRs were coming in early and logging

overtime, then, as a manager, he would have seen exceptions in eTotals for that).  Various opt-in

plaintiffs testified that they were aware of, knew how to use, and had in fact used eTotals to

report overtime in the past.  See Friedman Decl., Ex. K (Garrett Depo.) at 27:15–28:5; id., Ex. N

(Liles Depo.) at 27:5–8; id., Ex. S (Preddy Depo.) at 35:4–25; id., Ex. V (Scott Depo.) at

58:19–25; id., Ex. W (Seward Depo.) at 252:6–17; id., Ex. X (Starkey Depo.) at 71:5–72:3.

　　　　There appears to be no dispute that IBM's formal employment policies require that

employees be compensated for overtime work, including for time spent logging into computers

before the start of their shifts. See Friedman Decl., Ex. W (Seward Depo., Exs. 1 (offer letter),

27 (employment policy), 28 (employment policy)); Docket No. 48 (Ex. to Ray. Decl. in

Opposition to Plaintiff's Motion for Conditional Certification (Seward Depo., Ex. 32 at 7–8

(training materials))); see also Friedman Decl., Ex. S (Preddy Depo.) at 41:13–42:23 (noting that

he had been told by managers, in the context of post-shift overtime, that IBM's company policy was to compensate employees for all time worked); Langeland Decl., Ex. O (Reidy Depo.) at 61:5–21 (noting that IBM's business conduct guidelines inform hourly employees that they are required to report overtime accurately). Additionally, IBM's managers apparently receive training regarding IBM's policy to compensate for "common" tasks, such as where an "employee arrives early and starts working" or "logs on to a computer before start of shift." See Docket No. 45, Attachment No. 28 (Ex. 15 to Plaintiff's Motion for Conditional Certification (PowerPoint slide)). Finally, several IBM managers acknowledged that they consider booting up computers and logging into various tools to be compensable work. See Langeland Decl., Ex. C (Coy Depo.) at 36:18–37:3; Docket No. 150 (Cerny Decl.) at ¶ 11; Docket No. 152 (Waters Decl.) at ¶ 8; Docket No. 153 (Starratt Decl.) at ¶ 13; Docket No. 154 (MacDonald Decl.) at ¶ 11; Docket No. 155 (Musgrove Decl.) at ¶ 17; Langeland Decl., Ex. P (Musgrove Depo.) at 65:11–66:11; Docket No. 166 (Friedman Reply Decl., Ex. H (Reidy Depo.)) at 58:17–59:7. Some managers also stated that they have directed the CCRs on their teams to report pre-shift overtime on occasion when they have observed those CCRs performing such work. See Langeland Decl., Ex. AA (Cerny Depo.) at 69:24–73:17; Cerny Decl. at ¶¶ 14–15; MacDonald Decl. at ¶¶ 12–13; Friedman Decl., Ex. AA (J. Williams Depo.) at 191:13–192:6.

      2.    Functions of Various CCR Teams and Duties of Individual Opt-In Plaintiffs

As IBM argues in its Motion, the CCR teams in IBM's Riveredge facility had different purposes, functions, and shift structures, which may have affected the need to be call ready at the start of CCRs' shifts. See Mot. at 8–12. While Seward does not directly respond to this issue, he emphasizes that all of the plaintiffs worked on resolving customer service issues, often by telephone, and that they all worked in the same call center and had similar duties. See Opp. at

5–8. However, even former IBM manager Jeff Granger, who is one of Seward's key witnesses, acknowledged at his deposition that "some . . . groups had different functions" and that CCRs' job duties may have "varied, depending on function." See Langeland Decl., Ex. B (Granger Depo.) at 127:6–23. Additionally, when asked whether the CCRs in IBM's Riveredge and Dallas facilities were performing "essentially the same job duties," Granger said that "[m]ost were doing the same functions," but noted that there were some "one-off[]" teams, including PartnerWorld,[1] which had "some other things going on." See Langeland Decl., Ex. B (Granger Depo.) at 36:15–37:11.

While it appears that the duties of all opt-in plaintiffs involved, or at least could have involved, some telephone work, only some opt-in plaintiffs, like Seward, were regularly and primarily responsible for fielding incoming telephone calls.[2] See Friedman Decl., Ex. AA (J.

---

[1] PartnerWorld was managed by Wendi Kowren Musgrove, who stated in her declaration that only a few CCRs on this team were responsible for incoming calls, while all other CCRs on the team worked primarily in e-mail, under a 48-hour turnaround requirement, and occasionally made outgoing calls. See Musgrove Decl. at ¶¶ 3–4. On "rare" occasions, these CCRs might provide back-up to those few CCRs on the team who were responsible for fielding incoming calls. See id. at ¶ 3. Five opt-in plaintiffs apparently worked on this team, none of whom worked primarily on fielding incoming calls. See id. at ¶¶ 9–12; see also Langeland Decl., Ex. D (e-mail dated April 18, 2011 from Matthew W. Ray to Erik Langeland listing all plaintiffs and the managers to whom they reported). This Court notes that the e-mail set forth in Langeland Decl., Ex. D appears to be the most concise and authoritative document in the record regarding the managerial assignments of the opt-in plaintiffs. At oral argument, however, Seward's counsel noted that this e-mail is incomplete. See Transcript of December 13, 2011 Hearing at 34:1–11. Based upon this Court's review of the record, this representation appears to be accurate. For example, it appears that Opt-In Plaintiff Reginald McArthur is not included in Langeland Decl., Ex. D, although he continues to be a plaintiff in this case. See Docket No. 98 (McArthur's Consent to Join Collective Action). On the other hand, this e-mail is somewhat over-inclusive because, as Seward notes in his opposition, it lists two plaintiffs, Charletta Bohler and David Ohmann, who have since voluntarily dismissed their claims. See Opp. at 2 n.6; see also Docket Nos. 131, 142 (stipulations of voluntary dismissal for Bohler and Ohmann, respectively)

[2] IBM conceded at oral argument that approximately half of the opt-in plaintiffs regularly fielded incoming telephone calls at the start of their shifts. See Transcript of December 13, 2011

Williams Depo.) at 189:21–190:21 (discussing time at which Seward began "actively . . . taking calls" as a member of her team"), 192:12–21 (discussing her review of reports to ensure that her teams were meeting "service levels" for their calls"); Docket No. 151 (Betterson Decl.) at ¶¶ 2–3 (noting that CCRs on one of her teams spent majority of their time handling incoming calls); Starratt Decl. at ¶¶ 3–4 (noting that CCRs on his teams spent majority of their time handling incoming calls); Docket No. 158 (Davis Decl.) at ¶ 2 (noting that CCRs on her teams handled incoming calls); Docket No. 159 (Torres Decl.) at ¶ 5 (noting that CCRs on some of her teams primarily handled incoming calls). One team whose primary duty was to field incoming telephone calls was the System X team, which was managed by George Lambousis, Juanita Carver, Steven Coy, and Vicky Reidy, among others. See Docket No. 157 (Lambousis Decl.) at ¶ 3; Langeland Decl., Ex. E (Lambousis Depo.) at 65:2–11; Langeland Decl., Ex. C (Coy Depo.) at 16:11–18:4.

However, other opt-in plaintiffs worked primarily on preparing reports or communicating with customers via e-mail or outbound telephone calls and were not subject to immediate turnaround requirements. For example, IBM manager Rick Odle testified that incoming calls represented a "very small percentage of [his team's] total call volume" and that most of his team's telephone work involved returning calls within a certain time frame. See Langeland Decl., Ex. S (Odle Depo.) at 41:4–43:8. Other IBM managers similarly noted that the CCRs on their teams, including several opt-ins, were not regularly responsible for fielding incoming calls. See Betterson Decl. at ¶ 3 (noting that the "majority of calls handled by [one of her teams] are outgoing"); Musgrove Decl. at ¶¶ 3–5, 7, 9–10, 12 (noting that most CCRs on her team worked primarily in e-mail or on the internet, though "a few CCRs" on her team, apparently none of

---

Hearing at 5:15–22.

whom are opt-ins in this case, handled live, incoming calls); Cerny Decl. at ¶¶ 3–4 (noting that

CCRs on her team "spent roughly 90 percent of their time researching and performing non-

phone work and 10 percent of their time on phone calls"); Waters Decl. at ¶¶ 2–3, 5 (noting that,

until October 2010, CCRs on his team spent eighty-five to ninety percent of their time making

outgoing calls and ten to fifteen percent of their time handling live, incoming calls and that

currently they spend seventy-five to eighty percent of their time making outgoing calls and

twenty to twenty-five percent of their time handling incoming calls); Torres Decl. at ¶¶ 5–6

(noting that CCRs on one of her teams spend the "vast majority" of their time returning calls that

have been gathered in a queue); MacDonald Decl. at ¶¶ 2–6 (noting that, while some CCRs on

his team mostly handled incoming calls, other CCRs mostly handled outgoing calls).

 Additionally, some opt-in plaintiffs themselves have acknowledged during discovery that

they did not regularly field incoming telephone calls. See Friedman Decl., Ex. C (M. Armour

Depo.) at 15:13–16:9 (noting that she did not work on incoming telephone calls and that her job

duties primarily involved research and some outgoing calls), 21:24–22:16 (agreeing that she

determined in her "discretion" when to make outgoing calls); id., Ex. Z (B. Williams Depo.) at

18:7–20:25 (describing her duties on the Pended QSAR team and noting that this work involved

exchanging e-mails and instant messages, as well as some telephone calls, with technicians); id.

Ex. S (Preddy Depo.) at 21:8–22:8 (noting that he only answered general incoming calls if there

was a backlog and that he worked mostly with e-mail and occasional outgoing or incoming

calls).

 Even for teams on which some or all CCRs were regularly responsible for fielding

incoming calls, several managers organized their teams' schedules into staggered, overlapping

shifts so that there would always be phone coverage, even at the start of a particular CCR's shift.

9

See Friedman Decl., Ex. T (Raker Depo.) at 88:5–11; Cerny Decl. at ¶ 7; Betterson Decl. at ¶ 4; Waters Decl. at ¶ 4; MacDonald Decl. at ¶ 8; Musgrove Decl. at ¶ 8; Davis Decl. at ¶ 5; Torres Decl. at ¶ 7; Starratt Decl. at ¶ 4–5 (also noting that, before the first scheduled employee of the day arrived, a sister team at IBM's call center in Dallas would cover any incoming calls).  For example, one opt-in's shift was scheduled to start an hour before the telephone lines were even open.  See Friedman Decl., Ex. M (Landery Depo.) at 48:16–49:24 (noting that Opt-In Plaintiff John Gibson's shift started at 7 a.m. and that Gibson handled paperwork for that first hour until the telephone lines opened at 8 a.m.); Musgrove Decl. at ¶ 11 (noting same and that there was no need for Gibson to be call ready at the start of his shift).

### 3.   Requirements and Expectations of Individual IBM Managers

In light of these varying functions and duties, IBM also notes that expectations and practices of individual IBM managers varied from team to team and that there was no uniform expectation that CCRs perform work to make themselves call ready before the start of their scheduled shifts.  See Mot. at 8–12.

Some managers apparently did expect the CCRs on their teams, including some plaintiffs, to report to work pre-shift to boot up their computers and otherwise make themselves call ready.  For example, Seward has presented evidence to show that the managers of the System X team, a predominantly incoming call team, expected the CCRs on their team to engage in such pre-shift work.[3]  In a 2005 e-mail, IBM manager George Lambousis informed members

---

[3] Seward apparently did not work on the System X team, see, e.g., Transcript of December 13, 2011 Hearing at 22:7–24:5, although it appears based on managerial assignments that nine of the opt-in plaintiffs may have.  See Langeland Decl., Ex. D.

of the System X team, including six opt-in plaintiffs,[4] that his "policy"and "expectation" for the

CCRs on that team was that "your workstation is powered up, you are logged on to the necessary

applications, and you are in an available state on your phone at your start time." Langeland

Decl., Ex. DD.

