# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARLES SEWARD, Individually, and on Behalf of All Others Similarly Situated, ) ) ) ) Plaintiff, ) ) v. ) ) INTERNATIONAL BUSINESS MACHINES, CORP. d/b/a IBM CORP., ) ) ) ) Defendant. ) | Case No. 08 cv 3976 (VB/PED) ECF CASE |

**PLAINTIFF'S REPLY IN SUPPORT OF HIS APPEAL AND OBJECTIONS TO THE REPORT AND RECOMMENDATION TO DECERITIFY THIS CASE AS A COLLECTIVE ACTION**

Erik H. Langeland
ERIK H. LANGELAND, P.C.
500 Fifth Avenue, Suite 1610
New York, NY 10110
(212) 354-6270
elangeland@langelandlaw.com

Jon A. Tostrud
(Admitted Pro Hac Vice)
TOSTRUD LAW GROUP, P.C.
1901 Ave. of the Stars, 2nd Fl.
Los Angeles, CA 90067
(310) 278-2600
(310) 278-2640
jtostrud@tostrudlaw.com

James B. Zouras
Ryan F. Stephan
(Admitted Pro Hac Vice)
STEPHAN ZOURAS, LLP
205 North Michigan Avenue
Suite 2560
Chicago, IL 60601
(312) 233-1550
(312) 233-1560 (Fax)

## **TABLE OF CONTENTS**

**ARGUMENT**

1.  Since the onset of this litigation, Seward has consistently sought to represent a class of call-ready CCRs who were required to perform unpaid pre-shift work............1

2.  Seward is similarly situated to the proposed subclass because: 1) they were required to be call ready at the start of their shifts; 2) individualized defenses, if any, can be resolved through team-wide evidence; and 3) their claims can be fairly and efficiently resolved together..............................................................................4

A.  No differences exist in job duties or employment settings for the call-ready CCRs in Riveredge..........................................................................................4

B.  Purported individualized defenses vanish under the proposed subclass...............8

C.  Certifying a subclass of call ready CCRs allows their cases to be tried efficiently and avoids redundant claims being filed and tried in numerous jurisdictions............9

**CONCLUSION**

## ARGUMENT

**1.  Since the onset of this litigation, Seward has consistently sought to represent a class of call-ready CCRs who were required to perform unpaid pre-shift work.**

IBM posits two arguments in opposition to Plaintiff's appeal of Magistrate Judge Paul E. Davison's Report and Recommendation dated January 20, 2012 (hereinafter "R&R"): 1) The Court is not authorized to certify a subclass of call-ready CCRs at this stage in the litigation; and, 2) such a subclass is not similarly situated to Seward. Both arguments are incorrect.

Throughout this litigation, Seward has sought to represent an FLSA class of CCRs that had to be call ready at the start of their shifts. As a result of IBM's requirement, CCRs necessarily had to perform work before the start of their scheduled shift so as to be "ready" when their scheduled shift commenced. Plaintiffs claim IBM failed to record or pay for this pre-shift work.

From the beginning, IBM recognized the class of employees who Plaintiffs sought to represent. For example, on July 30, 2009, IBM's counsel wrote jointly for the parties to provide a proposed notice of this collective action to CCRs at IBM's Riveredge facility. The letter states: "Pursuant to this Court's July 21, 2009 Order, attached for the Court's review are a proposed Notice Of Collective Action Lawsuit and a proposed Consent To Join Collective Action form. The parties have agreed to the form and content of both documents." Exhibit A. The notice makes clear that it is directed to call-ready CCRs that performed unpaid pre-shift work:

> This lawsuit alleges that nonexempt call center employees at IBM's Riveredge facility whose duties primarily consist (or consisted) of providing customer service by telephone ("affected employees") did not receive overtime compensation for pre-shift work as required by law in

one or more workweeks in which they worked more than 40 hours per week.   Exhibit A.