Lambousis confirmed at his deposition that this was his expectation for the CCRs on his

team given that his "team is a predominantly live call team," though he stated in his declaration

that this e-mail only "advised that [he] expected System X CCRs to power up their work

stations, log into necessary applications, and be ready to handle phone calls *at the start* of their

scheduled shifts." Langeland Decl., Ex. E (Lambousis Depo.) at 54:3–15, 65:2–11; Lambousis

Decl. at ¶ 4 (emphasis added).  Lambousis also explained that he sent this e-mail as a

clarification to CCRs who had recently transferred to System X from other teams that did not

have an expectation that they be "available to take calls, booted up, ready to go at [their] start

time."  See Friedman Decl., Ex. L (Lambousis Depo.) at 64:4–17; Lambousis Decl. at ¶ 5.  There

is no indication that Lambousis's requirement extended to teams other than System X.  See

Lambousis Decl. at ¶ 6 (stating that he sent his e-mail "only to System X CCRs" and that he had

"no managerial or supervisory responsibility for any teams other than System X"); Cerny Decl.

at ¶ 20 (noting that Lambousis had no "role with respect to" her teams); Betterson Decl. at ¶ 13

(same); Waters Decl. at ¶ 14 (same); Starratt Decl. at ¶ 17 (same); MacDonald Decl. at ¶ 19

(same); Musgrove Decl. at ¶ 21 (same); Davis Decl. at ¶ 13 (same); Torres Decl. at ¶ 15 (same).

The testimony of other System X managers suggests that they also may have expected

the CCRs who reported to them to boot up pre-shift in order to be call ready at the start of their

---

[4] The recipients of the Lambousis e-mail include the following opt-in plaintiffs: Harry
Flair, James Starkey, Raymond Liles, Thomas Poehnelt, Walter Hendrix, and Ralph Wayne
Faircloth.  See Langeland Decl., Ex DD; see also id., Ex. D (listing opt-in plaintiffs).

shifts. See Langeland Decl., Ex. C (Coy Depo.) at 16:11–18:4 (listing System X managers, including Vicky Reidy, George Lambousis, and Juanita Carver, in addition to himself); Ex. DD (copying Reidy and Carver on e-mail sent to System X CCRs).  For example, System X Manager Steven Coy, to whom five opt-ins apparently reported, see Langeland Decl. Ex. D, said that he expected CCRs on his team to be "ready to roll or ready to take your phone calls and do your job at your scheduled time" and that this required them to "come in before [their] designated start time[s] in order to boot [their] system[s] up." See Langeland Decl., Ex. C (Coy Depo.) at 24:17–25:6, 26:14–21.  Another System X manager, Juanita Carver, testified that she "preferred that the agents are powered up at their start time . . . [and] ready to take a call," which would involve booting up their computers and launching applications, but noted that she was speaking only for "[her] department."[5] See Langeland Decl., Ex. F (Carver Depo.) at 94:5–15, 116:4–14; but see Friedman Decl., Ex. G (Carver Depo.) at 117:2–119:14 (stating that an employee who arrived exactly at start of shift but logged into telephone system and turned computer on immediately would be considered on time).

Outside of the System X team, the testimony of some other IBM managers suggests that they also expected the CCRs on their teams to begin working prior to the start of their scheduled shifts to ensure they were ready to log in to the telephone system and begin taking calls immediately. One of Seward's managers, Juanlyn Williams, stated at her deposition that, in order to be "successful," she expected that the CCRs on her team[6] would make themselves available to take calls only after "their computer and tools [were] fully up."  Langeland Decl.,

---

[5] Seven opt-in plaintiffs apparently reported to Carver.  See Langeland Decl., Ex. D.

[6] Williams also apparently supervised two opt-in plaintiffs.  See Friedman Decl., Ex. C (M. Armour Depo.) at 22:23–24; Friedman Decl., Ex. V (Scott Depo.) at 58:1–17.

Ex. Q (J. Williams Depo.) at 117:13–18.[7]  Another manager, Michael Landery, testified that

some CCRs on his team[8] may have engaged in pre-shift work, but noted that, to the extent they

did so, they should have reported it in eTotals and he would have approved it.[9]  See Langeland

Decl., Ex. BB (Landery Depo.) at 92:6–93:23 (also noting that, when overtime was reported, he

approved it "a lot").

Seward relies heavily on the testimony of one former IBM manager, Jeff Granger, in

support of his claim that all CCRs in the Riveredge facility were subject to a uniform

requirement that they perform pre-shift work.  Granger was a "second-line" IBM manager[10] and,

in that capacity, he supervised several "first-line" managers who, in turn, supervised some opt-in

plaintiffs.[11]  Granger testified that IBM's predictions of how much staff it needed on a particular

team were based on that team's productivity level, and that productivity levels were premised on

CCRs being call ready at the start of their shifts and, therefore, booting up their computers and

---

[7]  Williams also testified, however, that she considered the CCRs on her team to be on time as long as they logged in to the telephone system at the scheduled start of their shifts, even if they had to boot up their computers after that.  See Friedman Decl., Ex. AA (J. Williams Depo.) at 188:12–189:13.

[8]  Five opt-in plaintiffs apparently worked for Landery.  See Langeland Decl., Ex. D.

[9]  This Court was unable to locate specific testimony by Landery regarding whether he actually required or expected his CCRs to engage in such pre-shift work.

[10]  CCRs report directly to "first-line" managers.  In turn, first-line managers report to second-line managers.  See Friedman Reply Decl., Ex. D (Granger Depo.) at 22:10–25, 24:9–25:19; see also Opp. at 2.

[11]  Granger apparently supervised nine first-line managers.  See Friedman Reply Decl., Ex. D (Granger Depo.) at 22:15–25, 78:15–79:5.  It appears that thirteen opt-in plaintiffs were supervised by first-line managers who reported to Granger.  See Langeland Decl., Ex. D.  As noted below, several of these first-line managers have stated that they did not require the CCRs on their teams to be call ready or boot up before their shifts, including Sara Cerny, Roseanne Davis, Mike Landery, Wendi Kowren Musgrove, Pete Starratt, Viki Torres, and Juanlyn Williams.

13

launching applications before their shifts started. See Langeland Decl., Ex. B (Granger Depo.) at 20:3–21. Granger also stated that it "became the practice" or was "highly encouraged" for CCRs to "come in early to boot up their computers and launch their programs before their designated start times." Id. at 28:25–30:8. He denied that this practice was instituted by some "rogue manager" and agreed that "this was simply the practice followed at the call center in River Edge [sic]." Id. at 131:18–132:4.

Granger claimed that this practice "came from above," "remained in force and effect throughout the time that [he was] at IBM," and that CCRs "were directed to" comply. See id. at 30:19–20, 31:2–32:11. Specifically, he testified that this expectation came from former "director of the call center," Tim Allaway, who, according to Granger, never specifically directed CCRs to report to work early to boot up their computers but who "expected" or "highly encouraged" CCRs to do so. See Friedman Reply Decl., Ex. D (Granger Depo.) at 27:3–29:21. As IBM emphasizes, however, Granger testified that Allaway was one of his managers only until approximately 2002, several years before the three-year "class period" relevant for this case began. See id. at 54:6–21, 55:22–57:8; Docket No. 165 (Defendant's Reply Memorandum in Support of Motion for Decertification ("Reply")) at 3. Furthermore, Granger noted that he did not recall any of the managers to whom he reported after 2005 ever indicating that they expected CCRs to be call ready by the start of their scheduled shifts. See Friedman Reply Decl., Ex. D (Granger Depo.) at 68:19–78:7; see also Reply at 3. Granger also said that he was unaware of any written documentation regarding when CCRs should arrive to work or be call ready. See Friedman Reply Decl., Ex. D (Granger Depo.) at 70:16–24.

Granger testified that, as a second-line manager, he supervised nine different first-line managers. See Friedman Reply Decl., Ex. D (Granger Depo.) at 22:15–25 (listing names of

14

first-line managers whom he supervised).  At his deposition, Granger described meetings that he

had with two of those first-line managers, Pete Starratt and Viki Torres, and the CCRs on their

teams[12] regarding his expectation that they report early to make themselves call ready before the

start of their shifts in order to enhance their productivity.  See Langeland Decl., Ex. B (Granger

Depo.) at 37:22–39:24; Friedman Reply Decl., Ex. D (Granger Depo.) at 89:9–90:4, 91:9–93:10,

107:13–108:10.  Granger further testified that, although these were the only specific meetings or

discussions he recalled having with any of his first-line managers or CCRs, he believed that all

of his first-line managers followed this practice; however, he acknowledged that he did not

follow up with any of them to ensure that this was the case.  See Langeland Decl., Ex. B

(Granger Depo.) at 29:14–30:14, 39:12–40:5; Friedman Reply Decl., Ex. D (Granger Depo.) at

108:11–109:5, 124:17–125:24.  Granger also was careful to note that he did not instruct

CCRs—during the meetings discussed above or at any other time—to not report this pre-shift

overtime in eTotals.  See Friedman Reply Decl., Ex. D (Granger Depo.) at 90:5–25.

  While Granger said that it was his "understanding" that all CCRs in the Riveredge

facility were reporting early to boot up and make themselves call ready, he noted that the first-

line managers who reported to him and the CCRs on their teams would have the best knowledge

about whether there was a call-ready expectation on those particular teams and, if so, whether

CCRs recorded pre-shift time that they had worked in order to comply with this expectation.[13]

See id. at 91:2–8, 93:15–18, 102:24–103:20.  Granger also confirmed that he did not even know

---

[12] It appears that seven opt-in plaintiffs reported to either Starratt or Torres and therefore may have been present at these meetings.  See Langeland Decl., Ex. D.

[13] Opt-in Plaintiff Herbert Miller testified that, as "second-line manager," Granger "didn't get down to the nuts and bolts," but rather left details "to the first-line manager" and that Granger never told Miller that he needed to come in early.  See Friedman Reply Decl., Ex. C (Miller Depo.) at 76:15–17, 78:6–11.

what another second-line manager who worked on his floor, Sharon Lofton, may have required

for her teams.[14] See Langeland Decl., Ex. B (Granger Depo.) at 51:7–22; Friedman Reply Decl.,

Ex. D (Granger Depo.) at 113:19–114:7.  In fact, at her deposition, Lofton testified that her

"policy is that you're supposed to be at work during your scheduled work time[, so,] [i]f you're

scheduled at 8 o'clock, I expect for you to be at your desk at 8 o'clock." See Friedman Reply

Decl., Ex. E (Lofton Depo.) at 109:23–112:1 (also noting that she "expect[ed] for the agent at 8

o'clock to sit down and follow whatever process it is to get them prepared to do their job" and

that she had no expectation as to whether CCRs logged into the telephone system or booted up

their computers first).  Lofton also stated that she expected CCRs to report any overtime that

they worked in eTotals.  See id. at 109:6–14.

In addition to the Lambousis e-mail and Granger testimony, Seward also argues that a

2006 e-mail drafted by IBM analyst Gary Kamprath and forwarded to Seward and at least one

other opt-in further demonstrates that CCRs in the Riveredge facility were subject to a uniform

management expectation that they arrive early to make themselves call ready before their shifts

began.  See Langeland Decl., Ex. EE (listing Seward and Opt-in Plaintiff Cathy Barday as

recipients to whom this e-mail was forwarded); see also Langeland Decl., Ex. D.  Kamprath's e-

mail recommended that those CCRs who were subject to "daily operating reports," or "DORs"

prepared by his team "log in, only as required (ie [sic] scheduled to work at 9:00, be ready at

8:50), but only log in at 9:00 am to ensure we are not accumulating unproductive hours."  Id.