Only if a CCR meets this definition can they can join this lawsuit.  *Id.*  The consent echoes that the eligible class consists of call-ready employees that performed unpaid pre-shift work:

> By signing below, I hereby declare under penalty of perjury pursuant to 28 U.S.C. 1746 that I have been employed by International Business Machines Corporation as a Call Center Employee whose job duties consist (or consisted) of providing customer service by telephone in the Riveredge facility in Atlanta Georgia during a time period since [insert date three years and three weeks before date of notice] and that I worked more than forty (40) hours in at least one week and was not paid for all of the time I worked pre-shift."  *Id.*

Thus, IBM can hardly argue that it is surprised or somehow prejudiced by Seward's contention that this Court should grant final collective certification to those call-ready CCRs who performed pre-shift work because: 1) IBM agreed to the class definition; and, 2) this Court approved this definition on July 30, 2009.  *Id.*  While IBM successfully persuaded the magistrate that about one-half of the opt-in Plaintiffs did not meet this definition, the fact remains that an identifiable subclass of Plaintiffs exist who plainly and indisputably meet the Court-approved class definition.  Plaintiffs' inability to prove that *all* the opt-in Plaintiffs are entitled to final certification is not reason to prevent *some* of them from asserting their claims to unpaid earned wages through trial as a collective group.

Despite the fact that Seward has sought to maintain this case on behalf of the call-ready CCRs per this Court's July 30, 2009 Order, IBM contends that Seward has not raised certification of the very class he has sought to represent all along.   Indeed, IBM

2

suggests that this issue was not raised at the oral argument. But it is clear that the Court focused on exactly this subclass during oral argument:

> THE COURT: Do you acknowledge that the district court – and ultimately, that's going to be Judge Briccetti here – has the discretion to, rather than decertifying the entire group, to certify some subgroup to go forward as a collective action here?
>
> MR. LAMPE: As a general matter, the district court would certainly have the ability to certify a subset or a subclass. Transcript, p. 20.

Accordingly, the transcript—as well as the Report and Recommendation—reveal that the possibility of granting final FLSA certification of a call ready subclass was properly raised by the Court. Indeed, the magistrate raised the issue himself—as he was entitled to do. It is well-established, even under the more stringent Rule 23 standard, that the trial court, in its discretion, can create a subclass *sua sponte*. *Burka v. New York City Transit Authority, et al.,* 110 F.R.D. 595, 603 (S.D.N.Y. 1986) (citations omitted); *Simon v. Philip Morris Inc.*, 200 F.R.D. 21, 29 (E.D.N.Y. 1988) (citations omitted). Thus, while IBM argues that Plaintiffs somehow "waived" their ability to proceed as a subclass, there is no support for its contention. Unlike the decisions relied upon by IBM, which were decided in different contexts, Plaintiffs cannot waive an ability to proceed as a subclass because the proper scope of a class or collective action is always at issue. Therefore, as the above authorities point out, the Court always retains the ability to refine the class definition at any point in the litigation.

For example, in the similar case of *Burch v. Qwest Comm'ens Int'l. Inc*., 677 F. Supp. 2d 1101, 1122-23 (D. Minn. 2009) the Court decertified some claims and allowed the core claims to continue:

> Rather than determining that the combination of allegations requires the Court to decertify the FLSA class, the Court concludes that the better

3

course of action is to deny decertification as to a class consisting of persons pursuing FLSA violations based on the uncompensated pre- and post-shift work of booting up and shutting down their computers. This class is consistent with the allegations that formed the core of Plaintiffs' original conditional certification motion and this Court's conditional certification Order. It is within the Court's discretion to clarify and narrow the proposed class in this way in order to ensure that the certified class is consistent with the purposes and requirements of the FLSA. (citation omitted).

In *Burch*, the Plaintiffs did not raise the issue of a subclass in its opposition to defendant's motion to decertify. Exhibit B.