Kamprath testified that he understood his e-mail to mean only that CCRs should arrive early

enough to ensure that they were ready to "start[] work" at their start times by "logging into the

---

[14] Granger stated that Lofton supervised several first-line managers, including Mike
Landery, Wendi Kowren Musgrove, and Juanlyn Williams.  See Friedman Reply Decl., Ex. D
(Granger Depo.) at 113:25–114:16.

telephone and turning on [the] computer." See Langeland Decl., Ex. Y (Kamprath Depo.) at 153:1–154:15.

Kamprath was not a CCR manager; rather, he was a member of IBM's Workforce Management team who prepared DORs to assess the productivity of those CCR teams "who spend the majority of their time on the phone." See Docket No. 168 (Kamprath Decl.) at ¶¶ 2–3, 9–13; Langeland Decl., Ex. Y (Kamprath Depo.) at 25:16–29:20, 35:6–36:11. The preparation of these DORs apparently depended on the log-in/log-out data generated by the telephone system that IBM's CCRs use and are required to log into at the start of their shifts. See Kamprath Decl. at ¶ 8. Although CCRs on all teams seem to have been required to log into the telephone system at the start of their shifts, not all teams were primarily responsible for handling incoming telephone calls, nor were they all subject to Kamprath's DOR-related monitoring. See Kamprath Decl. at ¶ 3 (noting that "DOR teams are those teams with employees who spend the majority of their time on the phone . . . to assess how busy teams are when they are working the phones" and that "DORs are not provided to any other teams at the Riveredge facility," including to "any Riveredge teams on any floor other than the fifth floor");[15] Cerny Decl. at ¶ 21; Betterson Decl. at ¶ 12; Waters Decl. at ¶ 13; MacDonald Decl. at ¶ 18; Musgrove Decl. at ¶ 22.

Seward emphasizes the fact that, for productivity reasons, CCRs were not permitted to log into the telephone system until their scheduled shift time even though they were expected to report to work earlier in order to be call ready at the start of their shifts.[16] See Opp. at 6–7;

---

[15] According to Seward, twenty-four plaintiffs worked on the fifth floor, with thirteen of those reporting to Granger and eleven reporting to Lofton. See Opp. at 2.

[16] Some plaintiffs testified that, in order to be technically on time, they could have logged into the telephone system at the start of their shifts in an "AUX," or unavailable, mode until they had made themselves call ready by booting up their computers; however, they noted that their managers expected them to log into the telephone system in an "available" state so that they

Langeland Decl., Ex. G (Seward Depo.) at 86:7–87:25 (noting that, for "productivity" and "schedule adherence" reasons, CCRs were discouraged from logging into the telephone system more than a "minute or two" before the start of their shifts); see also Langeland Decl., Ex. I (Starkey Depo.) at 52:8–53:25. However, the telephone log-in data had no effect on payroll. See Boniche Decl. at ¶ 9; see also Cerny Decl. at ¶ 18; Starratt Decl. at ¶ 15; Musgrove Decl. at ¶ 19; Davis Decl. at ¶ 10; Torres Decl. at ¶ 12. As noted above, payroll was determined solely on the basis of eTotals. See Boniche Decl. at ¶ 9. Therefore, management requirements regarding the exact timing of CCRs' telephone log-ins does not seem relevant to Seward's claims. Even so, Seward argues that Kamprath's e-mail is reflective of management's expectation that CCRs "be ready" prior to their scheduled start time. See Opp. at 9–10. However, any expectation reflected by Kamprath's e-mail seems relevant only to those plaintiffs who worked on teams subject to DOR reporting, and even as to those plaintiffs, the persuasiveness of this e-mail is limited, given that Kamprath did not have supervisory authority over any CCRs. See Kamprath Decl. at ¶ 12.

In contrast to the evidence regarding managerial expectations regarding pre-shift work presented by Seward, IBM has presented substantial evidence demonstrating that several first-line IBM managers, including some who apparently reported to Granger, see Langeland Decl. Ex. D, did not expect or require the opt-in plaintiffs on their teams to be call ready at the start of their shifts or to engage in pre-shift boot up or other work, in light of the unique functions or

---

could begin handling call immediately and, therefore, that logging in as unavailable would not satisfy their managers' expectations. See Langeland Decl., Ex. N (Garrett Depo.) at 40:16–41:10, 41:23–42:11; id., Ex. U (Owens Depo.) at 87:20–88:10; Friedman Decl., Ex. P (Miller Depo.) at 49:25–50:12; 76:22–77:15; id., Ex. Y (Wasson Depo.) at 54:8–15. This expectation also apparently is reflected in the Lambousis e-mail, which instructed CCRs to be "in an available state on your phone at your start time." Langeland Decl., Ex. DD.

structures of their teams.[17] As discussed above, several opt-ins either worked on teams, or in specific positions, that were not regularly responsible for fielding incoming calls. Additionally, even among teams that did regularly handle incoming calls, some managers structured shifts so that the telephone lines were always covered and CCRs did not need to make themselves call ready before their shifts began. Several IBM managers accordingly have stated that the opt-ins on their teams were not subject to any requirement that they report early to begin working pre-shift. For example, manager Sara Cerny stated that it was "not [her] expectation" that CCRs arrive early to begin working and that, on the occasions when she did discover CCRs doing so, she instructed them to either record the overtime or leave early to make up for starting early and directed them not to continue this practice. See Langeland Decl., Ex. AA (Cerny Depo.) at 68:6–70:9; see also Cerny Decl. at ¶¶ 2–15 (describing the functions and shift structures of her teams and explaining why pre-shift boot up was unnecessary and neither expected nor required for those teams). Manager Michael MacDonald noted that CCRs on his teams were not required to log off each night so it was not even necessary for them to boot up at the start of every shift. See MacDonald Decl. at ¶ 15; see also id. at ¶¶ 2–17 (describing the functions and shift structures of his teams and explaining why pre-shift boot up was unnecessary and neither expected nor required for those teams). As noted above, second-line manager Sharon Lofton testified that "[i]f [a CCR was] scheduled [to work] at 8 o'clock," then she "expect[ed] for [the CCR] to be at [his] desk at 8 o'clock." Langeland Decl., Ex. CC (Lofton Depo.) at 106:19–25, 106:3–10 (also noting that her "expectation" was that CCRs would report any overtime worked in eTotals). Many other managers confirmed that pre-shift boot up was neither necessary nor

---

[17] Based on the information set forth in Langeland Decl., Ex. D and other parts of the record discussed below, it appears that twenty-seven opt-in plaintiffs worked for at least one manager who has said that he or she did not expect or require pre-shift work.

expected for the opt-ins who worked on their teams.  See Betterson Decl. at ¶¶ 3–11; Waters

Decl. at ¶¶ 3–12; Starratt Decl. at ¶¶ 3–16; Musgrove Decl. at ¶¶ 3–20; Davis Decl. at ¶¶ 2–8;

Torres Decl. at ¶¶ 2–10; see also Langeland Decl., Ex. R (Wampler Depo.) at 140:6–13 (noting

that he had a "level of confidence that the [CCRs on his team] know to start at their start time,"

which required that they log in at their start time, but not specifically stating whether CCRs on

his team had to boot up before the start of their shifts); Friedman Reply Decl., Ex. H (Reidy[18]

Depo.) at 58:2–11 (noting that she never observed CCRs booting up pre-shift and never directed

any first-line managers who reported to her that they should require CCRs to do so).  While this

testimony arguably conflicts with Jeff Granger's testimony regarding what was expected for all

CCRs, even Granger himself acknowledged that the functions of some CCR teams, including

Musgrove's PartnerWorld team, were different from his team and that other second and first-line

managers, including the first-line managers who reported to him, would be in the best position to

know what was required or expected for the CCRs who were under their direct supervision.  See

Langeland Decl., Ex. B (Granger Depo.) at 36:15–37:11, 51:7–22, 127:6–23; Friedman Reply

Decl., Ex. D (Granger Depo.) at 102:24–103:20; 113:19–114:7.

    4.    Experiences of Individual Opt-In Plaintiffs

        Several opt-in plaintiffs who worked on various teams testified that they believed they

were required to boot up their computers pre-shift and in fact did so without receiving

compensation for it.  Named Plaintiff Seward noted that he typically arrived to work twenty to

thirty minutes before his shift and that it was "procedure" for CCRs to arrive early to boot up but

---

[18] Reidy apparently was a System X second-line manager, see Langeland Decl., Ex. C (Coy Depo.) at 16:11–21, and her testimony is somewhat inconsistent with the statements of other System X managers who acknowledged that System X CCRs were expected to boot up and make themselves call ready prior to the start of their shifts.

not to log into the telephone system until their start time. See Langeland Decl., Ex. G (Seward Depo.) at 96:13–97:12, 148:6–150:10. Seward also described discussions that he had with other CCRs who were following the same practice, but said that no IBM managers ever told him that he could report pre-shift boot-up time in eTotals. See id. at 319:12–321:8. Opt-in Plaintiff Cathy Barday testified that she generally arrived to work at least fifteen minutes before her start time and that she spent this time performing tasks to make herself call ready. See id., Ex. H (Barday Depo.) at 20:19–22:11 (stating that she had no specific goal in terms of how early she wanted to arrive but then discussing the fifteen to twenty-minute process in which she engaged to make herself call ready), 138:5–23 (stating that she generally arrived to work more than fifteen minutes before start time); see also id. at 135:4–136:20 (stating that a manager instructed her team only to report time in eTotals if he had pre-approved it). Another opt-in plaintiff, James Starkey, stated that, as a member of the System X team, he was subject to the call-ready requirement described in the Lambousis e-mail and could not recall ever logging in to the telephone system before booting up his computer or knowing of anyone else who did. See id., Ex. I (Starkey Depo.) at 62:12–22, 67:9–68:2. Opt-in Plaintiff Eugene Scott testified that his manager, Juanlyn Williams,[19] instructed him to "be there early to . . . log the systems on before we get onto the phone," though he acknowledged that she never told him not to report this time in eTotals. See id., Ex. J (Scott Depo.) at 57:1–59:12; see also id. at 60:14-61:7 (noting that he had to spend ten to fifteen minutes booting up before the start of his shift).