Similarly, in *Russell v. Ill. Bell Tel. Co.*, 721 F. Supp. 2d 804, 813-14 (N.D. Ill. 2010), the Court decertified some individualized claims and allowed others to proceed collectively:

> Despite individualized issues, a collective action may be appropriate if common questions predominate, even the court decides to certify some claims and decertify others. *See Chabrier,* 2008 WL 938872, at *3 ("A showing that there are elements of plaintiffs' claim that differ, or that a small number of current plaintiffs are excluded cannot override the similarities present in most plaintiffs' claims and circumstances."). Some courts group together individuals who share common claims, because "[r]esolving common questions as a class, even through the additional mechanism of sub-classes, remains inherently more efficient." *Fravel v. County of Lake*, No. 07-253, 2008 WL 2704744, at *3 (N.D.Ind. Jul. 7, 2008). *Id.* at 812-813.

The *Russell* Court allowed the case to proceed collectively with three subclasses. As in *Burch,* the plaintiffs did not raise the issue of subclasses in their opposition to defendants motion to decertify but the Court created the subclasses *sua sponte* because, as here, it was a fair and efficient way to resolve plaintiffs' claims. Especially in light of the remedial purpose of the FLSA, Plaintiffs respectfully submit that the same result is warranted here. *See Herman v. RSR Sec. Services, Inc.,* 172 F.3d 132, 139 (2nd Cir. 1999) (citation omitted) ("[T]he remedial nature of the statute further warrants an expansive

4

interpretation of its provisions so that they will have 'the widest possible impact in the national economy.'")

2. **Seward is similarly situated to the proposed subclass because: 1) they were required to be call ready at the start of their shifts; 2) individualized defenses, if any, can be resolved through team-wide evidence; and 3) their claims can be fairly and efficiently resolved together.**

A. **No differences exist in job duties or employment settings for the call-ready CCRs in Riveredge.**

While IBM contends that Seward has not shown a uniform or pervasive practice that violates IBM's purportedly legal written policy requiring that CCRs be paid for all time worked, Magistrate Davison found the opposite:

> As for Named Plaintiff Seward, who worked for manager Juanlyn Williams on an incoming call team, and for opt-in plaintiffs who also worked for Williams or on the System X team or other incoming call teams, *the evidence does suggest the existence of a common policy or practice of requiring them to report to work early and boot up their computers pre-shift*. R&R, p. 43 (emphasis added).

As to the members of this subclass, the practice of requiring pre-shift work without pay was both uniform and pervasive. Thus, Seward is similar to this group and they should be entitled to have their claims tried collectively.

IBM's suggestion that some of the members of the subclass did not take incoming calls is misleading. For example, IBM argues that Beverly Williams did not take incoming calls because she was on the Pended QSAR team. But IBM overlooks her testimony that she worked on a team reporting to Jeff Granger which was indisputably required to be call ready. B. Williams Dep., p. 103, attached as Exhibit D. Williams testified that Granger expressly told her to be call ready at the start of her shift. *Id.*

Similarly, IBM contends that Denise Brown did not take calls but overlooks her testimony that she worked for Pete Starratt and Jeff Granger while on the Entitlement

5

team. D. Brown Dep., p. 23, 115-116, attached as Exhibit E. Ms. Brown testified that the majority of the calls on this team were inbound and that Granger told her to have her system up and running and be ready on time. *Id.* at 33, 115-116. Yolanda Brown similarly worked on the Entitlement team and was also required to be call ready. Barday Dep., p. 113-114, attached as Exhibit F. Eva Puckett also worked for the call ready Entitlement team. Exhibit D, pp. 11, 109. This team reported to Viki Torres. *Id.* at 11. And Granger testified that he specifically informed two first-line managers, Pete Starratt and Viki Torres, and the CCRs on their teams regarding his expectation that they report early to make themselves call ready before the start of their shifts in order to enhance their productivity. R&R, p. 15.