Many other opt-ins provided similar testimony at their depositions, indicating that they also believed they were expected to boot up their computers before the start of their shifts or that

---

[19] As noted above, Williams was also the manager of Named Plaintiff Seward and one other opt-in plaintiff. See Langeland Decl., Ex. D; Friedman Decl., Ex. C (M. Armour Depo.) at 22:23–24.

they in fact did so, even if they were not sure about their managers' expectations. See Langeland

Decl., Ex. K (Liles Depo.) at 49:12–52:10 (stating that he had been told by a non-manager "team

lead" that he should not report time he spent booting up pre-shift in eTotals and that this was the

"general attitude"); 92:9–25 (noting that "[w]ith regard to pre-shift overtime . . . management's

expectation" was "[t]hat it doesn't exist"); id., Ex. L (Lee Depo.) at 67:11–68:19 (noting that she

and others were instructed during training in 1998 to "arrive early to make sure everything was

up and running" prior to shift start); id., Ex. N (Garrett Depo.) at 32:2–19 (noting that System X

managers, including Juanita Carver, Steven Coy, and George Lambousis, "asked [him] to be

there early, 20 minutes or so early, so we could have all the programs and applications that IBM

used up and running prior to our start time"), 42:2–20 (noting that it was his managers'

expectation and his regular practice to arrive to boot up about twenty minutes before his shift

start time), 47:2–24 (stating that he did not record pre-shift boot-up time because it was an

"unwritten rule" that they should not do so, though acknowledging that no managers ever

specifically told him this was the case); id., Ex. T (Glanton Depo.) at 101:3–103:23 (discussing

his boot-up process, explaining that when he finished this process he would wait to log into the

telephone system until his scheduled start time); id., Ex. U (Owens Depo.) at 86:24–91:21

(noting that, when she arrived early, she would start working immediately although she did not

report this time in eTotals because this was "just expected"); id., Ex. GG (D. Brown Depo.) at

60:19–61:25, 76:7–17 (stating that her managers, including Pete Starratt, told her to have her

computer up and running so that she would be call ready at the start of her shift), 84:8–85:4,

92:2–21 (noting that Pete Starratt told her not to report pre-shift boot-up time in eTotals because

it was part of her "job description"); id., Ex. HH (M. Armour Depo.) at 43:17–46:3 (noting that

some, but not all, managers indicated to her that CCRs should arrive early to boot up pre-shift

22

and that she generally tried to arrive fifteen minutes before the start of her shift); Friedman

Decl., Ex. E (Bowers Depo.) at 38:14–41:19 (noting that he would arrive to work twenty to thirty

minutes before his shift to boot up because his "team lead" and other senior colleagues told him

this was expected, but acknowledging that no managers ever told him this was necessary); id.,

Ex. P (Miller Depo.) at 76:11–77:23 (stating that, although no managers specifically said so, it

was "more or less understood" that CCRs were expected to be in an available state on the

telephone system at the start of their shifts which required them to boot up their computers pre-

shift); id., Ex. R (Poehnelt Depo.) at 71:12–73:25 (noting that it took him somewhere between

ten and twenty minutes to boot up, and sometimes check e-mails and queues, prior to the start of

his shift); id., Ex. T (Raker Depo.) at 88:23–89:23 (noting that the "time window" in which

CCRs expected to arrive was "never discussed" but that "everything was about

productivity, being available, ready to take calls, take the most calls," so it was his understanding

that he should arrive early to boot up so he would be available to take calls at the start of his

shift); id., Ex. Y (Wasson Depo.) at 59:18–60:24 (noting that he aimed to arrive at work five to

thirty minutes before his shift and would typically begin working upon arrival, although no one

asked him to do so); see also Langeland Decl., Ex. W (Seward Decl.) at ¶¶ 14–18; id., Ex. X

(Barday Decl.) at ¶¶ 14–19.

However, some opt-ins acknowledged that their managers did not actually instruct them

to arrive early to boot up or that their managers would have considered them to be on time as

long as they were at their desks and logged into their telephones at the start of their shifts, even if

they had not yet booted up their computers. See Langeland Decl., Ex. L (Lee Depo.) at 83:8–25

(noting that her managers did not communicate their expectations with regard to arrival time or

compensation for any pre-shift time that may have been worked, despite testifying earlier that

23

she was told during training to arrive early); Friedman Decl., Ex. K (Garrett Depo.) at 49:7–23 (noting that, while working as a contract employee, his previous employer instructed him not to report pre-shift overtime so he assumed this was IBM's requirement as well, although no one at IBM ever told him not to report pre-shift overtime); id., Ex. P (Miller Depo.) at 49:22–50:9, 70:4–71:11 (noting that most members of his team arrived right at their scheduled shift time, logged into the telephone system in an unavailable state in order to avoid being considered late, and then booted up, but also stating that he thinks these CCRs were "spoken to"), 76:11–20 (acknowledging that no managers ever told him he needed to arrive to work early); id., Ex. T (Raker Depo.) at 88:23–89:23 (acknowledging that no one actually told him how early he was expected to arrive; id., Ex. Y (Wasson Depo.) at 54:8–25 (noting that, in order to be in an available state on the telephone system by shift start as expected, he had to boot up pre-shift, but acknowledging that no manager directed him to do this).

Similarly, some opt-in plaintiffs offered testimony that was internally inconsistent, at times indicating that it was expected for them to boot up pre-shift, but later suggesting that there was no such requirement. See Langeland Decl., Ex. M (Y. Brown Depo.) at 78:8–80:21, 85:24–87:18 (stating that her managers never instructed her to arrive early to boot up and would have considered her on time as long as she was logged into the telephone system at shift start time, but then noting that she would need to boot up ten to fifteen minutes before the start of her shift in order to be ready, and then stating again that she sometimes logged into the telephone system at the start of her scheduled shift to be considered on time and began taking calls before all her systems were booted up), 91:17–93:18 (noting that she did not record pre-shift overtime because it would have been considered unauthorized since "you're arriving early at your own discretion"); id., Ex. FF (Eyoh Depo.) at 59:7–63:21 (noting that she would "not necessarily" be

24

considered late if she logged into the telephone system at her scheduled time and then booted up
her computer after the start of her shift, but that it was "company policy" and management's
expectation that CCRs be logged into their telephones and computers at the start of their shifts);
Friedman Decl., Ex. E (Bowers Depo.) at 38:14–40:22 (acknowledging that no managers ever
told him to arrive early to boot up prior to the start of his shift, but stating that he in fact did so
given his understanding from colleagues that this was expected and due to his own "professional
work ethic"); id., Ex. P (Miller Depo.) at 76:11–77:10 (noting that "nobody" told him that he
"needed to come in early every day" and that he "could have logged in at [shift start] or run to
my desk at [shift start] and hit the button to bring the system up and everything" but that he
"prefer[red] to come in a little early so I could do it relaxed without pressure and put things
together the way I like them").  Opt-in Plaintiff Yolanda Brown testified that she often booted up
her computer "tools" after she logged into the telephone system and began taking calls.  See
Friedman Decl., Ex. F (Y. Brown Depo.) at 72:3–73:11 (noting that she turned her computer on
"[a]lmost simultaneously" with logging into the telephone system and that she would "take calls
while . . . [she was] booting up").  Another opt-in plaintiff, Monica Owens, conceded that her
manager did not require her to shut down her computer after every shift and therefore apparently
would not need to spend as much time booting up prior to each shift.  See id., Ex. Q (Owens
Depo.) at 58:11–59:22.

Further, while some opt-in plaintiffs maintain that they arrived early to boot up their
computers pre-shift, they have acknowledged that they did not generally handle incoming calls
at the start of their shifts which, according to IBM, undermines their claim that it was necessary
or expected by management for them to do so.  See id., Ex. C (M. Armour Depo.) at 15:13–16:9
(noting that she did not work on incoming telephone calls and that her job duties primarily

25

involved research and some outgoing calls), 21:24–22:16 (noting that she determined in her

"discretion" when to make outgoing calls); id., Ex. S (Preddy Depo.) at 21:2–22:8 (noting that he

generally "wouldn't be on the phones for the general calls that came in" and that he worked

mostly with e-mail and occasional outgoing or incoming calls); id., Ex. Z (B. Williams Depo.) at

18:7–20:25 (noting that her work involved exchanging e-mails and instant messages, as well as

some telephone calls, with technicians).

    Other opt-ins testified that they arrived early to work for personal reasons or engaged in

personal activities before starting work, even though they may also have engaged in pre-shift

work during that time; some managers also testified that this was their understanding of what

some opt-in plaintiffs were doing on occasions when they arrived early.  See Langeland Decl.

Ex. I (Starkey Depo.) at 40:14–41:4 (noting that he typically arrived to work an hour early and,

during that hour, would engage in both work-related and personal activities, including reading

the newspaper and searching the internet), 50:11–51:17 (stating that his managers likely would

have seen him at work early, but acknowledging that they may not have known whether he was

there for personal reasons or to do work); Friedman Decl., Ex. X (Starkey Depo.) at 47:24–48:9

(noting that he would arrive early because, given potential traffic issues, he would "rather get

there way early than ever be late," and it became "habit" for him to boot up and log in before his

shift start); Langeland Decl., Ex. M (Y. Brown Depo.) at 89:24:91–3 (noting that, on days she

arrived early, she typically would get her computer started but then might read, get coffee, or "do

other things"); Friedman Decl., Ex. E (Bowers Depo.) at 38:14–24 (noting that he would arrive

to work twenty to thirty minutes before his shift and, before booting up, would put his lunch

away, get coffee, and say hello to his co-workers); id., Ex. I (Coy Depo.) at 35:14–19 (discussing

his understanding that some CCRs came in early for breakfast, coffee, "surf[ing] the internet,"

and reading personal e-mail); Langeland Decl., Ex. P (Musgrove Depo.) at 61:7–21 (noting that

she observed some CCRs arrive early to "go to the cafeteria, put their lunch away, put their stuff

away or grab a drink before they sit down" but never saw CCRs doing work before their

scheduled start time); Friedman Decl., Ex. H (Cerny Depo.) at 73:7–74:4 (noting that Opt-in

Plaintiff Eva Puckett[20] apparently arrived early regularly to avoid traffic and that, after Cerny

told her not to begin working prior to her shift, Puckett would get breakfast during this pre-shift

time instead); id., Ex. M (Landery Depo.) at 46:18–47:4 (noting that some CCRs may have

arrived early to "get breakfast, grab a cup of coffee"); id., Ex. AA (J. Williams Depo.) at

193:8–194:6 (noting that she never saw Named Plaintiff Seward engaging in work on days that

he arrived early but rather saw him talking with his colleagues about sports, reading the

newspaper, or browsing the internet).

Some individual opt-ins also acknowledged that, even if they did arrive early to boot up

their computers or perform other work before the start of their shifts, their managers may not

have known that they were doing so. See Friedman Decl., Ex. F (Y. Brown Depo.) at 101:2–20

(stating that "managers never got [to work] before" the CCRs, so it would be "hard to say"

whether her managers knew that she was there early on some days); id., Ex. J (Eyoh Depo.) at

95:7–96:20 (noting that her manager, Michael Landery,[21] was located in Colorado and could not

physically see whether she arrived to work early to boot up but stating that he had electronic

tools with which he could have determined when she was present); id., Ex. K (Garrett Depo.) at

---

[20] Puckett is mistakenly identified in the deposition transcript as "Ms. Bucket." See
Friedman Decl., Ex. H (Cerny Depo.) at 73:10. However, she is identified by the correct name
earlier in the transcript. See Langeland Decl., Ex. AA (Cerny Depo.) at 71:17.

[21] Landery's name is misspelled in the deposition transcript as "Landry." See Friedman
Decl., Ex. J (Eyoh Depo.) at 95:8.

77:3–6 (noting that his manager, Vicky Reidy, could not physically see him from her desk because "[s]he was on the other side of the building"). To the extent that some managers learned that certain opt-in plaintiffs were arriving early to log in or otherwise engage in pre-shift work, these managers testified that they then instructed those plaintiffs to record that overtime in eTotals so that they would be compensated for it but advised them that this work was not necessary or required and that they should not do this going forward. See Langeland Decl., Ex. AA (Cerny Depo.) at 69:24–73:17 (regarding Opt-In Plaintiff Eva Puckett); Cerny Decl. at ¶¶ 14–15 (same); MacDonald Decl. at ¶ 13 (regarding Opt-In Plaintiff Michael Rich); Friedman Decl., Ex. AA (J. Williams Depo.) at 191:13–192:6 (regarding Named Plaintiff Charles Seward).