IBM also claims that Angela Green worked for Pended QSAR and, therefore, did not take incoming calls. But again IBM fails to mention that Ms. Green took inbound calls when she worked for "Depot." Green Dep., p. 53, attached as Exhibit G. Ms. Green testified that she informed her manager, Lisa Moody, that she was arriving early to be call ready and asked if she could be paid overtime for this work. *Id.* at 77. Ms. Moody did not respond to her overtime question. *Id.* at 78.

Marla Armour testified that she was regularly responsible for taking inbound calls. M. Armour Dep., p. 32-33, attached as Exhibit H. Her manager, Mr. Rashid, directed to arrive fifteen minutes early to make sure her system tools were loaded and ready. *Id.* at 43-45. Ms. Armour testified that she heard indirectly from Juanlyn Williams that CCRs needed to be call ready at their start times. *Id.* At 156-159.

IBM next attempts to concoct differences among the call-ready CCRs by claiming that some of them were subject to a staggered shift or that a redundant call center could

take their calls. Yet this flies in the face of the Lambousis email, which emphasizes the importance of strict adherence to assigned schedules:

> The expectation is that your workstation is powered up, you are logged on to the necessary applications, and you are in an available state on your phone at your start time. The call center environment requires strict adherence to the schedule. Many hours are put into studying inbound call patterns and developing shifts/start times. If individuals on this Team are making independent decisions as to when they go available, we are in effect out of control with little hope of taking care of our customers in a timely manner.[1]

CCRs were heavily monitored to ensure they were efficiently answering calls to meet the service levels expected of the call center. Kamprath's email again stresses the need to be call ready to eliminate "unproductive hours:"

> (1) **Ensure reps log in, only as required (ie scheduled to work at 9:00, be ready at 8:50), but only log in at 9:00 am** to ensure we are not accumulating unproductive hours under Default AUX or AUX 0 for which we are not utilizing or occupying the reps in question. **Crisp login and logouts will help eliminate any unutilized time for which we can't earn any hours**.[2]

Shifts were developed based on driving the efficiency of the call center—not to ease any burden on CCRs. IBM presents no evidence, moreover, that any staggered shift obviated either the need or the requirement that CCRs be call ready at their designated start times. This is equally true of IBM's purported defense based on its redundant call center in Dallas. The fact that the call center had CCRs performing the same duties as the Riveredge supports Seward's contention that the CCRs were similar. Indeed, Granger testified that that call center in Dallas was a mirror image of the one in Atlanta and that the CCRs there were performing essentially the same job duties as the CCRs in Atlanta.

---

[1] Exhibit DD to Plaintiff's Opposition To Defendant's Motion To Decertify.
[2] Group Exhibit EE to Plaintiff's Opposition To Defendant's Motion To Decertify. (emphasis added), pp. 153, 155-56 & 163-65.

7

Granger Dep., pp. 35-36, attached as Exhibit I.  IBM provides no evidence that the call center in Dallas somehow eliminated IBM's call ready requirement for these CCRs.

Finally, IBM argues that Ms. Puckett is different because she was told not to start working until her designated start time.  But this evidence again pertains only to the time that she was on Pended QSAR, not the Entitlement team.

**B.     Purported individualized defenses vanish under the proposed subclass.**

In attempting to show individualized defenses, IBM rehashes: 1) its arguments claiming that some of the subclass did not take incoming calls and, 2) its staggered shift argument.  Notably, IBM points to opt-ins Denise Brown and Beverly Williams as two such CCRs.  But, as explained above, both Ms. Brown and Ms. Williams testified that they worked on teams—other than Pended QSAR—where they took incoming calls and were required to be call ready.  *Supra,* pp. 5-6.  IBM again asserts its staggered shift argument without showing a single email or directive instructing CCRs not to worry about being call ready because other CCRs would take their calls while they leisurely booted up their computers.