Finally, the testimony of some IBM managers is in direct conflict with the testimony of opt-in plaintiffs who worked on their teams. In particular, some opt-in plaintiffs who claim that they were expected to boot up before the start of their shifts, and therefore did so, worked for managers who testified that this was not required or expected or worked on teams, or in specific jobs, in which they did not field incoming calls and apparently had no need to be call ready at the start of their shifts. For example, Opt-In Plaintiff Yame Lee, who testified that she believed she was expected to arrive early to prepare for her shift, was supervised by Wendi Kowren Musgrove, who stated that Lee was "rarely on the telephone in her role" and would not have had to boot up pre-shift to become call ready. Compare Langeland Decl., Ex. L (Lee Depo.) at 67:11–68:19, with Musgrove Decl. at ¶¶ 8, 10. Similarly, IBM manager Sara Cerny specifically noted in her declaration that Opt-In Plaintiff Yolanda Brown worked on her Pended QSAR and Entitlement Help Desk teams and was not expected to be call ready at the start of her shifts, yet Brown testified that, although Cerny did not instruct her to do so, she needed to boot up ten to fifteen minutes before the start of her shifts in order to be ready. Compare Cerny Decl. at ¶¶ 9,

28

12, with Langeland Decl., Ex. M (Y. Brown Depo.) at 78:8–80:21. Additionally, Opt-In Plaintiff

Denise Brown testified that IBM manager Pete Starratt instructed her to have her computer up

and running so that she would be call ready at the start of her shift and that time spent booting up

before her shift was part of her "job description;" however, Starratt stated in his declaration that

there was no call-ready requirement on his team, that the CCRs on his team, including Denise

Brown, "were not expected to boot up their computers, log into their computer tools, or perform

any other work prior to the beginning of their scheduled shift," and that he had communicated

these expectations to his CCRs. Compare Langeland Decl., Ex. GG (D. Brown Depo.) at

60:19–61:25, 76:7–17, 84:8–85:4, 92:2–21, with Starratt Decl. at ¶¶ 6, 8, 11. Furthermore, data

retained by IBM reflecting the times at which CCRs actually arrived to work apparently also

conflicts with the testimony of at least some plaintiffs who claim to have regularly arrived early

to boot up.[22]

---

[22] IBM employees apparently were required to use a badge to swipe into their buildings and, in some cases, their floors. IBM has submitted several hundred pages of badge swipe data, along with analysis thereof, that it plans to use to support its defenses against the claims of two opt-in plaintiffs, Thomas Poehnelt and Thomas McDonald, since this data apparently shows that these plaintiffs did not arrive to work early enough to have time to boot up pre-shift. See Docket No. 148 (Ralph Decl., Exs. A–D); see also Ray Decl., Exs. 1–2.

On the other hand, Seward plans to use this data to show that plaintiffs regularly arrived to work early and thereby attempt to support his argument that they engaged in pre-shift work. Seward has submitted an expert report analyzing "login and badge swipe data . . . to determine the daily time differences between first badge swipe time and first [telephone system] login time" for each plaintiff. See Langeland Decl., Ex. A at 1. At his deposition, Seward's expert acknowledged that he knew little about the job duties of the CCRs, or about the boot-up or other processes in which the CCRs may have engaged to prepare for work. See Friedman Reply Decl., Ex. F (Madansky Depo.) at 42:16–44:25 (also noting that, with respect to his analysis, he did not know whether plaintiffs arrived early or late for their scheduled shifts on any particular day or whether the plaintiffs had worked more than eight hours on any particular day). It is unclear to this Court how this data might demonstrate that, simply because plaintiffs swiped into their building or floor before the start of their shifts, they actually began booting up or otherwise working before their shifts began. When asked at oral argument how the badge swipe data was persuasive to show that plaintiffs actually began working before their shifts began, Seward's

## III. ANALYSIS

**A.    Standard on Motion for Decertification**

While the Second Circuit has "not yet provided clear guidance on the standard district

courts should apply to motions seeking certification of a 'collective action' under § 216(b) of

[the] FLSA, . . . the district courts of this Circuit . . . have coalesced around a two-step method."

Myers v. Hertz Corp., 624 F.3d 537, 554–55 (2d Cir. 2010). As noted above, at the first stage,

the court makes an "initial determination to send notice to potential opt-in plaintiffs" where the

named plaintiff has made a "modest factual showing" that he is "similarly situated" to the

proposed opt-ins. Id. (internal quotations omitted). At the second stage of the certification

process, the court, on the basis of a "fuller record," determines "whether the plaintiffs who have

opted in are in fact similarly situated to the named plaintiffs." Id. at 555 (internal quotations

omitted). If not, the court may decertify the action and dismiss the opt-in plaintiffs' claims

without prejudice. Id.

In making its determination at the second stage, the court examines the proposed class

under the following three prongs: (1) common or disparate factual and employment settings of

the individual plaintiffs; (2) defenses available which appear common to all plaintiffs or

individual to each plaintiff; and (3) fairness and procedural considerations. See, e.g., Zivali v.

AT&T Mobility, LLC, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011). At this second stage, the

"burden is on the named plaintiff to prove that the other employees are similarly situated" and

"the Court, now afforded a much fuller record, must apply a more stringent standard of proof in

---

counsel stated that this was a "merits issue." See Transcript of December 13, 2011 Hearing at
27:12–28:6.

determining whether plaintiffs are similarly situated for the purposes of the FLSA." Zivali, 784
F. Supp. 2d at 460 (internal quotations omitted).

In some cases, where the record following discovery reveals that only some plaintiffs or
claims are actually similar, the Court may decide in its discretion to grant a decertification
motion only in part, for example by decertifying particular claims, creating subclasses, or
modifying the scope of the class. See Realite v. Ark Rests. Corp., 7 F. Supp. 2d 303, 308
(S.D.N.Y. 1998) (Sotomayor, J.) (granting conditional certification but noting that, "should
discovery reveal that plaintiffs in fact are not similarly situated, or that only plaintiffs who
worked in the same [location] or who held the same job type are similarly situated, I may later
decertify the class, or divide the class into subgroups, if appropriate"); Russell v. Ill. Bell Tel.
Co., 721 F. Supp. 2d 804, 813–14 (N.D. Ill. 2010) (decertifying particular claims for which
plaintiffs had not demonstrated that they were similarly situated); Burch v. Qwest Comm'cns
Int'l, Inc., 677 F. Supp. 2d 1101, 1122–23 (D. Minn. 2009) (decertifying only some claims and
noting that "[i]t is within the Court's discretion to clarify and narrow the proposed class in this
way in order to ensure that the certified class is consistent with the purposes and requirements of
the FLSA"); Frank v. Gold'n Plump Poultry, Inc., No. 04-CV-1018 (PJS/RLE), 2007 WL
2780504, at *5 (D. Minn. Sept. 24, 2007) (creating subclass to ensure that plaintiffs shared
"factual similarities" and to enhance "procedural efficiency and case management").

While the factors to be considered in the decertification analysis are quite clear, it is
difficult to draw consistent guidelines from the case law on how to apply these factors in
particular factual settings. The decertification determination is extremely fact-dependent and
appears to be largely in the Court's discretion. As discussed below, the key cases relied upon by
Seward and IBM are very difficult to reconcile, as they apply the same standard from divergent

31

perspectives and, accordingly, reach different conclusions on relatively similar facts.[23]

IBM's motion for decertification draws heavily on Zivali v. AT&T Mobility, LLC, 784 F. Supp. 2d 456 (S.D.N.Y. 2011) (Rakoff, J.), in which this Court recently granted Defendant AT&T Mobility's ("Mobility") motion to decertify a class of 4,100 employees who worked in retail stores across the country and had alleged that they were required to engage in various types of uncompensated off-the-clock work. The Court was persuaded by Mobility's argument that these employees were not similarly situated under the three-prong analysis discussed above.

Mobility used a timekeeping system, somewhat similar to IBM's eTotals, that only recorded hours worked when an employee was physically present at the store, but that enabled supervisors to "override the system and retroactively adjust an employee's work hours." Id. at 460. The Court found that Mobility's timekeeping system and "formal policies regarding timekeeping and overtime" were lawful under the FLSA since they "allow[ed] for the complete and accurate recording of all time worked" and "mandate[d] that all overtime, even if not authorized in advance, be paid." Id. at 461–62. Therefore, the Court found, "the fact that the opt-in plaintiffs track their hours using [this timekeeping] system and are subject to Mobility's formal timekeeping policies is insufficient, without more, to demonstrate that plaintiffs are similarly situated for the purposes of a FLSA collective action." Id. at 463.

While the plaintiffs in Zivali conceded that Mobility's formal policies and timekeeping system were lawful, they argued that Mobility's "practices and . . . unwritten expectations created a corporate culture in which FLSA violations are common." Id. at 463. The Court determined that, for these "arguments to be pertinent to certification, however, plaintiffs must

---

[23] Given the scarcity of cases within the Second Circuit addressing the second stage of the certification process in the context of off-the-clock overtime claims, this Court also considers some relevant out-of-circuit opinions cited by the parties.

demonstrate that the 'practices' and 'culture' of which they complain are sufficiently uniform and pervasive as to warrant class treatment." Id. The Court found that the plaintiffs "failed" to make this showing since the "evidence point[ed] to an extremely wide range of company practices in the context of varied factual and employment settings," "the defenses available to Mobility appear to be highly individual to each plaintiff," and therefore "fairness and procedural considerations counsel in favor of decertifying the class." Id. at 464.

Apparently considering the first prong of the "similarly situated" analysis, the Court reviewed the plaintiffs' claim that they had not been compensated for reviewing and responding to work-related electronic communications while they were off duty. The Court found wide variation in the plaintiffs' testimony with regard to management expectations, the extent to which they even received such communications, and whether they were compensated for any such time worked. Accordingly, the Court could not "conclude that Mobility had any uniform business practices or 'culture' across its 2,000-plus retail stores encouraging off-duty electronic communication." Id. at 465. The Court therefore concluded that "plaintiffs [were] not similarly situated with respect to their factual and employment settings." Id. at 467.

On the second, "individual defenses" prong, the Court found that, "[i]n the absence of a company-wide policy or practice, plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation." Id. at 468. Because the "record suggests that the knowledge of each individual manager varies widely" and because the "extent to which work [may have been] de minimis . . . will necessarily vary widely according to the particular situation of each individual plaintiff," the Court found that "this factor weighs heavily against proceeding with this case as a collective action." Id. Finally, on the third prong, the Court determined that

33

there appeared to be "very few common issues of fact in this case," that the "testimony of the plaintiffs is not representative and cannot fairly be extrapolated to the 4,100 individuals who have opted into this action," and that "[b]ifurcation of the trial would not resolve the issue as there is no consistent evidence as to either liability or damages." Id. at 468–69. Therefore, "all three relevant factors favor[ed] decertification in this case." Id. at 469.

In contrast, Seward points to two recent out-of-circuit call center cases, Burch v. Qwest Communications International, Inc., 677 F. Supp. 2d 1101 (D. Minn. 2009), and Russell v. Illinois Bell Telephone Co., 721 F. Supp. 2d 804 (N.D. Ill. 2010), in support of his opposition to IBM's decertification motion. In Burch, the court denied a defendant's motion to decertify a class of 1,500 call center representatives who worked in call centers around the country and alleged that they had worked pre-shift boot-up time without receiving compensation for it.[24] The court found that the named plaintiff had made a sufficient showing that the employees who had opted in to the case were similarly situated. The court noted that the "[p]laintiffs' primary job duties are answering inbound calls from Qwest customers or potential customers and dealing with service or sales issues."[25] Burch, 677 F. Supp. 2d at 1107. The court also found that all plaintiffs were "subject to the same company-wide time monitoring and compensation policies" and that "[p]roduct lines, availability goals, sales goals, type of chains of command, and time monitoring practices are consistent across different call centers." Id. Like IBM, Qwest utilized

---

[24] The court did, however, modify the scope of the class to include only "persons pursuing FLSA violations based on the uncompensated pre- and post-shift work of booting up and shutting down their computers" and to exclude claims based on other types of off-the-clock tasks. See Burch, 677 F. Supp. 2d at 1122–23.