IBM also contents that this subclass cannot be certified because Managers did not know the opt-ins were working pre-shift.  But the evidence shows that Series X, Seward, and Granger's groups performed pre-shift work because their managers required it.  Magistrate Judge Davison, moreover, recognized that manager-dependent defenses could be addressed on a team-wide basis. R&R, p. 49, fn. 36.  This applied to defenses such as manager expectations, team-specific job functions, and staggered shift structures.  *Id.*  IBM's policy, moreover, states that "any time worked beyond an employee's regularly scheduled hours is "off the clock" work and employee must be compensated." Exhibit J.

8

Under common examples, it lists "employee logs on to computer before start of shift." *Id.* The workday for which compensation must be paid begins with the "first principal activity" of the day, and ends with the last principal activity of the day. *IBP, Inc. v. Alvarez,* 546 U.S. 21, 37 (2005); 29 C.F.R. 790.6(a).

> [C]onsistent with our prior decisions interpreting the FLSA, the Department of Labor has adopted the continuous workday rule, which means that the "workday" is generally defined as "the period between the commencement and completion on the same workday of an employee's principal activity or activities." 29 CFR § 790.6(b). These regulations have remained in effect since 1947, see 12 Fed. Reg. 7658 (1947), and no party disputes the validity of the continuous workday rule.

546 U.S. at 29. Time within the first and last principal activities of the day must be included in the computation of hours worked. *Id.*, n.3 citing 29 CFR § 790.6(a). "It includes all time within that period *whether or not the employee engages in work throughout all of that period*." 29 CFR § 790.6(b)(emphasis added). Thus, it is irrelevant under the FLSA if the employee got a cup of coffee or chatted with a friend after the workday commenced.

**C.     Certifying a subclass of call ready CCRs allows their cases to be tried efficiently and avoids redundant claims being filed and tried in numerous jurisdictions.**

A subclass of twenty-two call ready CCRs exists and should have the benefit of proceeding collectively. This subclass is consistent with the conditional certification of this case and with the Court's conclusion that the evidence suggest that CCRs working on incoming call teams were subject to a common practice of requiring them to report to work early and boot up their computers pre-shift. R&R, p. 43. IBM attempts to dodge this evidence by claiming that the members of this subclass were not required to take calls and that, therefore, Seward is seeking certification of a different subclass. But, as

9

stated above, IBM overlooks the fact that these same opt-ins worked on call-ready teams which IBM has ignored in its analysis. *Supra*, pp. 5-6.

Indeed little is gained in decertifying this case entirely as it will merely spawn twenty-two additional cases that could efficiently be handled here. And decertification would be contrary to the remedial purposes of the FLSA collective action:

> (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity.

*Moss v. Crawford & Co.,* 201 F.R.D. 398, 410 (W.D.Pa.2000) (citing *Hoffmann-La Roche, Inc. v. Sperling,* 493 U.S. 165, 170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989)). Decertifying this subclass would have the opposite effect and is unwarranted.

## CONCLUSION

Plaintiffs respectfully request that this Court sustain Plaintiff's objections and modify the January 20, 2012 Report and Recommendation.

Dated: March 5, 2012

Respectfully submitted,

/s/ Erik H. Langeland
Erik H. Langeland
ERIK H. LANGELAND, P.C.
500 Fifth Avenue, Suite 1610
New York, NY 10110
(212) 354-6270
elangeland@langelandlaw.com

James B. Zouras
Ryan F. Stephan
(Admitted Pro Hac Vice)
STEPHAN ZOURAS, LLP
205 North Michigan Avenue, Suite 2560
Chicago, IL 60601
(312) 233-1550
jzouras@stephanzouras.com

Jon A. Tostrud
(Admitted Pro Hac Vice)
TOSTRUD LAW GROUP, P.C.
1901 Ave. of the Stars, 2nd Fl.
Los Angeles, CA 90067
(310) 278-2600