[25] At oral argument, IBM's counsel noted that "[a]ll of the opt-ins in Burch had the job of fielding . . . incoming calls[] at the start of their shift" and that there was a "consistent 'call[-]ready' requirement." See Transcript of December 13, 2011 Hearing at 14:12–21.

a timekeeping system that defaulted to an employee's scheduled time but could be adjusted to reflect overtime.[26] Id. at 1108. Also like IBM, Qwest required its call center employees to log into and out of a telephone system at the start and end of their shifts and monitored this time, but did not base payroll on this data. Id. The court acknowledged that "[p]laintiff testimony about pre-shift work [was] varying" and that evidence of Qwest's knowledge also varied, particularly with regard to management observations, but was bolstered by the fact that Qwest had been subject to a prior lawsuit and internal audit regarding off-the-clock overtime violations. Id. at 1110–12. Despite Qwest's challenge to the existence of a common policy, and despite inconsistent testimony on this issue, the court determined that, "[a]s to the booting up and shutting down allegations, Plaintiffs have provided substantial evidence of a widespread Qwest policy that, in practice, required off-the-clock work." Id. at 1115.

With regard to whether the plaintiffs shared common employment settings, the plaintiffs argued that they "all [had] the same job descriptions and are subject to the same corporate policies," "all had availability goals and sales quotas and were subject to the same time monitoring policies," and "all allege[d] that they worked time for which they were not paid." Id. at 1116. Qwest argued that the employment and factual settings were not similar for various reasons, including the variety of off-the-clock tasks alleged; the amount of time spent working off-the-clock; the differences in call center locations, job duties, and individual manager

---

[26] IBM also noted at oral argument that, in Burch, "the company . . . simply did not provide a mechanism for the employees to record pre[-]shift time, because the type of overtime that was allowed to be submitted or entered . . . related only to calls that went past the end of the shift." See Transcript of December 13, 2011 Hearing at 14:22–15:5. The court in Burch had noted that, under the timekeeping system used by Qwest, employees could "report overtime and receive payment for incidental overtime," but that, in practice, "incidental overtime, as a category, is intended to cover overtime incurred finishing a customer call, not performing the various other off-the-clock activities alleged by Plaintiffs." Burch, 677 F. Supp. 2d at 1119.

practices; Qwest's knowledge of off-the-clock work; and whether plaintiffs actually engaged in pre-shift work and, if so, whether they were required to and how much time they spent doing so.[27] Id. at 1116–20. In particular, Qwest argued that, "because there is no evidence of a uniform plan or policy, Plaintiffs can only show knowledge on a manager-by-manager basis, and knowledge of off-the-clock work by one manager will not be imputed to other managers" and that "this inquiry will require hundreds, or even thousands, [of] individual credibility determinations between each Plaintiff's testimony and his or her managers' testimony, making certification inappropriate." Id. at 1118. The court disagreed, finding, "clear evidence of Qwest's knowledge of the uncompensated [pre-shift boot-up] work, arising from the audit, the apparently widespread nature of the practice, and Plaintiffs' argument that, logistically, these activities had to occur off the clock in order to meet Qwest's requirements regarding availability at the beginning . . . of shifts." Id. Though it acknowledged that there was varying testimony and individual questions related to many of the issues identified by Qwest, the court found, overall, that the opt-in plaintiffs shared a common factual and employment setting. Qwest also presented a number of individual defenses, including that some plaintiffs did not actually perform any off-the-clock work, some plaintiffs received compensation for off-the-clock work that was performed, and some plaintiffs may have engaged only in *de minimis* amounts of off-the-clock work. Id. at 1120–21. Again, however, the court found that most of these defenses presented damages questions or "legal questions that [could] be resolved on a classwide basis" and therefore determined that this factor "weigh[ed] in favor of certification." Id. at 1121.

---

[27] There is no indication in the Burch opinion that Qwest specifically argued, as IBM argues here, that plaintiffs were dissimilar due to the effect that their particular, individual job duties or shift structures may have had on their need to field incoming calls at the start of their shifts.

Finally, the court concluded that a collective action on the pre-shift boot-up claim "would be manageable and preferable." Id.

The court in Russell, 721 F. Supp. 2d, also denied a motion for decertification, finding that the plaintiffs in that case were similarly situated, although it severed some claims that it found to be individualized. In this case, 488 call center employees, who worked in four different call center locations in Illinois, claimed that they were required to work before and after their shifts and during mealtimes without compensation. Id. at 807–08. The plaintiffs claimed that, due to managerial expectations that they be "open and available" for calls at the start of their shifts and monitoring of "adherence" to schedule and "average [call] handle time," it was necessary for them to perform non-call work off the clock. Id. at 809. Several plaintiffs said that they were instructed to be call ready at the start of their shifts which required that they be "logged into the system," and that it could take "anywhere from three to twenty minutes to boot up and load." Id. at 809. As the court noted, "[p]laintiffs claim they inferred from the 'open and available' instruction that they needed to log into their computers and applications prior to their start time." Id. Illinois Bell denied that its managers required the employees to boot up prior to their shifts. Id.

While the court recognized that, "[i]n some cases, the variety of job duties, geographic locations, and salaries at issue may result in claims that are too individualized and difficult for the court to manage collectively," it found that "[b]ecause the plaintiffs in this case have similar job duties and because only four Illinois call centers are at issue, such differences among plaintiffs do not justify decertification here." Id. at 812 n.2. The court did not consider potential differences in the job duties of each plaintiff or in managerial expectations, but did acknowledge

that there would be plaintiff-specific differences with regard to the boot-up process itself.[28] See
id. at 813. Despite these differences, the court found that the overall question of whether these
activities were compensable could be determined across the class and that questions about the
amount of time spent by each plaintiff could be determined in a bifurcated, damages portion of
the trial. Id. The court, however, decertified "individualized claims" for off-the-clock activities
that did not fall under one of three court-defined subclasses, one of which was "pre-shift work
resulting from logging in [to] computers." Id. at 814.

      The court noted further that, "[i]n [some other] cases, plaintiffs could not show that there
was a common practice or policy, because one or relatively few managers gave the unlawful
instruction or varying unlawful instructions were provided, resulting in disparate individualized
claims." Id. at 815. However, in this case, the court was satisfied that the plaintiffs' testimony
was sufficiently consistent on the issue of an "open and available" expectation, which, according
to plaintiffs, required them to boot up pre-shift, despite the fact that, on the basis of management
testimony, Illinois Bell denied that it had imposed such a requirement or was aware that its
employees were engaging in this practice. Id. at 815–17. Moreover, the court found that the
"defenses Illinois Bell claims are individualized appear to be applicable to all plaintiffs or to
subclasses." Id. at 821. While Illinois Bell argued that questions of whether particular plaintiffs
were instructed by managers to be call ready and boot up pre-shift, whether they actually
followed this practice, and whether their managers were or should have been aware of this were
individualized, the court found that these defenses could "be addressed collectively because the
experiences alleged are similar across the case." Id. at 822. Because the "plaintiffs share similar

---

[28] As with Burch, there is no indication in the Russell opinion that any of the plaintiffs in
that case did not work in positions where they were fielding incoming calls at the start of their
shifts.

job duties, and the four call centers implement the same policies, use similar time-keeping methods, and share a similar interest in having representatives regularly answer incoming calls throughout the day, . . . [t]he Court [was] persuaded that these common liability-related questions can be resolved in collective trials even though there [were] some individualized questions." Id. at 823.

This Court recognizes the parallels that Seward draws between Burch and Russell and the present case. However, this Court is persuaded by the reasoning in Zivali. For the reasons discussed below, this Court finds that, on the basis of the record in this case, Seward has not met his burden of proving that he is similarly situated to the opt-in plaintiffs.

**B.     First Prong: Common or Disparate Factual and Employment Settings**

In determining whether the plaintiffs shared common factual and employment settings, the Court in Zivali first considered whether the defendant's formal policies and timekeeping systems were legal on their face and, finding that they were, next considered whether the plaintiffs had shown that they were subject to a common policy requiring off-the-clock work. IBM contends that Seward has conceded that IBM's formal policies and system are legal and has not shown that "the 'practices' . . . of which [the plaintiffs] complain are sufficiently uniform and pervasive as to warrant class treatment," Zivali, 784 F. Supp. 2d at 463, since the "opt-ins' different teams had numerous, different work rules and widely disparate functions, purposes, and tasks—all of which directly impacted whether CCRs needed to boot up pre-shift, with the vast majority not being required to boot up pre-shift." Mot. at 5; see also id. at 16–18. Given these various functions and structures, IBM argues that some CCR teams on the whole were under no pressure to be booted up and ready at the start of their shifts. See id. at 8–10. Additionally, IBM argues that, even within particular teams, a CCR's specific role on the team "affected the need to

be call ready." Id. at 10–11. While IBM acknowledged during oral argument that approximately

half of the plaintiffs were responsible for fielding incoming calls at the start of their shifts, it

maintains that the other half were not and, therefore, would not be subject to any expectation that

they be call ready when their shifts began. See Transcript of December 13, 2011 Hearing at

5:15–7:12. Given these disparities, IBM claims that Seward cannot show that the opt-ins were

subject to a uniform pre-shift boot-up requirement or, therefore, that they shared common factual

and employment settings.

      In response, Seward argues that IBM subjected all plaintiffs to a "single illegal practice .

. . [of] compensating employees for their *scheduled* time as opposed to their *actual* time worked,

which results in the failure to pay for pre-shift computer boot-up or other work" and that the opt-

ins' "relevant job duties are strikingly similar." Opp. at 4 (emphasis in original). Seward argues

that the opt-ins' claims should be "considered at a higher level of abstraction" than that proposed

by IBM, see id. at 4–5 (internal quotations omitted) (quoting Frank, 2007 WL 2780504, at *4),

and suggests that he need not prove the existence of a uniform policy "when there is a factual or

legal nexus binding the Plaintiffs together." Opp. at 8 (citing Vennet v. Am. Intercontinental

Univ. Online, No. 05 C 4889, 2005 WL 6215171, at *6 (N.D. Ill. Dec. 22, 2005)). Seward

highlights the fact that the opt-ins (1) "all performed customer service functions, handling

inbound and outbound communications with customers;" (2) all worked in the same Riveredge

facility; (3) all were subject to IBM's official overtime policies; (4) all "shared the same

corporate hierarchy;" and (5) all "tracked their time the same way," using the eTotals system.

Id. at 6–8. At oral argument, Seward also emphasized the fact that all opt-in

plaintiff—regardless of whether they worked mostly on fielding incoming calls—all relied on

their computers to perform their customer service tasks, even if those tasks included responding

to e-mails, performing research, or working on reports and, therefore, they all needed to boot up before they could begin working. See Transcript of December 13, 2011 Hearing at 30:6–25. Seward claims that most opt-ins worked on either the fifth or the ninth floor and that they were supervised by relatively few managers–including Granger and the System X managers–and thus shared a common factual and employment setting. See Opp. at 2, 2 n.6. He claims that "[t]here is no dispute that the CCRs on the ninth floor [on the System X team] were expected to perform pre-shift work to be ready to start handling their customer service duties immediately at their shift time." Id. at 2–3.

Seward does not directly dispute IBM's argument that differences in team functions or structures, or in the expectations of particular managers or job responsibilities of particular plaintiffs, may have made it simply unnecessary, and therefore unexpected by IBM, for at least some of the plaintiffs to boot up their computers before their shifts. While Seward's complaint alleged that the "primary duty" performed by Seward and other similarly situated CCRs was "to field phone calls relating to customer service for IBM,"[29] see Friedman Reply Decl., Ex. A (Amended Complaint) at ¶¶ 14–16, he now seems to characterize the plaintiffs' job duties more broadly, apparently conceding that not all of the plaintiffs who have in fact opted in to this case primarily fielded incoming calls. See Transcript of December 13, 2011 Hearing at 30:14–21 (noting that all plaintiffs were "responding to some kind of customer inquiry" and that they all needed to "have the computer up" to do their jobs), 35:11–21 (suggesting that this Court should not focus on "discrepancies within these different teams" but rather focus on the fact that "[t]hey're all in the call center, and they're all providing some kind of service relating to IBM's

---

[29] In opposition to this Motion, Seward also noted that "[t]he uncompensated pre-shift practice at issue in this case is IBM's failure to pay for time spent by CCRs booting-up [sic] their computers before the start of their shift." Opp. at 2.

products, or they're providing some kind of a function in order to make it possible to service the products"), 37:7–24 (noting that Seward and some opt-in plaintiffs needed to be call ready and that other plaintiffs, including those on Sara Cerny's Pended QSAR team, also had "to have the computer up" and "have [their] applications launched . . . before [their] workday starts"). Seward argues simply that "[t]he fact that each and every one of the plaintiffs does not claim to have performed the exact same tasks every day off-the-clock does not provide a basis for decertifying this action." Opp. at 11. Similarly, Seward does not directly address the testimony of various IBM managers regarding the fact that they did not require or expect the CCRs on their teams to report early to boot up their computers, but rather emphasizes the testimony of Jeff Granger and the e-mails drafted by George Lambousis and Gary Kamprath, arguing that this testimony and documentation provides sufficient evidence to show that all CCRs in the Riveredge facility, including those who have opted in to this case, were subject to a call-ready expectation that required them to work pre-shift. See Opp. at 8–12. However, Seward does not explain why Granger's testimony or the Lambousis or Kamprath e-mails are relevant to showing what may have been expected or required of opt-in plaintiffs who worked on completely different teams.

It seems clear that IBM's timekeeping system and formal overtime policies are legal under Zivali, since they "allow[] for the complete and accurate recording of all time worked by . . . employees" and provide that "all [off-the-clock] work that was actually performed will be paid for." Zivali, 784 F. Supp. 2d at 461–62. There appears to be no dispute that CCRs had the ability to enter overtime exceptions in eTotals to be submitted for management approval. Therefore, this Court next will consider whether the opt-in plaintiffs have shown that the "practices and culture of which they complain are sufficiently uniform and pervasive as to

42

warrant class treatment." Id. at 463 (internal quotations omitted).

As for Named Plaintiff Seward, who worked for manager Juanlyn Williams on an incoming call team, and for opt-in plaintiffs who also worked for Williams or on the System X team or other incoming call teams, the evidence does suggest the existence of a common policy or practice of requiring them to report to work early and boot up their computers pre-shift. Several plaintiffs testified that they believed that management expected for them to engage in this off-the-clock work or that it was necessary for them to do so in order to be call-ready at the start of their shifts, as required by management. See Russell, 721 F. Supp. 2d at 809 (denying decertification where plaintiffs had "inferred from the 'open and available' instruction that they needed to log into their computers and applications prior to start time"); Burch, 677 F. Supp. 2d at 1118 (denying decertification where plaintiffs argued in part that "logistically, these activities had to occur off the clock in order to meet Qwest's requirements regarding availability at the beginning of . . . shifts"); Brennan v. Qwest Commc'ns Int'l, Civil No. 07-2024 (ADM/JSM), 2009 WL 1586721, at *1, *3 (D. Minn. June 4, 2009) (denying decertification of ninety-one network technician plaintiffs who worked in Qwest facilities throughout Minnesota and had shown that they "necessarily had to work before the start of their shifts"). Additionally, the Lambousis and Kamprath e-mails, as well as the testimony of managers Carver, Coy, Williams, and Granger, further suggest that some opt-ins were required or expected to boot up pre-shift.

However, other plaintiffs have indicated that, although they may have engaged in this off-the-clock work, their managers did not necessarily expect them to do so.[30] Others indicated

---

[30] These plaintiffs include Yame Lee, Yolanda Brown, Mora Eyoh, John Bowers, Steve Garrett, Thomas McDonald, Michael Raker, Randle Wasson, and Monica Owens. See Part II.C.4, supra. However, three of these plaintiffs apparently worked under managers whose testimony or documents reflect that they did expect their CCRs to boot up pre-shift: Garrett worked for Coy, Raker worked for Carver and Coy, and Owens worked for Granger. See

that they performed job functions for which, according to evidence presented by IBM, they would not need to be call ready at the start of their shifts.[31]  The declarations of several managers[32] likewise indicate that opt-in CCRs on their teams were not subject to a common requirement that they boot up before their shifts.  Despite Seward's arguments to the contrary, neither the testimony of Jeff Granger, nor the e-mails drafted by George Lambousis or Gary Kamprath, is sufficient to show a common policy, especially in light of conflicting testimony from plaintiffs and other managers.  There is no indication that the expectations reflected in the Granger testimony or in the Lambousis or Kamprath e-mails extended to any opt-in plaintiffs other than those who were members of the teams for which Granger or Lambousis were responsible or which Kamprath monitored.  See Friedman Reply Decl., Ex. D (Granger Depo.) at 102:24–103:20 (noting that other managers would know best what was required for their teams); Lambousis Decl. at ¶ 6 (noting that he had no supervisory authority over CCRs on teams other than System X); Kamprath Decl. at ¶¶ 3, 9–13 (noting that he only prepared DORs for some teams and, even for those teams, he had no supervisory authority over CCRs or knowledge about managers' instructions to their CCRs regarding arrival times).

This Court recognizes that, on a somewhat cursory review of the record, several facts might suggest that the plaintiffs share common factual and employment settings, including the relatively small number of plaintiffs and the fact that they all worked at the same call center

---

Langeland Decl., Ex. D.

[31] These plaintiffs include Marla Armour, Gregory Preddy, and Beverly Williams.  See Part II.C.4, *supra*.

[32] These managers include Sara Cerny, Genelle Betterson, John Waters, Pete Starratt, Wendi Kowren Musgrove, Roseanne Davis, Viki Torres, and Michael MacDonald.  See Part II.C.3, *supra*.

location, all performed customer service duties, and apparently all potentially engaged in at least

some telephone work. See Russell, 721 F. Supp. 2d at 812 n.2 (finding that, because the call

center plaintiffs "in this case have similar job duties" and worked in "only four Illinois call

centers," decertification was not justified);[33] Burch, 677 F. Supp. 2d at 1107 (noting that

"[p]laintiffs' primary job duties are answering inbound calls . . . and dealing with service or sales

issues").[34]  However, from the perspective utilized by the Court in Zivali[35]—and adopted by this

Court in the present case—Seward has not shown that he shares common factual and

employment settings with all of the opt-in plaintiffs due to the existence of a "sufficiently

uniform and pervasive" policy requiring off-the-clock work, given the many differences in

specific job duties, team functions and structures, managerial expectations, and individual

experiences and understandings among the plaintiffs. See Zivali, 784 F. Supp. 2d at 463–67; see

also King v. CVS/Caremark Corp., No. 07-21824-Civ., 2008 WL 5973490, at *1, *6 (S.D. Fla.

Sept. 11, 2008) (decertifying class of only sixteen pharmacy technician plaintiffs due to

"variation in stores, management practices and factual disparities as to each Plaintiff"); Proctor

---

[33] IBM also noted at oral argument that, unlike some of the opt-in plaintiffs in this case, all of the plaintiffs in Russell "had the job of fielding incoming customer calls at the start of their shift." See Transcript of December 13, 2011 Hearing at 16:10–13; Russell, 721 F. Supp. 2d at 823 (noting that defendant had interest in call center representatives "regularly answer[ing] incoming calls throughout the day").

[34] As noted above, at oral argument, IBM noted that this language from Burch actually suggested that, unlike in the present case, all plaintiffs in Burch actually fielded incoming calls. See Transcript of December 13, 2011 Hearing at 14:12–21.

[35] This Court recognizes the distinctions identified by Seward between the facts in Zivali and in the present case, including that there were more than four-thousand plaintiffs in Zivali, while there are only forty here, and that those plaintiffs worked in many retail locations across the United States, while the plaintiffs here worked in only one location. See Opp. at 11–12 (arguing that Zivali is not persuasive given the "divergent factual basis" of that case). Despite these factual differences, however, this Court finds that the reasoning in Zivali is persuasive and applicable to this case given the many individualized issues demonstrated by the record.

v. Allsups Convenience Stores, Inc., 250 F.R.D. 278, 279, 281–82, 284 (N.D. Tex. 2008)
(decertifying class of approximately one-thousand retail workers because "there was great
variety in the factual allegations among the individual Plaintiffs," the defendant's official policy
regarding overtime compensation and off-the-clock work was lawful, and plaintiffs had failed to
show the existence of a "single, decision, policy, or plan that [was] causing the Plaintiffs to work
off the clock"). Accordingly, this factor weighs in favor of decertification.

C.      **Second Prong: Common or Individualized Defenses**

        On the second prong, IBM argues that, "given the absence of a uniform pre-shift boot-up
requirement, the evidence bearing on *whether* an opt-in booted up pre-shift and, even assuming
he/she did, *why* and *whether* the supervisor was even aware of the work, is highly particularized
and variable by opt-in." Mot. at 5 (emphasis in original). IBM contends that these "highly
individualized defenses . . . need to be examined and resolved on an opt-in by opt-in basis." Id.;
see also id. at 18–23. More specifically, IBM notes that it likely would raise the following
individualized defenses on the "threshold issue of whether opt-ins even worked pre-shift boot-up
time," id. at 18: (1) one opt-in's shift started an hour before his team began taking calls; (2) one
opt-in was not required to shut down after each shift, so therefore did not have to boot up at the
start of the next shift; (3) some opt-ins' duties did not include telephone work so there was no
need to be call ready at the start of their shifts; (4) some opt-ins on teams that handed incoming
calls worked staggered, overlapping shifts or had sister teams in other centers available to cover
calls until they became available; (5) some opt-ins may have arrived at work early to avoid
traffic, for example, but did not actually work pre-shift boot-up time following their arrivals; and
(6) some opt-ins who worked on teams that handled incoming calls and had a pre-shift boot-up
requirement did not actually comply with this requirement, as indicated by data showing that

these employees "swiped in" to the office building only a few minutes before the start of their

shifts. See id. at 18–20.

Additionally, IBM contends that, under Zivali, "[i]n the absence of a company-wide

policy or practice, plaintiffs will have to demonstrate that each individual manager had actual or

constructive knowledge that plaintiffs were performing off-the-clock work without proper

compensation." Id. at 20–21 (quoting Zivali, 784 F. Supp. 2d at 468); see also Singh v. City of

New York, 418 F. Supp. 2d 390, 397 (S.D.N.Y. 2005). IBM states that it will have "equally

varying defenses as to the element of actual or constructive knowledge," specifically: (1) one

plaintiff's manager was not physically present in the Riveredge facility so would not have

witnessed her engaging in pre-shift work; (2) some managers observed plaintiffs arriving only at

the start of their scheduled shifts; (3) some managers specifically advised plaintiffs to begin

working only at their scheduled shift start times, even if they chose to arrive at the office early,

for example, to avoid traffic; (4) some managers specifically advised plaintiffs that they were not

required to boot up before their shifts began and at least one manager who observed a CCR

performing unrequired pre-shift work directed that CCR to report that overtime in eTotals; and

(5) some managers observed plaintiffs who arrived early engaging in personal activities before

the start of their shifts. See Mot. at 20–23.

As to those opt-ins who actually may have been subject to a team-specific pre-shift boot-

up requirement, IBM claims that it will defend against their claims by showing that they were

aware of the company policy requiring them to report overtime hours and "had access to eTotals,

knew how to use it, and used it before." Id. at 22. However, IBM states, some opt-ins "were

repeatedly told by their managers *not* to boot up pre-shift," while others who "allegedly

performed pre-shift work without recording it . . [provided varying] testimony . . . as to whether

their managers had any way to know about it." Id. at 12–13 (emphasis in original). Therefore, IBM will have yet another defense to the claims of those opt-ins. Finally, IBM argues that it will be able to defend against some opt-ins' claims on the ground that the amount of pre-shift boot-up time they worked, if any, was *de minimis.* Id. at 23; see also Zivali, 784 F. Supp. 2d at 468 (noting that *de minimis* defense "will necessarily vary widely according to the particular situation of each individual plaintiff"). IBM further notes that its damages defenses will be individualized given the "wide variation in the amount of time it took CCRs to boot up their computers." Mot. at 23 n.8.

Seward contends generally that the "purportedly individual defenses raised by IBM are in fact common to many, if not all, Plaintiffs and can be easily resolved on a collective basis with representative evidence and testimony." Opp. at 12. Seward also claims that IBM's alleged defenses regarding IBM's actual or constructive knowledge, varying team policies, and the *de minimis* nature of some CCRs' overtime work are "either legal arguments that apply across the board to the entire class or are damages questions which are irrelevant on a decertification motion." Id. at 13. However, as IBM notes in its reply brief, Seward offers no specific, fact-based arguments about why IBM's defenses are actually common to all plaintiffs. Instead, Seward engages in a discussion of the merits of those defenses, even though the merits are not at issue on this Motion. See Opp. at 12–21.

Additionally, Seward argues that the "nature of the work [performed pre-shift by the plaintiffs] falls into one very discreet, highly-specific category" and that IBM's potential defenses about whether CCRs were expected or required to perform pre-shift work are irrelevant because the issue is that the plaintiffs were in fact performing this work without compensation and their managers were on notice. See id. at 17–18. Finally, Seward argues that any defenses

48

IBM intends to raise regarding how much time each CCR actually spent booting up her computer, including whether such time may have been *de minimis*, is a damages issue and has no bearing on whether the opt-ins are similarly situated. Id. at 19–21.

IBM's claim that its defenses will be individualized is persuasive in light of disparities in the testimony of both plaintiffs and managers with regard to whether pre-shift work was necessary or expected, whether plaintiffs actually engaged in such work and, if so, how much time they spent booting up, and whether managers knew or should have known that plaintiffs were engaging in this work. IBM's planned use of badge swipe data to defend against some claims also is necessarily individualized. Other than damages-related questions of how much time different plaintiffs may have spent booting up, most of these "highly fact specific," individualized defenses relate to liability and therefore could not be resolved simply by bifurcation.[36] See Zivali, 784 F. Supp. 2d at 468. This Court recognizes that, in some call center cases involving many plaintiffs, other courts have determined that defenses were not so individualized as to defeat certification. See Russell, 721 F. Supp. 2d at 813, 815–17, 821–22 (noting that damages question of how much time various plaintiffs spent booting up could be determined in a bifurcated portion of trial; finding that "defenses Illinois Bell claims are individualized appear to be applicable to all plaintiffs or to subclasses" despite management testimony denying that it imposed an off-the-clock requirement or had knowledge; noting that questions of knowledge could be determined by a "fact finder . . . based on the evidence presented to it;" and determining that questions of whether plaintiffs were instructed to boot up

---

[36] While this Court does not believe that they could be determined fairly on a class-wide basis, it acknowledges that some manager-dependent defenses, including those related to manager expectations, team-specific job functions, and staggered shift structures, potentially could be addressed on a team-wide, as opposed to individual, basis.

pre-shift, whether they actually did so, and whether their managers knew "may be addressed collectively because the experiences alleged are similar across the case"); <u>Burch</u>, 677 F. Supp. 2d at 1118, 1121 (finding, where defendant had raised similar defenses as IBM, that most of these defenses presented "legal questions that [could] be resolved on a classwide basis" and indicating that knowledge was a "clear" issue, in part, given prior internal audit investigating off-the-clock work); <u>Brennan</u>, 2009 WL 1586721, at *6 (finding that "liability will turn largely on the class-wide question of whether [defendant] knew or should have known" that plaintiffs were working off the clock). However, in the present case, IBM has demonstrated that its potential defenses are "highly fact specific," <u>Zivali</u>, 784 F. Supp. 2d at 468, and, therefore, likely will depend on the testimony of individual plaintiffs and managers and on individualized badge swipe data. Seward has presented no specific facts or arguments to persuade this Court otherwise. Therefore, this factor also weighs in favor of decertification. <u>See id.</u> (determining that the individualized defenses factor "weigh[ed] heavily against proceeding . . . as a collective action" because the "record suggests that the knowledge of each individual manager varies widely" and the "extent to which work [may have been] *de minimis* . . . will necessarily vary widely according to the particular situation of each individual plaintiff"); <u>King</u>, 2008 WL 5973490, at *5 (finding, in case with only sixteen plaintiffs, that defenses would be too individualized to proceed as a collective action); <u>Proctor</u>, 250 F.R.D. at 282–83 (finding that plaintiffs' claims varied from "manager to manager" and were "factually disparate" and therefore defenses also would be individualized).

**D.      Third Prong: Fairness and Procedural Considerations**

     IBM argues that it would be "highly unfair" to all parties to try these claims collectively since the "liability determination as to Seward or any particular opt-in will not control the

liability determination as to another opt-in." Mot. at 6. IBM also argues that "no jury, no matter

how attentive, could track and compartmentalize which evidence and defenses relate to each of

40 different plaintiffs." Id. IBM claims that, if this case proceeds as a collective action, "the

Court would essentially need to conduct a series of opt-in specific mini-trials . . . which would

raise serious questions . . . concerning the fairness, manageability and meaningfulness of the

procedure." Id. at 25 (internal quotations omitted) (citing Lusardi v. Xerox Corp., 118 F.R.D.

351, 370–71 (D.N.J. 1987)). Because "[t]rying multiple, varying claims in a single action is

legally prohibited where it would confuse the jury and prejudice the parties," id. at 24 (citing

Malcolm v. Nat'l Gypsum Co., 995 F.2d 346, 352 (2d Cir. 1993)), IBM argues that this

collective action must be decertified. IBM contends that representative testimony would not be

permissible in this case because it "is only allowed when the circumstances of opt-ins are

uniform—a far cry from the instant case." Reply at 9. IBM also argues that bifurcation would

not make it possible for the case to proceed collectively since "there is no consistent evidence as

to either liability or damages." Id. (internal quotations omitted) (quoting Zivali, 784 F. Supp. 2d

at 469).

 In contrast, Seward emphasizes the remedial nature of the FLSA and focuses on the

difficulty that the opt-ins would face if required to bring individual actions, noting that collective

action may be the "only cost effective and economically viable way" to bring these claims. See

Opp. at 21–23. Seward also argues that "a close call as to whether the plaintiffs are similarly

situated should be resolved in favor of certification," id. at 22 (internal quotations omitted)

(quoting Ahle v. Veracity Research Co., 738 F. Supp. 2d 896, 926 (D. Minn. 2010)), although

IBM argues that "this is simply not the standard in the Second Circuit." Reply at 9 n.8 (citing

Zivali,784 F. Supp. 2d at 460). Seward characterizes the "facts and evidence" in this case as

"identical" and argues that "adjudicat[ing these claims] in 40 separate trials . . . . would waste judicial resources . . . [and] be unfair and unduly prejudicial to Plaintiffs." Opp. at 22–23. Seward also argues that this Court "has procedural tools at its disposal to make the case more manageable, such as the use of representative testimony and bifurcation." Id. at 23. However, Seward does not make specific proposals for how these tools might be used in this case. Finally, Seward claims that it would be an "immense" waste of time and resources to conduct forty separate trials where, for example, George Lambousis or Jeff Granger would be called to testify several times. See Transcript of December 13, 2011 Hearing at 31:16–21.

The determination of this third factor appears largely to depend on the Court's analysis under the first two factors of the test. In other words, if a court finds that the plaintiffs share common factual and employment settings and that defenses are not individualized, then fairness and procedural considerations weigh in favor of certification. See Russell, 721 F. Supp. 2d at 823 (finding that, through the use of subclasses and bifurcation, "common liability-related questions can be resolved in collective trials even though there are some individualized questions" after finding that other two factors weighed against decertification); Burch, 677 F. Supp. 2d at 1121 (finding, as to third factor, that collective action "would be manageable and preferable," after finding that other two factors weighed against decertification). On the other hand, where plaintiffs do not share common factual and employment settings and defenses are individualized, then this third factor weighs against proceeding as a collective action. See Zivali, 784 F. Supp. 2d at 468–69, 469 n.37 (noting that this third factor weighed against certification because "the testimony of the plaintiffs is not representative" and "[b]ifurcation . . . would not resolve the issue as there is no consistent evidence as to either liability or damages" and quoting Johnson v. Big Lots Stores, Inc., 561 F. Supp. 2d 567, 574 (E.D. La. 2008), as follows: "[T]he

more dissimilar plaintiffs are and the more individuated [defendant's] defenses are, the greater doubts there are about the fairness of a ruling on the merits—for either side—that is reached on the basis of purportedly representative evidence."); King, 2008 WL 5973490, at *5–6 (finding that "significant procedural and fairness concerns" had been raised and that representative testimony would not be appropriate "based on the variation in stores, management practices and factual disparities as to each Plaintiff"); Proctor, 250 F.R.D. at 283–84 (finding that this factor weighed against certification where plaintiffs' claims were "factually disparate").

In the present case, this Court finds that this factor, like the preceding two, weighs in favor of decertification.  Although representative testimony might be appropriate on some issues, such as management requirements or the functions of different teams, and bifurcation could potentially be used to determine individual damages questions, overall, fairness requires that this collective action be decertified given the various individualized issues presented in the case.  See Zivali, 784 F. Supp. 2d at 468–69; King, 2008 WL 5973490, at *5–6 ; Proctor, 250 F.R.D. at 283–84.

**E.     Consideration of a Potential Subclass**

There is a close question as to whether Named Plaintiff Seward is similarly situated at least to those opt-in plaintiffs who worked on teams or in positions where their predominant responsibility was to field incoming calls, in light of evidence in the record suggesting that there may have been a common expectation that these particular plaintiffs be call ready at the start of their shifts.  Accordingly, this Court considered whether IBM's motion should be granted only in part and the scope of the class modified to permit these "incoming call" plaintiffs to proceed collectively, while decertifying the more individualized claims of those plaintiffs whose primary job duties would not require them to be call ready before their shifts begin.  See Realite v. Ark

Rests. Corp., 7 F. Supp. 2d 303, 308 (S.D.N.Y. 1998) (Sotomayor, J.) (granting conditional certification but noting that, "should discovery reveal that plaintiffs in fact are not similarly situated, or that only plaintiffs who worked in the same [location] or who held the same job type are similarly situated, I may later decertify the class, or divide the class into subgroups, if appropriate"); Russell, 721 F. Supp. 2d at 813-14 (decertifying particular claims for which plaintiffs had not demonstrated that they were similarly situated); Burch, 677 F. Supp. 2d at 1122–23 (decertifying only some claims and noting that "[i]t is within the Court's discretion to clarify and narrow the proposed class in this way in order to ensure that the certified class is consistent with the purposes and requirements of the FLSA").  However, neither party has requested such an approach, and IBM specifically objected to it during oral argument on the ground that it would be unfair at this stage of the litigation.  See Transcript of December 13, 2011 Hearing at 20:9–21:4.  In light of these considerations, and because this Court finds that Seward is not similarly situated to all opt-in plaintiffs on the whole, I recommend that IBM's motion for decertification be granted.

## IV.  CONCLUSION

For the reasons set forth above, I conclude—and respectfully recommend that Your Honor should conclude—that the Motion be GRANTED.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to serve and file written objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Hon. Vincent L. Briccetti, at the Hon. Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Briccetti.

Dated: January 20, 2012
White Plains, New York

Respectfully Submitted,

Paul E. Davison
United States Magistrate Judge
Southern District of New York

55